**Nos. 26-1648(L), 26-1694 & 26-2043**

# United States Court of Appeals for the Fourth Circuit

COURTHOUSE NEWS SERVICE; LEE ENTERPRISES, INCORPORATED; LEE BHM, LLC, Publisher of the Richmond Times-Dispatch, The Roanoke Times, Bristol Herald Courier, Lynchburg News and Advance, Fredericksburg Freelance Star and The Daily Progress,

*Plaintiffs-Appellees,*

– v. –

EDWARD JEWETT, in his official capacity as Clerk of the Circuit Court for the City of Richmond, Virginia; BRENDA HAMILTON, in her official capacity as Clerk of the Circuit Court for the City of Roanoke, Virginia; KELLY FLANNAGAN, in her official capacity as Clerk of the Circuit Court for the City of Bristol, Virginia KARL R. HADE, in his official capacity as Executive Secretary of the Office of Executive Secretary of the Supreme Court of Virginia,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA AT ABINGDON

## JOINT APPENDIX
## VOLUME II OF III (Pages 17 – 547)

Peter Askin
John P. O'Herron
William Daniel Prince IV
THOMPSON MCMULLAN P.C.
100 Shockoe Slip, 3rd Floor
Richmond, Virginia 23219
(804) 649-7545

*Counsel for Appellants Edward Jewett, Brenda Hamilton and Kelly Flannagan*

John Gilbody
*Assistant Attorney General*
Erin R. McNeill
*Senior Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA
202 North 9th Street
Richmond, Virginia 23219
(804) 786-4319

*Counsel for Appellant Karl R. Hade*

Dabney J. Carr, IV
Lauren Miller
TROUTMAN PEPPER LOCKE LLP
P.O. Box 1122
Richmond, Virginia 23218
(804) 697-1238

Rachel E. Matteo-Boehm
Roger Myers
BRYAN CAVE LEIGHTON PAISNER, LLP
Three Embarcadero Center, 7th Floor
San Francisco, California 94111
(415) 675-3400

*Counsel for Appellees*

COUNSEL PRESS
A Proceed Service
The Appellate Experts®
(800) 4-APPEAL • [816633]

# TABLE OF CONTENTS

**VOLUME I OF III**

Order of the Honorable James P. Jones
Re: Denying Defendants' Motions to Dismiss and Denying Plaintiffs' Motion for Leave to Amend Complaint and Request for Judicial Notice
filed May 5, 2026 .......... JA1

**VOLUME II OF III**

District Court Docket Sheet .......... JA17

Complaint
filed December 9, 2025 .......... JA28

Exhibit 1: Order Dismissing Claim without Prejudice .......... JA60

Exhibit 2: Joint Stipulations of Fact .......... JA62

Exhibit 3: Application for Remote Access to Richmond CC OCRA .......... JA78

Exhibit 4: Application for Remote Access to Roanoke CC OCRA .......... JA84

Exhibit 5: Application for Remote Access to Bristol CC OCRA .......... JA92

Exhibit 6: Report – Access to Public Records in VA Courts .......... JA100

Defendant Hade's Motion to Dismiss Pursuant to Rule 12(b)(1)
filed February 5, 2026 .......... JA112

Defendant Hade's Motion to Dismiss Pursuant to Rule 12(b)(6)
filed February 5, 2026 .......... JA114

Defendant Hade's Memorandum of Law in Support of Rule 12(b)(1) and 12(b)(6) Motion to Dismiss
filed February 5, 2026 .......... JA116

Clerk Defendants' Motion to Dismiss Pursuant to Rule 12(b)(1)
filed February 5, 2026 .......... JA143

Clerk Defendants' Memorandum in Support of Motion to Dismiss Pursuant to Rule 12(b)(1)
filed February 5, 2026 ........ JA146

Clerk Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6)
filed February 5, 2026 ........ JA175

Clerk Defendants' Memorandum in Support of Motion to Dismiss Pursuant to Rule 12(b)(6)
filed February 5, 2026 ........ JA178

Plaintiffs' Omnibus Opposition to Defendants' Motions to Dismiss
filed March 5, 2026........ JA195

Exhibit 1: Declaration of Steve Poulos ........ JA253

Plaintiffs' Motion for Leave to Amend
filed March 5, 2026........ JA256

Exhibit 1: Email Correspondence........ JA261

Exhibit 2: Email Correspondence........ JA267

Exhibit 3: Email Correspondence........ JA284

Exhibit 4: Email Correspondence........ JA295

Plaintiffs' Request for Judicial Notice in Support of Plaintiffs' Omnibus Opposition to Defendants' Motions to Dismiss
filed March 5, 2026........ JA304

Exhibit 1: OCRA Login Website........ JA311

Exhibit 2: Declaration of Jonathan E. Ginsberg........ JA313

Exhibit 3: Memorandum Opinion of the Supreme Court of Virginia ... JA324

Exhibit 4: Email Correspondence........ JA353

Defendant Hade's Reply in Support of Rule 12(b)(1) and 12(b)(6) Motion to Dismiss
filed March 19, 2026 ........ JA359

Defendant Hade's Reply in Support of Rule 12(b)(1) and 12(b)(6) Motion to Dismiss
filed March 19, 2026 ........ JA374

Exhibit 1: SCC Records for Lee Enterprises LLC ........ JA389

Exhibit 2: SCC Records for Lee BHM Corp ........ JA394

Exhibit 3: *Conlon v. Baber* Pleading ........ JA406

Exhibit 4: Criminal Docket for *USA v. Ruiz* ........ JA410

Exhibit 5: Emergency Petition filed in *In re: Public Access to November Transfer Hearing* ........ JA420

Exhibit 6: *Brubaker v. Epps* pleading ........ JA479

Clerk Defendants' Reply in Support of Motion to Dismiss Pursuant to Rule 12(b)(1)
filed March 19, 2026 ........ JA485

Clerk Defendants' Reply in Support of Motion to Dismiss Pursuant to Rule 12(b)(6)
filed March 19, 2026 ........ JA498

Plaintiffs' Sur-Reply
filed March 31, 2026 ........ JA511

**VOLUME III OF III**

Transcript of Motions Hearing before The Honorable James P. Jones
on April 10, 2026 ........ JA548

Defendant Hade's Notice of Appeal
filed May 19, 2026 ........ JA625

Clerk Defendants' Motion to Certify Order for Interlocutory Appeal
filed June 4, 2026 .......... JA627

Clerk Defendants' Memorandum in Support of Motion to Certify Order for Interlocutory Appeal
filed June 4, 2026 .......... JA631

Plaintiffs' Opposition to Defendants' Motions to Certify and Stay
filed June 12, 2026 .......... JA646

Clerk Defendants' Reply in Support of Motion to Certify Order for Interlocutory Appeal and Motion to Stay
filed June 4, 2026 .......... JA669

Order of the Honorable James P. Jones
Re: Granting Defendants' Motion to Stay and Motion to Certify Appeal
filed July 2, 2026 .......... JA682

Clerk Defendants' Petition for Permission to Appeal Pursuant to 28 U.S.C. § 1292(b)
filed July 13, 2026 .......... JA694

Order of the U.S. Court of Appeals for the Fourth Circuit
Re: Granting Clerk Defendants' Petition for Permission to Appeal Pursuant to 28 U.S.C. § 1292(b)
filed August 4, 2026 .......... JA696

STAYED,APPEAL

# U.S. District Court
# Western District of Virginia (Abingdon)
# CIVIL DOCKET FOR CASE #: 1:25−cv−00075−JPJ−PMS

Courthouse News Service et al v. Hade et al
Assigned to: Senior Judge James P. Jones
Referred to: US Magistrate Judge Pamela Meade Sargent
Case in other court: Fourth Circuit Court of Appeals, 26−01648
U.S. Court of Appeals for the Fourth Circuit, 26−02043
Cause: 42:1983 Civil Rights Act

Date Filed: 12/09/2025
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Courthouse News Service** represented by

**Dabney Jefferson Carr , IV**
Troutman Pepper Locke LLP
P.O. Box 1122
Richmond, VA 23218−1122
804−697−1200
Fax: 804−697−1339
Email: dabney.carr@troutman.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lauren Hancock Miller**
Troutman Pepper Locke LLP
1001 Haxall Point, Suite 1500
Richmond, VA 23219
804−697−1223
Email: lauren.h.miller@troutman.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Roger Myers**
Roger Myers
Bryan Cave Leighton Paisner LLP
3 Embarcadero Center, 7th Floor
San Francisco, CA 94111
415−675−3400
Fax: 415−675−3434
Email: roger.myers@bclplaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Carlie Tenenbaum**
Bryan Cave Leighton Paisner LLP
3 Embarcadero Center, Floor 7
San Francisco, CA 94111
415−675−3432
Email: carlie.tenenbaum@bclplaw.com
*ATTORNEY TO BE NOTICED*

**Rachel Matteo−Boehm**
Bryan Cave Leighton Paisner LLP
3 Embarcadero Center, 7th Floor
San Francisco, CA 94111
415−268−1996
Fax: 415−675−3434
Email: rachel.matteo−boehm@bclplaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Lee Enterprises, Incorporated** represented by

**Dabney Jefferson Carr , IV**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lauren Hancock Miller**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Roger Myers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Carlie Tenenbaum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachel Matteo−Boehm**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Lee BHM, LLC**
*Publisher of the Richmond Times−Dispatch, The Roanoke Times, Bristol Herald Courier, Lynchburg News and Advance, Fredericksburg Freelance Star and The Daily Progress*

represented by

**Dabney Jefferson Carr , IV**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lauren Hancock Miller**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Roger Myers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Carlie Tenenbaum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachel Matteo−Boehm**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Karl R. Hade**
*, in his official capacity as Executive Secretary of the Office of Executive Secretary of the Supreme Court of Virginia,*

represented by

**Erin Rose McNeill**
Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, VA 23219
804−692−0598
Fax: 804−371−2087
Email: emcneill@oag.state.va.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John David Gilbody**
Office of the Attorney General
202 N. 9th Street

Richmond, VA 23219
804−972−4635
Email: jgilbody@oag.state.va.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Edward Jewett**
*, in his official capacity as Clerk of the Circuit Court for the City of Richmond, Virginia,*

represented by

**John Paul O'Herron**
Thompson McMullan, P.C.
100 Shockoe Slip, 3rd Floor
Richmond, VA 23120
804−698−6253
Fax: 804−780−1813
Email: joherron@t−mlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Daniel Prince , IV**
Thompson McMullan, P.C.
100 Shockoe Slip, 3rd Floor
Richmond, VA 23120
804−649−7545
Fax: 804−780−1813
Email: wprince@t−mlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William W. Tunner**
Thompson McMullan, P.C.
100 Shockoe Slip, 3rd Floor
Richmond, VA 23120
804−649−7545
Fax: 804−780−1813
Email: wtunner@t−mlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Scott Askin**
ThompsonMcMullan, P.C.
100 Shockoe Slip, Third Floor
Richmond, VA 23219
804−460−9156
Email: paskin@t−mlaw.com
*ATTORNEY TO BE NOTICED*

**Rachel Willer Adams**
ThompsonMcMullan P.C.
100 Shockoe Slip, 3rd Floor
Richmond, VA 23219
804−698−5934
Email: radams@t−mlaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Brenda Hamilton**
*, in her official capacity as Clerk of the Circuit Court for the City of Roanoke, Virginia,*

represented by

**John Paul O'Herron**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Daniel Prince , IV**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William W. Tunner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Scott Askin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachel Willer Adams**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kelly Flannagan**
*, in her official capacity as Clerk of the Circuit Court for the City of Bristol, Virginia*

represented by **John Paul O'Herron**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Daniel Prince , IV**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William W. Tunner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Scott Askin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachel Willer Adams**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/09/2025 | 1 | COMPLAINT filed against Kelly Flannagan, Karl R. Hade, Brenda Hamilton, and Edward Jewett (Filing & Administrative fee $ 405 receipt number AVAWDC − 4811675.), filed by Lee Enterprises, Incorporated, Courthouse News Service, and Lee BHM, LLC. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6) (bsm) (Entered: 12/10/2025) |
| 12/09/2025 | 2 | Proposed Summons for Kelly Flannagan by Courthouse News Service, Lee BHM, LLC, and Lee Enterprises, Incorporated. (bsm) (Entered: 12/10/2025) |
| 12/09/2025 | 3 | Proposed Summons for Karl R. Hade by Courthouse News Service, Lee BHM, LLC, and Lee Enterprises, Incorporated. (bsm) (Entered: 12/10/2025) |
| 12/09/2025 | 4 | Proposed Summons for Brenda Hamilton by Courthouse News Service, Lee BHM, LLC, and Lee Enterprises, Incorporated. (bsm) (Entered: 12/10/2025) |
| 12/09/2025 | 5 | Proposed Summons for Edward Jewett by Courthouse News Service, Lee BHM, LLC, and Lee Enterprises, Incorporated. (bsm) (Entered: 12/10/2025) |
| 12/10/2025 | 6 | Electronic Summons Issued as to Kelly Flannagan, Karl R. Hade, Brenda Hamilton, and Edward Jewett NOTICE TO COUNSEL: Please print copies of the electronically issued summons for each defendant as necessary to effectuate service under Fed. R. Civ. P. 4. (Attachments: # 1 Summons − HADE, # 2 Summons − HAMILTON, # 3 Summons − JEWETT) (bsm) |
| 12/10/2025 | 7 | Notice of Filing Requirement to Courthouse News Service, Lee BHM, LLC, and Lee Enterprises, Incorporated − Pursuant to Standing Order dated May 15, 2000, and the |

| | | |
|---|---|---|
| | | adoption of Rule 7.1 of the Federal Rules of Civil Procedures, effective December 1, 2002, nongovernmental corporate parties are directed to file a Corporate Disclosure Statement with their first appearance, pleading, motion or response. Click here to access the Corporate Disclosure Statement Form. This form should be electronically filed in this matter as ordered. (bsm) |
| 12/10/2025 | 8 | Positive Corporate Disclosure Statement by Courthouse News Service, Lee BHM, LLC, Lee Enterprises, Incorporated identifying Other Affiliate GAMCO Investors, Inc., Other Affiliate Quint Digital Limited for Lee Enterprises, Incorporated. (Carr, Dabney) |
| 12/10/2025 | 9 | MOTION for *Roger R. Myers* to Appear Pro Hac Vice. Filing fee $ 100, receipt number AVAWDC−4813317. by Courthouse News Service, Lee BHM, LLC, Lee Enterprises, Incorporated. Motions referred to Judge Pamela Meade Sargent. (Attachments: # 1 Text of Proposed Order)(Carr, Dabney) |
| 12/10/2025 | 10 | MOTION for *Rachel Matteo−Boehm* to Appear Pro Hac Vice. Filing fee $ 100, receipt number AVAWDC−4813334. by Courthouse News Service, Lee BHM, LLC, Lee Enterprises, Incorporated. Motions referred to Judge Pamela Meade Sargent. (Attachments: # 1 Text of Proposed Order)(Carr, Dabney) |
| 12/10/2025 | 11 | MOTION for *Carlie Tenenbaum* to Appear Pro Hac Vice. Filing fee $ 100, receipt number AVAWDC−4813348. by Courthouse News Service, Lee BHM, LLC, Lee Enterprises, Incorporated. Motions referred to Judge Pamela Meade Sargent. (Attachments: # 1 Text of Proposed Order)(Carr, Dabney) |
| 12/11/2025 | 12 | MINUTE ORDER denying 9 MOTION to Appear Pro Hac Vice without prejudice because it does not meet the requirements of Local Rule 6(d). Entered by US Magistrate Judge Pamela Meade Sargent on 12/11/25. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.* (The Clerk is directed to mail a copy of this Order to any applicable pro se party/parties via US Mail)(PMS) |
| 12/11/2025 | 13 | MINUTE ORDER denying 10 MOTION to Appear Pro Hac Vice without prejudice because it does not meet the requirements of Local Rule 6(d). Entered by US Magistrate Judge Pamela Meade Sargent on 12/11/25. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.* (The Clerk is directed to mail a copy of this Order to any applicable pro se party/parties via US Mail)(PMS) |
| 12/11/2025 | 14 | MINUTE ORDER denying 11 MOTION to Appear Pro Hac Vice without prejudice because it does not meet the requirements of Local Rule 6(d). Entered by US Magistrate Judge Pamela Meade Sargent on 12/11/25. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.* (The Clerk is directed to mail a copy of this Order to any applicable pro se party/parties via US Mail)(PMS) |
| 12/11/2025 | 15 | Amended MOTION for *Roger R. Myers* to Appear Pro Hac Vice. Filing fee $ 100, receipt number AVAWDC−4814333. by Courthouse News Service, Lee BHM, LLC, Lee Enterprises, Incorporated. Motions referred to Judge Pamela Meade Sargent. (Attachments: # 1 Text of Proposed Order)(Carr, Dabney) |
| 12/11/2025 | 16 | Amended MOTION for *Rachel Matteo−Boehm* to Appear Pro Hac Vice. Filing fee $ 100, receipt number AVAWDC−4814342. by Courthouse News Service, Lee BHM, LLC, Lee Enterprises, Incorporated. Motions referred to Judge Pamela Meade Sargent. (Attachments: # 1 Text of Proposed Order)(Carr, Dabney) |
| 12/11/2025 | 17 | Amended MOTION for *Carlie Tenenbaum* to Appear Pro Hac Vice. Filing fee $ 100, receipt number AVAWDC−4814345. by Courthouse News Service, Lee BHM, LLC, Lee Enterprises, Incorporated. Motions referred to Judge Pamela Meade Sargent. (Attachments: # 1 Text of Proposed Order)(Carr, Dabney) |
| 12/12/2025 | 18 | ORDER granting 15 MOTION to Appear Pro Hac Vice as to Roger Myers. Signed by US Magistrate Judge Pamela Meade Sargent on 12/12/25. (kmc) |
| 12/12/2025 | 19 | ORDER granting 16 MOTION to Appear Pro Hac Vice as to Rachel E. Matteo−Boehm. Signed by US Magistrate Judge Pamela Meade Sargent on 12/12/25. (kmc) |
| 12/12/2025 | 20 | ORDER granting 17 MOTION to Appear Pro Hac Vice as to Carlie Tenenbaum. Signed by US Magistrate Judge Pamela Meade Sargent on 12/12/25. (kmc) |

| | | |
|---|---|---|
| 12/12/2025 | 21 | Electronic Summons Issued as to Edward Jewett NOTICE TO COUNSEL: Please print copies of the electronically issued summons for each defendant as necessary to effectuate service under Fed. R. Civ. P. 4.(alf) |
| 12/16/2025 | 22 | NOTICE of Appearance by Rachel Matteo−Boehm on behalf of Courthouse News Service, Lee BHM, LLC, Lee Enterprises, Incorporated (Matteo−Boehm, Rachel) |
| 12/17/2025 | 23 | NOTICE of Appearance by Carlie Tenenbaum on behalf of Courthouse News Service, Lee BHM, LLC, Lee Enterprises, Incorporated (Tenenbaum, Carlie) |
| 12/30/2025 | 24 | NOTICE of Appearance by Peter Scott Askin on behalf of Kelly Flannagan, Brenda Hamilton, Edward Jewett (Askin, Peter) |
| 12/30/2025 | 25 | NOTICE of Appearance by Rachel Willer Adams on behalf of Kelly Flannagan, Brenda Hamilton, Edward Jewett (Adams, Rachel) |
| 12/30/2025 | 26 | Consent MOTION for Extension of Time to File Answer *and Other Responsive Motions to Complaint* by Kelly Flannagan, Brenda Hamilton, Edward Jewett. Motions referred to Judge Pamela Meade Sargent. (Attachments: # 1 Text of Proposed Order)(Askin, Peter) |
| 12/31/2025 | 27 | SUMMONS Returned Executed by Lee Enterprises, Incorporated, Courthouse News Service, Lee BHM, LLC. Kelly Flannagan served on 12/16/2025, answer due 1/6/2026.(Carr, Dabney) |
| 12/31/2025 | 28 | SUMMONS Returned Executed by Lee Enterprises, Incorporated, Courthouse News Service, Lee BHM, LLC. Brenda Hamilton served on 12/16/2025, answer due 1/6/2026.(Carr, Dabney) |
| 12/31/2025 | 29 | SUMMONS Returned Executed by Lee Enterprises, Incorporated, Courthouse News Service, Lee BHM, LLC. Edward Jewett served on 12/16/2025, answer due 1/6/2026.(Carr, Dabney) |
| 12/31/2025 | 30 | SUMMONS Returned Executed by Lee Enterprises, Incorporated, Courthouse News Service, Lee BHM, LLC. Karl R. Hade served on 12/29/2025, answer due 1/20/2026.(Carr, Dabney) |
| 12/31/2025 | 31 | AGREED ORDER granting 26 Motion for Extension of Time to Answer Kelly Flannagan answer due 2/5/2026; Brenda Hamilton answer due 2/5/2026; Edward Jewett answer due 2/5/2026; the Clerk Defendants shall file their response to the complaint on or before 2/5/2026. Signed by US Magistrate Judge Pamela Meade Sargent on 12/31/2025. (flc) |
| 01/02/2026 | 32 | NOTICE of Appearance by Erin Rose McNeill on behalf of Karl R. Hade (McNeill, Erin) |
| 01/05/2026 | 33 | Magistrate Consent Notice to Parties. Click here to access the Consent Form (laa) |
| 01/20/2026 | 34 | MOTION for Extension of Time to File Answer re 1 Complaint, *or other response* by Karl R. Hade. Motions referred to Judge Pamela Meade Sargent. (Attachments: # 1 Text of Proposed Order)(Gilbody, John) |
| 01/21/2026 | 35 | ORDER granting 34 Motion for Extension of Time to Responsive Pleading. Karl R. Hade answer due 2/5/2026. Signed by US Magistrate Judge Pamela Meade Sargent on 1/21/2026. (rb) |
| 02/03/2026 | 36 | NOTICE of Appearance by Roger Myers on behalf of Courthouse News Service, Lee BHM, LLC, Lee Enterprises, Incorporated (Myers, Roger) |
| 02/05/2026 | 37 | NOTICE of Appearance by William Daniel Prince, IV on behalf of Kelly Flannagan, Brenda Hamilton, Edward Jewett (Prince, William) |
| 02/05/2026 | 38 | MOTION to Dismiss for Lack of Jurisdiction by Karl R. Hade. (McNeill, Erin) Modified on 2/6/2026 to remove referral text from docket entry (flc). |
| 02/05/2026 | 39 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Karl R. Hade. (McNeill, Erin) Modified on 2/6/2026 to remove referral text from docket entry (flc). |
| 02/05/2026 | 40 | Brief / Memorandum in Support re 38 MOTION to Dismiss for Lack of Jurisdiction , 39 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM . filed by Karl R. |

| | | |
|---|---|---|
| | | Hade. (McNeill, Erin) |
| 02/05/2026 | 41 | MOTION to Dismiss for Lack of Jurisdiction by Kelly Flannagan, Brenda Hamilton, Edward Jewett. (Askin, Peter) Modified on 2/6/2026to remove referral text from docket entry (flc). |
| 02/05/2026 | 42 | Brief / Memorandum in Support re 41 MOTION to Dismiss for Lack of Jurisdiction . filed by Kelly Flannagan, Brenda Hamilton, Edward Jewett. (Askin, Peter) |
| 02/05/2026 | 43 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Kelly Flannagan, Brenda Hamilton, Edward Jewett. (Askin, Peter) Modified on 2/6/2026to remove referral text from docket entry (flc). |
| 02/05/2026 | 44 | Brief / Memorandum in Support re 43 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM . filed by Kelly Flannagan, Brenda Hamilton, Edward Jewett. (Askin, Peter) |
| 02/09/2026 | 45 | NOTICE of Hearing on Motion 43 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 41 MOTION to Dismiss for Lack of Jurisdiction , 38 MOTION to Dismiss for Lack of Jurisdiction , 39 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM : **(CR)** : Motion Hearing set for 4/10/2026 at 10:00 a.m. in Abingdon before Senior Judge James P. Jones. (flc) |
| 02/11/2026 | 46 | Consent MOTION for Extension of Time to File Response/Reply as to 43 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 41 MOTION to Dismiss for Lack of Jurisdiction , 38 MOTION to Dismiss for Lack of Jurisdiction , 39 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Courthouse News Service, Lee BHM, LLC, Lee Enterprises, Incorporated. Motions referred to Judge Pamela Meade Sargent. (Attachments: # 1 Text of Proposed Order)(Carr, Dabney) |
| 02/12/2026 | 47 | ORDER granting 46 Motion for Extension of Time to File Response/Reply Responses due by 3/5/2026. Signed by US Magistrate Judge Pamela Meade Sargent on 2/12/26. (kmc) |
| 03/05/2026 | 48 | RESPONSE in Opposition re 43 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 41 MOTION to Dismiss for Lack of Jurisdiction , 38 MOTION to Dismiss for Lack of Jurisdiction , 39 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM . filed by Courthouse News Service, Lee BHM, LLC, Lee Enterprises, Incorporated. (Attachments: # 1 Exhibit 1 − Poulos Declaration)(Carr, Dabney) |
| 03/05/2026 | 49 | MOTION to Amend/Correct 1 Complaint, by Courthouse News Service, Lee BHM, LLC, Lee Enterprises, Incorporated. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Carr, Dabney) Modified on 3/9/2026 to remove referral text from docket entry (rb). |
| 03/05/2026 | 50 | MOTION Request for Judicial Notice by Courthouse News Service, Lee BHM, LLC, Lee Enterprises, Incorporated. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Carr, Dabney) Modified on 3/9/2026 to remove referral text from docket entry (rb). |
| 03/06/2026 | 51 | MINUTE ORDER. The motions filed by Plaintiffs on March 5, 2026, Dkt. Nos. 49 and 50, shall be heard at the previously scheduled hearing on April 10, 2026. The Clerk shall so indicate on the docket. Entered by Senior Judge James P. Jones on 3/6/2026. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.* (The Clerk is directed to mail a copy of this Order to any applicable pro se party/parties via US Mail)(JPJ) |
| 03/09/2026 | 52 | Consent MOTION for Extension of Time to File Response/Reply as to 48 Response in Opposition to Motion, by Kelly Flannagan, Brenda Hamilton, Edward Jewett. Motions referred to Judge Pamela Meade Sargent. (Attachments: # 1 Text of Proposed Order Agreed Order)(Askin, Peter) |
| 03/09/2026 | 53 | MOTION for Extension of Time to File Response/Reply as to 48 Response in Opposition to Motion, by Karl R. Hade. Motions referred to Judge Pamela Meade Sargent. (Attachments: # 1 Text of Proposed Order Proposed Order)(McNeill, Erin) |
| 03/10/2026 | 54 | ORDER granting 52 Motion for Extension of Time to File Response/Reply Replies due by 3/19/2026.. Signed by US Magistrate Judge Pamela Meade Sargent on 3/10/26. |

| | | |
|---|---|---|
| | | (kmc) |
| 03/10/2026 | 55 | ORDER granting 53 Motion for Extension of Time to File Response/Reply Replies due by 3/19/2026.. Signed by US Magistrate Judge Pamela Meade Sargent on 3/10/26. (kmc) |
| 03/12/2026 | 56 | NOTICE of Hearing on Motion 50 MOTION Request for Judicial Notice , 49 MOTION to Amend/Correct 1 Complaint, : **(CR)** : Motion Hearing set for 4/10/2026 at 10:00 a.m. in Abingdon before Senior Judge James P. Jones. (flc) |
| 03/19/2026 | 57 | REPLY to Response to Motion re 38 MOTION to Dismiss for Lack of Jurisdiction , 39 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM . filed by Karl R. Hade. (McNeill, Erin) |
| 03/19/2026 | 58 | Brief / Memorandum in Opposition re 50 MOTION Request for Judicial Notice . filed by Karl R. Hade. (McNeill, Erin) |
| 03/19/2026 | 59 | REPLY to Response to Motion re 38 MOTION to Dismiss for Lack of Jurisdiction , 39 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM . filed by Karl R. Hade. (Attachments: # 1 Exhibit SCC Records for Lee Enterprises LLC, # 2 Exhibit SCC Records for Lee BHM Corp, # 3 Exhibit Conlon v. Baber Pleading, # 4 Exhibit Criminal Docket for USA v. Ruiz, # 5 Exhibit Emergency Petition filed in In re: Public Access to November Transfer Hearing, # 6 Exhibit Brubaker v Epps pleading)(McNeill, Erin) |
| 03/19/2026 | 60 | Brief / Memorandum in Opposition re 49 MOTION to Amend/Correct 1 Complaint, . filed by Karl R. Hade. (McNeill, Erin) |
| 03/19/2026 | 61 | REPLY to Response to Motion re 41 MOTION to Dismiss for Lack of Jurisdiction . filed by Kelly Flannagan, Brenda Hamilton, Edward Jewett. (Askin, Peter) |
| 03/19/2026 | 62 | REPLY to Response to Motion re 43 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM . filed by Kelly Flannagan, Brenda Hamilton, Edward Jewett. (Askin, Peter) |
| 03/19/2026 | 63 | Brief / Memorandum in Opposition re 49 MOTION to Amend/Correct 1 Complaint, . filed by Kelly Flannagan, Brenda Hamilton, Edward Jewett. (Askin, Peter) |
| 03/19/2026 | 64 | Brief / Memorandum in Opposition re 50 MOTION Request for Judicial Notice . filed by Kelly Flannagan, Brenda Hamilton, Edward Jewett. (Askin, Peter) |
| 03/26/2026 | 65 | REPLY to Response to Motion re 49 MOTION to Amend/Correct 1 Complaint, . filed by Courthouse News Service, Lee BHM, LLC, Lee Enterprises, Incorporated. (Carr, Dabney) |
| 03/26/2026 | 66 | REPLY to Response to Motion re 50 MOTION Request for Judicial Notice . filed by Courthouse News Service, Lee BHM, LLC, Lee Enterprises, Incorporated. (Carr, Dabney) |
| 03/26/2026 | 67 | MOTION *for Leave to File Sur−Reply* by Courthouse News Service, Lee BHM, LLC, Lee Enterprises, Incorporated. Motions referred to Judge Pamela Meade Sargent. (Attachments: # 1 Exhibit 1 − Proposed Sur−Reply with Exhibits)(Carr, Dabney) |
| 03/28/2026 | 68 | MINUTE ORDER granting 67 Plaintiffs' Motion to File Sur−Reply. The Clerk is directed to docket the proposed Sur−Reply contained at Docket No. 67−1 as Plaintiff's Sur−Reply. Entered by Senior Judge James P. Jones on 3/28/2026. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.* (The Clerk is directed to mail a copy of this Order to any applicable pro se party/parties.) (JPJ) |
| 03/28/2026 | 69 | Plaintiff's Sur−Reply filed by Courthouse News Service, Lee BHM, LLC, Lee Enterprises, Incorporated. (alf) (Main Document 69 replaced on 3/31/2026) (alf). Modified on 3/31/2026 to remove Exhibit Page and delete proposed Wording (alf). (Entered: 03/31/2026) |
| 04/07/2026 | 70 | NOTICE RESCHEDULING HEARING on Motion 49 MOTION to Amend/Correct 1 Complaint, , 50 MOTION Request for Judicial Notice , 43 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 39 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 38 MOTION to Dismiss for Lack of Jurisdiction , 41 |

| | | |
|---|---|---|
| | | MOTION to Dismiss for Lack of Jurisdiction **(Zoom)** (Click on this link for guidance for participation via Zoom and Click on this link for instructions on how to listen to public hearings) Motion Hearing set for 4/10/2026 at 10:00 a.m. via Zoom before Senior Judge James P. Jones. *DATE AND TIME REMAIN THE SAME; CHANGED TO A ZOOM HEARING*(flc) |
| 04/10/2026 | 71 | Minute Entry for proceedings held before Senior Judge James P. Jones: Motion Hearing via Video Conference held on 4/10/2026 re 43 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Edward Jewett, Kelly Flannagan, Brenda Hamilton, 41 MOTION to Dismiss for Lack of Jurisdiction filed by Edward Jewett, Kelly Flannagan, Brenda Hamilton, 38 MOTION to Dismiss for Lack of Jurisdiction filed by Karl R. Hade, 50 MOTION Request for Judicial Notice filed by Courthouse News Service, Lee BHM, LLC, Lee Enterprises, Incorporated, 39 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Karl R. Hade, 49 MOTION to Amend/Correct 1 Complaint, filed by Courthouse News Service, Lee BHM, LLC, Lee Enterprises, Incorporated. Order forthcoming. (Court Reporter: Cynthia Bragg, OCR) (flc) |
| 04/10/2026 | 72 | ORAL ORDER taking under advisement 38 Motion to Dismiss for Lack of Jurisdiction; taking under advisement 39 Motion to Dismiss for Failure to State a Claim; taking under advisement 41 Motion to Dismiss for Lack of Jurisdiction; taking under advisement 43 Motion to Dismiss for Failure to State a Claim; taking under advisement 49 Motion to Amend/Correct 1 Complaint; taking under advisement 50 Motion Request for Judicial Notice. Entered by Senior Judge James P. Jones on 4/10/2026. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(flc) |
| 05/05/2026 | 73 | OPINION and ORDER denying 38 Motion to Dismiss for Lack of Jurisdiction; denying 39 Motion to Dismiss for Failure to State a Claim; denying 41 Motion to Dismiss for Lack of Jurisdiction; denying 43 Motion to Dismiss for Failure to State a Claim; denying 49 Motion to Amend/Correct; denying 50 Motion Request for Judicial Notice. Signed by Senior Judge James P. Jones on 5/5/2026. (flc) |
| 05/18/2026 | 74 | ANSWER to Complaint 1 Complaint, by Karl R. Hade.(McNeill, Erin) |
| 05/19/2026 | 75 | NOTICE OF APPEAL as to 73 Order on Motion to Dismiss/Lack of Jurisdiction,, Order on Motion to Dismiss for Failure to State a Claim,,,,,, Order on Motion to Amend/Correct,, Order on Motion for Miscellaneous Relief, by Karl R. Hade. Filing fee $ 605, receipt number AVAWDC−4928655. (McNeill, Erin) |
| 05/19/2026 | 76 | NOTICE of Appearance by John Paul O'Herron on behalf of Kelly Flannagan, Brenda Hamilton, Edward Jewett (O'Herron, John) |
| 05/19/2026 | 77 | ANSWER to Complaint 1 Complaint, by Kelly Flannagan, Brenda Hamilton, Edward Jewett.(Askin, Peter) |
| 05/20/2026 | 78 | NOTICE OF APPEAL as to 73 Order on Motion to Dismiss/Lack of Jurisdiction,, Order on Motion to Dismiss for Failure to State a Claim,,,,,, Order on Motion to Amend/Correct,, Order on Motion for Miscellaneous Relief, by Kelly Flannagan, Brenda Hamilton, Edward Jewett. Filing fee $ 605, receipt number AVAWDC−4929441. (O'Herron, John) |
| 05/20/2026 | 79 | Transmittal of Notice of Appeal to 4CCA re 75 Notice of Appeal, NOTE: The Docketing Statement and Transcript Order Form are available on the 4th Circuit Court of Appeals website at www.ca4.uscourts.gov. If CJA24 form(s) are applicable, you must submit a separate Auth−24 for each court reporter from whom you wish to order a transcript through the District Court's eVoucher system. (dsa) |
| 05/26/2026 | 80 | USCA Notice of Appellate Case Opening re 75 Notice of Appeal, filed by Karl R. Hade. **USCA Case Number 26−1648**. Case Manager: A. Walker. (kmc) |
| 05/29/2026 | 81 | Joint MOTION to Stay by Kelly Flannagan, Karl R. Hade, Brenda Hamilton, Edward Jewett. (O'Herron, John) Modified on 6/1/2026 to remove referral text from docket entry (flc). |
| 05/29/2026 | 82 | Brief / Memorandum in Support re 81 Joint MOTION to Stay . filed by Kelly Flannagan, Karl R. Hade, Brenda Hamilton, Edward Jewett. (O'Herron, John) |

| | | |
|---|---|---|
| 06/01/2026 | 83 | Transmittal of Notice of Appeal to 4CCA re 78 Notice of Appeal, NOTE: The Docketing Statement and Transcript Order Form are available on the 4th Circuit Court of Appeals website at www.ca4.uscourts.gov. If CJA24 form(s) are applicable, you must submit a separate Auth−24 for each court reporter from whom you wish to order a transcript through the District Court's eVoucher system. (kll) |
| 06/01/2026 | 84 | Appeal Transcript REQUEST by Karl R. Hade for Hearing on motion to dismiss held on **4/10/2026** before Judge James P Jones, Court Reporter Cindie Bragg, (McNeill, Erin) |
| 06/02/2026 | 85 | USCA Notice of Appellate Case Opening re 78 Notice of Appeal, filed by Edward Jewett, Kelly Flannagan, Brenda Hamilton. **USCA Case Number 26−1694**. Case Manager: A. Walker. (kmc) (Entered: 06/03/2026) |
| 06/03/2026 | 86 | ORDER of USCA consolidating 26−2694 and 26−1648 as to 78 Notice of Appeal, filed by Edward Jewett, Kelly Flannagan, Brenda Hamilton, 75 Notice of Appeal, filed by Karl R. Hade (kmc) |
| 06/04/2026 | 87 | MOTION Certify Appeal under 28 USC 1292(b) by Kelly Flannagan, Brenda Hamilton, Edward Jewett. (O'Herron, John) Modified on 6/5/2026 to remove referral text from docket entry (flc). |
| 06/04/2026 | 88 | Brief / Memorandum in Support re 87 MOTION Certify Appeal under 28 USC 1292(b) . filed by Kelly Flannagan, Brenda Hamilton, Edward Jewett. (O'Herron, John) |
| 06/04/2026 | 89 | USCA Appeal Transcript Order Acknowledgment re 71 Motion Hearing held on 4/10/2026 78 Notice of Appeal, Court Reporter: Cynthia Bragg. **Appeal Transcript due by 8/10/2026.** (slt) |
| 06/12/2026 | 90 | Brief / Memorandum in Opposition re 87 MOTION Certify Appeal under 28 USC 1292(b) , 81 Joint MOTION to Stay . filed by Courthouse News Service, Lee BHM, LLC, Lee Enterprises, Incorporated. (Carr, Dabney) |
| 06/22/2026 | 91 | REPLY to Response to Motion re 87 MOTION Certify Appeal under 28 USC 1292(b) , 81 Joint MOTION to Stay . filed by Kelly Flannagan, Brenda Hamilton, Edward Jewett. (O'Herron, John) |
| 06/30/2026 | 92 | NOTICE by Kelly Flannagan, Brenda Hamilton, Edward Jewett re 87 *Request for Hearing* (O'Herron, John) |
| 07/02/2026 | 93 | TRANSCRIPT REQUEST (3 Day Service) by Courthouse News Service, Lee BHM, LLC, Lee Enterprises, Incorporated for Hearing on Motion to Dismiss held on **4/10/2026** reported by Court Reporter Sindie Bragg before Judge James P. Jones. *Transcript Due Deadline will be set when Financial Arrangements are made.* (Carr, Dabney) |
| 07/02/2026 | 94 | OPINION and ORDER granting 81 Motion to Stay Case; granting 87 Motion Certify Appeal under 28 USC 1292(b). Signed by Senior Judge James P. Jones on 7/2/26. (kmc) Modified on 7/2/2026 to add copy sent to the Clerk of the US Court of Appeals for the 4th Circuit (kmc). Modified on 7/7/2026 to add Opinion to the docket text(kmc). |
| 07/02/2026 | 95 | ORDER certifying DE 73 for an interlocutory appeal under 28 U.S.C. 1292(b). Certified copy of this order and DE 73 sent to the Clerk of the US Court of Appeals for the 4th Circuit.. Signed by Senior Judge James P. Jones on 7/2/26. (kmc) |
| 07/05/2026 | 96 | **Financial arrangements made** (Original) (3 Days Service) re 93 Transcript Request, **Transcript due by 7/8/2026.** (clb) |
| 07/08/2026 | 97 | TRANSCRIPT of Proceedings: Motions Hearing held on **4/10/2026** before Judge James P. Jones. Court Reporter/Transcriber Cynthia Bragg, Telephone number (276) 451−6311. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vawd.uscourts.gov.** Transcript may be viewed at the court public terminal or purchased through Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After |

| | | |
|---|---|---|
| | | that date it may be obtained through PACER unless a Redacted Transcript has been filed. Redaction Request due 7/29/2026. Redacted Transcript Deadline set for 8/10/2026. Release of Transcript Restriction set for 10/6/2026. (clb) |
| 07/14/2026 | 98 | Appeal Transcript filed for Motion Hearing for dates of **4/10/2026** before Judge James P. Jones, re 78 Notice of Appeal, 89 USCA Appeal Transcript Order Acknowledgment Court Reporter/Transcriber: Cynthia Bragg, Telephone number (276) 451−6311. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vawd.uscourts.gov** ***Does this satisfy all appellate orders for this reporter? Yes*** **Transcript may be viewed at the court public terminal or purchased through Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER unless a Redacted Transcript has been filed. Redaction Request due 8/4/2026. Redacted Transcript Deadline set for 8/14/2026. Release of Transcript Restriction set for 10/13/2026. (clb)** |
| 07/14/2026 | 99 | Transcript Copy Delivered re 84 Appeal Transcript Request (clb) |
| 07/14/2026 | 100 | Appeal Remark − Petition for Permission to Appeal Pursuant to 28 USC Section 1292(b) − Pleading was filed in the Fourth Circuit Court of Appeals by defense counsel. (flc) (Entered: 07/15/2026) |
| 07/14/2026 | 101 | USCA Notice of Appellate Case Opening filed by Edward Jewett, Brenda Hamilton, Kelly Flannagan. **USCA Case Number 26−199**. Case Manager: A. Walker. (flc) (Entered: 07/15/2026) |
| 08/04/2026 | 102 | ORDER of USCA granting petition for permission to appeal as to 78 Notice of Appeal filed by Kelly Flannagan, Brenda Hamilton, Edward Jewett. The case is transferred to the regular docket and assigned docket number **26−2043**. (rb) |
| 08/04/2026 | 103 | USCA Notice of Appellate Case Opening re 78 Notice of Appeal filed by Edward Jewett, Kelly Flannagan, Brenda Hamilton. **USCA Case Number 26−2043**. Case Manager: A. Walker. (rb) |
| 08/04/2026 | 104 | ORDER of USCA granting petition for permission to appeal as to 78 Notice of Appeal filed by Kelly Flannagan, Brenda Hamilton, Edward Jewett. The case is transferred from docket 26−199 to 26−2043. (rb) |
| 08/04/2026 | | Filing Fee Received − Appeal Fee $ 605 receipt number AVAWDC−4984099. (rb) (Entered: 08/05/2026) |
| 08/11/2026 | 105 | ORDER of USCA consolidating 26−1649 and 26−2043 with 26−1648 as to 78 Notice of Appeal, filed by Edward Jewett, Brenda Hamilton, Kelly Flannagan, 75 Notice of Appeal, filed by Karl R. Hade (kmc) |

CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED
December 09, 2025
LAURA A. AUSTIN, CLERK
BY:
s/B. McAbee
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Abingdon Division**

COURTHOUSE NEWS SERVICE; LEE ENTERPRISES, INCORPORATED; AND LEE BHM LLC, PUBLISHER OF THE RICHMOND TIMES-DISPATCH, THE ROANOKE TIMES, BRISTOL HERALD COURIER, LYNCHBURG NEWS AND ADVANCE, FREDERICKSBURG FREE LANCE STAR AND THE DAILY PROGRESS.

Plaintiff,

v.

KARL R. HADE, in his official capacity as Executive Secretary of the Office of Executive Secretary of the Supreme Court of Virginia,

and

EDWARD JEWETT, in his official capacity as Clerk of the Circuit Court for the City of Richmond, Virginia,

and

BRENDA HAMILTON, in her official capacity as Clerk of the Circuit Court for the City of Roanoke, Virginia,

and

KELLY FLANNAGAN, in her official capacity as Clerk of the Circuit Court for the City of Bristol, Virginia

Defendants.

Civil Action No. 1:25-cv-00075

## COMPLAINT

Plaintiff Courthouse News Service ("Courthouse News") and Plaintiffs Lee Enterprises, Incorporated and its wholly owned subsidiary, Lee BHM LLC, publisher of, among others, the *Richmond Times-Dispatch*, *The Roanoke Times*, *Bristol Herald Courier*, *Lynchburg News and Advance*, *Fredericksburg Free Lance Star* and *The Daily Progress* in Charlottesville (collectively, "Lee") (and, together with Courthouse News, "Plaintiffs"), by and through their undersigned attorneys, allege the following in support of their Complaint against Defendant Karl R. Hade, in his official capacity as Executive Secretary (the "Executive Secretary") of the Office of Executive Secretary of the Supreme Court of Virginia ("OES"); Edward Jewett, in his official capacity as Clerk of the Circuit Court for the City of Richmond, Virginia ("Richmond Clerk"); Brenda Hamilton, in her official capacity of the Clerk of the Circuit Court for the City of Roanoke, Virginia ("Roanoke Clerk"); and Kelly Flannagan, in her official capacity as the Clerk of the Circuit Court for the City of Bristol, Virginia ("Bristol Clerk") (together, "Defendants").

## INTRODUCTION

1. The First Amendment to the United States Constitution provides the press and public with a presumptive right of access to certain civil, nonconfidential, public court filings. One such category is civil complaints. The complaint is the opening bell in a lawsuit. Without access to the complaint, the press cannot inform the public that a new court case has been initiated. Timely press access to new civil complaints is thus essential to accurate reporting of, and speech about, civil disputes, and is vital to the public's ability to discuss what is happening in an important branch of government as it is happening. *Courthouse News Serv. v. Schaefer*, 440 F. Supp. 532 (E.D. Va. 2020) (the First Amendment provides a contemporaneous right of access to newly filed civil complaints), *aff'd*, 2 F.4th 318, 328 (4th Cir. 2021) ("The press and

public thus have an important interest in reasonably contemporaneous access to civil complaints"); *Doe v. Public Citizen*, 749 F.3d 246, 272 (4th Cir. 2014) ("we take this opportunity to … emphasize that the public and press generally have a contemporaneous right of access to court documents and proceedings when the right applies").

2. The Fourth Circuit summarized the constitutional "logic" that mandates this right of contemporaneous access:

> The Supreme Court has recognized that openness of the judicial process – especially through the press's reporting – "affords citizens a form of legal education and hopefully promotes confidence in the fair administration of justice." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572 (1980) (plurality opinion). And access allows the public to "participate in and serve as a check upon the judicial process – an essential component in our structure of self-government." *Globe Newspaper Co. v. Superior Ct. for Norfolk Cty.*, 457 U.S. 596, 606 (1982). [¶] It would be impossible for the public to perform this role adequately without access to nonconfidential civil complaints. … Because they allow the public to understand the parties involved in a case, the facts alleged, the issues for trial, and the relief sought, access to complaints, like access to docket sheets, is crucial to "not only the public's interest in monitoring the functioning of the courts but also the integrity of the judiciary." *Doe*, 749 F.3d at 266.

*Schaefer*, 2 F.4th at 327 (parallel citations and additional internal quotation omitted).

3. Similar logic prevents government from prohibiting those who "lawfully obtained" information in public court records from disseminating that information, or from threatening to punish that dissemination. *Soderberg v. Carrion*, 999 F.3d 962, 968-69 (4th Cir. 2021). In light of "'[t]he special protected nature of accurate reports of judicial proceedings,'" the "public interest in such reports and their 'critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public business,'" *id.* at 967 (quoting *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 492 & 495 (1975)), once "'information is disclosed in public court documents open to public inspection'" and that information is "lawfully obtained," the Commonwealth may not prohibit or "'punish its publication except

when necessary to further [a sufficient substantial] interest'" – i.e., except where the prohibition survives "strict scrutiny." *Id.* at 967-69 (quoting, respectively, *Cox Broadcasting*, 420 U.S. at 496 and *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 104 (1979) (brackets in original)); *accord In re Murphy-Brown, LLC*, 907 F.3d 788, 792-93, 797 (4th Cir. 2018) (court orders prohibiting parties and their attorneys, among others, from disseminating to the public certain information about a pending civil case are "prior restraints" that "bear 'a heavy presumption against [their] constitutional validity'" because they "upend core First Amendment values" and thus "must survive strict scrutiny") (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963)).

4. Virginia's Officer of the Court Access system ("OCRA") offers Virginia-licensed attorneys and their staff – as well as attorneys admitted pro hac vice and authorized governmental agencies – remote online access to non-confidential Virginia circuit court records, including new civil complaints, through a paid subscription. Pursuant to Virginia Code § 17.1-293 and Defendants' policies and practices, those who do not fall into one of these categories may not subscribe (the "Access Restriction"). In addition, pursuant to Virginia Code § 17.1-293(H) and Defendants' policies and practices, those who ***are*** permitted to subscribe to OCRA are not permitted to share those records with the "general public," including with members of the news media for news reporting purposes or to post on news web sites, even though they are public court records open to public inspection at the courthouse (the "Dissemination Restriction"). Those who subscribe to OCRA and violate the Dissemination Restriction by disseminating information from a record lawfully obtained on OCRA may have their access revoked. Virginia-barred attorneys may be subject to further sanctions, including disbarment.

5. In a prior case filed in 2021, *Courthouse News Serv. v. Hade*, United States District Court, Eastern District of Virginia, Case No. 3:21-cv-460-HEH, Courthouse News

challenged the constitutionality of both the Access Restriction and the Dissemination Restriction. The Amended Complaint alleged the Access Restriction violated both the First Amendment and the Equal Protection clause of the U.S. Constitution (Counts I and III). It also contended that the Dissemination Restriction was a prior restraint that violated the First Amendment (Count II). In September 2022, that District Court found both restrictions to be constitutional without applying strict scrutiny or mentioning *Soderberg*, granted summary judgment to defendants, and entered a dismissal with prejudice. *Courthouse News Serv. v. Hade*, 631 F. Supp. 3d 349 (E.D. Va. 2022).

6. In January 2025, the Fourth Circuit affirmed (over a strong dissent) that District Court's ruling as to the Access Restriction, but vacated its ruling as to the Dissemination Restriction, finding that Courthouse News lacked standing on the record in that case – and, because the court lacked jurisdiction, the Dissemination Restriction should have been dismissed ***without*** prejudice. *Courthouse News Serv. v. Smith*, 126 F.4th 899, 917 (4th Cir. 2025), *rehearing and rehearing en banc denied*, 2025 WL 1218982 (4th Cir. Apr. 28, 2025).

7. On the standing issue, the panel majority said that "Courthouse News has not identified anyone who would redistribute data from OCRA to Courthouse News absent the Dissemination Restriction, nor has it offered any evidence from which the existence of such a person can be inferred. We therefore conclude that Courthouse News's assertion of derivative injury is 'too speculative to support standing.'" *Smith*, 126 F.4th at 917 (citation omitted). Judge Gregory disagreed, explaining that he "would hold the Dissemination Restriction is a prior restraint on speech" and therefore "would remand to the district court to apply strict scrutiny." *Id.* at 925 (Gregory, Circuit Judge, dissenting) (citing, e.g., *Soderberg*).

8. The Fourth Circuit issued its mandate on May 6, 2025, and on May 19, the District Court dismissed Courthouse News' claim challenging the Dissemination Restriction

(Count II) without prejudice for lack of subject matter jurisdiction, "in accordance with the Fourth Circuit's directive," on the ground that "Courthouse News lacks standing to bring such a claim." A copy of the May 19 order of dismissal without prejudice is attached as **Exhibit 1**.

9. Courthouse News, now joined by Lee, thus brings this new action, which cures the standing concern identified by the Fourth Circuit.

10. Outside of Virginia, lawyers often provide journalists with copies of court records so that the journalist can quickly access public pleadings without needing to incur the time or expense of traveling to the courthouse to obtain a copy, or where access is needed when the courthouse is closed (e.g., on nights and weekends).

11. Here, Lee's journalists have asked their Virginia-barred counsel, David Lacy, to provide them with copies of new civil complaints from his OCRA accounts on several occasions. While Lacy would provide the journalists with these new complaints and other public court records absent the Dissemination Restriction, Lacy told them he is prohibited from providing them with copies of – or of any information in – those public court records that he can obtain from OCRA because of the Dissemination Restriction.

12. Courthouse News journalists have also unsuccessfully asked Lacy to provide them with civil complaints obtained through his OCRA accounts on several occasions. Lacy also would provide these journalists with the new complaints they requested absent the Dissemination Restriction, but he was compelled to tell them that he is prohibited from providing journalists with copies of – or of any information in – those public court records that he can access on OCRA because of the Dissemination Restriction.

13. The Dissemination Restriction thus constitutes a "classic prior restraint on speech" that is "subject to strict scrutiny," *Smith*, 126 F.4th at 925 (Gregory, Circuit Judge,

dissenting), and Defendants cannot satisfy strict scrutiny. Plaintiffs thus ask this Court to enter a declaratory judgment that Virginia Code § 17.1-293(H) is unconstitutional on its face, and/or unconstitutional as applied by Defendants' policies and practices. Plaintiffs also ask this Court to enjoin Defendants, in their official capacities – as well as their agents, assistants, successors, employees, and all persons acting in concert or cooperation with them or at their direction or under their control – from continuing their policies, practices, and customs that prohibit the dissemination of public documents and information accessed via OCRA.

## JURISDICTION AND VENUE

14. Plaintiffs' claims arise under the First and Fourteenth Amendments to the U.S. Constitution and the Civil Rights Act, Title 42 U.S.C. §§ 1983, *et seq.* This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights), and 2201 (declaratory relief).

15. Defendants are citizens and residents of Virginia and therefore are subject to personal jurisdiction in this District.

16. Venue is proper in this District under 28 U.S.C. § 1391(b) because the Roanoke and Bristol Clerks' primary place of business is within this District, and Defendants all reside in Virginia. In addition, venue is proper in this district because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

17. Divisional venue is proper in the Abingdon Division under the Western District of Virginia Local Civil Rule 2(b) because the Bristol Clerk's primary place of business is in the Abingdon Division, and Defendants all have their principal place of business in Virginia. In addition, divisional venue is proper in the Abingdon Division because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the Abingdon Division.

## PARTIES

18. Courthouse News is a California corporation with its principal place of business in Pasadena, California. A widely read legal news service with thousands of subscribers across the nation, Courthouse News specializes in news reporting about civil litigation, from the date of filing through the appellate level, in state and federal courts throughout the United States. Courthouse News' comprehensive and timely coverage of civil litigation through its many publications has made it a go-to source of information about the nation's civil courts.

19. Based in Davenport, Iowa, Lee is the fourth largest newspaper publisher in the United States, a leading provider of local news and information, and a major platform for advertising, with daily newspapers, rapidly growing digital products, marketing services, innovative technology and nearly 350 weekly and specialty publications serving 72 markets in 25 states across the county. In Virginia alone, Lee publishes six daily newspapers (the *Richmond Times Dispatch*, *The Roanoke Times*, *Bristol Herald Courier*, *Lynchburg News and Advance*, *Fredericksburg Free Lance* and *The Daily Progress* in Charlottesville) and six others published online daily and in print either three times a week (the *Danville Register & Bee*, *Martinsville Bulletin*, the *News Virginian* in Waynesboro and *Culpeper Star-Exponent*), twice weekly (the *Franklin News Post* in Rocky Mount) or weekly (*SWVA Today* in Wytheville).

20. Defendant Karl R. Hade is the Executive Secretary of the Office of Executive Secretary ("OES") of the Supreme Court of Virginia and is sued in his official capacity. The Executive Secretary is "the court administrator for the Commonwealth," Va. Code § 17.1-314, which includes serving as "the administrator of the circuit court system." Va. Code § 17.1-502(A). OES created, provides, supports and maintains OCRA for Virginia court clerks, and bills $1.2 million to Virginia circuit court clerks annually for maintenance fees. Acting in his

official capacity, the Executive Secretary, as well as those acting at his direction and under his supervision, are directly involved with and/or responsible for the enforcement of the Dissemination Restriction.

21. Defendant Edward Jewett is the Clerk of the Circuit Court for the City of Richmond, Virginia, and is sued in his official capacity. The Richmond Clerk is the custodian of and responsible for, among other things, the administration of court records and ensuring that those records are maintained and made available to the public for inspection and examination. The Richmond Clerk is further responsible for enforcing the Dissemination Restriction.

22. The Richmond Clerk is also responsible for developing, implementing, and enforcing the policies and procedures for operating the City of Richmond Court Clerk's Office, in conformance with applicable law, including § 17.1-293(H) and all those relating to dissemination of non-confidential civil filings and other court records that are filed in the Circuit Court for the City of Richmond.

23. Defendant Brenda Hamilton is the Clerk of the Circuit Court for the City of Roanoke, Virginia, and is sued in her official capacity. The Roanoke Clerk is the custodian of and responsible for, among other things, the administration of court records and ensuring that those records are maintained and made available to the public for inspection and examination. The Roanoke Clerk is further responsible for enforcing the Dissemination Restriction.

24. The Roanoke Clerk is also responsible for developing, implementing, and enforcing the policies and procedures for operating the City of Roanoke Court Clerk's Office, in conformance with applicable law, including § 17.1-293(H) and all those relating to dissemination of non-confidential civil filings and other court records that are filed in the Circuit Court for the City of Roanoke.

25. Defendant Kelly Flannagan is the Clerk of the Circuit Court for the City of Bristol, Virginia, and is sued in her official capacity. The Bristol Clerk is the custodian of and responsible for, among other things, the administration of court records and ensuring that those records are maintained and made available to the public for inspection and examination. The Bristol Clerk is further responsible for enforcing the Dissemination Restriction.

26. The Bristol Clerk is also responsible for developing, implementing, and enforcing the policies and procedures for operating the City of Bristol Court Clerk's Office, in conformance with applicable law, including § 17.1-293(H) and all those relating to dissemination of non-confidential civil filings and other court records that are filed in the Circuit Court for the City of Bristol.

27. Defendants' actions reflect their official policies, practices, and customs. Defendants' actions are taken, in part, pursuant to their responsibility to enforce Virginia law, including §17.1293(H). Defendants' actions, as alleged in this Complaint, are under color of Virginia law and constitute state action within the meaning of the Fourteenth Amendment to the Unites States Constitution and 42 U.S.C. § 1983.

28. Plaintiffs seek relief against Defendants, as well as against their agents, assistants, successors, employees, and all persons acting in concert or cooperation with them or at their direction or under their control.

## FACTUAL ALLEGATIONS

### A. Courthouse News' Publications and Subscribers

29. Courthouse News is a nationwide news service founded almost 35 years ago out of a belief that great swaths of news about civil litigation went unreported because the traditional news media do not cover much of the important business of the courts. Courthouse News now

employs more than 220 people, most of them editors and reporters, covering approximately 3,000 state and federal trial and appellate courts in all 50 states in the United States. The overwhelming majority are full-fledged employees who write content for the New Litigation Reports, Courthouse News' website (both described below) or both.

30. Courthouse News offers its readers a variety of publications. Its New Litigation Reports contain original, staff-written summaries of significant new civil complaints. These reports are sent to subscribers via e-mail each evening. Courthouse News publishes two New Litigation Reports in Virginia – the *Virginia Report* and the *Southern Virginia State Report*. These reports do not cover criminal, domestic relations or probate matters.

31. Among Courthouse News' other publications is the *Daily Brief*, which covers published rulings nationwide, including all U.S. Supreme Court and federal circuit decisions, decisions from state appellate courts, and significant rulings from the federal district courts. Courthouse News also publishes a freely available website, www.courthousenews.com, containing news reports and commentary that is read by roughly 25,000 people every weekday. The website functions much like a print daily newspaper, featuring staff-written articles that are posted throughout each day and rotated on and off the page on a 24-hour news cycle.

32. Courthouse News has been credited as the original source of reporting on various topics by a wide range of publications, including: the *ABA Journal*, ABC News, *The Atlantic*, *Austin American Statesman*, Black Christian News Network, *California Bar Journal*, CBS News, *The Christian Science Monitor*, The Daily Beast, *The Dallas Morning News*, Forbes, Fox News, *The Guardian*, The Hill, *Houston Chronicle*, The Huffington Post, *Long Island Press*, *Los Angeles Times*, *Mother Jones*, National Public Radio (NPR); NBC News, *New York Daily News*, *New York Magazine*, *The New York Times*, *The Orange County Register*, Politico, *Rolling Stone*,

*Salt Lake City Tribune, San Antonio Express-News*, *The (San Jose) Mercury News,* Slate, *The Telegraph* (UK), *The Wall Street Journal*, *The Washington Post*, *The Washington Times*, *Women's Health Policy Report*, United Press International (UPI), *USA Today*, *U.S. News and World Report* and the YouTube news channel. American, Canadian and New Zealand radio shows have also interviewed Courthouse News reporters.

33. Courthouse News has more than 2,200 subscribers nationwide, including law firms, law schools, government offices and publicly traded companies. Many other publications also subscribe, putting Courthouse News in the position of a pool reporter. Such news outlets include: The Associated Press, *The Atlanta Journal Constitution*, *The Boston Globe*, *Chicago Tribute, The Dallas Morning News*, *Denver Post, Detroit Free Press*, International Consortium of Investigative Journalists, Fox Entertainment Group, *The Guardian, Honolulu Civil Beat, Las Vegas Review-Journal, Los Angeles Times*, NBC News Digital, North Jersey Media Group, *Pacific Coast Business Times, Phoenix New Times, Portland Business Journal, Seattle Times, St. Paul Business Journal, The Salt Lake Tribune*, *The (San Jose) Mercury News, The Washington Post, San Antonio Express News*, *Tampa Bay Business Journal*, *The Wall Street Journal* and Walt Disney Company.

34. In Virginia, two of Lee's papers – the *Richmond Times-Dispatch and The Roanoke Times* – subscribe to the *Southern Virginia State Report*.

35. Courthouse News subscribers also include educational institutions, such as Arizona State University, Baylor College, Boston University, Drake University Law Library, Columbia Journalism Investigations, Santa Clara University, University of Colorado, University of Maryland – College of Journalism, University of Mississippi Medical Center, University of

Nebraska, University of New Mexico, University of North Carolina at Chapel Hill, University of Pennsylvania School of Law, University of South Florida and Wake Forest University.

36. Traditionally, to prepare the New Litigation Reports and identify new cases that may warrant a website article, Courthouse News reporters have visited their assigned courts on a daily or weekly basis to review all the complaints filed that day (or since their last visit) to determine which ones are newsworthy. However, as the vast majority of federal courts and many state courts are putting court records online via court web sites, Courthouse News also covers courts remotely through the Internet, without the need to require reporters to travel to those courts. All federal courts in the nation, including the United States district courts in Virginia, give the press and public remote online access to civil court records via PACER. So do an increasing number of state courts.

37. State courts that provide remote online access to all civil filings and other court records (except for those that are recognized as confidential under any applicable law or sealed pursuant to court order), either on a statewide basis or through individual courts within the state, include courts in Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Indiana, Iowa, Kansas, Kentucky, Louisiana, Massachusetts, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Washington and Wyoming, as well as Washington, D.C. None of these jurisdictions restrict online access only to state-barred attorneys or government employees. ***And none purport to prohibit those with access from disseminating any information in or copies of public court records obtained via remote access to members of the press or other third parties for reporting to the public***.

38. Courthouse News currently employs three reporters who cover the state and federal trial and appellate courts within the Commonwealth of Virginia. They are supervised by Courthouse News' Southeast regional bureau chief, Ryan Abbott. Courthouse News' three Virginia reporters are based in three of the Commonwealth's larger metropolitan areas – Prince William, Norfolk and Richmond.

39. Of the 120 Virginia circuit courts, Courthouse News is only able to cover five of them – Prince William, Fairfax, Norfolk, Richmond City and Virginia Beach – by sending a reporter to the courthouse every day to review the new complaints. Twelve (12) other circuit courts – the counties of Arlington, Chesterfield, Fauquier, Hanover, Henrico, Loudoun and Stafford, and the cities of Chesapeake, Hampton, Newport News, Portsmouth and Suffolk – are covered intermittently by sending a reporter to the courthouse on a less than daily basis. Courthouse News covers the remaining 103 Virginia circuit courts by reviewing the bare-bones docket information that is available online from the Virginia Courts Case Information system ("VCCI"). Information on the VCCI system is limited to party names, case type and court name. Courthouse News cannot cover these courts in person, even on a less than daily basis, due to their remote location and the expense of hiring numerous additional reporters to cover each of those far-off courts every day.

40. Courthouse News' *Virginia Report* covers new litigation filed in 31 circuit courts, primarily in the northern and eastern parts of the Commonwealth.

41. Courthouse News' *Southern Virginia State Report* covers new litigation filed in the remaining 89 Virginia circuit courts throughout the southern and western regions of the Commonwealth. Many of these courts are located hundreds of miles from the more populated metro areas of Washington, D.C., Richmond and Hampton Roads.

42. Subscribers to Courthouse News' litigation reports regularly request Courthouse News to provide them copies of complaints filed in courts that the subscriber cannot visit in person. This includes requests from members of both the press and the bar. Often these requests seek complaints filed in circuit courts in Virginia far from where Courthouse News' reporters are based. Other times the requests are time sensitive and come in when Courthouse News' reporter is occupied covering another matter. In either scenario, OCRA's Dissemination Restriction prevents Courthouse News from fulfilling its subscribers' requests because Courthouse News cannot obtain a copy of the complaint from an OCRA subscriber.

43. In a recent example, on October 28, 2025, one of Courthouse News' subscribers outside Virginia asked Courthouse News for a copy of a complaint filed in Richmond Circuit Court. But Courthouse News' reporter was busy covering a civil trial brought by a teacher shot by her six-year-old student last year in Newport News, so Courthouse News' Bureau Chief Ryan Abbott emailed attorney Lacy, who has an OCRA account with the City of Richmond, to ask Lacy if he could send Abbott a copy of the complaint to forward to Courthouse News' subscriber and to post in Courthouse News' online database, where it would also be available to other subscribers. Lacy responded that but for OCRA's Dissemination Restriction he would provide Courthouse News a copy of the complaint, but that he was prohibited by OCRA's restrictions from sending Courthouse News a copy of the complaint for these purposes.

44. But for the Dissemination Restriction, Courthouse News would hire a Virginia lawyer and have that person access complaints via OCRA. Indeed, one of its Texas reporters is a lawyer and member of the Texas Bar. However, because of the Dissemination Restriction, even if Courthouse News were to hire a Virginia lawyer, that person could not share information about, or copies of, complaints accessed via OCRA for news reporting.

**B. Lee's Publications and Subscribers**

45. In Virginia, Lee publishes 12 newspapers that combined have nearly 100,000 print and online subscribers. In years past, Lee's newspapers in Virginia – like most newspapers in the United States – had at least one reporter dedicated to covering the courts in their circulation area, and sometimes several reporters where a newspaper's coverage area included multiple circuit courts, or a team of reporters who rotated the assignment. But that was before the growth of digital and social media outlets cannibalized the audience and advertising, significantly eroding both newspapers' circulation and their revenue stream from display and classified advertising, which led to staffing cuts in most newsrooms, including at Lee's Virginia newspapers. In light of those staff reductions, most newspapers – including Lee's newspapers in Virginia – now require a reporter to cover the courts along with several other beats, which means the reporters do not have the time to travel to as many courts to review new filings on a regular basis – let alone daily – and especially to courts in the outlying parts of the circulation area.

46. Combined with OCRA's restrictions on remote access and dissemination, the newspapers' staff reductions mean Lee's newspapers are only able to cover a handful of Virginia's 120 circuit courts on a regular basis.

47. Traditionally, reporters for Lee's Virginia newspapers would review new civil filings in federal and many Commonwealth courts daily or at least several times a week to identify and report on new cases that may be newsworthy and of interest to their readers. While Lee's reporters can regularly monitor new federal court filings remotely via PACER, the number of Virginia circuit courts they can cover on a daily or near-daily basis is comparatively tiny. Limited by OCRA's restrictions to those courts to which its reporters can physically travel to review court records, Lee's Virginia newspapers can only monitor new civil filings on a daily or

near-daily basis in about eight circuit courts in the immediate vicinity of the various newsrooms (the counties of Albemarle, Henry and Pittsylvania, and the cities of Charlottesville, Danville, Martinsville, Richmond and Roanoke).

48. Even after adding the circuit courts that are close enough to Lee's Virginia newsrooms that its reporters can monitor them on a near-weekly basis (the counties of Augusta, Chesterfield, Culpeper, Greene, Roanoke, Hanover, Henrico, Spotsylvania and Stafford, as well as the cities of Fredericksburg, Lynchburg, Salem, Staunton and Waynesboro), that is a small fraction of Virginia's 120 circuit courts. Civil cases in the remaining Virginia circuit courts are either covered only intermittently or not at all.

49. For example, the *Richmond Times-Dispatch* can only cover four circuit courts regularly – the city of Richmond, and the counties of Chesterfield, Hanover and Henrico – out of the 12 courts in its circulation area (including, in its immediate coverage area, the counties of Dinwiddie and Goochland and the cities of Colonial Heights, Hopewell and Petersburg, as well as, at the edges of its circulation area, the counties of Charles City, New Kent and Powhatan). Absent OCRA's Dissemination Restriction – *i.e.*, if the newspaper's attorney could forward copies of court records obtained via OCRA – the *Times-Dispatch* could and would cover many of those courts regularly, as well as cases in other courts throughout the Commonwealth. As it is, cases filed in courts like the Petersburg City Circuit Court, which the *Times-Dispatch* used to cover regularly, now get covered rarely, if at all, because the roundtrip to the courthouse takes about two hours, not including the time to find and review the pertinent records, and the paper no longer has sufficient staffing to spare a reporter to do that on a regular basis, let alone daily.

50. Similarly, *The Roanoke Times* can now only cover the three courts closest to its newsroom on a daily or regular basis – the cities of Roanoke and Salem, as well as the county of

Roanoke. It has been forced to stop regular coverage of nearly a dozen other courts that it now can only cover occasionally, such as when it learns (through a source or limited docket information available online) of a potentially important hearing or court record it needs to check (in Botetourt, Franklin or Montgomery counties) or if there is a clearly newsworthy case (in the counties of Alleghany, Craig , Floyd, Giles, Pulaski or Rockbridge, and the cities of Buena Vista or Radford). A roundtrip to many of these courts to review records, such as Montgomery or Rockbridge County, can take nearly half of a reporter's workday, including more than two hours of travel time round trip, which staff reductions preclude except on exceptional occasions.

51. Unable to review new filings remotely on OCRA, or to rely on their attorney to forward filings he can access on OCRA, Lee's reporters are forced largely to rely on what they hear from their sources about potentially newsworthy new filings in Virginia courts, as well as checks of the limited docket information available on the VCCI system. Lee also subscribes to Courthouse News' *Southern Virginia State Report*, but due to OCRA's restrictions that *Report* can largely provide only the same limited docket sheet information available on VCCI.

**C. The Dissemination Restriction**

52. Virginia law provides that the Virginia circuit court clerks "shall have custody of and shall keep all court records, including books, evidence, records, maps, and papers, deposited in their offices or at such location otherwise designated by the clerk, as well as records stored in electronic format whether the storage media for such electronic records are on premises or elsewhere." Va. Code § 17.1-242.

53. Virginia law also provides that "[t]he Executive Secretary of the Supreme Court shall be the administrator of the circuit court system, which includes the operation and maintenance of a case management system and financial management system and related

technology improvements." Va. Code § 17.1-502(A). In the prior litigation over OCRA, Courthouse News and Hade stipulated to, *inter alia*, the following facts:

> In response to demand from circuit clerks, OES created, and now supports and maintains, a Case Imaging System ("CIS") that enables participating circuit courts … to create and store electronic images of case documents that the clerk may, if he or she so chooses, make available for viewing by members of the public and press on public access terminals at the courthouse.
>
> * * *
>
> OES also created, and now supports and maintains, OCRA, which is an application developed by OES for circuit clerks that use CIS. The OCRA application enables circuit clerks to make non-confidential CIS case images available for secure online viewing by their subscribers …
>
> * * *
>
> The Executive Secretary provides maintenance and technical support for the OCRA platform for those Virginia circuit courts . . . that pay for this support and utilize OCRA. . . . [T]here is a sliding scale for annual maintenance charges for clerks who have five (5) or more private (non-governmental) subscribers: the annual maintenance charge is $500 for clerks with 5-14 private subscribers; $1,500 for clerks with 15-34 private subscribers; $3,500 for clerks with 35-54 private subscribers; $5,500 for clerks with 55-94 private subscribers; and $9,500 for clerks with 95-400 private subscribers.

*Courthouse News Serv. v. Hade*, U.S. District Court, E.D. of Va. Case No. 3:21cv460-HEH, Joint Stipulations of Fact, Doc. No. 55, ¶¶ 31, 35, 38 (copy attached as **Exhibit 2**).

54. Virginia law permits remote access to nonconfidential court records through each Virginia circuit court clerk. *See* Va. Code § 17.1-225; *see also* State Officials and Employees-Costs, Fees, Salaries, Allowances, Courts of Record, 1998 Va. Laws Ch. 872 (H.B. 1114).

55. Most Virginia circuit courts – including the cities of Bristol, Richmond and Roanoke, and another 109 of Virginia's 120 circuit courts – offer remote access via OCRA.

56. The provisions governing OCRA in the Virginia Code say that a circuit court clerk can only "[p]rovid[e] secure remote access to nonconfidential court records, subject to any fees charged by the clerk, to members in good standing with the Virginia State Bar and their

authorized agents, pro hac vice attorneys authorized by the court for purposes of the practice of law, and such governmental agencies as authorized by the clerk." Va. Code § 17.1-293(E)(7). However, the Virginia Code does not provide the same access for the press or public.

57. Another subdivision of the same statute bars attorneys with OCRA subscriptions from providing copies of public court records on OCRA to third parties, including members of the media for purposes of informing the public about their contents. It says:

> Nothing in this section shall be construed to permit any data accessed by secure remote access to be sold or posted on any other website or in any way redistributed to a third party, and the clerk, in his discretion, may deny secure remote access to ensure compliance with these provisions. However, the data accessed by secure remote access may be included in products or services provided to a third party of the subscriber provided that (i) such data is not made available to the general public and (ii) the subscriber maintains administrative, technical, and security safeguards to protect the confidentiality, integrity, and limited availability of the data.

Va. Code § 17.1-293(H).

58. To get remote access to judicial filings at a Virginia circuit court through OCRA, potential users must submit a completed and notarized OCRA Subscriber Agreement, and pay a separate subscription fee, for each individual circuit court for which they wish to have OCRA access. The Subscriber Agreement for the Richmond City Court ("Richmond City OCRA Agreement"), a copy of which is attached as **Exhibit 3**, provides, among other things:

> For the purposes of this Agreement, Subscriber shall include the following: a member in good standing of the Virginia State Bar, or a directly supervised staff member, a *pro hac vice* attorney authorized by the Court for the purposes of the practice of law, and such governmental agencies as authorized by the Clerk.
>
> * * *
>
> Subscriber may not permit any data accessed by secure remote access to be sold or posted on any other Internet website or in any way redistributed to any third party, and the clerk reserves the discretion to deny secure remote access to ensure compliance with the provision.
>
> * * *

> The Subscriber also relieves and releases the Office of the Executive Secretary … for any and all damages … against the subscriber by any other party.

59. The OCRA Subscriber Agreements for the City of Roanoke Circuit Court and the Bristol Circuit Court, which are virtually identical to each other and are attached as **Exhibit 4** and **Exhibit 5**, similarly define a "subscriber" to mean "members in good standing with the Virginia State Bar and their authorized agents, pro hac vice attorneys authorized by the court for the purposes of the practice of law, and governmental agencies authorized by the Clerk of a Circuit Court to have OCRA." In almost identical language as used by the Richmond Clerk, both agreements go on to state, in relevant part:

> Subscriber may not permit any data accessed by secure remote access to be sold or posted on any other Internet website or in any way redistributed to any third party, and the Clerk reserves the discretion to deny secure remote access to ensure compliance with this provision.
>
> * * *
>
> The Subscriber also relieves and releases the … Office of the Executive Secretary … from liability for any and all damages resulting from incorrect data or any other misinformation accessed from this service.
>
> * * *
>
> The Subscriber also relieves and releases the … Office of the Executive Secretary … from liability for any and all damages resulting from a claim for negligence or lost profits against the Subscriber or any other party.

60. Plaintiffs are informed and believe, and on that basis allege, that the OCRA agreements of circuit court clerks elsewhere in Virginia include the same restriction against subscribers sharing information from records obtained via OCRA with a third party, like a journalist, to report that information to the public or post it on a newspaper's or broadcast outlet's website, as well as similar language indemnifying OES. Indeed, Plaintiffs are informed and believe, and on that basis allege, that OES requires that clerks include these restrictions and indemnifying language in their OCRA subscription agreements.

61. Those with OCRA access who violate the Dissemination Restriction by providing a copy of, or information obtained from, a public court record lawfully obtained on OCRA may have their access revoked. And Virginia-barred attorneys may be subject to further sanctions. At the argument before the Fourth Circuit in *Courthouse News Serv. v. Hade* held on December 7, 2023, counsel for the Commonwealth asserted that Virginia attorneys who violate the Dissemination Prohibition could be disbarred.[1] By prohibiting those with access to OCRA from disseminating information on OCRA to members of the general public, including the press, and punishing those who do, Defendants have imposed a prior restraint on protected speech.

62. These restrictions infringe Plaintiffs' First Amendment rights, and the rights of the public, to gather, disseminate and read about newsworthy information to which a constitutional right of access exists. While Plaintiffs can access nonconfidential civil complaints and other civil court records at the courthouse, this is not a viable option for most of Virginia's 120 circuit courts – let alone all of them – because the cost and time necessary are prohibitive. The burdensome impact of the restrictions thus infringes on the First Amendment right of the public to receive information.

**D. Accessing Complaints And Other Nonconfidential Civil Records Via OCRA**

63. Confidential documents are not available via OCRA. The documents on OCRA

[1] Virginia has long allowed attorneys' licenses to be "'revoked or suspended'" for "'any unlawful or dishonest or unworthy or corrupt or unprofessional conduct on the part of the attorney.'" *Norfolk & Portsmouth Bar Ass'n v. Drewry*, 161 Va. 833, 841-42, 172 S.E. 282, 285 (1934) (quoting statute). Virginia's ethical rules' current list of "professional misconduct" constituting grounds for attorney discipline includes "commit[ting] a criminal or deliberately wrongful act that reflects adversely on the lawyer's honesty, trustworthiness or fitness to practice law" and "engag[ing] in conduct involving dishonesty, fraud, deceit or misrepresentation which reflects adversely on the lawyer's fitness to practice law." Va. R. Prof. Conduct 8.4(b) & (c). The Commonwealth contends violation of Virginia Code § 17.1-293(H) constitutes professional misconduct under Rule 8.4 warranting "suspension or revocation of his or her license to practice law in Virginia." *Courthouse News Serv. v. Hade*, 2022 WL 22955643, ECF Doc. 67 at 16-17 (E.D. Va. July 9, 2022) (Commonwealth Memo. of Law in support of Summary Judgment).

are the same documents that have been made available on courthouse public access terminals.

64. To log into the OCRA System, a subscriber visits a centralized website (https://cisweb.courts.state.va/us/Ocra/login/577728/a.html) – which OES provides and maintains for the participating circuit clerks – and enters his/her e-mail address, password and bar number/authorized officer of the court number. The OCRA login page states: "This system is intended solely for the use of authorized Officer of the Court personnel to retrieve and review court documents they are specifically authorized to view. All other use is expressly prohibited." After logging in, a user then has access to the circuit courts for which they have accounts.

65. After paying a nominal subscriber's fee – the amount of which varies and is set forth in each clerk's subscription agreement – and registering for OCRA, attorneys in Virginia, and from anywhere else in the country as long as they have been admitted pro hac vice, can view all civil, non-confidential, public court filings remotely over the internet on any day of the week, at any time of day, and from any location in the world. This access is not limited to filings in their own cases. Rather, this access extends to all filings in non-confidential civil cases in courts for which they have an OCRA subscription. OCRA access also gives these attorneys the ability to print out the filings at no additional charge. *See* Attorney Subscriber Agreements, Exhs. 3-5.

66. There is no difference in the content of the court records that Plaintiffs and other members of the press and public must travel to each individual court to see, and the court records that subscribers authorized to access OCRA can see remotely over the Internet via OCRA – they are the same records. The difference between those with access to OCRA and those who do not have access, such as the Courthouse News and Lee plaintiffs here, is the time, distance and expense that is required to access that complaint – which, in real life, means the difference between being able to review the complaint or not review it at all.

**E. Direct And Derivative Injury Caused By The Dissemination Restriction**

67. Because of the limited OCRA access and the Dissemination Restriction, Plaintiffs can only report on newly filed civil complaints or other nonconfidential civil court records by reviewing and/or copying them off the public access terminal at each courthouse.

68. None of Courthouse News' reporters or editors are attorneys who are licensed to practice law in Virgina. None of Lee's Virginia reporters or editors are attorneys who are licensed to practice law in Virginia.

69. The 112 Virginia circuit courts that use OCRA cover an area of over 30,000 square miles, rendering it impossible for Plaintiffs' reporters to regularly drive to each court to report on the complaints filed that day.

70. In 2022, three Courthouse News journalists – its publisher and editor, accompanied by two of its bureau chiefs – traveled in person to 25 of the 105 Virginia courts that then offered OCRA access. They then published a report to document the time and travel required to obtain copies of court records at less than one-quarter of the OCRA courts without remote access. A true and correct copy of their report is attached as **Exhibit 6**. As the report explains, it took five days to cover these 25 courts, requiring travel of 1,036 miles.

71. Because Courthouse News is unable to send a reporter to every court every day, it is compelled to rely on bare-bones information available online through the VCCI system – i.e., party names, case type, court name – to report on new civil actions for the vast majority of the Virginia circuit courts covered in its *Virginia Report* and its *Southern Virginia Report*. This is not nearly the coverage Courthouse News would provide if it had access to the new complaints themselves via OCRA. Among other shortcomings, Courthouse News' reporters cannot inform

their readers about the particular claims alleged (which is different from case type), or the factual allegations that are the basis for those claims.

72. Lee's Virginia newspapers are similarly unable to send a reporter to each court in their circulation area even on a weekly basis, let alone daily. They therefore must rely on information they happen to hear from a source – or sheer luck – to learn about new significant filings, especially in remote courts, and have been forced to forego coverage of newsworthy cases in remote courts they would have informed the public about but for OCRA's restrictions.

73. As the Reporters Committee for Freedom of the Press described in its amicus brief filed in support of Courthouse News in *Courthouse News Service v. Jacqueline Smith*, 2023 WL 2067776 (4th Cir. filed Feb. 10, 2023), the inability of news outlets to obtain information from OCRA greatly restricts their ability to cover local news in remote areas, creating news deserts – i.e., communities in which there is no "access to reporting on court proceedings of local importance." *Id.* at *13-14 & 17.

74. The Dissemination Restriction further prohibits Plaintiffs from relying on their legal counsel, and other Virginia lawyers or those admitted pro hac vice, to provide them with potentially newsworthy complaints – a common practice across newsrooms around the country.

75. Even if Plaintiffs' Virginia-barred counsel, or other counsel with access to OCRA, identified potentially newsworthy complaints for Plaintiffs, the Dissemination Restriction prohibits sharing those complaints or information in them. Plaintiffs' reporters are still required to drive to the relevant courthouse and view/print the complaint from the public access terminal, paying not only for each page but, more prohibitively, the expense of travel – if they are able to make the trip at all.

76. The Dissemination Restriction also curtails Plaintiffs' ability to report on pleadings filed in courts close to their newsrooms. Pleadings submitted in the late afternoon may be filed without sufficient time for Plaintiffs' reporters to go to the courthouse and copy each newsworthy complaint or pleading. Pleadings that journalists learn about over the weekend cannot be reported on until the next week because they cannot be accessed in person at the courthouse while the courthouse is closed. Because the Dissemination Restriction bars Plaintiffs from obtaining such pleadings from legal counsel who have access to OCRA, Plaintiffs are unable to report on these newly filings concerning matters of public import for days, if at all.

77. For example, on Friday afternoon, September 26, 2025, the court reporter for the *Richmond Times-Dispatch* learned a complaint had been filed in Richmond Circuit Court against the parent company of the digital music streaming service Spotify and its American subsidiary, alleging Spotify had stolen an idea created by students as a class project that allows users to stream music with friends, and seeking $10 million in damages. The reporter, Luca Powell, could not get to the Richmond courthouse before it closed for the weekend, so he contacted the *Times-Dispatch*'s attorney, David Lacy, asking if he could pull the complaint off OCRA and email it to him. Lacy replied that he did have access to the filing through OCRA and would like to assist, but unfortunately his subscription agreement contained a restriction prohibiting Lacy from sending Powell a copy to review and report to the public.

78. In another example some 16 months earlier involving a more remote court, Powell had asked Lacy in May 2024 if he had an OCRA subscription for the Dinwiddie County Circuit Court because Powell heard a pleading had been filed there late on a Friday afternoon that he needed so he could confirm its contents and report the information. The Dinwiddie court is more than 50 miles from the *Times-Dispatch*'s newsroom and Powell knew it would close

before he could get there. But Lacy informed Powell that he could not provide him a copy of anything from OCRA even if he had a subscription to OCRA for Dinwiddie.

79. More recently, Lacy was unable to assist *The Roanoke Times* with respect to a new lawsuit filed against Barnes and Noble Booksellers in Roanoke City Circuit Court that the *Times*' court reporter, Laurence Hammack, learned about on Saturday, November 22, 2025. That day, Hammack asked Lacy if he could provide him a copy or a summary of the allegations over the weekend, but Lacy said OCRA's rules prevent him from providing Hammack the pleadings or to summarize information from the pleadings obtained via OCRA.

80. This past June, the Henrico Doctors Hospital in Henrico County attempted to prevent the public from learning of settlements with families of nine infants who died or were seriously injured in its neonatal intensive care unit by moving for court approval in Salem, a three-hour drive from Richmond. A judge in this district has said he was "appalled" by this practice of using Virginia Code § 8.01-55 in an attempt to bury news about wrongful death settlements in remote courts. *Williamson Jain v. Abbott Labs, Inc.*, No. 7:13-cv-00551-MFU-RSB, Trans. of Hg. 10:3 (Doc. 171) (W.D. Va. Jan 28, 2015); *see id.*, Order 2-3 & n.2 (Doc. 166) (Jan. 29, 2015); Hammack, *Pattern of Settling Lawsuits against Roanoke-area hospitals makes them hard to find*, The Roanoke Times (Oct. 11, 2015) (settlement approval often sought "in small towns such as Fincastle, Floyd and Stuart"). Aware of this practice, the media or their counsel could monitor OCRA subscriptions for filings in remote courts ***if*** the media could subscribe to OCRA, or if their attorneys could alert them to the contents of records obtained on OCRA. Given OCRA's restrictions, however, Lee's Richmond reporter, Eric Kolenich, was only able to learn about the settlements because a reporter for the Roanoke paper was "lucky enough to stumble" across the motion for approval in Salem. The public's right to know about

newsworthy developments in its courts should not need to depend on luck.

81. On the evening of October 20, 2025, Hammack – the court reporter for *The Roanoke Times* – saw in Courthouse News' *Southern Virginia State Report* that a pro se wrongful death complaint had been filed in Montgomery County Circuit Court against a defendant identified as Warm Health Inc. There is a retirement home called Warm Hearth Village in Blacksburg, a city in Montgomery County, and Hammack thought the pro se plaintiff may have mistyped the name. Montgomery is in *The Times* circulation and coverage area, and allegations of a wrongful death at a retirement home is something Hammack would want to review and potentially report to his readers. But Hammack did not have time to make the two-hour round trip to Montgomery to pull a copy of the complaint, so he emailed Lacy on October 21 asking if Lacy could pull a copy of the complaint off of OCRA and send it to him or at least summarize for Hammack the key allegations, and provide the plaintiff's contact information, so Hammack could determine if it warranted a story. Lacy informed Hammack that OCRA is unlike PACER and that, while Lacy would have been able to assist if the complaint was in federal court and thus available on PACER, unfortunately OCRA's restrictions did not allow Lacy to send Hammack the complaint or the information he'd requested about the complaint.

82. Lacy has been similarly unable to help Courthouse News obtain copies of, or information from, complaints on OCRA because of the Dissemination Restriction.

83. On October 3, 2025, Courthouse News' Southeast Bureau Chief, Ryan Abbott, saw information in the VCCI system about a new civil complaint filed against Meta and Facebook in Roanoke City Circuit Court, but other than bare-bones information – the case number, name, case type (one-word description: "injunction") and the names of the first three defendants (which may not include the most newsworthy defendants) – could not obtain any

other information from VCCI. So Abbott asked Lacy if he could pull a copy of that complaint off OCRA and send it to him because Courthouse News did not otherwise have enough information to report the case. In response, Lacy said he did have access through OCRA, "but unfortunately the subscription agreement prohibits me from using [his OCRA access] to send you a copy." Consequently, Courthouse News was unable to include a full report about the lawsuit in its *Southern Virginia State Report* or to consider a more detailed story for its website.

84. On October 21, 2025, Abbott asked Lacy if he could pull off OCRA and send him a petition the Commonwealth of Virginia had filed in Bristol Circuit Court, or at least summarize what the petition alleged and counsel's contact information. Abbott wanted to determine if he should include it in Courthouse News' *Southern Virginia State Report*. When he clicked on the case number in VCCI, it took Abbott to docket information for a case filed in 2024 – in which a bail bondsman was a co-defendant, further piquing Abbott's reporting interest – but he could not determine what either the old case or new petition were about. Bristol is more than 300 miles and five hours one way from Richmond, and Abbott could not send a reporter to spend more than 10 hours to obtain a single petition. However, Lacy told Abbott he was unable to assist because OCRA prevented him from sending Abbott a copy of the petition for reporting purposes, and providing a summary of the filing could be construed as improper circumvention of OCRA.

85. Lee was also unsuccessful in trying to get Lacy to provide it with a copy of a complaint filed in Bristol Circuit Court. On the evening of October 31, 2025, Courthouse News' *Southern Virginia State Report* noted that a declaratory judgment action had been filed in Bristol against Virginia Farm Bureau Town, but was unable to provide further details because they were not available on VCCI. The Executive Editor of the *Bristol Herald Courier,* David McGee, subsequently asked Lacy if he could send McGee a copy of the complaint, or if he could

summarize the main allegations in an email, so McGee could determine if it was worth reporting about the case for the newspaper's readers. Lacy was compelled to inform McGee that, "unfortunately, I am prohibited by OCRA's terms from sending you a copy of the filings under these circumstances," nor could he send him a summary of the allegations.

**COUNT ONE**
**Violation of U.S. Const. Amend. I and 42 U.S.C. § 1983**
**First Amendment – Dissemination Restriction**
**(Against All Defendants)**

86. Plaintiffs incorporate and repeat the allegations of Paragraphs 1-85 herein.

87. The Dissemination Restriction, as set forth by Virginia Code § 17.1-293 and as further imposed and enforced by Defendants in OCRA subscriber agreements, on its face and as-applied by Defendants through their policies, practices and customs, is a prior restraint that deprives Plaintiffs, and by extension their subscribers and the public, of their rights under the First Amendment to the U.S. Constitution, incorporated and made applicable to the states by the Fourteenth Amendment to the U.S. Constitution.

88. The First Amendment generally precludes the government from suppressing the dissemination of truthful information about issues of civic importance. Thus, "'state action to punish the publication of truthful information seldom can satisfy constitutional standards.'" *Soderberg*, 999 F.3d at 968 (quoting *Smith*, 443 U.S. at 102).

89. Defendants' actions under color of state law, including without limitation their policy, practice and custom of imposing and enforcing the Dissemination Restriction on non-confidential judicial documents obtained via OCRA, burdens the fundamental First Amendment rights of Plaintiffs, their subscribers, and other readers of their news reports.

90. Plaintiffs have standing to assert this claim. On multiple occasions, they have requested that an attorney who subscribes to OCRA provide them with copies of, and/or

information from, new civil complaints and other public court filings available on OCRA. The subscriber was compelled to inform Plaintiffs that the Dissemination Restriction prevented him from providing Plaintiffs with the copies and/or information they requested. But for OCRA's Dissemination Restriction, the subscriber would have provided Plaintiffs the requested material.

91. There is no compelling or overriding interest sufficient to justify Defendants' actions. Even if an overriding or compelling interest did exist, there are far less restrictive means of protecting any such interest. As such, Defendants' policies and practices are not narrowly tailored, as required by law.

92. Plaintiffs have no adequate remedy at law to prevent or redress Defendants' unconstitutional actions and will suffer irreparable harm as a result of Defendants' violations of Plaintiffs' First Amendment rights. Plaintiffs are therefore entitled to declaratory and injunctive relief to prevent further deprivation of these rights.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seek judgment in their favor and against Defendants Karl R. Hade, in his official capacity as Executive Secretary of the Office of Executive Secretary of the Supreme Court of Virginia; Edward Jewett, in his official capacity as Clerk of the Circuit Court for the City of Richmond, Virginia; Brenda Hamilton, in her official capacity of the Clerk of the Circuit Court for the City of  Roanoke, Viginia; and Kelly Flannagan, in her official capacity as the Clerk of the Circuit Court for the City of Bristol, Virginia, as follows:

1. Injunctions against Defendants, including their agents, assistants, successors, employees, and all persons acting in concert or cooperation with them, or at their direction or under their control, prohibiting them from continuing their policies, practices, and customs of prohibiting the dissemination of public court records obtained from OCRA;

2. A declaratory judgment pursuant to 28 U.S.C. § 2201 declaring Virginia Code § 17.1-293(H), and Defendants' policies and practices of conditioning OCRA access on the Dissemination Restriction, and enforcing the Dissemination Restriction with penalties including disbarment for violations of the Dissemination Restriction, unconstitutional on its face because it impermissibly burdens the fundamental First Amendment rights of Plaintiffs, their subscribers, and other readers of their news reports;

3. A declaratory judgment pursuant to 28 U.S.C. § 2201 declaring Virginia Code § 17.1-293(H), and Defendants' policies and practices of conditioning OCRA access on the Dissemination Restriction, and enforcing the Dissemination Restriction with penalties including disbarment for violations of the Dissemination Restriction, unconstitutional as-applied because it impermissibly burdens the fundamental First Amendment rights of Plaintiffs, their subscribers, and other readers of their news reports;

4. An award of costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

5. For all other relief the Court deems just and proper.

Dated: December 8, 2025

Respectfully Submitted,

**BRYAN CAVE LEIGHTON PAISNER LLP**

By: */s/ Roger Myers*
Roger Myers, *pro hac vice* forthcoming
Rachel Matteo-Boehm, *pro hac vice* forthcoming
3 Embarcadero Center, 7th Floor
San Francisco, California 94111
Tel: (415) 675-3400
roger.myers@bclplaw.com
rachel.matteo-boehm@bclplaw.com

**TROUTMAN PEPPER LOCKE LLP**

By: */s/ Dabney J. Carr IV*
Dabney J. Carr IV, VSB No. 28679
Lauren H. Miller, VSB No. 100566
P.O. Box 1122
Richmond, Virginia 23218
Tel: (804) 697-1200
Fax: (805) 697-1339
dabney.carr@troutman.com
lauren.h.miller@troutman.com

*Counsel for Plaintiffs Courthouse News Service, Lee Enterprises, Incorporated and Lee BHM LLC*

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| COURTHOUSE NEWS SERVICE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:21-cv-460–HEH |
| | ) | |
| KARL R. HADE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**
**(Dismissing Claim Without Prejudice)**

THIS MATTER is before the Court on remand from the United States Court of Appeals for the Fourth Circuit. (ECF No. 100.) The Fourth Circuit vacated the Court's ruling on Count II and directed that Plaintiff Courthouse News Service's ("Courthouse News") claim challenging the Dissemination Restriction (Count II) be dismissed without prejudice because Courthouse News lacks standing to bring such a claim. (ECF No. 96 at 27–28, 30.) In accordance with the Fourth Circuit's directive, Count II is DISMISSED WITHOUT PREJUDICE for lack of subject matter jurisdiction.

The Clerk is DIRECTED to send a copy of this Order to all counsel of record.

It is so ORDERED.

/s/
Henry E. Hudson
Senior United States District Judge

Date: May 19, 2025
Richmond, Virginia

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**COURTHOUSE NEWS SERVICE,**

**Plaintiff,**

**v.** **Civil Action No.: 3:21cv460-HEH**

**KARL R. HADE**, *et al.*,

**Defendants.**

**JOINT STIPULATIONS OF FACT**

Plaintiff Courthouse News Service ("CNS"), Defendant Karl R. Hade, in his official capacity as Executive Secretary of the Office of Executive Secretary of the Supreme Court of Virginia (the "Executive Secretary"), and Defendant Jacqueline C. Smith, in her official capacity as Clerk of the Circuit Court for Prince William County, Virginia (the "Prince William Clerk") stipulate and agree as follows:

**About CNS**

1. CNS is a nationwide news service that specializes in reporting on civil litigation, from the initial complaint to subsequent filings, hearings, and rulings, through the appellate level, in state and federal courts across all 50 states, including Virginia.

2. CNS now has more than 2,750 subscribers nationwide, including law firms and libraries, academic institutions, publicly traded companies, government entities, non-profit organizations, news and entertainment media outlets, and watchdog groups.

3. A wide range of news and media outlets rely on CNS to learn about new civil filings, and CNS has been credited as the original source of reporting by newspapers, legal publications, magazines, television, radio, and online media.

4. CNS offers a variety of publications. One category of publications is CNS' New Litigation Reports, which contain original, staff-written summaries of significant and newsworthy new civil complaints. New Litigation Reports focus on general jurisdiction civil complaints against business institutions, public entities, prominent individuals, or other civil actions that might be of interest to CNS' subscribers.

5. CNS publishes two New Litigation Reports in Virginia: the *Virginia Report*, which covers new litigation filed in 31 Virginia circuit courts, including the Circuit Court for Prince William County (the "Prince William Circuit Court"), and the *Southern Virginia State Report*, which covers new litigation filed in 89 Virginia circuit courts. These reports are sent to subscribers via email each weekday evening.

6. Among CNS' other publications are its monthly newsletter, the *Entertainment Digest*, as well as the *Daily Brief*, which covers published, nationwide appellate rulings, including all U.S. Supreme Court and federal circuit decisions, as well as significant rulings from federal district courts, including the district courts in Virginia.

7. CNS also publishes a publicly-available website (www.courthousenews.com) featuring news reports and commentary, which is read by hundreds of thousands of readers each month. The website functions much like a print daily newspaper, featuring staff-written articles about the news of the day from throughout the nation that are posted and rotate on and off the page on a 24-hour news cycle. Many of the stories on the website focus on ongoing court cases and rulings in state and federal courts, including those in Virginia.

8. CNS' publications do not cover criminal, domestic relations, or juvenile matters, nor do they include name changes, probate filings, or most residential foreclosure.

Case 3:21-cv-00460-HEH Document 53 Filed 05/04/22 Page 3 of 15 PageID# 485

9. To prepare the New Litigation Reports and identify civil filings that may warrant a website article, CNS reporters have traditionally visited their assigned courts on a daily or weekly basis to review complaints and other civil court documents filed that day, or since their last visit, to determine which ones are newsworthy. However, as the vast majority of federal courts and many state courts are putting court records online via court web sites, CNS also covers courts remotely through the Internet, without the need to require reporters to travel to those courts.

10. State courts that provide remote online access to all civil filings and other court records (except for those that are recognized as confidential under any applicable law or sealed pursuant to court order), either on a statewide basis or through individual courts within the state, include California, Louisiana, Massachusetts, Oklahoma, Tennessee, and Washington – in which several of the courts are predominantly paper-filing courts – as well as courts within Alabama, Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Indiana, Iowa, Kansas, Kentucky, Maine, Minnesota, Mississippi, Montana, Nevada, New Jersey, New Mexico, New York, North and South Dakota, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, Texas, and Utah.

11. All federal courts in the nation, including the United States district courts in Virginia, give the press and public remote online access to civil court records via PACER.

12. CNS currently employs approximately 240 people, most of them editors and reporters, who review and report on the day's civil filings filed at their assigned courthouse(s).

13. In Virginia, CNS currently employs three reporters who cover the state and federal trial and appellate courts across the state and who are based in the larger metropolitan

areas – Prince William County, Norfolk, and Richmond. Those reporters are supervised by CNS' Southeast Bureau Chief, Ryan Abbott.

14. Of the 120 Virginia circuit courts, CNS currently sends reporters to five of them on a daily basis, *i.e.*, Prince William, Fairfax, Norfolk, Richmond City, and Virginia Beach.

15. CNS currently covers one circuit court, *i.e.*, Alexandria, remotely on a daily basis by accessing new civil filings through the Internet via the Alexandria Justice Information System ("AJIS"). CNS previously covered the Alexandria Circuit Court by sending a reporter to the court on a weekly basis.

16. Twelve other circuit courts are currently covered by sending one of the three Virginia-based reporters to the court on a less than daily basis, *i.e.*, Arlington, Chesapeake, Chesterfield, Fauquier, Hampton, Hanover, Henrico, Loudoun, Newport News, Portsmouth, Stafford, and Suffolk.

17. CNS covers the remaining 102 Virginia circuit courts only with docket information, *i.e.*, party names, case type, court name, due to their remote locations.

18. The CNS reporter covering the Prince William Court, Joan Hennessey, visits the courthouse in person on a daily basis. She also covers the Fairfax County Circuit Court in person on a daily basis. Upon arrival at the clerk's office at each courthouse, Ms. Hennessey reviews all newly filed complaints and other civil filings made available since her last visit, and then reports on the newsworthy filings that day. Any cases filed and made available after she leaves the courthouse each day are not covered until the next day.

19. Ms. Hennessey also currently covers the Alexandria Circuit Court remotely via AJIS on a daily basis, while covering the circuit courts in Arlington, Fauquier, and Loudoun in person on a weekly basis.

Case 3:21-cv-00460-HEH Document 35 Filed 05/04/22 Page 6 of 15 PageID# 487

**About the Prince William Clerk and Virginia Circuit Courts**

20. The Prince William Clerk, Jacqueline C. Smith, was elected the Clerk of the Circuit Court for Prince William County, Virginia in April 2017.

21. The Prince William Clerk is an independently elected constitutional officer and serves as the custodian of all court records, including books, evidence, records, maps, and papers, deposited in her offices or other locations designated by her, including records stored in electronic format whether in the clerk's office or elsewhere, and the clerk is responsible for making those records available to the public for inspection and examination.

22. The Prince William Clerk is also responsible for developing and implementing the policies and procedures for operating the Prince William Circuit Court Clerk's Office, in conformance with applicable law, including those relating to access to non-confidential civil filings and other court records that are filed in the Prince William Circuit Court.

23. The term "non-confidential civil filings" and "non-confidential civil court records" as used herein shall mean any civil filing or other court record maintained by a clerk of a Virginia circuit court that is not recognized as confidential under any applicable law or sealed pursuant to court order.

24. In all Virginia circuit courts, including the Prince William Circuit Court, upon request, and subject to other demands of their office, clerks provide the public and press with access to non-confidential civil filings and other court records filed in their respective courts at the physical courthouse.

25. The Prince William Clerk provides the public and press, including CNS, with access to non-confidential electronic civil court records, including new filings and court rulings, through its public access terminals located in the Civil Division during normal business hours.

26. The Civil Division of the Prince William Clerk's Office is open to the public Monday through Friday, 8:30 a.m. to 5:00 p.m.

27. Since 2012, the Prince William Clerk has also provided all subscribers, whom the Clerk approves and authorizes, with remote online access to electronic images of all non-confidential civil court records filed in the Prince William Circuit Court, including new filings and court rulings, through an application known as the Officer of the Court Remote Access System ("OCRA"). OCRA is provided by OES to the Prince William Clerk and any other interested circuit court clerks. Currently, in addition to the Prince William Clerk, clerks for 104 other Virginia circuit courts provide subscribers, whom those clerks likewise approve and authorize, with remote online access to electronic images of certain non-confidential civil court records filed in their respective courts through OCRA. Other circuit clerks have acquired similar applications provided by private vendors.

28. The Prince William Clerk does not offer remote online access to civil court records to any members of the press or public unless they are a Virginia-barred attorney or the staff member of a Virginia licensed attorney.

**About the Executive Secretary**

29. The Executive Secretary serves as the administrator of the Virginia circuit court system, which includes the operation and maintenance of a case management system utilized by many circuit court clerks, including the Prince William Clerk, to conduct the business of the clerk's office.

30. The case management system used by the Prince William Clerk, as well as all but two Virginia circuit court clerks, which helps manage their court records, including new civil filings, is known as the Circuit Court Case Management System ("CCMS"), which was created,

and is now operated and maintained, by the Office of the Executive Secretary of the Supreme Court of Virginia ("OES").

31. In response to demand from circuit clerks, OES created, and now supports and maintains, a Case Imaging System ("CIS") that enables participating circuit courts, including the Prince William Circuit Court, to create and store electronic images of case documents that the clerk may, if he or she so chooses, make available for viewing by members of the public and press on public access terminals at the courthouse. The Prince William Clerk makes electronic images of case documents available for viewing by the public and press in this manner. Clerks using CCMS may or may not use CIS.

**About the Virginia Information Technologies Agency (VITA)**

32. Virginia Information Technologies Agency ("VITA") is the state agency "responsible for the administration and enforcement of" Chapter 20 of Title 2.2, which is the Chapter of the State Code related to Information Technology. *See* Virginia Code § 2.2-2005 *et. seq.*

33. VITA has developed and promulgated Information Technology Resource Management (ITRM) Standard SEC503-02.2: Security Standard for Restricted Remote Access to Documents on Court-Controlled Websites, available at https://www.vita.virginia.gov/media/vitavirginiagov/it-governance/psgs/pdf/RemoteAccessDocsCrtContrdSEC503.pdf.

34. VITA Standard SEC503-02.2 includes a model Application for Internet Access to Records Management System. This Standard also includes a model Subscriber Agreement For Internet Access to Circuit Court Documents.

**<u>About OCRA Access</u>**

35. OES also created, and now supports and maintains, OCRA, which is an application developed by OES for circuit courts that use CIS. The OCRA application enables circuit clerks to make non-confidential CIS case images available for secure online viewing by their subscribers at https://cisweb.vacourts.gov/Ocra. Clerks using CCMS may or may not use OCRA.

36. The records viewable through the OCRA application are stored on local servers controlled by the respective local circuit court clerks.

37. An OCRA subscriber is responsible for paying any subscriber fee charged by the circuit court clerk and for the proper use of the secure remote access system pursuant to the subscriber agreement and applicable Virginia law. OES has no statutory authority to set the subscriber fee and does not receive any part of the fee from individual subscribers.

38. The Executive Secretary provides maintenance and technical support for the OCRA platform for those Virginia circuit courts, such as the Prince William Clerk, that pay for this support and utilize OCRA. The application for government OCRA access is provided to clerks free of charge. There is a sliding scale for annual maintenance charges for clerks who have five (5) or more private (non-governmental) subscribers: the annual maintenance charge is $500 for clerks with 5-14 private subscribers; $1,500 for clerks with 15-34 private subscribers; $3,500 for clerks with 35-54 private subscribers; $5,500 for clerks with 55-94 private subscribers; and $9,500 for clerks with 95 – 400 private subscribers.

39. The Prince William Clerk currently has 269 private subscribers to OCRA, and pays OES an annual maintenance charge of $9,500.

40. To log in to the OCRA System, a subscriber visits a centralized website (https://cisweb.courts.state.va.us/Ocra/login/577728/a.html) – which OES provides and maintains for the participating circuit clerks – and enters his/her e-mail address, password, and bar number or assigned authorized subscriber number. The OCRA login page states: "This system is intended solely for the use of authorized Officer of the Court personnel to retrieve and review court documents they are specifically authorized to view. All other use is expressly prohibited." Each participating clerk ultimately determines who is authorized to access the clerk's records via OCRA, pursuant to and in compliance with applicable law.

41. For circuit court clerks that use OCRA, the clerk or someone designated by the clerk serves as the court's OCRA Administrator and this person is responsible for both approving and adding subscribers and for removing them, pursuant to and in compliance with applicable law. The court's OCRA Administrator is responsible for providing their subscribers with a username and temporary password that allows the subscriber to initially log in, and when the subscriber does log in, he/she will be prompted to change their password after their first log in. If OES receives questions about subscriber access, these are referred to the designated OCRA Administrator in the circuit clerk's office. If a clerk determines that a subscriber is authorized to have access to OCRA, pursuant to and in compliance with applicable law, then that subscriber will be provided access to OCRA. OES does not in any way evaluate or screen potential subscribers once the clerk determines they are authorized. OES receives the name and email addresses of subscribers but does not receive other information and does not know if a subscriber is a licensed attorney.

Case 3:21-cv-00460-HEH Document 33 Filed 05/04/22 Page 10 of 13 PageID# 492

42. The OCRA application has been provided to 105 out of 120 Virginia circuit courts, including the Prince William Circuit Court, and these clerks now offer OCRA to their subscribers.

43. According to the Attorney Subscriber Agreement For Remote Access to Prince William County Circuit Court Case Documents (the "Attorney Subscriber Agreement") "[t]he subscription fee is $200.00 per year for 1 attorney and 1 employee" and any "additional employee for the attorney is $75 per individual per year." CNS is willing to enter into an agreement with each circuit court clerk, including the Prince William Clerk, and to pay a similar subscriber's fee for OCRA access to the Prince William Circuit Court and other circuit courts throughout Virginia for its non-attorney employees.

44. After paying a subscriber's fee and registering for OCRA, Virginia attorneys and their staff have the ability to view non-confidential civil filings that each court clerk has made available through OCRA remotely over the Internet – on any day of the week, at any time of day, and from any location in the world. To access the same court records without OCRA or an alternative means of remote access, CNS and other members of the press and public must travel to each individual courthouse that uses OCRA, including the Prince William Circuit Court, during business hours.

45. Subscribers, who are authorized and approved by the circuit court clerk, pursuant to and in compliance with applicable law, and who use OCRA have access to civil filings and records in their own cases, as well as filings and records in other cases in which they are not attorneys of record, parties, or otherwise involved, provided those records are scanned into CIS. Not all historical civil court records in a particular circuit court are viewable on OCRA because

each circuit court that uses OCRA began scanning records into CIS at different times. The Prince William Court began doing so in 2009.

46. A new non-confidential civil filing filed at the Prince William Circuit Court, and other Virginia circuit courts, goes through several stages before it is available for viewing online at either the courthouse via public access terminals or remotely via OCRA: (1) initial intake; (2) data entry into CCMS; and (3) scanning into CIS.

47. Once a new civil filing is scanned into CIS, it can be viewed by the press and public via public access terminals at courthouses that provide public terminals, like the Prince William Circuit Court, almost immediately and on OCRA, by subscribers authorized by the circuit clerk shortly thereafter, usually within five minutes of being scanned into CIS.

48. For courts that provide public access terminals at the courthouse, like the Prince William Circuit Court, every civil court record that is available remotely on OCRA has already been made available to the public and press via public access terminals at the courthouse in which the record was filed.

49. There is no difference in the content of the court records that CNS and other members of the press and public must travel to each individual court to see, and the court records that subscribers authorized by the circuit clerk can see remotely over the Internet via OCRA – they are the same records.

50. CNS and other members of the press and public must pay a per page charge for any paper copies of civil court records that they request at the courthouse. Those with OCRA subscriber access can download, save, and print out civil court records as part of their OCRA subscription fee.

51. Pursuant to Va. Code § 8.01-420.8, effective July 1, 2014, those filing civil court records in Virginia circuit courts, including the Prince William Circuit Court, are required to redact all but the last four digits of social security numbers or other identification numbers appearing on a driver's license, credit card, debit card, bank account, or other billing or payment system. The Prince William Clerk and her staff review new civil filings for any unredacted social security numbers or other identification numbers appearing on a driver's license, credit card, debit card, bank account, or other billing or payment system and, if discovered, redact such information before scanning the filing into CIS.

52. In 2018, the General Assembly passed a budget appropriations bill that required OES to convene a workgroup to evaluate issues related to the potential statewide adoption of electronic filing of civil cases in circuit courts and to evaluate the implementation of a system in which digital images of non-confidential records within civil cases in circuit courts may be viewed by subscribers of that system. The workgroup's findings are available at https://rga.lis.virginia.gov/Published/2018/RD526/PDF, and those findings shall be admissible for the purpose of this lawsuit.

**CNS' Requests for OCRA Access**

53. In 2016, CNS requested OCRA access from 46 Virginia circuit court clerks that utilized OCRA at that time. Many did not respond. Of the Virginia circuit court clerks who did respond, they either denied OCRA subscriber access outright or offered CNS OCRA subscriber access if the CNS subscriber was a Virginia-barred attorney.

54. In May 2021, CNS, through its Southeast Bureau Chief, Ryan Abbott, wrote to the Prince William Clerk to request OCRA access. In response, the Prince William Clerk sent a

letter to Mr. Abbott, dated May 13, 2021, denying CNS access to OCRA because Mr. Abbott did not include a Virginia bar license number and a copy of a Virginia bar card with his application.

55. Neither Mr. Abbott nor any of CNS' reporters covering Virginia are attorneys or licensed to practice law in Virginia.

56. In or around January 2019, the Prince William Clerk requested an Opinion from the Attorney General regarding "whether a circuit court clerk may provide members of the press with secure remote access to nonconfidential court records" under Va. Code § 17.1-293. In response to that inquiry, on June 25, 2021, the Prince William Clerk received an informal opinion and advice from Robert B. McEntee, an Assistant Attorney General for the Commonwealth of Virginia and the Executive Secretary's counsel in this case, representing only his "individual view." Mr. McEntee's individual view is that "the Code of Virginia grants circuit court clerks the ability to provide secure remote access to nonconfidential court records to members of the general public under § 17.1-225" but that "[b]ecause systems like OCRA … exist in part to facilitate access by officers of the court to protected private information pursuant to § 17.1-293(E)(7), circuit court clerks cannot grant the general public remote access to nonconfidential documents through OCRA."

57. The Prince William Clerk denies that she has now, or had at any time, discretion to provide CNS access to OCRA.

58. On March 31, 2021, CNS, through its counsel, wrote to the Executive Secretary and also OES' Director of Judicial Information Technology, Michael J. Riggs, Sr., requesting that CNS be permitted remote online access to OCRA.

59. On April 22, 2021, the Executive Secretary, through OES' Assistant Executive Secretary and Counsel, Edward M. Macon, responded by stating, in part, "The circuit court

Case 3:21-cv-00460-HEH Document 33 Filed 05/04/22 Page 14 of 15 PageID# 496

clerks are the legal custodians of all circuit court records." After citing Va. Code § 17.1-293 and stating that OCRA access is limited to "members in good standing with the Virginia State Bar and their authorized agents," Mr. Macon also stated that "the contents and records that are viewable [on OCRA] are under the custody and control of the circuit court clerks." Mr. Macon then concluded, "For the foregoing reasons, [the Executive Secretary is] not in a position to provide you with the access you request."

Dated: May 4, 2022

____*Dabney Carr /s/*______________

Dabney J. Carr, IV (VSB No. 28679)
**Troutman Pepper Hamilton Sanders LLP**
1001 Haxall Point
Richmond, VA 23219
Tel: (804) 697-1238
Fax: (804) 697-1339
dabney.carr@troutman.com

Jonathan E. Ginsberg (admitted *pro hac vice*)
**Bryan Cave Leighton Paisner LLP**
1290 Avenue of the Americas
New York, NY 10104
Tel: (212) 541-2000
Fax: (212) 541-4630
jon.ginsberg@bclplaw.com

Jessica R. Blaemire (VSB No. 96356)
**Bryan Cave Leighton Paisner LLP**
1155 F Street, NW, Suite 700
Washington, DC 20004
Tel: (202) 508-6000
Fax: (202) 508-6200
jessica.blaemire@bclplaw.com

*Counsel for Plaintiff Courthouse News Service*

___*John C. Altmiller /s/*______

John C. Altmiller (VSB No. 34902)
Heather R. Steele (VSB No. 75473)
**Pesner Altmiller Melnick DeMers & Steele PLC**
8000 Westpark Drive, Suite 600
Tysons, VA 22102
Tel: (703) 506-9446
Fax: (703) 506-0929
jaltmiller@pesner.com
hsteele@pesner.com

*Counsel for Defendant Jacqueline C. Smith*

/s/ Erin McNeill

Robert B. McEntee, III (VSB No. 89390)
Erin R. McNeill (VSB No. 78816)
Assistant Attorneys General
**Office of the Attorney General**
202 North Ninth Street
Richmond, VA 23219
Tel: (804) 786-8198 (McEntee)
Tel: (804) 317-0977 (McNeill)
rmcenteeiii@oag.state.va.us
emcneill@oag.state.va.us

*Counsel for Defendant Karl R. Hade*

# EXHIBIT 3

**CLERK'S OFFICE OF THE CITY OF RICHMOND CIRCUIT COURT**
**EDWARD F. JEWETT, CLERK**

## APPLICATION FOR REMOTE ACCESS TO RICHMOND CITY CIRCUIT COURT CASE IMAGING SYSTEM (OCRA)

**This application must be completed by each individual user for access to case documents. A non-attorney applicant must be a directly supervised staff member of an Attorney who is an active Subscriber. The supervising Attorney must also sign this application.**

The approval of this application is at the Clerk of the Circuit Court's discretion. By signing this application the Subscriber acknowledges and accepts the terms and conditions of the *Subscriber Agreement for Remote Access to Richmond City Circuit Court Case Imaging System* as incorporated by reference herein.

**All information below is mandatory (print clearly)**

***CHECK ONE:*** **NEW APPLICANT** _________ **RENEWAL APPLICANT** __________

**APPLICANT'S LAST NAME**: ____________________________________________________________

**APPLICANT'S FIRST NAME**: ___________________________________________________________

**BUSINESS NAME, IF APPLICABLE**: _____________________________________________________

**STREET ADDRESS**: ________________________________________________________________

**CITY/STATE/ZIP**: _________________________________________________________________

**PHONE NUMBER**: _________________________________________________________________

**EMAIL ADDRESS**: _________________________________________________________________

**VSB NUMBER**: ____________________________________________________________________

**!!!!! Include a copy of your Virginia State Bar card !!!!!**

**UNITED STATES CITIZEN:** ( ) **YES** ( ) **NO**

**NAME OF ACTIVE ATTORNEY SUBSCRIBER UNDER WHOM YOU ARE DIRECTLY SUPERVISED:**
__________________________________________________________________________________________

**ARE YOU CURRENTLY SUBSCRIBED TO "OCRA" IN ANOTHER COURT?** ___________________________

I certify that the information above is true and correct.

**APPLICANT SIGNATURE**: ______________________________________________________________

**SIGNATURE OF SUPERVISING ATTORNEY:** __________________________________________

City / County of: _______________________
State of :______________________________

I, _______________________________, a Notary Public or Deputy Clerk, do hereby certify that on this _______ day of ___________________, 20____, _________________________________ and _____________________________personally
(name of applicant) (name of supervising attorney, if applicable)
appeared before me and swore and acknowledged to me that the statements contained herein are true and correct.

My Commission Expires: ______________ ______________________________________________
Notary Public or Deputy Clerk

Commission Number: ______________ ______________________________________________
Print or Type Name and Phone # of Notary

*****************************************************************************************************

*For use by the Circuit Court Clerk's Office Only*
SUBSCRIBER ID

_____________________________________________ PASSWORD _____________________ EXPIRATION DATE:___________

*Revised January 1, 2014*

**Mail this completed application with payment AND a copy of your BAR CARD , if applicable, to:**

**Clerk of the Circuit Court City of Richmond**
**Attn: OCRA Subscription**
**400 N. 9th Street, Richmond, VA 23219.**

**Make checks payable to: Edward F. Jewett, Clerk**

**The Subscriber's ID, password and expiration date with instructions will be e-mailed to you if approved.**

# SUBSCRIBER AGREEMENT FOR REMOTE ACCESS TO RICHMOND CITY CIRCUIT COURT CASE IMAGING SYSTEM

Officer of the Court Remote Access (hereinafter "OCRA")

This agreement is made and entered into by and between the Richmond City Circuit Court Clerk and the Subscriber. For the purposes of this Agreement, Subscriber shall include the following: a member in good standing of the Virginia State Bar, or a directly supervised staff member, a *pro hac vice* attorney authorized by the Court for purposes of the practice of law, and such governmental agencies as authorized by the Clerk.

## TERMS AND CONDITIONS OF THE AGREEMENT

### 1. TERM OF AGREEMENT

It is the intent of both parties to participate in a remote access program to commence upon the day of approval by both parties and to continue until terminated as provided herein.

### 2. APPLICATION

An application must be completed. The application must be approved by the Clerk before the Subscriber ID and Password will be issued.

### 3. DEFINITIONS

a. "Remote Access" means that inspection can be made without the need to physically visit the courthouse where the Court record is maintained.
b. "Subscriber" means any person authorized by the Clerk of the City of Richmond Circuit Court to have remote access to Court documents on its website.
c. "Inquiry Only Access" means access to only search for, view and print document images.
d. "OCRA" is the Supreme Court of Virginia's (SCV) Officer of the Court Remote Access System that enables remote viewing of documents in the SCV Case Imaging System.
e. "Clerk" shall include the City of Richmond Circuit Court Clerk's Office, its deputies, employees and agents.

### 4. SUBSCRIBER OPTIONS

The Clerk provides one option: access to an on-line database allowing inquiry-only access to currently scanned court cases.

### 5. DAYS AND HOURS OF OPERATION

The internet access to the Circuit Court documents will generally be available seven days a week, twenty-four hours a day, including all holidays, or otherwise at the discretion of the Clerk, except:

a. For periods of preventative maintenance;
b. For such other periods of remedial maintenance as may be required;
c. For operational issues beyond the control of the Clerk's Office; and
d. When intrusions against security are being remedied.

### 6. FEES

The subscription fee is a rate of $100.00 per year, per attorney, and $50.00 per year for each additional attorney or staff member supervised by the attorney, and is only available as a one-year subscription. Fees are charged at the discretion of the Clerk. If a fee is charged, payment is due upon the issuance of the User ID and Password. The Clerk reserves the right to suspend or terminate service to the Subscriber if payment is not received. All fees are subject to change.

### 7. SERVICES

The Clerk will provide the Subscriber with "inquiry-only" access to all currently scanned court case documents in its Case Imaging System except for juvenile, adoption, and sealed cases as well as those parts of a file that are marked confidential, restricted, sealed, private addendum or victim/witness. The servers that store the programs and data are maintained and managed by the Supreme Court of Virginia. The Clerk will assume responsibility for:

a. Providing the Subscriber with the current OCRA link on the Clerk's Circuit Court's Web Page at https://sharepoint.richmondgov.com/circuitcourt.
b. Providing the Subscriber with limited consultation on specific problems that arise in the use of the OCRA. The Clerk does not guarantee consultation results nor warrant or represent that all errors or problems will be corrected.
c. Limited customer support is only available Monday through Friday 8:45AM to 4:45PM excluding Richmond Circuit Court holidays.

**8. SUBSCRIBER OBLIGATIONS**

a. It is the responsibility of the Subscriber to provide the computer hardware and software and/or make modifications to their existing equipment that are necessary to effect access to OCRA.
b. Subscriber shall not use automated tools to navigate this website. Subscriber must manually enter any requests using the queries provided on the website.
c. The subscriber is responsible for ensuring that unauthorized personnel do not use the Subscriber's account. Unauthorized personnel for the purposes of the contract shall be any person, employee, support staff, or entity other than the Subscriber.
d. Information accessed from OCRA is for the use of the Subscriber in the ordinary course of their business. Subscriber has a duty to bring to the Clerk's attention any errors or omissions in the currently scanned Court case documents. Notification may be by electronic mail.
e. Subscriber shall not permit any data accessed by secure remote access to be sold or posted on any other Internet website or in any way redistributed to any third party, and the clerk reserves the discretion to deny secure remote access to ensure compliance with this provision.
f. The Subscriber is responsible for ensuring that the use of OCRA is conducted in a proper and legal manner. If the Subscriber is convicted of a crime, including but not limited to, a violation of the Virginia Computer Crimes Act (Section 18.2-152.1 of the Code of Virginia), arising out of their use of OCRA, the Clerk shall have the right to terminate this Agreement immediately. This shall not be construed as prohibiting the Clerk from pursuing any other remedy available to it for such breach.
g. The Subscriber is responsible for ensuring the security of the Subscriber's assigned username and password. If at any time the Subscriber has knowledge of compromised security of Subscriber's access credentials, Subscriber will IMMEDIATELY notify the Clerk in writing.
h. The Subscriber may NOT share passwords or login credentials with anyone for any reason. Access is STRICTLY one username login for one individual Subscriber.

**9. LIMITATION OF LIABILITY**

a. It is acknowledged by the Subscriber that the information to be accessed through OCRA is stored and maintained in the Clerk's Office database system. The Subscriber hereby relieves and releases the Clerk from liability or any and all damages resulting from the use of this service or interrupted service of any kind. The Subscriber further relieves and releases the City of Richmond, it's Mayor, and it's Council members, officers and their deputies, employees and agents from liability for any and all damages resulting from the use of this service or interrupted service of any kind.
b. The Subscriber hereby relieves, releases, indemnifies and holds harmless the Clerk, the City of Richmond, it's Mayor, and it's Council members, officers and their deputies, employees and agents from liability for any and all damages resulting from incorrect data or any other misinformation accessed from this service.
c. The Subscriber agrees that the Clerk shall not be liable for negligence or lost profits, resulting from any claim or demand against the Subscriber by any other party.
d. In no event will the Clerk be liable for consequential damages even if the Clerk has been advised of the possibility of such damages.
e. It is acknowledged by the Subscriber that the City of Richmond, its Mayor, its Council members, officers and their deputies, employees or agents are not a party to this Agreement and that the City shall incur no liability hereunder.
f. This Agreement creates no rights or privileges that are enforceable by anyone not a party to this Agreement.
g. The Subscriber also relieves and releases the Office of the Executive Secretary, Supreme Court of Virginia, employees and agents from liability for any and all damages resulting from interrupted service of any kind, any and all damage resulting from incorrect data or other misinformation accessed from this service, or any claim or demand against the subscriber by any other party.
h. The information or data accessed by Subscriber may or may not be the official governmental record required by law. In order to assure the accuracy of the date or information, the Subscriber should consult the official governmental record.
i. Nothing in this Agreement shall be construed as waiving the sovereign or governmental immunity of the Clerk of the Richmond Circuit Court, the City of Richmond, it's Mayor, and it's Council members, officers and their deputies, employees or agents.

**10. WARRANTIES**

Neither the Clerk, deputy clerks, employees, or agents, nor the City of Richmond, it's Mayor, its Council members, officers and their deputies, employees or agents expressly or impliedly warrant that the information or data accessed by Subscriber is accurate or correct. There are no expressed or implied warranties in connection with this service.

**11. ASSIGNMENT**
The Subscriber agrees not to assign any right or interest in this Agreement. Any attempt by the Subscriber to transfer by any means, any of the rights, duties, or obligations of this Agreement, is null and void.

**12. GOVERNING LAW**
This Agreement and/or any dispute arising there from shall in all respects be governed by and interpreted in accordance with the applicable law of the Commonwealth of Virginia.

**13. ENTIRE AGREEMENT**
This Agreement contains the entire understanding of the parties, there being no promises, warranties, or undertakings, written or oral, other than those expressly set forth herein. Furthermore, no modifications, alterations or amendments to this Agreement shall be valid unless in writing, and signed by all parties, except as otherwise provided herein. The Clerk may change the Agreement terms, at any time for any reason. If the Clerk changes the terms of the Agreement, Subscriber will receive notice and have the right to terminate this Agreement.

**14. NOTICE**
Any notice or written communication of any kind required or desired to be given or sent pursuant to the terms hereon shall be delivered in person, mailed postage prepaid by certified or registered mail, or mailed electronically, unless otherwise specifically stated herein.

**15. TERMINATION**

a. This Agreement may be terminated without cause by either party on fifteen (15) days written notice to the other. Subscriber remains responsible for payment of fees, pro rata, for services rendered or obligations incurred.
b. This Agreement may be terminated immediately by the Clerk for failure to comply with the terms of this Agreement, failure to make payments of charges or breach of Agreement.
c. This Agreement shall terminate immediately if the Commonwealth of Virginia or the City of Richmond fails to appropriate and continue funding for the services provided under this Agreement.

**16. SEVERABILITY**
If any provision (or part thereof) of this Agreement is found to be invalid, then it shall be stricken and have no effect. The remaining provisions shall continue in full force and effect.

# EXHIBIT 4

CLERK'S OFFICE OF THE CITY OF ROANOKE CIRCUIT COURT
BRENDA S. HAMILTON, CLERK

## APPLICATION FOR REMOTE ACCESS TO ROANOKE CITY CIRCUIT COURT CASE IMAGING SYSTEM (OCRA)

**This application must be completed by each individual user for access to case documents. A non-attorney applicant must be a directly supervised staff member of an Attorney who is an active Subscriber. The supervising Attorney must also sign this application. If you are a current subscriber to OCRA in another Circuit Court, you must furnish your user ID and Password below. The Supreme Court of Virginia only allows one username/password combination for subscribers to OCRA.**

The approval of this application is at the Clerk of the Circuit Court's discretion. By signing this application the Subscriber acknowledges and accepts the terms and conditions of *the Subscriber Agreement for Remote Access to Roanoke City Circuit Court Case Imaging System* as incorporated by reference herein. **All information below is mandatory (print clearly).**

**APPLICANT'S LAST NAME:** ______________________________

**APPLICANT'S FIRST NAME:** ______________________________

**GOVERNMENTAL AGENCY (IF APPLICABLE):** ______________________________

**STREET ADDRESS:** ______________________________

**CITY/STATE/ZIP:** ______________________________

**PHONE NUMBER:** ______________________________

**EMAIL ADDESS** ______________________________

**VSB NUMBER OF SUPERVISING ATTORNEY OR ATTORNEY APPLICANT:** ______________________________
**(INCLUDE A COPY OF YOUR Virginia State Bar Card)**

**UNITED STATES CITIZEN: ( ) YES ( ) NO**

**NAME OF ACTIVE ATTORNEY SUBSCRIBER BY WHOM YOU ARE DIRECTLY SUPERVISED:** ______________________________

**ARE YOU A CURRENT SUBSCRIBER TO OCRA IN ANOTHER COURT? ( ) YES ( ) NO**

**IF YES, PROVIDE YOUR: USER ID** ____________________ **PASSWORD** ____________________

**I certify that the information above is true and correct.**

**APPLICANT SIGNATURE:** ______________________________

**SIGNATURE OF SUPERVISING ATTORNEY:** ______________________________

City/County of: ____________________

State of: ____________________

I, ____________________, a Notary Public or Deputy Clerk, do hereby certify that on this ______ day of ______________, 20____,

____________________ and ______________________________ personally appeared before me and swore and acknowledged to me that the statements contained herein are true and correct.

My Commission Expires: ____________ ______________________________
Notary Public or Deputy Clerk

Commission Number: ____________ ______________________________
Print or Type Name and Phone # of Notary

*For use by the Circuit Court Clerk's Office Only*

SUBSCRIBER'S USER ID: ____________ PASSWORD ____________ EXPIRATION DATE: ________

Mail this completed application with payment to:

The Honorable Brenda S. Hamilton
Clerk of Circuit Court of Roanoke City
Post Office Box 2010
Roanoke, VA 24010

Make checks payable to: Roanoke City Clerk of Circuit Court

The Subscriber's ID, password and expiration date with instructions will be e-mailed to you if approved.

# SUBSCRIBER AGREEMENT FOR OFFICER OF THE COURT REMOTE ACCESS TO ROANOKE CITY CIRCUIT COURT CASE IMAGING SYSTEM

This Agreement ("Agreement") is entered into ____________________, 20 ____, by and between Roanoke City Circuit Court Clerk's Office (Clerk's Office) and:

____________________________________________________________ (Subscriber).

1. Terms of Agreement

It is the intent of both parties to participate in Officer of the Court Remote Access (OCRA) to certain Roanoke City Circuit Court Clerk's Office civil and criminal case file records stored in the Supreme Court of Virginia's Case Imaging System (CIS) to commence on the day of the User ID and Password are assigned and access to OCRA is activated and to continue until terminated as provided herein.

2. Subscriber Options

The Clerk provides one subscriber option: An online database system providing "inquiry-only" access to all currently scanned circuit court criminal and civil cases, except those cases or parts of cases that are Restricted, Confidential or Sealed.

3. Days and Hours of Operation

The secure remote access system known as OCRA will generally be available seven days a week, twenty-four hours a day, including holidays, except during periods:

a. Of preventive and remedial maintenance
b. Of operational issues beyond the control of the Clerk's Office
c. When intrusions against security are being remedied

4. Fees

Unless the Subscriber is employed by an authorized governmental agency, the fee for service is $150.00 per year per attorney, and $50.00 per year per staff member supervised by an attorney, and is only available as a one-year subscription.

Payment of the subscription fee shall be made by check made payable to Roanoke City Clerk of Circuit Court and shall accompany the signed application and subscription agreement. If the application is not approved, the check for the subscription fee will be returned to the applicant.

The Clerk's Office will not bill for this service. It is the responsibility of the Subscriber to pay the annual subscription fee prior to each anniversary of the date of acceptance of this agreement by the Circuit Court Clerk. If payment is not received by the due date, the Clerk's Office reserves the right to suspend or terminate service; however, if suspended or terminated, the Subscriber is not relieved from the obligations set forth in this agreement, up to and including the date upon which the service is discontinued.

Fees are charged at the discretion of the Clerk's Office. All fees are subject to change.

5. Services

The Clerk will provide the Subscriber with "inquiry-only" access to all currently scanned court case documents in its CIS except for those case files or parts of case files that are marked Confidential, Restricted or Sealed. The servers that store the programs and data are maintained and managed by the Supreme Court of Virginia. The Clerk will assume responsibility for:

a. Providing the Subscriber with the current OCRA link on the Circuit Court Clerk's Web Page at http://cisweb.courts.state.va.us/Ocra.
b. Providing the Subscriber with limited consultation on specific problems that arise in the use of OCRA. The Clerk does not guarantee consultation results nor warrant or represent that all errors or problems will be corrected.
c. Limited customer support is only available Monday through Friday 8:15AM to 4:45PM excluding Roanoke City Circuit Court holidays.

For questions regarding your user account or subscriber fees, please contact the Clerk's Office at (540)853-6702.

6. Subscriber's Obligations

a. It is the responsibility of the subscriber to purchase computer hardware and software and/or make modifications to his/her existing equipment that are necessary for the access to OCRA.
b. The Subscriber is responsible for ensuring that OCRA is used in a proper and legal manner. If the Subscriber is convicted of a crime, including, but not limited to a violation of the Virginia Computer Crimes Act (§18.2-152.1 of the Code of Virginia), arising out of the use of OCRA, such conviction shall constitute a material breach of the Agreement, and the Clerk's Office shall have the right to terminate this Agreement immediately. Nothing herein shall be construed as prohibiting the Clerk's Office from pursuing any other remedy available to it for such breach.
c. The Subscriber is responsible for ensuring that unauthorized personnel do not use the Subscriber's account. Unauthorized personnel for the purposes of the contract shall be any person, employee, support staff, or entity other than the Subscriber. The Subscriber may NOT share passwords or login credentials with anyone for any reason. Access is STRICTLY one username login for one individual Subscriber.
d. Information accessed from OCRA is for the use of the Subscriber in the ordinary course of their business as provided by Virginia Code §17.1-293. Subscriber has a duty to bring to the Clerk's attention any errors or omissions in the scanned court case documents. Notification may be by electronic mail to Brenda.Hamilton@roanokeva.gov.
e. The Subscriber shall not permit any data accessed by OCRA to be sold or posted on any other Internet website or in any way redistributed to any third party, and the Clerk reserves the discretion to deny secure remote access to ensure compliance with this provision.
f. The Subscriber is responsible for ensuring the security of the Subscriber's assigned username and password. If at any time the Subscriber has knowledge of compromised security of Subscriber's access credentials, Subscriber will IMMEDIATELY notify the Clerk by electronic mail to Brenda.Hamilton@roanokeva.gov.
g. Supervising attorneys shall be responsible for reporting termination of employment of any Subscriber under their supervision.
h. Subscribers shall be responsible for reporting any change in the information provided in the OCRA Application.

7. Limitation of Liability

a. It is acknowledged by the Subscriber that the City of Roanoke and it's City Council, employees or agents, volunteers or servants are not a party to the Agreement and that the City of Roanoke shall incur no liability hereunder.

b. The Subscriber relieves and releases the Clerk's Office and its Clerk, deputy clerks, employees or agents from liability and all damages resulting from interruption of service of any kind. The Subscriber further relieves and releases the City of Roanoke, its City Council, officers and their deputies, employees and agents from liability for any and all damages resulting from interrupted service of any kind. The Subscriber also relieves and releases the Supreme Court of Virginia, Office of the Executive Secretary and its employees and agents from liability for any and all damages resulting from interrupted service of any kind.

c. The Subscriber hereby relieves and releases and holds harmless the Clerk's Office and its Clerk, deputy clerks, employees or agents, the City of Roanoke, its City Council, officers and their deputies, employees or agents of any liability for any and all damages resulting from incorrect data or any other misinformation accessed from this service. The Subscriber also relieves and releases the Supreme Court of Virginia, Office of the Executive Secretary and its employees and agents from liability for any and all damages resulting from incorrect data or any other misinformation accessed from this service.

d. Subscriber agrees that the Clerk's Office, its Clerk, the City of Roanoke, its City Council, officers and their deputies, employees or agents shall not be liable for negligence or lost profits resulting from any claim or demand against the Subscriber to any other party. The Subscriber also relieves and releases the Supreme Court of Virginia, Office of the Executive Secretary and its employees and agents from liability for any and all damages resulting from a claim for negligence or lost profits against the Subscriber by any other party.

e. The information or data accessed by Subscriber may or may not be the official government record required by law. In order to assure the accuracy of the data or information, the Subscriber should consult the official government record.

f. In no event will the Clerk, deputy clerks, employees or agents by liable for consequential damages even if the Clerk's Office has been advised of the possibility of such damages.

g. Nothing in this agreement shall be construed as waiving the sovereign or governmental immunity of the Clerk of the Circuit Court for Roanoke City, the City Council, or their respective officers, deputy clerks, employees or agents.

8. Warranties

The Clerk's Office, its officials, employees, volunteers, servants or agents neither expressly not impliedly warrant that the information or data accessed by the Subscriber is accurate or correct. There are no expressed or implied warranties in connection with this service.

9. Assignment

The Subscriber agrees not to assign any right or interest in this Agreement. Any attempt by this Subscriber to transfer by any means, any of the rights, duties or obligations of this Agreement shall render this Agreement null and void.

10. Governing Law/Venue

This Agreement and/or any dispute arising there from shall in all respects by governed by and interpreted in accordance with the applicable law of the Commonwealth of Virginia, regardless of where actually accepted or delivered. This Agreement shall be deemed to have been accepted and delivered by the parties in the Commonwealth of Virginia.

Any and all suits for claims or for any and every breach or dispute arising out of this Agreement shall be maintained in the appropriate court of competent jurisdiction in the City of Roanoke, Virginia.

11. Entire Agreement

The Agreement contains the entire understanding of the parties, there being no promises, warranties, or undertakings, written or oral, other than those expressly set forth herein. Furthermore, no modifications, alterations or amendments to the Agreement shall be valid unless in writing, and signed by all parties, except as otherwise provided herein.

13. Notice

Any notice or written communication of any kind required or desired to be given or sent pursuant to the terms hereof shall be delivered in person or mailed postage prepaid by certified or registered mail, unless specifically stated herein. Any email notices specified in this Agreement shall be to the email address provided by the Subscriber in the application form, or if to the Clerk, to Brenda.Hamilton@roanokeva.gov.

14. Termination

Either party may terminate this agreement without cause within fifteen days email notice to the other.

This agreement may be immediately terminated by the Clerk for Subscriber's failure to provide correct or complete information on the application, failure to comply with the terms of this agreement, failure to make payments of fees or breach of agreement. In the event of such termination the Clerk shall notify the Subscriber by email.

The agreement shall terminate immediately if the Commonwealth of Virginia or the City of Roanoke fail to appropriate and continue funding for services provided under this Agreement.

In no event shall any refund of Subscriber fees be paid.

15. Definitions

1. "Public Access" means that the public can inspect and obtain a copy of the information in a court record.
2. "Remote Access" means that inspection can be made without the need to physically visit the courthouse where the court record is maintained.
3. "Subscriber" means members in good standing with the Virginia State Bar and their authorized agents, pro hac vice attorneys authorized by the court for purposes of the practice of law, and governmental agencies authorized by the Clerk of a Circuit Court to have OCRA.

16. Application

The Subscriber must complete an application for OCRA. The application must be approved by the Clerk's Office before the User ID and Password will be issued.

17. Severability

If any provision (or part thereof) of this agreement is found to be invalid, then it shall be stricken and have no effect. The remaining provisions of this agreement shall continue in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this agreement.

______________________________ ______________________
Signature Date

______________________________ ______________________
Printed/Typed Name Title

ROANOKE CITY CIRCUIT COURT CLERK'S OFFICE:

Brenda S. Hamilton, Clerk of Circuit Court

BY: ______________________________ Date: ______________________

# EXHIBIT 5

**CLERK'S OFFICE OF THE CITY OF BRISTOL VA CIRCUIT COURT**
**KELLY L. FLANNAGAN, CLERK**

# APPLICATION FOR REMOTE ACCESS TO CITY OF BRISTOL VA CIRCUIT COURT CASE IMAGING SYSTEM (OCRA)

**This application must be completed by <u>each individual user</u> for access to case documents. A non-attorney applicant must be a directly supervised staff member of an Attorney who is an active Subscriber. The supervising Attorney must also sign this application. If you are a current subscriber to OCRA in another Circuit Court, you must furnish your user ID and Password below. The Supreme Court of Virginia only allows one username/password combination for subscribers to OCRA.**

The approval of this application is at the Clerk of the Circuit Court's discretion. By signing this application the Subscriber acknowledges and accepts the terms and conditions of the *Subscriber Agreement for Remote Access to City of Bristol VA Circuit Court Case Imaging System* as incorporated by reference herein. **All information below is mandatory (print clearly)**

**APPLICANT'S LAST NAME**: ______________________________________________

**APPLICANT'S FIRST NAME**: ______________________________________________

**GOVERNMENTAL AGENCY (IF APPLICABLE):** ______________________________________

**STREET ADDRESS**: ______________________________________________

**CITY/STATE/ZIP**: ______________________________________________

**PHONE NUMBER**: ______________________________________________

**EMAIL ADDRESS**: ______________________________________________

**VSB NUMBER OF SUPERVISING ATTORNEY OR ATTORNEY APPLICANT:** ____________________
**(Include a copy of your Virginia State Bar card)**

**UNITED STATES CITIZEN: ( ) YES ( ) NO**

**NAME OF ACTIVE ATTORNEY SUBSCRIBER BY WHOM YOU ARE DIRECTLY SUPERVISED:**
______________________________________________

**ARE YOU A CURRENT SUBSCRIBER TO OCRA IN ANOTHER COURT? ( ) YES ( ) NO**

**IF YES PROVIDE YOUR: USER ID**________________ **PASSWORD**______________

I certify that the information above is true and correct.

**APPLICANT SIGNATURE**: ______________________________________________

**SIGNATURE OF SUPERVISING ATTORNEY:** ________________________________

City / County of: ____________________

State of :________________________

I, ________________________, a Notary Public or Deputy Clerk, do hereby certify that on this _______ day of

________________, 20____, ________________________ and ______________________personally appeared before me and swore and acknowledged to me that the statements contained herein are true and correct.

My Commission Expires: ____________ ________________________________
Notary Public or Deputy Clerk

Commission Number: ____________ ________________________________
Print or Type Name and Phone # of Notary

*******************************************************************************************

*For use by the Circuit Court Clerk's Office Only*

SUBSCRIBER'S USER ID :______________________ PASSWORD ______________ EXPIRATION DATE:____________

**Mail this completed application with payment to:**

**Clerk of the Circuit Court**
**City of Bristol, VA**
**497 Cumberland Street**
**Courthouse Room 210**
**Bristol, VA 24201**

**Make checks payable to: Bristol VA Circuit Court Clerk**

**The Subscriber's ID, password and expiration date with instructions will be e-mailed to you if approved.**

# SUBSCRIBER AGREEMENT FOR OFFICER OF THE COURT REMOTE ACCESS TO CITY OF BRISTOL VA CIRCUIT COURT CASE IMAGING SYSTEM

This Agreement ("Agreement") is entered into __________________, 20___, by and between Bristol VA Circuit Court Clerk's Office and -
____________________________________________________________, (Subscriber).

1. Terms of Agreement

It is the intent of both parties to participate in Officer of the Court Remote Access (OCRA) to certain Bristol VA Circuit Court Clerk's Office civil and criminal case file records stored in the Supreme Court of Virginia's Case Imaging System (CIS) to commence on the day the User ID and Password are assigned and access to OCRA is activated and to continue until terminated as provided herein.

2. Subscriber Options

The Clerk provides one subscriber option: An online database system providing "inquiry-only" access to all currently scanned circuit court criminal and civil cases, except those cases or parts of cases that are Restricted, Confidential or Sealed.

3. Days and Hours of Operation

The secure remote access system known as OCRA will generally be available seven days a week, twenty-four hours a day, including holidays, except during periods:

a. Of preventive and remedial maintenance
b. Of operational issues beyond the control of the Clerk's Office
c. When intrusions against security are being remedied

4. Fees

Unless the Subscriber is employed by an authorized governmental agency, the fee for service is ________ per year per attorney, and $50.00 per year per staff member supervised by an attorney, and is only available as a one-year subscription.

Payment of the subscription fee shall be made by check made payable to Bristol VA Circuit Court Clerk and shall accompany the signed application and subscription agreement. If the application is not approved the check for the subscription fee will be returned to the applicant.

The Clerk's Office will not bill for this service. It is the responsibility of Subscriber to pay the annual subscription fee prior to each anniversary of the date of acceptance of this agreement by the Circuit Court Clerk. If payment is not received by the due date, the Clerk's Office reserves the right to suspend or terminate service; however, if suspended or terminated, the Subscriber is not relieved from the obligations set forth in this agreement, up to and including the date upon which the service is discontinued.

Fees are charged at the discretion of the Clerk's Office. All fees are subject to change.

5. Services

The Clerk will provide the Subscriber with "inquiry-only" access to all currently scanned court case documents in its CIS except for those case files or parts of case files that are marked Confidential, Restricted or Sealed. The servers that store the programs and data are maintained and managed by the Supreme Court of Virginia. The Clerk will assume responsibility for:

a. Providing the Subscriber with the current OCRA link on the Circuit Court Clerk's Web Page at http://www.bristolva.org/index.aspx?NID=468.
b. Providing the Subscriber with limited consultation on specific problems that arise in the use of OCRA. The Clerk does not guarantee consultation results nor warrant or represent that all errors or problems will be corrected.
c. Limited customer support is only available Monday through Friday 9:00AM to 5:00PM excluding Bristol VA Circuit Court holidays.

For questions regarding your user account or subscriber fees, please contact the Clerk's Office at (276) 645-7321.

6. Subscriber's Obligations

a. It is the responsibility of the Subscriber to purchase computer hardware and software and/or make modifications to his/her existing equipment that are necessary for the access to OCRA.
b. The Subscriber is responsible for ensuring that OCRA is used in a proper and legal manner. If the Subscriber is convicted of a crime, including, but not limited to a violation of the Virginia Computer Crimes Act (§18.2-152.1 of the Code of Virginia), arising out of the use of OCRA, such conviction shall constitute a material breach of the Agreement, and the Clerk's Office shall have the right to terminate this Agreement immediately. Nothing herein shall be construed as prohibiting the Clerk's Office from pursuing any other remedy available to it for such breach.
c. The Subscriber is responsible for ensuring that unauthorized personnel do not use the Subscriber's account. Unauthorized personnel for the purposes of the contract shall be any person, employee, support staff, or entity other than the Subscriber. The Subscriber may NOT share passwords or login credentials with anyone for any reason. Access is STRICTLY one username login for one individual Subscriber.
d. Information accessed from OCRA is for the use of the Subscriber in the ordinary course of their business as provided by Virginia Code §17.1-293. Subscriber has a duty to bring to the Clerk's attention any errors or omissions in the scanned court case documents. Notification may be by electronic mail to kflannagan@vacourts.gov.
e. The Subscriber shall not permit any data accessed by OCRA to be sold or posted on any other Internet website or in any way redistributed to any third party, and the Clerk reserves the discretion to deny secure remote access to ensure compliance with this provision.
f. The Subscriber is responsible for ensuring the security of the Subscriber's assigned username and password. If at any time the Subscriber has knowledge of compromised security of Subscriber's access credentials, Subscriber will IMMEDIATELY notify the Clerk by electronic mail to kflannagan@vacourts.gov.
g. Supervising attorneys shall be responsible for reporting termination of employment of any Subscriber under their supervision.
h. Subscribers shall be responsible for reporting any change in the information provided in the OCRA Application.

7. Limitation of Liability

a. It is acknowledged by the Subscriber that the City of Bristol, VA, and its employees or agents, volunteers or servants are not a party to the Agreement and that the City of Bristol, VA, shall incur no liability hereunder.
b. The Subscriber relieves and releases the Clerk's Office and its Clerk, deputy clerks, employees or agents from liability for any and all damages resulting from interruption of service of any kind. The Subscriber further relieves and releases the City of Bristol, VA, its officers and their deputies, employees and agents from liability for any and all damages resulting from interrupted service of any kind. The Subscriber also relieves and releases the Supreme Court of Virginia, Office of the Executive Secretary and its employees and agents from liability for any and all damages resulting from interrupted service of any kind.
c. The Subscriber hereby relieves and releases and holds harmless the Clerk's Office and its Clerk, deputy clerks, employees or agents, the City of Bristol, VA, its officers and their deputies, employees or agents of any liability for any and all damages resulting from incorrect data or any other misinformation accessed from this service. The Subscriber also relieves and releases the Supreme Court of Virginia, Office of the Executive Secretary and its employees and agents from liability for any and all damages resulting from incorrect data or any other misinformation accessed from this service.
d. Subscriber agrees that the Clerk's Office, its Clerk, the City of Bristol, VA, its officers and their deputies, employees or agents shall not be liable for negligence or lost profits resulting from any claim or demand against the Subscriber by any other party. The Subscriber also relieves and releases the Supreme Court of Virginia, Office of the Executive Secretary and its employees and agents from liability for any and all damages resulting from a claim for negligence or lost profits against the Subscriber by any other party.
e. The information or data accessed by Subscriber may or may not be the official government record required by law. In order to assure the accuracy of the data or information, the Subscriber should consult the official government record.
f. In no event will the Clerk, deputy clerks, employees or agents be liable for consequential damages even if the Clerk's Office has been advised of the possibility of such damages.
g. Nothing in this agreement shall be construed as waiving the sovereign or governmental immunity of the Clerk of the Circuit Court of Bristol, VA, or their respective officers, deputy clerks, employees, or agents.

8. Warranties

The Clerk's Office, its officials, employees, volunteers, servants or agents neither expressly nor impliedly warrant that the information or data accessed by the Subscriber is accurate or correct. There are no expressed or implied warranties in connection with this service.

9. Assignment

The Subscriber agrees not to assign any right or interest in this Agreement. Any attempt by this Subscriber to transfer by any means, any of the rights, duties or obligations of this Agreement shall render this Agreement null and void.

10. Governing Law/Venue

This Agreement and/or any dispute arising there from shall in all respects be governed by and interpreted in accordance with the applicable law of the Commonwealth of Virginia, regardless of where actually accepted or delivered. This Agreement shall be deemed to have been accepted and delivered by the parties in the Commonwealth of Virginia.

Any and all suits for any claims or for any and every breach or dispute arising out of this Agreement shall be maintained in the appropriate court of competent jurisdiction in the City of Bristol, Virginia.

11. Entire Agreement

The Agreement contains the entire understanding of the parties, there being no promises, warranties, or undertakings, written or oral, other than those expressly set forth herein. Furthermore, no modifications, alterations or amendments to the Agreement shall be valid unless in writing, and signed by all parties, except as otherwise provided herein.

13. Notice

Any notice or written communication of any kind required or desired to be given or sent pursuant to the terms hereof shall be delivered in person or mailed postage prepaid by certified or registered mail, unless specifically stated herein. Any email notices specified in this Agreement shall be to the email address provided by the Subscriber in the application form, or if to the Clerk, to kflannagan@vacourts.gov.

14. Termination

Either party may terminate this agreement without cause with fifteen days email notice to the other.

This agreement may be immediately terminated by the Clerk for Subscriber's failure to provide correct or complete information on the application, failure to comply with the terms of this agreement, failure to make payments of fees or breach of agreement. In the event of such termination the Clerk shall notify the Subscriber by email.

The agreement shall terminate immediately if the Commonwealth of Virginia or the City of Bristol VA Circuit Court Clerk's Office fail to appropriate and continue funding for services provided under this Agreement.

In no event shall any refund of Subscriber fees be paid.

15. Definitions

1. "Public Access" means that the public can inspect and obtain a copy of the information in a court record.
2. "Remote access" means that inspection can be made without the need to physically visit the courthouse where the court record is maintained.
3. "Subscriber" means members in good standing with the Virginia State Bar and their authorized agents, pro hac vice attorneys authorized by the court for purposes of the practice of law, and governmental agencies authorized by the Clerk of a Circuit Court to have OCRA.

16. Application

The Subscriber must complete an application for OCRA. The application must be approved by the Clerk's Office before the User ID and Password will be issued.

17. Severability

If any provision (or part thereof) of this agreement is found to be invalid, then it shall be stricken and have no effect. The remaining provisions of this agreement shall continue in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this agreement.

______________________________ ______________
Signature Date

______________________________ ______________
Printed/Typed Name Title

CITY OF BRISTOL VA CIRCUIT COURT CLERK'S OFFICE:

Kelly L. Flannagan, Clerk of Circuit Court

By: ______________________________ ______________
Date

# EXHIBIT 6




# REPORT: Access to Public Records in Virginia Courts

Traveling more than 1,000 miles over the course of five days, Courthouse News journalists visited 25 Virginia circuit courts to report on civil complaints filed in those courthouses. Their goal was to demonstrate what it would take to cover the public record of the Virginia courts by visiting each courthouse in person.

The trip took the journalists down the western edge of the Commonwealth and into the small counties of Southwest Virginia. During five days from September 19 through September 23, 2022, they started when one clerk's office opened and finished their work late in the afternoon as the last clerk's office closed.

In all those 25 courts, the journalists printed a total of 10 recent complaints that were sufficiently newsworthy to include in Courthouse News new litigation reports, out of hundreds of lesser matters.

During their travels, they also found a network of working clerks who wanted to give reporters online access but said they could not. Nearly all the clerks freely gave public access to a "vault" that contained paper land records and often civil case records, while also serving as a historical library for the court. Within the vaults were computer terminals that displayed an icon that says "CPS," standing for Circuit Public Search, a program developed and maintained by the Richmond-based Office of the Executive Secretary, often referred to as OES. The records seen through the Circuit Public Search program were the same records that can be seen online through a program called Officer of the Court Remote Access, or OCRA, also developed and maintained by the Executive Secretary.

The journalists discovered that the local clerks were caught in a web of payments to the Executive Secretary, contracts with the Executive Secretary, and rules made by the Executive Secretary. All of which prevented the clerks from allowing the journalists to sign up for online access. The Executive Secretary's dominance of access was so pervasive that one clerk compared the Executive Secretary's software to the Wizard of Oz because it controlled "everything."

As Mid-Atlantic Bureau Chief Ryan Abbott, Northeast Bureau Chief Adam Angione and California-based Editor Bill Girdner traveled from one court to the next, word spread and the journalists were expected by clerks who said, "I heard." It emerged that the clerks and officials from the Executive Secretary's office had been having active online discussions about the journey of the journalists and their request to subscribe for online access. While the full content of the discussion was not known, the results were evident: the clerks were convinced they did not have authority to grant journalists access to OCRA.

A typical exchange took place in Roanoke City Circuit Court where the three Courthouse News journalists approached the clerk's counter and were quickly directed to a waiting area around the corner from the office of Clerk Brenda Hamilton. They sat down in a row in seats along the wall and she soon came striding around the corner.

"Are you officers of the court!" she demanded.

They answered in rough unison that they were not, they were journalists.

"I can't give it to y'all, she said. "Sorry Harry. Too big a weight to carry!" She said Supreme Court rules prevented her from giving online access to journalists.

Another telling exchange took place in Salem City Circuit Court where Clerk Chance Crawford listened carefully to their request for access online. "I'm not saying I totally disagree with you," he said, measuring his words. "I can't allow it unless we get something from the federal court with regards to your lawsuit that it's OK."

**Frederick County Circuit Court, Winchester City Circuit Court**



*The Frederick County and Winchester City Courthouse.*

The 25-court trip started in Frederick County, the northern most county of Virginia, where both the city and county courts are located in the same building. Both clerks gave access to civil records on a local terminal and both denied access online.

At the counter in Winchester City Circuit Court, a deputy clerk named Anne showed the reporters behind the counter into the records area. She gave Courthouse News bureau chief Ryan Abbott, whose bureau includes Virginia, a form to sign up for OCRA, but added, "It's for attorneys. I don't know what you do as reporters."

Abbott printed out one complaint and paid a copy fee of $.50 per page. Around 521 civil cases had been filed in the current year in the county court, and 429 in the city court. On the way out of town, the three journalists stopped by the historic home of Patsy Cline whose songs were played and sung throughout the Angione household as he grew up in Ohio.

**Shenandoah County Circuit**



*The Shenandoah County Courthouse.*

The journalists drove south on Virginia State Route 628 past several wineries and over Turkey Run creek until they arrived at the courthouse in Woodstock. They were buzzed into a large, open area filled with land records. County Clerk Sarona Irvin said OCRA is only for attorneys. She referred to "liability" and "the Legislature" as reasons for refusing online access. "I would rather you had online access," she added. "It's more convenient."

Abbott printed out two newsworthy complaints from the Circuit Public Search program on a local terminal. The court had received 970 new civil case so far in 2022. Three women offered free Bible lessons on the sidewalk in front of the courthouse. The journalists had lunch at the Woodstock Café across the street.

**Rockingham County Circuit Court**



*Dream Lake, inside the Luray Caverns in Virginia's Blue Ridge Mountains.*

They drove south on winding roads toward the Blue Ridge Mountains and halted to see the 7-million-year-old rock formations of the Luray Caverns, including the "Dream Lake" reflecting pool. They then continued south crisscrossing the Shenandoah River before heading west on Route 33 into Harrisonburg where Rockingham County Circuit Court is located.

A form provided by a deputy clerk specified that the applicant must be either a Virginia attorney or working directly under same. Abbott printed one complaint out from the public search terminal in the vault and paid the copy fee. The court has seen 2,204 civil cases filed in 2022.

**Augusta County Circuit Court**



*The Augusta County Courthouse.*

The journalists continued ever south on routes 253 and 11 through the manicured campus of James Madison University and past the imposing barracks of the Augusta Military Academy before arriving at the Augusta County Clerk's Office in Staunton. Deputy Clerk Gina Coffey said "the code" would not allow her to sign journalists up to OCRA. She said a bar number is required but noted that only a business license is needed for online access to Secure Remote Access which holds marriage records, deeds, financial reports and judgments.

While searching the Circuit Public Search program on a local terminal, Abbott pointed out that docket information, which is available to the public online, describes many complaints simply as "catch-all" complaints and also imposes a character limit on party information such that clerks often omit some party names. From the terminal, where cases numbers had reached 1854 so far in 2022, Abbott printed one recent complaint. The cashier took his payment.

On the counter next to her was a stack of fliers about a local ballot measure to decide whether the new courthouse should be built in the current courthouse location or in nearby Verona. Asked by Abbott which she thought best, the cashier pointed to the Verona option, saying, "Cheaper."

**Staunton City Court**

The journalists were promptly told by a deputy clerk that OCRA is only for attorneys. The civil case numbers had reached 455. The clerk's office was closing as they left, and they stopped in Staunton for the night. They had dinner at the Mill St. Grill where they were served by a waitress named Shea, after the stadium, who was monitoring the Mets game on a phone in her jean pocket, while working.

**Rockbridge County Circuit Court**



*On the road from Rockbridge to Botetourt and Bland counties, Virginia.*

Tuesday morning, the journalists drove south on Route 252 through a rolling terrain of green hills, old wood barns and prosperous farms of the Shenandoah Valley. After an hour, they arrived at Rockbridge County Circuit Court where a group of clerks concluded, "Only attorneys can have access to OCRA." But they gave Abbott an application form anyway. Abbott printed out one complaint. Civil case numbers had reached 566 for the year.

**Botetourt County Circuit Court**



*The Botetourt County Courthouse.*

The journalists drove south along Broad Creek and crossed the James River, then continued on Highway 220 toward Fincastle, where they arrived at Botetourt County Circuit Court. "Only attorneys," said the counter clerk in answer to their question. They were then buzzed into the vault which, as in almost all the courthouses, doubled as a historical library. Alongside the public terminal, a long rifle owned by a man born in 1805 was mounted on the wall, and on a shelf was a book about Virginia courthouses.

Abbott printed out one complaint and paid for it at the counter. The civil case numbers had reached 400. They had lunch at the Pie Shoppe across the street.

**Bland County Circuit Court**



*The Bland County Courthouse.*

From Fincastle, they drove southwest on forested roads through the New River Valley where leaves were turning to yellow and orange, past Coal Bank Hollow Road and Dismal Falls, to arrive two hours later at Bland County Circuit Court.

A deputy clerk named Lesa Berry let them into the records room, where Abbott checked the recent civil cases through a public terminal. "It's a public record," said Berry, referring to the civil complaints. She added, "Most people come in to check deeds and land records." Berry texted the clerk to ask about OCRA access for journalists, then returned to tell them, "The site would have to approve it."

Civil case numbers had reached 235 for the year.

**Tazewell County Circuit Court**




*The Tazewell County Courthouse, and bureau chiefs Angione and Abbott (seated) inside its "vault."*

The journalists crossed the Appalachian Trail on North Scenic Highway and then headed west hugging Wolf Creek, before taking Route 61 south to arrive at Tazewell County Circuit Court.

At the counter a clerk told Abbott online access to OCRA is only for attorneys. Posted next to her was a notice saying fines can now be paid online. In the vault, Abbott checked the public search program on the local terminal where case numbers had reached 1035 for the year.

Now deep into Southwest Virginia, the journalists drove up the switchbacks of the Back of the Dragon. The narrow and winding road went through dense forest and emerged to overlooks on a vast green valley with occasional farms. They reached Marion after Smyth County Circuit Court had closed and spent the night.

**Smyth County Circuit Court**



*Back of the Dragon, Virginia.*

Wednesday morning, shortly after the court opened, the journalists arrived at the courthouse and were directed into the vault where terminals provided local access to civil records. On the wall was a framed photo of the Smyth County Bar Association in 1985. There were 19 lawyers in the photo, 18 men and 1 woman.

Referring to OCRA, Clerk John Graham noted, "It's a subscription service so it's not on the internet." Nevertheless, he said, "the code" prevented him from granting press access online. The case numbers had reached 789 for the year.

**Washington County Circuit Court**



*The Washington County, Virginia Courthouse.*

The journalists took Lee Highway south to Abingdon where Clerk Patricia Moore told them that most local lawyers still file their papers in the narrow lobby, adding, "Some days, you can't swing a dead cat around here without hitting an attorney."

She explained the wide-ranging role of the clerks in a county she described as "hillbilly adjacent." During the pandemic, she was called to attest to the marriage of elderly constituents as they lay on their death beds, to help the transition of an estate to a common law spouse.

She was also asked to pull deeds and drop them off for constituents, and occasionally acted as a "defacto probate judge." The clerk was also creating a set of tik-tok videos titled "Did You Know," aimed at the people of Washington County, telling them how to file their documents and handle juror duties. But she would not let the journalists subscribe. "OCRA is only available to attorneys," she said. "The Supreme Court has not offered it to the public. It's just for officers of the court."

She added that she had heard ahead of time what the journalists were looking for. She said she would love to take their subscription fee as her budget is so tight that she had to go to Costco and pay for the blue tape that marked the floor during the pandemic, showing where filers should stand. Abbott printed two complaints and paid the fee. Civil case numbers had reached 1433 for the year.

**Russell County Circuit Court**



*The Russell County Courthouse in Virginia.*

Turning north, the reporters drove Route 19 through Hansonville and Willis until they arrived at Russell County Circuit Court. They made their way past the stately façade of the courthouse and went around the corner to a small, non-descript doorway off the back parking lot. It was 12:03 by then, and the uniformed officers at the entrance said the clerk's office was closed for lunch.

Later contacted by bureau chief Abbott, Clerk Ann McReynolds said, "Only attorneys and probation officers and people like that can sign up for OCRA." Asked why that was, she said, "Because that's how it's always been since it started." Abbott pointed out that the clerk in Alexandria Circuit Court allows journalists to subscribe for online access to civil case records, McReynolds simply repeated, "OCRA is just for attorneys."

**Lee County Circuit Court**



*On the road to Lee County, Virginia.*

The journalists drove west on U.S. Highway 58, as the houses and farms grew smaller and the Baptist churches grew more frequent, to arrive at Lee County Circuit Court.

Clerk Rene Lamey invited them into her office. She had been working in the clerk's office in Lee County at the furthest west end of Virginia for over 20 years. "Lee County is where Virginia starts," she said. "So we try to set a high bar."

She described herself as a working clerk, not an administrator, while her phone rang, her watch buzzed, an i-pad lay in a silver case on her desk, a cell phone played a pop song as it rang, and her computer screen was open to an ongoing discussion, in addition to which a uniformed officer came in needing a signature.

She painted a dismal picture of her court's finances and consulted her budget to confirm that she pays the Executive Secretary an annual software maintenance fee of $3900 plus annual payments for hardware and software of $11,000. OCRA subscriptions bring in $100 per subscriber but she has only 11 paying subscribers. Her limit on the number of subscriber slots is 35 and she is required to ask the Executive Secretary to increase her allotment if she needs more.

She tentatively agreed to allow Abbott to sign up for OCRA online. But the subscriber interface – controlled by the Executive Secretary -- requires the subscriber to certify he or she is a member of the Virginia bar or a government official, in order to proceed to a review of court records. Abbott was neither and could not make the certification. Therefore he could not review civil circuit court records for Lee County online.

Abbott and Angione checked the public search program on the local terminal in the clerk's vault where Clerk Lamey had assembled an old hand stamp and other courthouse artifacts in a small historical display. Case numbers had reached 215 so far in 2022.

**Scott County Circuit Court**

Forty-five minutes east on Highway 58, over the Clinch River and down Daniel Boone Road, the journalists arrived at the courthouse in Gate City. They were allowed into the public records vault and could use the Circuit Public Search program from there. But the deputy clerk at the counter said "only attorneys" can sign up for online access to OCRA. The clerk himself, Beau Taylor, was not in his office that day. But he later talked with Abbott, and said, "Look, if the judge says I'm not breaking the law I'd be the first in the state to sign y'all up."

Civil case numbers had reached 616 for the year. The journalists finished the day driving another 30 miles east to Bristol, where they stayed the night in a hotel on the Virginia side of State Street but had dinner on the Tennessee side.

**Bristol City Circuit Court**



*The Bristol City Courthouse in Virginia.*

"I heard," said Clerk Kelly Flannagan in the Bristol City court on Thursday morning when asked if she already knew the purpose of the journalists' visit. She said the civil complaints are "public records" and noted that she has a good relationship with the local press.

Flannagan confirmed that the docketing software provided by the Executive Secretary limits the number of characters when typing in the parties. She also confirmed that, like other Commonwealth clerks, she creates bar numbers for officials who are not attorneys, so they can use OCRA online. The clerk said her budget is so tight that if the wood table behind her broke, she would have to put it back together with super glue.

Nevertheless she refused to take their offer to pay the subscription fee for OCRA access. "Reporters are not officers of the court. Until that language is changed, I follow the rules." Asked what remedy the journalists had, she referred them to the Office of the Executive Secretary, saying, "Contact OES to figure it out."

Abbott printed out one complaint. The case numbers for the year stood at 544.

**Grayson County Circuit Court**



*Inside the Grayson County Courthouse vault.*

Taking Interstate 81 north to Chilhowie, then south on Route 762, past Little Granny's Lane, and east on Highway 58, they arrived at Grayson County Circuit Court which sits atop a hill in the town of Independence.

A deputy clerk said, "OCRA is only for attorneys," and said the clerk herself was in court. The vault, open to the public, contained an expansive collection of public records. The search program on the local terminal showed case numbers had reached 144 for the year.

In a courtroom up one floor, Clerk Susan Herrington was sitting at the bench to one side of the judge considering the case against a man stopped in his truck carrying a 9 mm. handgun and a blue pipe containing crystal methedrine. The judge sentenced him to one year's probation.

**Wythe County Circuit Court**



The Wythe County, Virginia Courthouse.

Going north on Highway 21, the journalists drove past Cripple Creek and arrived at Wythe County Circuit Court where Clerk Jeremiah "Mo" Musser got up from his desk as the journalists walked in. A big man in a loose blue suit and tie, he said online access to OCRA is restricted. "It's officers of the court. Probation has it, commonwealth attorneys have it."

"*Why* won't they let you *have* it?" he added. Musser went back to his office to find the amount charged by OES to run the OCRA software. "Twenty nine hundred!" he said in a loud voice when he came back.

Describing the Executive Secretary's software, he said, "It's like the Wizard of Oz. It controls everything."

Musser described himself as "working clerk" and not an "administrator" like the clerks in the Eastern Virgina courts, such as Chesapeake City Circuit Court, who "mostly handle HR." Before the journalists left, he regaled them with stories of his run for the clerkship. He pointed to the spot behind his knee where he was hit and knocked down by a billy goat. He described the sound of a rooster – "like a helicopter" – attacking his head before he fought it off with his cowboy hat. He roughly pantomined being mooned through a glass door at a drug-using house by a very large man. All that he said was while seeking permission to plant campaign signs. The owner of the rooster, he said, watched it all from his second floor window and told him he wished he had a video. "He told me to come on back and I could put up a sign."

The case numbers in Mo's court had reached 859 for the year.

**Pulaski County Circuit Court**




*Draper's Valley in Virginia.*

A half-hour east on the Lee Highway took the journalists down into Draper's Valley and past Calfee Park, home of the Appalachian League's Pulaski River Turtles, to the circuit court. A deputy clerk named Terri Hagen told the journalists she had heard they were traveling in the region.

She said she could not let them subscribe to OCRA online. "You have to have a bar number," she said. "The programs we bought were set up for officers of the court so they don't have to come into court." The yearly rate for online OCRA access is $200 per year, she said, adding, "We have a lot of subscribers."

The journalists checked the Circuit Public Search program on a local terminal in the clerk's vault. Case numbers stood at 464 for the year.

**Radford City Circuit Court**



*Inside the Radford County Courthouse vault.*

From Pulaski Town, it was a short drive northeast on Route 11 to Radford City Circuit Court, where a counter clerk said OCRA access online is only for attorneys. The public search program on the local terminal in the vault showed that case numbers had reached 184 for the year.

**Montgomery County Circuit Court**



*Virginia Tech Hokies play the West Virginia Mountaineers.*

Continuing northeast on the same route, the reporters arrived in Christiansburg where they entered a big, modern courthouse. "Only attorneys can sign up for it," said the intake clerk at the counter.

In addition to public search terminals, the clerk's extensive vault held paper case records going back to 1792. An attendant buzzed the journalists into a small side room that held particularly significant documents, including a census from the early 1800s that recorded the number of free men and women and slave men and women in each Virginia county. Case numbers seen on the search terminal had reached 1561 for the year.

The journalists then drove on to Blacksburg to attend a football game between the Virginia Tech Hokies and the West Virginia Mountaineers. The reporters found themselves walking to the stadium alongside the Virginia Tech Core of Cadets as they called cadence, including, "With that bayonet in my hand, I want to be a stabbin' man," all the way into the game. Virginia Tech committed a number of mistakes and penalties and lost the game 33-10.

Past midnight, the journalists arrived at the Liberty Trust Hotel, a refurbished bank in Roanoke, and spent the night.

**Roanoke City Circuit Court**





*Roanoke City Circuit Court and Bread Craft baguettes.*

Friday morning, shortly after the clerk's office opened in Roanoke City Circuit Court – housed in a well-appointed structure betraying the affluence of the region -- the journalists arrived and asked at the counter about subscribing for online access to OCRA. They were promptly directed to seats along the wall next to Clerk Brenda Hamilton's office, just past a sign marked "Public Vault." They sat all in a row and waited.

Hamilton soon strode around the corner and demanded, "Are you officers of the court!" More or less in unison they answered that no, they were journalists. "I can't give it to y'all. Sorry Harry. Too much weight to carry!" Hamilton continued, "Can't do it. Sorry. That's the Supreme Court rules. It's all set up there in the Supreme Court."

She agreed that she pays a fee for the OCRA software but did not have the amount at hand. "Nothing in life is free," she said. "Not even from the Supreme Court." She told the journalists that they can request documents that her office will send them. "You can have anything you want." But the reporters must call first, then send a check, and then wait for the requested document to be mailed back.

In the public vault, a terminal showed civil case numbers had reached 1840 for the year. Roanoke is a town of small shops and boutiques and is clearly in the midst of an economic resurgence. The journalists stopped for breakfast at Bread Craft, a small bakery that makes remarkably faithful artisanal French baguettes which they consumed with butter and black coffee.

**Roanoke County Circuit Court**

The journalists drove west on city streets to Salem where the Roanoke County Circuit Court is located. A Virginia Tech pennant hung high on a central pillar in the clerk's office. "You'd have to have a bar number. It's for attorneys," said Deputy Clerk Jill Camilletti. She conceded probation and parole officers also have access. "They fall into the group that's OK."

She said her office's online access to civil records costs $120 and the service has at least 50 subscribers. She pays the Executive Secretary roughly $35,000 per year, she estimated, for software maintenance and for hardware. When her office has difficulties with the software, she deals with a team from the Executive Secretary's office. She said the teams are broken up by the software programs. "Different teams have responsibilities." Case numbers had reached 1150.

**Salem City Circuit Court**



*On the road from Salem to Floyd County.*

Walking the short distance to Salem City Circuit Court, the journalists were ushered into Clerk Chance Crawford's office. "I was waiting on ya," he said with a wry smile. He said the clerks' intranet carried news of their journey.

In answer to their request for online access, Clerk Crawford said, "Not yet." And as they discussed the right of public access to court records, he said, "I'm not saying I totally disagree with you. I can't allow it unless we get something from the federal court with regards to your lawsuit that it's OK."

After a wide-ranging and friendly conversation that included the politics of the region, the resurgence of Roanoke, and an analysis of the previous night's Virginia Tech game, the journalists left for their 25th and final court. Case numbers in Salem City had reached 290 for the year.

**Floyd County Circuit Court**



*Filling up the tank before arriving at the Floyd County Courthouse.*

They traveled south on Route 221 along a winding mountain road through Poages Mill and Copper Hill, stopping only to take on fuel, before reaching the Floyd County Courthouse. "I've heard why you're coming," said Clerk Rhonda Vaughn, getting up from her desk behind the counter in the small clerk's office. "OCRA we provide to officers of the court. That's the name of the program.

That's how we set up our agreements." She said about 9 local attorneys and other officials were signed up for online access to civil records. As to why reporters could not sign up, she said, "It's policy."

The journalists then checked the vault of public records which, like almost all the rest of the courts they visited, was open to the public. Through a terminal in the vault, Abbott went to the Circuit Public Search site and checked for recent civil complaints but found none that were newsworthy. As they were on their way out, the clerk commented about the online access, "It's very little used. I look at the usage, at the log-ins, and they don't use it much." New civil case numbers had reached 99.

Asked about the region, she said Floyd County is now home to a number of musicians and is becoming an artist destination. With that, the reporters said she could inform the rest of the clerks communicating through their intranet site that the press visits had come to an end. They waved and said, "We're outta here."

**The Road Home**



*A solitary barn next to the road leaving Floyd County, Virginia.*

The three journalists departed after visiting their 25th court on a five-day voyage from the north to the south along the western side of the Virginia Commonwealth. The odometer on their red rental Toyota had started at 25373 and now stood at 26409, representing travel of 1,036 miles. They had found 10 new civil cases for their reports on new and noteworthy litigation. It was a little after 2:00 on Friday afternoon and they were headed to Charlotte for flights home to Washington, New York and Los Angeles.

*This report was prepared by Mid-Atlantic Bureau Chief Ryan Abbott, Northeast Bureau Chief Adam Angione and Editor Bill Girdner.*

UNITED STATES DISTRICT COURT
For the Western District of Virginia
Abingdon Division

| | | |
|---|---|---|
| COURTHOUSE NEWS SERVICES, et al., *Plaintiffs,* | ) | |
| v. | ) | Civil Action No. 1:25-cv-00075 |
| KARL R. HADE, in his official capacity as Exec. Sec'y of the Office of Exec. Sec'y of the Supreme Ct. of Va., *et al.* *Defendants.* | ) | |

**DEFENDANT KARL R. HADE'S**
**MOTION TO DISMISS PURSUANT TO RULE 12(b)(1)**

The Defendant, Karl R. Hade, by counsel, requests that this Court grant this Motion to Dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure and thereby dismiss the claims brought by Courthouse News Service, Lee Enterprises, Incorporated, and Lee BHM LLC against him. The factual and legal basis for dismissing these claims is set forth in Karl R. Hade's Memorandum in Support of Motion to Dismiss Pursuant to Rule 12(b)(1) and 12(b)(6).

Respectfully submitted,

KARL R. HADE, in his official capacity,

By Counsel: */s/ Erin R. McNeill*

Jay Jones
*Attorney General of Virginia*

Gretchen Nygaard
*Deputy Attorney General*

Erin R. McNeill (VSB No. 78816)
John D. Gilbody (VSB No. 42788)
Assistant Attorneys General
Office of the Virginia Attorney General
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 692-0598
emcneill@oag.state.va.us
jgilbody@oag.state.va.us

**CERTIFICATE OF SERVICE**

I hereby certify that on February 5, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system.

*/s/ Erin R. McNeill*
Erin R. McNeill (VSB No. 78816)
Sr. Assistant Attorney General
Office of the Virginia Attorney General
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 692-0598
emcneill@oag.state.va.us

UNITED STATES DISTRICT COURT
For the Western District of Virginia
Abingdon Division

| | | |
|---|---|---|
| COURTHOUSE NEWS SERVICES, et al., | ) | |
| *Plaintiffs,* | ) | |
| v. | ) | Civil Action No. 1:25-cv-00075 |
| KARL R. HADE, in his official capacity as Exec. Sec'y of the Office of Exec. Sec'y of the Supreme Ct. of Va., *et al.* | ) | |
| *Defendants.* | ) | |

**DEFENDANT KARL R. HADE'S**
**MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)**

The Defendant, Karl R. Hade, by counsel, requests that this Court grant this Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and thereby dismiss the claims brought by Courthouse News Service, Lee Enterprises, Incorporated, and Lee BHM LLC against him. The factual and legal basis for dismissing these claims is set forth in Karl R. Hade's Memorandum in Support of Motion to Dismiss Pursuant to Rule 12(b)(1) and 12(b)(6).

Respectfully submitted,

KARL R. HADE, in his official capacity,

By Counsel: */s/ Erin R. McNeill*

Jay Jones
*Attorney General of Virginia*

Gretchen Nygaard
*Deputy Attorney General*

Erin R. McNeill (VSB No. 78816)
John D. Gilbody (VSB No. 42788)
Assistant Attorneys General
Office of the Virginia Attorney General
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 692-0598
emcneill@oag.state.va.us
jgilbody@oag.state.va.us

**CERTIFICATE OF SERVICE**

I hereby certify that on February 5, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system.

*/s/ Erin R. McNeill*
Erin R. McNeill (VSB No. 78816)
Sr. Assistant Attorney General
Office of the Virginia Attorney General
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 692-0598
emcneill@oag.state.va.us

UNITED STATES DISTRICT COURT
For the Western District of Virginia
Abingdon Division

| | |
|---|---|
| COURTHOUSE NEWS SERVICES, et al., | ) |
| | ) |
| *Plaintiffs,* | ) |
| | ) |
| v. | ) Civil Action No. 1:25-cv-00075 |
| | ) |
| KARL R. HADE, in his official capacity as Exec. Sec'y of the Office of Exec. Sec'y of the Supreme Ct. of Va., *et al.* | ) |
| | ) |
| *Defendants.* | ) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT KARL R. HADE'S RULE 12(b)(1) AND RULE 12(b)(6) MOTION TO DISMISS**

The Defendant, Karl R. Hade ("Hade"), by counsel, submits this memorandum of law in support of his Rule 12(b)(1) and Rule 12(b)(6) Motion to Dismiss.

I. INTRODUCTION

This case is ironically not about free speech, but profitable speech. Courthouse News Service ("CNS") previously attempted a constitutional challenge to Virginia Code § 17.1-293. That suit involved a different court clerk in a different jurisdiction than the parties in the present suit but the claim was the same: CNS argued that without remote access to unredacted court records, its constitutional right to pleadings was unconstitutionally impaired.

Fortunately, the Eastern District and the Fourth Circuit saw through the glaring hole in CNS's constitutional challenge. CNS, like all members of the general public, has the same access to court records that was available when the First Amendment was written. The records are available to anyone at the courthouse clerk's office during business hours.

In truth, the only challenge CNS faced with access to court records was accessing them profitably. Virginia is a large state. Covering remote courthouses would require paying more reporters in more jurisdictions to travel to far-flung courthouses than CNS wanted to spend. To preserve their profit margin, CNS sought to have Virginia's common-sense solution to protect its digital court records from exploitation from data mining while facilitating efficient access to records for court officers declared unconstitutional. This would allow CNS to access court records in any online database in Virginia without the tedious and expensive trip to the courthouse and without having to hire extra reporters to cover a wider geographic area.

The Fourth Circuit ultimately held that CNS did not have a constitutional right to the unredacted digital court records maintained by many Virginia circuit court clerks. But the court also held that CNS lacked the standing to challenge the dissemination restriction, which prevents lawyers with access to secure online court records from downloading the files and selling or distributing them to third parties. Without standing to challenge the dissemination restriction, CNS's challenge to that subsection was dismissed without prejudice.

Now CNS is back, but it has filed suit against a new set of clerks in the Western District of Virginia instead of the Eastern, perhaps in an attempt to start afresh. They have added another news publishing plaintiff and asserted some additional facts in an effort to state a claim. But at its heart, the lawsuit is the same. The plaintiff news companies, located out of state, want access to Virginia's state courts' digital court records to allow them to operate as profitably as possible, without having to pay as many reporters to cover Virginia's courthouses. The plaintiffs openly admit that if the dissemination restriction is invalidated they will hire Virginia licensed attorneys to do what they cannot do directly; namely, download court records off OCRA for dissemination to their paid subscribers.

The Constitution does not require that Virginia's court system put corporate profitability ahead of the twin policy concerns at issue. Virginia is constitutionally entitled to protect litigants' privacy in a digital age, where information itself is a commodity, while leveraging technology to allow for the efficient operation of its justice system. The Constitution does not require Virginia to sacrifice either of these values to preserve corporate profits.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Parties

Courthouse News Service ("CNS") is a California corporation that earns profits through selling subscriptions to its reports on civil litigation in state and federal courts. (ECF No. 1, ¶ 18). CNS also operates a case search engine called "CasePortal" that contains "cases and opinions from federal and state court courts across the nation" including "the text of filed documents." *Courthouse News Serv. v. Hade*, 631 F. Supp. 3d 349, 365, n. 14. (E.D.Va. 2022).

Lee Enterprises, Incorporated ("LEI") owns Lee BHM LLC ("BHM"), but the Complaint does not include any allegations relating to LEI. (ECF No. 1 at 1.) BHM publishes numerous periodicals throughout the Commonwealth of Virginia, including the *Richmond Times Dispatch* and *The Roanoke Times*. *Id.* at 1, ¶ 19.

Defendant Karl Hade is the Executive Secretary of the Office of the Executive Secretary ("OES") of the Supreme Court of Virginia. *Id.* ¶ 20. This position is created by statute, Virginia Code § 17.1-314, and the Executive Secretary serves as the "court administrator for the Commonwealth."

Edward Jewett, Brenda Hamilton, and Kelly Flannagan are the duly-elected circuit court clerks for their respective jurisdictions.

### B. Previous Litigation

CNS previously, and unsuccessfully, sued defendant Hade in his official capacity as Executive Secretary of the Office of the Executive Secretary of Virginia ("OES").[1] *Courthouse News Serv. v. Hade*, 631 F. Supp. 3d 349 (E.D.Va. 2022) affirmed in part, reversed in part, and remanded by *Courthouse News Serv. v. Smith*, 126 F.4th 899 (4th Cir. 2025). In *Hade,* CNS also named Jacqueline Smith, in her official capacity as Clerk of the Circuit Court for Prince William County, Virginia, as a defendant to obtain access to Prince William County Circuit Court's OCRA database records. As in this lawsuit, CNS sought to have the statute restricting online access to unredacted, nonconfidential court records restricted pursuant to Virginia Code § 17.1-293(H), declared unconstitutional. *Id.*

The Commonwealth intervened in that case after Hade was dismissed, and the district court subsequently granted summary judgment to the Commonwealth on all three counts, finding that both the Access Restriction and the Dissemination Restriction in the statute were constitutional time, place, and manner restrictions and there was no Equal Protection right to remote access of court records. *Hade*, 631 F. Supp. 3d at 370. CNS appealed that decision to the Fourth Circuit. *Smith*, 126 F.4th at 905.The Fourth Circuit upheld the trial court's holding that there was no First Amendment or Equal Protection right to access unredacted court records online because the restriction was "a content-neutral time, place, and manner regulation that is narrowly tailored to further the Commonwealth's important interests in protecting sensitive personal information and promoting the orderly and efficient administration of justice." *Smith*, 126 F.4th at 917-18.

[1] Hade was dismissed as a party before summary judgment and the Commonwealth intervened to defend the constitutionality of the statue.

The Fourth Circuit held that the dissemination restriction should have been dismissed without prejudice, however, because CNS "lacks standing to challenge this provision." *Id.* at 917. The Fourth Circuit also held that it failed to state a basis for even derivative injury because "Courthouse News has not identified anyone who would redistribute data from OCRA to Courthouse News absent the Dissemination Restriction." *Id.*

In the current iteration of its suit against Hade, this is the only factual change from the prior suit, along with the addition of LEI and BHM as plaintiffs. Now, CNS and BHM have identified a single lawyer, David Lacy, who they allege would be willing to provide them with copies of pleadings obtained from OCRA absent the dissemination restriction in Virginia Code § 17.1-293(H). (ECF No. 1, ¶¶ 11-12, 43, 77-79) Lacy is identified as the "Virginia-barred counsel" of BHM. (ECF No. 1, ¶ 11) According to the plaintiffs, the addition of this allegation, "cures the standing concern identified by the Fourth Circuit." (*Id.* ¶ 9)

## III. LEGAL STANDARD

### A. Rule 12(b)(1)

"Federal Rule of Civil Procedure 12(b)(1) permits a party to move to dismiss an action for lack of subject matter jurisdiction." *Allen v. College of William & Mary*, 245 F. Supp. 2d, 777, 782 (E.D. Va. 2003). The burden rests with a plaintiff to establish that jurisdiction is proper. *Blankenship v. Am. Fed. Gov't Empl.*, No. 3:15-cv-294, 2016 U.S. Dist. LEXIS 42851, at *2 (E.D. Va. Mar. 30, 2016). "When considering a motion to dismiss pursuant to Rule 12(b)(1), the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Minns v. Portsmouth Juvenile & Domestic Relations District Court, et al.*, No. 2:07-cv-233, U.S. Dist. LEXIS 23847, at *6 (E.D. Va. Mar. 26, 2008) (quotations omitted).

Because questions of immunity relate to subject matter jurisdiction, a Rule 12(b)(1) motion is an appropriate avenue to seek resolution of these questions and, as appropriate, dismissal. See, e.g., *Haley v. Va. Dep't of Health,* No. 4:12-cv-00016, 2012 WL 5494306, at *2 n.2 (W.D. Va. Nov. 3, 2011) (dismissing civil action against a Commonwealth agency in ruling on a Rule 12(b)(1) motion which asserted Eleventh Amendment immunity).

**B. Rule 12(b)(6)**

Pursuant to Rule 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion to dismiss under Rule 12(b)(6), the Court "accept[s] as true all well-pleaded allegations and view[s] the complaint in the light most favorable to the plaintiff." *Philips v. Pitt County Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). But the complaint's factual allegations "must be enough to raise a right to relief above the speculative level" and "to state a claim to relief that is plausible on its face." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Conclusory statements and facts "merely consistent with a defendant's liability" do not suffice to carry a complaint over 'the line between possibility and plausibility.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). The Court "'need not accept the [plaintiff's] legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" *Phillips*, 572 F.3d at 180 (quoting *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009)).

IV. ARGUMENT

A. <u>LEI lacks standing</u>.

According to the Complaint, Lee Enterprises, Incorporated ("LEI") owns Lee BHM LLC ("BHM"), and BHM publishes various newspapers in the Commonwealth. ECF No. 1, 2. The Complaint, however, does not identify any injuries to Lee, only to BHM, the newspapers that BHM publishes, and to BHM employees. While the Complaint refers to LEI and BHM collectively as "Lee," the allegations of injury relate to Virginia newspapers, which are published by BHM. *Id.* ¶¶ 45-51. In paragraphs 77 -81 & 85 of the Complaint, the plaintiffs complain that reporters working for newspapers published by BHM could not obtain court filings either after hours or because the courthouse was too far away and Attorney Lacy could not send them copies from OCRA.

The alleged injuries described in the Complaint affected BHM, not LEI. LEI has no independent right to claim damages on behalf of its "wholly owned subsidiary," because once a corporation has a legal existence of its own, it functions as a separate entity. *See Terry v. Yancey*, 344 F.2d 789, 790 (4th Cir. 1965). Having created Lee BHM LLC for some beneficial reason, LEI "cannot now ignore the existence of the LLC in order to escape its disadvantages." *Kreisler v. Goldberg*, 478 F.3d 209, 214 (4th Cir. 2007). LEI has not identified any injury that it has or might suffer, and "it is axiomatic that a party seeking to establish standing in the federal courts must demonstrate an injury." *Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 808 (E.D. Va. 2007). Accordingly, LEI's claims should be dismissed pursuant to Rule 12(b)(6).

B. <u>The Eleventh Amendment bars Plaintiffs' claims against Hade.</u>

Hade is not a proper party in the case at bar because he is sued in his official capacity but lacks the requisite authority to enforce the allegedly unconstitutional statute.

The Eleventh Amendment provides, in part, that "[t]he Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State." U.S. CONST. AMEND. XI.

Essentially, the Eleventh Amendment "render[s] States immune from being hauled into federal court by private parties." *Wright v. North Carolina*, 787 F.3d 256, 261 (4th Cir. 2015). State officers sued in their official capacity—as Defendant Karl Hade is here, ECF No. 1 at 1—are "also entitled to Eleventh Amendment protection" because official-capacity suits are in effect suits against the State. *Lytle v. Griffith*, 240 F.3d 404, 408 (4th Cir. 2001); *accord Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (noting that "a suit against a state official in his or her official capacity" is "no different from a suit against the State itself").

In *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court recognized an exception to Eleventh Amendment immunity that permits a federal court to grant prospective relief against a state officer when that officer acts in violation of federal law. As the Court explained, the exception is based on the "fiction" that an officer who acts unconstitutionally is "stripped of his official or representative character" and may therefore be "subject[]" to "the consequences of his individual conduct" in federal court. *Id.* at 159–60.

Although this doctrine provides an avenue for plaintiffs seeking injunctive relief against States, "[t]he purpose of allowing suit against state officials to enjoin their enforcement of an unconstitutional statute is not aided by enjoining the actions of a state official not directly involved in enforcing the subject statute." *Waste Management Holdings, Inc. v. Gilmore*, 252 F.3d 316, 332 (4th Cir. 2001). Accordingly, the *Young* exception is limited to situations where a plaintiff can show: (1) a "special relation" between the officer sued and the challenged policy; and (2) the officer has "acted or threatened" to enforce the policy. *McBurney v. Cuccinelli*, 616 F.3d 393, 399, 402 (4th Cir. 2010). These requirements ensure both that "the appropriate party is before the federal court, so as not to interfere with the lawful discretion of state officials" and

that "a federal injunction will be effective with respect to the underlying claim." *South Carolina Wildlife Fed. v. Limehouse*, 549 F.3d 324, 333–34 (4th Cir. 2008). (check cite)

In this case, Plaintiff's Complaint fails to demonstrate either requirement. First, the Executive Secretary lacks a "special relation" to the challenged Dissemination Restriction within the meaning defined by *Ex parte Young*'s progeny. A "special relation" exists only when "[t]he officer sued [is] able to enforce, if he so chooses, the specific law the plaintiff challenges." *Doyle v. Hogan*, 2021 U.S. App. LEXIS 17823, *7 (4th Cir. 2021). "Without this enforcement duty, the officer is merely a 'representative of the State' who cannot be sued because allowing such a suit would essentially 'make the State a party.'" *Id.* (quoting *Ex parte Young*, 209 U.S. at 157).

The plaintiffs have not and cannot point to any actions taken by the OES or Hade to enforce the Dissemination Restriction, Code § 17.1-242(H). The OES provides the technology platform through which the circuit court clerks may elect to provide access to OCRA. But "[e]ach participating clerk ultimately determines who is authorized to access the clerk's records via OCRA." (ECF No. 1-2, ¶ 40) Virginia law grants circuit court clerks the exclusive legal custody of all records filed in their respective circuit courts, including "records stored in electronic format *whether the storage media for such electronic records are on premises or elsewhere*." Code § 17.1-242. (emphasis added). Because Virginia circuit court clerks possess exclusive statutory authority to enforce the Dissemination Restriction, the Executive Secretary does not have a "special relation" with OCRA under *Ex parte Young* jurisprudence. Code § 17.1-293(H)(

Similarly, Plaintiff cannot show that Defendant Karl Hade has "acted or threatened" to enforce any policies related to OCRA access. The statute at issue provides a single method of enforcement – denying future OCRA access. Va. Code § 17.1-293(H) (granting the clerk "his

discretion" authority to "deny secure remote access to ensure compliance with these provisions). And only circuit court clerks determine who may receive access. As explained in Exhibit 2 to the Complaint:

> If a clerk determines that a subscriber is authorized to have access to OCRA, pursuant to and in compliance with applicable law, then that subscriber will be provided access to OCRA. OES does not in any way evaluate or screen potential subscribers once the clerk determines they are authorized. OES receives the name and email addresses of subscribers but does not receive other information and does not know if a subscriber is a licensed attorney.

ECF No. 1-2, ¶ 41. In short, the plaintiffs have conceded that Defendant Hade and the OES have no authority to enforce the Dissemination Restriction.

Accordingly, the Executive Secretary cannot be a proper party to this suit under *Ex parte Young*. The Eleventh Amendment bars this suit and the claims against Defendant Hade should be dismissed pursuant to Rule 12(b)(1).

C. Code § 17.1-293(H) regulates lawyer conduct, not speech.

Plaintiffs cannot make a valid First Amendment challenge to Code § 17.1-293(H) because the statute is a restraint on conduct, not speech. The core of Plaintiffs' claim is that the Dissemination Restriction is a statute that "punish[es] the publication of truthful information." ECF No. 1, ¶ 88. This is simply a mischaracterization of the function of the Dissemination Restriction, because there is no restriction on the dissemination of information gleaned from court records. Instead, there is a restriction on downloading data from an OCRA database and disseminating it to third parties. This is not a restriction on content. Instead, it is a restriction on sharing unredacted digital court records that can contain information that is particularly vulnerable to exploitation that is not present for the same information when accessed at the courthouse and shared only on paper.

To determine the meaning of any statute, including whether it is a regulation on conduct or speech, a court should "look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy." *Crandon v. United States*, 494 U.S. 152, 158 (1990). The public policy behind the various subsections of Code § 17.1-293 demonstrates a concern with the dissemination of digital court records containing unredacted sensitive information, not an attempt to restrict the sharing of truthful information relevant to the public interest. It is a regulation of a particular medium, not of a particular message.

Virginia law treats digital court records differently than the same information accessible at the courthouse because of the significant state interest in protecting digital records from a unique form of data harvesting. *See Smith*, 126 F.4th at 910-11. The digital records "are uniquely susceptible to a practice known as 'data mining' or 'data harvesting,' which facilitates easy identification, collection, and misuse of sensitive personal information." *Id.* at 911. Unlike the same information accessed through a terminal at the courthouse or on paper, digital records are vulnerable to data mining because automated computer programs can search through large masses of data in a database for personally identifiable information ("PII") that "can then be used to enable identity theft and other types of fraud and exploitation." *Id.* In *Smith*, the Commonwealth provided evidence that other online records systems have been subject to data mining, despite various preventive measures that the Commonwealth has imposed to prevent data mining. *Id.* at 911-12. As a result, the Fourth Circuit upheld the restriction on public access for unredacted digital court records as "narrowly tailored to serve the Commonwealth's important interests in protecting sensitive personal information and promoting the orderly and efficient administration of justice." *Id.* at 917.

Virginia's system restricts the access to court records with unredacted PII to attorneys, their staff, and certain other government employees because if the information is downloaded and misused, attorneys are "a self-policing, pre-vetted group subject to . . . serious professional sanctions for violating [the] Rules [of Professional Conduct]." *Id.* at 912. Allowing attorneys and government employees access, however, rather than no one at all, facilitates the efficient and orderly administration of the court system. *Id.* In this way, Code § 17.1-293 balances competing public policy interests: protecting litigants from the types of data mining and exploitation of PII unique to digital records, especially court records, while using the convenience of databases of online court records to facilitate the efficient administration of the court system for attorneys, their staff, and government employees. *Id.* at 914.

Thus, the statute at issue, as a whole, is crafted to "not burden substantially more access to court records than necessary to further the government's interests in protecting sensitive [PII] and facilitation the orderly and efficient administration of justice." *Id.* The law was enacted to address a specific "online danger" that is not present when the same information is accessible in person via computer terminal in the courthouse or on paper printouts. *Id.*

If attorneys could grant access to digital court records by downloading them and providing them to anyone who hired them to do so, it would defeat this delicate balance. The hazard Virginia is trying to prevent is widespread access to digital court records that are vulnerable to exploitation without restricting access to the information contained in those records. *Id.* at 916. The restriction in Code § 17.1-193(H) is a restriction on distributing digital files downloaded from OCRA, not a restriction on disseminating the information contained in court records however obtained, because the exact information is available to anyone at the courthouse. *Id.* at 916. The Plaintiffs are deliberately misapplying the Dissemination Restriction

to apply to even a lawyer preparing a summary of the contents of a petition for a client. ECF No. 1, ¶¶ 84-85.

Virginia is regulating the ability of a lawyer with privileged access to a database of digital court files containing unredacted sensitive PII to disseminate those digital files to third parties. This is a conduct restriction, not a prior restraint of the lawyer's speech about the information he learns from court filings. Therefore, there are no Free Speech protections for the conduct being regulated. Hade therefore respectfully requests that this case be dismissed for failure to state a claim for violations of the Plaintiff's First Amendment rights.

D. <u>The challenged statute is not a "prior" restraint on free speech.</u>

Plaintiffs couch their challenge to the Dissemination Restriction as a "prior restraint on free speech" because prior restraints are particularly disfavored. ECF No. 1, ¶ 87. A prior restraint on speech refers to either administrative or judicial orders that forbid certain types of speech or expressive conduct, such as a public parade, in advance the speech or conduct is to occur. *Alexander v. United States*, 509 U.S. 544, 550 (1993). A restraining order or permanent injunction are typical examples of a prior restraint on free speech. *Id.* Licensing schemes and permitting requirements, in which a speaker must apply for a license granted at the discretion of the government, is another type of common prior restraint. *See, e.g., City of Lakewood v. Plain Dealer Publ'g. Co.,* 486 U.S. 750, 755–56 (1988); *Sec'y of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 964 (1984); *Green v. City of Raleigh*, 523 F.3d 293, 300-01 (4th Cir. 2008) (holding that parade permits are constitutional if content-neutral with appropriate procedural safeguards).

These prior restraints are distinct from contracts or statutes that punish speech after it occurs, such as civil forfeiture for dealing in contraband pornography that was part of a larger criminal scheme. *Alexander*, 509 U.S. at 553. Another example is the non-disparagement clause

in the settlement agreement signed in *Overbey*. *Overbey v. Mayor of Balt.*, 930 F.3d 215, 222 (2019). Plaintiff Overbey settled a police brutality case against the Baltimore Police Department. *Id.* at 220. The settlement agreement included a non-disparagement clause, which imposed a severe financial penalty if the plaintiff disparaged the police department after the settlement. *Id.* The plaintiff publicly countered a newspaper story about her case and in her public comments she disparaged the police. *Id.* As a result, she forfeited half her settlement. *Id.* The non-disparagement clause was not a prior restraint on free speech. It was a waiver of the plaintiff's constitutional rights with a penalty if she violated that contractual agreement. *Id.* at 223.[2]

The statute at issue is not a prior restraint on free speech. It does not require a license or pre-approval for attorneys with OCRA access to speak. At most, if the attorney is found to be downloading and selling the digital court records to third parties, a clerk may choose in their discretion to revoke the attorney's access to OCRA. Code § 17.1-293(H). This measure is not punitive as much as it simply prevents the attorney from further impairing the privacy rights of litigants, which is the purpose of the Dissemination Restriction. *Smith*, 126 F.4th at 912. Therefore, the statute has none of the hallmarks of a prior restraint of free speech and cannot be invalidated on that basis.

E. <u>Plaintiffs fail to state a facial challenge to Virginia Code § 17.1-293(H).</u>

Plaintiffs allege they are challenging the Dissemination Restriction as set forth in Code § 17.1-293(H) on its face and as applied. ECF No. 1, ¶ 87. Even if the Dissemination Restriction were a regulation of speech and not conduct, Plaintiffs have failed to state a valid claim that the Dissemination Restriction is invalid on its face.

---

[2] The clause was ultimately held to be unenforceable because it was against public policy, but it was not a prior restraint. *Id.* at 225.

First, a facial challenge to a statute "typically requires a showing that 'no set of circumstances exists under which the Act would be valid, i.e., that the law is unconstitutional in all of its applications. *United States v. Miselis*, 972 F.3d 518, 530 (4th Cir. 2020). This is a deliberately high bar, because "facial challenges 'run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law that is broader than is required by the precise facts to which it is to be applied.'" *Id.* (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)).

In the context of a First Amendment facial challenge, however, courts have entertained facial challenges based on "hypothetical application of the law to nonparties" only if the statute is invalid because it is overbroad in that "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* at 530 (internal quotations omitted). To prevail on a facial overbreadth challenge, the statute's overbreadth must be substantial, "not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Id.* at 531 (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008)). The Plaintiffs' First Amendment facial challenge to the statute at issue must depend on the law's hypothetical application to nonparties, because they do not have standing to challenge the law's application to their own conduct because they do not have access to a secure remote database of digital court records. *Smith*, 126 F.4th at 917. The Plaintiffs' only possible claim must depend on facial overbreadth.

An analysis of whether a statute is facially overbroad has several steps. *Id.* at 531. First, a court must construe what speech the statute restricts and whether the statute "is subject to a limiting instruction." *Id.* (internal quotations omitted). Second, whether the statute as construed

"criminalizes a substantial amount of protected expressive activity." *Id.* (internal quotations omitted). Finally, if the statute is overbroad, a court must determine if the unconstitutional restriction can be severed from the whole and only invalidate the portion that is overly broad. *Id.* at 532. "Altogether these efforts to preserve a statute from facial invalidation reflect the notion that the overbreadth doctrine is strong medicine to be applied only as a last resort in cases where it is truly warranted." *Id.* (quotations omitted).

As discussed above, in context the statute is not restricting any speech, only the downloading and dissemination of digital copies of court records containing sensitive PII that has not been redacted to third parties who would otherwise not be authorized to access the digital databases. The statue is intended to protect the sensitive information in court records when it is in a digital format that is particularly vulnerable to data mining and exploitation. *Smith*, 126 F.4th at 911. To the degree that the dissemination of electronic court records is "speech," the restriction applies only to digital records and only to those records accessed by a lawyer through "secure remote access" rather than through another channel or even digital records the attorney retained because they were the filing attorney. Code § 17.1-293. At best, this is a content-neutral time, place, and manner restriction. *Hade*, 631 F. Supp. 3d at 368. At the trial court level, the court found the burden the Dissemination Restriction posed on speech to be "relatively small" because non-lawyers who did not have secure remote access could "sell, post, or redistribute" the information obtained in person at the courthouse without restriction. *Id.* at 369. Thus, the restriction at issue is subject to limiting language: it applies only to the digital court records, not court records more broadly, and it only applies when those digital records were obtained by secure remote access to the court's database, and not any other method.

The facial challenge fails most clearly on the second prong, however. The statute being challenged does not criminalize any behavior. Instead, the Dissemination Restriction simply gives court clerks the discretionary authority to revoke access to their OCRA database if a lawyer disseminates data to third parties. Code § 17.1-293(H). Although Plaintiffs pleaded that the Commonwealth's position is that "Virginia attorneys who violate the Dissemination Prohibition could be disbarred," ECF No. 1, ¶ 61, this is a clear mischaracterization of what would trigger a sanction under the Rules of Professional Conduct.

The Fourth Circuit held that restricting access to attorneys protected "against data mining and misuse of sensitive personal information by confining remote online access to" attorneys who were subject to disciplinary action if they violated the Rules of Professional Conduct. *Smith*, 126 F.4th at 912. Even the Plaintiffs note in a footnote that professional misconduct that could result in professional sanctions by the Virginia State Bar under the ethics rules would have to involve "a criminal or deliberately wrongful act that reflects adversely on the lawyer's honesty, trustworthiness or fitness to practice law. ECF No. 1, 22 n. 1 (quoting Va. R. Prof. Conduct 8.4(b)). Thus, for even a non-criminal regulatory sanction by the Virginia State Bar, a lawyer would not have to merely violate the Dissemination Restriction but do so as a knowing part of an effort to mine the disseminated digital files for sensitive personal information and misuse it. *Smith*, 126 F.4th at 912. There is simply no criminal, civil, or even administrative penalty for violating the statute unless a person also violates other applicable laws, rules, or regulations. Therefore, the challenged statute cannot be facially overly broad – it simply does not criminalize or penalize speech at all. The only sanction discussed in the statute itself is discretionary and is simply loss of access to the secure online court records database.

Because the statute does not criminalize or penalize any speech, there is no basis to reach the third prong, which is to determine if the unconstitutional provision can be severed from the statute as a whole. Regardless, the statute fails the three-prong test articulated by the Fourth Circuit in *Miselis* to determine if a statute is an unconstitutionally overbroad restriction on speech. Therefore, the Plaintiffs' facial challenge fails.

F. Plaintiffs fail to state a constitutional challenge to Code § 17.1-293(H) as applied.

Plaintiffs also claim to challenge the Dissemination Restriction "as applied." ECF No. 1, ¶ 87. Although the statute itself has not been applied to the Plaintiffs, they assert that the Dissemination Restriction is "imposed and enforced by Defendants in OCRA subscriber agreements." ECF No. 1, ¶ 87. There are two fatal flaws with the Plaintiffs' "as applied" challenge, however. The first is that the statute has not been "applied" to them. Secondly, Lacy is not a "speaker" within the meaning of the First Amendment from which they could claim derivative standing as would-be consumers of his message.

The Fourth Circuit has already held that CNS lacked standing to challenge the dissemination "because it applies only to individuals with remote online access to court records." *Smith*, 126 F.4th at 917. Thus, Lee Enterprises and Lee BHM LLC also lack standing, because they similarly lack remote online access to court records. ECF No. 1, ¶ 66.

Instead, the Plaintiffs claim they have cured their standing problem by claiming injuries as a potential consumer of speech. ECF No. 1, ¶ 90. The First Amendment does protect not only speakers, but the rights of consumers of speech. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 756-57, 96 S. Ct. 1817, 1823 (1976). The Fourth Circuit held that for a plaintiff "to have standing to assert a right to receive speech, a plaintiff must show that there exists a speaker willing to convey the information to her." *Smith*, 136 F. 4th at 917. To cure

the defect identified by the court in their last attempt to challenge the Dissemination Restriction, in the current suit Plaintiffs identify David Lacy as a Virginia-barred attorney who has access to some jurisdictions' OCRA databases. ECF No. 1, ¶¶ 11-12. They identify Lacy as the speaker willing to convey information to them but for the Dissemination Restriction. ECF No. 1, ¶¶ 11-12.

Lacy is not clearly a speaker engaging in speech, however, from which Plaintiffs could derive a claim as consumers. Publishers of speech are entitled to the protection of the Free Speech provision of the First Amendment either by publishing original work or by exercising editorial discretion over which messages to publish. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 728 (2024) (holding that a regulation applying to a party republishing someone else's content implicates the First Amendment when the publisher is engaged in his own expressive activity, which includes "presenting a curated compilation of speech originally created by others."). But under the facts as alleged by the Plaintiffs, Lacy is not "curating" or editing the pleadings. Instead, he would simply provide the specific, unaltered pleading requested by the Plaintiffs after downloading it from an OCRA database.

Federal law defining when people are "speakers" or "publishers" of digital information followed the same fundamental formula when Congress enacted the Communications Decency Act, 42 U.S.C. § 230. In the Communications Decency Act, Congress expressly stated that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider" even if the user or provider had basic restrictions to ensure that the information shared through the interactive computer service was not obscene. 42 U.S.C. § 230(c)(1). With the ease of sharing digital content, simply

republishing the content created by others, without exercising more than basic editorial discretion to prevent the republication of obscenity, does not make one a speaker.

Under the facts as alleged in the Complaint, Lacy is not a speaker from whom the Plaintiffs can claim derivative Free Speech protections as consumers of his "speech," because Lacy does not "speak" within the meaning of the First Amendment. As alleged, Lacy does not seek to send out pleadings he has downloaded of his own choosing. Instead, Plaintiffs allege that they contacted Lacy and affirmatively asked him to download and distribute pleadings that the Plaintiffs or their employees want to read. ECF No. 1, ¶¶ 11-12, 43. Furthermore, CNS alleges that in Texas it simply hired a Texas-barred attorney whose job was to download pleadings from Texas's restricted court database to distribute to other CNS employees. ECF No. 1, ¶ 44. They allege they would do the same if the Dissemination Restriction was invalidated. ECF No. 1, ¶ 44. The lawyer in the hypothetical, or in the real-world examples cited in the Complaint of Lacy and CNS's Texas counsel, do not select what pleadings to "publish" to the Plaintiffs. Instead, they acquiesce to Plaintiffs' requests for specific content. There is no editorial discretion in selecting pleadings to share or exclude. To the degree that Plaintiffs may seek copies of pleadings Lacy drafted himself, Lacy would not have to use OCRA to obtain an electronic copy to share. Thus, Lacy and the other actual and hypothetical lawyers hired by the Plaintiffs to download and share pleadings from secure court databases are not engaged in the types of editorial activities that have traditionally been classified as protected speech or expressive activity by a publisher.

On the other hand, Lacy and his colleagues do fit within the Communications Decency Act as a user who is simply providing a conduit for content created by another user of the same interactive internet database. 42 U.S.C. § 230(f)(2), (3). Under Federal law, they are not "speakers" for simply providing access to the content created by someone else and shared via the

internet. 42 U.S.C. § 230(c)(1). Lacy is not entitled to the protections of the First Amendment, but he is also shielded from liability for any inaccuracies or defamatory information in the pleadings he would share only by express request of a client. *Id.*

Plaintiffs may point to allegations that Lacy is sometimes asked to prepare a summary of the allegations in a pleading if he believes he is contractually prohibited from providing the pleading itself. ECF No. 1, ¶ 79. Lacy's own summaries of pleadings that he has prepared are clearly protected speech but Plaintiffs cannot cite to any occasion any of the Defendants have ever penalized an attorney for providing a summary of a pleading downloaded from OCRA under the Dissemination Restriction or the applicable OCRA user agreements. The law and the user agreements have simply never been applied or interpreted that way by the Defendants. Therefore, Lacy, and by extension the Plaintiffs, cannot claim the Defendants' past application of the Dissemination Restriction to lawyer-prepared summaries of pleadings downloaded from OCRA chill their engagement in lawful speech.

In short, Plaintiffs continue to lack standing to challenge the Dissemination Restriction on an as applied basis because they do not have access to the content to which the Dissemination Restriction applies. They cannot claim derivative status because the Dissemination Restriction impairs them from consuming the content of a would-be speaker because they have not identified a person who qualifies as a "speaker" under federal law. Finally, to the degree they have alleged a "chilling effect" on a lawyer preparing original summaries of pleadings he downloaded from OCRA, that effect is not the result of the plain language of the statute or any application of the statute to anyone, anywhere by the Defendants. Therefore, Plaintiffs have failed to state a claim for impairment of their First Amendment Rights.

G. <u>Code § 17.1-293(H) is a reasonable time, place, and manner restriction.</u>

Even if Plaintiffs had standing to bring an as applied challenge and Lacy was a speaker for the purposes of a First Amendment analysis, the Dissemination Restriction in Code § 17.1-293(H) would be constitutional. First, it is as reasonable a time, place, and manner restriction as the Access Restriction upheld by the Fourt Circuit in *Smith*. The Dissemination Restriction closes a loophole that CNS admits it exploits in Texas. Secondly, the Dissemination Restriction is the product of a voluntary agreement between the court clerks and attorneys in order for the attorney to obtain the privilege of access to the clerk's OCRA database. Citizens can enter into knowing and voluntary agreements with a governmental entity to waive constitutional rights they otherwise have.

The Eastern District previously upheld the Dissemination Restriction as a reasonable time, place, and manner restriction in prior litigation between CNS, a circuit court clerk, and the Commonwealth. *Hade*, 631 F. Supp. 3d at 370. Although this holding was reversed on appeal, the reversal was because CNS did not have standing to challenge the Dissemination Restriction, not because the Dissemination Restriction was unconstitutional. *Smith*, 126 F.4th at 917.

The reasoning of the overturned *Hade* decision applies with equal force to the present lawsuit. The challenged statute does not punish "the press or the public [for] publishing legally obtained, truthful information." *Hade*, 631 F. Supp. 3d at 368. The trial court saw the inherent question posed by the Plaintiffs as "whether the First Amendment provides . . . a member of the public a right to sell, post, and redistribute information obtained from *electronic* civil court records while it may already sell, post, and redistribute information obtained *physically* from the courthouse." *Id.* Thus, the court viewed the Dissemination Restriction as a time, place, and manner restriction on speech, subject to relaxed scrutiny. *Id.* The Dissemination Restriction is

consent neutral because it was not adopted out of "disagreement with the message" but "to promote the fair and orderly administration of justice by protecting citizens' privacy and security and ensure the orderly and efficient administration of its justice system." *Id.* at 369. The statute "treats all electronically accessed civil court records the same." *Id.*

The court in *Hade* also expressly held that the Dissemination Restriction was narrowly tailored to serve a significant government interest "that would be achieved less effectively absent the regulation." *Id.* Because the "express purposes in creating this regulation are the same justifying the attorney-access restriction," the state interest is just as substantial. *Id.*

The court then analyzed whether the State had met its burden in showing that the restriction "materially advances" the substantial interest "by redressing past harms or preventing future ones." *Id.* (internal quotation omitted). The court found that the State had met this burden by appealing to "common sense and logic" which "support the notion that if any individual with electronic access to all nonconfidential civil court records could freely sell, post, or redistribute such data to third parties, it could jeopardize citizens' privacy and security as well as the orderly and efficient administration of its justice system." *Id.* Access only at the courthouse "serves as a bulwark against widespread dissemination of [the] private information" contained in court records. *Id.* The Complaint in the instant case contains an admission that this Dissemination Restriction is necessary to prevent attorneys from bypassing the access restriction contained in Code § 17.1-293(E)(7). CNS openly admits that but for the Dissemination Restriction it would. simply hire a Virginia-licensed attorney as a reporter and have that person download filings on OCRA, as they do in Texas. ECF No. 1, ¶ 44.

Finally, the *Hade* court concluded that the Dissemination Restriction does not burden substantially more speech than necessary because it applies only to records obtained

electronically and not records obtained physically at the courthouse. *Hade*, 631 F. Supp. 3d at 370. The Dissemination Restriction "does no more than prevent the mass publication of Virginians' private information from being posted online and the likely data mining that would result, which is the exact source of evil it seeks to remedy." *Id.* (internal quotations omitted).

Notably, the *Hade* court relied on the fact that "a quick review of CNS's website shows that in addition to publishing news articles, it markets a case search engine–'CasePortal'—to anyone who subscribes to CNS. If CNS, or any other third party, were given access to the civil court records, there would be nothing stopping such entities from downloading all the all content from the clerk's software, only paying one fee, then posting such information on their own website for profit, exploitation, or to sell such information to third parties," but restricting all access to online digital court records would impede the efficiency of the judicial system. *Id.* at 365. Thus, the restrictions on access and dissemination thread the needle between the competing public policies of preserving privacy of litigants' information and promoting efficiency in the justice system.

Because the analysis that supported the *Hade* court's opinion that the Dissemination Restriction holds with equal force now that CNS has attempted to cure its standing problem, this Court should reach the same result the Eastern District did should it reach the question. The Dissemination Restriction, to the degree it restricts speech and not conduct and to the degree the Plaintiffs have standing to challenge it, is a reasonable time, place, and manner restriction that supports the Access Restriction that has already been affirmed as constitutional by the Fourth Circuit.

H. The Dissemination Restriction is a voluntary waiver of a right to publish court records knowingly made to gain privileged access.

Even if all the above were set aside, at bottom, the user agreements Lacy signed in order to gain access to OCRA for various Virginia jurisdictions is an enforceable waiver of his right to free speech. "It is well-settled that a person may choose to waive certain constitutional rights pursuant to a contract with the government." *Overbey*, 930 F.3d at 223. Not all waivers are constitutional, even if the contract is otherwise valid. *Id.* To be enforceable, the waiver must meet two conditions. *Id.* The first is that it must have been made "knowingly and voluntarily." *Id.* Secondly, "the interest in enforcing the waiver" cannot be "outweighed by a relevant public policy that would be harmed by enforcement." *Id.* In the case at bar, both conditions are easily met.

There is no question that the waiver of any purported constitutional right to disseminate the digital files downloaded from OCRA was entered into by Lacy and other Virginia lawyers knowingly and voluntarily. The restriction on dissemination of OCRA materials is publicly available in the statute being challenge. Code § 17.1-293(H). Plaintiffs included the user agreements that are used by the defendant Clerks. ECF No. 1-4; ECF No. 1-5; ECF No. 1-6. Each agreement includes the prohibition on sharing login information or selling or posting the information accessed on the internet or distributing the data to a third party. ECF No. 1-4, 5; ECF No. 1-5, 5; ECF No. 1-6, 5. The user agreements are between the Clerks and a sophisticated group: licensed Virginia lawyers, who by definition have a demonstrated competency in contracts and constitutional law.

The user agreements are also clearly voluntarily entered into by the users. There is no basis to claim duress, for example. The same information is available at the courthouse, thus OCRA access is not strictly necessary to access court records. *Smith*, 126 F.4th at 905. Instead, it

simply facilitates the efficient administration of the court system by permitting attorneys to access the records in a convenient digital format and outside of business hours. *Id.* at 906.

The waiver of the purported right to disseminate the digital records from OCRA also meets the second prong of enforceability because the public interest is better served by enforcement than non-enforcement. *Overbey*, 930 F.3d at 223. The Fourth Circuit's opinion in *Smith* analyzed the benefits of restricting public access to digital court files at length. *Smith*, 126 F.4th at 910-12. The Dissemination Restriction simply closes a loophole to prevent lawyers with access from disseminating the digital files in a way that would make them accessible to the general public, such as by posting them on the internet or giving them to a third party that may post them or exploit them. *Hade,* 631 F. Supp. 3d at 368-70.

Plaintiffs argue that the public policy against enforcement would allow journalists to more easily report on new pleadings at a lower cost to their employers by allowing them to avoid travel costs or even employ fewer reporters overall. ECF No. 1, ¶¶ 45-51, 70-73, 75. Notably, however, these interests all accrue benefits to the corporate employers of journalists, by making reporting faster, cheaper, and by allowing fewer reporters to cover a greater geographical area. The ability of reporters to access the information and report on the contents of court filings remains unfettered, however. There is no infringement on the right to a free press. Only an impediment to a profitable press. Thus, Plaintiffs have identified a corporate interest and not necessarily a public one.

The balance of these interests demonstrates the public interest in maintaining the Dissemination Restriction as it applies only to digital versions of court records that were obtained through the court's own secure remote servers. Because both qualifications are met for

enforceability of Lacy's waiver of any possible constitutional right in disseminating the records he can access through OCRA, the waiver is constitutional and enforceable.

## V. CONCLUSION

For the reasons stated above, Hade respectfully requests that this Court dismiss the case with prejudice if it finds the Plaintiffs have standing to bring their claim at all.

Respectfully submitted,

KARL R. HADE

By Counsel:

Jerrauld C.C. Jones
*Attorney General of Virginia*

Gretchen E. Nygaard
*Deputy Attorney General*

Jacqueline C. Hedblom
*Senior Assistant Attorney General*

/s/ Erin R. McNeill
Erin R. McNeill (VSB# 78816)*
Senior Assistant Attorneys General
Office of the Virginia Attorney General
202 North 9th Street
Richmond, Virginia 23219
Telephone (ERM): (804) 692-0598
Facsimile (ERM): (804) 371-0200
Email (ERM): EMcneill@oag.state.va.us
**Counsel of Record for Hade*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 5, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel of record.

/s/ Erin R. McNeill
Erin R. McNeill (VSB No. 78816)
Senior Assistant Attorney General

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Abingdon Division**

COURTHOUSE NEWS SERVICE, *et al.*,

Plaintiffs,

v. Civil Action No. 1:25-cv-75-JPJ-PMS

KARL R. HADE, *et al.,*

Defendants.

**THE CLERKS' MOTION TO DISMISS PURSUANT TO RULE 12(B)(1)**

Defendants Edward Jewett, in his official capacity as Clerk of the Circuit Court for the City of Richmond, Virginia, Brenda Hamilton, in her official capacity as Clerk of the Circuit Court for the City of Roanoke, Virginia, and Kelly Flannagan, in her official capacity as Clerk of the Circuit Court for the City of Bristol, Virginia (collectively, the "Clerks"), by counsel, and pursuant to Federal Rule of Civil Procedure 12(b)(1), move this Court to dismiss all counts in the Complaint for lack of subject matter jurisdiction.

A memorandum in support of this Motion is being filed contemporaneously herewith. The Clerks request a hearing on the Motion.

Respectfully submitted,

**EDWARD JEWETT**, in his official capacity as Clerk of the Circuit Court for the City of Richmond, Virginia;

**BRENDA HAMILTON**, in her official capacity as Clerk of the Circuit Court for the City of Roanoke, Virginia; and

**KELLY FLANNAGAN**, in her official capacity as Clerk of the Circuit Court for the City of Bristol, Virginia

By: /s/ Peter Askin
William W. Tunner (VSB No. 38358)
William D. Prince IV (VSB No. 77209)
Rachel W. Adams (VSB No. 92605)
Peter S. Askin (VSB No. 93371)
*Thompson*McMullan, P.C.
100 Shockoe Slip, 3rd Floor
Richmond, Virginia 23219
Telephone: (804) 649-7545
Facsimile: (804) 780-1813
wtunner@t-mlaw.com
wprince@t-mlaw.com
radams@t-mlaw.com
paskin@t-mlaw.com

*Counsel for Defendants Edward Jewett, in his official capacity as the Clerk of the Circuit Court for the City of Richmond, Virginia, Brenda Hamilton, in her official capacity as the Clerk of the Circuit Court for the City of Roanoke, Virginia, and Kelly Flannagan, in her official capacity as the Clerk of the Circuit Court for the City of Bristol, Virginia*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of February, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record:

Roger Myers, *pro hac vice* forthcoming
Rachel Matteo-Boehm, *pro hac vice* forthcoming
Carlie Tenenbaum, *pro hac vice* forthcoming
BRYAN CAVE LEIGHTON PAISNER LLP
3 Embarcadero Center, 7th Floor
2100 East Cary Street, Suite 310
San Francisco, California 94111
Telephone: (415) 675-3400
roger.myers@bclplaw.com
rachel.matteo-boehm@bclplaw.com
carlie.tenenbaum@bclplaw.com

*Counsel for Plaintiffs Courthouse News Service, Lee Enterprises, Incorporated and Lee BHM LLC*

Dabney J. Carr IV, Esq.
Lauren H. Miller, Esq.
TROUTMAN PEPPER LOCKE LLP
P.O. Box 1122
Richmond, Virginia 23218
Telephone: (804) 697-1200
Facsimile: (805) 697-1339
dabney.carr@troutman.com
lauren.h.miller@troutman.com

*Counsel for Plaintiffs Courthouse News Service, Lee Enterprises, Incorporated and Lee BHM LLC*

By: /s/ Peter Askin
Peter S. Askin (VSB No. 93371)
*Thompson*McMullan, P.C.
100 Shockoe Slip, Third Floor
Richmond, Virginia 23219
Telephone: (804) 649-7545
Facsimile: (804) 780-1813
Email: paskin@t-mlaw.com

*Counsel for Defendants Edward Jewett, Brenda Hamilton, and Kelly Flannagan*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Abingdon Division**

COURTHOUSE NEWS SERVICE, *et al.*,

Plaintiffs,

v. Civil Action No. 1:25-cv-75-JPJ-PMS

KARL R. HADE, *et al.,*

Defendants.

**MEMORANDUM IN SUPPORT OF THE CLERKS' MOTION TO DISMISS PURSUANT TO RULE 12(B)(1)**

Defendants Edward Jewett, in his official capacity as Clerk of the Circuit Court for the City of Richmond ("Jewett"), Brenda Hamilton, in her official capacity as Clerk of the Circuit Court for the City of Roanoke ("Hamilton"), and Kelly Flannagan, in her official capacity as Clerk of the Circuit Court for the City of Bristol ("Flannagan") (collectively, the "Clerks") file this Motion to Dismiss based on Eleventh Amendment immunity and Plaintiffs' lack of standing and ripeness.

## INTRODUCTION

Plaintiffs assert a First Amendment prior restraint challenge to Virginia Code § 17.1-293(H) and the Officer of the Court Remote Access ("OCRA") system—both of which authorize and provide Virginia attorneys to have remote online access to court records. Although that statute does not prohibit public access to court records at the physical courthouse, it gives discretionary authority to the Clerks to revoke an attorney's OCRA access for sending an OCRA-accessed pleading to a third party. This Court lacks subject-matter jurisdiction, for three reasons.

First, the Eleventh Amendment immunizes the Clerks from suit in federal court. Although Plaintiffs may invoke the *Ex parte Young* exception to this immunity, that narrow exception does not apply to "the exercise of the discretion of an officer," *Ex parte Young*, 209 U.S. 123, 158

(1908), and Virginia Code § 17.1-293(H) permits a clerk to revoke OCRA access, "in his discretion." The Eleventh Amendment thus applies.

Second, Plaintiffs lack standing. In a related case, the Fourth Circuit held that Plaintiffs lack standing to challenge Virginia Code § 17.1-293(H)'s prohibition on sending OCRA pleadings to third parties—termed the "Dissemination Restriction"—because it "does not impose any restraint on Courthouse News's speech"; rather, it only regulates Virginia attorneys. *Courthouse News Serv. v. Smith*, 126 F.4th 899, 917 (4th Cir. 2025). The current Complaint attempts to remedy this defect by asserting a third party standing theory to vindicate their attorney's interests.

But the Complaint fails to show that the Clerks have asserted any "imminent" and "credible threat of enforcement" to revoke their attorney's OCRA access. *See Rock for Life-UMBC v. Hrabowski*, 411 F. App'x 541, 547 (4th Cir. 2010). The Complaint also fails to show a prior restraint injury because Plaintiffs can access the "same" court pleadings at each courthouse in person. Compl. ¶ 66; Ex. 2, ¶ 49; *see Covenant Media of N.C., L.L.C. v. City of Monroe*, 285 F. App'x 30, 36-37 (4th Cir. 2008) (unpublished opinion). More fundamentally, Plaintiffs are not vindicating their attorney's individual interests. Instead, *Plaintiffs* are directing their lawyer to send them the OCRA pleadings—Plaintiffs are thus advancing their own interests via an agent. *See Newman v. Newman*, 42 Va. App. 557, 567 (2004) (courts "treat an attorney as *legally synonymous* with his or her client").

Third and finally, the Complaint's as-applied prior restraint challenge is not ripe because neither Plaintiffs nor their attorney "claim that they are presently subject to an injunction under the [challenged statute] or that one is being sought against them." *See Woodall v. Reno*, 47 F.3d 656, 658 (4th Cir. 1995). This Court should accordingly dismiss this lawsuit against the Clerk defendants for lack of subject matter jurisdiction.

## BACKGROUND[1]

Plaintiff Courthouse News is a 35 year-old California corporation that summarizes civil court pleadings and court cases. Compl. ¶¶ 29-31. The remaining Plaintiffs are part of Lee Enterprises, Inc., which "is the fourth largest newspaper publisher" in the country. Compl. ¶ 45.

The Clerks are responsible for the maintenance and administration of court records, including court filings and pleadings, in their respective jurisdictions. Compl. ¶¶ 21, 23, 25. Jewett, Hamilton, and Flannagan are the elected clerks for the Circuit Courts of Richmond City, Roanoke City, and Bristol City, respectively. *Id.*

### A. Plaintiffs Have Access to Civil Court Records at the Courthouse.

Court pleadings and records are available to the public at each "physical courthouse" in which the record is stored. Compl. ¶¶ 63, 66; Ex. 2, ¶ 24. Such records can be accessed via "courthouse public access terminals" or "in person." Compl. ¶¶ 63, 70.

Plaintiffs can access, and have accessed, court pleadings and records by visiting Virginia circuit court courthouses in person. Compl. ¶¶ 36, 45, 47. Plaintiffs' employees, for instance, "visit[] their assigned court on a daily or weekly basis to review all the complaints filed." Compl. ¶ 36; *see id.* ¶¶ 45, 47. In fact, over a five-day period, Plaintiffs' employees retrieved court pleadings and records from 25 courthouses across Western Virginia. Compl. ¶ 70; Ex. 6.

### B. Virginia Code § 17.1-293 Provides Requirements for Online Remote Access to Civil Court Records.

The General Assembly has passed various statutes regulating the ability of clerks to offer remote online access to "nonconfidential court records." *See* Va. Code §§ 17.1-225; -292.

[1] The following section is identical to the Background section in the Memorandum in Support of the Clerks' Motion to Dismiss Pursuant to Rule 12(b)(6) filed contemporaneously.

"Nonconfidential court records" are all court records and pleadings, except those deemed confidential via "applicable law or sealed pursuant to court order." Va. Code § 17.1-292(B); *see* Compl. Ex. 2, ¶ 10. For instance, "social security number[s] or other identification numbers"—such as a driver's license or banking number—are confidential and cannot be disclosed to the public, regardless of whether a court record is accessed electronically or physically. Va. Code § 17.1-293(A).

Clerks are not required to offer remote online access to nonconfidential records—it is discretionary. Va. Code § 17.1-225 ("[Clerks] *may* provide remote access, including Internet access, to all nonconfidential court records" (emphasis added)). There is no statutory restriction on who clerks can offer remote access to—be it an attorney or a member of the public. *See* Va. Code §§ 17.1-225, -293.

If a clerk decides to offer remote access, Virginia Code § 17.1-293 provides requirements for doing so. At the outset, remotely accessible records and pleadings cannot contain any person's signature, social security number, date of birth, maiden name of a parent, the name or age of a minor, or banking numbers. Va. Code § 17.1-293(B). Virginia-licensed attorneys and their agents, however, are exempt from this restriction and can view these unredacted records via remote access. Va. Code § 17.1-293(E)(7).

Subsection H—the provision challenged by the Complaint in this case—then states:

> Nothing in this section shall be construed to permit any data accessed by secure remote access to be sold or posted on any other website or in any way redistributed to any third party, and the clerk, *in his discretion, may deny secure remote access to ensure compliance with these provisions*. However, the data accessed by secure remote access may be included in products or services provided to a third party of the subscriber provided that (i) such data is not made available to the general public and (ii) the subscriber maintains administrative, technical, and security safeguards to protect the confidentiality, integrity, and limited availability of the data.

Va. Code § 17.1-293(H) (emphases added).

In sum, any person can access any court record or pleading in person at a courthouse, except for sealed or confidential records. Clerks may, in their discretion, offer remote online access to these court records and pleadings to any person, subject to the redaction of certain sensitive information. Virginia-licensed attorneys and their staff, however, may review unredacted court pleadings via remote access through OCRA. If an OCRA subscriber transmits a remotely accessed pleading to a third party, a clerk may, in the clerk's discretion, revoke their OCRA access. *See id.*

**C. Courts Records Accessed Via OCRA Are the Same as in the Physical Courthouse.**

Of the clerks who offer remote access, the vast majority use the OCRA system. Compl. ¶¶ 53, 55. OCRA allows its users to view an "electronic image" scan of nonconfidential court records online. Compl. ¶ 53. Any person who wishes to use OCRA must seek approval from each individual court that provides such remote access. Compl. ¶ 58. For attorneys who use OCRA to remotely access court records and pleadings in Richmond, Bristol, and Roanoke, the Clerks typically require the attorneys to sign a subscriber agreement. Compl. Exs. 3–5. Such agreements limit OCRA access to only Virginia-barred and pro hac vice attorneys and their staff and select government agencies. Compl. ¶¶ 58–60.

"The documents on OCRA are the same documents that have been made available on courthouse public access terminals." Compl. ¶ 63. "There is no difference in the content of the court records that Plaintiffs and other members of the press and public must travel to each individual court to see . . . they are the same record." Compl. ¶ 66; Ex. 2, ¶ 49. The only difference "is the time, distance, and expense" to access a physical, versus an electronic, record. *Id*.

**D. Plaintiffs Lost Their First First Amendment Challenge to OCRA and Virginia Code § 17.1-293.**

Courthouse News, one of the Plaintiffs in this case, previously filed a similar lawsuit in the Eastern District of Virginia challenging the constitutionality of the Access Restriction's limitation

of OCRA access to Virginia attorneys and the Dissemination Restriction of remotely-accessed civil court records in Virginia Code § 17.1-293(H). Courthouse News sued the Circuit Court Clerk in Prince William County, and the Commonwealth of Virginia intervened as a defendant. Courthouse News alleged that the Access Restriction deprived it of its First Amendment right of access to court records and violated the Equal Protection Clause by discriminating between attorneys and non-attorneys. *Courthouse News Serv. v. Smith*, 126 F.4th 899, 909 (4th Cir. 2025); *see* Compl. ¶ 5. Courthouse News similarly alleged that the Disseminiation Restriction violated its First Amendment rights. *See id.*

The Eastern District of Virginia granted summary judgment to the defendants and dismissed all these claims. *Courthouse News Serv. v. Hade*, 631 F. Supp. 3d 349, 370 (2022) (Hudson, J.), *aff'm in part, vacated in part* 126 F.4th 899. The Eastern District upheld the Access Restriction and Dissemination Restriction as content-neutral time, place, and manner regulations that were justified by the Commonwealth's interests in the orderly and efficient administration of justice and narrowly tailored to the protection of sensitive personal information contained in court filings. *Id.* at 360–70. The Court also reasoned that the Dissemination Restriction in Virginia Code § 17.1-293(H) does not prohibit Courthouse News from "redistribut[ing] information from civil court records obtained physically at the courthouse." *Id.* at 370.

On appeal, the Fourth Circuit affirmed Judge Hudson's decision that limited OCRA access to attorneys—the Access Restriction—did not violate the First Amendment or Equal Protection Clause. The Fourth Circuit reasoned that "[b]y limiting online access to this relatively small, vetted group of individuals [Virginia attorneys] who are strongly incentivized to follow OCRA's rules and who can be effectively disciplined for misconduct, the Access Restriction furthers the Commonwealth's interest in safeguarding sensitive personal information in court records."

*Courthouse News*, 126 F.4th at 913. As the Fourth Circuit observed, "attorneys and their staff do not pose the same threat to sensitive personal information as the public at large." *Id.* at 915.

Because Courthouse News lacked a constitutional right of access to OCRA, the Fourth Circuit accordingly concluded that Courthouse News lacked standing to challenge the Dissemination Restriction. *Id.* at 917. The Fourth Circuit reasoned that the Dissemination Restriction

> *does not impose any restraint on Courthouse News's speech*, because it applies only to individuals with remote online access to court records. Courthouse News does not currently have such access, and we have determined that it is not constitutionally entitled to receive that access.

*Id.* (emphasis added). Although CNS suggested that the dissemination restriction in Code § 17.1-293(H) indirectly injured it by hindering its ability to acquire electronic court records from its attorneys with OCRA access, the Fourth Circuit concluded that Courthouse News's assertion of derivative injury was "too speculative to support standing." *Id.*

**E. Plaintiffs Now Allege that Virginia Code § 17.1-293(H) Is a Prior Restraint of their Attorney's Speech.**

Plaintiffs subsequently filed the current Complaint in this Court seeking to remedy the standing defect identified by the Fourth Circuit in its first lawsuit. Plaintiffs allege that they have asked their privately-retained Virginia attorney, David Lacy ("Mr. Lacy"), to provide them with certain civil court pleadings available through OCRA.[2] Compl. ¶ 11. The Complaint alleges that Mr. Lacy would have provided such pleadings, "but he was compelled to tell [Plaintiffs] that he is prohibited" by Virginia Code § 17.1-293(H) from doing so. Compl. ¶ 12. If Mr. Lacy had conveyed the pleading, Plaintiffs allege that he "*may* have [had his] access revoked" and "*may* [have been] subject to further sanctions, including disbarment." Compl. ¶¶ 4, 61 (emphases added).

---

[2] It is unclear from the allegations in the Complaint whether Mr. Lacy has an OCRA subscriber agreement in all three jurisdictions relevant to the Clerks.

The Complaint asserted a single First Amendment claim under 42 U.S.C. § 1983. Specifically, the Complaint asserts that the Dissemination Restriction in Virginia Code § 17.1-293(H) is unconstitutional on its face and as applied as a "prior restraint." Compl. ¶ 87. The Complaint accordingly requests this Court to declare Virginia Code § 17.1-293(H) unconstitutional and enjoin all enforcement thereof, "including disbarment" of attorneys for violating the dissemination restriction contained in Virginia Code §17.1-293(H). Compl. at 31–32.

## LEGAL STANDARD

Under Rule 12(b)(1), a plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction. *See Demetres v. E. W. Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015). A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed in one of two ways: either a facial challenge or a factual challenge. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). In a facial challenge, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Id.*

Federal district courts are courts of limited jurisdiction: they possess "only that power authorized by Constitution and statute." *Gunn v. Minton*, 586 U.S. 251, 256 (2013) (citations and internal quotation marks omitted). "[I]f Congress has not empowered the federal judiciary to hear a matter, then the case must be dismissed." *Home Buyers Warranty Corp. v. Hanna*, 750 F.3d 427, 432 (4th Cir. 2014). "Because jurisdictional limits define the very foundation of judicial authority, subject matter jurisdiction must, when questioned, be decided before any other matter." *United States v. Wilson*, 699 F.3d 789, 793 (4th Cir. 2012). Accordingly, both Eleventh Amendment immunity and standing are threshold jurisdictional considerations for this Court to decide.

*Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018). *Roach v. W. Virginia Reg'l Jail & Corr. Facility Auth.*, 74 F.3d 46, 48 (4th Cir. 1996)

## ARGUMENT

This Court should dismiss the claims against the Clerks for three distinct reasons. First, the Eleventh Amendment bars this lawsuit against the Clerks, who are state officials. Second, Plaintiffs lack standing to litigate their claims against the Clerks. Third, the as-applied prior restraint challenge is not ripe.

### A. THE ELEVENTH AMENDMENT IMMUNIZES THE CLERKS FROM SUIT IN FEDERAL COURT.

The Eleventh Amendment provides that the "judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.

The Eleventh Amendment, therefore, creates a form of "sovereign immunity" for "state agents and state instrumentalities." *Pense v. Md. Dep't of Pub. Safety & Corr. Servs.*, 926 F.3d 97, 100 (4th Cir. 2019) (citation and internal quotes omitted); *Hussein v. Miller*, 232 F. Supp. 2d 653, 656–57 (E.D. Va. 2002). Neither a state, state entity, other "arm of the State," nor a state official in their official capacity, can be sued in federal court. *Alabama v. Garrett*, 531 U.S. 356, 363 (2001); *Singleton v. Md. Tech. & Dev. Corp.*, 103 F.4th 1042, 1047 (4th Cir. 2024).

Plaintiffs have sued the Clerks in their official capacities. Clerks of circuit courts in Virginia are state officials. *Nash v. Taylor*, Civil Action No. 5:12cv077, 2013 U.S. Dist. LEXIS 38765, at *5 (W.D. Va. Mar. 19, 2013); *Dowdy v. Virginia*, Civil Action No. 7:11-cv-00492, 2011 U.S. Dist. LEXIS 123345, at *6 (W.D. Va. Oct. 25, 2011). The Clerk defendants thus enjoy Eleventh Amendment immunity.

There are certain exceptions to that immunity, however. These include where Congress abrogates Eleventh Amendment immunity, the state waives immunity via statute, or the plaintiffs invoke the *Ex parte Young* exception. *See Garrett*, 531 U.S. at 363 (2001); *Edelman v. Jordan*, 415 U.S. 651, 673 (1974); *Ex parte Young*, 209 U.S. 123, 159-60 (1908).

Neither Congress nor Virginia have abrogated or waived Eleventh Amendment immunity as to § 1983 claims specifically. *Biggs v. N.C. Dep't of Pub. Safety*, 953 F.3d 236, 241 (4th Cir. 2020); *Napier v. Ohai*, No. 7:23-cv-00098, 2025 U.S. Dist. LEXIS 190336, at *9 (W.D. Va. Sep. 26, 2025). The Complaint must exclusively rely on the *Ex parte Young* exception for Eleventh Amendment immunity to not apply.

**1. The *Ex Parte Young* Only Applies to Threatened Enforcement Authority.**

The *Ex parte Young* exception "allows private citizens, in proper cases, to petition a federal court to enjoin State officials in their official capacities from engaging in future conduct that would violate the Constitution or a federal statute." *Antrican v. Odom,* 290 F.3d 178, 184 (4th Cir. 2002). This exception permits suit only if a plaintiff seeks "prospective, injunctive relief against a state officer to prevent ongoing violations of federal law." *McBurney v. Cuccinelli*, 616 F.3d 393, 399 (4th Cir. 2010). This exception, however, turns on the specific official sued, the official's relationship to the enforcement of a grant of authority, and the nature of that authority.

At the outset, the exception applies only to state officials with "some *duty* in regard to the *enforcement* of the laws of the state, and who *threaten and are about to commence* proceedings . . . to enforce against parties affected [by] an unconstitutional act.'" *McBurney*, 616 F.3d at 399 (emphases added) (quoting *Ex parte Young,* 209 U.S. at 155–56). The state official must, therefore, have "a special relation" with "the challenged *statute*," such that the official has both "proximity to and responsibility for the challenged state action." *Id.* (cleaned up and emphasis added). In other

words, *Ex parte Young* only applies to state officials who are specifically charged with enforcing the statute or authority that the plaintiff challenges.

For this reason, *Ex parte Young* "does not normally permit federal courts to issue injunctions against state-court judges or clerks." *Whole Women's Health v. Jackson*, 595 U.S. 30, 39–40 (2021). Indeed, "state-court clerks . . . serve to file cases as they arrive, not to participate as adversaries in those disputes." *Id*. Clerks are not typically enforcers of the law.

But, even if a state official has some sort of enforcement power, that power cannot be discretionary:

> There is no doubt that the court cannot control the exercise of the *discretion* of an officer. It can only direct affirmative action where the officer having some duty to perform *not involving discretion*, but merely ministerial in its nature, refuses or neglects to take such action. In that case the court can direct the defendant to perform this merely ministerial duty.

*Ex parte Young*, 209 U.S. at 158 (emphases added). Thus, "to proceed under the *Ex Parte Young* exception, [a plaintiff] must challenge a ministerial, not discretionary, act by . . . a state official." *Brooks v. St. Charles Hotel Operating*, LLC, No. DLB-23-0208, 2023 U.S. Dist. LEXIS 171143, at *38-39 (D. Md. Sep. 26, 2023) (citing *Antrican v. Odom*, 290 F.3d 178, 191 (4th Cir. 2002)). In sum, *Ex parte Young* applies only where a plaintiff exclusively seeks prospective injunctive relief to enjoin a state official's ministerial enforcement, or threatened enforcement, of a state statute or authority.

Here, the Complaint seeks to enjoin two enforcement mechanisms: "disbarment" of Plaintiff's private outside counsel, and revoking OCRA access as provided in Virginia Code § 17.1-293(H). Compl. at 31–32. The *Ex parte Young* exception does not apply to either.

**2. The Clerks Lack Any Enforcement Relationship to Virginia State Bar Proceedings.**

The Complaint seeks to enjoin the Clerks from seeking "penalties including disbarment" of Mr. Lacy and Plaintiffs' other counsel for forwarding them pleadings accessed on OCRA. Compl. at 32; *see id.* ¶¶ 4, 61. Plaintiffs note that such penalties occur as a result of potential violations of Virginia "ethical rules," such as the Virginia Rules of Professional Conduct. Compl. ¶ 61, n.1.

The Clerks, however, lack any "duty in regard to the enforcement" of Virginia attorney disciplinary rules, including the Virginia Rules of Professional Conduct. *See McBurney*, 616 F.3d at 399. The Clerks have no special "connection with the enforcement" of these rules, *see Ex parte Young*, 209 U.S. at 157, and attorney discipline—including disbarment—lies exclusively with the Virginia state bar.

Moreover, *Ex parte Young* applies only to a state official "who threaten[es]" or is "about to commence proceedings" to enforce an unconstitutional act. *McBurney*, 616 F.3d at 399. The Complaint fails to allege that the Clerks have threatened or are about to threaten disbarment of Mr. Lacy, or Plaintiffs' other outside attorneys with OCRA access, for sharing electronic court records with Plaintiffs. In fact, the Complaint fails to allege *any* imminent threat of such disbarment by any government authority.

The *Ex parte Young* exception thus does not apply to the Complaint's request for injunctive and declaratory relief regarding enforcement of the Rules of Professional Conduct, other ethical standards, or disbarment proceedings. The Eleventh Amendment therefore immunizes the Clerks' from suit regarding this relief.

**3. *Ex Parte Young* Does Not Apply to the Clerk's Discretionary Authority Under Virginia Code § 17.1-293(H).**

The Complaint also seeks to enjoin the Clerks' authority in enforcing Virginia Code § 17.1-293(H) and, by extension, the subscriber agreements for OCRA access. As stated above, however, *Ex parte Young* does not apply to "the exercise of the discretion" of a state official. *Ex parte Young*, 209 U.S. at 158. Instead, a federal court can only enjoin a state official's "ministerial duty." *Id.*

In *Brooks v. St. Charles Hotel Operating*, for instance, a plaintiff sought to enjoin a sheriff from allowing certain use-of-force practices or from arresting persons based on a false report. 2023 U.S. Dist. LEXIS 171143, at *39. The District Court of Maryland held these acts involved the "exercise of discretion," and thus, the *Ex parte Young* exception did not apply. *Id.* at *39-40.

The Complaint seeks to enjoin the Clerks from revoking OCRA access pursuant to Virginia Code § 17.1-293(H), which states:

> Nothing in this section shall be construed to permit any data accessed by secure remote access to be sold or posted on any other website or in any way redistributed to any third party, and the clerk, *in his discretion, may deny* secure remote access to ensure compliance with these provisions.

(Emphases added.). According to the Complaint, if an individual violates this provision, that individual "*may* have their [remote] access revoked." Compl. ¶¶ 4, 61 (emphasis added).

The threatened enforcement authority at issue is the Clerks' power to revoke OCRA access. That authority, however, is discretionary. The statute specifically states that "the clerk, in his discretion, may" revoke such access. Va. Code § 17.1-293(H). The Complaint also admits that this power is discretionary by pleading that OCRA access "may" be revoked. Compl. ¶ 4. A federal court, however, cannot enjoin the Clerks' discretionary grants of authority.

Furthermore, the Complaint fails to plead any threatened enforcement action to revoke Mr. Lacy's OCRA access for sharing electronic court records with Plaintiffs. The Complaint does not allege or attach any actual subscriber agreement between the Clerks and Mr. Lacy, nor does it

attach any communication from the Clerks regarding Mr. Lacy's attempts to share or disseminate electronic court records obtained through OCRA with Plaintiffs.

Because Virginia Code § 17.1-293(H) is discretionary and the Complaint fails to allege any imminent enforcement thereof, the *Ex parte Young* exception does not apply, and the Eleventh Amendment insulates the Clerks from suit in federal court.

### B. Plaintiffs Have Failed to Demonstrate Standing.

Every plaintiff in federal court must satisfy three elements of standing under Article III of the Constitution:

> (1) an injury-in-fact that is "concrete and particularized and actual or imminent,"
> (2) "a causal connection between the injury and the conduct complained of" that renders the injury "fairly traceable" to the defendant's actions; and
> (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (identation and numeration added). The complaint must plead "necessary factual allegations" to support each of these elements. *Bishop v. Bartlett*, 575 F.3d 419, 424 (4th Cir. 2009).

Plaintiffs here do not assert standing on behalf of their own interests. Nor could they—the Fourth Circuit has already held that Plaintiffs lack any direct injury regarding the Dissemination Restriction in Virginia Code § 17.1-293(H) because it "does not impose any restraint on Courthouse News's speech." *Courthouse News Serv. v. Smith*, 126 F.4th 899, 917 (4th Cir. 2025). Instead, Plaintiffs claim "derivative" standing for the alleged injury that Virginia Code § 17.1-293(H) imposes on their attorneys, such as Mr. Lacy. Compl. ¶¶ 7, 90; *id.* at 24.

Ordinarily, a plaintiff "cannot rest his claim to relief on the legal rights or interests of third parties." *Bishop*, 575 F.3d at 423; *see also Council v. Taxpayers for Vincent*, 466 U.S. 789, 796

(1984) (holding that a civil rights plaintiff "only has standing to vindicate his own constitutional rights"). This doctrine reflects

> a healthy concern that if the claim is brought by someone other than one at whom the constitutional protections is aimed, the courts might be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights.

*Kowalski v. Tesmer*, 543 U.S 125, 129 (2004) (internal citations and quotation marks omitted).

Courts, however, recognize certain instances when a plaintiff can assert "third party standing" and litigate the rights of another. *Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 214 (4th Cir. 2020). Where a plaintiff challenges a regulation of "someone else, satisfying standing requirements will be substantially more difficult." *Frank Krasner Enters. v. Montgomery Cty.*, 401 F.3d 230, 234–35 (4th Cir. 2005) (internal emphasis, citations, and quotation marks omitted).

To advance this theory, and in addition to the Article III requirements above, a plaintiff must demonstrate:

(1) "the *litigant* suffered some *injury-in-fact*, adequate to satisfy Article III's case-or-controversy requirement"; and

(2) "prudential considerations which we have identified in our prior cases point to permitting the litigant to advance the claim," including:

   i. "the relationship of the litigant to the person whose rights are being asserted,"

   ii. "the ability of the person to advance *his own* rights," and

   iii. "the impact of the litigation on *third-party interests*."

*Caplin & Drysdale v. United States*, 491 U.S. 617, 623 n.3 (1989) (emphases, indentations and numeration added).

Courts have applied these third party standing requirements to First Amendment claims. The First Amendment protects "the communication" for the benefit of the speaker and listener.

*Stephens v. Cnty. of Albemarle*, 524 F.3d 485, 492 (4th Cir. 2008). A plaintiff thus has a "right to receive" the free speech at issue, if they can show a "speaker willing to convey the information" to them. *Id*. Specifically, plaintiffs must show "a concrete, specific connection to the speaker." *Murthy v. Missouri*, 603 U.S. 43, 75 (2024).

Under such a theory, the listener's right to receive speech is "entirely derivative" of the speaker's rights. *In re Application of Dow Jones & Co., Inc.*, 842 F.2d 603, 608 (2d Cir. 1988); *accord Pa. Family Inst., Inc. v. Black*, 489 F.3d 156, 165 (3d Cir. 2007); *N.A.A.C.P., Los Angeles Branch v. Jones*, 131 F.3d 1317, 1322 & n.5 (9th Cir. 1997). The right to receive speech thus "cannot enlarge" the willing speaker's rights. *Animal Legal Def. Fund v. Schmidt*, 434 F. Supp. 3d 974, 995 (D. Kan. 2020). Put simply, "the right to listen depends entirely on the infringement on the rights of a willing speaker." *Pa. Family Inst*, 489 F.3d at 166. If the speaker has not "been subjected to sanctions," the plaintiff lacks standing. *Ind. Right to Life, Inc. v. Shepard*, 507 F.3d 545, 549 (7th Cir. 2007); *accord Stockton v. Brown*, 152 F.4th 1124, 1147 (9th Cir. 2025). Thus, if the willing speaker has suffered no injury, then neither has the listener.

In sum, to advance a First Amendment claim on behalf of another, a plaintiff must show, at a minium, (1) an Article III injury to the alleged third party speaker, (2) a resulting injury-in-fact to the plaintiff, and (3) sufficient facts that the plaintiff is adequately representing the "third party" interests at issue. The Complaint has failed to meet Plaintiffs' burden of proving all three of these requirements.

**1. The Complaint Fails to Allege Imminent Enforcement Against Their Attorney.**

To satisfy the injury-in-fact standing requirement, a party "must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548, 194 L.

Ed. 2d 635 (2016) (citation and internal quotation marks omitted). In the *Ex parte Young* context—where a party exclusively seeks prospective injunctive relief—the party "must establish an ongoing or future injury in fact." *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018). The party cannot "rely on prior harms." *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018).

Instead, for a future injury, a party must show "imminent" and "certainly impending" harm. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 345 (2006). "[F]ears of [future] enforcement that are 'imaginary' or 'wholly speculative' are insufficient to confer standing." *Rock for Life-UMBC v. Hrabowski*, 411 F. App'x 541, 547 (4th Cir. 2010) (unpublished opinion) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979)).

Because Plaintiffs exclusively seek prospective relief, they must show "a credible threat of enforcement" that is "imminent." *See DaimlerChrysler*, 547 U.S. at 345; *Rock for Life-UMBC*, 411 F. App'x at 547. Because Plaintiffs derivatively seek to vindicate their private attorney's rights, they must demonstrate a credible threat of imminent enforcement against that attorney.

The Complaint alleges only two potential consequences for their attorney for hypothetically transmitting an OCRA record to Plaintiffs: a disbarment proceeding, and the Clerks' revocation of the attorney's OCRA access pursuant to Virginia Code § 17.1-293(H). The Complaint fails to allege any imminent enforcement of either.

First, the Complaint fails to allege any enforcement of a Virginia ethics or disbarment proceeding against their attorney. In fact, the Complaint fails to allege that *any* attorney has ever been disciplined by the Virginia State Bar for transmitting an OCRA pleading to a third party. The Complaint's alleged hypothetical disbarment proceeding is thus "wholly speculative" and does not satisfy the injury-in-fact requirement. *See Babbitt*, 442 U.S. at 302.

Second, the Complaint similarly fails to allege that the Clerks are about to enforce Virginia Code § 17.1-293(H) against Plaintiffs' private attorney, Mr. Lacy. Under that statute, the Clerks may, in their discretion, deny OCRA access to an attorney who conveys an OCRA pleading to an unauthorized third party. Although the Complaint alleges that their attorney would provide Plaintiffs with court records obtained via OCRA if he were allowed to do so, it falls short of alleging that the Clerks have ever threatened to revoke Mr. Lacy's OCRA access for any reason.

The absence of such allegations reveals that Plaintiffs are not seeking to vindicate any rights held by Mr. Lacy, specifically; rather, they are asserting a "generalized interest" of the public. *Moss v. Spartanburg Cnty. Sch. Dist. Seven*, 683 F.3d 599, 604–05 (4th Cir. 2012). Standing "is not to be placed in the hands of concerned bystanders, who will use it simply as a vehicle of the vindication of value interests." *Diamond v. Charles*, 476 U.S. 54, 62 (1986) (citation and internal quotation marks omitted). Plaintiffs lack standing, for example, to "raise generalized grievances about the administration of the state and federal courts."*Anders v. South Carolina*, No. 2:24-cv-06311-BHH-MGB, 2025 U.S. Dist. LEXIS 75931, at *9 (D.S.C. Mar. 31, 2025).

In *Anders*, for instance, a plaintiff with disabilities challenged filing and signature requirements in court that violated the ADA and other civil rights of disabled persons. *Id.* at *2-*3. Even though the plaintiff had suffered these barriers personally, the District Court of South Carolina nonetheless held the plaintiff lacked standing to challenge how courts were administered generally. *Id.* at *9.

In this case, the Complaint attempts just that. It challenges the subscriber agreements and Virginia Code § 17.1-293(H) generally, on behalf of any potential Virginia-barred attorney who is an OCRA subscriber and wants to share OCRA records with third parties, in a hypothetical scenario. *See Murthy*, 603 U.S. at 75 (holding that plaintiffs' listeners lacked derivative standing

to challenge "restrictions that countless other social-media users have experienced"). The Complaint fails to allege any past revocation of OCRA access for any attorney or any imminent harm to Mr. Lacy, specifically.

In short, the injury to Mr. Lacy is hypothetical and speculative. In the absence of any imminent enforcement against Mr. Lacy, Plaintiffs lack any derivative injury to receive that speech. Plaintiffs therefore lack standing, and this Court should dismiss the Complaint as a result.

**2. The Complaint Fails to Show Plaintiffs Will Suffer an Actual Injury.**

Even if this Court decides that the Complaint has alleged an imminent enforcement against Mr. Lacy, that is not enough to satisfy the standing requirement. The Complaint must still allege that such enforcement would then cause an actual injury to Plaintiffs' First Amendment rights. *See Caplin & Drysdale*, 491 U.S. at 623 n.3. Here, the Complaint alleges that Virginia Code § 17.1-293(H) causes an injury in the form of a "prior restraint" of their ability to "receive" the court records and pleadings that their attorney wishes to send them. Compl. ¶¶ 61–62.

Injury-in-fact requirements are unique for prior restraint claims. A prior restraint refers to "administrative and judicial orders *forbidding* certain communications when issued *in advance* of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (emphasis added to "in advance"). Prior restraints—unlike other regulations of free speech—impose an "immediate and irreversible sanction" by "freez[ing]" speech before it occurs, rather than punishing the speech "after publication." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). But "until an order forbidding speech issues, no such restraint has yet been imposed." *Bruce & Tanya & Assocs., Inc. v. Bd. of Supervisors of Fairfax Cty.*, 854 F. App'x 521, 525 (4th Cir. 2021) (unpublished opinion).

Accordingly, the Article III "injury" in a prior restraint claim is "censorship." *Covenant Media of N.C., L.L.C. v. City of Monroe*, 285 F. App'x 30, 36-37 (4th Cir. 2008) (unpublished opinion) (citing *City of Lakewood v. Plain Dealer Publ'g.*, 486 U.S. 750, 755–56 (1988)); *Fairway Outdoor Advert., LLC v. City of High Point*, No. 1:21-CV-00867, 2022 U.S. Dist. LEXIS 232186, at *18–19 (M.D.N.C. Dec. 28, 2022) (same); *see Phillips v. DeWine*, 841 F.3d 405, 416–17 (6th Cir. 2016) (same). If a prior restraint plaintiff fails to show any speech "would require prior approval or otherwise be impeded" *before* the speech occurs, the plaintiff fails to show an "injury-in-fact" under Article III. *Phillips*, 841 F.3d at 417.

The Complaint alleges that Virginia Code § 17.1-293(H) constitutes a prior restraint on Mr. Lacy's ability to send Plaintiffs an OCRA-accessed court record. *See* Compl. ¶ 90. In other words, Plaintiffs' alleged injury is that the statute prohibits them from "listening" to those court records and pleadings.

But Plaintiffs *can* access the court pleadings at issue. The Complaint concedes that "the same [pleading] documents" are "available on courthouse public access terminals" located at the courts themselves. Compl. ¶ 63. The Complaint admits that there "is no difference in the content of the court records" available at "each individual court" in person, "and the court records that subscribers authorized to access OCRA can see remotely." Compl. ¶ 66. Simply put, whether accessed in person, or Mr. Lacy's remote access via OCRA, "they are the same records." Compl. ¶ 66.

Thus, Plaintiffs are not being denied the ability to "listen" to the court pleadings at issue. Nothing prohibits Plaintiffs from accessing the court records from the courthouses directly. In fact, the Complaint concedes that Plaintiffs have created an entire business on being able to do so for the past 35 years, and their employees "visit[] their assigned court on a daily or weekly basis to

review all the complaints filed." Compl. ¶¶ 29-31, 36, *see* ¶¶ 45, 47. Plaintiffs cannot claim that they cannot "listen" to alleged speech that they have historically accessed.

Moreover, the Virginia statute prohibits an attorney from transmitting a civil court filing to a third party *only if* the pleading is accessed through OCRA. The statute does not prohibit Plaintiffs' attorneys from transmitting court records if obtained by any other means. The statute does not, for example, facially prohibit Mr. Lacy from transmitting, to Plaintiffs, any pleading obtained at the courthouse or from any other source. The Complaint thus fails to show any imminent prior restraint injury.

Plaintiffs will likely argue that they have suffered an injury due to the additional inconvenience and expense of physically traveling to every local courthouse to retrieve civil court records. For example, the Complaint asserts that the only "difference" between OCRA-accessed pleadings and in-person pleadings "is the time, distance and expense that is required" to access the pleading. Compl. ¶ 66.

But this argument is inconsistent with a prior restraint theory. If Plaintiffs' lone injury is "time, distance and expense," that injury presupposes the ability to receive the alleged speech at issue. Plaintiffs' injury is thus not "censorship"—it is inconvenience.

The Complaint has failed to show any "censorship" of court pleadings or any pre-publication "freeze" on the pleadings before they are issued to the public. Nor do the allegations show that Plaintiffs or Plaintiffs' attorney must seek approval from the Clerks before accessing or transmitting the court pleadings. The Complaint has thus failed to allege facts demonstrating standing for prior restraint—its sole claim. This Court should therefore dismiss the claims against the Clerks.

**3. Plaintiffs Lack Third-Party Standing Because Their Attorney-Agent Represents Plaintiffs' Interests, Not His Own.**

Even if this Court concludes that the Complaint has demonstrated adequate injuries to Plaintiffs and their attorney, there is a more fundamental problem: the Complaint's allegations demonstrate that Plaintiffs are not legally vindicating their attorney's individual interests.

As noted above, Plaintiffs advance a "third party" derivative standing theory. This doctrine allows a litigant to advance "third-party interests." *Caplin & Drysdale*, 491 U.S. at 623 n.3 (1989). Those interests and rights must be held by "someone else" other than the plaintiff. *See Frank Krasner*, 401 F.3d at 235. In the First Amendment context, that "someone else" is the alleged speaker. *Murthy*, 603 U.S. at 75. A First Amendment litigant advancing third-party standing must therefore vindicate the "rights of [the] willing speaker." *Pa. Family Inst*, 489 F.3d at 166.

As the Complaint admits, Plaintiffs' standing is entirely "derivative" of the rights and interests of their attorney, Lacy. Compl. ¶ 7; *see Pa. Family Inst.*, 489 F.3d at 165 ("The right to receive speech is 'entirely derivative' of the rights of the speaker."); *accord Stockton v. Brown*, 152 F.4th 1124, 1147 (9th Cir. 2025). Accordingly, the Complaint must demonstrate that Plaintiffs are representing and vindicating *Lacy*'s interests distinct from their own. The Complaint fails this requirement because Lacy is acting as an attorney.

As Plaintiffs' lawyer, Lacy represent his clients' interests and not his own, as a matter of law. "[A]n attorney is the agent of his client" and serves "his client's interest[s]." *Va. Elec. & Power Co. v. Bowers*, 181 Va. 542, 547 (1943). An attorney-client relationship is a "quintessential principal-agent relationship." *Comm'r v. Banks*, 543 U.S. 426, 436 (2005). Thus, courts "treat an attorney as *legally synonymous* with his or her client." *Newman v. Newman*, 42 Va. App. 557, 567 (2004) (emphasis added).

The Complaint alleges that Lacy is Plaintiffs' "Virginia-barred counsel"—they are allegedly in an attorney-client relationship. Compl. ¶ 11; *see id.* ¶ 49 (referring to "the newspaper's attorney"), ¶ 51 (referring to "their attorney to forward filing he can access on OCRA"). Accordingly, any act Lacy commits pursuant to that relationship does not further *Lacy's* interests, it furthers *Plaintiffs'* interests.

The Complaint demonstrates that Lacy's potential act at issue—forwarding OCRA-accessed pleadings—is pursuant to that attorney-client relationship. The Complaint asserts numerous examples of Plaintiffs requesting Lacy to forward them OCRA-accessed pleadings. For instance, Courthouse News's Bureau Chief "emailed attorney Lacy . . . to ask Lacy if he could send [him] a copy of [a] complaint." Compl. ¶ 43. In another instance a Lee reporter asked Lacy "if he could pull [a] complaint off OCRA and email it to him." Compl. ¶ 77. In another, "Lacy was unable to assist *The Roanoke Times* with respect to a new lawsuit . . . ." Compl. ¶ 79.

In each of these examples, *Plaintiffs* initiate the OCRA request to "their" attorney—they are the ones instigating and controlling Lacy's actions. "Control" is a hallmark of a principal-agent relationship. *Acordia of Va. Ins. Agency v. Genito Glenn, L.P.*, 263 Va. 377, 384 (2002). Absent Plaintiffs making these specific requests to Lacy, there is no allegation that Lacy would have indepdently attempted to give Plaintiffs these pleadings. Lacy is not a "willing [independent] speaker"—he is acting pursuant to Plaintiffs' direction to further their interests.

Accordingly, because Lacy wishes to forward the OCRA pleadings to Plaintiffs pursuant to an attorney-client relationship, his actions are "legally synonymous" with Plaintiffs' actions and interests. *See Newman*, 42 Va. App. at 567. Thus, the alleged speech at issue—Lacy's act of forwarding an OCRA pleading to Plaintiffs—is not a communication between two distinct parties. Instead, Plaintiffs are vindicating their own interests through an agent—they are "speaking" with

themselves. Plaintiffs therefore are not, as a matter of law, advancing the interests of a "third party" sufficient for standing. *See Paradise Ent. Ltd. v. Empire Tech. Grp. Ltd.*, No. 2:24-cv-00428-JCM-BNW, 2025 U.S. Dist. LEXIS 206898, at *16 (D. Nev. Oct. 20, 2025) ("[I]t is illogical for [an attorney's] client to also be a third party under the plain meaning of the word.").

Moreover, Plaintiffs' standing theory would render the Fourth Circuit's prior holding as to Courthouse News meaningless. If Plaintiffs are not "constitutionally entitled to receive" OCRA access as the Fourth Circuit held, *Courthouse News Serv.*, 126 F.4th at 917, then they have no right to it via any of their agents either—be it an employee or their attorney. To hold otherwise would render the Fourth Circuit's holding, and the Access Restriction, meaningless.

Plaintiffs may rely on two Supreme Court cases holding "an attorney-client relationship as sufficient to confer third-party standing." *Kowalski v. Tesmer*, 543 U.S. 125, 130-31 (2004) (citing and discussing *Caplin & Drysdale*, 491 U.S. and *United States Dep't of Labor* v. *Triplett*, 494 U.S. 715 (1990)). In *Caplin*, the Court "granted a law firm third-party standing to challenge a drug forfeiture statute by invoking the rights of an existing client." *Id.* In *Triplett*, the Court recognized an attorney's third-party standing to invoke the due process rights of his client to challenge an attorney's fees regulation in Black Lung administrative cases. *Id.*

These cases are distinguishable for one crucial reason: they involved *attorneys* having derivative standing as a litigant to litigate their *clients'* interests. Such a conclusion is consistent with agency law because "an attorney is the agent of his client" and serves "his client's interest[s]." *Va. Elec. & Power*, 181 Va. at 547. It is not farfetched to grant third party standing to an attorney to vindicate his client's interest when he has already been doing so through his legal services.

But the reverse is not true: a *client* cannot have derivative standing to litigate their *attorney's* interests. Counsel for the Clerks has been unable to find any binding precedent

recognizing such a theory. To agree with such an outcome would be perverse to the principal-agent relationship, and give every client the third-party right to challenge any regulation of attorney conduct.

In short, the Complaint has failed to show that Plaintiffs are vindicating the rights and interests of "someone else." *Frank Krasner*, 401 F.3d at 235. Instead, they are advancing their own interests via an agent to gain access to OCRA pleadings, which the Fourth Circuit has already foreclosed.

For each of the above independent reasons, Plaintiffs lack standing and this Court should dismiss their claims against the Clerks as a result.

### C. The Complaint's As-Applied Prior Restraint Claim Is Not Ripe.

For many of the same reasons that Plaintiffs lack standing, their as-applied challenge to the Dissemination Restriction in Virginia Code § 17.1-293(H) is not ripe for adjudication.

A federal court lacks subject-jurisdiction under Article III over a claim that is not yet ripe. *South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019). While standing asks "who can sue," ripeness asks "when they [can] sue." *Id.* (citation omitted).

Ripeness requires that a controversy be "final and not dependent on future uncertainties." *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013). Accordingly, "a claim should be dismissed as unripe if the plaintiff has not yet suffered injury and any future impact remains wholly speculative." *Id.* (citation and internal quotation marks omitted). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, *or indeed may not occur at all*." *Texas v. United States*, 523 U.S. 296, 300 (1998) (emphasis added) (citation and internal quotation marks omitted).

Ripeness is especially important in as-applied prior restraint challenges to government action. "An as-applied challenge attacks the constitutionality of a statute based on a developed factual record and the application of a statute to a specific person." *Doe*, 713 F.3d at 762 (citation and internal quotation marks omitted). A factual record of the statute's specific application to an individual is thus necessary

> to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*South Carolina*, 912 F.3d at 730 (quoting *Abbott Labs v. Gardner*, 387 U.S. 136, 148–49 (1967)). Accordingly, a prior restraint claim, in particular, is not ripe if the plaintiffs "do not claim that they are presently subject to an injunction under the [challenged statute] or that one is being sought against them." *Woodall v. Reno*, 47 F.3d 656, 658 (4th Cir. 1995).

In *Woodall*, for instance, plaintiffs challenged the Freedom of Access to Clinic Entrances Act, which prohibits interfering with individuals seeking reproductive care. *Id.* at 657. The Act allowed the Department of Justice to seek an injunction if any person "is being, has been or may be injured by" a violation of the Act. *Id.* at 658. The plaintiffs argued that this clause constituted a prior restraint. *Id*.

The Fourth Circuit held that the issue was not ripe. Specifically, it noted there was

> no factual record of an actual or threatened application of the Access Act's injunctive relief provisions. Moreover, we will not assume that a court would issue an injunction in violation of the well established prior restraint doctrine.

*Id*. The Fourth Circuit has repeateadly concluded that prior restraint claims are not ripe where no order or injunction has been issued. *See, e.g., Bruce & Tanya & Assocs., Inc. v. Bd. of Supervisors of Fairfax Cty.*, 854 F. App'x 521, 525 (4th Cir. 2021) (unpublished opinion) ("Because the state court has not awarded the Board the injunction it seeks . . . . [s]uch a claim is not ripe for

adjudication."); *Donnangelo v. Myers*, No. 98-1730, 1999 U.S. App. LEXIS 18210, at *10 (4th Cir. Aug. 2, 1999) (unpublished opinion) ("[T]he mere allegation that an action was not repeated for fear of future adverse action is insufficient to create a ripe controversy.").

Plaintiffs have "the burden of proving ripeness." *Doe*, 713 F.3d at 758. The Complaint fails that burden as to its as-applied challenge. It fails to allege that any of the Clerks have revoked Mr. Lacy's OCRA access or that the Clerks have revoked anyone's access at all. Nor does it allege the existence of an injunction or order entered—or even sought—pursuant to Virginia Code § 17.1-293(H). An as-applied challenge "necessarily requires the development of a factual record on how statute applies in particular circumstances," *Doe*, 713 F.3d at 762, but the Complaint fails to provide even a single instance of any clerk revoking OCRA access. The Complaint's as-applied challenge is therefore not ripe and this Court should dismiss that claim as a result.

## CONCLUSION

Because the *Ex parte Young* exception does not apply to the Complaint, the Clerks are immune under the Eleventh Amendment. Even in the absence of immunity, the Complaint has failed to establish the necessary facts to establish standing and ripeness. This Court should therefore dismiss the claims against the Clerks for lack of subject matter jurisdiction.

Respectfully submitted,

**EDWARD JEWETT**, in his official capacity as Clerk of the Circuit Court for the City of Richmond, Virginia;

**BRENDA HAMILTON**, in her official capacity as Clerk of the Circuit Court for the City of Roanoke, Virginia; and

**KELLY FLANNAGAN**, in her official capacity as Clerk of the Circuit Court for the City of Bristol, Virginia

By: /s/ Peter Askin
William W. Tunner (VSB No. 38358)
William D. Prince IV (VSB No. 77209)
Rachel W. Adams (VSB No. 92605)
Peter S. Askin (VSB No. 93371)
*Thompson*McMullan, P.C.
100 Shockoe Slip, 3rd Floor
Richmond, Virginia 23219
Telephone: (804) 649-7545
Facsimile: (804) 780-1813
wtunner@t-mlaw.com
wprince@t-mlaw.com
radams@t-mlaw.com
paskin@t-mlaw.com

*Counsel for Defendants Edward Jewett, in his official capacity as the Clerk of the Circuit Court for the City of Richmond, Virginia, Brenda Hamilton, in her official capacity as the Clerk of the Circuit Court for the City of Roanoke, Virginia, and Kelly Flannagan, in her official capacity as the Clerk of the Circuit Court for the City of Bristol, Virginia*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of February, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record:

Roger Myers, *pro hac vice* forthcoming
Rachel Matteo-Boehm, *pro hac vice* forthcoming
Carlie Tenenbaum, *pro hac vice* forthcoming
BRYAN CAVE LEIGHTON PAISNER LLP
3 Embarcadero Center, 7th Floor
2100 East Cary Street, Suite 310
San Francisco, California 94111
Telephone: (415) 675-3400
roger.myers@bclplaw.com
rachel.matteo-boehm@bclplaw.com
carlie.tenenbaum@bclplaw.com

*Counsel for Plaintiffs Courthouse News Service, Lee Enterprises, Incorporated and Lee BHM LLC*

Dabney J. Carr IV, Esq.
Lauren H. Miller, Esq.
TROUTMAN PEPPER LOCKE LLP
P.O. Box 1122
Richmond, Virginia 23218
Telephone: (804) 697-1200
Facsimile: (805) 697-1339
dabney.carr@troutman.com
lauren.h.miller@troutman.com

*Counsel for Plaintiffs Courthouse News Service, Lee Enterprises, Incorporated and Lee BHM LLC*

By: /s/ Peter Askin
Peter S. Askin (VSB No. 93371)
*Thompson*McMullan, P.C.
100 Shockoe Slip, Third Floor
Richmond, Virginia 23219
Telephone: (804) 649-7545
Facsimile: (804) 780-1813
Email: paskin@t-mlaw.com

*Counsel for Defendants Edward Jewett, Brenda Hamilton, and Kelly Flannagan*

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Abingdon Division**

COURTHOUSE NEWS SERVICE, *et al.*,

Plaintiffs,

v. Civil Action No. 1:25-cv-75-JPJ-PMS

KARL R. HADE, *et al.,*

Defendants.

**THE CLERKS' MOTION TO DISMISS PURSUANT TO RULE 12(B)(6)**

Defendants Edward Jewett, in his official capacity as Clerk of the Circuit Court for the City of Richmond, Virginia, Brenda Hamilton, in her official capacity as Clerk of the Circuit Court for the City of Roanoke, Virginia, and Kelly Flannagan, in her official capacity as Clerk of the Circuit Court for the City of Bristol, Virginia (collectively, the "Clerks"), by counsel, and pursuant to Federal Rule of Civil Procedure 12(b)(6), move this Court to dismiss all counts in the Complaint for failure to state a claim on which relief can be granted.

A memorandum in support of this Motion is being filed contemporaneously herewith. The Clerks request a hearing on the Motion.

Respectfully submitted,

**EDWARD JEWETT**, in his official capacity as Clerk of the Circuit Court for the City of Richmond, Virginia;

**BRENDA HAMILTON**, in her official capacity as Clerk of the Circuit Court for the City of Roanoke, Virginia; and

**KELLY FLANNAGAN**, in her official capacity as Clerk of the Circuit Court for the City of Bristol, Virginia

By: /s/ Peter Askin
William W. Tunner (VSB No. 38358)
William D. Prince IV (VSB No. 77209)
Rachel W. Adams (VSB No. 92605)
Peter S. Askin (VSB No. 93371)
*Thompson*McMullan, P.C.
100 Shockoe Slip, 3rd Floor
Richmond, Virginia 23219
Telephone: (804) 649-7545
Facsimile: (804) 780-1813
wtunner@t-mlaw.com
wprince@t-mlaw.com
radams@t-mlaw.com
paskin@t-mlaw.com

*Counsel for Defendants Edward Jewett, in his official capacity as the Clerk of the Circuit Court for the City of Richmond, Virginia, Brenda Hamilton, in her official capacity as the Clerk of the Circuit Court for the City of Roanoke, Virginia, and Kelly Flannagan, in her official capacity as the Clerk of the Circuit Court for the City of Bristol, Virginia*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of February, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record:

Roger Myers, *pro hac vice* forthcoming
Rachel Matteo-Boehm, *pro hac vice* forthcoming
Carlie Tenenbaum, *pro hac vice* forthcoming
BRYAN CAVE LEIGHTON PAISNER LLP
3 Embarcadero Center, 7th Floor
2100 East Cary Street, Suite 310
San Francisco, California 94111
Telephone: (415) 675-3400
roger.myers@bclplaw.com
rachel.matteo-boehm@bclplaw.com
carlie.tenenbaum@bclplaw.com

*Counsel for Plaintiffs Courthouse News Service, Lee Enterprises, Incorporated and Lee BHM LLC*

Dabney J. Carr IV, Esq.
Lauren H. Miller, Esq.
TROUTMAN PEPPER LOCKE LLP
P.O. Box 1122
Richmond, Virginia 23218
Telephone: (804) 697-1200
Facsimile: (805) 697-1339
dabney.carr@troutman.com
lauren.h.miller@troutman.com

*Counsel for Plaintiffs Courthouse News Service, Lee Enterprises, Incorporated and Lee BHM LLC*

By: /s/ Peter Askin
Peter S. Askin (VSB No. 93371)
*Thompson*McMullan, P.C.
100 Shockoe Slip, Third Floor
Richmond, Virginia 23219
Telephone: (804) 649-7545
Facsimile: (804) 780-1813
Email: paskin@t-mlaw.com

*Counsel for Defendants Edward Jewett, Brenda Hamilton, and Kelly Flannagan*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Abingdon Division**

COURTHOUSE NEWS SERVICE, *et al.*,

Plaintiffs,

v. Civil Action No. 1:25-cv-75-JPJ-PMS

KARL R. HADE, *et al.,*

Defendants.

**MEMORANDUM IN SUPPORT OF THE CLERKS' MOTION TO DISMISS PURSUANT TO RULE 12(B)(6)**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants Edward Jewett, in his official capacity as Clerk of the Circuit Court for the City of Richmond ("Jewett"), Brenda Hamilton, in her official capacity as Clerk of the Circuit Court for the City of Roanoke ("Hamilton"), and Kelly Flannagan, in her official capacity as Clerk of the Circuit Court for the City of Bristol ("Flannagan") (collectively, the "Clerks") file this Motion to Dismiss because Plaintiffs have failed to allege an actionable First Amendment prior restraint claim.

## INTRODUCTION

Plaintiffs assert a First Amendment prior restraint challenge to Virginia Code § 17.1-293(H) and the Officer of the Court Remote Access ("OCRA") system—both of which authorize and provide Virginia attorneys to have remote online access to court records. Although that statute does not prohibit public access to court records at the physical courthouse, it gives discretionary authority to the Clerks to revoke an attorney's OCRA access for sending an OCRA-accessed pleading to a third party.

This lawsuit is Courthouse News Service's second challenge to Virginia Code § 17.1-293(H) and OCRA. They lost their first challenge: the Fourth Circuit held that restricting OCRA

access to only Virginia attorneys (the "Access Restriction") was constitutional and that Courthouse News did not have a right of access to OCRA. *Courthouse News Serv. v. Smith*, 126 F.4th 899, 916–17 (4th Cir. 2025). It further held that Courthouse News lacked standing to challenge the Virginia Code § 17.1-293(H)'s restriction on sending OCRA-accessed pleadings to third parties (the "Dissemination Restriction"). *Id.* at 917.

The present Complaint is an end-run around these holdings. Instead of alleging a restraint on Plaintiffs' speech, the Complaint alleges that Virginia Code § 17.1-293(H) constitutes a prior restraint on their privately-retained attorney's alleged speech to send Plaintiffs OCRA pleadings.

Virginia Code § 17.1-293(H) is not a prior restraint, for two reasons. First, the statute prescribes a *possible* consequence—revocation of OCRA access—only *after* disclosure of an OCRA pleading. But a prior restraint is not, categorically, a "subsequent punishment[]"—it is an "order" that prohibits communication "*in advance* of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550, 553–54 (1993).

Second, the Dissemination Restriction in Virginia Code § 17.1-293(H) does not prohibit disseminating a court record accessed from the physical courthouse. The First Amendment does not invalidate regulations that allow the dissemination of "identical information . . . gained through means independent" of a legal restriction. *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34 (1984). Yet, the Complaint concedes a pleading is "the same record" whether accessed via OCRA or at the courthouse. Compl. ¶ 66; Ex. 2, ¶ 49. Plaintiffs have access to the pleadings they seek—just not via method that they prefer—which is inconsistent with a prior restraint.

This Court should accordingly dismiss this lawsuit against the Clerk defendants, with prejudice.

## BACKGROUND[1]

Plaintiff Courthouse News is a 35 year-old California corporation that summarizes civil court pleadings and court cases. Compl. ¶¶ 29-31. The remaining Plaintiffs are part of Lee Enterprises, Inc., which "is the fourth largest newspaper publisher" in the country. Compl. ¶ 45.

The Clerks are responsible for the maintenance and administration of court records, including court filings and pleadings, in their respective jurisdictions. Compl. ¶¶ 21, 23, 25. Jewett, Hamilton, and Flannagan are the elected clerks for the Circuit Courts of Richmond City, Roanoke City, and Bristol City, respectively. *Id.*

### A. Plaintiffs Have Access to Civil Court Records at the Courthouse.

Court pleadings and records are available to the public at each "physical courthouse" in which the record is stored. Compl. ¶¶ 63, 66; Ex. 2, ¶ 24. Such records can be accessed via "courthouse public access terminals" or "in person." Compl. ¶¶ 63, 70.

Plaintiffs can access, and have accessed, court pleadings and records by visiting Virginia circuit court courthouses in person. Compl. ¶¶ 36, 45, 47. Plaintiffs' employees, for instance, "visit[] their assigned court on a daily or weekly basis to review all the complaints filed." Compl. ¶ 36; *see id.* ¶¶ 45, 47. In fact, over a five-day period, Plaintiffs' employees retrieved court pleadings and records from 25 courthouses across Western Virginia. Compl. ¶ 70; Ex. 6.

### B. Virginia Code § 17.1-293 Provides Requirements for Online Remote Access to Civil Court Records.

The General Assembly has passed various statutes regulating the ability of clerks to offer remote online access to "nonconfidential court records." *See* Va. Code §§ 17.1-225; -292.

[1] The following section is identical to the Background section in the Memorandum in Support of the Clerks' Motion to Dismiss Pursuant to Rule 12(b)(1) filed contemporaneously.

"Nonconfidential court records" are all court records and pleadings, except those deemed confidential via "applicable law or sealed pursuant to court order." Va. Code § 17.1-292(B); *see* Compl. Ex. 2, ¶ 10. For instance, "social security number[s] or other identification numbers"—such as a driver's license or banking number—are confidential and cannot be disclosed to the public, regardless of whether a court record is accessed electronically or physically. Va. Code § 17.1-293(A).

Clerks are not required to offer remote online access to nonconfidential records—it is discretionary. Va. Code § 17.1-225 ("[Clerks] *may* provide remote access, including Internet access, to all nonconfidential court records" (emphasis added)). There is no statutory restriction on who clerks can offer remote access to—be it an attorney or a member of the public. *See* Va. Code §§ 17.1-225, -293.

If a clerk decides to offer remote access, Virginia Code § 17.1-293 provides requirements for doing so. At the outset, remotely accessible records and pleadings cannot contain any person's signature, social security number, date of birth, maiden name of a parent, the name or age of a minor, or banking numbers. Va. Code § 17.1-293(B). Virginia-licensed attorneys and their agents, however, are exempt from this restriction and can view these unredacted records via remote access. Va. Code § 17.1-293(E)(7).

Subsection H—the provision challenged by the Complaint in this case—then states:

> Nothing in this section shall be construed to permit any data accessed by secure remote access to be sold or posted on any other website or in any way redistributed to any third party, and the clerk, *in his discretion, may deny secure remote access to ensure compliance with these provisions*. However, the data accessed by secure remote access may be included in products or services provided to a third party of the subscriber provided that (i) such data is not made available to the general public and (ii) the subscriber maintains administrative, technical, and security safeguards to protect the confidentiality, integrity, and limited availability of the data.

Va. Code § 17.1-293(H) (emphases added).

In sum, any person can access any court record or pleading in person at a courthouse, except for sealed or confidential records. Clerks may, in their discretion, offer remote online access to these court records and pleadings to any person, subject to the redaction of certain sensitive information. Virginia-licensed attorneys and their staff, however, may review unredacted court pleadings via remote access through OCRA. If an OCRA subscriber transmits a remotely accessed pleading to a third party, a clerk may, in the clerk's discretion, revoke their OCRA access. *See id.*

**C. Courts Records Accessed Via OCRA Are the Same as in the Physical Courthouse.**

Of the clerks who offer remote access, the vast majority use the OCRA system. Compl. ¶¶ 53, 55. OCRA allows its users to view an "electronic image" scan of nonconfidential court records online. Compl. ¶ 53. Any person who wishes to use OCRA must seek approval from each individual court that provides such remote access. Compl. ¶ 58. For attorneys who use OCRA to remotely access court records and pleadings in Richmond, Bristol, and Roanoke, the Clerks typically require the attorneys to sign a subscriber agreement. Compl. Exs. 3–5. Such agreements limit OCRA access to only Virginia-barred and pro hac vice attorneys and their staff and select government agencies. Compl. ¶¶ 58–60.

"The documents on OCRA are the same documents that have been made available on courthouse public access terminals." Compl. ¶ 63. "There is no difference in the content of the court records that Plaintiffs and other members of the press and public must travel to each individual court to see . . . they are the same record." Compl. ¶ 66; Ex. 2, ¶ 49. The only difference "is the time, distance, and expense" to access a physical, versus an electronic, record. *Id*.

**D. Plaintiffs Lost Their First First Amendment Challenge to OCRA and Virginia Code § 17.1-293.**

Courthouse News, one of the Plaintiffs in this case, previously filed a similar lawsuit in the Eastern District of Virginia challenging the constitutionality of the Access Restriction's limitation

of OCRA access to Virginia attorneys and the Dissemination Restriction of remotely-accessed civil court records in Virginia Code § 17.1-293(H). Courthouse News sued the Circuit Court Clerk in Prince William County, and the Commonwealth of Virginia intervened as a defendant. Courthouse News alleged that the Access Restriction deprived it of its First Amendment right of access to court records and violated the Equal Protection Clause by discriminating between attorneys and non-attorneys. *Courthouse News Serv. v. Smith*, 126 F.4th 899, 909 (4th Cir. 2025); *see* Compl. ¶ 5. Courthouse News similarly alleged that the Disseminiation Restriction violated its First Amendment rights. *See id.*

The Eastern District of Virginia granted summary judgment to the defendants and dismissed all these claims. *Courthouse News Serv. v. Hade*, 631 F. Supp. 3d 349, 370 (2022) (Hudson, J.), *aff'm in part, vacated in part* 126 F.4th 899. The Eastern District upheld the Access Restriction and Dissemination Restriction as content-neutral time, place, and manner regulations that were justified by the Commonwealth's interests in the orderly and efficient administration of justice and narrowly tailored to the protection of sensitive personal information contained in court filings. *Id.* at 360–70. The Court also reasoned that the Dissemination Restriction in Virginia Code § 17.1-293(H) does not prohibit Courthouse News from "redistribut[ing] information from civil court records obtained physically at the courthouse." *Id.* at 370.

On appeal, the Fourth Circuit affirmed Judge Hudson's decision that limited OCRA access to attorneys—the Access Restriction—did not violate the First Amendment or Equal Protection Clause. The Fourth Circuit reasoned that "[b]y limiting online access to this relatively small, vetted group of individuals [Virginia attorneys] who are strongly incentivized to follow OCRA's rules and who can be effectively disciplined for misconduct, the Access Restriction furthers the Commonwealth's interest in safeguarding sensitive personal information in court records."

*Courthouse News*, 126 F.4th at 913. As the Fourth Circuit observed, "attorneys and their staff do not pose the same threat to sensitive personal information as the public at large." *Id.* at 915.

Because Courthouse News lacked a constitutional right of access to OCRA, the Fourth Circuit accordingly concluded that Courthouse News lacked standing to challenge the Dissemination Restriction. *Id.* at 917. The Fourth Circuit reasoned that the Dissemination Restriction

> *does not impose any restraint on Courthouse News's speech*, because it applies only to individuals with remote online access to court records. Courthouse News does not currently have such access, and we have determined that it is not constitutionally entitled to receive that access.

*Id.* (emphasis added). Although CNS suggested that the dissemination restriction in Code § 17.1-293(H) indirectly injured it by hindering its ability to acquire electronic court records from its attorneys with OCRA access, the Fourth Circuit concluded that Courthouse News's assertion of derivative injury was "too speculative to support standing." *Id.*

**E. Plaintiffs Now Allege that Virginia Code § 17.1-293(H) Is a Prior Restraint of their Attorney's Speech.**

Plaintiffs subsequently filed the current Complaint in this Court seeking to remedy the standing defect identified by the Fourth Circuit in its first lawsuit. Plaintiffs allege that they have asked their privately-retained Virginia attorney, David Lacy ("Mr. Lacy"), to provide them with certain civil court pleadings available through OCRA.[2] Compl. ¶ 11. The Complaint alleges that Mr. Lacy would have provided such pleadings, "but he was compelled to tell [Plaintiffs] that he is prohibited" by Virginia Code § 17.1-293(H) from doing so. Compl. ¶ 12. If Mr. Lacy had conveyed the pleading, Plaintiffs allege that he "*may* have [had his] access revoked" and "*may* [have been] subject to further sanctions, including disbarment." Compl. ¶¶ 4, 61 (emphases added).

[2] It is unclear from the allegations in the Complaint whether Mr. Lacy has an OCRA subscriber agreement in all three jurisdictions relevant to the Clerks.

The Complaint asserted a single First Amendment claim under 42 U.S.C. § 1983. Specifically, the Complaint asserts that the Dissemination Restriction in Virginia Code § 17.1-293(H) is unconstitutional on its face and as applied as a "prior restraint." Compl. ¶ 87. The Complaint accordingly requests this Court to declare Virginia Code § 17.1-293(H) unconstitutional and enjoin all enforcement thereof, "including disbarment" of attorneys for violating the dissemination restriction contained in Virginia Code §17.1-293(H). Compl. at 31–32.

## LEGAL STANDARD

A motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted "challenges the legal sufficiency of a complaint." *Francis v. Giacomelli,* 588 F.3d 186, 192 (4th Cir. 2009) (citations omitted). When considering a motion to dismiss, the court should accept as true all well-pleaded allegations, viewed in a light most favorable to the plaintiff. *Ostrzenski v. Seigel,* 177 F.3d 245, 251 (4th Cir. 1999). However, the court does not accept legal conclusions or conclusory statements. *Langford v. Joyner*, 62 F.4th 122, 124 (4th Cir. 2023).

## ARGUMENT

The Complaint pleads one count—a prior restraint challenge to Virginia Code § 17.1-293(H), which it challenges facially and as-applied to Plaintiffs.

This claim fails for two reasons. First, Virginia Code § 17.1-293(H) is not a prior restraint because it does not restrain speech before it occurs. Second, to the extent this Court concludes the statute is a prior restraint, the Complaint has failed to plead a facial challenge to the statute.

### A. VIRGINIA CODE § 17.1-293(H) IS NOT A PRIOR RESTRAINT.

The First Amendment prohibits "abridging the freedom of speech." At its core, the First Amendment prohibits the government from restricting "expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).

The First Amendment accordingly restricts the use of "prior restraints" of such expression. *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 713–23 (1931).

Virginia Code § 17.1-293(H) is not a prior restraint for two reasons: (1) the statute only provides a consequence after speech—it does not restrain speech before it occurs; and (2) the statute does not restrict accessibility of the court pleadings from other sources.

**1. Virginia Code § 17.1-293(H) Does Not Prohibit Speech Before it Occurs.**

A prior restraint refers to "administrative and judicial orders *forbidding* certain communications when issued *in advance* of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (emphasis added to "in advance"). Prior restraints—unlike other speech regulations—impose an "immediate and irreversible sanction" by "freez[ing]" speech before it occurs, rather than punishing the speech "after publication." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

Courts have deemed only a narrow set of regulations as a prior restraint, including:

- Licensing regimes, which condition speech on obtaining a license subject to the discretion of the government. *See, e.g., City of Lakewood v. Plain Dealer Publ'g. Co.,* 486 U.S. 750, 755–56 (1988); *Sec'y of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 964 (1984).
- Regulations that require registration before one can utter speech. *See, e.g., Watchtower Bible & Tract Society of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 164–69 (2002); *Thomas v. Collins*, 323 U.S. 516, 525 (1945).
- Court orders and injunctions that "actually forbid speech activities." *Alexander*, 509 U.S. at 550; *see, e.g., Tory v. Cochran*, 544 U.S. 734, 738 (2005) (order prohibiting libel).
- Parade or protest permitting requirements. *Green v. City of Raleigh*, 523 F.3d 293, 300–01 (4th Cir. 2008) (holding that such permits are constitutional if content-neutral with appropriate procedural safeguards).

All of these regulations required prior approval before speech could occur. But "until an order forbidding speech issues, no such restraint has yet been imposed." *Bruce & Tanya & Assocs., Inc. v. Bd. of Supervisors of Fairfax Cty.*, 854 F. App'x 521, 525 (4th Cir. 2021) (unpublished opinion).

Indeed, courts are reluctant to overdefine prior restraint such that it "stretches the term . . . well beyond [its] limits." *Alexander*, 509 U.S. at 549–50. Instead, courts "have steadfastly preserved the distinction between prior restraints and *subsequent* punishments." *Id.* at 553–54 (emphasis added).

For instance, a forfeiture order that required a business owner to forfeit his possession of his adult entertainment literature and materials, for instance, is not a prior restraint. *Id.* at 554. In *Alexander*, the plaintiff specifically asserted that such an order was "an unconstitutional prior restraint on speech, rather than a permissible criminal punishment" because it was a "complete *ban* on his future expression." *Id.* at 549–50.

The Court disagreed. It noted that the order did not "*forbid* petitioner to engage in any expressive activities in the future, nor [did] it require him to obtain prior approval for any expressive activities." *Id.* at 550–51. The order allowed the plaintiff to re-open a store and "engage in any expressive activity he chooses"; "he just cannot finance these enterprises with assets derived from his prior racketeering offense." *Id.* at 551.

The Court further reasoned that accepting plaintiff's argument "would virtually obliterate the distinction . . . between prior restraints and subsequent punishments." *Id.* at 549–50. If "[s]tiff criminal penalties for obscenity offenses are consistent with the First Amendment; so is the forfeiture of expressive materials as punishment for criminal conduct." *Alexander*, 509 U.S. at 557.

By the same token, Virginia Code § 17.1-293(H) is not a prior restraint. Nothing in the statute requires Mr. Lacy, or any other OCRA subscriber, to seek approval from the Clerks before sending an OCRA pleading. The statute does not authorize the Clerks to seek an injunction from such disclosure, either. Nor has the Complaint alleged the existence of any judicial or

administrative order from the Clerks that restrains disclosure of a pleading. *See Bruce & Tanya & Assocs.*, 854 F. App'x at 525 ("[U]ntil an order forbidding speech issues, no such restraint has yet been imposed.").

Instead, Virginia Code § 17.1-293(H) merely provides a possible subsequent consequence for disclosure. If an individual violates the statute by disclosing an OCRA-accessed pleading to a third party, the sole potential consequence is revocation of that individual's OCRA access, at the clerk's discretion. The statute does not prohibit that individual from further speaking or disclosing the pleading, impose any criminal or penal sanction for disclosure, or remove the pleading from the physical courthouse or OCRA.

Adopting Plaintiffs' argument would otherwise "obliterate the distinction" between "prior restraints and subsequent punishments." *See Alexander*, 509 U.S. at 549–50. Taken to its logical extension, Plaintiffs' argument would render every statute, regulation, or court order that imposes some sort of consequence for disclosure of information as unconstitutional. Regulations that prohibit the disclosure of grand jury testimony, sealed records, trade secrets, or social security numbers, for instance, would be subject to an exacting standard of prior restraint scrutiny.

Because Virginia Code § 17.1-293(H) provides only a "subsequent punishment," it is not, categorically, a prior restraint. The Complaint's First Amendment prior restraint claim therefore fails as a matter of law, and this Court should dismiss the Clerks as defendants with prejudice.

**2. Virginia Code § 17.1-293(H) Does Not Prohibit Obtaining Court Records by Other Means.**

A prior restraint also does not apply to restrictions on disclosures of information accessible by other means. While the press have rights to access information and receive speech, the First Amendment does not "require government to accord the press special access to information not shared by members of the public generally." *Pell v. Procunier*, 417 U.S. 817, 834 (1974).

> It is one thing to say that a journalist is free to seek out sources of information not available to members of the general public, that he is entitled to some constitutional protection of the confidentiality of such sources, and that government cannot restrain the publication of news emanating from such sources. It is quite another thing to suggest that the Constitution imposes upon government the affirmative duty to make available to journalists *sources of information not available to members of the public generally*.

*Pell*, 417 U.S. 834–35 (emphasis added) (holding that prohibiting the press from interviewing prison inmates did not violate the First Amendment). Accordingly, even if an order prohibits disclosure of information, it is still not a prior restraint if it allows dissemination of information "gained through means independent of the court's processes." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34 (1984).

*Seattle Times Co. v. Rhinehart* is instructive on this principle. There, the news media challenged a protective order issued by a court that prohibited the dissemination of information discovered pursuant to a lawsuit. *Id.* at 26-28. The Court thus asked whether the First Amendment

> comprehends the right to disseminate information that [a plaintiff] has obtained pursuant to a court order that both *granted him access* to that information and placed *restraints on the way in which the information might be used*.

*Id.* at 32 (emphases added).

The Court answered this question in the negative. It reasoned that the protective order prohibited only the disclosure of information obtained through the discovery process—it did not prohibit disclosure of such information obtained elsewhere. *Id.* at 34. Thus, the press was still entitled to report on "identical information." *Id.* In other words, the protective order did not restrain speech; it restrained access to sources of speech. *See id.* at 32 ("The right to speak and publish does not carry with it the unrestrained right to gather information." (citation omitted)). The Court found that merely restricting access is not a prior restraint on speech and does not violate the First Amendment. *Id.* at 33–34, 37.

Similarly, Virginia Code § 17.1-293(H) restricts only access to information sources. It does not prohibit discussing or advising about a court pleading, nor does it prohibit the public from reading or obtaining that pleading. The statute merely limits who is entitled to OCRA access and how electronic court records accessed through OCRA can be shared or distributed. If the statute could not prohibit OCRA disclosures to third parties, its constitutionally valid Access Restriction would be meaningless. That valid Access Restriction limits access to Virginia-licensed attorneys, their staff, and select government agencies. Compl. ¶ 4. OCRA-accessed pleadings thus constitute "sources of information not available to members of the public generally." *See Pell*, 417 U.S. at 834–35.

Nor does Virginia Code § 17.1-293(H) prohibit Plaintiffs from obtaining "identical information" from other sources. *See Seattle Times*, 467 U.S. at 34. Indeed, Plaintiffs concede that the "documents on OCRA *are the same* documents that have been made available on courthouse public access terminals." Compl. ¶ 63 (emphasis added). Whether accessed via OCRA or in person at the courthouse, the pleadings "are the same record." Compl. ¶ 66; Ex. 2, ¶ 49. And Plaintiffs admit that, over their 35-year existence, they have been able to "visit[] their assigned court on a daily or weekly basis to review all the complaints filed." Compl. ¶ 36, *see id.* ¶¶ 45, 47. Plaintiffs can thus access the exact same information from lawful sources and mediums. The statute cannot, then, constitute a prior restraint.

This conclusion exposes the Complaint for what Plaintiffs really seek—access to OCRA through the intermediary of their attorney and agent. But If Plaintiffs are not "constitutionally entitled to receive" OCRA access directly, *Courthouse News Serv.*, 126 F.4th at 917, they have no right to it via any of their agents either—be it an employee or their attorney. To hold otherwise would render the Fourth Circuit's holding, and the Access Restriction, meaningless.

In short, Virginia Code § 17.1-293(H) does not restrict speech—it restricts access to sources of information. But a prior restraint does not constitutionally compel access to information, and Plaintiffs have no right to OCRA access. Yet, their Complaint seeks an end-around that conclusion. The statute thus does not violate the First Amendment, and this Court should accordingly dismiss the Clerks as defendants, with prejudice.

### B. The Complaint's Facial Challenge Fails As a Matter of Law.

As argued above, Virginia Code § 17.1-293(H) is not a prior restraint, which defeats the Complaint in its entirety. If this Court disagrees, it should still dismiss the Complaint's facial challenge to the statute.

A First Amendment claim can challenge a statute facially and as-applied. *See Greater Balt. Cent. for Pregnancy Concerns, Inc. v. Mayor and City Council Balt.*, 721 F.3d 264, 282 (4th Cir. 2013). "An as-applied challenge attacks the constitutionality of a statute based on a developed factual record and the application of a statute to a specific person." *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 762 (4th Cir. 2013) (citation and internal quotation marks omitted). An as-applied constitutional challenge involves reviewing the statute's application to "the challenger's individual circumstances." *Educ. Media Co. at Va. Tech, Inc. v. Insley*, 731 F.3d 291, 300 (4th Cir. 2013). In a facial constitutional challenge, by contrast, a litigant must demonstrate "that a statute always operates in an unconstitutional manner." *Doe*, 713 F.3d at 762.

Facial challenges are "disfavored." *Moody v. NetChoice, LLC*, 603 U.S. 707, 744 (2024); *accord United States v. Miselis*, 972 F.3d 518, 530 (4th Cir. 2020).

> [F]acial challenges run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law that is broader than is required by the precise facts to which it is to be applied.

*Miselis*, 972 F.3d at 530 (citation internal quotation marks omitted).

Accordingly, to sustain a facial challenge, a plaintiff has the burden of showing "that no set of circumstances exists under which the law would be valid, or that the law lacks any plainly legitimate sweep." *Miselis*, 972 F.3d at 530 (internal citations omitted). In the First Amendment context, the plaintiff must show that "a substantial number" of the law's "applications are unconstitutional." *Id.* at 530 (citation omitted).

The Complaint fails to allege that Virginia Code § 17.1-293(H) operates as a prior restraint of speech in all, or even a substantial number, of instances. The Fourth Circuit has already held that the Access Restriction is constitutional and that the Dissemination Restriction "does not impose any restraint on Courthouse News' speech." *Courthouse News Serv.*, 126 F.4th at 917. Such a conclusion would equally apply to any member of the public, who likewise lacks any constitutional right to OCRA access.

Accordingly, in light of the Fourth Circuit's prior rulings, the statute is conceivably unconstitutional *only if* an attorney is willing to convey the OCRA-accessed pleading to a member of the public. In a facial challenge, the Complaint would therefore have to show "willing" attorneys in a "substantial number" of instances. *See Miselis*, 972 F.3d at 530.

The Complaint fails to do so. It only alleges one attorney, Mr. Lacy, who wishes to convey an OCRA-accessed pleading to Plaintiffs or any other member of the public. The Complaint does not allege that any other attorneys, or attorneys as a class, wish to be "willing speakers" and broadcast OCRA-accessed pleadings to the public at large. The Complaint has therefore failed to allege an actionable facial challenge to Virginia Code § 17.1-293(H).

## CONCLUSION

The Complaint seeks an end-run around the Fourth Circuit's prior holding that the Access Restriction is unconstitutional, and Virginia Code § 17.1-293(H) fails all aspects of a prior

restraint. It does not provide for injunctive relief nor prohibit disclosure of an OCRA-accessed pleading before it occurs, and it otherwise allows the public to access the same pleadings at the physical courthouse. The Complaint's First Amendment prior restraint claim thus fails as a matter of law and the Clerks ask this Court to dismiss them as defendants, with prejudice.

Respectfully submitted,

**EDWARD JEWETT**, in his official capacity as
Clerk of the Circuit Court for the City of Richmond, Virginia;

**BRENDA HAMILTON**, in her official capacity as
Clerk of the Circuit Court for the City of Roanoke, Virginia; and

**KELLY FLANNAGAN**, in her official capacity as
Clerk of the Circuit Court for the City of Bristol, Virginia

By: /s/ Peter Askin

William W. Tunner (VSB No. 38358)
William D. Prince IV (VSB No. 77209)
Rachel W. Adams (VSB No. 92605)
Peter S. Askin (VSB No. 93371)
*Thompson*McMullan, P.C.
100 Shockoe Slip, 3rd Floor
Richmond, Virginia 23219
Telephone: (804) 649-7545
Facsimile: (804) 780-1813
wtunner@t-mlaw.com
wprince@t-mlaw.com
radams@t-mlaw.com
paskin@t-mlaw.com

*Counsel for Defendants Edward Jewett, in his official capacity as the Clerk of the Circuit Court for the City of Richmond, Virginia, Brenda Hamilton, in her official capacity as the Clerk of the Circuit Court for the City of Roanoke, Virginia, and Kelly Flannagan, in her official capacity as the Clerk of the Circuit Court for the City of Bristol, Virginia*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of February, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record:

Roger Myers, *pro hac vice* forthcoming
Rachel Matteo-Boehm, *pro hac vice* forthcoming
Carlie Tenenbaum, *pro hac vice* forthcoming
BRYAN CAVE LEIGHTON PAISNER LLP
3 Embarcadero Center, 7th Floor
2100 East Cary Street, Suite 310
San Francisco, California 94111
Telephone: (415) 675-3400
roger.myers@bclplaw.com
rachel.matteo-boehm@bclplaw.com
carlie.tenenbaum@bclplaw.com

*Counsel for Plaintiffs Courthouse News Service, Lee Enterprises, Incorporated and Lee BHM LLC*

Dabney J. Carr IV, Esq.
Lauren H. Miller, Esq.
TROUTMAN PEPPER LOCKE LLP
P.O. Box 1122
Richmond, Virginia 23218
Telephone: (804) 697-1200
Facsimile: (805) 697-1339
dabney.carr@troutman.com
lauren.h.miller@troutman.com

*Counsel for Plaintiffs Courthouse News Service, Lee Enterprises, Incorporated and Lee BHM LLC*

By: /s/ Peter Askin
Peter S. Askin (VSB No. 93371)
*Thompson*McMullan, P.C.
100 Shockoe Slip, Third Floor
Richmond, Virginia 23219
Telephone: (804) 649-7545
Facsimile: (804) 780-1813
Email: paskin@t-mlaw.com

*Counsel for Defendants Edward Jewett, Brenda Hamilton, and Kelly Flannagan*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Abingdon Division**

| | |
|---|---|
| COURTHOUSE NEWS SERVICE; LEE ENTERPRISES, INCORPORATED; AND LEE BHM LLC, PUBLISHER OF THE RICHMOND TIMES-DISPATCH, THE ROANOKE TIMES, BRISTOL HERALD COURIER, LYNCHBURG NEWS AND ADVANCE, FREDERICKSBURG FREE LANCE STAR AND THE DAILY PROGRESS.<br><br>Plaintiff,<br><br>v.<br><br>KARL R. HADE, in his official capacity as Executive Secretary of the Office of Executive Secretary of the Supreme Court of Virginia,<br><br>and<br><br>EDWARD JEWETT, in his official capacity as Clerk of the Circuit Court for the City of Richmond, Virginia,<br><br>and<br><br>BRENDA HAMILTON, in her official capacity as Clerk of the Circuit Court for the City of Roanoke, Virginia,<br><br>and<br><br>KELLY FLANNAGAN, in her official capacity as Clerk of the Circuit Court for the City of Bristol, Virginia<br><br>Defendants. | Civil Action No. 1:25-cv-0075-JPJ-PMS |

**PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

**TABLE OF CONTENTS**

**Page(s)**

INTRODUCTION ..... 1

BACKGROUND ..... 4

A. OCRA's Restrictions Bar CNS and Lee From Reporting on Cases in Many Courts ..... 5

B. OCRA's Restrictions are Enforced by Defendant Hade and Defendant Clerks ..... 6

C. OCRA Restrains Subscribers from Providing Information to CNS and Lee ..... 7

I. DEFENDANTS OVERLOOK CLEAR PRECEDENT HOLDING CNS AND LEE HAVE STANDING TO PROTECT THEIR FIRST AMENDMENT RIGHT TO GATHER NEWS ..... 9

A. The Complaint Plausibly Alleges Injury to CNS and Lee the Court Can Redress ..... 10

1. Under Governing Precedent, CNS' and Lee's Newsgathering is Being Injured ..... 10

2. The Complaint Alleges Attorneys Are Willing to Speak But For the Restriction ..... 13

B. Lee Enterprises' Harm From the Restriction Give It Standing as Well as Lee BHM ..... 16

II. THE AS-APPLIED CLAIM BY CNS AND LEE IS RIPE BECAUSE THE DISSEMINATION RESTRICTION CURRENTLY IMPAIRS NEWSGATHERING ..... 18

III. DEFENDANTS' ELEVENTH AMENDMENT "ENFORCEMENT" ARGUMENTS FARE NO BETTER AT THIS PLEADING STAGE THAN THEY DID IN *HADE I* ..... 20

A. Defendant Hade's Eleventh Amendment Ignores *Hade I* as Well as CNS' and Lee's Factual Allegations Here That Are More Than Sufficient at This Pleading Stage ..... 20

B. The Defendant Clerks Enforcement Argument Misunderstands How "Discretion" Is Relevant For *Ex Parte Young* Purposes In This First Amendment Case ..... 25

IV. THE DISSEMINATION RESTRICTION IS A RESTRAINT ON PROTECTED SPEECH ABOUT CIVIL COURT RECORDS ON OCRA THAT IMPAIRS NEWSGATHERING, AND THUS IS UNCONSTITUTIONAL UNLESS IT SATISFIES STRICT SCRUTINY ..... 28

A. Strict Scrutiny Applies to Restraints on Disseminating Content from Court Records ..... 29

1. *Soderberg* Requires that District Courts Apply Strict Scrutiny Even to Partial Bans On Disseminating Information Obtained from Publicly Available Court Records ..... 29

2. Strict Scrutiny Applies to Restraints on Speaking with the Media about Civil Cases ........ 30

B. Defendants' Arguments for Not Applying Any Scrutiny to the Restriction All Fail ........ 33

1. Contractual Waivers of Constitutional Rights Do Not Apply to Statutory Restraints ........ 33

2. The Court Must Decline Defendants' Plea to Ignore the Plain Text of the Restriction ........ 36

3. CNS and Lee Have Stated Both Facial and As Applied Claims ........ 39

V. DEFENDANTS DO NOT ARGUE THE DISSEMINATION RESTRICTION SURVIVES STRICT SCRUTINY AND THE SCRUTINY THEY APPLY REQUIRES FACTUAL EVIDENCE THEY HAVE NOT AND CANNOT PRESENT AT THIS STAGE ........ 43

CONCLUSION ........ 46

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU v. Holder*,
673 F.3d 245 (4th Cir. 2011) ....................16

*Alexander v. United States*,
509 U.S. 544 (1993)....................30, 37

*Am. Entertainers, LLC v. City of Rocky Mount*,
888 F.3d 707 (4th Cir. 2018) ....................2, 32, 41

*In re Andrews*,
80 F.3d 906 (4th Cir. 1996) ....................36

*Animal Legal Def. Fund v. Kelly*,
9 F.4th 1219 (10th Cir. 2021) ....................38

*Antrican v. Odom*,
290 F.3d 178 (4th Cir. 2002) ....................2, 26, 27

*Ass'n of Am. Railroads v. Hudson*,
144 F.4th 582 (4th Cir. 2025) ....................42

*Baltimore Sun Co. v. State*,
667 A.2d 166 (Md. App. 1995)....................35

*Billups v. City of Charleston*,
194 F. Supp. 3d 452 (D.S.C. 2016)....................44

*Billups v. City of Charleston*,
961 F.3d 673 (4th Cir. 2020) ....................44, 45

*Board of Cnty Comm'rs v. Umbehr*,
518 U.S. 668 (1996)....................34

*Branzburg v. Hayes*,
408 U.S. 665 (1972)....................11, 12, 13

*Brooks v. St. Charles Hotel Operating, LLC.*,
2023 WL 6244612 (D. Md. Sept. 26, 2023) ....................27

*Bruce & Tanya & Assocs. v. Bd. of Supervisors of Fairfax Cty.*,
854 F. App'x 521 (4th Cir. 2021) ....................19

*Bruni v. City of Pittsburgh*,
824 F.3d 353 (3d Cir. 2016)....................44

*In re Callaway*,
1978 WL 222036 (Bankr. E.D. Va. Oct. 26, 1978)....................38

*Caplin & Drysdale, Chartered v. United States*,
491 U.S. 617 (1989)....................15

*Carroll v. New People's Bank, Inc.*,
2018 WL 1659482 (W.D. Va. Apr. 5, 2018)....................17

*CBS Inc. v. Young*,
522 F.2d 234 (6th Cir. 1975) (per curiam)....................9, 11, 30, 31

*In re Charlotte Observer*,
921 F.2d 47 (4th Cir. 1990)....................3

*Citizens United v. Schneiderman*,
882 F.3d 374 (2d Cir. 2018)....................40

*City of Lakewood v. Plain Dealer Pub'g Co.*,
486 U.S. 750 (1988).................... *passim*

*Classic Commc'ns, Inc. v. Rural Tel. Serv. Co.*,
956 F. Supp. 896 (D. Kan. 1996)....................17

*Clatterbuck v. City of Charlottesville*,
708 F.3d 549 (4th Cir. 2013)....................4

*Connecticut Mag. v. Moraghan*,
676 F. Supp. 38 (D. Conn. 1987)....................31

*Cooksey v. Futrell*,
721 F.3d 226 (4th Cir. 2013).................... *passim*

*Courthouse News Serv. v. Gilmer*,
48 F.4th 908 (8th Cir. 2022)....................26

*Courthouse News Serv. v. Hade*,
580 F. Supp. 3d 289 (E.D. Va. 2022).................... *passim*

*Courthouse News Serv. v. Hade*,
631 F. Supp. 3d 349 (E.D. Va. 2022).................... *passim*

*Courthouse News Serv. v. Planet*,
750 F.3d 776 (9th Cir. 2014)....................5, 39

*Courthouse News Serv. v. Planet*,
947 F.3d 581 (9th Cir. 2020) ....................5

*Courthouse News Serv. v. Schaefer*,
2 F.4th 318 (4th Cir. 2021) ....................36, 39, 42, 47

*Courthouse News Serv. v. Smith*,
126 F.4th 899 (4th Cir. 2025) .................... *passim*

*Cox Broadcasting Corp. v. Cohn*,
420 U.S. 469 (1975)....................34, 43

*Crandon v. United States*,
494 U.S. 152 (1990)....................36

*Deep South Today v. Murrill*,
779 F. Supp. 3d 782 (M.D. La. 2025)....................18

*Democracy Rising PA v. Celluci*,
603 F. Supp. 2d 780 (M.D. Pa. 2009)....................19

*Dirks v. Bd. of Cnty. Comm'rs.*,
2016 WL 2989240 (D. Kan. May 24, 2016)....................37, 40

*Doe v. Pub. Citizen*,
749 F.3d 246 (4th Cir. 2014) .................... *passim*

*In re Dow Jones & Co.*,
842 F.2d 603 (2d Cir. 1998)....................31

*Doyle v. Hogan*,
1 F.4th 249 (4th Cir. 2021) ....................21, 25

*Edgar v. Haines*,
2 F.4th 298 (4th Cir. 2021) ....................2, 10, 13, 18

*Elephant Butte Irr. Dist. v. Dep't of Interior*,
160 F.3d 602 (10th Cir. 1998) ....................26

*Evans v. United States*,
105 F.4th 606 (4th Cir. 2024) ....................4

*In re Express-News*,
695 F.2d 807 (5th Cir. 1982) ....................28, 30

*Faircloth v. Lundy Packing Co.*,
91 F.3d 648 (4th Cir. 1996) ....................36

*Flynt v. Rumsfeld*,
355 F.3d 697 (D.C. Cir. 2004) ....................18

*Food Line, Inc. v. Capital Cities/ABC, Inc.*,
194 F.3d 505 (4th Cir. 1999) ....................13

*Fuentes v. Shevin*,
407 U.S. 67 (1972) ....................35

*FW/PBS, Inc. v. City of Dallas*,
493 U.S. 215 (1990) ....................19

*Globe Newspaper Co. v. Superior Court*,
457 U.S. 596 (1982) ....................28, 36, 39, 42

*Goines v. Valley Cmty. Servs. Bd.*,
822 F.3d 159 (4th Cir. 2016) ....................4

*Hirschkop v. Snead*,
594 F.2d 356 (4th Cir. 1979) ....................31

*Hutchins v. U.S. Dep't of Lab.*,
683 F.3d 75 (4th Cir. 2012) ....................37, 38

*Journal Publ'g Co. v. Mechem*,
801 F.2d 1233 (10th Cir. 1986) ....................31

*Kelly v. Hegseth*,
2026 WL 391777 (D.D.C. Feb. 12, 2026) ....................36

*Laber v. Harvey*,
438 F.3d 404 (4th Cir. 2006) (en banc) ....................17

*Lake James Cmty. Volunteer Fire Dep't, Inc. v. Burke Cnty.*,
149 F.3d 277 (4th Cir. 1998) ....................34

*Leigh v. Salazar*,
677 F.3d 892 (9th Cir. 2012) ....................47

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ....................10, 11, 12, 16

*Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*,
576 F.3d 172 (4th Cir. 2009) ....................3

*Matsumoto v. Labrador*,
122 F.4th 787 (9th Cir. 2024) ....................24

*McBurney v. Cuccinelli*,
616 F.3d 393 (4th Cir. 2010) ....................20, 21

*McCullen v. Coakley*,
573 U.S. 464 (2014)....................44, 45

*Meese v. Keene*,
481 U.S. 465 (1987)....................15

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)....................15, 39, 41

*In re Murphy-Brown, LLC*,
907 F.3d 788 (4th Cir. 2018) ....................30, 47

*Mutafis v. Erie Ins. Exch.*,
728 F.2d 672 (4th Cir. 1984) ....................38

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964)....................35, 36

*Nebraska Press Ass'n v. Stuart*,
427 U.S. 539 (1976)....................19, 31, 47

*New Mexicans for Bill Richardson v. Gonzales*,
64 F.3d 1495 (10th Cir. 1995) ....................18, 19

*Nutritional Health All. v. Shalala*,
144 F.3d 220 (2d Cir. 1998)....................19

*Ohio Valley Env't Coal., Inc. v. Hernshaw Partners, LLC*,
984 F. Supp. 2d 589 (S.D.W. Va. 2013)....................3, 17

*Ostergren v. McDonnell*,
2008 WL 3895593 (E.D. Va. Aug. 22, 2008) ....................19

*Ostergren v. Cuccinelli*,
615 F.3d 263 (4th Cir. 2010) ....................19, 33, 42

*Overbey v. Mayor of Baltimore*,
930 F.3d 215 (4th Cir. 2019) .................... *passim*

*Pennhurst State Sch. & Hosp. v Halderman*,
465 U.S. 89 (1984)....................21

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992)....................41

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015)........41, 44

*Reynolds v. Middleton*,
779 F.3d 222 (4th Cir. 2015)........3, 44, 45

*Richmond Newspapers, Inc. v. Virginia*,
448 U.S. 555 (1980)........39

*Richwine v. Matuszak*,
707 F. Supp. 3d 782 (N.D. Ind. 2023)........35

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
18 F.3d 269 (4th Cir. 1994)........33, 34

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
515 U.S. 819 (1995)........33, 34

*Ross v. Early*,
746 F.3d 546 (4th Cir. 2014)........45

*Rushford v. New Yorker Mag., Inc.*,
846 F.2d 249 (4th Cir. 1988)........12

*S.C. Wildlife Fed'n v. Limehouse*,
549 F.3d 324 (4th Cir. 2008)........21, 25

*San Bernardino Cnty. Dep't of Public Social Servs. v. Superior Court*,
232 Cal. App. 3d 188 (1991)........35

*In re Shain*,
978 F.2d 850 (4th Cir. 1992)........13

*Silver Spurs, Inc. v. Town of Palm Shores*,
1997 WL 809203 (M.D. Fla. Dec. 30, 1997)........32

*Smith v. Daily Mail Publ'g Co.*,
443 U.S. 97 (1979)........28, 34

*Soderberg v. Carrion*,
999 F.3d 962 (4th Cir. 2021)........*passim*

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)........11

*Stephens v. Cnty. of Albemarle*,
524 F.3d 485 (4th Cir. 2008)........12, 14, 16

*Stiltner v. Beretta U.S.A. Corp.*,
74 F.3d 1473 (4th Cir. 1996) ....................37

*Stone v. Univ. of Md. Med. Sys. Corp.*,
855 F.2d 178 (4th Cir. 1988) ....................12

*Susan B. Anthony List v. Driehaus*,
814 F.3d 466 (6th Cir. 2016) ....................40, 41

*Telco Commc'ns, Inc. v. Carbaugh*,
885 F.2d 1225 (4th Cir. 1989) ....................19

*Texas v. Johnson*,
491 U.S. 397 (1989)....................38

*Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*,
450 U.S. 707 (1981)....................34

*United States v. Amodeo*,
71 F.3d 1044 (2d Cir. 1995)....................47

*United States v. Blankenship*,
79 F. Supp. 3d 613 (S.D. W. Va. 2015)....................12, 14

*United States v. Dinwiddie*,
885 F. Supp. 1286 (W.D. Mo. 1995) ....................37

*United States v. Miselis*,
972 F.3d 518 (4th Cir. 2020) ....................39, 40, 41, 42

*Verizon Md., Inc. v. Public Serv. Com'n of Md.*,
535 U.S. 635 (2002)....................21

*Virginia v. Am. Booksellers Ass'n*,
484 U.S. 383 (1988)....................18

*In re Wall St. J.*,
601 F. App'x 215 (4th Cir. 2015) (per curiam) .................... *passim*

*Warth v. Seldin*,
422 U.S. 490 (1975)....................17

*Whole Women's Health v. Jackson*,
595 U.S. 30 (2021)....................26

*Woodall v. Reno*,
47 F.3d 656 (4th Cir. 1995) ....................19

*Ex parte Young*,
209 U.S. 123 (1908) ........ *passim*

*Zak v. Chelsea Therapeutics Int'l*,
780 F.3d 597 (4th Cir. 2015) ........ 4

*Zeran v. AOL*,
129 F.3d 327 (4th Cir. 1997) ........ 15, 40

**Statutes**

47 U.S.C. § 230 ........ 15, 40

Va. Code § 8.01-420.8 ........ 87

Va. Code. § 17.292 ........ 37

Va. Code § 17.1-293(E)(7) ........ 1, 6, 24

Va. Code § 17.1-293(H) ........ *passim*

Va. Code § 17.1-314 ........ 22, 24

Va. Code § 17.1-502(A) ........ 22, 24

Va. Code § 59.1–443.2(A)(1) ........ 33

**Rules**

Federal Rule of Civil Procedure 12(b)(1) ........ 1, 7, 20

Federal Rule of Civil Procedure 12(b)(6) ........ 1

Federal Rule of Civil Procedure 15(a) ........ 17

## INTRODUCTION

The media have remote access to nonconfidential civil court records in federal courts and about 75 percent of the states and the District of Columbia. Compl., ¶ 37. While Virginia also provides remote access through "a system called 'Virginia Officer of the Court Remote Access' ('OCRA')," *Courthouse News Serv. v. Hade*, 580 F. Supp. 3d 289, 292 (E.D. Va. 2022) ("*Hade I*"), "OCRA is subject to two important statutory limitations," *id.*, that differ from other states.

First, the public and the press cannot use OCRA; only attorneys and government agencies. Va. Code § 17.1-293(E)(7) (the "Access Restriction"). Second, Virginia imposes a prior restraint preventing OCRA users from disseminating any content in court records accessed through OCRA to "any third party" who may make them "available to the general public" – i.e., the press. *Id.* § 17.1-293(H) (the "Dissemination Restriction").

One Plaintiff in this case, Courthouse News Service ("CNS"), initially sued Defendant Karl Hade, Executive Secretary of the Office of the Executive Secretary of the Virginia Supreme Court ("OES"), over both Restrictions. Compl., ¶ 5 ("*CNS v. Hade*"). The Eastern District granted summary judgment against CNS after declining to apply strict scrutiny and finding both satisfied time, place and manner scrutiny. *Courthouse News v. Hade*, 631 F. Supp. 3d 349 (E.D. Va. 2022) ("*Hade II*"). On appeal, a divided panel affirmed as to the Access Restriction but reversed as to the Dissemination Restriction on standing grounds, and that claim was dismissed without prejudice. *Courthouse News Serv. v. Smith*, 126 F.4th 899 (4th Cir. 2025).

Defendant Hade and the three Defendant Clerks in this action are happy to tell the Court about *Hade II*, but their motions to dismiss are completely silent about *Hade I*, for good reason. In *Hade I*, the Eastern District ***denied*** motions to dismiss under Rules 12(b)(1) and (b)(6) on the same sovereign immunity and merits grounds asserted here. 580 F. Supp. 3d at 295-96.

That is not all Defendants neglect to mention. The list includes but is not limited to:

- The Fourth Circuit has instructed that both "'standing [and] ripeness requirements are … ***relaxed in First Amendment cases***.'" *Edgar v. Haines*, 2 F.4th 298, 311 (4th Cir. 2021).[1]

- The Fourth Circuit has found the media – here, CNS and co-Plaintiffs Lee Enterprises and Lee BHM, Inc. ("Lee") – have standing based on their own "legally protected interest … to gather news," and ***"no merit"*** in Defendants' theory that it derives from "'the free speech rights of third parties.'" *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 228 & n.11 (4th Cir. 2019).

- The Fourth Circuit has defined who "qualifies as a willing speaker" in a way that includes the OCRA subscriber in this case, who on multiple occasions told CNS and Lee he was "willing to provide information" to them, but did "not want to violate" OCRA. *Id.* at 228.

- The Fourth Circuit has held that the discretion to deny OCRA access does not immunize Defendant Clerks from suit under the Eleventh Amendment, *Antrican v. Odom*, 290 F.3d 178, 191 (4th Cir. 2002), but constitutes a prior restraint in violation of the First Amendment. *Am. Entertainers, LLC v. City of Rocky Mount*, 888 F.3d 707, 720 (4th Cir. 2018).

- The Fourth Circuit has held a district court was "wrong" not to apply strict scrutiny to a restraint on the ground that it is not an "absolute" prohibition on dissemination of information available from other records. *Soderberg v. Carrion*, 999 F.3d 962, 970 (4th Cir. 2021).

- The Fourth Circuit has held the Supreme Court "clarifie[d] what is necessary to carry the government's burden of proof under intermediate scrutiny," which now requires "***actual evidence***," *Reynolds v. Middleton*, 779 F.3d 222, 228, 231 (4th Cir. 2015); which Defendants cannot present on motions to dismiss and which varies here from the context in *Hade II*.

---

[1] All emphases in ***bold italics*** are added, those in *italics* only were in the original. Citations for internal quotations, and parallel citations in quotations, are omitted unless otherwise noted.

These omissions all point to the same conclusion: CNS and Lee have plausibly alleged the Dissemination Restriction is unconstitutional. So, Defendants instead attempt to make this case about something it's not. They claim the Dissemination Restriction is necessary to protect confidential information from public disclosure, but that claim is entirely illusory. By statute, the public records on OCRA are nonconfidential and do not contain confidential information. Defendants in *Hade II* presented no evidence that the privacy concern they raise is actually implicated by OCRA itself (as opposed to other dissimilar systems), especially with respect to reporters contacting OCRA subscribers to request factual information about new filings.

The real concern in this case is that the "public's interest in monitoring the work of the courts is subverted'" by restraints on information available to the press. *Doe v. Pub. Citizen*, 749 F.3d 246, 272-73 (4th Cir. 2014); *Overbey*, 930 F.3d at 227. That "'damage can be particularly great when [a] prior restraint," like the Dissemination Restriction, "'falls upon the communication of news and commentary on current events,'" such as "'reports of public judicial proceedings.'" *In re Charlotte Observer*, 921 F.2d 47, 49 (4th Cir. 1990).

CNS and Lee apologize for the length of this brief, but they had to address not only what Defendants omitted but also what they said. Some arguments were unexpected because they were rejected in *Hade I* (sovereign immunity) or misread the Complaint (Lee Enterprises' alleged lack of standing). If the Court prefers additional allegations on Defendants' enforcement of OCRA, Lee's standing or other points, CNS and Lee submit herewith a motion for leave to amend, which "should be freely given" as it would not "'be prejudicial to the opposing party,'" there has been no "'bad faith,'" and the amendment would "not be futile." *Ohio Valley Env't Coal., Inc. v. Hernshaw Partners, LLC*, 984 F. Supp. 2d 589, 592 (S.D.W. Va. 2013) (quoting *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.,* 576 F.3d 172, 193 (4th Cir. 2009)).

## BACKGROUND

In May 2024, while the appeal in *Smith* was pending in the Fourth Circuit, the court reporter for the *Richmond Times-Dispatch*, Luca Powell, learned a pleading had been filed on a Friday afternoon in a case Powell was covering in Dinwiddie County. Compl., ¶ 79.[2] Powell wanted to see the pleading so he could report about it to the *Times-Dispatch*'s readers, but Dinwiddie's Circuit Court is more than 50 miles away and would close before he could get there. *Id.* So he reached out to the *Times-Dispatch*'s attorney, David Lacy, to ask if Lacy could pull a copy off OCRA. *Id.* Due to the Dissemination Restriction, Lacy had to inform Powell he could not provide him anything from OCRA even if he had a subscription to OCRA for Dinwiddie. *Id.*

The *Times-Dispatch* is one of a dozen newspapers published by Lee in Virginia, Compl., ¶ 19, but Lee was not a party to *CNS v. Hade*. Had it been, *Smith* would have turned out differently; the two-judge majority vacated summary judgment against the Dissemination Restriction, and remanded for dismissal without prejudice, because the lone plaintiff, CNS, had "not identified anyone who would redistribute data from OCRA to [it] absent the Dissemination Restriction." *Smith*, 126 F.3d at 918. The only judge on the panel to reach the merits of the Dissemination Restriction found it to be "a prior restraint on speech" that was unconstitutional unless it could survive strict scrutiny on remand. *Id.* at 925 (Gregory, Circuit Judge, dissenting).

---

[2] This summary is drawn from facts the Court can consider at this stage, which includes "the allegations of the complaint itself," the "documents … attached to the complaint as exhibits," *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016), and "facts and documents subject to judicial notice." *Zak v. Chelsea Therapeutics Int'l*, 780 F.3d 597, 607 (4th Cir. 2015). The Court must "accept as true" the facts alleged in the complaint, *id.* at 601, and exhibits the complaint "has adopted as true." *Goines*, 822 F.3d at 167. These facts, and those "subject to judicial notice," must be "construed in the light most favorable to the plaintiff." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013); *see Evans v. United States*, 105 F.4th 606, 615 (4th Cir. 2024) (under Rule 12(b)(1), "where the defendant contends that the allegations in the complaint are insufficient to confer subject-matter jurisdiction, the district court assesses the motion under the same standard as one brought under 12(b)(6)"). .

**A. <u>OCRA's Restrictions Bar CNS and Lee From Reporting on Cases in Many Courts</u>**

Lee is the fourth largest newspaper publisher in the United States, with 100,000 subscribers in Virginia alone. Compl., ¶¶ 19, 45. CNS is a nationwide news service that publishes reports about civil litigation in federal and state courts in all 50 states. *Id.*., ¶ 29. It has more than 2,200 subscribers, *id.*, ¶ 30, "including lawyers, law firms, news organizations, other media outlets, and entertainment and watchdog groups." *Courthouse News Serv. v. Planet*, 947 F.3d 581, 585 (9th Cir. 2020) ("*Planet III*"). CNS serves "as a 'pool reporter' for national media, which disseminate CNS's litigation news to the broader public." *Id.* If CNS cannot obtain and report information about litigation in courts that are difficult to reach, "the expression of the newspapers, lawyers, libraries, and others who rely on CNS for information will also be stifled." *Courthouse News Serv. v. Planet*, 750 F.3d 776, 788 (9th Cir. 2014) ("*Planet I*").

Among CNS' publications are its New Litigation Reports, which contain staff-written summaries of significant new civil complaints. Compl., ¶ 30. CNS publishes two New Litigation Reports in Virginia, the *Virginia Report* and *Southern Virginia State Report*. *Id.*, ¶ 34. Lee's 12 newspapers in Virginia also cover newsworthy civil litigation. *Id.*, ¶¶ 19, 47-51.

CNS' reporters gather information for its news reports by visiting courts in person or online via PACER for federal courts or similar platforms now offered in most states. Compl., ¶¶ 29, 36-37. But covering courts in person or online is impossible for CNS and Lee in much of Virginia, turning many counties into "news deserts." Compl., ¶¶ 39, 47-48, 71-73. Courts are often in counties far from where reporters are based and the trip takes hours they do not have. *Id.*, ¶¶ 38-42, 47-51. It took three CNS journalists five days and 1,000 miles to reach 25 circuit courts. Compl., Exh. 6 at 2. And Virginia prevents its platform allowing online access from being used by journalists to report about civil litigation in remote courts. Compl., ¶¶ 56-57.

**B. <u>OCRA's Restrictions are Enforced by Defendant Hade and Defendant Clerks</u>**

At least 112 of Virginia's 120 circuit courts make civil court records available online through OCRA, which OES created and controls. Compl., ¶¶ 20, 53, 56 & 64. But journalists cannot use it to report on civil litigation. The Access Restriction limits access to "officers of the court" – attorneys and government agencies. Va. Code §§ 17.1-293(E)(7). The Dissemination Restriction prohibits those with access from "redistribut[ing] to any third party" any information in ***nonconfidential*** court records obtained from OCRA; while the statute allows attorneys with access to include content from OCRA "in products or services provided to a third party," none of that information may in turn be "made available to the general public." *Id.* § 17.1-293(H).

Defendants Hade, through OES, and the Clerks enforce these restrictions. Among other things, "the OCRA website, which Defendant Hade operates and maintains, states that OCRA 'is intended solely for the use of authorized Officer of the Court personnel ... and [a]ll other use is expressly prohibited.'" *Hade I*, 580 F. Supp. 3d at 295. Defendant Clerks require attorneys and agencies to sign a Subscriber Agreement for OCRA, the Terms and Conditions of which include, in identical language, an even stricter version of the Dissemination Restriction:

> Subscriber shall not permit any data accessed by secure remote access to be sold or posted on any other Internet website or in any way redistributed to any third party, and the clerk reserves the discretion to deny secure remote access to ensure compliance with this provision.

Compl., Exhs. 3, ¶ 8(e), 4 & 5, ¶ 6(e). An email produced in *CNS v. Hade* said OES created "the original version" of this Agreement's terms. Req. for Jud. Not. ("RJN"), Exh. 4; *see* Compl., ¶ 60 (alleging OES requires clerks to include this term). In courts CNS visited, clerks said "rules made by the Executive Secretary" controlled OCRA. Compl., Exh. 6 at 3. One clerk compared OES' OCRA software to "the Wizard of Oz" because "[i]t controls everything." *Id.* at 3, 9.

**C. <u>OCRA Restrains Subscribers from Providing Information to CNS and Lee</u>**

In 2021, CNS sued Defendant Hade and Prince William County's Circuit Court Clerk in the Eastern District over the Access and Dissemination Restrictions. Defendant Hade moved to dismiss on sovereign immunity grounds under Rule 12(b)(1) and both defendants sought dismissal on the merits under 12(b)(6). The court denied both motions, *Hade I*, 580 F. Supp. 3d at 295-96, except to the extent it agreed to dismiss CNS' equal protection claim. *Id.* at 297.

CNS later dismissed Hade without prejudice, and the Commonwealth intervened. In September 2022, the court granted summary judgment for defendants on both the Access and Dissemination Restrictions. *Hade II*, 631 F. Supp. 3d at 367-70. It found both resembled time, place and manner regulations because CNS could access civil case records by traveling to courthouses. *Id.* at 361, 368. And it found intermediate scrutiny satisfied by defendant's interest in protecting "sensitive information" from "potential … data harvesting … by bots," *id.* at 358, 363-64, 369-70, even though Virginia requires parties to redact sensitive information such as Social Security and financial account numbers ***before*** filing. Va. Code § 8.01-420.8.

On appeal, two judges affirmed as to the Access Restriction, but reversed on the Dissemination Restriction for lack of standing because CNS did not identify anyone willing to provide information from OCRA but for the Restriction. *Smith*, 126 F.3d at 916-17. The dissent would have reversed and remanded to apply strict scrutiny to both Restrictions. *Id.* at 918-25.

After *Smith*, CNS and Lee asked Lacy on several more occasions to provide copies of complaints available on OCRA, or information from those records, such as the names of the parties, factual allegations or causes of action. Each time, Lacy said he was willing to do so but for Dissemination Restriction, which prevented it. Compl., ¶¶ 11-12, 43, 77-79 & 81-85. In other states, attorneys often provide copies of court records to reporters. *Id.*, ¶¶ 10 & 74.

**D. Neither OCRA Nor CNS' CasePortal Contain Unredacted Sensitive Private Data**

Defendants say the Dissemination Restriction is intended to protect against disclosure of sensitive Personally Identifiable Information ("PII"). *See e.g.*, Defendant Hade Mem. of Law 13 (Dkt. 40) ("Hade Mem.") ("Virginia is regulating the ability of a lawyer with privileged access to a database of digital court files containing unredacted sensitive PII to disseminate those digital files to third parties."); *id*. at *id*. at 10 (restriction on dissemination "is a restriction on sharing unredacted digital court records that can contain information that is particularly vulnerable to exploitation"); Defendant Clerks Mem. in Supp. of Rule 12(b)(1) Motion 4-5 (Dkt. 42) ("Clerks' Mem I.") at 4, 5 (claiming attorneys can view unredacted records via remote access).

But no PII is available on OCRA, which contains only public, nonconfidential records – the same records available on public computer terminals at the courthouse. That is because, by statute, circuit court clerks may provide remote access only to "nonconfidential court records." Va. Code Ann. § 17.1-225; § 17.1-293(E)(7) (clerks may provide "secure remote access to nonconfidential court records"); § 17.1-225 (clerks are "responsible for insuring that proper security measures are implemented and maintained to prevent remote access users from obtaining any data that are confidential under this Code").[3] As a result, OCRA has no "unredacted digital court records" that contain sensitive PII. Hade Mem. 10, Clerks' Mem. 4-5.

Similarly, CNS' subscribers cannot use CasePortal to "'download[] all the content from the clerk's [OCRA feed].'" Hade Mem. 24 (quoting *Hade II*, 631 F. Supp. 3d at 370). CNS does not put on CasePortal most complaints it reports on or confidential information, and it bars use of automated tools – such as "bots" – to mine CNS' content on CasePortal. *See* Section V.

---

[3] Va. Code Ann. § 8.01-420.8 also requires that parties redact from civil pleadings all social security numbers, as well as the identification numbers from driver's licenses, credit cards, debit cards, bank accounts, or other electronic billing and payment systems before filing.

## I.

## DEFENDANTS OVERLOOK CLEAR PRECEDENT HOLDING CNS AND LEE HAVE STANDING TO PROTECT THEIR FIRST AMENDMENT RIGHT TO GATHER NEWS

Trying in vain to shield their unconstitutional prior restraint from judicial review, Defendants overlook that "'First Amendment cases raise unique standing considerations that tilt dramatically toward a finding of standing'" and therefore "'the Supreme Court has dispensed with rigid standing requirements.'" *Cooksey v. Futrell*, 721 F.3d 226, 235, 240 (4th Cir. 2013).

Moreover, the Fourth Circuit has rejected Defendants' theory that CNS and Lee "do not have standing to challenge the law's application to their own conduct." Hade Mem. 15; Clerks Mem. I 15. To the contrary, CNS and Lee have standing to sue over restrictions impairing their ***own*** First Amendment-protected "right to gather news." *Overbey*, 930 F.3d at 227 & n.11 (reversing dismissal on standing grounds). As *Overbey* illustrates, "[t]he doctrine of standing is well established" in this context: Where, as here, the case involves a statute or order "denying to [the media] access to potential sources of information," the media have "standing to maintain the present action and to challenge the validity of the restricti[on]." *CBS Inc. v. Young*, 522 F.2d 234, 237 (6th Cir. 1975) (per curiam); *see also Doe*, 749 F.3d at 262-63; *In re Wall St. J.*, 601 F. App'x 215, 218 (4th Cir. 2015) (per curiam).

As these cases show, the question is not whether CNS and Lee "can assert 'third-party standing,'" Clerks Mem. I 15, "derivative [of] Free Speech protections" for OCRA subscribers. Hade Mem. 20. *Overbey*, 930 F.3d at 227 n.11 (finding "no merit" in argument that media suing over restriction on a source "assert[ed] the free speech rights of third parties"). Rather, the question is whether the Dissemination Restriction has impaired the newsgathering rights of CNS and Lee in a way that can be redressed by a ruling in their favor. The question answers itself.

## A. The Complaint Plausibly Alleges Injury to CNS and Lee the Court Can Redress

To have standing, CNS and Lee need only show: "'(1) an injury in fact; (2) a sufficient causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision.'" *Overbey*, 930 F.3d at 226-27.

In this case, that showing is relaxed in two ways. First, standing is "analyze[d] … differently depending on the stage of litigation at which the challenge is brought." *Id.* at 227. At the pleading stage, the question is "whether [CNS' and Lee's] plausible allegations in the … Complaint, taken as true, are enough to give [them] constitutional standing." *Id.* Second, "'when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged.'" *Cooksey*, 721 F.3d at 235 (reversing dismissal where "[t]he district court erred … in not analyzing [Plaintiff]'s claims under the First Amendment standing framework").

While all three elements of the Article III standing analysis are therefore "'somewhat relaxed in First Amendment cases,'" *Edgar*, 2 F.4th at 310 (quoting *Cooksey*, 721 F.3d at 235), the "leniency of First Amendment standing manifests itself most commonly in the doctrine's first element: injury-in-fact." *Cooksey*, 721 F.3d at 235.

### 1. Under Governing Precedent, CNS' and Lee's Newsgathering is Being Injured

To determine that CNS and Lee have standing to sue over injuries to their own First Amendment rights, "[t]he crux of this issue is whether [they] ha[ve] alleged an injury in fact." *Overbey*, 930 F.3d at 227; *Doe*, 749 F.3d at 262 ("To satisfy the requirements for constitutional standing, the party invoking federal court jurisdiction must demonstrate 'that the conduct of which he complains has caused him to suffer an "injury in fact" that a favorable judgment will redress.'") (ultimately quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992)).

"An injury in fact is 'an invasion of a legally protected interest that is concrete and

particularized and actual or imminent, not conjectural or hypothetical.'" *Overbey*, 930 F.3d at 227 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan,* 504 U.S. at 560). As the Sixth Circuit explained in holding that CBS had standing to challenge a "gag" order restricting attorneys and other participants in a civil litigation over the Kent State shootings from "discussing … these cases with members of the news media or the public," the legally protected interest of CNS and Lee is their right "guaranteed … by the First Amendment" to "gather news." *CBS*, 522 F.2d at 237-38 ("News gathering … qualifies for First Amendment protections" because "'[w]ithout some protection for seeking out the news, freedom of the press could be eviscerated'") (quoting *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972)).

As the Sixth Circuit emphasized, that legally protected interest is invaded – i.e., "directly impaired or curtailed" – even when the media is "not made a specific target of the restricti[on]" if they are "effectively cut off" from access "to important sources of information" about, in that case and this one, civil litigation. *Id.* at 237-39 ("Although the news media are not directly enjoined from discussing the case, it is apparent that ***significant and meaningful sources of information*** concerning the case are ***effectively removed from them*** and their representatives.").

The Fourth Circuit follows the Sixth in recognizing media standing to challenge restrictions on access to people or records with information about civil cases. *Overbey*, 930 F.3d at 226-30; *Wall St. J.*, 601 F. App'x at 218; *Doe*, 749 F.3d at 262-63. This is hardly surprising since the governing rules, which Defendants ignore, were set by the Supreme Court.

The initial Fourth Circuit precedent in this area addressed media standing to intervene and appeal sealing orders. *Doe*, 749 F.3d at 262-63 ("This Court has previously permitted news organizations to intervene in actions in which they were not otherwise parties to challenge a district court's sealing order" because "the news organizations' failure to obtain information" to

which they alleged a right of access "supplied the case or controversy necessary for the intervenors to secure appellate review") (citing *Stone v. Univ. of Md. Med. Sys. Corp.,* 855 F.2d 178 (4th Cir. 1988); *Rushford v. New Yorker Mag., Inc.,* 846 F.2d 249, 252-54 (4th Cir. 1988)).

A district court applied *Doe* to find the media had standing to challenge a sealing and gag order barring counsel and trial participants from "mak[ing] any statements … or release[ing] any documents to the media or any other entity regarding the facts or substance of this case." *United States v. Blankenship*, 79 F. Supp. 3d 613, 616-17 (S.D. W. Va. 2015). In vacating that order, the Fourth Circuit agreed the media "meet the constitutional requirements for standing because their right under the First Amendment to gather news, *see Branzburg v. Hayes,* 408 U.S. 665, 681 (1972), and to receive speech from willing speakers, *see Stephens v. Cnty. of Albemarle,* 524 F.3d 485, 492 (4th Cir. 2008), has been directly impaired by the district court's order. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992)." *Wall St. J.*, 601 F. App'x at 218.

The Fourth Circuit later applied *Branzburg* and *Stephens* to reverse dismissal on standing grounds of a claim by the Baltimore Brew, a "local news website that … investigates and reports on … allegations of police misconduct" and asserted a "policy of including non-disparagement clauses in its settlements with police-misconduct claimants violated the Brew's First Amendment interest in newsgathering." *Overbey*, 930 F.3d at 221 & 226-30. Recognizing that, when courts "evaluate standing based on the pleadings … 'we presume that general allegations embrace those specific facts that are necessary to support the claim,'" *id.* at 230 (quoting *Lujan*, 504 U.S. at 561), the Circuit held "the Brew has sufficiently alleged that the City's pervasive use [of] non-disparagement clauses in settlement agreements with police brutality claimants has interfered with its right to receive newsworthy information from willing speakers." *Id.* at 228-29.

As these cases make clear, CNS and Lee have standing on their own to seek to vindicate

their "legally protected interest … to gather news, which derives from the First Amendment." *Id.* at 227 (citing *Branzburg* and *Food Line, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 520 (4th Cir. 1999) ("'There are First Amendment interests in newsgathering.'") (quoting *In re Shain*, 978 F.2d 850, 855 (4th Cir. 1992) (Wilkinson, J., concurring)). The presence of a willing speaker does not mean the media's standing derives from third-party rights, *id.* at 228 n.11, but rather shows a ruling in their favor will redress the injury to their own right. *Id.* at 229-30.[4]

**2. <u>The Complaint Alleges Attorneys Are Willing to Speak But For the Restriction</u>**

CNS and Lee have clearly alleged the Dissemination Restriction "interfered with [their] right to receive newsworthy information from willing speakers." *Overbey*, 930 F.3d at 228-29. To begin with, they allege that "[o]utside of Virginia, lawyers often provide journalists with copies of court records so that the journalist can quickly access public pleadings without needing to incur the time or expense of traveling to the courthouse to obtain a copy, or where access is needed when the courthouse is closed (e.g., on nights and weekends)." Compl., ¶¶ 10 & 74 (Restriction prevents media from "relying on their legal counsel" or "other … lawyers" to "provide them with potentially newsworthy complaints," a "common practice across newsrooms

---

[4] Defendants do not dispute the other standing elements, for good reason. "Once [CNS and Lee] clear[] the initial hurdle of injury-in-fact, [they] easily satisf[y] the other two elements of the standing inquiry, causation and redressibility." *Cooksey*, 721 F.3d at 238. In *Overbey*, the media "sufficiently pleaded an ongoing or imminent injury in fact that is both traceable to the City's challenged conduct and redressable by the court" even where "a significant amount of information about most claimants' lawsuits is available in the public record," because "some claimants' refusal to talk" had "a significant and deleterious effect on the Brew's reporting." 930 F.3d at 229-30. That same result must follow here. *Accord Edgar*, 2 F.4th at 311 ("plaintiffs' allegations also satisfy the causation and redressability elements" because "chilling of the plaintiffs' speech was plainly alleged to have been caused by the particular prepublication review regimes at issue" and a "favorable decision on the plaintiffs' behalf would deem the defendants' regimes unconstitutional and enjoin the defendants from enforcing them") (citing *Cooksey*, 721 F.3d at 238 ("causation is satisfied where 'a causal connection between the injury and the conduct complained of ... is "fairly traceable," and "not the result of the independent action of some third party not before the court"'" and "redressibility … is satisfied where there is 'a non-speculative likelihood that the injury would be redressed by a favorable judicial decision'")).

around the country"). Under *Overbey*, that is sufficient to infer a willing speaker. While "[t]his allegation is general, … it is plausible on its face" that, but for the Dissemination Restriction, attorneys in Virgina would be willing to give CNS and Lee the same information about new complaints they get from attorneys "[o]utside of Virginia." 930 F.3d at 230.

This general allegation is supported by specific allegations that Lee's attorney repeatedly told CNS' and Lee's journalists he was willing to give them information they wanted but for the Dissemination Restriction, which prevents him from providing copies of, or "any information" from, new complaints and other records on OCRA. Compl., ¶¶ 11-12, 43, 77-85. That is also sufficient to "allege that [the Restriction] has interfered with [CNS' and Lee's] right to receive newsworthy information from willing speakers." *Overbey*, 930 F.3d at 228-29. This is not a high bar, as illustrated by *Wall St. J.*, 601 F. App'x at 218 and *Blankenship*, 79 F. Supp. 3d at 616-19 (finding media standing based on broad assertion in motion to intervene that "'there exist willing speakers") and the dearth of Fourth Circuit cases denying media standing to challenge restrictions on sources of information until *Smith*, where the issue was never briefed nor argued.[5]

Ignoring Fourth Circuit precedent, Defendants attempt to convert the willing speaker

[5] The only case *Smith* cited to impose the "willing speaker" requirement on CNS did ***not*** involve the media. 126 F.4th at 917. Rather, *Stephens* involved a widow suing for damages on the theory that non-disclosure agreements in settlements of environmental claims by neighbors of a landfill caused her husband's death in an explosion at the landfill years later. 524 F.3d at 486-87. The panel did not hold the widow's First Amendment claims were derivative (the words "derived" and "derivative" do not appear in the decision). Instead, it recognized plaintiff and her husband could "have suffered 'injuries in fact' – ***violations of their First Amendment right to receive information*** – that were caused by the speech restrictions," *id.* at 491, ***if*** she could show a "direct connection between [the neighbors] and [plaintiff] such that, absent the settlement agreements, [plaintiff] would expect to receive the information that [the neighbors] possessed." *Id.* at 492.

In the more recent case involving a media entity suing over denial of access to information caused by non-disclosure agreements, *Overbey* noted that, because the Brew had adequately alleged willing speakers, "this case does not require us to decide whether the news media's interest in newsgathering can be invaded when no willing speaker exists." 930 F.3d at 229 n.13.

standard into an insurmountable barrier to standing through a series of inapt arguments based on a misreading of the precedent they cite and the theory, rejected by *Overbey*, that CNS' and Lee's standing is derivative of OCRA subscribers. For example, Defendant Clerks contend CNS and Lee have no standing absent a "credible threat of imminent enforcement" against Lacy, ignoring that the Restriction already prevents him from providing them information.[6] Hade argues Lacy does not qualify as a speaker under a tortured theory misapplying inapposite doctrines.[7]

Neither theory has any application here. "For the purposes of constitutional standing, a

---

[6] Defendant Clerks also misapply the "'third-party' standing theory," Clerks Mem. I 22, and "'put the merits cart before the standing horse.'" *Cooksey*, 721 F.3d at 239. First, the reason they have not "threatened to revoke Mr. Lacy's OCRA access," Clerks Mem. I 18, is because Lacy self-censored to comply with the Dissemination Restriction, thereby injuring CNS' and Lee's right to gather news. Second, their theory that Lee and CNS have not been injured because the records are available at the courthouse, *id.* 19-21, goes to the merits of the underlying claim that the Restriction is a prior restraint even if it is a "partial ban." *Soderberg*, 999 F.3d at 969. As "[t]he Supreme Court has explained, 'whether the statute in fact constitutes an abridgement of the plaintiff's freedom of speech is, of course, irrelevant to the standing analysis.'" *Cooksey*, 721 F.3d at 239 (quoting *Meese v. Keene,* 481 U.S. 465, 473 (1987)). Finally, the argument that Lee's attorney cannot serve as its willing speaker ignores that Lacy is not CNS' attorney, rests on the assertion rejected in *Overbey* that CNS' and Lee's claim relies on "third party derivative standing," Clerks Mem. I 22, and misreads the case it cites, which held "the attorney-client relationship" ***does*** "satisfy[y] our requirements for *jus tertii* standing." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 n.3 (1989).

[7] *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), said ***nothing*** suggesting speakers are only protected "by publishing original work or by exercising editorial discretion." Hade Mem. 19. Addressing the narrow question of "whether ordering [an online platform] to provide a forum for someone else's views implicates the First Amendment," the Court said it does if "the regulated party is engaged in its own expressive activity," which includes, but is not limited to, "presenting a curated compilation of speech originally created by others." *Moody*, 603 U.S. at 728.

Like *Moody*, section 230 of the Communications Decency Act says ***nothing*** about who qualifies as a "'speak[er]' within the meaning of the First Amendment." Hade Mem. 20. Section 230 protects online platforms from liability "for information originating with a third-party user." *Zeran v. AOL*, 129 F.3d 327, 330 (4th Cir. 1997). It says: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). It defines "information content provider" to include "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet." *Id.* § 230(f)(3). The statute does not say who qualifies as a speaker under the First Amendment, but its definition of "information content provider" includes those providing information from court records available on OCRA.

person qualifies as a willing speaker if she would be willing to provide information on a matter of public significance to the news media but chooses not to because she does not want to violate a settlement agreement" or another restriction on their speech. *Overbey*, 930 F.3d at 228 (citing *ACLU v. Holder*, 673 F.3d 245, 255 (4th Cir. 2011) ("First Amendment … provides standing to persons who are 'willing listeners' to a willing speaker who, but for the restriction, would convey information."). Under Fourth Circuit law, CNS' and Lee's allegations more than suffice. *Overbey*, 930 F.3d at 228-29; *Holder*, 673 F.3d at 255 (plaintiff in *Stephens* "could have shown [a] direct connection" between "an identifiable willing speaker and herself as a willing listener" by showing speaker "would have spoken to her in the past but for the speech restriction").

**B. Lee Enterprises' Harm From the Restriction Give It Standing as Well as Lee BHM**

The Complaint alleges Lee's Virginia newspapers were injured when they were unable to obtain information available on OCRA from an OCRA subscriber. Compl., ¶¶ 51, 72, 77-81, 85 & 89-90. Nonetheless, Defendant Hade contends Lee Enterprises lacks standing on the theory that the Complaint says only Lee BHM publishes the Virginia newspapers. Hade Mem. 7. But he misreads the Complaint, which defines both Lee plaintiffs collectively as "Lee," and alleges the collective "Lee" publishes the Virginia newspapers. Compl., ¶¶ 19 & 45.

At the pleading stage, that is sufficient. "This allegation is general, but it is plausible on its face. And when we evaluate standing based on the pleadings, … 'we presume that general allegations embrace those specific facts that are necessary to support the claim.'" *Overbey*, 930 F.3d at 230 (quoting *Lujan*, 504 U.S. at 561).

Moreover, it is accurate. The Complaint alleges the collective "Lee" publishes the Virginia newspapers because "both Lee entities are involved in publishing Lee's Virginia

newspapers." Decl. of S. Poulos, ¶ 4 (Ex. 1).[8] Contrary to Defendant's speculation that Lee's Virginia reporters are employees of Lee BHM, Hade Mem. 7, in fact "the reporters and others who work for Lee's Virginia newspapers are employees of Lee Enterprises." Poulos Decl., ¶ 4.

Lee BHM initially receives advertising and subscription revenue obtained by the Virginia newspapers, but net profits from the Virginia newspapers flow to Lee Enterprises. *Id.*, ¶ 5. Consequently, the First Amendment newsgathering injuries and financial injuries from the Dissemination Restriction – from hiring more reporters to cover remote courts and/or losing subscription revenue from readers at the edge of a newspaper's circulation area who cancel due to lack of coverage of their courts – are borne by both Lee Enterprises and Lee BHM. *See id.*.

While a "parent corporation" has "a discrete corporate existence" and thus cannot rest its standing on "[i]njury that arises ***solely*** out of harm done to a subsidiary corporation," both the parent and the subsidiary have standing to sue where, as here, Defendants caused each "to suffer some redressable injury to an enforceable legal right." *Classic Commc'ns, Inc. v. Rural Tel. Serv. Co.*, 956 F. Supp. 896, 902 (D. Kan. 1996). "[D]rawing all reasonable inferences in favor of [Lee], the court cannot say beyond doubt that plaintiffs can prove no set of facts connecting [Lee Enterprises'] alleged harm to [Defendants'] challenged conduct." *Id.*

---

[8] The Court "may allow [or require] proof of standing" by "affidavits or other evidence." *Carroll v. New People's Bank, Inc.*, 2018 WL 1659482, *1 n.2 (W.D. Va. Apr. 5, 2018) (citing *Warth v. Seldin*, 422 U.S. 490, 501-02 (1975) (court "***ruling on a motion to dismiss for want of standing*** … must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party," but "[a]t the same time, it is ***within the trial court's power to allow or to require*** the plaintiff to supply, by ***amendment to the complaint or by affidavits***, further particularized allegations of fact deemed supportive of … standing")).

If the Court believes the Complaint needs to allege the facts set out in the Poulos Declaration to support Lee Enterprises' standing, CNS and Lee have moved for leave pursuant to Federal Rule of Civil Procedure 15(a) to submit an amended complaint doing so, which should be freely given since the facts set out in the declaration show amendment would not be futile. *Ohio Valley Env't Coal,* 984 F. Supp. 2d at 592-93; *see Laber v. Harvey*, 438 F.3d 404, 429 (4th Cir. 2006) (en banc) (district court "abused its discretion" in denying motion to amend).

## II.

## THE AS-APPLIED CLAIM BY CNS AND LEE IS RIPE BECAUSE THE DISSEMINATION RESTRICTION CURRENTLY IMPAIRS NEWSGATHERING

Underscoring their fatal misunderstanding of First Amendment law, Defendant Clerks contend CNS' and Lee's as-applied claim is not ripe because they "fail[] to allege that any of the Clerks have revoked Mr. Lacy's OCRA access or that the Clerks have revoked anyone's access." Clerks Mem. I 27. They overlook that the Fourth Circuit rejects the notion that First Amendment "claims are not ripe because [Defendants] ha[ve] taken no action against [a speaker]" where, as here, he must comply or face "'the threat of penalty.'" *Cooksey*, 721 F.3d at 240.

This conclusion flows from how ripeness is applied in this context. Generally, the ripeness analysis considers "'[1] the "fitness of the issues for judicial decision" and [2] the "hardship to the parties of withholding court consideration."'" *Edgar*, 2 F.4th at 311 (brackets added). But "'much like standing, ripeness requirements are also relaxed in First Amendment cases.'" *Id.* "Indeed, 'First Amendment rights ... are particularly apt to be found ripe for immediate protection, because of the fear of irretrievable loss.'" *Cooksey*, 721 F.3d at 240 (quoting *New Mexicans for Bill Richardson v. Gonzales,* 64 F.3d 1495, 1500 (10th Cir. 1995)).

In light of the "danger … of self-censorship," courts "are not troubled by the pre-enforcement nature of [a] suit.' *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988). Self-censorship here is not merely threatened but has occurred. Lacy is compelled to "choose[] not to" provide information "because []he does not want to violate" the Dissemination Restriction. *Overbey*, 930 F.3d at 228. CNS' and Lee's as-applied claim that this Restriction "violate[s] their First Amendment right to gather and report the news" is ripe because it currently restricts their access to sources of information. *Deep South Today v. Murrill*, 779 F. Supp. 3d 782, 796, 799-801 (M.D. La. 2025); *Flynt v. Rumsfeld*, 355 F.3d 697, 700-03 (D.C. Cir. 2004).

Unlike the authority cited by Defendants, CNS and Lee "'***do*** … claim that they are presently subject'" to the Dissemination Restriction. Clerks Mem. I 26 (quoting *Woodall v. Reno*, 47 F.3d 656, 658 (4th Cir. 1995). "'[T]he legal issue presented is fit for judicial resolution'" as "[n]o further action from [Defendants] is needed." *Cooksey*, 721 F.3d at 240-41. The allegation that Lacy "declined to answer because of" the Restriction means the claim is ripe because CNS and Lee "had a right to listen to speech that was chilled." *Democracy Rising PA v. Celluci*, 603 F. Supp. 2d 780, 793-94 (M.D. Pa. 2009), *aff'd*, 380 F. App'x 155 (3d Cir. 2010).

For similar reasons, "the cost to" is too high to "delay[] judicial review." *Ostergren v. McDonnell*, 2008 WL 3895593, *5 (E.D. Va. Aug. 22, 2008), *aff'd sub nom. Ostergren v. Cuccinelli*, 615 F.3d 263 (4th Cir. 2010). CNS and Lee should not be required to "face [the] significant impediment" to their right to gather news from "delay[ed] consideration." *Cooksey*, 721 F.3d at 240 ("'In a wide variety of settings, courts have found First Amendment claims ripe, often commenting directly on the special need to protect against any inhibiting chill.'") (quoting *Gonzales*, 64 F.3d at 1500) (reversing ruling that claim was not ripe where "the statute has a direct and immediate effect on [plaintiff's] exercise of his First Amendment liberties").[9]

---

[9] The Dissemination Restriction impairs CNS' and Lee's newsgathering because it is "impossible for Plaintiffs' reporters to regularly drive to each [OCRA] court" to obtain records, so they are "forced to forego coverage of newsworthy cases in remote courts they would have informed the public about but for OCRA's restrictions." Compl., ¶¶ 69-72. Contrary to Clerks Mem. I 26, challenges to the "prior restraint" in OCRA are "clearly ripe," *Nutritional Health All. v. Shalala*, 144 F.3d 220, 227 (2d Cir. 1998), because "a 'prior restraint'" not only "chills speech, but … 'freezes' it," *Telco Commc'ns, Inc. v. Carbaugh*, 885 F.2d 1225, 1233 (4th Cir. 1989) (quoting *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976)). Immediate review is important given Defendants' "discretion" to decide whether to revoke OCRA access if a subscriber violates the Restriction, Clerk Mem. I 4, as a "scheme that places 'unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship.'" *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225-26 (1990) (quoting *City of Lakewood v. Plain Dealer Pub'g Co.,* 486 U.S. 750, 757 (1988)). In Defendants' cases, the claims were not ripe because no prior restraint had issued. *Woodall*, 47 F.3d at 658; *Bruce & Tanya & Assocs. v. Bd. of Supervisors of Fairfax Cty.*, 854 F. App'x 521 (4th Cir. 2021).

## III.

## DEFENDANTS' ELEVENTH AMENDMENT "ENFORCEMENT" ARGUMENTS FARE NO BETTER AT THIS PLEADING STAGE THAN THEY DID IN *HADE I*

Although they do not acknowledge it, Defendants' Eleventh Amendment arguments rest largely on the same theory – purported lack of enforcement authority over the Dissemination Restriction – that Defendant Hade made and lost in *Hade I*. At this pleading stage, this Court should reject these arguments for the same reason Judge Hudson rejected it at the pleading stage in *Hade I*: "CNS [and Lee] ha[ve] adequately alleged that [the Defendants] maintain[] a 'special relation' to the challenged policy and ha[ve] 'acted or threatened' to enforce it." 580 F. Supp. 3d at 295 (quoting *McBurney v. Cuccinelli*, 616 F.3d 393, 402 (4th Cir. 2010)).

Defendant Hade's argument here is virtually identical to the one he made in *Hade I* – a purported lack of a "special relation" or enforcement of the Dissemination Restriction on the part of him or his office, OES – and it fails for the same reasons it did in *Hade I*: at the motion to dismiss stage, the Complaint adequately alleges the predicates for *Ex parte Young*, 209 U.S. 123 (1908). As for the Defendant Clerks, they argue that because the penalty they may impose for violation of the Dissemination Restriction (revoking OCRA access) is discretionary, and *Ex parte Young* "does not apply to 'the exercise of the discretion' of a state official," Clerks' Mem. I 11, 13, they also lack the requisite enforcement authority. But Defendant Clerks do not understand that their discretion is not a virtue but a vice in in the context of a First Amendment case like this one, and their attempt to escape the *Ex parte Young* doctrine similarly fails.

### A. Defendant Hade's Eleventh Amendment Ignores *Hade I* as Well as CNS' and Lee's Factual Allegations Here That Are More Than Sufficient at This Pleading Stage

In *Hade I*, Defendant Hade sought dismissal under Federal Rule of Civil Procedure 12(b)(1) on the same argument he asserts here: his claim that "he has no special relation to the challenged statutes here and never acted or threatened to enforce them." *Hade I*, 580 F. Supp. 3d

at 294; *cf.* Hade Mem. 9-10. In January 2022, Judge Hudson denied his motion to dismiss, observing that CNS' complaint adequately alleged the requirements to fit within the "expansive exception to sovereign immunity where state officers may be sued in their official capacity when the plaintiff is only seeking prospective injunctive relief to remedy the enforcement of an unconstitutional statute." *Hade I*, 580 F. Supp. 3d at 294. This exception, set forth by the Supreme Court in *Ex parte Young*, "has been accepted as necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to 'the supreme authority of the United States.'" *Pennhurst State Sch. & Hosp. v Halderman*, 465 U.S. 89, 105 (1984).[10]

Under *Ex parte Young*, an action seeking to enjoin a state official's ongoing violation of federal law is not barred by the Eleventh Amendment for an important reason: if his conduct violates federal law, the state cannot cloak his actions with state authority or immunity. 209 U.S. at 159-60. "To fit within the exception, the officer must have a 'special relation' to the challenged policy or statute;[11] and (2) the officer must have 'acted or threatened'[12] to enforce the policy or statute.'" *Hade I*, 580 F. Supp. 3d at 294 (quoting *McBurney*, 616 F.3d at 402).

Hade's Eleventh Amendment argument fails to even acknowledge the *Hade I* ruling. Instead, it reads as if *Hade I* does not exist: Hade reargues, as he did in *Hade I*, that he lacks a "special relation" to the Dissemination Restriction and claims that CNS and Lee "cannot show"

[10] "[T]he inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim." *Verizon Md., Inc. v. Public Serv. Com'n of Md.*, 535 U.S. 635, 646 (2002).

[11] This requirement "is not met when an official merely possesses "[g]eneral authority to enforce the laws of the state." *McBurney*, 616 F.3d at 399. Rather, the relationship must be "qualitatively special …. This requirement ensures that a federal injunction will be effective with respect to the underlying claim." *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 333 (4th Cir. 2008). The measure of the relationship is the "proximity to and responsibility for the challenged state action." *McBurney*, 616 F.3d at 399.

[12] Enforcement "authority can come from 'the particular act' being challenged, a more general law providing enforcement authority, or 'the general duties of the officer.'" *Doyle v. Hogan*, 1 F.4th 249, 255 (4th Cir. 2021) (quoting *Ex parte Young*, 209 U.S. at 158).

that he "has 'acted or threatened to enforce any policies related to OCRA access." Hade Mem. 9.

As in *Hade I*, the complaint here "contains many factual allegations to the contrary." 580 F. Supp. 3d at 294. It alleges Hade's agency, OES, created and exerts almost total control over OCRA. As Executive Secretary, Hade is "'the court administrator for the Commonwealth,' Va. Code § 17.1-314, which includes serving as 'the administrator of the circuit court system.' Va. Code § 17.1-502(A)." Compl. ¶ 20. "OES created, and now supports and maintains, a Case Imaging System ("CIS") that enables participating circuit courts … to create and store electronic images of case documents." *Id.* ¶ 53. "OES also created, and now supports and maintains, OCRA, which is an application developed by OES for circuit clerks that use CIS." *Id.* OES "provides and maintains" the OCRA login page. *Id.* ¶ 64. "The Executive Secretary provides maintenance and technical support for the OCRA platform for those Virginia circuit courts … that pay for this support and utilize OCRA," and charges clerks an annual maintenance fee of up to $9,500. OES bills $1.2 million to circuit court clerks annually for maintenance fees. *Id.* ¶¶ 20, 53.

The Complaint also alleges OES requires clerks to include the Dissemination Restriction – and language indemnifying OES – in their OCRA subscription agreements. Compl. ¶ 60. That allegation is supported by email produced in *CNS v. Hade* showing OES created the agreements, including the "disclaimer," from exemplars, which it "modified" for OCRA, RJN, Exh. 4,[13] and the control OES asserted over a Work Group convened to examine the possibility of opening OCRA to the public, which resulted in a November 2018 report by Defendant Hade. *Id.*, Exh. 3.

That report was "prepared in response to … language in the 2018 Appropriation Act" stating that the "Executive Secretary shall convene a working group, to include a minimum of

[13] This and other documents produced in *CNS v. Hade* are also submitted in support of the motion for leave to file an amended complaint that CNS and Lee file herewith.

five circuit clerks, to evaluate issues related to the statewide adoption of electronic filing of civil cases in circuit courts, and the implementation of a statewide system through which images of nonconfidential records within civil case files in the circuit courts may be viewed by subscribers of that system." *Id*. at 1. As the report shows, membership of the Work Group included seven OES staff members, *id*. at 14, and, read in full, the report confirms the extent to which OES and Virgina circuit court clerks, including the clerks in this case (Defendants Jewett and Flannagan were on the Work Group with OES), collaborate with one another on OCRA and its restrictions.

It is also illustrated by the allegations that "the OCRA website, which Defendant Hade operates and maintains, states that OCRA 'is intended solely for the use of authorized Officer of the Court personnel … and [a]ll other use is expressly prohibited.'" *Hade I*, 580 F. Supp. 3d at 295; Compl. ¶ 64 & Exh. 2 ¶ 40. Thus, "even if CNS received permission from the circuit court clerk to access OCRA, it would still be confronted with this overt warning that, since its employees are not attorneys, its access is 'expressly prohibited.'" *Hade I*, 580 F. Supp. 3d at 295.

Indeed, when CNS journalists visited the Lee County Circuit Court in September 2022 as part of trip to 25 Virginia Circuit Courts over five days and more than 1,000 miles, the Lee Clerk "tentatively agreed to allow [CNS Bureau Chief Ryan] Abbott to sign up for OCRA online." But the OCRA subscriber interface – controlled by OES – requires a bar number or an "Authorized Officer of the Court" number to review court records on OCRA. Having neither, Abbott was unable to use it. Compl., Exh. 6, at 7; *see* RJN, Exh. 1 (OCRA login page). In that instance, it was OES – and not the Lee Circuit Clerk – that effectively enforced the OCRA restrictions.

*Hade I* also noted that "an OES employee, in response to a deposition question, stated that it has "always been [OES'] stance that the [Va. Code] does not support providing [OCRA] to anyone other than members of the bar." 580 F. Supp. 3d at 295. This Court may take judicial

notice of the same page of the same deposition testimony, in which the OES deponent went on to testify that the restriction than an OCRA user "[m]ust be a member in good standing of the Virginia State Bar" was "***an OES-imposed requirement***." RJN Exh. 2 (Depo. Trans. 98).

These allegations, and *Hade I*'s conclusion, of OES' and Defendant Hade's role in imposing and enforcing the Access Restriction apply equally to the Dissemination Restriction, which was also at issue in *Hade I*. As Defendant asserts, enforcement of the Dissemination Restriction is part and parcel of enforcement of the Access Restriction. Hade Mem. 23 ("this Dissemination Restriction is necessary to prevent attorneys from bypassing the access restriction contained in Code § 17.1-293(E)(7)"); 22 ("Dissemination Restriction closes a loophole").

Ignoring all this, Defendant claims he "lacks a 'special relation' to the challenged Dissemination Restriction because "Virginia circuit court clerks possess exclusive statutory authority to enforce the Dissemination Restriction." Hade Mem. 9. But he cites no authority to support this bald assertion of exclusive statutory control. And "even accepting Defendant Hade's argument that he does not have unilateral control over court records inside of OCRA," *Hade I*, 580 F. Supp. 3d at 295 – since clerks have "legal custody" of the records, Hade Mem. 9 – *Ex Parte Young* does not require the defendant be the ***only*** official with a relationship and an enforcement role. *Matsumoto v. Labrador*, 122 F.4th 787, 803 (9th Cir. 2024) ("defendant's enforcement role need not be exclusive to make that defendant proper under *Ex parte Young*").

*Hade I* rejected this argument for good reason: the allegations in the complaint, the statute and OCRA's website contradict it. 580 F. Supp. 3d at 294; *see* Compl., ¶¶ 20, 60, 64, Exh. 2 ¶¶ 35, 38, 40, 59; Va. Code §§ 17.1-314 & -502(A). That conclusion is buttressed by Exhibit 6 to the Complaint. During CNS' 2022 tour of 25 Virginia circuit courts, many clerks spoke of OES control over OCRA and its restrictions. When CNS' reporters asked the Bristol

Clerk what remedy they had for her denial of their request for OCRA access, she told them: "Contact OES to figure it out." Compl., Exh. 6 at 8. At the Wythe County Circuit Court, the clerk described OES OCRA software as "like the Wizard of Oz. It controls everything." *Id*. at 9.

All told, the Complaint and its exhibits include more than enough to plausibly allege that Defendant Hade's OES has sufficient control over OCRA to allow him "'to enforce, if he so chooses, the [Dissemination Restriction],'" Hade Mem. 9 (quoting *Doyle v. Hogan*, 1 F.4th 249, 255 (4th Cir. 2021)), and that OES has, at the very least, "threatened" to enforce that restriction. *Id*. Indeed, even if it is a clerk that directs OES to terminate an OCRA subscriber for violation of the Dissemination Restriction, it would certainly be OES that carries out the punishment, and "[a]s the administrative head of [OES] with responsibility for carrying out its policies and representing the agency in its dealings with the federal government, [Defendant Hade] possesses a sufficient connection to the alleged violation of federal law." *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 333 (4th Cir. 2008). Even accepting as true OES' contention that it "does not in any way evaluate or screen potential subscribers once the clerk determines they are authorized," Hade Mem. 10 (quoting Compl., Exh. 2, ¶ 41), the allegations in the complaint, if true, establish "a federal injunction with be effective" as to Hade. *Limehouse*, 549 F.3d at 333.

**B. The Defendant Clerks Enforcement Argument Misunderstands How "Discretion" Is Relevant For *Ex Parte Young* Purposes In This First Amendment Case**

The Complaint contains particularized allegations regarding the OCRA Subscriber Agreements used by each Defendant Clerk, each of whom incorporated the Dissemination Restriction into their Agreements. Compl. ¶¶ 58-59 & Exh. 3 ¶ 8(e) (Richmond); Exh. 4 ¶ 6(e) (Roanoke); Exh. 5 ¶ 6(e) (Bristol). All three Agreements provide that OCRA access may be denied, and the agreement terminated, for failure to comply with those terms. Compl. Exhs. 3 ¶¶ 8(e) & 15(b), 4 ¶ 6(e) & 14, 5 ¶ 6(e) & 14. This alone is enough for Defendant Clerks to satisfy

the "special relation" and "enforcement" requirements of *Ex Parte Young*. They therefore try a different tack; they claim to lack the requisite enforcement authority because they cannot disbar attorneys and their power to revoke OCRA access is "discretionary." Clerks Mem. I 10-14.

This position reflects a grievous misunderstanding of the relevance of a state defendant's discretion in the context of *Ex Parte Young* in a First Amendment case like this one. Simply put, it cannot be that the same "unbridled discretion" which shows that the Dissemination Restriction is an unconstitutional "prior restraint," *City of Lakewood v. Plain Dealer Publ'g Co*., 486 U.S. 750, 757 (1988), also immunizes them from suit over that restraint. And it is not.

What Defendant Clerks overlook is that, while "the *Ex parte Young* doctrine does not allow the courts to interfere with their discretionary acts," that doctrine "does not extend this rule to preclude judicial review of discretionary acts that violate federal law." *Elephant Butte Irr. Dist. v. Dep't of Interior*, 160 F.3d 602, 611 (10th Cir. 1998) (citing *Ex parte Young*, 209 U.S. at 158-59 ("holding the state officials' 'general discretion regarding the enforcement of the laws ... is not interfered with by an injunction which restrains the state officer from taking any steps towards the enforcement of an unconstitutional enactment, to the injury of the complainant'"); *accord, e.g., Antrican*, 290 F.3d at 191 (defendants' *Ex parte Young* "argument lacks merit because the Medicaid Act does not provide participating States with discretion to deny dental screening and treatment as specified in the Act").[14]

[14] Defendant Clerks' reliance on *Whole Women's Health v. Jackson*, 595 U.S. 30, (2021), for the proposition that the *Ex parte Young* exception "does not normally permit federal courts to issue injunctions against state-court judges or clerks," is equally misplaced. Mem. I 11. Plaintiffs there sought "an order enjoining all state-court clerks from docketing" Texas "Heartbeat Act" abortion cases "and all state-court judges from hearing them." 595 U.S. at 39. Thus, while the general proposition the Defendant Clerks recite may be correct, that is because "[***u]sually***, those individuals ***do not enforce state laws as executive officials might; instead, they work to resolve disputes between parties.***" That is not the case here, as the Eighth Circuit held in rejecting the same argument in *Courthouse News Serv. v. Gilmer*, 48 F.4th 908, 911-13 (8th Cir. 2022).

Put another way, Defendant Clerks concede that *Ex parte Young* allows CNS and Lee to asset a claim "seek[ing] prospective injunctive relief to enjoin a state official's ministerial enforcement, or threatened enforcement, of a state statute or authority." Clerks Mem. I 11; *Ex parte Young*, 209 U.S. at 158. The ministerial duty here is implementation of OCRA, and they have no discretion to implement it in a way that violates the First Amendment. Consequently, "[a]n injunction to prevent [them] from doing that which [they] ha[ve] no legal right to do is not an interference with the discretion of an officer." *Ex parte Young*, 209 U.S. at 159. Just so, the injunctive relief sought by CNS and Lee seeks "only an order that State officials 'comply with federal law,' not how to use their discretion in complying." *Antrican*, 290 F.3d at 191.[15]

Their alternate argument that CNS and Lee failed to adequately allege the requisite threat of enforcement, Clerks Mem. I 12-14, completely misses the point. Enforcement of the Dissemination Restriction does not require authority to disbar an attorney for violating it. *See id.* It simply requires that Defendant Clerks require OCRA users to sign a Subscriber Agreement imposing the Dissemination Restriction in its terms, and threatening sanctions for non-compliance, which is what their Agreements do. Compl., Exhs. 3, ¶ 8(e), 4, ¶ 6(e) & 5, ¶ 6(e). Their successful enforcement is illustrated by the fact that they have not had to "threaten[] … to revoke Mr. Lacy's OCRA access for sharing electronic court records with the Plaintiffs," Clerks Mem. I 13, as it shows he is self-censoring, and has not shared any electronic court records with CNS or Lee, because he is compelled to comply with the Restriction to avoid revocation.[16]

---

[15] Even cursory review of the complaint reveals CNS and Lee do not allege the Defendant Clerks are "'fail[ing] to properly train and supervise the [deputy clerks],'" acts that "plainly involve the exercise of discretion." *Brooks v. St. Charles Hotel Operating, LLC.*, 2023 WL 6244612, *12 (D. Md. Sept. 26, 2023). Their reliance on *Brooks* is therefore misplaced. Clerks Mem. I 11, 13.

[16] Nor is there any merit to Defendant Clerks' contention that CNS and Lee did not adequately plead "an actual subscriber agreement between the Clerks and Mr. Lacy," Clerks Mem. 13, as review of the Complaint also makes perfectly clear. Compl. ¶¶ 11-12, 43, 77, 79, 83.

## IV.

## THE DISSEMINATION RESTRICTION IS A RESTRAINT ON PROTECTED SPEECH ABOUT CIVIL COURT RECORDS ON OCRA THAT IMPAIRS NEWSGATHERING, AND THUS IS UNCONSTITUTIONAL UNLESS IT SATISFIES STRICT SCRUTINY

Defendants contend the Dissemination Restriction is not a prior restraint on the ground that it is not an absolute ban on disseminating information from civil court records. Hade Mem. 22; Clerks Mem. in Supp. of Rule 12(b)(6) Motion 11 ("Mem. II"). But they never address Fourth Circuit authority rejecting that very theory in holding that another "district court was wrong to apply intermediate scrutiny, rather than strict scrutiny." *Soderberg*, 999 F.3d at 970.

Defendants twist themselves into pretzels trying to deny the Dissemination Restriction is a prior restraint. They argue the Restriction does not do what it says – i.e., "does not prohibit speech before it occurs" – but "only provides a consequence after speech." Clerks Mem. II 9; Hade Mem. 10-13. But this is a distinction without a difference: "[I]t [i]s 'not dispositive' whether the challenged … statute [i]s 'view[ed] as a prior restraint or as a [post-speech] sanction'" because both "'require[] the highest form of state interest.'" *Soderberg*, 999 F.3d at 968 n.3 (quoting *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 101-02 (1979)). Moreover, they concede that consequence is at the clerks' "unbridled discretion," which alone "constitutes a prior restraint." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988).

In *Smith,* Judge Gregory – the only member of the panel to address the merits of the Dissemination Restriction – found it to be a prior restraint under *Soderberg*. 126 F.4th at 925. And even if that Restriction is not subject to strict scrutiny for that reason, it is for another: any "inhibition of press news-gathering rights must be necessitated 'by a compelling governmental interest, and ... narrowly tailored to serve that interest.'" *In re Express-News,* 695 F.2d 807, 808-09 (5th Cir. 1982) (quoting *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 607 (1982)).

**A. <u>Strict Scrutiny Applies to Restraints on Disseminating Content from Court Records</u>**

The district court in *Hade II* said the Dissemination Restriction "resembles a 'time, place and manner' restriction" on the ground that it is not an absolute ban because "the access restriction merely prevents information from such records *obtained electronically* from being sold, posted, or distributed to third parties." 631 F. Supp. 3d at 368. Defendants repeat that same argument here, Hade Mem. 22, in so many words. Clerks Mem. II 11-14.

As Judge Gregory explained, this theory was plainly wrong when applied to media seeking access to OCRA to inform the public about civil complaints available on OCRA. *Smith*, 126 F.4th at 925-26 (Gregory, Circuit Judge, dissenting) (citing, e.g., *Soderberg*, 999 F.3d at 966-68). It is equally misguided here, where CNS and Lee seek to vindicate their First Amendment-protected right to gather and report about newsworthy information in public court records available on OCRA filed in courts too remote for CNS and Lee to travel to, or filed when a reporter cannot make it to court (such as close to deadline or when the courthouse is closed).

**1. *Soderberg* Requires that District Courts Apply Strict Scrutiny Even to Partial Bans <u>On Disseminating Information Obtained from Publicly Available Court Records</u>**

Neither *Hade II* nor Defendants mention *Soderberg*, in which the Fourth Circuit reversed another district court that used the same theory as *Hade II* to avoid applying strict scrutiny.

*Soderberg* involved a Maryland statute that included a "Broadcast Ban" prohibiting dissemination only of electronic recordings of criminal proceedings. 999 F.3d at 964-65. The district court adopted the state's theory that strict scrutiny "applies only to absolute prohibitions on the publication of information in any form," not where "the same information" could be obtained from other court records or by watching "what occurred during the proceedings." *Id.* at 966. The district court said "a partial ban" was a restriction on the method of dissemination subject only to intermediate scrutiny as a time, place and manner restriction. *Id.* at 969.

The Fourth Circuit said this ruling was "belied" by *Daily Mail* – the case cited by *Hade I* and Defendant – "which involved a partial ban on the publication of information." *Soderberg*, 999 F.3d at 969. "Rather than treating the limited nature of the ban as a reason to subject it to intermediate scrutiny as a time, place and manner regulation, [*Daily Mail*] considered it to be significant to the applicable strict scrutiny analysis and fatal to the constitutionality of the statute." *Id.* Consequently, the Fourth Circuit held "the district court was wrong to apply intermediate scrutiny, rather than strict scrutiny." *Id.* at 970

Contrary to Defendant Clerks' theory that "[a] prior restraint … does not apply to restrictions on disclosures of information accessible by other means," Clerks Mem. II 11, it is often the case that restrictions on speech about civil litigation, such as gag orders, involve only a partial ban that does not prohibit providing the press the information by other means, such as by providing copies of, or information in, public records filed in the case. *See, e.g., In re Murphy-Brown, LLC*, 907 F.3d 788, 793 (4th Cir. 2018) (gag order allowed attorneys and other "covered individuals" to discuss "'information contained in the public record of this case'"); *CBS*, 522 F.2d at 236. Despite their partial nature, these "gag orders are prior restraints" ***on those subject to them*** – "[l]ike ***all*** 'court orders that actually forbid speech activities.'" *Murphy-Brown*, 907 F.3d at 797 (quoting *Alexander v. United States*, 509 U.S. 544, 550 (1993)).

This is also true of a statute or policy that "'prohibits … disseminating ***digital*** recordings of criminal court proceedings'" even though the identical information can be gleaned from other records. *Soderberg*, 999 F.3d at 965-66 & n.3. All are subject to strict scrutiny. *Id.*

**2. <u>Strict Scrutiny Applies to Restraints on Speaking with the Media about Civil Cases</u>**

Strict scrutiny applies regardless of whether the media are directly subject to a restraint or their newsgathering is "directly impaired" by a prior restraint imposed on attorneys from whom it seeks to gather information. *CBS*, 522 F.2d at 238; *compare Express-News*, 695 F.2d at 808-

09 (ordering press not to interview jurors failed strict scrutiny) *with Journal Publ'g Co. v. Mechem*, 801 F.2d 1233, 1235 (10th Cir. 1986) (ordering jurors to "not discuss your verdict" failed strict scrutiny because it "effectively prohibit[ed] [the press] from interviewing jurors" and "any inhibitions against news coverage of a trial carry a heavy presumption of an unconstitutional prior restraint" unless "necessitated by a compelling governmental interest").

"An order prohibiting extrajudicial comments by counsel constitutes a prior restraint on the right to gather news and derivatively on publication." *Connecticut Mag. v. Moraghan*, 676 F. Supp. 38, 42 (D. Conn. 1987) (citing *Journal Publ'g,* 801 F.2d at 1236)). Even where it "does not directly restrict the speech or publication of [the press], it does impede its ability to gather news by listening to and reporting on the out-of-court statements of counsel …. Prior restraints are of particular concern under the first amendment, and therefore must be approached with special caution." *Id.* (citing *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 559 (1976)).[17]

Perhaps aware that cases like *CBS* and *Wall Street Journal* invalidated prior restraints restricting what attorneys can say to the press when challenged by the press, Defendants contend the Dissemination Restriction "is not a prior restraint" on the speech of attorneys on the ground that it "does not require a license or pre-approval for attorneys with OCRA access to speak. At most, if the attorney is found to be downloading and selling the digital court records to third

[17] A case cited by Defendant Clerks – which held "the news agencies ***have standing*** to appeal [an] order restraining speech of the trial participants," *In re Dow Jones & Co.*, 842 F.2d 603, 608 (2d Cir. 1998) – applied a lower standard to a gag order requested by counsel in a criminal case because grand jury leaks created "a 'reasonable likelihood' that pretrial publicity will prejudice a fair trial." *Id.* at 610. The Fourth Circuit has not addressed *Dow Jones*, but has indicated it would follow *CBS*. In vacating a gag order challenged by the media, the Circuit cited *Nebraska Press*, which *Connecticut Mag.* cited to support following *CBS*. *Wall St. J.*, 601 F. App'x at 218-19. And in holding a Virginia restriction on attorneys' comments about their own pending cases was constitutional in criminal cases but violated the First Amendment in civil cases, the Circuit cited *CBS*, noting that the "gag on lawyers during [that] civil trial was reversed because the order infringed the first amendment." *Hirschkop v. Snead*, 594 F.2d 356, 373 (4th Cir. 1979).

parties, a clerk may choose in their discretion to revoke the attorney's access to OCRA," which Defendants claim "is not punitive." Hade Mem. 14; *see* Clerks Mem. II 2, 5.[18]

But Defendants' concession that OCRA gives clerks discretion is fatal to their argument. "[I]n the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint." *Lakewood*, 486 U.S. at 757. This is one of "'two evils that will not be tolerated in [licensing] schemes.'" *Am. Entertainers, LLC v. City of Rocky Mount*, 888 F.3d 707, 720 (4th Cir. 2018) (the other is '"fail[ing] to place limits on the time … [to] issue the license"'").

Even where "issuance of the license is ministerial," a statute allowing government to "suspend or absolutely revoke the license" with "no safeguards governing" exercise of that discretion creates the "kind of subjective and arbitrary power [that] cannot withstand constitutional scrutiny." *Silver Spurs, Inc. v. Town of Palm Shores*, 1997 WL 809203, *3 (M.D. Fla. Dec. 30, 1997). This is also true of statutes, like OCRA that require subscribers to "periodically renew [their] license." *Lakewood,* 486 U.S. at 759. The vice in a law that "contains no explicit limits on the [Clerk's] discretion" – giving them "unfettered discretion" to decide whether to revoke or deny renewal of OCRA access to a subscriber who provides information to the press – is that it "gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech." *Id.* at 759, 769.

[18] After telling the Eastern District that violating the Dissemination Restriction could subject attorneys to discipline, including "'suspension or revocation of his or her license,'" to support the Access Restriction, Compl., ¶ 61 n.1 (quoting *CNS v. Hade*, ECF Doc. 67 at 16-17), Hade's counsel should not now be heard to say the Dissemination Restriction is "not punitive." Hade Mem. 14. The Dissemination Restriction does "punish" some members of the "public [for] publishing" information from OCRA, contrary to the conclusion in *Hade II*, 631 F. Supp. 3d at 368, repeated here. Hade Mem. 22. In any event, it does not matter "whether the [Restriction] [i]s 'view[ed] as a prior restraint or as a penal sanction.'" *Soderberg*, 999 F.3d at 968 n.3.

It is far from unfathomable that a clerk may use this unchecked discretion not to revoke OCRA access of an attorney who provides information to a reporter for a favorable article on, say, a lawsuit by the Commonwealth, but revoke OCRA access for an attorney who provides information for an article criticizing the Commonwealth or a clerk. Indeed, something similar has happened before. *Ostergren*, 615 F.3d at 266, 268-73, 286-87 (holding unconstitutional Commonwealth's prosecution of plaintiff's "advocacy website" for its "political speech" in posting unredacted land records – to "criticize[]" Virginia "clerks of court" for placing those records online without redacting social security numbers – under a statute banning dissemination of "another's individual social security number to the general public'").[19]

**B. <u>Defendants' Arguments for Not Applying Any Scrutiny to the Restriction All Fail</u>**

Unable to even attempt to argue the Dissemination Restriction survives strict scrutiny, and apparently aware the square peg of the time, place and manner scrutiny applied to the Access Restriction in *Hade II* does not fit the round hole of the Dissemination Restriction (as CNS and Lee will explain in Section V), Defendants try to assert a handful of arguments why the Court should not apply any scrutiny to the Dissemination Restriction, none of which have merit.

**1. <u>Contractual Waivers of Constitutional Rights Do Not Apply to Statutory Restraints</u>**

To take Defendant Hade's final argument first, contractual waiver of First Amendment rights does not apply to prior restraints imposed by statute. *See Rosenberger v. Rector & Visitors of Univ. of Virginia*, 18 F.3d 269 (4th Cir. 1994), *rev'd*, 515 U.S. 819 (1995). In the only case cited by Defendant, "waiver of constitutional rights" was applied to "an otherwise valid contract

---

[19] The Virginia statute originally exempted from its prohibition SSNs contained in "'records required by law to be open to the public,'" which would include unredacted land records. *Ostergren*, 615 F.3d at 269 (quoting Va. Code § 59.1–443.2(A)(1)). In her effort to spur a change in the law and clerks' practices, plaintiff posted unredacted land records of Virginia clerks of court and other public officials, after which the exemption was removed from the law and the Attorney General announced plaintiff would be prosecuted. *Id.* at 269 & n.5, 288-89.

with the government" that was not used to enforce a statutory restraint. *Overbey*, 930 F.3d at 223. It has not been applied when the "challenge is to the [government's] regulation" of speech, even where it may be enforced through a "standard agreement." *Rosenberger*, 515 U.S. at 823.

In *Rosenberger*, the "regulation" involved University of Virginia "Guidelines" for student groups. *Id.* at 823-24. An agreement each group signed was "'the only source of any control the University may have over the [group] or its activities.'" *Id.* at 849 (O'Connor, J., concurring). The Fourth Circuit said the issue was "whether [the Guidelines] are imposing an unconstitutional condition upon the exercise of the plaintiffs' protected speech." *Rosenberger*, 18 F.3d at 280. By "erect[ing] … a prior restraint'" on funding a student publication due to its religious content, the Guidelines were unconstitutional unless "'necessary to serve a compelling state interest and is narrowly drawn to achieve that end.'" *Id.* at 280-81.[20] The Supreme Court agreed analytically but found the restraint was not necessary to "comply[] with the Constitution's prohibition against state establishment of religion." *Rosenberger*, 515 U.S. at 828, 831, 837.

*Rosenberger* did not address contractual waiver, and it is inconceivable the high court would have upheld the statutory restraints in prior cases even if the media were required to sign a contract agreeing to comply in exchange for access to proceedings or information.[21] Indeed,

---

[20] Conditions on receipt of a government benefit requiring sacrifice of a First Amendment right must by justified "by showing that it is the least restrictive means of achieving some compelling state interest." *Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 717-18 (1981). When one court applied this "unconstitutional condition" doctrine to a contract between a city and its fire department, the Fourth Circuit reversed and applied "waiver" analysis, including the balancing test used in *Overbey*, which it took from public employee speech case involving an independent contractor. *Lake James Cmty. Volunteer Fire Dep't, Inc. v. Burke Cnty.*, 149 F.3d 277, 280-82 (4th Cir. 1998) (applying *Board of Cnty Comm'rs v. Umbehr,* 518 U.S. 668 (1996)).

[21] *See Soderberg*, 930 F.3d at 967-69 & n.3 (citing *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469 (1975) (First Amendment barred privacy claim based on Georgia law prohibiting publication of name of rape victim where reporter obtained the information from court records lawfully obtained) and *Daily Mail*, 443 U.S. at 98-100 (striking down West Virginia statute prohibiting publication of names of youths charged as juvenile offenders without court approval)).

other courts have held exactly that.[22]

Even if a Subscriber Agreement incorporating the statutory Dissemination Restriction could be considered a contractual waiver, it will not be enforced where the interests supporting waiver "are outweighed by strong policy interests that are rooted in the First Amendment." *Overbey*, 930 F.3d at 223. Defendant Hade notes this rule, but overlooks that, given the "'profound'" First Amendment interests at stake, the Fourth Circuit refused to enforce a waiver because defendant had "not identified a comparably ***compelling*** public good" justifying enforcement. *Id.* at 223-26 (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).[23]

Neither *Smith* nor Defendant Hade in relying on that decision articulate a "compelling public good" justifying enforcement of the alleged waiver because the threat posited to justify the Access Restriction – automated "bots" mining the OCRA database to scrap any PII in the court records there, *Smith*, 126 F.3d at 911-12 – does not exist with respect to the individual records, or the public information in those records, that an attorney may want to disseminate or be asked to provide the media so they can report it to the public. *See also infra* Section V.

---

[22] *See, e.g., Baltimore Sun Co. v. State*, 667 A.2d 166, 173 (Md. App. 1995) ("'portion of the order conditioning [press] attendance … upon their agreeing in advance not to publish the name of the juvenile is … an unconstitutional prior restraint'"); *San Bernardino Cnty. Dep't of Public Social Servs. v. Superior Court*, 232 Cal. App. 3d 188 (1991) (First Amendment prohibited juvenile court from "imposing [as] conditions of access" a prior restraint on publishing certain information in reports about proceeding).

[23] In addition, courts "do not presume that the waiver of a constitutional right … is enforceable." *Overbey*, 930 F.3d at 223. "In the civil no less than the criminal area, courts indulge every reasonable presumption against waiver" of "fundamental rights." *Fuentes v. Shevin,* 407 U.S. 67, 94 n.31 (1972). This in turn requires Defendant to show the waiver was "made knowingly and voluntarily," *Overbey*, 930 F.3d at 223, which he cannot do. The OCRA "[a]greement does not mention [subscribers'] rights under the federal Constitution," let alone explain that but for the Dissemination Restriction the subscribers would have a "First Amendment" right to inform others about the public court records on OCRA that they waive by signing. *Richwine v. Matuszak*, 707 F. Supp. 3d 782, 794 (N.D. Ind. 2023), *aff'd,* 148 F.4th 942 (7th Cir. 2025). And it is difficult to see how a provision required by statute can be considered voluntary.

Even if that asserted interest exists at some limited level in this context, it is clearly outweighed by the "'profound national commitment'" – which lies "at the heart of the First Amendment" – "'to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Overbey*, 930 F.3d at 223-24 (quoting *Times v. Sullivan*, 376 U.S. at 270)). Dissemination of information about newsworthy complaints and other court records "allow[s] the public to understand the parties involved in a case, the facts alleged, the issues for trial, and the relief sought," and is "'an essential component'" in that debate, *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 327 (4th Cir. 2021) (quoting *Globe Newspaper,* 457 U.S. at 606), because it "is crucial to 'not only the public's interest in monitoring the functioning of the courts but also the integrity of the judiciary.'" *Id.* (quoting *Doe*, 749 F.3d at 266).

Consequently, enforcement of the alleged "waiver of [OCRA subscribers'] First Amendment rights … cuts against strong public interests that are highly relevant to the very right that [the subscribers purportedly] waived," and should be denied. *Overbey*, 930 F.3d at 226.

**2. <u>The Court Must Decline Defendants' Plea to Ignore the Plain Text of the Restriction</u>**

Defendant Hade implores the Court to overlook the plain language of section 17.1-293(H) and consider "'the design of the statute as a whole and its object and policy,'" Hade Mem. 10-11 (quoting *Crandon v. United States*, 494 U.S. 152, 158 (1990)), which, he contends, shows that the Dissemination Restriction "is a restraint on conduct, not speech." *Id.* at 10.

To quote a recent decision in another First Amendment context, "Horsefeathers!" *Kelly v. Hegseth*, 2026 WL 391777, *10 (D.D.C. Feb. 12, 2026). The rules on statutory interpretation are clear: "Analysis properly begins with the language of the statute itself," and only when its "ordinary meaning" is "ambiguous" are courts "left … to give it the meaning most consistent with the statute's purpose." *In re Andrews*, 80 F.3d 906, 909 (4th Cir. 1996) (citing *Crandon*, 494 U.S. at 158); *Faircloth v. Lundy Packing Co.,* 91 F.3d 648, 653 (4th Cir. 1996) ("If the

statutory language is clear and unambiguous, our inquiry ends there as well; we neither resort to an examination of the statute's legislative history nor apply the traditional rules of statutory construction.") (citing *Stiltner v. Beretta U.S.A. Corp.,* 74 F.3d 1473, 1482 (4th Cir. 1996)).

In this case, the statute at issue is clear and unambiguous on its face:

> Nothing in this section shall be construed to permit ***any data*** accessed by secure remote access to be sold or posted on any other website or ***in any way redistributed to any third party***, and the clerk, in his discretion, may deny secure remote access to ensure compliance with these provisions. However, ***the data accessed*** by secure remote access ***may be included in products or services provided to a third party*** of the subscriber provided that (i) ***such data is not made available to the general public*** and (ii) the subscriber maintains administrative, technical, and security safeguards to protect the confidentiality, integrity, and limited availability of the data.

Va. Code § 17.1-293(H).[24]

"Data" is not defined in the statute. *See id.* § 17.292(B). "[W]here a word is not defined by statute, the Court normally construe[s] it in accord with its ordinary or natural meaning," and it "'customarily turn[s] to dictionaries for help in determining whether a word in a statute has a plain or common meaning.'" *Hutchins v. U.S. Dep't of Lab.*, 683 F.3d 75, 77 (4th Cir. 2012).

As dictionary definitions demonstrate, "[t]oday, data is used in English both as a plural noun meaning 'facts or pieces of information' (*These data are described more fully elsewhere*) and as a singular mass noun meaning 'information' (*Not much data is available on flood control in Brazil*)." Dictionary.com/browse/data (Usage). Data most broadly means "facts or information, especially when examined and used to find out things or to make decisions,"

---

[24] Defendant Clerks ask the Court to ignore what the statute says by claiming prior restraints are limited to "a narrow set of regulations" that do not include a statute prohibiting dissemination on information from OCRA to third parties and the public. Clerks Mem. II 9. But "[a] prior restraint may take many forms" not included in the Clerks' list. *Dirks v. Bd. of Cnty. Comm'rs.*, 2016 WL 2989240, *5 n.47 (D. Kan. May 24, 2016); *see Alexander*, 509 U.S. at 569. Restraints such as OCRA "that actually forbid speech activities" are not limited to "[c]ourt orders and injunctions." Clerks Mem. II 9. "A prior restraint is generally any governmental action that would prevent a communication from reaching the public." *United States v. Dinwiddie*, 885 F. Supp. 1286, 1298 (W.D. Mo. 1995), *aff'd and remanded*, 76 F.3d 913 (8th Cir. 1996).

Oxfordlearnersdictionaries.com/us/definition/english/data, and secondarily "information that is stored by a computer." *Id.*; Dictionary.com/browse/data (data is "information in digital format," or "a body of facts, information," or "individual facts, statistics, or items of information.").

Defendant's attempt to rewrite the statute thus fails because it cannot be limited to "a restriction on ***downloading data*** from an OCRA database and disseminating it" when what Defendant means is sharing of "'Personally Identifiable Information (PII)" in "unredacted digital court records." Hade Mem. 10-11. "If the General Assembly of Virginia had intended to" limit section 17.1-293(H) to downloading and sharing of PII in unredacted digital records "it could have easily said so." *In re Callaway*, 1978 WL 222036, *3 (Bankr. E.D. Va. Oct. 26, 1978).

It most certainly would not have said that no "data" may be "in any way redistributed to any third party." As Defendant concedes, this Restriction prohibits "disseminating it to third parties," Hade Mem. 10, which includes telling a reporter over the phone the contents of court records or emailing a copy. *See Mutafis v. Erie Ins. Exch.*, 728 F.2d 672, 674 (4th Cir. 1984) (statute recognized "disseminating" may be accomplished via "any oral or written statement").

Moreover, by asserting the Dissemination Restriction is a "restraint on conduct," Hade Mem. 10, Defendant concedes the game because the conduct here ***is*** speech. "Speech for First Amendment purposes includes 'the spoken or written word' as well as 'conduct [that] possesses sufficient communicative elements," including "dissemination of information." *Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1227-28 (10th Cir. 2021) (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989)). That includes providing reporters information about civil court records so they can "report on whatever newsworthy content they contain," and the Dissemination Restriction's restraint on that speech "portends particularly egregious damage to First Amendment rights because it stifles the 'free discussion of governmental affairs' that the First Amendment exists to

protect." *Planet I*, 750 F.3d at 787-88 (9th Cir. 2014) (quoting *Globe Newspaper*, 457 U.S. at 604); *Schaefer*, 2 F.4th at 327 ("openness of the judicial process – especially through the press's reporting – 'affords citizens a form of legal education and hopefully promotes confidence in the fair administration of justice'") (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572 (1980)); *Ostregren*, 615 F.3d at 268-72 (First Amendment protects posting "land records containing unredacted SSNs online" to "publicize her message that governments are mishandling SSNs and generate pressure for reform").

Even if the statute was ambiguous – and, as shown, it is not – Defendant Hade cites no other part of the statute that supports reading the Restriction as limited to prohibiting dissemination of unredacted court records with PII. All he cites is the description of defendant's arguments in *Smith* about data mining ***in other remote access systems*** dissimilar to OCRA (as they neither require a subscription agreement nor redaction of PII by filers) to justify the interest served ***by the Access Restriction*** to prevent "'easy access to large volumes of data'" – a court's OCRA database– that "'bots programmed to seek personal information can quickly search,'" which "'[d]ata mining typically requires.'" 126 F.4th at 911 (quoting Commonwealth brief).

Whatever the merits of this argument with respect to the Access Restriction, it does not even remotely suggest the clear terms of the Dissemination Restriction could be read as limited to restraining distribution of PII. Rather, it establishes the Restriction is manifestly overbroad.

### 3. CNS and Lee Have Stated Both Facial and As Applied Claims

Defendants' contentions that CNS and Lee have not stated a facial challenge to the Dissemination Restriction "rest on a serious misunderstanding of First Amendment precedent and principle." *Moody v. NetChoice, LLC*, 603 U.S. 707, 727 (2024) (cited at Hade Mem. 19).

The case Defendants rely on explains one reason why the "so-called overbreadth doctrine" does not apply here. *United States v. Miselis*, 972 F.3d 518, 530 (4th Cir. 2020); *see*

Hade Mem. 13; Clerks Mem. II 14-15. This "doctrine 'allows a party to challenge a law facially under the First Amendment by "describing a substantial number of instances of arguable overbreadth of the contested law," even ***if the law is constitutional as applied to [himself]***.'" *Miselis*, 972 F.3d at 530. Consequently, "the 'usual judicial practice' is to determine that the statute 'would be valid as applied' to the challenger's own conduct before proceeding to a facial challenge premised on the hypothetical conduct of others 'unnecessarily.'" *Id.*

As shown above, Defendant Hade's objections to the as-applied claim are without merit: CNS and Lee ***do*** have standing to challenge impairment of their right to gather news; that right is impaired by the restraint on OCRA subscribers' ability to provide information; and subscribers' speech is protected by the First Amendment whether or not they are also an "information content providers" under section 230 of the CDA. *Compare* Hade Mem. 15 & 18-21 *with Overbey*, 930 F.3d at 228-29; *Zeran v. AOL*, 129 F.3d 327, 330 (4th Cir. 1997); *supra* Section I.A.1-2 & n.7.

Even if CNS and Lee could not bring an "as applied" challenge – and, as shown, they can – the substantial overbreadth doctrine has not been applied to "certain speech prohibitions" that are "presumptively unconstitutional," as to which the only question is whether they survive constitutional scrutiny. *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 473 (6th Cir. 2016). Those prohibitions include "content-based restrictions," *id.*, and "traditional types of prior restraint," *Citizens United v. Schneiderman*, 882 F.3d 374, 386-87 (2d Cir. 2018), such as statutes barring speech or providing discretion to deny or revoke a license for speech activity. *Id.*; *Dirks v. Bd. of Cnty. Comm'rs of Ford Cnty.*, 2016 WL 2989240, *5 n.46 (D. Kan. May 24, 2016) ("licensing and censorship schemes [are] classic forms of prior restraint").

The Dissemination Restriction combines both forms of prior restraint. As to the first, it is unconstitutional unless it survives strict scrutiny, and Defendant has not attempted to show it

can. *Soderberg*, 999 F.3d at 970 (4th Cir. 2021) (after reversing use of intermediate scrutiny, Fourth Circuit remanded to apply strict scrutiny with no discussion of overbreadth); *see R.A.V. v. City of St. Paul*, 505 U.S. 377, 381 (1992) ("ordinance is facially unconstitutional in that it prohibits otherwise permitted speech solely on the basis of the subjects the speech addresses").[25] As to the second, the Restriction is invalid because "the face of the ordinance itself contains no explicit limits on the [clerk's] discretion." *Lakewood*, 486 U.S. at 769. No further analysis is required. *Am. Entertainers*, 888 F.3d at 720-21 (reversing holding that ordinance "confer[ring] too much discretion" was not a prior restraint and remanding for entry of judgment).[26]

Even if the facial challenge to the Dissemination Restriction is subject to the overbreadth doctrine, Defendants' own arguments show "the [Restriction] 'prohibits a substantial amount of protected speech relative to its plainly legitimate sweep.'" *Moody*, 603 U.S. at 723-24.

Defendant contends the legitimate sweep of the Dissemination Restriction "is not [to] restrict[] any speech, only the downloading and dissemination of digital copies of court records

---

[25] Although the Court need not reach this issue to deny the motions to dismiss, CNS and Lee note that the Dissemination Restriction is also content-based. A "speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." *Reed v. Town of Gilbert*, 576 U.S. 155, 169 (2015). The Dissemination Restriction is a content-based "'prohibition of public discussion of an entire topic,'" *id.* – civil court records available on OCRA – even though "it impose[s] no limits on the political viewpoints that could be expressed." *Id.* "Content-based laws 'are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.'" *Susan B. Anthony List*, 814 F.3d at 473 (Ohio law prohibiting false statements about political candidates during election season an unconstitutional content-based restriction "focused on a specific subject matter") (quoting *Reed*, 576 U.S. at 163).

[26] In cases challenging an entire statutory scheme where the reviewing courts only held provisions imposing a prior restraint unconstitutional, those courts remanded for determination of whether the unconstitutional provisions were severable or whether the entire ordinance needed to be invalidated. *Lakewood*, 486 U.S. at 772; *Am. Entertainers*, 888 F.3d at 723-24. Contrary to what Defendant Hade suggests, severability analysis is not an impediment to holding the Dissemination Restriction facially unconstitutional, Hade Mem. 16, but would simply identifies whether "the appropriate remedy is to invalidate the statute only to the extent that it reaches too far, while leaving the remainder intact." *Miselis*, 972 F.3d at 530.

containing sensitive PII that has not been redacted to third parties." Hade Mem. 16. Setting aside that posting public records that contain PII – and there was no showing in *CNS v. Hade* that civil records on OCRA do, as Virginia requires redaction of most sensitive PII before filing – can be protected speech, *Ostergren*, 615 F.3d at 272, the Restriction is not nearly so limited. Instead, it "sweeps up a substantial amount of protected [speech]." *Miselis*, 972 F.3d at 541.

The Dissemination Restriction does not just ban disseminating digital copies of records with PII; it also bans disseminating copies of court records that never contained PII or from which PII was redacted, and disseminating any information in those records – even if provided in an oral or written summary about the parties, factual allegations and causes of action – to any third party who might disseminate it to the public. Compl., ¶¶ 10-12, 43-44 & 77-85. ***All*** of that constitutes First Amendment-protected speech that "allows the public to 'participate in and serve as a check upon the judicial process." *Schaefer*, 2 F.4th at 327 (quoting *Globe Newspaper,* 457 U.S. at 606). None of it implicates Defendant's asserted legitimate sweep. "Altogether, these areas of overbreadth cover the whole realm of [speech] that [*Schaefer* and the First Amendment] protects, and dwarfs that which [is] … unprotected." *Miselis*, 972 F.3d at 541.[27]

---

[27] Defendant Clerks cite ***no cases*** even suggesting that media challenging a restraint on sources of information need to "show 'willing' attorneys in a 'substantial number' of instances." Clerks Mem. II 15. That is because whether "a 'willing speaker' exists" is part of the "standing" analysis, *Overbey*, 930 F.3d at 228, while the merits of facial challenge involves "'a substantial number of instances of arguable overbreadth,'" *Miselis*, 972 F.3d at 530, and never the twain should meet. "Courts 'must not confuse standing with the merits.'" *Ass'n of Am. Railroads v. Hudson*, 144 F.4th 582, 589 (4th Cir. 2025). Even if a court could combine "willing speaker" and the substantive "overbreadth doctrine,'" *id.*, CNS and Lee have more than plausibly alleged a substantial number of willing speakers, as they have alleged that "across the country" attorneys provided journalists with copies of court records, which attorneys within Virginia have said they were also willing to do "[o]n multiple occasions" but for OCRA. Compl., ¶¶ 10, 74, 90.

## V.

## DEFENDANTS DO NOT ARGUE THE DISSEMINATION RESTRICTION SURVIVES STRICT SCRUTINY AND THE SCRUTINY THEY APPLY REQUIRES FACTUAL EVIDENCE THEY HAVE NOT AND CANNOT PRESENT AT THIS STAGE

The "reasoning of the overturned *Hade* decision" on summary judgment, Hade Mem. 22, cannot apply here because the context is different. Perhaps the "'precise question'" if CNS had access to OCRA was "'whether the First Amendment provides Plaintiff, as a member of the public, a right to sell, post, and redistribute information obtained from *electronic* civil court records while it may already sell, post, and redistribute information obtained *physically* from the courthouse.'" *Id.* (quoting *Hade II*, 631 F. Supp. 3d at 368). But that is not the question now.

Rather, the question is whether the government can prohibit those with access from providing any information in nonconfidential public records on OCRA to the press if they are also available at that courthouse (which may be too remote for most people to reach). The answer, *Soderberg* said, is "no." The First Amendment requires strict scrutiny of a statutory restraint banning dissemination of "'truthful information'" – such as parties' names, factual allegations and causes of action – "'disclosed in public court documents'" on OCRA even if "the Ban … does not limit other means of disseminating the same information." *Soderberg*, 999 F.3d at 966-68 (quoting *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 495-96 (1975)).

Defendants do not argue the Dissemination Restriction meets strict scrutiny, for good reason. They cannot show it is "'need[ed] to further a state interest of the highest order'" and "'narrowly tailored to [that] state interest.'" *Id.* at 969; *Ostregren*, 615 F.3d at 267, 276 & 286-87 (clerks' failure to redact SSNs before making records available via "secure remote access" meant statute prohibiting publication of SSNs was not narrowly tailored to protect state interest of the highest order). Consequently, their motions should be denied.

The same result follows if the Restriction is viewed as a content-neutral time, place and

manner regulation, especially on a motion to dismiss given "'the rigorous and fact-intensive nature of intermediate scrutiny's narrow-tailoring analysis'" requires "'the government [must] present ***actual evidence*** supporting its assertion[s].'" *Billups v. City of Charleston*, 194 F. Supp. 3d 452, 471 (D.S.C. 2016) (denying dismissal) (quoting *Bruni v. City of Pittsburgh*, 824 F.3d 353, 372 (3d Cir. 2016) (reversing dismissal) and *Reynolds v. Middleton*, 779 F.3d 222, 229 (4th Cir. 2015) (reversing summary judgment)).

Indeed, *Hade I* denied a motion to dismiss on this ground. 580 F. Supp. 3d at 296.[28]

The two-judge majority in *Smith* did not address the merits of the Dissemination Restriction or *Hade II*'s application of time, place and manner scrutiny to it. The northstar for this analysis, then, becomes "the Supreme Court's recent decision" on time, place and manner scrutiny – *McCullen v. Coakley*, 573 U.S. 464 (2014) – which "clarifie[d what is necessary to carry the government's burden of proof under intermediate scrutiny." *Reynolds*, 779 F.3d at 228.

Under *McCullen,* "'intermediate scrutiny ... ***require[s]*** the government to present ***actual evidence*** supporting its assertion that a speech restriction does not burden substantially more speech than necessary; argument unsupported by the evidence will not suffice to carry the government's burden.'" *Billups v. City of Charleston, S.C.*, 961 F.3d 673, 687 (4th Cir. 2020). Defendant Hade does not address this "evidentiary showing required of a governmental entity seeking to uphold a speech restriction under intermediate scrutiny," *Reynolds*, 779 F.3d at 232, nor explain how it can be satisfied at the pleading stage.

Instead, he contends "the Dissemination Restriction does not burden substantially more

[28] *Hade II* erred in concluding the Dissemination Restriction is content-neutral if it was not imposed "'because of disagreement with the message [speech] conveys.'" 631 F. Supp. 3d at 361. As the Supreme Court has held, a ban on "'public discussion of an entire topic'" is content based even if it is viewpoint (i.e., message) neutral. *Reed*, 576 U.S. at 169; *see supra* at 41 n.25.

speech than necessary because it applies only to records obtained electronically and not records obtained physically at the courthouse." Hade Mem. 23-24 (citing *Hade II*, 631 F. Supp. 3d at 370) (following *Ross v. Early*, 746 F.3d 546, 557 (4th Cir. 2014), decided ***before*** *McCullen*).

Whatever the merits of that conclusion if the Access Restriction had been invalidated and CNS had access to a court's OCRA database, it cannot suffice here, where "the [Dissemination Restriction] ***burdens*** a wide range of protected speech," *Reynolds*, 779 F.3d at 230 – all speech about any information in court records on OCRA – particularly when the press cannot travel to the courthouse. It is also manifestly insufficient after *McCullen*, under which proving the Restriction "'does not burden substantially more speech than necessary'" – i.e., "'the burden of proving narrow tailoring'" – "'requires the [government] to *prove* that it actually *tried* other methods to address the problem'" and did so "***before*** enacting the speech-restricting law." *Billups*, 961 F.3d at 687-88 (4th Cir. 2020) (quoting *Reynolds*, 779 F.3d at 229, 231).

*Hade II* did not discuss any evidence showing Virginia tried relying on any alternatives – such as redaction by filers or agreements prohibiting data mining – to prevent disclosure of PII that are less restrictive before banning all dissemination of information from OCRA. *Hade II* thus cannot support dismissal here because the Commonwealth there "had 'not shown that it seriously undertook to address the problem with less intrusive tools readily available to it. Nor ha[d] it shown that it considered different methods that other jurisdictions have found effective.'" *Billups*, 961 F.3d at 688 (quoting *McCullen*, 573 U.S. at 494).[29]

---

[29] In Texas, CNS did not need to hire an attorney to "exploit[]" a "loophole," Hade Mem. 22, because remote access there is not "restricted" to attorneys, *id.* at 20, but open to all. Https://research.txcourts.gov/CourtRecordsSearch/Home#!/howToGetAccess ("General Public" under "Register"). Texas successfully prohibits "[d]ata scrapping," https://research.txcourts.gov/CourtRecordsSearch/Assets/site/termsAndConditions/TX_TermsAndConditions.html, and the *Hade I* defendants offered no evidence this restriction failed to work.

Nor did *Hade II* discuss evidence that CNS' subscribers used CasePortal to download, exploit or sell content from OCRA, Hade Mem. 24, a false theory the Commonwealth raised for the first time at the summary judgment hearing. That may be why *Hade II* mistakenly thought there "would be nothing stopping" this outcome but for the Access Restriction. 631 F. Supp.3d at 365. In actuality, CasePortal is a web-based interface used by CNS' subscribers to view and manage docket sheets and alerts, and to access and download CNS' daily reports to which they subscribe. *CNS v. Hade*, Doc. 89 at 63-64. CNS does not download complaints or any other court filings "in a mass way" to "resell it through their website." *Id.* at 65; *cf. id.* at 40 & 47.

Moreover, CNS' Terms of Use bar such misuse of CasePortal or any use of "automated software, devices, or other processes … designed to scrape the content, data or information from CasePortal …, or otherwise use, access, or collect the content, data, or information from CasePortal." Https://search.cnscaseportal.com/terms-of-use (Para. 8(a), (d), (g), (j), (k) & (l)). Absent evidence that these terms had been ineffective, which has never been presented, this argument cannot support dismissal of this case,[30] where CNS and Lee seeks to obtain information about new civil filings to further their right to gather and report news about them.

## CONCLUSION

Defendants' arguments have been rejected by *Hade I* at the same stage of the case, and by a host of Fourth Circuit precedent they never address. Among other things, the Circuit has rejected the argument that restraining sources from providing information about civil litigation to the press does not "appreciably inhibit[] debate on the relevant public issues" if the "complaint

---

[30] The discussion about this theory at the hearing indicated the court thought the Access Restriction necessary to prevent "a detrimental economic impact on the clerk of courts' budgets" by protecting their revenue stream from OCRA, *CNS v. Hade*, Doc. 89 at 44, which even the Commonwealth recognized was not an argument "permitted … under the First Amendment." *Id.*

and related filings are part of the public record" available at the courthouse. *Overbey*, 930 F.3d at 224 n.8; *see Wall Street J.*, 601 F. App'x 218-19 (citing *Nebraska Press Ass'n*, 427 U.S. at 562 (applying strict scrutiny to prior restraint on press); *Murphy-Brown*, 907 F.3d at 795-96.

While *Overbey* held "the relevant public discourse cannot be considered 'uninhibited' or 'wide-open'" when participants in civil litigation cannot provide information to the press about their case, 930 F.3d at 224 n.8, that is even more true of the Dissemination Restriction. It cuts off the press from sources that could provide information about newsworthy new civil filings that they are otherwise unable to report on ***at all*** when they cannot get to a remote courthouse, or a local one when the filing is near deadline. This undermines "the vital public interest in preserving the media's ability to monitor government activities," *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012), which requires "reasonably contemporaneous access" to information about new pleadings to allow the press and public to "play[] a positive role in the functioning of the judicial process." *Schaefer*, 2 F.4th at 327; *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995) ("[s]uch monitoring is not possible without access" to information about filings in litigation). CNS and Lee thus respectfully request that the Court deny all Defendants' motions.

Dated: March 5, 2026

Respectfully Submitted,

**BRYAN CAVE LEIGHTON PAISNER LLP**

By: /s/ Roger Myers
Roger Myers
Rachel Matteo-Boehm
Carlie Tenenbaum
(All Admitted Pro Hac Vice)
3 Embarcadero Center, 7th Floor
San Francisco, California 94111
Tel: (415) 675-3400
roger.myers@bclplaw.com
rachel.matteo-boehm@bclplaw.com

**TROUTMAN PEPPER LOCKE LLP**

By: /s/ Dabney J. Carr IV
Dabney J. Carr IV
VSB No. 28679
Lauren H. Miller
VSB No. 100566
P.O. Box 1122
Richmond, Virginia 23218
Tel: (804) 697-1238
dabney.carr@troutman.com
lauren.h.miller@troutman.com

*Counsel for Plaintiffs Courthouse News Service, Lee Enterprises, Incorporated, Lee BHM LLC*

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Abingdon Division**

| | |
|---|---|
| COURTHOUSE NEWS SERVICE; LEE ENTERPRISES, INCORPORATED; AND LEE BHM LLC, PUBLISHER OF THE RICHMOND TIMES-DISPATCH, THE ROANOKE TIMES, BRISTOL HERALD COURIER, LYNCHBURG NEWS AND ADVANCE, FREDERICKSBURG FREE LANCE STAR AND THE DAILY PROGRESS.<br><br>Plaintiff,<br><br>v.<br><br>KARL R. HADE, in his official capacity as Executive Secretary of the Office of Executive Secretary of the Supreme Court of Virginia,<br><br>and<br><br>EDWARD JEWETT, in his official capacity as Clerk of the Circuit Court for the City of Richmond, Virginia,<br><br>and<br><br>BRENDA HAMILTON, in her official capacity as Clerk of the Circuit Court for the City of Roanoke, Virginia,<br><br>and<br><br>KELLY FLANNAGAN, in her official capacity as Clerk of the Circuit Court for the City of Bristol, Virginia<br><br>Defendants. | Civil Action No. 1:25-cv-0075-JPJ-PMS |

**DECLARATION OF STEVE POULOS**

I, Steve Poulos, declare and state as follows:

1. I am the Senior Director for General Accounting at Lee Enteprises, Incorporated ("Lee Enterprises" or "Lee"). I have been employed by Lee for 19 years and have worked as a finance director for the past eight years.

2. I have personal knowledge of Lee's relationship with its subsidiary, Lee BHM, LLC, which acquired the newspaper assets and operations of BH Media Group, Inc., including without limitation its newspaper assets and operations in Viriginia, in 2020.

3. Lee BHM owns all the assets in the newspapers in Virginia identified in the Complaint in this case as being owned by Lee and Lee BHM ("Lee's Virginia newspapers), but Lee Enterprises pays the salaries of Lee's Virginia newspapers' staff and has since January 2025.

4. While the reporters and others who work for Lee's Virginia newspapers are employees of Lee Enterprises, Lee BHM arranges printing and distribution of those newspapers. As a result, both Lee entities are involved in publishing Lee's Virginia newspapers.

5. Lee BHM bills subscribers to and advertisers in Lee's Virginia newspapers and collects that revenue. Revenue from Lee's Virginia newspapers is deposited into a Lee Enterprises bank account used for all Lee subsidiaries to pay expenses. If readers of Lee's Virginia newspapers cancel their subscriptions, that results in lower cash for Lee Enterprises to pay Lee BHM expenses.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed in Davenport, Iowa on this 5 day of March 2026.

[signature]

Steve Poulos

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Abingdon Division**

COURTHOUSE NEWS SERVICE; LEE ENTERPRISES, INCORPORATED; AND LEE BHM LLC, PUBLISHER OF THE RICHMOND TIMES-DISPATCH, THE ROANOKE TIMES, BRISTOL HERALD COURIER, LYNCHBURG NEWS AND ADVANCE, FREDERICKSBURG FREE LANCE STAR AND THE DAILY PROGRESS.

Plaintiff,

v.

KARL R. HADE, in his official capacity as Executive Secretary of the Office of Executive Secretary of the Supreme Court of Virginia,

and

EDWARD JEWETT, in his official capacity as Clerk of the Circuit Court for the City of Richmond, Virginia,

and

BRENDA HAMILTON, in her official capacity as Clerk of the Circuit Court for the City of Roanoke, Virginia,

and

KELLY FLANNAGAN, in her official capacity as Clerk of the Circuit Court for the City of Bristol, Virginia

Defendants.

Civil Action No. 1:25-cv-0075-JPJ-PMS

**PLAINTIFFS' MOTION FOR LEAVE TO AMEND**

Pursuant to Federal Rule of Civil Procedure 15, Plaintiff Courthouse News Service ("Courthouse News") and Plaintiffs Lee Enterprises, Incorporated and its wholly owned subsidiary, Lee BMH LLC (collectively, "Lee") (and, together with Courthouse News, "Plaintiffs"), respectfully move for leave to amend their Complaint in this action in the event the Court grants Defendants' motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and/or 12(b)(6).

Leave to amend "should be freely given" as it would not "'be prejudicial to the opposing party,'" there has been no "'bad faith,'" and the amendment would "not be futile." *Ohio Valley Env't Coal., Inc. v. Hernshaw Partners, LLC*, 984 F. Supp. 2d 589, 592 (S.D.W. Va. 2013) (quoting *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.,* 576 F.3d 172, 193 (4th Cir. 2009)); *see Laber v. Harvey*, 438 F.3d 404, 429 (4th Cir. 2006) (en banc) (district court "abused its discretion" in denying motion to amend).

All of these factors are satisfied here. This case is in its very early stages, and thus amendment would not prejudice any defendant. Nor is there any bad faith, as demonstrated by Plaintiffs' Omnibus Opposition to Defendants' Motions to Dismiss (the "Opposition"). As for the final factor, in the event the Court grants Defendants' motions to dismiss on the grounds of standing, Plaintiffs would amend their complaint to allege, *inter alia*, the facts alleged in the Polous Declaration attached to the Opposition. In the event the Court grants Defendants' Rule 12(b)(6) motions on the merits, Defendants would amend their complaint to allege further facts demonstrating how and why Virginia Code § 17.1-293(H) (the "Dissemination Restriction") cannot meet either the strict scrutiny required of prior restraints on speech or the intermediate scrutiny required of content-neutral time, place and manner regulations.

Similarly, in the event the Court grants Hade's motion to dismiss based on the Eleventh Amendment, Plaintiffs would amend their complaint to allege additional facts demonstrating (1)

the involvement of the Office of the Executive Secretary ("OES") in drafting the OCRA subscriber agreements, including the Dissemination Restriction; (2) OES involvement in enforcing the Dissemination Restriction; and (3) collaboration between OES and Virginia circuit clerks, including the clerks in this case, concerning the enforcement of the Dissemination Restriction. Support for these allegations is found in documents Hade produced in *Courthouse News Serv. v. Hade*, Civil Action No. 3:21-cv-00460-HEH ("*CNS v. Hade*"), including, by way of example only:

1. A 2015 email string involving Richmond Clerk Edward Jewett, a Defendant in this action, along with several representatives of the Office of the Executive Secretary ("OES"), discussing enforcement of the Dissemination Restriction. Included in that email string is an email from one OES representative to another discussing his involvement in creating OCRA's Terms and Conditions and advising Mr. Jewett on his response to an inquiry from an OCRA subscriber regarding the Dissemination Restriction. Copies of these documents, Bates Stamped MCBRYDE0058-62, are attached as **Exhibit 1.**

2. An April 2013 email from OES to Spotsylvania Circuit Court Clerk Christalyn Mitchell Jett transmitting to Clerk Jett, *inter alia*, a "sample subscription agreement" "that you could send to your local bar" containing the Dissemination Restriction. Copies of these documents, Bates Stamped MCBRYDE0155-170, are attached as **Exhibit 2**.

3. A 2014 email string between OES and Lynette Coe, Deputy Clerk of the Prince Edward County Circuit Court, in which OES advises Ms. Coe that OCRA cannot be set up on public access terminals because each OCRA user must have a unique login, and OCRA is only accessible by attorneys and other Officers of the Court. Copies of these documents, Bates Stamped MCBRYDE0135-144, are attached as **Exhibit 3**.

4. A June 2011 email string in which (at the bottom of the string) OES provides, to numerous circuit court clerks "new certification language that should replace the current 'disclaimer," and states, "We would like the system to require every person to 'certify' to this each time they access OCRA." The proposed language is: "I, ----, certify in accordance with Virginia Code § 17.1-293 that I am either an attorney in good standing with the Virginia State Bar, an authorized agent of such an attorney, an attorney currently admitted to practice law in Virginia on a pro hac vice basis, or an authorized representative of a governmental agency authorized by the clerk to access the system. I acknowledge and agree that any data accessed in this system may not be sold or posted on any other Internet Web site or in any way redistributed to any third party. I further acknowledge and agree that the Circuit Court Clerk reserves the discretion to deny secure remote access to ensure compliance with the Code of Virginia." Copies of these documents, Bates Stamped WRIGHT0030-37, are attached as **Exhibit 4**.

WHEREFORE Plaintiffs respectfully request that, if the Court grants the motions to dismiss pursuant to Rule 12(b)(6) or 12(b)(1) for any of the reasons argued in Defendants' motions to dismiss, or for any other reason, the Court grant it leave to amend its complaint, and enter any such other and further relief as the Court deems just and proper.

COURTHOUSE NEWS SERVICE
LEE ENTERPRISES, INCORPORATED
LEE BHM LLC

By: _____/s/ Dabney J. Carr___________
Of Counsel

Dabney J. Carr IV, VSB No. 28679
Lauren H. Miller, VSB No. 100566
P.O. Box 1122
Richmond, Virginia 23218
Tel: (804) 697-1200
Fax: (804) 697-1339
dabney.carr@troutman.com
lauren.h.miller@troutman.com

Roger Myers (admitted pro hac vice)
Rachel Matteo-Boehm (admitted pro hac vice)
Carlie Tenenbaum (admitted pro hac vice)
Bryan Cave Leighton Paisner LLP
3 Embarcadero Center, 7th Floor
San Francisco, California 94111
Tel: (415) 675-3400
Fax: (415) 675-3434
roger.myers@bclplaw.com
rachel.matteo-boehm@bclplaw.com
carlie.tenenbaum@bclplaw.com

*Counsel for Plaintiffs Courthouse News Service,*
*Lee Enterprises, Incorporated and Lee BHM LLC*

# EXHIBIT 1

**From:** Bob Smith
**To:** Daniel McBryde
**Subject:** Re: Fw: OCRA and provision of documents from a case to a client or person who is involved in the case
**Date:** Friday, March 6, 2015 1:38:00 PM
**Attachments:** graycol.gif

---

Go ahead and email Kristi, Eddie Macon and Norma

Daniel McBryde---03/06/2015 10:16:48 AM---So we do need to get Kristi and others involved to change the verbiage, who provides legal advice to

From: Daniel McBryde/OES/VaJud
To: Bob Smith/OES/VaJud@VaJud,
Date: 03/06/2015 10:16 AM
Subject: Re: Fw: OCRA and provision of documents from a case to a client or person who is involved in the case

---

So we do need to get Kristi and others involved to change the verbiage, who provides legal advice to clerks?

Let me know how you want to proceed. We can draft and email or be available for a meeting if needed.

Who should respond to Ed?

Thanks,
Daniel

Derek Kestner---03/05/2015 10:41:22 AM---Daniel - The original version of OCRA's Terms and Conditions was taken from VITA language for SRA an

From: Derek Kestner/OES/VaJud
To: Daniel McBryde/OES/VaJud@VaJud
Cc: Bob Smith/OES/VaJud@VaJud, Justin Griffin/OES/VaJud@VaJud, Peter Trauernicht/OES/VaJud@VaJud, RMS
Date: 03/05/2015 10:41 AM
Subject: Re: Fw: OCRA and provision of documents from a case to a client or person who is involved in the case

---

Daniel -

The original version of OCRA's Terms and Conditions was taken from VITA language for SRA and modified by me. After about 5 courts were on the system Eddie, Katya, Kristie and Steven all reviewed the system and had major concerns about many elements of OCRA. Changes were then made to the language and features at that time, though I don't recall the details of the changes. For that reason, I would state that the disclaimer and other language has gone through the official process but not the way we do it today.

I think 17.1-293 (E)(5) provides enough direction for Ed to feel comfortable that the information may be legally provided to the client by the OCRA subscriber, but that puts the burden on the subscriber and ultimately Ed to enforce if needed as Mr. Baker points out. If you recall, the original plan for the Clerks that initiated OCRA was to have each case assigned in CIS to a specific attorney and an OCRA subscriber would only be able to see those cases --- specifically because of the allowance made in 17.1-

293 (E)(5). Michele McQuigg and other didn't like that plan for several reasons and sponsored legislation that ultimately added 17.1-293 (E)(7). I believe that Ed could update his agreement to clearly state that subcribers are permitted to distribute the documents to their clients or potential clients that are parties to the case, or if he would prefer then we could request Public Relations review the "OR IN ANY WAY REDISTRIBUTED TO ANY THIRD PARTY" clause.

17.1-293(D)(5). Providing secure remote access to any person, his counsel, or staff which counsel directly supervises to documents filed in matters to which such person is a party;

** Please note that Mr. Baker references 17.1-293(D) in his email, but I believe he meant (E) and my email is based on that assumption.

Derek M. Kestner
Information Systems Analyst / Project Coordinator
Juvenile & Domestic Relations Court Imaging, Records Management Team
Department of Judicial Information Technology, Office of the Executive Secretary
Supreme Court of Virginia
804.786.1789
dkestner@courts.state.va.us

"We must never forget that the only real source of power that we as judges can tap is the respect of the people." -- Thurgood Marshall

Daniel McBryde---03/04/2015 06:06:36 PM---There is an attorney in Richmond who has an issue with this part of the OCRA disclaimer: I ACKNOWLED

From: Daniel McBryde/OES/VaJud
To: Peter Trauernicht/OES/VaJud@VaJud, Justin Griffin/OES/VaJud@VaJud, Derek Kestner/OES/VaJud@VaJud
Cc: RMS, Bob Smith/OES/VaJud@VaJud
Date: 03/04/2015 06:06 PM
Subject: Fw: OCRA and provision of documents from a case to a client or person who is involved in the case

---

There is an attorney in Richmond who has an issue with this part of the OCRA disclaimer:

I ACKNOWLEDGE AND AGREE THAT ANY DATA ACCESSED IN THIS SYSTEM MAY NOT BE SOLD OR POSTED ON ANY OTHER INTERNET
WEB SITE OR IN ANY WAY REDISTRIBUTED TO ANY THIRD PARTY.

Derek - was the OCRA disclaimer an "RMS" policy, or was it sent through the OES policy group?

If it was made up by us, then we might be able to just "adjust" it to address the concerns - otherwise, we will need to send it through the OES policy group for approval.

Peter / Justin - what are your thought on the matter?

Thanks,
Daniel

----- Forwarded by Daniel McBryde/OES/VaJud on 03/04/2015 05:58 PM -----

From: "Jewett, Edward - Circuit Court" <Edward.Jewett@richmondgov.com>
To: <dmcbryde@courts.state.va.us>, <bsmith@courts.state.va.us>
Cc: "Hargrove, Cecelia M. - Circuit Court" <Cecelia.Hargrove@richmondgov.com>, "Taylor, Tammy J. - Circuit Court"

<Tammy.Taylor@richmondgov.com>
Date: 03/04/2015 11:10 AM
Subject: FW: OCRA and provision of documents from a case to a client or person who is involved in the case

---

gentlemen- how do you think we should respond to the below email?

Thanks,

Ed

Edward F. Jewett
Clerk of Circuit Court
City of Richmond
400 N 9th Street., Richmond, VA 23219
804-646-6506

WARNING: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

-----Original Message-----
From: Taylor, Tammy J. - Circuit Court
Sent: Tuesday, March 03, 2015 4:19 PM
To: Jewett, Edward - Circuit Court; Hargrove, Cecelia M. - Circuit Court
Subject: FW: OCRA and provision of documents from a case to a client or person who is involved in the case

additional comment from Mr. Baker...

Tammy J. Taylor, Asst. Chief Deputy Clerk
Accounting and Administration
Circuit Court of the City of Richmond
400 N. 9th Street, Rm. 101, Richmond, VA 23219
Tammy.Taylor@richmondgov.com
office (804) 646-6506 / direct (804) 646-0837
fax: (804) 646-6562

WARNING: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

-----Original Message-----
From: Keith Barker [mailto:keithbarker@richmondlaw.net]
Sent: Tuesday, March 03, 2015 3:34 PM
To: Taylor, Tammy J. - Circuit Court
Subject: Re: OCRA and provision of documents from a case to a client or person who is involved in the case

S. Keith Barker wrote:
I would also note that by statute there is a definition of "Confidential court records". It states as follows:
17.1-295 "Confidential court records" means any civil or criminal record maintained by a clerk of the circuit court designated by this Code as confidential or any such record sealed pursuant to court order.

On 3/3/2015 3:27 PM, Keith Barker wrote:
> 3/3/2015
> S. Keith Barker wrote:
> Per our call questions arise as a result of the certification page that
> is on the website that states:
>
> "Terms of Service
> I, Barker, Samuel, certify in accordance with Virginia Code § 17.1-293
> that I am either an attorney in good standing with the Virginia State
> Bar, an authorized agent of such an attorney, an attorney currently
> admitted to practice law in Virginia on a pro hac vice basis, or an
> authorized representative of a governmental agency authorized by the
> clerk to access the system. I ACKNOWLEDGE AND AGREE THAT ANY DATA
> ACCESSED IN THIS SYSTEM MAY NOT BE SOLD OR POSTED ON ANY OTHER INTERNET
> WEB SITE OR IN ANY WAY REDISTRIBUTED TO ANY THIRD PARTY. I further
> acknowledge and agree that the Circuit Court Clerk reserves the
> discretion to deny Officer of the Court remote access to ensure
> compliance with the Code of Virginia." [Caps added to indicate].
>
> It appears the statement is made by the OCRA administrators at the Va.
> Sup Ct and it quotes a part of Code § 17.1-293(D). Further the
> certification clearly leaves the enforcement of violations up to the Clerk.
> I kindly request that the Clerk please give me guidance about
> supplying a document I obtain from the Court's records to a client who
> is a party in the case from which I get records or a records custodian
> who seeks my advice about a case in which a s.d.t. has been issued.
> Please bear in mind that the Sup Ct. statement in caps above does not
> include another relevant part of the same subsection of Code §
> 17.1-293(D), which states "However, the data accessed by secure
> remote access may be included in products or services provided to a
> third party of the subscriber provided that (i) such data is not made
> available to the general public and (ii) the subscriber maintains
> administrative, technical, and security safeguards to protect the
> confidentiality, integrity, and limited availability of the data." Code

```
> § 17.1-293(D).
> Several question arise including
> 1. As to a client being advised about a case, whether as a party or
> records custodian who received an s.d.t, could the subscriber send a
> copy of the record effecting advice to that client?
> 2. If the answer to question 1 above is "yes" what would the clerk
> consider to be "to protect... the administrative, technical, and
> security safeguards to protect the "integrity, and limited availability
> of the data" per 17.1-293(D)(ii)?
> 3. If the answer to question 1 above is "yes" what would the clerk
> consider to be some of the means that should be used "the
> administrative, technical, and security safeguards" used to protect the
> "confidentiality of the data" per 17.1-293(D)(ii), IF the data in
> subject to public access anyhow? That would address the situation where
> the data is not confidential and sealed by the court order and any
> member of the public could walk up to the counter and get a copy.
> I very much appreciate your guidance on these matters. Thank you.
> S. Keith Barker, P.C.
> (o) 804-934-0550
> (fax) 804-346-5338
> 4908 Dominion Boulevard, Suite K
> Glen Allen, VA 23060
>
> On 3/3/2015 12:11 PM, Taylor, Tammy J. - Circuit Court wrote:
>> Samuel Keith Barker, Esq.
>>
>> 3/3/15
>>
>> Please find below the user name and password assigned to you for Officer
>> of the Court Remote Access to the case imaging system (OCRA) of the
>> Circuit Court of the City of Richmond, Virginia. Confidentiality of this
>> information is governed by the Subscriber agreement and by the laws of
>> the Commonwealth of Virginia.
>>
>> *Instructions are included with this communication, as an attachment.*
>> Additional instructions can be located at
>> https://sharepoint.richmondgov.com/circuitcourt under the tab OCRA.
>>
>> User Login: keithbarker@richmondlaw.net
>>
>> Password: (use your Henrico password)
>>
>> Bar no./authorized Court number: 19513
>>
>> Start date for account: 3/2/15
>>
>> Expiration date for account: 3/2/16
>>
>> ** NOTICE REGARDING LOGIN INFORMATION: If you are currently subscribed
>> to OCRA IN MORE THAN ONE COURT and have been assigned another passcode
>> and/or authorized court number from another court, you may need to login
>> with the most recent passcode and/or authorized court number you have
>> received from the last Court you subscribed to. Once logged in, you
>> will be able to select the Court you wish to view records from.
>>
>> __
>>
>> This office must be notified immediately should any of the information
>> provided in the Subscriber's Application change, including, but not
>> limited to, termination of your current employment and/or you are no
>> longer a member in good standing of the Virginia State Bar.
>>
>> Pursuant to the Terms of the Subscriber Agreement for Remote Access to
>> Richmond City's Circuit Court Case Imaging System, you may NOT share
>> passwords or login credentials with anyone for any reason. Access is
>> strictly one username login for one individual Subscriber.
>>
>> The Clerks Office can only offer limited assistance in troubleshooting
>> problems associated with OCRA. For assistance, please contact Tammy
>> Taylor at Tammy.Taylor@richmondgov.com
>> <mailto:Tammy.Taylor@richmondgov.com> or 804-646-6506.
>>
>> **** EFFECTIVE 10/1/13 - E-FILING IS AVAILABLE FOR CIVIL ACTIONS
>> https://sharepoint.richmondgov.com/circuitcourt
>>
>> Yours truly,
>>
>> Edward F. Jewett, Clerk, Circuit Court of the City of Richmond.
>>
>> */Tammy J. Taylor, Asst. Chief Deputy Clerk/*
>>
>> */Accounting and Administration/*
>>
>> */Circuit Court of the City of Richmond /*
>>
>> */400 N. 9th Street, Rm. 101, Richmond, VA 23219/*
>>
>> */Tammy.Taylor@richmondgov.com/*
>>
>> */office (804) 646-6506 / direct (804) 646-0837/*
>>
>> */fax: (804) 646-6562/*
>>
>> *WARNING: This communication with its contents may contain confidential
>> and/or legally privileged information. It is solely for the use of the
>> intended recipient(s). Unauthorized interception, review, use or
>> disclosure is prohibited and may violate applicable laws. If you are
>> not the intended recipient, please contact the sender and destroy all
>> copies of the communication. *
>>
>
```

--
NOTICE
The information contained in this transmission and other transmissions from this office, (including all attachments, or retransmissions) is strictly confidential and intended only for the person(s) to whom it is addressed. The information contained herein or sent at any other time is privileged under the work product and/or attorney client privilege or other applicable law. If the reader of this message is not an intended recipient as indicated by the context, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately [1] notify us by calling the law offices of S. Keith Barker, P.C. 804-934-0550 or by return email [keithbarker@richmondlaw.net] or by fax (804-346-5338) and [2] destroy and delete the original and all copies of this email. Thank you. (c) S. Keith Barker, P.C. 2010, all rights reserved.
NOTICE: THE SCOPE OF OUR ENGAGEMENT DOES NOT INCLUDE TAX ADVICE OF ANY KIND. FURTHER as to IRS Circular 230 Disclosure: Any statements regarding federal tax law contained in this communication (including any attachments) are not intended or written to be used, and cannot be used, for the purpose of avoiding penalties that may be imposed by the IRS on the taxpayer or for promoting, marketing or recommending to another party any transaction or tax-related matter addressed herein.

# EXHIBIT 2

| | |
|---|---|
| **From:** | Daniel McBryde |
| **To:** | Christy Jett |
| **Cc:** | Cynthia Jessup/CC/VaJud; Wynn Malone |
| **Bcc:** | Daniel McBryde |
| **Subject:** | Fw: appeals module / OCRA in Spotsylvania CC / Sample OCRA articles and bar announcement |
| **Date:** | Friday, April 19, 2013 3:02:00 PM |
| **Attachments:** | pic01035.gif<br>ecblank.gif<br>doclink.gif<br>02964242.jpg<br>graycol.gif<br>pic01627.gif<br>OCRA Application and Subscriber Agreement final.pdf |

---

Hi Christy, - Here it is - let me know if you need more info.

Thanks,
Daniel

----- Forwarded by Daniel McBryde/OES/VaJud on 04/19/2013 03:24 PM -----

**Daniel McBryde/OES/VaJud**

12/19/2012 05:57 PM

To
Christy Jett/CC/VaJud

cc
RMS

Subject
Re: appeals module / OCRA in Spotsylvania CC / Sample OCRA articles and bar announcement

Hi Christy,

Per your request, please find two write-ups from Va Lawyers weekly, followed by links for three additional articles. This access is managed and controlled the same way SRA is in that the Clerk's office is responsible for adding, deleting modifying user access and collects all subscription fees.

There is also a sample subscription agreement and a sample email that you could send to your local bar announcing OCRA attached to the end of this email.

Thanks,
Daniel

Daniel T. McBryde
Records Imaging Systems Manager
Department of Judicial Information Technology
Office of the Executive Secretary
Supreme Court of Virginia
(804) 786-8680
========================

# Internet access to court docs expanded for lawyers (FROM VA LAWYER'S WEEKLY)

By Alan Cooper
Published: August 19, 2011

Tags: Technology

Lawyers using a new system to access Richmond Circuit Court documents through an Internet connection find the convenience addictive.

"It's scary how quickly you get spoiled," said Tracy Paner, the deputy public defender in Richmond. She has had access for only a few months to a program that allows her to view the court documents for her cases from her office or anywhere she has Internet access.

Paner recalled spending hours every month hunting down files, which might be in the judge's chambers, with the courtroom clerk or with one of the file clerks – or floating around somewhere in between those locations. Now, the physical file doesn't exist, and the electronic one is available 24 hours a day, seven days a week to attorneys who subscribe to Officer of the Court Remote Access, or OCRA.

Tracy Thorne-Begland, Paner's counterpart in the city prosecutor's office, said the program has been "a tremendous asset for our office." Prosecutors can review files at their desks as they prepare their dockets rather than checking the paper file at the last minute to make sure the essential documents are there, he said.

Norfolk Circuit Court served as the pilot project for the program, according to Circuit Court Clerk George Schaefer. The Norfolk court began its test in the spring of 2010 and made it officially available in September. Richmond is among eight courts that have added OCRA this year. The others are the cities of Richmond and Chesapeake and the counties of Caroline, Northampton, Prince William, Roanoke, Rockingham and Smyth. Fauquier is scheduled to offer the service by the end of the month.

The first step, Schaefer said, was scanning the paper documents and putting them into a searchable database. His office has scanned criminal cases since 2004 and civil cases since 1997. All new case documents are scanned as soon as they are filed and no paper file is kept.

Visitors to the courthouse who want to look at a file or a document go to a computer terminal, where they can search the database by case number or the name of a party. But with a subscription, a trip to the courthouse to view the file is no longer necessary.

Katya Herndon, a spokeswoman for the Supreme Court of Virginia, said 50 courts have case imaging projects to scan documents as they are filed. Only a few of those are not maintaining a paper file as well for the time being, she said.

As its name suggests, OCRA is available only to attorneys or to someone supervised by an attorney. Subscribers must apply for access and are given a password that allows them to log in to the system.

The service is free to attorneys who work for state agencies such as the offices of prosecutors and public defenders, but private attorneys must pay a fee set by the individual clerks of the circuit court.

Schaefer charges $500 a year, but members of the Norfolk & Portsmouth Bar Association get a $300 discount because the association helps administer the program. Bevill Dean, the clerk in Richmond, charges each attorney $100 a year plus $50 for each employee who works for the attorney.

Chaz Evans-Haywood, the Rockingham County clerk, charges $25 per month, and Michelle McQuigg, the clerk in Prince William County, charges $200 a year for an attorney and one employee.

None of the clerks charged a fee at first, and Evans-Haywood said his goal is to cover the cost of changing out the scanners, computers and other equipment every three years.

Dean said the absence of a paper file creates practical obstacles. Judges need to have documents in front of them when they're presiding over a case, and the larger computer monitor that would make that work would obscure the judge if it were positioned in the normal fashion.

His staff tried to put the monitor almost flat, but that created a glare on the screen. Each judge has a preference for balancing visibility to the parties with seeing documents on the monitor, Dean said.

The cost of making the electronic documents convenient to read and use is offset by savings in the elimination of the traditional paper file. Dean said the color-coded, sequentially numbered files that his office used cost roughly a dollar apiece, and the office opens more than 13,000 files a year.

Schaefer estimates he will need 15,000 less square feet of storage in a proposed new court building in Norfolk. That translates to a savings of about $4 million, he said.

Much of the cost of shuffling files from the clerk's office to the judge's secretary and the judge himself is eliminated, he added.

Even free access to governmental agencies can result in savings, Evans-Haywood said. His staff spends less time pulling files for those agencies, and "my office was required to eat the cost of those copies" for state and local agencies.

Dean began scanning files at the beginning of the year and has no plans to digitize files from earlier years, as Schaefer did. "It's very, very time consuming" to scan old files, he said.

On the other hand, Schaefer said, the more files that are available, the more valuable the service is to attorneys who are under no compulsion to subscribe to it.

Evans-Haywood acknowledged the limited number of files in a relatively small court such as his makes selling the service to attorneys somewhat more difficult. "I spent the better part of last year giving it away," he said. That trial period allowed him to learn who his customers would be and set an appropriate price, he said.

Michelle McQuigg, the clerk in Prince William, also provided the service free until July 1, when a state law made it clear that the clerks could charge for it. Attorneys who use it tell her they can't live without it, she said. Northern Virginia traffic congestion and a small courthouse parking lot have added to its appeal, she added.

All this might sound rudimentary to attorneys who spend most of their time in federal court, which are now paperless to the point that all documents are filed electronically.

Virginia courts are trying to get there, and Schaefer's court is the pilot for e-filing, the next

step in the process. He said he expects to be able to accept electronically filed documents by the end of the year.

==================



A lawyer needing a last-minute look at a document in the court file used to have to rush over to the courthouse and hurriedly review the papers before a hearing.

Now, thanks to a program started by the Supreme Court of Virginia last year, he can call it up on the computer in his office, saving time and headaches.

The court's program called "OCRA," for "Officer of the Court Remote Access," is now available in 12 jurisdictions, with three more coming online shortly.

According to Katya N. Herndon, a spokesperson for the Supreme Court of Virginia, the circuit courts with OCRA are:

- Norfolk
- Richmond
- Chesapeake
- Caroline County
- Northampton County
- Prince William County
- Roanoke County
- Rockingham County/Harrisonburg
- Smyth County
- Fauquier County
- Dinwiddie County
- James City County/Williamsburg

Herndon said that circuit courts in Hanover, Bedford and Washington counties will be getting the OCRA system soon.
From all accounts, lawyers, clerks and law enforcement officials are finding OCRA to their taste.

The program has been in operation for nearly a year in Richmond. Circuit Court Clerk Bevill M. Dean has 212 subscribers, split between paid subscriptions and free access for law enforcement agencies. Dean said the service is popular with criminal defense

attorneys.

The Richmond court charges $100 a year for the first subscription at a private law office, and $50 for each additional subscriber in the office.

Dean said lawyers have stopped him on the street to compliment the system. "I'm getting nothing but positive feedback," he said.

Because electronic access to court files means fewer phone calls to the clerk's office, it's a "win-win," Dean said. "I believe attorneys truly are loving it."

That appears to be the case at the Richmond commonwealth's attorney's office. "It's working great for us," said Tracy

Thorne-Begland, chief deputy commonwealth's attorney.

Prosecutors commonly would have to go to the clerk's office or a judge's chamber to check on last minute filings before a hearing. Now, they can just pull up the case on their screens, Thorne-Begland said.

The Richmond system offers access to records from January 2011. Since that time, his office has been "file-less," Dean said. He said his staff scans paper documents as they are filed, then stores the documents in boxes labeled by date.

The court "file" for each case is the electronic version stored in the computer system.

Once a document is scanned in, "hopefully, we will never have to touch it again," Dean said.

Richmond criminal defense lawyer William T. Linka said while he finds the system useful, he still checks the files for his clients' cases for documents he might have missed on the electronic system. "Sometimes, there are subpoenas in there" he had not seen online, he said.

The Rockingham County Circuit Court offered OCRA in July, and clerk Chaz W. Evans-Haywood says he has 99 subscribers. As with other courts, law enforcement agencies get free access, but private attorneys have to pay. Evans-Haywood charges $25 a month or $300 a year.

Evans-Haywood said it saves "a ton of time" for his staffers, who no longer have to pull files and copy documents for lawyers. "Using technology like this is exactly what we should be concentrating on," he said.

The circuit court in Prince William County also is using OCRA, charging $200 a year for an attorney and one support staffer.

OCRA originated in Norfolk Circuit Court, explained Thomas A. Larson, the chief deputy clerk, who hopes to see it become a statewide standard someday. "We're hoping people are going to jump on board," he said.

**MCBRYDE0159**

Unlike the federal courts' PACER system, OCRA is not designed for public access nor is it available for data mining. The rules for OCRA effectively limit it to lawyers and others involved in the court process. The state code forbids selling the data, posting it on a website, or redistributing it to any third party.

Original link: http://valawyersweekly.com/2012/03/16/court%e2%80%99s-remote-access-system-adding-circuits/

Previous Articles:

Two more articles:

http://www.richmondbizsense.com/2011/10/13/richmond-court-goes-higher-tech/

Another article: Interesting article about Richmond Circuit...

**The password police**
http://www.richmondbizsense.com/2012/02/28/the-password-police/

http://www2.swvatoday.com/news/2012/aug/03/2/officers-court-gain-online-access-smyth-records-ar-2098755/

**Richmond Bar <RichmondBar@RichmondBar.org>**

04/23/2012 12:01 PM

To
cc
Subject: Remote Access to Hanover Circuit Court case files

Members of the Richmond City Bar Association:

The Hanover County Circuit Court maintains its criminal and civil cases filed after January 1, 2010 in digital, rather than paper, case files using the Case Imaging System (CIS) developed by the Supreme Court of Virginia.

For an annual yearly subscription price of $150 for attorneys and $50 for each staff member supervised by an attorney, the Hanover Circuit Court Clerk's Office is offering remote access to its electronic criminal and civil case files via a secure connection to the CIS servers at the Supreme Court of Virginia. This is known as Officer of the Court Remote Access (OCRA). It is limited to members in good standing of the Virginia State Bar and their staff members, pro hoc vice attorneys authorized by the court for purposes of the practice of law, and governmental agencies authorized by the Clerk.

It is easy to subscribe to OCRA. Each attorney, staff member, or governmental employee must complete the attached application and subscriber agreement and send them with the annual subscription fee to: Hanover Circuit Court Clerk's Office, Attention: OCRA Subscription, Post Office Box 39, Hanover, Virginia 23069. The Subscriber ID, password, and expiration date will be e-mailed to the Subscriber when the application is accepted.

OCRA will save subscribers time and money as case files will be available 24 hours day, limiting the need to travel to Hanover Courthouse or call the Clerk's Office for routine matters.

I hope OCRA is a helpful tool in your law practice. Call Deputy Clerk Sarah Penny (365-6493) if you have any questions or suggestions.

Frank D. Hargrove, Jr.
Clerk, Hanover County Circuit Court

(804) 365-6152
(804) 365-6278 (fax)
*(See attached file: OCRA Application and Subscriber Agreement final.pdf)*

*(See attached file: OCRA Application and Subscriber Agreement final.pdf)*

Christy Jett/CC/VaJud

**Christy Jett/CC/VaJud**

12/19/2012 09:41 AM

To Daniel McBryde/OES/VaJud@VaJud

cc

Subject Re: appeals module / OCRA in Spotsylvania CC

Good morning Daniel.

Could you please send me the articles and the sample e-mail that I can send to the local bar announcing OCRA?

Thanks so much!

Christy

______________________________

Christalyn Mitchell Jett
Clerk of Court
Spotsylvania Circuit Court
P.O. Box 96
Spotsylvania, VA 22553
540-507-7600
fax: 540-582-2169

Daniel McBryde---12/17/2012 04:32:02 PM---Hi Christy - I have copied Wynn on this email to call you back. His number is 804.371.0801.

From: Daniel McBryde/OES/VaJud
To: Christy Jett/CC/VaJud,
Cc: Wynn Malone/OES/VaJud@VaJud, RMS
Date: 12/17/2012 04:32 PM
Subject: Re: appeals module / OCRA in Spotsylvania CC

---

Hi Christy -

I have copied Wynn on this email to call you back. His number is 804.371.0801.

Here is a quote for OCRA if you want to get started, please sign and send back in. It usually takes about a month to get everything set up before you can start giving access to your subscribers.

I have some articles from writeups on OCRA - have I sent those out to you yet? If not just let me know and I can send you the articles for extra background on OCRA. Also I have a sample email that you could send to your local bar announcing OCRA if you are interested in it, let me know.

[attachment "OCRA quote to clerk -Spotsylvania cc.pdf" deleted by Christy Jett/CC/VaJud]
Thanks,
Daniel

Daniel T. McBryde
Records Imaging Systems Manager
Department of Judicial Information Technology
Office of the Executive Secretary
Supreme Court of Virginia
(804) 786-8680

Christy Jett/CC/VaJud

**Christy Jett/CC/VaJud**

12/17/2012 12:06 PM

To Daniel McBryde/OES/VaJud@VaJud

cc

Subject Re: appeals module

Daniel,

I think Wynn may have left me a message, but I didn't get the message. Can you give me his direct # or have him call me again? My direct # is 540-507-7611. Also, how do I go about getting OCRA, I have several people asking for it since Fredericksburg now has it.

____________________________

Christalyn Mitchell Jett
Clerk of Court
Spotsylvania Circuit Court
P.O. Box 96
Spotsylvania, VA 22553
540-507-7600
fax: 540-582-2169

Daniel McBryde---12/03/2012 08:34:23 PM---Hi Christy - You should be getting a call on Tuesday from Wynn Malone to discuss. Thanks,

From: Daniel McBryde/OES/VaJud
To: Christy Jett/CC/VaJud,
Cc: Wynn Malone/OES/VaJud@VaJud
Date: 12/03/2012 08:34 PM
Subject: Re: appeals module

---

Hi Christy - You should be getting a call on Tuesday from Wynn Malone to discuss.

Thanks,
Daniel

Christy Jett---12/03/2012 11:53:17 AM---Hi Daniel, Where did we leave off regarding my office getting the appeals module?

**Christy Jett/CC/VaJud**

To

12/03/2012 11:53 AM

Daniel McBryde/OES/VaJud@VaJud

cc

Subject

appeals module

Hi Daniel,

Where did we leave off regarding my office getting the appeals module?

thanks.

Christy

______________________________

Christalyn Mitchell Jett
Clerk of Court
Spotsylvania Circuit Court
P.O. Box 96
Spotsylvania, VA 22553
540-507-7600
fax: 540-582-2169

**CLERK'S OFFICE OF THE COUNTY OF HANOVER CIRCUIT COURT**
**FRANK D. HARGROVE, JR., CLERK**

# APPLICATION FOR REMOTE ACCESS TO HANOVER COUNTY CIRCUIT COURT CASE IMAGING SYSTEM (OCRA)

**This application must be completed by each individual user for access to case documents. A non-attorney applicant must be a directly supervised staff member of an Attorney who is an active Subscriber. The supervising Attorney must also sign this application.**

The approval of this application is at the Clerk of the Circuit Court's discretion. By signing this application the Subscriber acknowledges and accepts the terms and conditions of the *Subscriber Agreement for Remote Access to Hanover County Circuit Court Case Imaging System* as incorporated by reference herein. **All information below is mandatory (print clearly)**

**APPLICANT'S LAST NAME**: ___________________________________________________________

**APPLICANT'S FIRST NAME**: ___________________________________________________________

**GOVERNMENTAL AGENCY (IF APPLICABLE):** ___________________________________________

**STREET ADDRESS**: ___________________________________________________________

**CITY/STATE/ZIP**: ___________________________________________________________

**PHONE NUMBER**: ___________________________________________________________

**EMAIL ADDRESS**: ___________________________________________________________

**VSB NUMBER OF SUPERVISING ATTORNEY OR ATTORNEY APPLICANT:** ____________________
**(Include a copy of your Virginia State Bar card)**

**UNITED STATES CITIZEN: ( ) YES ( ) NO**

**NAME OF ACTIVE ATTORNEY SUBSCRIBER BY WHOM YOU ARE DIRECTLY SUPERVISED:**

___________________________________________________________________________

I certify that the information above is true and correct.

**APPLICANT SIGNATURE**: ___________________________________________________________

**SIGNATURE OF SUPERVISING ATTORNEY:** ________________________________________

City / County of: ______________________

State of :_____________________________

I, _______________________________, a Notary Public or Deputy Clerk, do hereby certify that on this _______ day of

___________________, 20____, ________________________________ and _____________________________personally appeared before me and swore and acknowledged to me that the statements contained herein are true and correct.

My Commission Expires: ______________ ______________________________________________
Notary Public or Deputy Clerk

Commission Number: ______________ ______________________________________________
Print or Type Name and Phone # of Notary

*****************************************************************************************

*For use by the Circuit Court Clerk's Office Only*

SUBSCRIBER'S USER ID :______________________ PASSWORD _____________ EXPIRATION DATE:____________

**Mail this completed application with payment to:**

**Clerk of the Circuit Court County of Hanover**
**Attn: OCRA Subscription**
**Post Office Box 39, Hanover, VA 23069**

**Make checks payable to: Hanover County Circuit Court Clerk**

**The Subscriber's ID, password and expiration date with instructions will be e-mailed to you if approved.**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# SUBSCRIBER AGREEMENT FOR OFFICER OF THE COURT REMOTE ACCESS TO HANOVER COUNTY CIRCUIT COURT CASE IMAGING SYSTEM

This Agreement ("Agreement") is entered into ___________________, 20___, by and between Hanover Circuit Court Clerk's Office (Clerk's Office) and _______________________________________________________, (Subscriber).

1. Terms of Agreement

It is the intent of both parties to participate in Officer of the Court Remote Access (OCRA) to certain Hanover County Circuit Court Clerk's Office civil and criminal case file records stored in the Supreme Court of Virginia's Case Imaging System (CIS) to commence on the day the User ID and Password are assigned and access to OCRA is activated and to continue until terminated as provided herein.

2. Subscriber Options

The Clerk provides one subscriber option: An online database system providing "inquiry-only" access to all currently scanned circuit court criminal and civil cases, except those cases or parts of cases that are Restricted, Confidential or Sealed.

3. Days and Hours of Operation

The secure remote access system known as OCRA will generally be available seven days a week, twenty-four hours a day, including holidays, except during periods:

a. Of preventive and remedial maintenance
b. Of operational issues beyond the control of the Clerk's Office
c. When intrusions against security are being remedied

4. Fees

Unless the Subscriber is employed by an authorized governmental agency, the fee for service is $150.00 per year per attorney, and $50.00 per year per staff member supervised by an attorney, and is only available as a one-year subscription.

Payment of the subscription fee shall be made by check made payable to Hanover County Circuit Court Clerk and shall accompany the signed application and subscription agreement. If the application is not approved the check for the subscription fee will be returned to the applicant.

The Clerk's Office will not bill for this service. It is the responsibility of Subscriber to pay the annual subscription fee prior to each anniversary of the date of acceptance of this agreement by the Circuit Court Clerk. If payment is not received by the due date, the Clerk's Office reserves the right to suspend or terminate service; however, if suspended or terminated, the Subscriber is not relieved from the obligations set forth in this agreement, up to and including the date upon which the service is discontinued.

Fees are charged at the discretion of the Clerk's Office. All fees are subject to change.

5. Services

The Clerk will provide the Subscriber with "inquiry-only" access to all currently scanned court case documents in its CIS except for those case files or parts of case files that are marked Confidential, Restricted or Sealed. The servers that store the programs and data are maintained and managed by the Supreme Court of Virginia. The Clerk will assume responsibility for:

a. Providing the Subscriber with the current OCRA link on the Circuit Court Clerk's Web Page at http://co.hanover.va.us/circuitct/default.htm.
b. Providing the Subscriber with limited consultation on specific problems that arise in the use of OCRA. The Clerk does not guarantee consultation results nor warrant or represent that all errors or problems will be corrected.
c. Limited customer support is only available Monday through Friday 8:00AM to 4:30PM excluding Hanover Circuit Court holidays.

For questions regarding your user account or subscriber fees, please contact the Clerk's Office at (804) 365-6493.

6. Subscriber's Obligations

a. It is the responsibility of the Subscriber to purchase computer hardware and software and/or make modifications to his/her existing equipment that are necessary for the access to OCRA.
b. The Subscriber is responsible for ensuring that OCRA is used in a proper and legal manner. If the Subscriber is convicted of a crime, including, but not limited to a violation of the Virginia Computer Crimes Act (§18.2-152.1 of the Code of Virginia), arising out of the use of OCRA, such conviction shall constitute a material breach of the Agreement, and the Clerk's Office shall have the right to terminate this Agreement immediately. Nothing herein shall be construed as prohibiting the Clerk's Office from pursuing any other remedy available to it for such breach.
c. The Subscriber is responsible for ensuring that unauthorized personnel do not use the Subscriber's account. Unauthorized personnel for the purposes of the contract shall be any person, employee, support staff, or entity other than the Subscriber. The Subscriber may NOT share passwords or login credentials with anyone for any reason. Access is STRICTLY one username login for one individual Subscriber.
d. Information accessed from OCRA is for the use of the Subscriber in the ordinary course of their business as provided by Virginia Code §17.1-293. Subscriber has a duty to bring to the Clerk's attention any errors or omissions in the scanned court case documents. Notification may be by electronic mail to HanoverCC@courts.state.va.us.
e. The Subscriber shall not permit any data accessed by OCRA to be sold or posted on any other Internet website or in any way redistributed to any third party, and the Clerk reserves the discretion to deny secure remote access to ensure compliance with this provision.
f. The Subscriber is responsible for ensuring the security of the Subscriber's assigned username and password. If at any time the Subscriber has knowledge of compromised security of Subscriber's access credentials, Subscriber will IMMEDIATELY notify the Clerk by electronic mail to HanoverCC@courts.state.va.us.
g. Supervising attorneys shall be responsible for reporting termination of employment of any Subscriber under their supervision.
h. Subscribers shall be responsible for reporting any change in the information provided in the OCRA Application.

7. Limitation of Liability

a. It is acknowledged by the Subscriber that the County of Hanover and its Board of Supervisors, employees or agents, volunteers or servants are not a party to the Agreement and that the County of Hanover shall incur no liability hereunder.
b. The Subscriber relieves and releases the Clerk's Office and its Clerk, deputy clerks, employees or agents from liability for any and all damages resulting from interruption of service of any kind. The Subscriber further relieves and releases the County of Hanover, its Board of Supervisors, officers and their deputies, employees and agents from liability for any and all damages resulting from interrupted service of any kind. The Subscriber also relieves and releases the Supreme Court of Virginia, Office of the Executive Secretary and its employees and agents from liability for any and all damages resulting from interrupted service of any kind.
c. The Subscriber hereby relieves and releases and holds harmless the Clerk's Office and its Clerk, deputy clerks, employees or agents, the County of Hanover, its Board of Supervisors, officers and their deputies, employees or agents of any liability for any and all damages resulting from incorrect data or any other misinformation accessed from this service. The Subscriber also relieves and releases the Supreme Court of Virginia, Office of the Executive Secretary and its employees and agents from liability for any and all damages resulting from incorrect data or any other misinformation accessed from this service.
d. Subscriber agrees that the Clerk's Office, its Clerk, the County of Hanover, its Board of Supervisors, officers and their deputies, employees or agents shall not be liable for negligence or lost profits resulting from any claim or demand against the Subscriber by any other party. The Subscriber also relieves and releases the Supreme Court of Virginia, Office of the Executive Secretary and its employees and agents from liability for any and all damages resulting from a claim for negligence or lost profits against the Subscriber by any other party.
e. The information or data accessed by Subscriber may or may not be the official government record required by law. In order to assure the accuracy of the data or information, the Subscriber should consult the official government record.
f. In no event will the Clerk, deputy clerks, employees or agents be liable for consequential damages even if the Clerk's Office has been advised of the possibility of such damages.
g. Nothing in this agreement shall be construed as waiving the sovereign or governmental immunity of the Clerk of the Circuit Court of Hanover County, the Board of Supervisors, or their respective officers, deputy clerks, employees, or agents.

8. Warranties

The Clerk's Office, its officials, employees, volunteers, servants or agents neither expressly nor impliedly warrant that the information or data accessed by the Subscriber is accurate or correct. There are no expressed or implied warranties in connection with this service.

9. Assignment

The Subscriber agrees not to assign any right or interest in this Agreement. Any attempt by this Subscriber to transfer by any means, any of the rights, duties or obligations of this Agreement shall render this Agreement null and void.

10. Governing Law/Venue

This Agreement and/or any dispute arising there from shall in all respects be governed by and interpreted in accordance with the applicable law of the Commonwealth of Virginia, regardless of where actually accepted or delivered. This Agreement shall be deemed to have been accepted and delivered by the parties in the Commonwealth of Virginia.

Any and all suits for any claims or for any and every breach or dispute arising out of this Agreement shall be maintained in the appropriate court of competent jurisdiction in the County of Hanover, Virginia.

11. Entire Agreement

The Agreement contains the entire understanding of the parties, there being no promises, warranties, or undertakings, written or oral, other than those expressly set forth herein. Furthermore, no modifications, alterations or amendments to the Agreement shall be valid unless in writing, and signed by all parties, except as otherwise provided herein.

13. Notice

Any notice or written communication of any kind required or desired to be given or sent pursuant to the terms hereof shall be delivered in person or mailed postage prepaid by certified or registered mail, unless specifically stated herein. Any email notices specified in this Agreement shall be to the email address provided by the Subscriber in the application form, or if to the Clerk, to HanoverCC@courts.state.va.us.

14. Termination

Either party may terminate this agreement without cause with fifteen days email notice to the other.

This agreement may be immediately terminated by the Clerk for Subscriber's failure to provide correct or complete information on the application, failure to comply with the terms of this agreement, failure to make payments of fees or breach of agreement. In the event of such termination the Clerk shall notify the Subscriber by email.

The agreement shall terminate immediately if the Commonwealth of Virginia or the County of Hanover fail to appropriate and continue funding for services provided under this Agreement.

In no event shall any refund of Subscriber fees be paid.

15. Definitions

1. "Public Access" means that the public can inspect and obtain a copy of the information in a court record.
2. "Remote access" means that inspection can be made without the need to physically visit the courthouse where the court record is maintained.
3. "Subscriber" means members in good standing with the Virginia State Bar and their authorized agents, pro hac vice attorneys authorized by the court for purposes of the practice of law, and governmental agencies authorized by the Clerk of a Circuit Court to have OCRA.

16. Application

The Subscriber must complete an application for OCRA. The application must be approved by the Clerk's Office before the User ID and Password will be issued.

17. Severability

If any provision (or part thereof) of this agreement is found to be invalid, then it shall be stricken and have no effect. The remaining provisions of this agreement shall continue in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this agreement.

________________________________ __________________
Signature Date

________________________________ __________________
Printed/Typed Name Title

HANOVER COUNTY CIRCUIT COURT CLERK'S OFFICE:

Frank D. Hargrove, Jr., Clerk of Circuit Court

By: ________________________________ __________________
Date

# EXHIBIT 3

**From:** Derek Kestner
**To:** Lynnette Coe
**Cc:** Jennifer Trombley; RMS; Daniel McBryde
**Subject:** Re: Officer of The Court Remote Access
**Date:** Tuesday, May 27, 2014 4:25:00 PM
**Attachments:** graycol.gif
02576120.jpg

---

Lynnette -

You can't use OCRA at the pubic access stations b/c OCRA's governing legislation requires that each user have a unique login, and OCRA is only accessible by attorney's and other Officers of the Court.

There is a program called CIS Search that can be installed on the viewstations at no charge. It is similar to the non-web RMS search that the public uses, which I believe you are familiar with. The program doesn't require the individual users to login and only displays non-confidential cases and document.

Let us know if you would like for us to have CIS Search installed on the PCs and I will have Joe Flynn provide you with an estimate on when you can expect it.

Derek M. Kestner
Information Systems Business Analyst / Project Coordinator
Juvenile & Domestic Relations Court Imaging, Records Management Team
Department of Judicial Information Technology, Office of the Executive Secretary
Supreme Court of Virginia
804.786.1789
dkestner@courts.state.va.us

"We must never forget that the only real source of power that we as judges can tap is the respect of the people." -- Thurgood Marshall

Lynnette Coe---05/19/2014 12:04:17 PM---Derek,

From: Lynnette Coe/CC/VaJud
To: Derek Kestner/OES/VaJud@VaJud
Cc: Lynnette Coe/CC/VaJud@VaJud, Jennifer Trombley/CC/VaJud@VaJud
Date: 05/19/2014 12:04 PM
Subject: Officer of The Court Remote Access

---

Derek,

What needs to be done to set up OCRA on our 5 public access terminals? Do we set up "Public" users so anyone can come in and view files?

Lynnette Coe, Deputy Clerk

Prince Edward County Circuit Court
P.O. Box 304
Farmville, VA 23901
434-392-5145

lcoe@courts.state.va.us

-----Derek Kestner/OES/VaJud wrote: -----
To: Lynnette Coe/CC/VaJud@VaJud
From: Derek Kestner/OES/VaJud
Date: 05/13/2014 09:51AM
Subject: Fw: Officer of The Court Remote Access

Let me know if you have any questions.

Derek M. Kestner
Information Systems Business Analyst / Project Coordinator
Juvenile & Domestic Relations Court Imaging, Records Management Team
Department of Judicial Information Technology, Office of the Executive Secretary
Supreme Court of Virginia
804.786.1789
dkestner@courts.state.va.us

"We must never forget that the only real source of power that we as judges can tap is the respect of the people." -- Thurgood Marshall

----- Forwarded by Derek Kestner/OES/VaJud on 05/13/2014 09:47 AM -----

From: Derek Kestner/OES/VaJud
To: Kelly Duffy/CC/VaJud@VaJud
Date: 03/25/2014 10:23 AM
Subject: Fw: Officer of The Court Remote Access

---

Kelly -

Please see email below that I sent to Danville this morning regarding User Access Agreement for OCRA. If you look further down in the chain you will see lots of information regarding OCRA, including write-ups, articles, etc... It should help you in making an informed decision in how you want to administrate your OCRA access. You should be hearing from me within 30 days with your admin account credentials, then you can provide access at your leisure.

Let me know if you have any questions.

Derek M. Kestner
Information Systems Business Analyst / Project Coordinator
Juvenile & Domestic Relations Court Imaging, Records Management Team
Department of Judicial Information Technology, Office of the Executive Secretary

Supreme Court of Virginia
804.786.1789
dkestner@courts.state.va.us

"We must never forget that the only real source of power that we as judges can tap is the respect of the people." -- Thurgood Marshall

----- Forwarded by Derek Kestner/OES/VaJud on 03/25/2014 10:21 AM -----

From: Derek Kestner/OES/VaJud
To: Piper Furgurson/CC/VaJud@VaJud
Date: 03/25/2014 09:07 AM
Subject: Re: Fw: Officer of The Court Remote Access

---

Piper -

Here is the agreement we share with new clerks using OCRA because Frank has given us permission to do so. Each court has their own agreement, but I believe this is one of the more popular ones. Ed Jewett in Richmond and Michele McQuigg are two others that will typically share with clerks if you ask them. Typically, Frank is very thorough though.

*(See attached file: OCRA Application and Subscriber Agreement.doc)*

Derek M. Kestner
Information Systems Business Analyst / Project Coordinator
Juvenile & Domestic Relations Court Imaging, Records Management Team
Department of Judicial Information Technology, Office of the Executive Secretary
Supreme Court of Virginia
804.786.1789
dkestner@courts.state.va.us

"We must never forget that the only real source of power that we as judges can tap is the respect of the people." -- Thurgood Marshall

Piper Furgurson---03/24/2014 04:57:19 PM---Thanks for everything! I am faxing the Clerk's suthorization to go ahead shortly.

From: Piper Furgurson/CC/VaJud
To: Derek Kestner/OES/VaJud@VaJud
Date: 03/24/2014 04:57 PM
Subject: Re: Fw: Officer of The Court Remote Access in Halifax CC

---

Thanks for everything! I am faxing the Clerk's suthorization to go ahead shortly.

Is the agreement similar to the SRA agreement? Do you guys provide a sample?

Thanks again,
Piper

Piper Furgurson
Danville Circuit Court Clerk's Office
434-799-5168
pfurgurson@courts.state.va.us

-----Derek Kestner/OES/VaJud wrote: -----
To: Piper Furgurson/CC/VaJud@VaJud
From: Derek Kestner/OES/VaJud
Date: 03/24/2014 04:16PM
Subject: Fw: Officer of The Court Remote Access in Halifax CC

Piper -

Below is the chain email we typically send out to courts regarding OCRA.

Derek M. Kestner
Information Systems Business Analyst / Project Coordinator
Juvenile & Domestic Relations Court Imaging, Records Management Team
Department of Judicial Information Technology, Office of the Executive Secretary
Supreme Court of Virginia
804.786.1789
dkestner@courts.state.va.us

"We must never forget that the only real source of power that we as judges can tap is the respect of the people." -- Thurgood Marshall

----- Forwarded by Derek Kestner/OES/VaJud on 03/24/2014 04:14 PM -----

From: Daniel McBryde/OES/VaJud
To: Cathy Cosby/CC/VaJud@VaJud
Cc: RMS
Date: 03/05/2014 02:30 PM
Subject: Fw: Officer of The Court Remote Access in Halifax CC

---

Hi Cathy,

We received your signed quote - Thanks. It usually takes about 30 days for OCRA to be setup and usable by your court. As we discussed, you can allow access to your CIS images remotely. We call the program Officer of the Court Remote Access or OCRA. It is a subscription based service to provide remote access to your case files - much in the same way that SRA provides access to your Land Records.

Attached below is a sample application and announcement email from Hanover Circuit Court Clerk to a bar association regarding OCRA Access.

I have attached some background information and newspaper articles regarding OCRA to the end of this email (scroll way down). OCRA access is managed and controlled the same way SRA is in that the

Clerk's office is responsible for adding, deleting modifying user access and collects all subscription fees.

The code section is § 17.1-293.

> 7. Providing secure remote access to nonconfidential court records, subject to any fees charged by the clerk, to members in good standing with the Virginia State Bar and their authorized agents, pro hac vice attorneys authorized by the court for purposes of the practice of law, and such governmental agencies as authorized by the clerk.

Thanks,
Daniel

Daniel T. McBryde
Records Imaging Systems Manager
Department of Judicial Information Technology
Office of the Executive Secretary
Supreme Court of Virginia
(804) 786-8680
================================================================

Members of the Richmond City Bar Association:

The Hanover County Circuit Court maintains its criminal and civil cases filed after January 1, 2010 in digital, rather than paper, case files using the Case Imaging System (CIS) developed by the Supreme Court of Virginia.

For an annual yearly subscription price of $150 for attorneys and $50 for each staff member supervised by an attorney, the Hanover Circuit Court Clerk's Office is offering remote access to its electronic criminal and civil case files via a secure connection to the CIS servers at the Supreme Court of Virginia. This is known as Officer of the Court Remote Access (OCRA). It is limited to members in good standing of the Virginia State Bar and their staff members, pro hoc vice attorneys authorized by the court for purposes of the practice of law, and governmental agencies authorized by the Clerk.

It is easy to subscribe to OCRA. Each attorney, staff member, or governmental employee must complete the attached application and subscriber agreement and send them with the annual subscription fee to: Hanover Circuit Court Clerk's Office, Attention: OCRA Subscription, Post Office Box 39, Hanover, Virginia 23069. The Subscriber ID, password, and expiration date will be e-mailed to the Subscriber when the application is accepted.

OCRA will save subscribers time and money as case files will be available 24 hours day, limiting the need to travel to Hanover Courthouse or call the Clerk's Office for routine matters.

I hope OCRA is a helpful tool in your law practice. Call Deputy Clerk Sarah Penny (365-6493) if you have any questions or suggestions.

Frank D. Hargrove, Jr.
Clerk, Hanover County Circuit Court

(804) 365-6152
(804) 365-6278 (fax)
*(See attached file: OCRA Application and Subscriber Agreement final.pdf)*
*(See attached file: OCRA Application and Subscriber Agreement.doc)*
*(See attached file: OCRA instructions.doc)*
============================================

===================

# Internet access to court docs expanded for lawyers (FROM VA LAWYER'S WEEKLY)

By Alan Cooper
Published: August 19, 2011
Tags: Technology

Lawyers using a new system to access Richmond Circuit Court documents through an Internet connection find the convenience addictive.

"It's scary how quickly you get spoiled," said Tracy Paner, the deputy public defender in Richmond. She has had access for only a few months to a program that allows her to view the court documents for her cases from her office or anywhere she has Internet access.

Paner recalled spending hours every month hunting down files, which might be in the judge's chambers, with the courtroom clerk or with one of the file clerks – or floating around somewhere in between those locations. Now, the physical file doesn't exist, and the electronic one is available 24 hours a day, seven days a week to attorneys who subscribe to Officer of the Court Remote Access, or OCRA.

Tracy Thorne-Begland, Paner's counterpart in the city prosecutor's office, said the program has been "a tremendous asset for our office." Prosecutors can review files at their desks as they prepare their dockets rather than checking the paper file at the last minute to make sure the essential documents are there, he said.

Norfolk Circuit Court served as the pilot project for the program, according to Circuit Court Clerk George Schaefer. The Norfolk court began its test in the spring of 2010 and made it officially available in September. Richmond is among eight courts that have added OCRA this year. The others are the cities of Richmond and Chesapeake and the counties of Caroline, Northampton, Prince William, Roanoke, Rockingham and Smyth. Fauquier is scheduled to offer the service by the end of the month.

The first step, Schaefer said, was scanning the paper documents and putting them into a searchable database. His office has scanned criminal cases since 2004 and civil cases since 1997. All new case documents are scanned as soon as they are filed and no paper file is kept.

Visitors to the courthouse who want to look at a file or a document go to a computer terminal, where they can search the database by case number or the name of a party. But with a subscription, a trip to the courthouse to view the file is no longer necessary.

Katya Herndon, a spokeswoman for the Supreme Court of Virginia, said 50 courts have case imaging projects to scan documents as they are filed. Only a few of those are not maintaining a paper file as well for the time being, she said.

As its name suggests, OCRA is available only to attorneys or to someone supervised by an attorney. Subscribers must apply for access and are given a password that allows them to log in to the system.

The service is free to attorneys who work for state agencies such as the offices of prosecutors and public defenders, but private attorneys must pay a fee set by the individual clerks of the circuit court.

Schaefer charges $500 a year, but members of the Norfolk & Portsmouth Bar Association get a $300 discount because the association helps administer the program. Bevill Dean, the clerk in Richmond, charges each attorney $100 a year plus

$50 for each employee who works for the attorney.

Chaz Evans-Haywood, the Rockingham County clerk, charges $25 per month, and Michelle McQuigg, the clerk in Prince William County, charges $200 a year for an attorney and one employee.

None of the clerks charged a fee at first, and Evans-Haywood said his goal is to cover the cost of changing out the scanners, computers and other equipment every three years.

Dean said the absence of a paper file creates practical obstacles. Judges need to have documents in front of them when they're presiding over a case, and the larger computer monitor that would make that work would obscure the judge if it were positioned in the normal fashion.

His staff tried to put the monitor almost flat, but that created a glare on the screen. Each judge has a preference for balancing visibility to the parties with seeing documents on the monitor, Dean said.

The cost of making the electronic documents convenient to read and use is offset by savings in the elimination of the traditional paper file. Dean said the color-coded, sequentially numbered files that his office used cost roughly a dollar apiece, and the office opens more than 13,000 files a year.

Schaefer estimates he will need 15,000 less square feet of storage in a proposed new court building in Norfolk. That translates to a savings of about $4 million, he said.

Much of the cost of shuffling files from the clerk's office to the judge's secretary and the judge himself is eliminated, he added.

Even free access to governmental agencies can result in savings, Evans-Haywood said. His staff spends less time pulling files for those agencies, and "my office was required to eat the cost of those copies" for state and local agencies.

Dean began scanning files at the beginning of the year and has no plans to digitize files from earlier years, as Schaefer did. "It's very, very time consuming" to scan old files, he said.

On the other hand, Schaefer said, the more files that are available, the more valuable the service is to attorneys who are under no compulsion to subscribe to it.

Evans-Haywood acknowledged the limited number of files in a relatively small court such as his makes selling the service to attorneys somewhat more difficult. "I spent the better part of last year giving it away," he said. That trial period allowed him to learn who his customers would be and set an appropriate price, he said.

Michelle McQuigg, the clerk in Prince William, also provided the service free until July 1, when a state law made it clear that the clerks could charge for it. Attorneys who use it tell her they can't live without it, she said. Northern Virginia traffic congestion and a small courthouse parking lot have added to its appeal, she added.

All this might sound rudimentary to attorneys who spend most of their time in federal court, which are now paperless to the point that all documents are filed electronically. Virginia courts are trying to get there, and Schaefer's court is the pilot for e-filing, the next step in the process. He said he expects to be able to accept electronically filed documents by the end of the year.

==================

A lawyer needing a last-minute look at a document in the court file used to have to rush over to the courthouse and hurriedly review the papers before a hearing.

Now, thanks to a program started by the Supreme Court of Virginia last year, he can call it up on the computer in his office, saving time and headaches.

The court's program called "OCRA," for "Officer of the Court Remote Access," is now available in 12 jurisdictions, with three more coming online shortly.

According to Katya N. Herndon, a spokesperson for the Supreme Court of Virginia, the circuit courts with OCRA are:

- Norfolk
- Richmond
- Chesapeake
- Caroline County
- Northampton County
- Prince William County
- Roanoke County
- Rockingham County/Harrisonburg
- Smyth County
- Fauquier County
- Dinwiddie County
- James City County/Williamsburg

Herndon said that circuit courts in Hanover, Bedford and Washington counties will be getting the OCRA system soon.

From all accounts, lawyers, clerks and law enforcement officials are finding OCRA to their taste.

The program has been in operation for nearly a year in Richmond. Circuit Court Clerk Bevill M. Dean has 212 subscribers, split between paid subscriptions and free access for law enforcement agencies. Dean said the service is popular with criminal defense attorneys.

The Richmond court charges $100 a year for the first subscription at a private law office, and $50 for each additional subscriber in the office.

Dean said lawyers have stopped him on the street to compliment the system. "I'm getting nothing but positive feedback," he said.

Because electronic access to court files means fewer phone calls to the clerk's office, it's a "win-win," Dean said. "I believe attorneys truly are loving it."

That appears to be the case at the Richmond commonwealth's attorney's office. "It's working great for us," said Tracy

Thorne-Begland , chief deputy commonwealth's attorney.
Prosecutors commonly would have to go to the clerk's office or a judge's chamber to check on last minute filings before a hearing. Now, they can just pull up the case on their screens, Thorne-Begland said.
The Richmond system offers access to records from January 2011. Since that time, his office has been "file-less," Dean said. He said his staff scans paper documents as they are filed, then stores the documents in boxes labeled by date.
The court "file" for each case is the electronic version stored in the computer system.
Once a document is scanned in, "hopefully, we will never have to touch it again," Dean said.
Richmond criminal defense lawyer William T. Linka said while he finds the system useful, he still checks the files for his clients' cases for documents he might have missed on the electronic system. "Sometimes, there are subpoenas in there" he had not seen online, he said.
The Rockingham County Circuit Court offered OCRA in July, and clerk Chaz W. Evans-Haywood says he has 99 subscribers. As with other courts, law enforcement agencies get free access, but private attorneys have to pay. Evans-Haywood charges $25 a month or $300 a year.
Evans-Haywood said it saves "a ton of time" for his staffers, who no longer have to pull files and copy documents for lawyers. "Using technology like this is exactly what we should be concentrating on," he said.
The circuit court in Prince William County also is using OCRA, charging $200 a year for an attorney and one support staffer.
OCRA originated in Norfolk Circuit Court, explained Thomas A. Larson, the chief deputy clerk, who hopes to see it become a statewide standard someday. "We're hoping people are going to jump on board," he said.
Unlike the federal courts' PACER system, OCRA is not designed for public access nor is it available for data mining. The rules for OCRA effectively limit it to lawyers and others involved in the court process. The state code forbids selling the data, posting it on a website, or redistributing it to any third party.
Original link: http://valawyersweekly.com/2012/03/16/court%e2%80%99s-remote-access-system-adding-circuits/
Previous Articles:
Two more articles:

http://www.richmondbizsense.com/2011/10/13/richmond-court-goes-higher-tech/
Another article: Interesting article about Richmond Circuit...

The password police
http://www.richmondbizsense.com/2012/02/28/the-password-police/
====================================

In order to increase the usage of OCRA, we have revamped the OCRA pricing model to make it much

friendlier (and generous) to the courts. A side effect is that the first year pricing is a bit more complex for rapidly growing courts. For larger courts already on the system there is no change except in terminology (Large is now considered Jumbo).

Here are the details of the new pricing:

Small is 1 to 34 paying (non-exempt) users. Annual Maintenance is $1,500. Initial setup cost for first year is $2,000 (initial setup includes first year annual maintenance).

Medium is 35 to 54 paying users. Annual Maintenance is $3,500.00. Initial setup cost for first year is $3,500 (includes first year annual maintenance).

Large is 55 to 94 paying users. Annual Maintenance is $5,500.00. Initial setup cost for the first year is $5,500(includes first year annual maintenance) .

Jumbo is 95 to 300 paying users. Annual Maintenance is $9,500.00. Initial setup cost for the first year is $9,500(includes first year annual maintenance) .

There are several changes from the original model:

- Reclassification of small, medium and large groups.

Originally the smallest level was 35 users with a setup fee of $3,500 and an annual maintenance of $3,500. Now this level is considered Medium.
The Small option has been reworked. Small category is now defined as up to 34 users with annual maintenance of $1,500.

- The original pricing had the higher fees starting as soon as the limit was exceeded by one user.

For example: Once a court reached 36 users, the $5,500.00 fee kicked in even though only 36 paying customers were subscribing at the time.
With the new method the court does not pay for the next higher level costs until the new subscriber fees have kicked in to cover the higher costs.

- Creation of new category - Jumbo. Previously this was the large category.

After the first year using OCRA, when a court wants to move from one level of subscribers to another higher level of users, the higher level costs for
annual maintenance will be reflected in the next annual maintenance invoice.
During the first year, when a court wants to move to a higher level of users, the difference in initial setup costs from the lower level will be due in additional to
the higher annual maintenance level.
Please let me know if you have any questions or concerns.
Thanks,
Daniel

[attachment "OCRA Application and Subscriber Agreement.doc" removed by Lynnette Coe/CC/VaJud]

# EXHIBIT 4

**From:** Katya Herndon/OES/VaJud
**To:** Daniel McBryde
**Cc:** Kristi S Wright
**Subject:** Fw: OCRA - New verbiage / Bar Number
**Date:** Thursday, June 30, 2011 12:13:00 PM

---

Daniel,

It sounds from Chaz's latest email below that he is okay with having the drop down for type of user since it is just being used when the account is set up. We think they should be capturing this information. If things change, and the clerks are saying they don't want it included, please let know as I'd like to discuss with Eddie, and he is out of the office for another week.

Thanks,
Katya

Katya N. Herndon
Director of Legislative and Public Relations
Office of the Executive Secretary
Supreme Court of Virginia
100 North Ninth Street, Third Floor
Richmond, Virginia 23219
(804) 786-7595
----- Forwarded by Katya Herndon/OES/VaJud on 06/30/2011 12:10 PM -----

**"Chaz Evans-Haywood" <clerkchaz@rockinghamcountyva.gov>**

06/30/2011 12:06 PM

To
<dmcbryde@courts.state.va.us>

cc
<bblevins@courts.state.va.us>, <cmorrison@courts.state.va.us>, <deanbm@ci.richmond.va.us>, <dmdavis@courts.state.va.us>, <DNichols@courts.state.va.us>, <dschaffer@roanokecountyva.gov>, <Edward.Jewett@richmondgov.com>, <FMitchell@courts.state.va.us>, <GDuquette@courts.state.va.us>, <GSchaefer@courts.state.va.us>, <Janie.Edmonds@richmondgov.com>, <JGraham@courts.state.va.us>, <JReyes@courts.state.va.us>, <mmcquigg@pwcgov.org>, <MWJones@courts.state.va.us>, <ngates@courts.state.va.us>, <rcampbell@courts.state.va.us>, <rms@courts.state.va.us>, <RPennington@courts.state.va.us>, <rperdue@roanokecountyva.gov>, <smcgraw@roanokecountyva.gov>, <TLarson@courts.state.va.us>, "Thomas Larson" <tom.larson@circuitcourtva.us>, <KHerndon@courts.state.va.us>

Subject
RE: OCRA - New verbiage / Bar Number

So this is an admin section when the account is set up NOT a sign on each time issue? I would agree to that.

What I don't think needs to occur is having different sign on screen options. Just another unnecessary step. I apologize if I misunderstood the intent.

**WRIGHT0030**

All my best,
Chaz

Chaz W. Evans-Haywood
Clerk of the Circuit Court
Rockingham County and the City of Harrisonburg
80 Court Square
Harrisonburg, Virginia 22802
Direct: 540-564-3111
Fax: 540-564-3127
ClerkChaz@RockinghamCountyVa.gov

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

---

**From:** dmcbryde@courts.state.va.us [mailto:dmcbryde@courts.state.va.us]
**Sent:** Thursday, June 30, 2011 11:48 AM
**To:** Chaz Evans-Haywood
**Cc:** bblevins@courts.state.va.us; cmorrison@courts.state.va.us; deanbm@ci.richmond.va.us; dmdavis@courts.state.va.us; DNichols@courts.state.va.us; dschaffer@roanokecountyva.gov; Edward.Jewett@richmondgov.com; FMitchell@courts.state.va.us; GDuquette@courts.state.va.us; GSchaefer@courts.state.va.us; Janie.Edmonds@richmondgov.com; JGraham@courts.state.va.us; JReyes@courts.state.va.us; mmcquigg@pwcgov.org; MWJones@courts.state.va.us; ngates@courts.state.va.us; rcampbell@courts.state.va.us; rms@courts.state.va.us; RPennington@courts.state.va.us; rperdue@roanokecountyva.gov; smcgraw@roanokecountyva.gov; TLarson@courts.state.va.us; Thomas Larson; KHerndon@courts.state.va.us
**Subject:** RE: OCRA - New verbiage / Bar Number

Chaz - How about if we just make the categories available as an optional field? The idea was that it might be beneficial for the clerks to break down categories of usage on reports - that way you could sort a report and list all attorneys in one section and all judges in another section. If you don't have some sort of grouping, reports will all be lumped together - probably alphabetically by username.

Tom - No need to track authorized agents using a separate spreadsheet, we can add another field at this point relatively easy.

Thanks,
Daniel

Daniel T. McBryde
Records Imaging Systems Manager
Department of Judicial Information Technology
Office of the Executive Secretary
Supreme Court of Virginia
(804) 786-8680

"Chaz Evans-Haywood" <clerkchaz@rockinghamcountyva.gov>

**"Chaz Evans-Haywood" <clerkchaz@rockinghamcountyva.gov>**

06/30/2011 11:32 AM

To <MWJones@courts.state.va.us>

cc <bblevins@courts.state.va.us>, <cmorrison@courts.state.va.us>, <deanbm@ci.richmond.va.us>, <dmcbryde@courts.state.va.us>, <dmdavis@courts.state.va.us>, <DNichols@courts.state.va.us>, <dschaffer@roanokecountyva.gov>, <Edward.Jewett@richmondgov.com>, <FMitchell@courts.state.va.us>, <GDuquette@courts.state.va.us>, <GSchaefer@courts.state.va.us>, <Janie.Edmonds@richmondgov.com>, <JGraham@courts.state.va.us>, <JReyes@courts.state.va.us>, <mmcquigg@pwcgov.org>, <ngates@courts.state.va.us>, <rcampbell@courts.state.va.us>, <rms@courts.state.va.us>, <RPennington@courts.state.va.us>, <rperdue@roanokecountyva.gov>, <smcgraw@roanokecountyva.gov>, <TLarson@courts.state.va.us>, "Thomas Larson" <tom.larson@circuitcourtva.us>

Subject RE: OCRA - New verbiage / Bar Number

Again, I think this is a great idea and should be decided locally and not have anything to do with SCV. The contracting is the responsibility of the clerk as written.

All my best,
Chaz

Chaz W. Evans-Haywood
Clerk of the Circuit Court
Rockingham County and the City of Harrisonburg
80 Court Square
Harrisonburg, Virginia 22802
Direct: 540-564-3111
Fax: 540-564-3127
ClerkChaz@RockinghamCountyVa.gov

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

---

**From:** MWJones@courts.state.va.us [mailto:MWJones@courts.state.va.us]
**Sent:** Thursday, June 30, 2011 11:08 AM
**To:** Chaz Evans-Haywood

**Cc:** bblevins@courts.state.va.us; cmorrison@courts.state.va.us; deanbm@ci.richmond.va.us; dmcbryde@courts.state.va.us; dmdavis@courts.state.va.us; DNichols@courts.state.va.us; dschaffer@roanokecountyva.gov; Edward.Jewett@richmondgov.com; FMitchell@courts.state.va.us; GDuquette@courts.state.va.us; GSchaefer@courts.state.va.us; Janie.Edmonds@richmondgov.com; JGraham@courts.state.va.us; JReyes@courts.state.va.us; mmcquigg@pwcgov.org; ngates@courts.state.va.us; rcampbell@courts.state.va.us; rms@courts.state.va.us; RPennington@courts.state.va.us; rperdue@roanokecountyva.gov; smcgraw@roanokecountyva.gov; TLarson@courts.state.va.us; Thomas Larson
**Subject:** RE: OCRA - New verbiage / Bar Number

For support staff I was going to use the attorney's bar # and add alfa to support staff.
Example 17642A, 17642B

Thank you,
Michelle Jones, Court Supervisor
Prince William County Circuit Court
9311 Lee Ave.
Manassas, VA. 20110
mwjones@courts.state.va.us
703 792-6026 Voice
703 792-5746 Fax

"Chaz Evans-Haywood" <clerkchaz@rockinghamcountyva.gov>

**"Chaz Evans-Haywood" <clerkchaz@rockinghamcountyva.gov>**

06/30/2011 10:31 AM

To
<dmcbryde@courts.state.va.us>, "Thomas Larson" <tom.larson@circuitcourtva.us>

cc
<cmorrison@courts.state.va.us>, <deanbm@ci.richmond.va.us>, <dmdavis@courts.state.va.us>, <DNichols@courts.state.va.us>, <dschaffer@roanokecountyva.gov>, <Edward.Jewett@richmondgov.com>, <FMitchell@courts.state.va.us>, <GDuquette@courts.state.va.us>, <GSchaefer@courts.state.va.us>, <Janie.Edmonds@richmondgov.com>, <JGraham@courts.state.va.us>, <JReyes@courts.state.va.us>, <mmcquigg@pwcgov.org>, <MWJones@courts.state.va.us>, <ngates@courts.state.va.us>, <rcampbell@courts.state.va.us>, <rms@courts.state.va.us>, <RPennington@courts.state.va.us>, <rperdue@roanokecountyva.gov>, <smcgraw@roanokecountyva.gov>, <TLarson@courts.state.va.us>, <bblevins@courts.state.va.us>

Subject
RE: OCRA - New verbiage / Bar Number

I think you should let us handle the user type on our contracts and just keep the sign on screen simple with a username, password, and MAYBE bar number. I have two contract, paid and not paid.

All my best,
Chaz

Chaz W. Evans-Haywood
Clerk of the Circuit Court
Rockingham County and the City of Harrisonburg
80 Court Square
Harrisonburg, Virginia 22802
Direct: 540-564-3111
Fax: 540-564-3127
ClerkChaz@RockinghamCountyVa.gov

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

---

**From:** dmcbryde@courts.state.va.us [mailto:dmcbryde@courts.state.va.us]
**Sent:** Thursday, June 30, 2011 10:19 AM
**To:** Thomas Larson
**Cc:** Chaz Evans-Haywood; cmorrison@courts.state.va.us; deanbm@ci.richmond.va.us; dmdavis@courts.state.va.us; DNichols@courts.state.va.us; dschaffer@roanokecountyva.gov; Edward.Jewett@richmondgov.com; FMitchell@courts.state.va.us; GDuquette@courts.state.va.us; GSchaefer@courts.state.va.us; Janie.Edmonds@richmondgov.com; JGraham@courts.state.va.us; JReyes@courts.state.va.us; mmcquigg@pwcgov.org; MWJones@courts.state.va.us; ngates@courts.state.va.us; rcampbell@courts.state.va.us; rms@courts.state.va.us; RPennington@courts.state.va.us; rperdue@roanokecountyva.gov; smcgraw@roanokecountyva.gov; TLarson@courts.state.va.us; bblevins@courts.state.va.us
**Subject:** RE: OCRA - New verbiage / Bar Number

Tom,

Sorry for the delay, I have been working with the Legislative and Public Relations group to get an answer on deleting the Bar Number field.

We would like to just eliminate the need for account holders to enter the "Bar Number/Authorized Officer of the Court Number" at login - hopefully this will simplify OCRA access for everyone.

You should continue to enter Bar numbers for attorneys - we will be changing the account setup screen to allow different
classes of users so only accounts designated as attorneys will need a bar number.

Currently we plan to offer these classifications of user accounts:

- Member in good standing with the Virginia State Bar *
- Authorized agent of a member in good standing with the Virginia State Bar
- Pro hac vice attorney authorized by the court for the purpose of the practice of law
- Representative of governmental agency authorized by the clerk
- Judge

* Bar Number Required

All - please let us know (email rms@courts.state.va.us) if you see the need for additional categories.

Thanks,
Daniel

Daniel T. McBryde
Records Imaging Systems Manager
Department of Judicial Information Technology
Office of the Executive Secretary
Supreme Court of Virginia
(804) 786-8680

Thomas Larson <tom.larson@circuitcourtva.us>

**Thomas Larson <tom.larson@circuitcourtva.us>**

06/09/2011 04:15 PM

To

"dmcbryde@courts.state.va.us" <dmcbryde@courts.state.va.us>, "mmcquigg@pwcgov.org" <mmcquigg@pwcgov.org>, "MWJones@courts.state.va.us" <MWJones@courts.state.va.us>, "DNichols@courts.state.va.us" <DNichols@courts.state.va.us>, "GSchaefer@courts.state.va.us" <GSchaefer@courts.state.va.us>, "TLarson@courts.state.va.us" <TLarson@courts.state.va.us>, "dmdavis@courts.state.va.us" <dmdavis@courts.state.va.us>, "GDuquette@courts.state.va.us" <GDuquette@courts.state.va.us>, "clerkchaz@rockinghamcountyva.gov" <clerkchaz@rockinghamcountyva.gov>, "rcampbell@courts.state.va.us" <rcampbell@courts.state.va.us>, "cmorrison@courts.state.va.us" <cmorrison@courts.state.va.us>, "JGraham@courts.state.va.us" <JGraham@courts.state.va.us>, "Edward.Jewett@richmondgov.com" <Edward.Jewett@richmondgov.com>, "deanbm@ci.richmond.va.us" <deanbm@ci.richmond.va.us>, "Janie.Edmonds@richmondgov.com" <Janie.Edmonds@richmondgov.com>, "FMitchell@courts.state.va.us" <FMitchell@courts.state.va.us>, "JReyes@courts.state.va.us" <JReyes@courts.state.va.us>, "smcgraw@roanokecountyva.gov" <smcgraw@roanokecountyva.gov>, "rperdue@roanokecountyva.gov" <rperdue@roanokecountyva.gov>, "dschaffer@roanokecountyva.gov" <dschaffer@roanokecountyva.gov>, "RPennington@courts.state.va.us" <RPennington@courts.state.va.us>

cc

"rms@courts.state.va.us" <rms@courts.state.va.us>, "ngates@courts.state.va.us" <ngates@courts.state.va.us>

Subject

RE: OCRA - New verbiage

Daniel,

Thanks. This language is fine. I still think that users should only have to certify to this once.

What are you going to do with the Bar Number field? Since non-attorney's do not have a VSB

**WRIGHT0035**

number will it still be a required field in OCRA and if so, what number will we use for non-attorney's? This will become an issue based on your comments this morning stating that the user data is system-wide and not just by locality.

Thanks,

Tom

Thomas A. Larson
Chief Deputy Clerk
Norfolk Circuit Court Clerk's Office
100 St. Paul's Blvd
Suite 100
Norfolk, VA 23510
tom.larson@circuitcourtva.us
(757) 664-4392
(757 664-4393
http://icourt.info

**From:** dmcbryde@courts.state.va.us [mailto:dmcbryde@courts.state.va.us]
**Sent:** Thursday, June 09, 2011 4:10 PM
**To:** mmcquigg@pwcgov.org; MWJones@courts.state.va.us; DNichols@courts.state.va.us; GSchaefer@courts.state.va.us; TLarson@courts.state.va.us; dmdavis@courts.state.va.us; GDuquette@courts.state.va.us; clerkchaz@rockinghamcountyva.gov; rcampbell@courts.state.va.us; cmorrison@courts.state.va.us; JGraham@courts.state.va.us; Edward.Jewett@richmondgov.com; deanbm@ci.richmond.va.us; Janie.Edmonds@richmondgov.com; FMitchell@courts.state.va.us; JReyes@courts.state.va.us; smcgraw@roanokecountyva.gov; rperdue@roanokecountyva.gov; dschaffer@roanokecountyva.gov; RPennington@courts.state.va.us
**Cc:** rms@courts.state.va.us; ngates@courts.state.va.us
**Subject:** Fw: OCRA - New verbiage

All - Here is the proposed disclaimer for initial OCRA access. Please let us know (email "rms") if you have any concerns or changes.

Thanks for attending the meeting this morning.
Daniel

Daniel T. McBryde
Records Imaging Systems Manager
Department of Judicial Information Technology
Office of the Executive Secretary
Supreme Court of Virginia
(804) 786-8680

I, -----, certify in accordance with Virginia Code § 17.1-293 that I am either an attorney in good standing with the Virginia State Bar, an authorized agent of such an attorney, an attorney currently admitted to practice law in Virginia on a pro hac vice basis, or an authorized

representative of a governmental agency authorized by the clerk to access the system. I acknowledge and agree that any data accessed in this system may not be sold or posted on any other Internet Web Site or in any way redistributed to any third party. I further acknowledge and agree that the Circuit Court Clerk reserves the discretion to deny secure remote access to ensure compliance with the Code of Virginia.

----- Forwarded by Daniel McBryde/OES/VaJud on 06/09/2011 04:00 PM -----

| | | |
|---|---|---|
| **Katya Herndon/OES/VaJud** | To | Bob Smith |
| 06/02/2011 09:24 AM | cc | "Eddie Macon" <emacon@courts.state.va.us>, Paul DeLosh/OES/VaJud@VaJud, Kristi S Wright/OES/VaJud@VaJud, Daniel McBryde/OES/VaJud@VaJud |
| | Subject | Fw: OCRA |

Bob,

Please find attached below new certification language that should replace the current "disclaimer". We would like the system to require every person to "certify" to this each time they access OCRA. Please call me or have Daniel call me if you have questions.

Thanks,
Katya

*(See attached file: OCRA Certification.final.doc)*

Katya N. Herndon
Director of Legislative and Public Relations
Office of the Executive Secretary
Supreme Court of Virginia
100 North Ninth Street, Third Floor
Richmond, Virginia 23219
(804) 786-7595

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Abingdon Division**

| | |
|---|---|
| COURTHOUSE NEWS SERVICE; LEE ENTERPRISES, INCORPORATED; AND LEE BHM LLC, PUBLISHER OF THE RICHMOND TIMES-DISPATCH, THE ROANOKE TIMES, BRISTOL HERALD COURIER, LYNCHBURG NEWS AND ADVANCE, FREDERICKSBURG FREE LANCE STAR AND THE DAILY PROGRESS.<br><br>Plaintiff,<br><br>v.<br><br>KARL R. HADE, in his official capacity as Executive Secretary of the Office of Executive Secretary of the Supreme Court of Virginia,<br><br>and<br><br>EDWARD JEWETT, in his official capacity as Clerk of the Circuit Court for the City of Richmond, Virginia,<br><br>and<br><br>BRENDA HAMILTON, in her official capacity as Clerk of the Circuit Court for the City of Roanoke, Virginia,<br><br>and<br><br>KELLY FLANNAGAN, in her official capacity as Clerk of the Circuit Court for the City of Bristol, Virginia<br><br>Defendants. | Civil Action No. 1:25-cv-0075-JPJ-PMS |

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF**
**PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

In accordance with Federal Rule of Evidence 201, Plaintiff Courthouse News Service ("Courthouse News") and Plaintiffs Lee Enterprises, Incorporated and its wholly owned subsidiary, Lee BMH LLC (collectively, "Lee") (and, together with Courthouse News, "Plaintiffs"), hereby request that the Court take judicial notice of the following facts and documents in support of Plaintiffs' Omnibus Opposition to Defendants' Motion to Dismiss.

**Requests for Judicial Notice**

1. A printout of the Officer of the Court Remote Access ("OCRA") login page stating that OCRA "is intended solely for the use of authorized Officer of the Court personnel" and "[a]ll other use is expressly prohibited." This is the login page that is described in Stipulation No. 40 of the Joint Stipulations of Fact ("Joint Stipulations") in *Courthouse News Serv. v. Hade*, U.S. District Court, E.D. Va., Case No. 3:21cv460-HEH ("*CNS v. Hade*"), Doc. No. 55, and that is attached as Exhibit 2 to CNS' Complaint in the current action. It is also the login page the district court relied on in its ruling denying Defendants' motions to dismiss in *Courthouse News Serv. v. Hade*, 580 F. Supp. 3d 289, 295 (E.D. Va. 2022). A true and correct copy of the printout of the OCRA login page is attached as **Exhibit 1.**

2. The November 16, 2021, Declaration of Jonathan E. Ginsberg in Opposition to Defendants' Motions to Dismiss filed in *CNS v. Hade* (Doc. No. 33-3), together with its Exhibit B (Doc. No. 33-5). As stated in the Ginsberg Declaration, Exhibit B consists of excerpts from the Federal Rule of Civil Procedure 30(b)(6) deposition of Robert Smith, the then-director of the department of judicial information and technology for the Office of Executive Secretary of the Supreme Court of Virginia, in *Courthouse News Serv. v. Schaefer*, U.S. District Court, E.D. Va.,

Case No. 2:18-cv-391-HCM ("*Schaefer*"). True and correct copies of the November 16, 2021, Ginsberg Declaration from *CNS v. Hade* and its Exhibit B are attached as **Exhibit 2.**

3. The existence and contents of the November 30, 2018 Response of Work Group Established Pursuant to Item 38 (O) of the Appropriation Act of 2018 (Virginia House Bill 5002, Chapter 2 of Special Session I), issued by OES to the Co-Chairman of the Senate Committee on Finance, the Chairman of the Senate Committee on Courts of Justice, the Chairman of the House Committee on Appropriations, and the Chairman of the House Committee on Courts of Justice ("Work Group Report"). The Work Group Report was attached to Plaintiff's Memorandum of Law in Support of its Motion for Summary Judgment (Doc. No. 71) as Exhibit D (Doc. No. 71-13) in *CNS v. Hade*. A true and correct copy of the Work Group Report is attached as **Exhibit 3.**

4. The existence of a 5-page email string produced by Defendant Hade in discovery in *CNS v. Hade*, Bates Stamped MCBRYDE0058-0062. A true and correct copy of this document is attached as **Exhibit 4.**

**Applicable Law**

Federal Rule of Evidence 201(b) allows this Court to take judicial notice of any fact "not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." The Court "must take judicial notice if a party requests it and the court is supplied with the necessary information."

***Contents of a Government and Party Websites* –** The Court may take judicial notice of the OCRA website attached at Exhibit 1 as both a government and party website. The Fourth Circuit has established "[t]his court and numerous others routinely take judicial notice of information contained on state and federal government websites." *United States v. Garcia*, 855

F.3d 615, 621 (4th Cir. 2017); *see also Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004) (taking judicial notice of publicly available information on government website); *Spears v. Jones*, No. 7:12-CV-00296, 2012 WL 4460514 *1 n.1 (W.D. Va. July 9, 2012) (citing cases for the proposition that "federal courts may take judicial notice of governmental websites, including court records" and "postings on government websites are inherently authentic or self-authenticating").

In addition, "[a] court may take judicial notice of information publicly announced on a party's web site, so long as the web site's authenticity is not in dispute and it is capable of accurate and ready determination." *Jeandron v. Bd. of Regents of Univ. Sys. of Maryland*, 510 F. App'x 223, 227 (4th Cir. 2013) (unpublished per curiam opinion). The contents of OES' OCRA website, as reflected in Exhibit 1, is not subject to reasonable dispute and is thus properly judicially noticed. *See, e.g., Brown-Thomas v. Hynie*, 367 F. Supp. 3d 452, 469 n.3 (D.S.C. 2019) (citing *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006)) ("For purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination.'").

***Records Filed With Courts –*** The court may take judicial notice of the November 16, 2021 Declaration of Jonathan Ginsberg in Opposition to Defendants' Motions to Dismiss and the attached deposition transcript from *Courthouse News Serv. v. Schaefer*, Case No. 2:18-cv-391-HCM (E.D. Va.). Both of these documents were filed with the court in *CNS v. Hade* as documents entered in other federal or state court proceedings that directly relate to the issues in this action. *Doe v. Mast*, 741 F. Supp. 3d 409, 424 n.1 (W.D. Va. 2024) ("The Court may also take judicial notice of state-court proceedings that directly relate to the issues in this federal-

court action."); *Design Gaps, Inc. v. Distinctive Design & Constr. LLC*, 162 F.4th 452, 468 n.3 (4th Cir. 2025) ("We take judicial notice of court filings not included in the joint appendix as matters of public record."); *Certusview Techs., LLC v. S&N Locating Servs., LLC*, 198 F. Supp. 3d 568, 581 (E.D. Va. 2016) (taking judicial notice of documents previously filed in case, including, *inter alia*, a portion of a deposition transcript). The following testimony appears on pages 97-98 of the transcript: "Q: Are there any restrictions to individuals who can access OCRA? A: Yes. Q: What are those restrictions? A: Must be a member in good standing of the Virginia State Bar. Q: And is that an OES-imposed requirement? A: Yes." For the purposes of the pending motions to dismiss, Court need not take judicial notice of the truth of these statements; only that OES' 30(b)(6) representative made these statements.

Fed. R. Evid. 201(b) also allows the Court to take judicial notice of Exhibit 3, the November 30, 2018, Response of Work Group Established Pursuant to Item 38 O of the Appropriation Act of 2018, which was attached as Exhibit D to the July 11, 2022 Courthouse News Service's Memorandum of Law in Support of its Motion for Summary Judgment in *CNS v. Hade*. Judicial notice of the Work Group Report is proper because it is a government document. *Shore v. Charlotte-Mecklenburg Hosp. Auth.*, 412 F. Supp. 3d 568, 573 (M.D.N.C. 2019) ("The court may take judicial notice of public documents and government documents because their sources cannot reasonably be questioned.") (quotation omitted); *see also 5th Cong. Dist. Republican Comm. v. O'Bannon*, No. 5:25-CV-00059, 2025 WL 3515265 at *2 n.3 (W.D. Va. Dec. 8, 2025) ("State Attorney General opinions are government documents subject to judicial notice") (citing *United States v. Lawson*, 677 F.3d 629, 654 (4th Cir. 2012)).

**Existence of email produced in *CNS v. Hade* –** Finally, this court may take judicial notice of the existence of the email string Bates Stamped MCBRYDE0058-62 and produced by

Defendant Hade in *CNS v. Hade* because it is "not subject to reasonable dispute" and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Federal Rule of Evidence 201(b). Where, as here, Defendant Hade can confirm by its Bates number that this is the same document he produced in *CNS v. Hade*, its existence cannot be reasonably disputed. In addition, the document is relevant to Defendant Hade's Eleventh Amendment-related claim that he has played no role in the enforcement of the Dissemination Restriction. *See*, *e.g.*, *In re Harmony Holdings, LLC*, 393 B.R. 409, 414 (D.S.C. 2008) (request for judicial notice of emails "will be allowed," although circumstances did "not make the matters contained on the emails so reliable as to justify judicial notice of all of the facts stated therein."); *Fair Fight Inc. v. True the Vote*, 710 F. Supp. 3d 1237, 1264 & n.33 (N.D. Ga. 2024) (taking judicial notice of "the complete email correspondence" between trial witness and her voting county in Voting Rights Act case); *U.S. v. Coleman*, 2015 WL 1582462, *5 (E.D. Va. June 4, 2025) (taking judicial notice of email "'disclosed after the hearing"); *Smith v. Cook*, 2018 WL 1185221 *2 (S.D. Cal. March 7, 2018) (taking judicial notice of, among other items, "email chains" where "the accuracy and relevancy of these documents have not been disputed by Defendant").

COURTHOUSE NEWS SERVICE
LEE ENTERPRISES, INCORPORATED
LEE BHM LLC

By: /s/ Dabney J. Carr, IV
Of Counsel

Dabney J. Carr IV, VSB No. 28679
Lauren H. Miller, VSB No. 100566
P.O. Box 1122
Richmond, Virginia 23218
Tel: (804) 697-1200
Fax: (804) 697-1339
dabney.carr@troutman.com
lauren.h.miller@troutman.com

Roger Myers (admitted pro hac vice)
Rachel Matteo-Boehm (admitted pro hac vice)
Carlie Tenenbaum (admitted pro hac vice)
Bryan Cave Leighton Paisner LLP
3 Embarcadero Center, 7th Floor
San Francisco, California 94111
Tel: (415) 675-3400
Fax: (415) 675-3434
roger.myers@bclplaw.com
rachel.matteo-boehm@bclplaw.com
carlie.tenenbaum@bclplaw.com

*Counsel for Plaintiffs Courthouse News Service,*
*Lee Enterprises, Incorporated and Lee BHM LLC*

# EXHIBIT 1

RGINIA'S
IAL SYSTEM

## Judicial Information System

## Officer of the Court Remote Access

**Attention**

This system is intended solely for the use of authorized Officer of the Court personnel to retrieve and review court documents they are specifically authorized to view. All other use is expressly prohibited.

For account creation, maintenance, and support, please contact the Circuit Court Clerk.

This website uses cookies. By continuing to use this website you are giving consent to cookies being used. Version 25.2

**Enter your Account Information**

User Login (E-mail Address):

User Passcode :

Bar Number / Authorized Officer of the Court Number :

Login

Officer of the Court Remote Access

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| COURTHOUSE NEWS SERVICE,<br>*Plaintiff,*<br>v.<br>KARL R. HADE, *et al.*,<br>*Defendants.* | ) | Civil Action No. 3:21-cv-00460-HEH |

DECLARATION OF JONATHAN E. GINSBERG
IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

I, Jonathan E. Ginsberg, declare and state as follows:

1. I am an associate with the law firm of Bryan Cave Leighton Paisner LLP, counsel for Courthouse News Service ("CNS"), the plaintiff in the above-captioned case. I make this declaration in support of CNS' Omnibus Opposition to the Motions to Dismiss filed by Defendant Karl R. Hade, in his official capacity as Executive Secretary of the Office of Executive Secretary of the Supreme Court of Virginia, and Defendant Jacqueline C. Smith, in her official capacity as Clerk of the Circuit Court for Prince William County, Virginia. I have personal knowledge of the following facts, except where otherwise stated, and would and could testify to them if called as a witness.

2. On January 8, 2019, CNS took the deposition of Jacqueline C. Smith in her official capacity as the Prince William Clerk in *Courthouse News Serv. v. Schaefer*, 440 F. Supp. 3d 532, (E.D. Va. 2020) ("*Schaefer I*"), *aff'd*, 2 F.4th 318 (4th Cir. 2021). Attached hereto as Exhibit A are true and correct copies of relevant excerpts from Ms. Smith's deposition transcript.

3. On December 19, 2018, CNS took the Federal Rule of Civil Procedure 30(b)(6) deposition in the *Schaefer I* matter of Robert I. Smith, the then-director of the department of

judicial information and technology for the Office of Executive Secretary of the Supreme Court of Virginia. Attached hereto as Exhibit B are true and correct copies of relevant excerpts from Mr. Smith's deposition transcript.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in New York, New York on this 16th day of November 2021.

/s/ Jonathan E. Ginsberg
Jonathan E. Ginsberg

Case 3:21-cv-00460-HEH Document 33-5 Filed 11/16/21 Page 1 of 8 PageID# 321



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>Plaintiff,<br><br>v.<br><br>GEORGE E. SCHAEFER, in his official capacity as Clerk of the Circuit Court for Norfolk, Virginia, et al.,<br><br>Defendants. | Case No.: 2:18-cv-391-HCM |

DEPOSITION UPON ORAL EXAMINATION OF

ROBERT L. SMITH

TAKEN ON BEHALF OF THE PLAINTIFF

RICHMOND, VIRGINIA

DECEMBER 19, 2018

Appearances:

BRYAN CAVE LEIGHTON PAISNER
BY: HEATHER S. GOLDMAN, ESQUIRE
BRYAN J. HARRISON, ESQUIRE
WILLIAM J. HIBSHER, ESQUIRE
1155 F STREET, NW
WASHINGTON, D.C. 20004
(202)508-6000
heather.goldman@bclplaw.com
bryan.harrison@bclplaw.com
Counsel for the Plaintiff

THOMPSON McMULLAN, PC
BY: MICHAEL G. MATHESON, ESQUIRE
WILLIAM W. PRINCE, IV, ESQUIRE
100 SHOCKOE SLIP, 3RD FLOOR
RICHMOND, VIRGINIA 23219
(804)649-7545
mmatheson@t-mlaw.com
wprince@t-mlaw.com
Counsel for the Defendants

OFFICE OF THE ATTORNEY GENERAL
BY: ELIZABETH BUSHNELL MYERS, AAG
202 NORTH 9TH STREET
RICHMOND, VIRGINIA 23219
(804)786-9516
ebmyers@oag.state.va.us
Counsel for the OES

Also present:

Joanne Fronfelter

C-O-N-T-E-N-T-S

WITNESS: ROBERT L. SMITH


| | Page |
|---|---|
| EXAMINATION BY: | |
| Mr. Harrison | 4 |
| Mr. Matheson | 101 |


E-X-H-I-B-I-T-S


No. 1 - Subpoena....................................8
No. 2 - Info Tab Spreadsheet of 2018 PW and Norfolk cases filed/Doc Req Responses.....10
No. 3 - Norfolk Electronic Filing Data............11
No. 4 - PW Electronic Filing Data 2018............11
No. 5 - 10/25/18 Myers E-mail/OES Report..........26
No. 6 - Norfolk Paper Filing Data 2018............29
No. 7 - PW Paper Filing Data 2018.................30
No. 8 - 11/2/18 & 10/30/18 Myers E-mails..........38
No. 9 - 10/30/18 E-mail/Prince Letter to Myers....51
No. 10 - NOR 001412 to 001627.....................53
No. 11 - PWC 001401 to 001622.....................53
No. 12 - NOR 001377 to 001394.....................58
No. 13 - PWC 001383...............................58
No. 14 - 11/4/2018 Norfolk Circuit Receipt........69
No. 15 - CIS - Images.............................

Deposition upon oral examination of ROBERT SMITH, taken on behalf of the Plaintiff, before Deanna A. Arend, Registered Professional Reporter, a Notary Public for the Commonwealth of Virginia at large, taken pursuant to notice, commencing at 9:58 a.m., on December 19, 2018, at the Office of the Attorney General, 202 North 9th Street, Richmond, Virginia; and this in accordance with the Federal Rules of Civil Procedure.

ROBERT L. SMITH was sworn and deposed on behalf of the Plaintiff as follows:

EXAMINATION

BY MR. HARRISON:

Q Good morning, Mr. Smith. We met off the record, but my name is Bryan Harrison, and I represent the Plaintiff in the proceedings before us, Courthouse News Service. I may refer to them as CNS throughout the course of today, but I just wanted to let you know so that you understand that. With me are my colleagues, Heather Goldman and Bill Hibsher.

A few other abbreviations that I may use as long as you're fine with them: Office of Executive Secretary I may refer to as OES for purposes of this.

A Yes.

subpoena?
A Yes.
Q And you understand that you are appearing today as the designee for the Office of Executive Secretary?
A Yes.
Q And that your testimony will bind OES as to these issues?
A Yes.
Q If I could direct your attention to the attachment where it says topics for examination, it's probably about halfway through.
A Okay.
Q Did you prepare yourself to testify as to these topics?
A Yes, sir.
Q And are you also aware that there were document requests as part of the subpoena as well?
A Yes.
Q And has OES produced documents responsive to those requests?
A Yes.
Q Has OES completed its production of documents?
A Yes.

A Yes.

Q And with an OCRA subscription, can an OCRA user view all of the filings in a particular Circuit Court?

A Except for confidential. Those, yes.

Q And those are the same filings that could be viewed at the public access terminal?

A Yes.

Q Is there any information available on OCRA that is not available on the public access terminal?

A No.

Q Are you aware if the FMS receipts are available on OCRA?

A I don't know.

Q How is confidential information designated on OCRA or handled?

A When documents are scanned, depending on when -- the case -- the types of documents that are selected, the clerks can designate them -- well, depending on the type of document selected or sort of manually saying these are confidential, and then they would not show up on OCRA.

Q Are there any restrictions to individuals who can access OCRA?

Case 3:21-cv-00460-HEH Document 38-5 Filed 11/16/21 Page 7 of 8 PageID# 327



A Yes.
Q What are those restrictions?
A Must be a member in good standing of the Virginia State Bar.
Q And is that an OES-imposed requirement?
A Yes.
Q But for that requirement, could OES allow members of the public to subscribe to OCRA?
MR. PRINCE: Objection to form.
THE WITNESS: The clerks, themselves, determine who has and controls the access to OCRA. It's always been our office's stance that the Code does not support providing to anyone other than members of the bar.
BY MR. HARRISON:
Q Would providing access to members of the public that are not members of the Virginia Bar -- would that increase the costs of OES's administration of OCRA?
MR. PRINCE: Objection to form.
THE WITNESS: Yes.
MR. HARRISON: Off the record for a second.
(Brief off-the-record discussion.)
BY MR. HARRISON:

Case 3:21-cv-00460-HEH Document 38-5 Filed 11/16/21 Page 8 of 8 PageID# 328



CERTIFICATE OF NOTARY PUBLIC

I, Deanna A. Arend, the officer before whom the foregoing deposition was taken, do hereby certify that the witness was duly sworn by me; that the testimony of said witness was taken by me in stenotype and thereafter reduced to typewritten form under my supervision; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

_______________________

Deanna A. Arend, RPR
Notary Public, State of Virginia at Large.
My Commission expires: June 30, 2020
Notary Number: 131169

# EXHIBIT 3

EXECUTIVE SECRETARY
KARL R. HADE

ASSISTANT EXECUTIVE SECRETARY & LEGAL COUNSEL
EDWARD M. MACON

COURT IMPROVEMENT PROGRAM
SANDRA L. KARISON, DIRECTOR

EDUCATIONAL SERVICES
CAROLINE E. KIRKPATRICK, DIRECTOR

FISCAL SERVICES
JOHN B. RICKMAN, DIRECTOR

HUMAN RESOURCES
RENÉE FLEMING MILLS, DIRECTOR

SUPREME COURT OF VIRGINIA

OFFICE OF THE EXECUTIVE SECRETARY
100 NORTH NINTH STREET
RICHMOND, VIRGINIA 23219-2334
(804) 786-6455

JUDICIAL INFORMATION TECHNOLOGY
ROBERT L. SMITH, DIRECTOR

JUDICIAL PLANNING
CYRIL W. MILLER, JR., DIRECTOR

JUDICIAL SERVICES
PAUL F. DELOSH, DIRECTOR

LEGAL RESEARCH
STEVEN L. DALLE MURA, DIRECTOR

LEGISLATIVE & PUBLIC RELATIONS
KRISTI S. WRIGHT, DIRECTOR

MAGISTRATE SERVICES
MASON L. BYRD, DIRECTOR

November 30, 2018

The Honorable Mark D. Obenshain
Chair, Courts of Justice Committee
Senate of Virginia
P.O. Box 555
Harrisonburg, Virginia 22803

The Honorable Robert B. Bell
Chair, Courts of Justice Committee
Virginia House of Delegates
2309 Finch Court
Charlottesville, VA 22911

The Honorable Thomas K. Norment, Jr.
Co-Chair, Finance Committee
Senate of Virginia
P.O. Box 6205
Williamsburg, Virginia 23188

The Honorable S. Chris Jones
Chair, Appropriations Committee
Virginia House of Delegates
P.O. Box 5059
Suffolk, VA 23435

The Honorable Emmett W. Hanger, Jr.
Co-Chair, Finance Committee
Senate of Virginia
P.O. Box 2
Mount Solon, Virginia 22843-0002

RE: Item 38, Paragraph O, of the Appropriation Act, Chapter 2, Virginia Acts of Assembly, 2018 Special Session I

Dear Chairmen Obenshain, Norment, Hanger, Bell, and Jones:

Please find enclosed a summary of the findings and recommendations of the working group to evaluate issues related to statewide adoption of electronic filing of civil cases in circuit courts, as required by Item 38, Paragraph O, of the Appropriation Act, Chapter 2, Virginia Acts of Assembly, 2018 Special Session I.

If you have any questions regarding this report, please do not hesitate to contact me.

With kind regards, I am

Very truly yours,

Karl R. Hade

KRH:jrp
Enclosure

MEMORANDUM

To: Co-Chairman of the Senate Committee on Finance
Chairman of the Senate Committee on Courts of Justice
Chairman of the House Committee on Appropriations
Chairman of the House Committee on Courts of Justice

From: Office of the Executive Secretary of the Supreme Court of Virginia

Date: November 30, 2018

Re: Response of Work Group Established Pursuant to Item 38 O of the Appropriations Act of 2018

## Background

This report was prepared in response to the following language in the 2018 Appropriation Act ("the Budget Language"). Item 38 (O) of the 2018 Appropriation Act (House Bill 5002, Chapter 2 of Special Session I) reads as follows:

> *O. The Executive Secretary shall convene a working group, to include a minimum of five circuit court clerks, to evaluate issues related to statewide adoption of electronic filing of civil cases in circuit courts, and the implementation of a statewide system through which images of nonconfidential records within civil case files in the circuit courts may be viewed by subscribers of that system. The evaluation shall include consideration of (i) the benefits of the availability of electronic case filing of civil cases in all circuit courts; (ii) the benefits of the adoption of one statewide electronic case filing system by all circuit courts; (iii) the benefits of a statewide system through which images of nonconfidential records within civil case files in the circuit courts may be viewed by subscribers via a single subscription for statewide access; (iv) the types of information to be made available to subscribers of the system or, alternatively, excluded from the system; (v) how a subscription process may be established to provide a clear definition of the duties of the Office of the Executive Secretary and each circuit court clerk with respect to implementation and operation of the system; (vi) the estimated one-time and ongoing costs of all circuit courts implementing and operating a) an electronic case filing system, and b) one statewide electronic case filing system for use by all circuit courts; (vii) the estimated one-time and ongoing costs of implementing and operating a statewide system through which images of nonconfidential records within civil case files in the circuit courts may be viewed by subscribers of that system via a single subscription for statewide access; (viii) a fee schedule for subscribers and how such fee schedule should be established, and (ix) any potential loss of revenues by circuit court clerks reasonably attributed to the implementation of one statewide electronic case filing system and a statewide system through which images of nonconfidential records within civil*

*case files in the circuit courts may be viewed by subscribers of that system. The Executive Secretary shall provide a summary of the findings and recommendations of the working group to the Chairmen of the House Committees on Courts of Justice and Appropriations, and the Senate Committees on Courts of Justice and Finance no later than November 30, 2018.*

Work Group Meetings

The Office of the Executive Secretary (OES) convened a Work Group in accordance with the Budget Language. Specifically, the Work Group focused on addressing the considerations enumerated in the Budget Language.

The membership of the Work Group is attached as Appendix A – and included circuit court clerks representing the Virginia Court Clerks Association ("VCCA") and staff within the OES. The first meeting of the Work Group was held on June 20, 2018, during which it was determined that OES and the VCCA would separately develop draft responses to components of the specific considerations within the Budget Language. Following the June 20 meeting, OES met internally and worked on potential draft responses to the Budget Language, and VCCA met internally and worked on potential drafts of legislation. The next meeting was held on September 5, 2018, with the members of the Work Group doing research and working internally on the potential draft responses to the Budget Language between the June 20 meeting and the September 5 meeting. At the September meeting the Work Group discussed OES' draft responses to the Budget Language with the VCCA expressing concerns that the responses were too heavily focused on OES developed systems. There was consensus that neither the VCCA nor OES believes that legislation relating to the considerations set forth in the Budget Language should be introduced in the 2019 General Assembly. At the meeting on October 4, 2018, the VCCA presented alternative responses to the considerations set forth in the Budget Language and those responses were discussed.

The Work Group discussions revealed that OES approaches the development and implementation of technology systems in a manner that is uniform and system-wide, to the extent possible, while the VCCA prefers preserving the authority of circuit court clerks to select technology systems that are tailored to the needs of the individual circuit court the clerk serves. The VCCA does not believe that a "one-size fits all technology approach" recognizes the diverse needs of the circuit courts in the Commonwealth of Virginia.

Consequently, what follows is a list of findings upon which the Work Group achieved consensus, followed by responses to the considerations the Work Group was asked to evaluate. While many of the considerations were phrased in the affirmative, as an examination of the benefits of a course of action, discussion must necessarily be had concerning the downside of any given course of action. OES has sought to provide a summary of both.

Finally, the options set forth in this report seek to inform the legislature as to how certain policy goals may be achieved and wherein lie the shortfalls of any given policy choice. Recognizing that those policy decisions lie squarely with the legislative branch, the

"recommendations" set forth in this report are offered without endorsement under the heading of "Options."

## Findings

Following hours of discussion and extensive work over the course of six months, the Work Group has reached the following conclusions:

1. Circuit court clerks are independent elected constitutional officers and by law are given the discretion to make decisions about the technologies utilized by their offices.

2. It has been demonstrated by the example of other states that until attorneys are required to use electronic case filing the benefits associated with it cannot be realized. Indeed, adoption of e-filing while maintaining traditional paper filing increases the workload of the clerks by creating parallel systems for the same process.

3. Any mandate that the clerks adopt a single, statewide e-filing system could be costly for individual clerk's offices. Clerks' offices may be required to transition from an existing system or acquire a system not currently in use and depending on the selected system's ability to interface with other existing systems, pay for any necessary interfaces. If a single statewide e-filing system were required, the circuit court clerks and localities that have invested in technology systems to support the needs of that particular court would experience a loss of investment and would likely have costs associated with integrating a new system.

   If a system other than the current OES e-filing system is required, OES would experience a significant loss of the investments made in the existing systems and would likely have significant costs associated with integrating a new system with existing systems.

4. Providing a technology system for e-filing of civil cases has benefits to litigants and to the members of the Virginia State Bar but also can be expensive for the clerks to operate and for OES to maintain, including the training of staff and providing support to users of the system, particularly if members of the Virginia State Bar do not use such systems.

5. In those jurisdictions currently offering e-filing in civil cases, user rates are very low as a percentage of total cases filed.

6. The Work Group does not recommend any legislation to mandate use of a single civil e-filing system in the circuit courts.

7. Significant participation by Virginia lawyers is a prerequisite to successful adoption of any comprehensive civil e-filing system. Therefore, the Virginia State Bar should seek input from its members as to whether they would support mandatory electronic filing of civil cases by attorneys in any jurisdiction where e-filing of civil cases is available.

Discussion of Considerations

Because a rudimentary understanding of the technology currently employed by the circuit court clerks is necessary to understand the discussion that follows, the various OES systems are described briefly here. For a detailed overview of the OES systems currently in use in the circuit courts for both e-filing and online viewing of case documents, please see Appendix B. What follows is an explanation of the OES systems available to the circuit court clerks; however, pursuant to Va. Code § 17.1-502, any clerk may choose a private vendor to supply any one or a combination of these foundational systems. Pursuant to this authority, some clerks have implemented technology systems offered by private vendors. A table detailing the known systems used by each circuit court is provided in Appendix C.

The Circuit Case Management System (CCMS) is the operational system maintained by OES that serves as the main case-processing mechanism for all circuit court clerks' offices, except Fairfax and Alexandria that do not use CCMS. Multiple technology systems developed by OES are built upon CCMS' structure. The Virginia Judiciary E-Filing System (VJEFS), Case Imaging System (CIS), and Officer of the Court Remote Access System (OCRA) require use of CCMS before they can be implemented by any circuit court. VJEFS allows electronic filing of most civil cases in circuit court and is available for use by members of the Virginia State Bar and their designated staff. CIS provides circuit courts the ability to create and store electronic documents that are part of a case file. OCRA allows participating circuit court clerks to grant attorneys, attorneys' agents, pro hac vice attorneys, and government agencies secure remote access to documents in CIS.

*1. Benefits of the availability of electronic case filing of civil cases in all circuit courts*

In addition to the general benefits of e-filing, such as avoidance of travel to the courthouse and extended hours to file, attorneys throughout the Commonwealth with a statewide or multi-jurisdictional practice would benefit from the ability to manage their cases remotely. Circuit court clerks would benefit from the reduced amount of case processing functions such as case entry and case receipting, as well as the scanning necessary to create and store images of documents in case imaging systems, as the case data, payment information, and e-filed documents would already be available in an electronic format.

However, if lawyers do not use the e-filing system, then making e-filing available increases the workload of the clerk by creating a second, parallel process for case filing which must also be staffed. It is for this reason that clerks in some smaller courts with limited staff report not wanting to adopt e-filing even though that court may otherwise be equipped to do so.

*2. Benefits of the adoption of one statewide electronic case filing system by all circuit courts*

Use of one statewide e-filing system would provide uniformity and consistency across the Commonwealth and would create efficiencies for the attorneys and their staff who must learn

only one system. In addition, there are efficiencies for OES with the operation and support of one e-filing system.

However, adoption of a single system to be used by every circuit court would be disruptive and costly to those courts forced to transition to a new system. Some circuit court clerks have invested significantly in private sector technology systems that meet the needs of the community they serve. In some larger, wealthier localities the court technology systems are included in the local government IT contract with an outside vendor. For those communities, forcing the adoption of an e-filing system incompatible with the existing IT systems would be a hardship that would affect multiple local institutions, including those that have system interoperability with the local judicial system. Even if the state chose an outside private vendor to provide statewide e-filing, it would force the 35 courts currently using the OES' VJEFS off of the current system, as well as any court using a different private vendor than the one selected for e-filing. An outside vendor system would significantly impact the interoperability of the OES' case management, imaging, and OCRA systems across the Commonwealth.

*3. Benefits of a statewide system through which images of nonconfidential records within civil case files in the circuit courts may be viewed by subscribers via a single subscription for statewide access*

A statewide system through which images of nonconfidential records within the civil case files could be viewed would benefit subscribers[1] wishing to access case information across multiple courts. Currently, a subscriber seeking such access may be required to pay a separate subscription fee for each circuit court that offers electronic access to nonconfidential records or visit each court in-person to access the case file. In addition, a single statewide system would only require users to learn to use a single system, as opposed to the multiple systems that are currently offered by circuit court clerks statewide. Operation of a single statewide system would likely reduce both foot traffic and calls to the clerk's offices. Subscribers accessing the records would possibly avoid paying a copy fee to obtain a copy of the electronically-viewed document.

However, a subscriber wishing to remotely view files within a single court may potentially face a higher subscription fee to access the statewide system than would normally be charged to access files within a single court. Such subscriber may view the cost increase to access records statewide as a detriment, although these higher costs could be reduced through the implementation of a multi-tier fee structure, with the costs of such subscription dependent on the number of courts accessible within each tier. Also, changing the manner in which users access images of records in civil case files to a statewide, single subscription model would result in loss of revenue to individual clerks' offices, as discussed in greater detail in Consideration #9.

OCRA, which was developed by OES and is currently being utilized in 92 of the 120 circuit courts, is a system through which images of nonconfidential records within civil case files in the circuit courts may be viewed by subscribers, who are limited by statute to attorneys,

[1] Subscribers are currently limited to members in good standing with the Virginia State Bar and their authorized agents, pro hac vice attorneys authorized by the court for purposes of the practice of law, and such governmental agencies as authorized by the clerk as set forth in Va. Code § 17.1-293(E)(7).

attorneys' agents, pro hac vice attorneys, and government agencies as authorized by the clerk. Currently, subscribers are limited to viewing images for only the circuit courts to which they have a paid subscription. In order to access the records of all 92 courts that offer OCRA, subscribers currently must subscribe with each of the 92 circuit court clerks' offices.

*4. The types of information to be made available to subscribers of the system, or alternatively, excluded from the system*

Information available to subscribers would include all documents in civil cases except sealed, juvenile, adoption, and other confidential cases, as well as those documents that are marked confidential or sealed or are contained in a confidential addendum. The current manner in which information is filed for a civil case in circuit court would need to be altered to protect sensitive information if remote access to electronic documents is available to the public rather than as restricted by VA. Code § 17.1-293.

*5. How a subscription process may be established to provide a clear definition of the duties of the Office of the Executive Secretary and each circuit court clerk with respect to implementation and operation of the system*

OES could develop, operate and maintain OCRA as a single statewide system for viewing of nonconfidential civil case documents. In doing so, OES would establish an automated subscription process with the capability for online payments of the subscription fee. Each circuit court clerk would be responsible for imaging, maintaining and making available the case records through the system, including properly coding confidential documents to prevent unauthorized access to such records.

If this course of action is mandated, OES would request that the money generated from subscription fees be directed to OES to support the costs associated with the development, maintenance, and support of the system. OES would develop and distribute to the clerks the requirements necessary for implementing case imaging including hardware and server requirements, as it currently does when a court wants to implement CIS. Circuit courts that do not already have the equipment necessary to create or maintain electronic images of case records would need to obtain the necessary equipment.

In recognition of the fact that moving to a statewide, single subscription access to images of civil case records would deprive clerks of the fees they are currently receiving via OCRA subscriptions, the VCCA would request that the General Assembly provide for the initial equipment and ongoing maintenance costs so that OES could provide this service to clerks without having to pass along the costs. Currently, imaging is not mandatory and acquiring CIS is an option for the circuit court clerk. As this is an option, there are costs associated with this application, which include initial set-up, equipment and ongoing maintenance. OES charges the clerks for use of CIS to defray the costs of operation and maintenance of this system.

*6. The estimated one-time and ongoing costs of all circuit courts implementing and operating 1) an electronic case filing system, and 2) one statewide electronic case filing system for use by all circuit courts*

*1) One-time and ongoing costs for all circuit courts implementing and operating an electronic case filing system*

If the current OES systems are used, the one-time cost for all circuit courts to implement and operate an electronic case filing system can be ascertained by determining the number of courts that do not currently have e-filing capability, and the hardware and software costs associated with adopting VJEFS in each of these courts. We cannot determine what the costs would be if courts not currently offering e-filing were to do so through a private vendor. Currently, 35 of 120 circuit courts offer e-filing via VJEFS. OES has been able to ascertain that five courts offer e-filing through private vendors.

The cost for a court to implement VJEFS is determined by calculating the cost for the court to purchase the required hardware and software that will support VJEFS. OES offers a "CIS package," which includes VJEFS within the software, along with customizable hardware options that would provide participating courts with the equipment necessary to scan and print case records. Upon purchase of the CIS package, a court can offer VJEFS at no additional cost to the court. Ninety-three circuit courts currently utilize the CIS package, and OES is in the process of adding CIS capabilities for 8 additional circuit courts (see Appendix C). Thus, there are 101 circuit courts that have (or will soon have) the capability of offering VJEFS at no further cost to the Clerk.

Of the remaining 19 circuit courts that do not operate CIS, 13 do not operate any type of case imaging system, and therefore would have to purchase a CIS package from OES or a technology system from a private vendor to offer e-filing. The total amount necessary for OES to provide the CIS package in these 13 circuit courts, which would also provide e-filing capability, is $53,608 (see Appendix D, Table 1). The six remaining courts operate case imaging systems other than CIS and may offer e-filing through independent systems other than VJEFS. If all six courts offer e-filing through an independent system, no further costs would be necessary to establish e-filing in every circuit court. However, if none of these six courts offer e-filing through an independent system, and the courts opted to offer e-filing through use of VJEFS, the cost to implement CIS and VJEFS in four of the six courts would be $34,688 (see Appendix D, Table 2).[2]

If the current OES systems are used, in addition to the one-time costs, there would be ongoing costs associated with system maintenance. System maintenance would include server upkeep, security updates, scanner support, and software licensing for components of

[2] This amount does not include the cost to convert Fairfax and Alexandria's case management systems to CCMS and CIS. The estimated cost to convert Alexandria Circuit Court and Fairfax Circuit Court to CCMS is unknown and cannot be determined without extensive investigation into and analysis of their existing systems. Also, in consideration of the scale and complexity of converting Fairfax Circuit Court to CCMS, it is anticipated that the cost will be exorbitant and any effort to convert will take more than two years to complete. For these reasons, and because CCMS is required to implement CIS, the costs for converting Alexandria Circuit Court and Fairfax Circuit Court to CIS are not available, and listed as "Not Available" in Table 2 of Appendix D.

applications. Each circuit court that offers CIS is currently responsible for paying fees to OES for maintenance of the system. The fees paid by each individual court vary based on system usage and services provided.

If the current OES systems are used and if interconnectivity among OES systems and private e-filing systems were required, the maintenance costs would increase significantly with each independent system operated by the circuit court clerks and linked through an interface, as the system complexity and potential fail points would increase with each additional system.




*2) One-time and ongoing costs for all circuit courts implementing and operating one statewide electronic case filing system for use by all circuit courts*

VJEFS offers interconnectivity among all participating circuit courts, and thus could serve as the statewide system if every circuit court were to utilize it. Again, we are unable to determine the costs associated with adopting a statewide electronic case filing system provided by a private vendor.

If the current OES systems are used, the one-time costs of a statewide e-filing system is directly related to the amount required for every circuit court to operate the CIS package offered by OES, which includes access to VJEFS for no additional cost. As previously stated, 101 circuit courts already operate, or are scheduled to operate, the CIS package offered by OES. The cost for 13 of the remaining courts to purchase the CIS package would be $53,608. The cost for four of the six remaining courts to purchase CIS would be $34,688. (see Appendix D, Table 2). As noted within Footnote 3, the amounts provided in Appendix D do not include the costs associated with converting Alexandria Circuit Court or Fairfax Circuit Court to CCMS or CIS. The costs associated with converting these two circuit courts to CCMS and CIS would need to be determined to provide the total amount for establishing a fully statewide e-filing system for circuit courts.

Regarding ongoing costs, circuit courts are currently required to pay maintenance costs for their use of CIS. Those costs vary based on services provided and system usage. However, efficiencies would be created in development, training, support, compatibility, and security of the statewide system if all circuit courts were to use the same e-filing system.

If the current OES systems are used, OES would need two additional dedicated personnel to provide technical support to clerks and VJEFS users. Although VJEFS is currently supported by the individual participating circuit clerk's offices, OES staff are often needed to assist with questions and provide support to both clerks and attorneys and their staff who use the system. If VJEFS were to be available statewide, the need for technical support and assistance is expected to increase. The total estimated yearly cost for dedicated VJEFS technical support personnel in OES is approximately $126,000.

If a single statewide e-filing system is mandated by the General Assembly, the costs to the circuit court clerks and the localities who have invested in development, maintenance and operation of private e-filing systems to address the needs of that circuit court are indeterminate but potentially substantial. The loss of ongoing revenue in terms of fees paid to the circuit court clerks is also indeterminate.

In the clerks' experience, when an attorney has a question, they call the clerk where they are trying to e-file something. Therefore, the clerks believe they will need additional employees to handle this additional workload.

*7. The estimated one-time and ongoing costs of implementing and operating a statewide system through which images of nonconfidential records within civil case files in the circuit courts may be viewed by subscribers of that system via a single subscription for statewide access*

The estimated costs are highly dependent upon the type of statewide electronic access system that would be implemented. The estimated costs provided below assume the uniform use of the current OES systems in all circuit courts, including use of CCMS. Integrating independent systems into an OES system through an interface would increase the costs, both for the clerks and OES.

There are currently 19 circuit courts that either do not have an imaging system in place, have no plans of acquiring such a system, or do not use an electronic imaging system that is compatible with systems maintained by OES. The one-time cost to purchase and install hardware for 17 of these 19 courts is approximately $88,296. This estimate does not include the costs for converting Alexandria Circuit Court and Fairfax Circuit Court to CCMS and CIS (see Footnote 3).

Persons seeking secure remote access to electronic court documents within the system maintained by OES would be required to register for a paid subscription service. The cost associated with creating the electronic registration portal includes the cost of programming and

developing this electronic registration feature. The estimated one-time cost to develop an automated and paperless user registration process is approximately $78,000[3].

In addition, if the current OES systems are used, there would be ongoing personnel costs. Two additional record management services personnel would be needed in OES to maintain oversight and assist users in their registration and use of the system. Currently, OCRA is supported by the individual participating circuit clerks but it is expected, if legislation is enacted mandating a statewide system, that support would be provided by OES since clerks would no longer receive the registration fees. Users of the system would be directed to OES for support. In addition, records management services personnel would provide support to circuit clerks regarding document imaging. If the current OES systems are used, the total estimated yearly cost for record management services personnel is approximately $126,000. The costs to the circuit court clerks to operate a statewide e-filing in each circuit court are indeterminate in terms of personnel costs.

If the current OES systems are used, OES would offer semi-annual training sessions to attorneys to demonstrate the system's capabilities and increase public usage of the system. Training would also be offered to circuit court personnel to increase their familiarity with the system and convey best practices. OES estimates yearly training costs to be approximately $10,000.

If the current OES systems are used, based on prior experience with the development and maintenance of applications similar in size and scope, OES would need two full-time development contractors to ensure a high level of security and performance of the application. These dedicated resources would be needed to maintain system security and integrity, ensure ongoing performance, and develop system enhancements. If the current OES systems are used, the estimated yearly cost for two development contractors is approximately $256,000.

*8. The fee schedule for subscribers and how such fee schedule should be established*

If a single statewide system for viewing nonconfidential civil case documents is implemented, such a system should be subscriber based. The fees charged for the service would be applied to the costs of development and maintenance of the system. If OES were to develop and maintain such a system, OES would recommend that the fee structure be established by the Judicial Council, as this would allow for the fee to be adjusted based on a range of determinants in the future without the need for further legislation. The fee schedule to be established would vary depending upon the number of users if such system were to be self-supporting. The VCCA would request that, regardless of whether OES develops and maintains a statewide system, or a private vendor does so, the fee structure be established by the General Assembly.

*9. Any potential loss of revenues by circuit court clerks reasonably attributed to the implementation of one statewide electronic case filing system and a statewide system through*

---

[3] The VITA Security Standard for Remote Access to Court Documents Online would apply to this process and would need to be updated to allow for automated and paperless user registration.

*which images of nonconfidential records within civil case files in the circuit courts may be viewed by subscribers of that system*

It is difficult to estimate the potential loss of revenues by circuit court clerks in this circumstance. Circuit court clerks anticipate an indeterminate loss of revenues due to loss of copy fees, loss of OCRA fees (where applicable), additional expenses to pay OES for these additional technology systems, loss of funds from the clerks' nonreverting local funds and expenses related to imposition of additional duties for Clerks with no new staffing.

The most finite numbers available suggest a statewide loss of $78,714.97 annually from the optional fee charged pursuant to Code § 17.1-258.3 for paper filing when e-filing is available and $286,034.49 in lost revenue from OCRA fees. These numbers were gathered by running a fiscal year 2017 report for the two accounts into which these two types of fees are deposited. The circuit court clerks anticipate an additional indeterminate negative fiscal impact for the reasons stated herein.

If a course of action is taken that removes a revenue stream to the clerks, it could be offset by an increase in technology funding that would allow OES to provide the clerks with OES systems without having to pass along costs for initial hardware, maintenance, and updates. In addition, the VCCA believes that the circuit court clerks need annual appropriations to cover the expense of being on the front line with users of such a system.

## Options

1. Incentivize those courts that do not currently offer e-filing.

The Commonwealth could continue to allow each circuit court clerk to select the technology system for e-filing of civil cases that fits the needs of that circuit court. The General Assembly could incentivize those courts that do not have the technology infrastructure to offer e-filing by funding the costs for those courts, whether this is the OES technology or technology from a private vendor. This would also lay the necessary groundwork for remote access to those courts' case papers. OES and the VCCA believe that e-filing would be more widely adopted if the General Assembly incentivized circuit courts to offer e-filing for civil cases.

OES could offer a single page of web links on its website where practitioners could link to each circuit court's e-filing web page, regardless of whether an individual circuit court clerk uses the OES technology or that of a private vendor. In combination with these efforts, outreach to the Bar to educate and gauge interest in civil e-filing in circuit court could hasten the pace at which e-filing becomes available across the Commonwealth.

2. Adoption of one statewide electronic filing system by all circuit courts.

Option 2A: VJEFS, which was developed by OES, is utilized in 35 circuit courts and could be implemented in an additional 66 courts within six months, and could serve as the single

statewide electronic case filing system, as users of the system can register once and then e-file in any circuit court that uses VJEFS.

Benefits of adopting VJEFS as a single statewide electronic case filing system: There are efficiencies for OES with the operation and support of one e-filing system. VJEFS is already available in 35 circuit courts. An additional 58 circuit courts have, and eight will soon have, the OES technology infrastructure in place to enable them to adopt VJEFS at no additional cost to the clerk. Use of VJEFS provides the assurance of continued service because there is no risk that OES will become insolvent or discontinue support and service as has occurred with commercial vendors.[4]

Challenges of adopting VJEFS as a single statewide electronic case filing system: Although OES provides VJEFS at no additional cost to the clerks, circuit court clerks must have CIS in place to implement VJEFS. There are costs to circuit court clerks associated with the implementation of CIS, which are discussed in Consideration 6 above. As discussed above, clerks who have chosen to invest in private technology systems would lose the benefit of that investment if they were mandated to switch to VJEFS. In addition, both clerks and OES would incur significant costs associated with the conversion and migration of various existing systems to OES systems.

Option 2B: Alternatively, the Commonwealth could seek an outside vendor to provide or develop an electronic case filing system for statewide use in the circuit courts. The VCCA believes that the competitive procurements could request that bids from private vendors accommodate the diverse needs of the circuit courts in the Commonwealth. Benefits of adopting a private technology system for statewide electronic case filing: clerks would have the opportunity to evaluate various types of systems and select one that best fits the clerks' needs.

Challenges of adopting a private technology system for statewide electronic case filing: clerks would likely have difficulty selecting a single system that meets the needs of diverse jurisdictions but the VCCA would advocate that any competitive procurement request private technology vendors to submit proposals that would not limit technology solutions to "one size fits all" systems. In addition, OES would lose the benefit of the investment it has made in the development of existing systems and may incur costs in the process of converting and supporting clerks who would need to transition to a new system.

3. Adoption of a statewide system through which images of nonconfidential records within civil case files in the circuit courts may be viewed by subscribers via a single subscription for statewide access.

OCRA, which was developed by OES and is being utilized in 92 circuit courts, could serve as the statewide system through which images of nonconfidential records within civil case files in the circuit courts may be viewed by subscribers.

---

[4] The Virginia Beach Circuit Court is again using CCMS after the private vendor it used for over six years went out of business and no longer provided updates and support for their system. A great deal of OES resources were expended in the process of transferring the case records back to CCMS. Similar situations have occurred nationally, leaving courts around the country with either incomplete systems or without support for existing systems.

Benefits of adopting OCRA statewide: Subscribers of OCRA would benefit from having access to images of civil case records of circuit courts statewide, as they currently are limited to viewing images for only the circuit courts to which they have a paid subscription. Currently, to access the records of all 92 courts that offer OCRA, subscribers need a subscription with each of the 92 circuit court clerks' offices, which is likely cost prohibitive.

Challenges of adopting OCRA statewide: As discussed above, some circuit court clerks have invested in private technology systems and would lose the benefit of those investments as well as incurring conversion costs if they were required to transition to OCRA. In addition, and as previously explained, the current OCRA system is limited to officers of the court. If made available to the public (which the VCCA does not feel is appropriate), steps would need to be taken to prevent unauthorized access to sensitive information such as social security numbers, dates of birth and financial account numbers. Remote access to records that contain such information is currently allowed by Va. Code § 17.1-293 when secure remote access is restricted to "members in good standing with the Virginia State Bar and their authorized agents, pro hac vice attorneys authorized by the court for purposes of the practice of law and such governmental agencies as authorized by the clerk." To avoid the need for clerks to redact certain information, legislation would need to provide that any petition, pleading, motion, order, decree, agreement of parties, or transcript that is filed in a civil case in circuit court could not contain sensitive information such as social security numbers, financial information that provides identifying account numbers, names of minors, or other information deemed confidential. The legislation would also need to provide that the party that prepares and submits the document that would otherwise contain such information would instead be required to include the confidential or sensitive information on a separate addendum, which would only be made available to the parties, their attorneys, and to such other persons deemed necessary by the court. The legislation would further need to provide that the party who submits documents in circuit court would also be required to ensure that any such information is removed prior to filing with the clerk and that the separate addendum is incorporated by reference within the document. Clerks would need to have the authority to reject any document that does not comply with this requirement and would need to be immune from liability for disclosures that may result from a party's failure to protect the information within documents that are filed with the clerk. OES would also need to be immune from liability for disclosures that may result from a party's failure to protect the information within documents that are available within the system. Due to the need to restrict the public's remote access to sensitive information, only cases filed after the implementation of the above described addendum requirement would be available within the system.

Because centralization of OCRA would result in indeterminate but likely significant lost revenue to circuit court clerks, some thought should be given to how that revenue might be replaced or how the clerks' operating costs for the requisite systems that make remote access to case contents possible might be reduced or eliminated in order to offset that lost revenue stream.

**Appendix A**

The Budget Language stated that "[t]he Executive Secretary shall convene a working group, to include a minimum of five circuit court clerks, to evaluate issues related to statewide adoption of electronic filing of civil cases in circuit courts, and the implementation of a statewide system through which images of nonconfidential records within civil case files in the circuit courts may be viewed by subscribers of that system." In accordance with this language, OES and the VCCA worked together to establish the membership of the Work Group. The following individuals participated in the development of this report.

- Hon. Gayle Ashworth, Clerk, Essex Circuit Court
- Hon. John B. Chappell, Clerk, Dinwiddie Circuit Court
- Hon. Gail P. Clayton, Clerk, Surry Circuit Court
- Hon. Gary M. Clemens, Clerk, Loudoun Circuit Court
- Chip Dicks, Gentry Locke
- Hon. Paul Ferguson, Clerk, Arlington Circuit Court
- Hon. John Frey, Clerk, Fairfax Circuit Court
- Jo Fronfelter, Circuit Court Analyst, OES
- Norma Gates, Circuit Court Services Manager, OES
- Hon. Ed Jewett, Clerk, Richmond City Circuit Court
- Myron McClees, Staff Attorney, OES
- Hon. Kristen N. Nelson, Clerk, York County/Poquoson Circuit Court
- Alisa Padden, Staff Attorney, OES
- Jaime Reyes, Records Management Services Manager, OES
- Hon. Thomas E. Roberts, Clerk, Staunton Circuit Court
- Brandy Singleton, Staff Attorney, OES
- Hon. Tina Sinnen, Clerk, Virginia Beach Circuit Court
- Judy Worthington, Legislative Consultant, Sage Consulting LLC
- Kristi Wright, Director of Legislative and Public Relations, OES

# Appendix B

## Current OES Systems

The Office of the Executive Secretary (OES) has developed and currently maintains both an electronic filing system and a system that provides electronic access to imaged records for use in the circuit courts. Multiple circuit courts provide electronic filing and/or electronic access to images of records within case files, with some clerks using the systems developed by OES, and others may use privately developed or purchased systems.[5] A table detailing the known systems used by each circuit court is provided in Appendix C. Included below is a brief explanation of the OES systems, including their functionality.

*Circuit Case Management System*

The Circuit Case Management System (CCMS) is the operational system maintained by OES that serves as the main case-processing mechanism for participating circuit court clerks' offices and allows clerks to manage numerous office functions. Once clerks enter case information into CCMS, or the information is imported from a separate system, CCMS provides tools that allow clerks to process day-to-day operations, such as creation of an interactive docket, and automatic updating of a master calendar. CCMS has database capabilities that allow for storage and timely retrieval of entered case information, which limits the amount of manual processes that must be conducted by clerks. As cases are processed by the courts, CCMS can automatically generate reports and abstracts for state agencies through interfaces with other state-operated systems. For instance, criminal case information can be transmitted to the Department of State Police by means of an automatically-generated Central Criminal Records Exchange Report after the case is properly updated in CCMS. In addition, CCMS also provides specialized metrics, such as caseload statistics, that can be used by clerks to enhance office operations and efficiency.

Multiple technology systems developed by OES rely upon CCMS' structure. The Virginia Judiciary E-Filing System (VJEFS), Case Imaging System (CIS), and Officer of the Court Remote Access System (OCRA) require use of CCMS before they can be implemented by any circuit court. Currently, all circuit courts except Alexandria Circuit Court and Fairfax Circuit Court use CCMS, which is provided to the clerks by OES at no cost.

*Virginia Judiciary E-Filing System*

VJEFS, which began as a pilot in 2013, allows electronic filing of most civil cases in circuit court and is available for use by members of the Virginia State Bar and their designated staff. VJEFS can be used to track case submissions, receive status and other notifications by email, request service of process, and calculate and pay fees online. For example, when a case is filed in VJEFS, the system automatically calculates the fees for the filing attorney. Once the case is accepted by the clerk, the system creates a receipt in the Financial Accounting System,

[5] Pursuant to Va. Code § 17.1-502, the clerks are authorized to operate their own systems that are independently developed and maintained.

file stamps the document with the time of submission, and sends notification that a document has been filed in the case. If service is requested by the attorney, VJEFS also produces forms for service. The automation of these steps reduces the amount of processing that must be carried out by personnel in the clerk's office.

Currently, 35 of the 120 circuit court clerks use VJEFS as their e-filing system. Any member of the Virginia State Bar who completes the registration process through a participating circuit court clerk's office may file cases in any of the 35 circuit courts that use VJEFS. The ability to e-file is not limited to the operating hours of the circuit court clerk's offices. Cases may be filed in VJEFS weekdays from 7 a.m. to 7 p.m.

Implementation of VJEFS in a circuit court requires that the court use CCMS. This requirement is necessary because of the interaction between the two systems. In addition, a court must also use OES' CIS to offer VJEFS.

*Case Imaging System*

CIS provides circuit courts the ability to create and store electronic documents that are part of a case file. Stored documents can be accessed by the court or the public at the courthouse, or by OCRA subscribers, who can view the documents through the OCRA interface. To view the documents, users can retrieve cases based on various search criteria, including name, case number, file date, or hearing date.

Implementation of CIS requires that the court be a user of CCMS. A court can use CIS after purchasing a "CIS package" from OES, which will include necessary software and hardware to allow for the scanning and printing of case records. Among the software included within the CIS package is VJEFS and OCRA, though not every court that purchases a CIS package opts to use these programs.

*Officer of the Court Remote Access System*

OCRA has been available to circuit courts since July 1, 2011. OCRA allows participating circuit court clerks to grant attorneys, attorneys' agents, pro hac vice attorneys, and government agencies secure remote access to documents in CIS. Users can view all documents for cases associated with the specific circuit court(s) for which they are registered except sealed, juvenile, adoption, and other confidential cases, as well as those documents that are marked confidential or sealed. Each circuit court clerk determines the subscription fee for accessing its documents through OCRA, and subscription fees are paid to and retained by the circuit court clerk. Currently, 92 of the 120 circuit court clerks offer secure remote access through OCRA.

## Appendix C

The following table details the known systems operated by each circuit court. Courts in rows with no shading operate the Court Imaging System (CIS) maintained by OES. Courts that are shaded in blue do not have CIS and have not previously requested a quote for adopting use of CIS. The courts shaded in green are in the process of adopting CIS. These courts have either been sent a quote, signed a quote, or they are awaiting CIS installation. The courts that are shaded red have a third-party case imaging system that is not maintained by OES and have not requested a quote for adopting use of CIS.

| | Court | Case Management System | Case Imaging System | Public Search of Images at Courthouse | OCRA | e-Filing |
|---|---|---|---|---|---|---|
| 1 | Albemarle County | CCMS | CIS | Yes | OCRA | No |
| 2 | Amelia County | CCMS | CIS | Yes | OCRA | No |
| 3 | Amherst County | CCMS | CIS | No | OCRA | No |
| 4 | Augusta County | CCMS | CIS | Yes | OCRA | VJEFS |
| 5 | Bath County | CCMS | CIS | No | OCRA | No |
| 6 | Bedford County | CCMS | CIS | Yes | OCRA | VJEFS |
| 7 | Bland County | CCMS | CIS | No | OCRA | No |
| 8 | Bristol | CCMS | CIS | Yes | OCRA | VJEFS |
| 9 | Buchanan County | CCMS | CIS | No | OCRA | No |
| 10 | Buena Vista | CCMS | CIS | No | OCRA | No |

| | Court | Case Management System | Case Imaging System | Public Search of Images at Courthouse | OCRA | e-Filing |
|---|---|---|---|---|---|---|
| 11 | Campbell County | CCMS | CIS | No | OCRA | No |
| 12 | Caroline County | CCMS | CIS | Yes | OCRA | VJEFS |
| 13 | Carroll County | CCMS | CIS | No | OCRA | VJEFS |
| 14 | Charles City County | CCMS | CIS | Yes | OCRA | No |
| 15 | Charlotte County | CCMS | CIS | Yes | OCRA | No |
| 16 | Chesapeake | CCMS | CIS | Yes | OCRA | VJEFS |
| 17 | Chesterfield County | CCMS | CIS | Yes | OCRA | No |
| 18 | Colonial Heights | CCMS | CIS | No | OCRA | No |
| 19 | Craig County | CCMS | CIS | Yes | OCRA | VJEFS |
| 20 | Culpeper County | CCMS | CIS | Yes | OCRA | No |
| 21 | Danville | CCMS | CIS | Yes | OCRA | VJEFS |
| 22 | Dickenson County | CCMS | CIS | Yes | OCRA | VJEFS |
| 23 | Dinwiddie County | CCMS | CIS | Yes | OCRA | VJEFS |
| 24 | Fauquier County | CCMS | CIS | Yes | OCRA | No |

| | Court | Case Management System | Case Imaging System | Public Search of Images at Courthouse | OCRA | e-Filing |
|---|---|---|---|---|---|---|
| 25 | Floyd County | CCMS | CIS | Requested | OCRA | No |
| 26 | Fluvanna County | CCMS | CIS | Yes | OCRA | No |
| 27 | Franklin County | CCMS | CIS | No | OCRA | No |
| 28 | Frederick County | CCMS | CIS | Yes | OCRA | No |
| 29 | Fredericksburg | CCMS | CIS | Yes | OCRA | VJEFS |
| 30 | Gloucester County | CCMS | CIS | No | OCRA | No |
| 31 | Goochland County | CCMS | CIS | Yes | OCRA | No |
| 32 | Grayson County | CCMS | CIS | Yes | OCRA | VJEFS |
| 33 | Greene County | CCMS | CIS | No | OCRA | No |
| 34 | Greensville County | CCMS | CIS | Yes | OCRA | No |
| 35 | Halifax County | CCMS | CIS | Yes | OCRA | No |
| 36 | Hampton | CCMS | CIS | No | OCRA | No |
| 37 | Hanover County | CCMS | CIS | Yes | OCRA | VJEFS |
| 38 | Henrico County | CCMS | CIS | Yes | OCRA | No |

| | Court | Case Management System | Case Imaging System | Public Search of Images at Courthouse | OCRA | e-Filing |
|---|---|---|---|---|---|---|
| 39 | Henry County | CCMS | CIS | Yes | OCRA | No |
| 40 | Highland County | CCMS | CIS | No | OCRA | No |
| 41 | Hopewell | CCMS | CIS | Yes | OCRA | No |
| 42 | Isle of Wight County | CCMS | CIS | Yes | OCRA | VJEFS |
| 43 | King and Queen County | CCMS | CIS | Yes | OCRA | No |
| 44 | King George County | CCMS | CIS | Yes | OCRA | No |
| 45 | King William County | CCMS | CIS | No | No | No |
| 46 | Lancaster County | CCMS | CIS | Yes | OCRA | No |
| 47 | Lee County | CCMS | CIS | Yes | OCRA | VJEFS |
| 48 | Loudoun County | CCMS | CIS | Yes | OCRA | No |
| 49 | Louisa County | CCMS | CIS | Yes | OCRA | No |
| 50 | Lynchburg | CCMS | CIS | Yes | OCRA | No |
| 51 | Madison County | CCMS | CIS | Yes | OCRA | No |
| 52 | Martinsville | CCMS | CIS | Yes | OCRA | No |

| | Court | Case Management System | Case Imaging System | Public Search of Images at Courthouse | OCRA | e-Filing |
|---|---|---|---|---|---|---|
| 53 | Mecklenburg County | CCMS | CIS | Yes | OCRA | VJEFS |
| 54 | Montgomery County | CCMS | CIS | Yes | OCRA | VJEFS |
| 55 | Nelson County | CCMS | CIS | No | OCRA | No |
| 56 | New Kent County | CCMS | CIS | No | OCRA | No |
| 57 | Newport News | CCMS | CIS | Yes | OCRA | VJEFS |
| 58 | Norfolk | CCMS | CIS | Yes | OCRA | VJEFS |
| 59 | Northampton County | CCMS | CIS | No | OCRA | No |
| 60 | Northumberland County | CCMS | CIS | No | OCRA | No |
| 61 | Orange County | CCMS | CIS | No | OCRA | No |
| 62 | Petersburg | CCMS | CIS | Requested on 4/11/18 | OCRA | No |
| 63 | Pittsylvania County | CCMS | CIS | Yes | OCRA | VJEFS |
| 64 | Portsmouth | CCMS | CIS | Yes | OCRA | VJEFS |
| 65 | Powhatan County | CCMS | CIS | Yes | OCRA | VJEFS |
| 66 | Prince Edward County | CCMS | CIS | Yes | OCRA | No |

| | Court | Case Management System | Case Imaging System | Public Search of Images at Courthouse | OCRA | e-Filing |
|---|---|---|---|---|---|---|
| 67 | Prince George County | CCMS | CIS | No | OCRA | No |
| 68 | Prince William County | CCMS | CIS | Yes | OCRA | VJEFS |
| 69 | Pulaski County | CCMS | CIS | Yes | OCRA | VJEFS |
| 70 | Rappahannock County | CCMS | CIS | Yes | OCRA | No |
| 71 | Richmond | CCMS | CIS | Yes | OCRA | VJEFS |
| 72 | Richmond County | CCMS | CIS | No | OCRA | No |
| 73 | Roanoke City | CCMS | CIS | Yes | OCRA | VJEFS |
| 74 | Roanoke County | CCMS | CIS | Yes | OCRA | VJEFS |
| 75 | Rockingham County | CCMS | CIS | Yes | OCRA | Tyler |
| 76 | Russell County | CCMS | CIS | No | OCRA | No |
| 77 | Salem | CCMS | CIS | Yes | OCRA | No |
| 78 | Shenandoah County | CCMS | CIS | Yes | OCRA | VJEFS |
| 79 | Smyth County | CCMS | CIS | Yes | OCRA | VJEFS |
| 80 | Southampton County | CCMS | CIS | Yes | OCRA | No |

| | Court | Case Management System | Case Imaging System | Public Search of Images at Courthouse | OCRA | e-Filing |
|---|---|---|---|---|---|---|
| 81 | Spotsylvania County | CCMS | CIS | Yes | OCRA | No |
| 82 | Stafford County | CCMS | CIS | Yes | OCRA | No |
| 83 | Staunton | CCMS | CIS | Yes | OCRA | VJEFS |
| 84 | Suffolk | CCMS | CIS | Yes | OCRA | No |
| 85 | Tazewell County | CCMS | CIS | Yes | OCRA | VJEFS |
| 86 | Virginia Beach | CCMS | CIS | Yes | OCRA | No |
| 87 | Warren County | CCMS | CIS | Yes | OCRA | VJEFS |
| 88 | Washington County | CCMS | CIS | Yes | OCRA | VJEFS |
| 89 | Waynesboro | CCMS | CIS | Yes | OCRA | VJEFS |
| 90 | Williamsburg | CCMS | CIS | Yes | OCRA | VJEFS |
| 91 | Winchester | CCMS | CIS | Yes | OCRA | No |
| 92 | Wythe County | CCMS | CIS | Yes | OCRA | No |
| 93 | York County | CCMS | CIS | Yes | OCRA | No |
| 94 | Alleghany County | CCMS | No | No | No | No |

| | Court | Case Management System | Case Imaging System | Public Search of Images at Courthouse | OCRA | e-Filing |
|---|---|---|---|---|---|---|
| 95 | Brunswick County | CCMS | No | No | No | No |
| 96 | Clarke County | CCMS | No | No | No | No |
| 97 | Essex County | CCMS | No | No | No | No |
| 98 | Giles County | CCMS | No | No | No | No |
| 99 | Lunenburg County | CCMS | No | No | No | No |
| 100 | Page County | CCMS | No | No | No | No |
| 101 | Patrick County | CCMS | No | No | No | No |
| 102 | Radford | CCMS | No | No | No | No |
| 103 | Rockbridge County | CCMS | No | No | No | No |
| 104 | Surry County | CCMS | No | No | No | No |
| 105 | Sussex County | CCMS | No | No | No | No |
| 106 | Westmoreland County | CCMS | No | No | No | No |
| 107 | Accomack County | CCMS | E-Legal | Unknown | No | eLegal Case Pro |
| 108 | Appomattox County | CCMS | No | No | No | No |

| | Court | Case Management System | Case Imaging System | Public Search of Images at Courthouse | OCRA | e-Filing |
|---|---|---|---|---|---|---|
| 109 | Botetourt County | CCMS | No | No | No | No |
| 110 | Buckingham County | CCMS | No | No | No | No |
| 111 | Cumberland County | CCMS | No | No | No | No |
| 112 | Mathews County | CCMS | No | No | No | No |
| 113 | Middlesex County | CCMS | No | No | No | No |
| 114 | Nottoway County | CCMS | No | No | No | No |
| 115 | Alexandria | Other | Other | Unknown | No | Unknown |
| 116 | Arlington County | CCMS | Other | Unknown | No | TrueFiling |
| 117 | Charlottesville | CCMS | Conduent | Unknown | No | Unknown |
| 118 | Fairfax County | Other | CPAN | Unknown | No | Unknown |
| 119 | Scott County | CCMS | E-Legal | ClerkePass | No | eLegal Case Pro |
| 120 | Wise County | CCMS | E-Legal | ClerkePass | No | eLegal Case Pro |

**Appendix D**

The following tables detail the costs associated with converting individual courts to CIS. All courts that do not currently operate CIS and are not currently in the process of adopting CIS, are included within the table. Table 1 lists courts that do not have CIS or any other case imaging system and have not previously requested a quote for adopting use of CIS. Table 2 lists the courts that have a third-party case imaging system that is not maintained by OES and have not requested a quote for adopting use of CIS.
Amounts marked with an asterisk (*) include the cost of database and server purchase and licensing.

**TABLE 1:**

| | Court | Case Management System | One-time Conversion Costs |
|---|---|---|---|
| 1 | Alleghany County | CCMS | $2,700.00 |
| 2 | Brunswick County | CCMS | $1,700.00 |
| 3 | Clarke County | CCMS | $1,700.00 |
| 4 | Essex County | CCMS | $500.00 |
| 5 | Giles County | CCMS | $500.00 |
| 6 | Lunenburg County | CCMS | $2,300.00 |
| 7 | Page County | CCMS | $6,720.00 |
| 8 | Patrick County | CCMS | $5,700.00 |
| 9 | Radford | CCMS | $500.00 |
| 10 | Rockbridge County | CCMS | $3,300.00 |

| | Court | Case Management System | One-time Conversion Costs |
|---|---|---|---|
| 11 | Surry County | CCMS | $25,088.00* |
| 12 | Sussex County | CCMS | $1,200.00 |
| 13 | Westmoreland County | CCMS | $1,700.00 |
| **TOTAL** | | | **$53,608.00** |

**TABLE 2:**

| | Court | Case Management System | CIS or Other? | One-time Conversion Costs |
|---|---|---|---|---|
| 1 | Alexandria | Other | Other | Not Available |
| 2 | Arlington County | CCMS | Other | $4,300.00 |
| 3 | Charlottesville | CCMS | Conduent | $24,988.00* |
| 4 | Fairfax County | Other | Other | Not Available |
| 5 | Scott County | CCMS | E-Legal | $2,700.00 |
| 6 | Wise County | CCMS | E-Legal | $2,700.00 |
| **TOTAL** | | | | **$34,688.00** |

# EXHIBIT 4

**From:** Bob Smith
**To:** Daniel McBryde
**Subject:** Re: Fw: OCRA and provision of documents from a case to a client or person who is involved in the case
**Date:** Friday, March 6, 2015 1:38:00 PM
**Attachments:** graycol.gif

---

Go ahead and email Kristi, Eddie Macon and Norma

Daniel McBryde---03/06/2015 10:16:48 AM---So we do need to get Kristi and others involved to change the verbiage, who provides legal advice to

From: Daniel McBryde/OES/VaJud
To: Bob Smith/OES/VaJud@VaJud,
Date: 03/06/2015 10:16 AM
Subject: Re: Fw: OCRA and provision of documents from a case to a client or person who is involved in the case

---

So we do need to get Kristi and others involved to change the verbiage, who provides legal advice to clerks?

Let me know how you want to proceed. We can draft and email or be available for a meeting if needed.

Who should respond to Ed?

Thanks,
Daniel

Derek Kestner---03/05/2015 10:41:22 AM---Daniel - The original version of OCRA's Terms and Conditions was taken from VITA language for SRA an

From: Derek Kestner/OES/VaJud
To: Daniel McBryde/OES/VaJud@VaJud
Cc: Bob Smith/OES/VaJud@VaJud, Justin Griffin/OES/VaJud@VaJud, Peter Trauernicht/OES/VaJud@VaJud, RMS
Date: 03/05/2015 10:41 AM
Subject: Re: Fw: OCRA and provision of documents from a case to a client or person who is involved in the case

---

Daniel -

The original version of OCRA's Terms and Conditions was taken from VITA language for SRA and modified by me. After about 5 courts were on the system Eddie, Katya, Kristie and Steven all reviewed the system and had major concerns about many elements of OCRA. Changes were then made to the language and features at that time, though I don't recall the details of the changes. For that reason, I would state that the disclaimer and other language has gone through the official process but not the way we do it today.

I think 17.1-293 (E)(5) provides enough direction for Ed to feel comfortable that the information may be legally provided to the client by the OCRA subscriber, but that puts the burden on the subscriber and ultimately Ed to enforce if needed as Mr. Baker points out. If you recall, the original plan for the Clerks that initiated OCRA was to have each case assigned in CIS to a specific attorney and an OCRA subscriber would only be able to see those cases --- specifically because of the allowance made in 17.1-

293 (E)(5). Michele McQuigg and other didn't like that plan for several reasons and sponsored legislation that ultimately added 17.1-293 (E)(7). I believe that Ed could update his agreement to clearly state that subcribers are permitted to distribute the documents to their clients or potential clients that are parties to the case, or if he would prefer then we could request Public Relations review the "OR IN ANY WAY REDISTRIBUTED TO ANY THIRD PARTY" clause.

17.1-293(D)(5). Providing secure remote access to any person, his counsel, or staff which counsel directly supervises to documents filed in matters to which such person is a party;

** Please note that Mr. Baker references 17.1-293(D) in his email, but I believe he meant (E) and my email is based on that assumption.

Derek M. Kestner
Information Systems Analyst / Project Coordinator
Juvenile & Domestic Relations Court Imaging, Records Management Team
Department of Judicial Information Technology, Office of the Executive Secretary
Supreme Court of Virginia
804.786.1789
dkestner@courts.state.va.us

"We must never forget that the only real source of power that we as judges can tap is the respect of the people." -- Thurgood Marshall

Daniel McBryde---03/04/2015 06:06:36 PM---There is an attorney in Richmond who has an issue with this part of the OCRA disclaimer: I ACKNOWLED

From: Daniel McBryde/OES/VaJud
To: Peter Trauernicht/OES/VaJud@VaJud, Justin Griffin/OES/VaJud@VaJud, Derek Kestner/OES/VaJud@VaJud
Cc: RMS, Bob Smith/OES/VaJud@VaJud
Date: 03/04/2015 06:06 PM
Subject: Fw: OCRA and provision of documents from a case to a client or person who is involved in the case

---

There is an attorney in Richmond who has an issue with this part of the OCRA disclaimer:

I ACKNOWLEDGE AND AGREE THAT ANY DATA ACCESSED IN THIS SYSTEM MAY NOT BE SOLD OR POSTED ON ANY OTHER INTERNET
WEB SITE OR IN ANY WAY REDISTRIBUTED TO ANY THIRD PARTY.

Derek - was the OCRA disclaimer an "RMS" policy, or was it sent through the OES policy group?

If it was made up by us, then we might be able to just "adjust" it to address the concerns - otherwise, we will need to send it through the OES policy group for approval.

Peter / Justin - what are your thought on the matter?

Thanks,
Daniel

----- Forwarded by Daniel McBryde/OES/VaJud on 03/04/2015 05:58 PM -----

From: "Jewett, Edward - Circuit Court" <Edward.Jewett@richmondgov.com>
To: <dmcbryde@courts.state.va.us>, <bsmith@courts.state.va.us>
Cc: "Hargrove, Cecelia M. - Circuit Court" <Cecelia.Hargrove@richmondgov.com>, "Taylor, Tammy J. - Circuit Court"

<Tammy.Taylor@richmondgov.com>
Date: 03/04/2015 11:10 AM
Subject: FW: OCRA and provision of documents from a case to a client or person who is involved in the case

---

gentlemen- how do you think we should respond to the below email?

Thanks,

Ed

Edward F. Jewett
Clerk of Circuit Court
City of Richmond
400 N 9th Street., Richmond, VA 23219
804-646-6506

WARNING: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

-----Original Message-----
From: Taylor, Tammy J. - Circuit Court
Sent: Tuesday, March 03, 2015 4:19 PM
To: Jewett, Edward - Circuit Court; Hargrove, Cecelia M. - Circuit Court
Subject: FW: OCRA and provision of documents from a case to a client or person who is involved in the case

additional comment from Mr. Baker...

Tammy J. Taylor, Asst. Chief Deputy Clerk
Accounting and Administration
Circuit Court of the City of Richmond
400 N. 9th Street, Rm. 101, Richmond, VA 23219
Tammy.Taylor@richmondgov.com
office (804) 646-6506 / direct (804) 646-0837
fax: (804) 646-6562

WARNING: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

-----Original Message-----
From: Keith Barker [mailto:keithbarker@richmondlaw.net]
Sent: Tuesday, March 03, 2015 3:34 PM
To: Taylor, Tammy J. - Circuit Court
Subject: Re: OCRA and provision of documents from a case to a client or person who is involved in the case

S. Keith Barker wrote:
I would also note that by statute there is a definition of "Confidential court records". It states as follows:
17.1-295 "Confidential court records" means any civil or criminal record maintained by a clerk of the circuit court designated by this Code as confidential or any such record sealed pursuant to court order.

On 3/3/2015 3:27 PM, Keith Barker wrote:
> 3/3/2015
> S. Keith Barker wrote:
> Per our call questions arise as a result of the certification page that
> is on the website that states:
>
> "Terms of Service
> I, Barker, Samuel, certify in accordance with Virginia Code § 17.1-293
> that I am either an attorney in good standing with the Virginia State
> Bar, an authorized agent of such an attorney, an attorney currently
> admitted to practice law in Virginia on a pro hac vice basis, or an
> authorized representative of a governmental agency authorized by the
> clerk to access the system. I ACKNOWLEDGE AND AGREE THAT ANY DATA
> ACCESSED IN THIS SYSTEM MAY NOT BE SOLD OR POSTED ON ANY OTHER INTERNET
> WEB SITE OR IN ANY WAY REDISTRIBUTED TO ANY THIRD PARTY. I further
> acknowledge and agree that the Circuit Court Clerk reserves the
> discretion to deny Officer of the Court remote access to ensure
> compliance with the Code of Virginia." [Caps added to indicate].
>
> It appears the statement is made by the OCRA administrators at the Va.
> Sup Ct and it quotes a part of Code § 17.1-293(D). Further the
> certification clearly leaves the enforcement of violations up to the Clerk.
> I kindly request that the Clerk please give me guidance about
> supplying a document I obtain from the Court's records to a client who
> is a party in the case from which I get records or a records custodian
> who seeks my advice about a case in which a s.d.t. has been issued.
> Please bear in mind that the Sup Ct. statement in caps above does not
> include another relevant part of the same subsection of Code §
> 17.1-293(D), which states "However, the data accessed by secure
> remote access may be included in products or services provided to a
> third party of the subscriber provided that (i) such data is not made
> available to the general public and (ii) the subscriber maintains
> administrative, technical, and security safeguards to protect the
> confidentiality, integrity, and limited availability of the data." Code

```
> § 17.1-293(D).
> Several question arise including
> 1. As to a client being advised about a case, whether as a party or
> records custodian who received an s.d.t, could the subscriber send a
> copy of the record effecting advice to that client?
> 2. If the answer to question 1 above is "yes" what would the clerk
> consider to be "to protect... the administrative, technical, and
> security safeguards to protect the "integrity, and limited availability
> of the data" per 17.1-293(D)(ii)?
> 3. If the answer to question 1 above is "yes" what would the clerk
> consider to be some of the means that should be used "the
> administrative, technical, and security safeguards" used to protect the
> "confidentiality of the data" per 17.1-293(D)(ii), IF the data in
> subject to public access anyhow? That would address the situation where
> the data is not confidential and sealed by the court order and any
> member of the public could walk up to the counter and get a copy.
> I very much appreciate your guidance on these matters. Thank you.
> S. Keith Barker, P.C.
> (o) 804-934-0550
> (fax) 804-346-5338
> 4908 Dominion Boulevard, Suite K
> Glen Allen, VA 23060
>
> On 3/3/2015 12:11 PM, Taylor, Tammy J. - Circuit Court wrote:
>> Samuel Keith Barker, Esq.
>>
>> 3/3/15
>>
>> Please find below the user name and password assigned to you for Officer
>> of the Court Remote Access to the case imaging system (OCRA) of the
>> Circuit Court of the City of Richmond, Virginia. Confidentiality of this
>> information is governed by the Subscriber agreement and by the laws of
>> the Commonwealth of Virginia.
>>
>> *Instructions are included with this communication, as an attachment.*
>> Additional instructions can be located at
>> https://sharepoint.richmondgov.com/circuitcourt under the tab OCRA.
>>
>> User Login: keithbarker@richmondlaw.net
>>
>> Password: (use your Henrico password)
>>
>> Bar no./authorized Court number: 19513
>>
>> Start date for account: 3/2/15
>>
>> Expiration date for account: 3/2/16
>>
>> ** NOTICE REGARDING LOGIN INFORMATION: If you are currently subscribed
>> to OCRA IN MORE THAN ONE COURT and have been assigned another passcode
>> and/or authorized court number from another court, you may need to login
>> with the most recent passcode and/or authorized court number you have
>> received from the last Court you subscribed to. Once logged in, you
>> will be able to select the Court you wish to view records from.
>>
>> __
>>
>> This office must be notified immediately should any of the information
>> provided in the Subscriber’s Application change, including, but not
>> limited to, termination of your current employment and/or you are no
>> longer a member in good standing of the Virginia State Bar.
>>
>> Pursuant to the Terms of the Subscriber Agreement for Remote Access to
>> Richmond City’s Circuit Court Case Imaging System, you may NOT share
>> passwords or login credentials with anyone for any reason. Access is
>> strictly one username login for one individual Subscriber.
>>
>> The Clerks Office can only offer limited assistance in troubleshooting
>> problems associated with OCRA. For assistance, please contact Tammy
>> Taylor at Tammy.Taylor@richmondgov.com
>> <mailto:Tammy.Taylor@richmondgov.com> or 804-646-6506.
>>
>> **** EFFECTIVE 10/1/13 - E-FILING IS AVAILABLE FOR CIVIL ACTIONS
>> https://sharepoint.richmondgov.com/circuitcourt
>>
>> Yours truly,
>>
>> Edward F. Jewett, Clerk, Circuit Court of the City of Richmond.
>>
>> */Tammy J. Taylor, Asst. Chief Deputy Clerk/*
>>
>> */Accounting and Administration/*
>>
>> */Circuit Court of the City of Richmond /*
>>
>> */400 N. 9th Street, Rm. 101, Richmond, VA 23219/*
>>
>> */Tammy.Taylor@richmondgov.com/*
>>
>> */office (804) 646-6506 / direct (804) 646-0837/*
>>
>> */fax: (804) 646-6562/*
>>
>> *WARNING: This communication with its contents may contain confidential
>> and/or legally privileged information. It is solely for the use of the
>> intended recipient(s). Unauthorized interception, review, use or
>> disclosure is prohibited and may violate applicable laws. If you are
>> not the intended recipient, please contact the sender and destroy all
>> copies of the communication. *
>>
>
```

--
NOTICE
The information contained in this transmission and other transmissions from this office, (including all attachments, or retransmissions) is strictly confidential and intended only for the person(s) to whom it is addressed. The information contained herein or sent at any other time is privileged under the work product and/or attorney client privilege or other applicable law. If the reader of this message is not an intended recipient as indicated by the context, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately [1] notify us by calling the law offices of S. Keith Barker, P.C. 804-934-0550 or by return email [keithbarker@richmondlaw.net] or by fax (804-346-5338) and [2] destroy and delete the original and all copies of this email. Thank you. (c) S. Keith Barker, P.C. 2010, all rights reserved.
NOTICE: THE SCOPE OF OUR ENGAGEMENT DOES NOT INCLUDE TAX ADVICE OF ANY KIND. FURTHER as to IRS Circular 230 Disclosure: Any statements regarding federal tax law contained in this communication (including any attachments) are not intended or written to be used, and cannot be used, for the purpose of avoiding penalties that may be imposed by the IRS on the taxpayer or for promoting, marketing or recommending to another party any transaction or tax-related matter addressed herein.

UNITED STATES DISTRICT COURT
For the Western District of Virginia
Abingdon Division

| | | |
|---|---|---|
| COURTHOUSE NEWS SERVICES, et al., | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:25-cv-00075 |
| | ) | |
| KARL R. HADE, in his official capacity as Exec. Sec'y of the Office of Exec. Sec'y of the Supreme Ct. of Va., *et al.* | ) | |
| | ) | |
| *Defendants.* | ) | |

**REPLY IN SUPPORT OF DEFENDANT KARL R. HADE'S**
**RULE 12(b)(1) AND RULE 12(b)(6) MOTION TO DISMISS**

The Defendant, Karl R. Hade ("Hade"), by counsel, submits this reply in support of his Rule 12(b)(1) and Rule 12(b)(6) Motion to Dismiss.

I. INTRODUCTION

Plaintiffs direct this Court's attention to a number of cases except the one that truly dictates the outcome of the current lawsuit: *Courthouse News Serv. v. Smith*, 126 F.4th 899 (4th Cir. 2025), which held that the general public, including Courthouse News Service (CNS), does not have a constitutional right to access digital court records available on OCRA. CNS, now joined by Lee, cannot reckon with that holding, because if they have no constitutional right to access the digital files on OCRA through direct subscription, then they surely have no constitutional right to access them indirectly, through a proxy.

II. ARGUMENT

**A. <u>Neither Lee Enterprises Incorporated nor Lee BHM LLC are proper parties.</u>**

As a threshold issue, Plaintiffs have not correctly associated the proper entities to state a claim on behalf of the publisher of various newspapers throughout Virginia. First, Lee Enterprises, Incorporated ("LEI") is not a proper party to this action. The first sentence of the Complaint alleges that Lee BHM LLC ("BHM") is the publisher of various papers throughout Virginia, "Plaintiffs Lee Enterprises, Incorporated and its wholly owned subsidiary, Lee BHM LLC, publisher of, among others, the *Richmond Times-Dispatch*, *The Roanoke Times*, *Bristol Herald Courier*, *Lynchburg News and Advance*, *Fredericksburg Free Lance Star* and *The Daily Progress* in Charlottesville (collectively, "Lee")." ECF 1 at 2. These allegations indicate that LEI and BHM are two related companies, and that one of those companies, BHM, publishes various papers throughout the Commonwealth. Nowhere in the Complaint do the plaintiffs state "particularized allegations of fact supporting [LEI's] standing to sue." *Carroll v. New People's Bank, Inc*., No. 1:17-cv-0044, 2018, U.S. Dist. LEXIS 57916, *3 (W.D. Va. April 5, 2018) (citing *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990)).

In response, the plaintiffs chide Hade for "misreading" the Complaint. They assert that because the Complaint "defines both Lee plaintiffs collectively as 'Lee,' and alleges the collective 'Lee' publishes the Virginia newspapers," the plaintiffs have plausibly pleaded standing. ECF 48 at 16. Apparently uncomfortable with this position, however, the plaintiffs attempt to raise factual allegations outside the Complaint to buttress their claimed standing. *Id*. The declaration submitted by the plaintiffs raises new facts not set forth in the Complaint and describes accounting practices that blur the distinct corporate existence of LEI and BHM. ECF 48-1 at 1.

Faced with these new facts, Hade asserts now that both BHM and LEI lack standing to pursue claims in this case.

**1. A defendant may raise factual challenges to a plaintiff's claim of standing.**

Hade is procedurally entitled to raise evidence in support of his standing challenge. In the Fourth Circuit, a defendant may challenge subject-matter jurisdiction in one of two ways: facially or factually. *See Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). In a facial challenge, the facts alleged in the complaint are taken as true. *Id.* In a factual challenge, however, the defendant may challenge the veracity of the jurisdictional allegations in the complaint, and this Court may "go beyond the allegations of the complaint" to determine if there are facts to support standing. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). *See also Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) ("For a factual challenge, on the other hand, the court may go beyond the complaint to resolve the disputed jurisdictional facts.") (citation omitted).

"When, as here, a defendant challenges the existence of subject matter jurisdiction in fact, the plaintiff bears the burden of proving the truth of such facts by a preponderance of the evidence." *See Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982) ("The burden of proving subject matter jurisdiction on a motion to dismiss is on the plaintiff, the party asserting jurisdiction."). *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347-48 (4th Cir. 2009). Thus the Plaintiffs must show that the LEI and BHM are the correct entities to bring a claim based on standing they are asserting that arises from being the publisher of the Virginia newspapers listed in the complaint.

**2. New factual evidence indicates LEI and BHM do not have standing to sue as publishers of the alleged Virginia-based newspapers.**

LEI and BHM are likely not proper parties. LEI is not registered with the Virginia State Corporation Commission ("SCC") to transact business in the Commonwealth. ***See* Ex. 1**.[1] Exhibit 1 shows that no company named "Lee Enterprises, Incorporated" is registered with the SCC. The only corporation named "Lee Enterprises" is a now defunct entity formerly headquartered at a residence in Henrico County. Similarly, the SCC's records do not indicate that "Lee BHM LLC" is registered with the SCC, though a search does reveal that "Lee BHM Corp." is registered with the SCC. ***See* Ex. 2**. That corporation also holds fictitious name certificates for numerous publications, including those referenced in the Complaint. *Id.*

Lee BHM Corp., who is not a party to this action, was a party to a recent action in this district. *See Conlon v. Baber,* No. 5:23-cv-0040 (W.D. Va. 2023). David Lacy, who is mentioned throughout the Complaint as counsel for Lee, was counsel of record for Lee BHM Corp. in that case. Moreover, in that case, Lacy indicated that he represented "Lee BHM Corp. d/b/a *The Daily Progress*." Motion to Dismiss, *Conlon v. Baber,* No. 5:23-cv-0040, ECF 38 at 1 (W.D. Va. Aug. 15, 2023). **Ex. 3**. Lacy also represented "Lee BHM Corp. Publisher of the *Richmond Times Dispatch*" as an interested party in a criminal matter in the Eastern District of Virginia. *See* Docket Sheet, *USA v. Ruiz*, 3:22-cr-00038 (E.D. Va. 2022). ***See* Ex. 4**.

Lee BHM Corp. has also been involved in Virginia state court litigation. Lacy represented "Lee BHM Corp., publishers of the *Richmond Times Dispatch*" in a mandamus proceeding in Henrico County Circuit Court. *In re: Public Access to November 22, 2021 Transfer Hearing Relating to the Death of Lucia Bremer*, CL21-7567, Henrico County Circuit

---

[1] Exhibits 1 and 2 were obtained from a website operated by the Virginia State Corporation Commission. *See* https://cis.scc.virginia.gov/EntitySearch/Index (last visited March 18, 2026).

Court, Nov. 29, 2021. **Ex. 5**. Mr. Lacy also represented "Lee BHM Corp., d/b/a Free Lance Star Publishing" in a civil matter in Spotsylvania County Circuit Court. *Brubaker v. Epps*, CL23-2210, Spotsylvania County Circuit Court, July 12, 2023. **Ex. 6**.

Finally, the Form 10-K Annual Report submitted by LEI to the United States Securities and Exchange Commission lists "Lee BHM Corp." as a subsidiary but makes no mention of "Lee BHM LLC." Annual Rpt. at 91. https://investors.lee.net/static-files/a595a4e4-39a9-4d66-bdad-a38a538a27d1 (last visited 3/10/2026).

All of the above facts point to the conclusion that "Lee BHM Corp.," not "Lee BHM LLC" is the publisher of the various news publications employing reporters who seek access to records in this case. If this is correct, then Lee BHM LLC lacks standing, because it does not transact business in Virginia. Likewise, LEI would lack standing because LEI's only connection to this case is through "Lee BHM LLC" according to the Complaint and the Plaintiffs' memorandum opposing the motions to dismiss.

In any event, BHM, as a limited liability company, cannot maintain this lawsuit unless and until it registers with the SCC. Va. Code § 13.1-1057. Additionally, if LEI transacts business in Virginia, it must obtain a certificate of authority from the SCC. Va. Code § 13.1-757.

Accordingly both BHM and LEI are improper plaintiffs in the lawsuit at bar and Hade respectfully requests that they be dismissed based on the above facts. Furthermore, any facts or claims arising from their status as publishers of the named Virginia papers should be struck from the complaint and disregarded.

**B. Hade is not a proper party.**

Hade is also not a proper party to a suit seeking an injunction of the Dissemination Restriction for the simple reason that the statute at issue does not give anyone but the circuit

court clerks authority to enforce the restriction. Code § 17.1-293(H)(" . . . and the clerk, in his discretion, may deny secure remote access to ensure compliance with these provisions . . ."). Hade's lack of authority to enforce the Dissemination Restriction is a much clearer question of law than the Access Restriction, which simply creates an exception to subsection B's redaction requirements if court records available on the internet are only available via secure remote access for Virginia-barred attorneys and other enumerated people. Code §§ 17.1-293(B), (E)(7). But for the Dissemination Restriction, it is a clear question of law: only the clerk has authority to enforce the restriction. Therefore, an injunction against Hade as the Executive Secretary would not affect the enforcement of the Dissemination Restriction. There is no additional factual development necessary, nor can additional facts change this simple statutory reality. Only the clerk can authorize the revocation of access to his jurisdiction's OCRA database to enforce the prohibition against selling or disseminating digital court records downloaded from OCRA to third parties. Hade is not a proper party and is properly dismissed with prejudice.

**C. There is no right to receive digital court records downloaded from OCRA.**

Plaintiffs' case also fails to state a claim. Plaintiffs begin by attempting to relitigate the holding in *Smith* that they have standing to challenge Code § 17.1-293(H) ("the Dissemination Restriction") on the basis that the Dissemination Restriction impairs their constitutional right to "gather news." ECF 48, 11. This is directly contradicted by the binding authority in the Fourth Circuit's opinion in *Smith*, which held that "The Dissemination Restriction does not impose any restraint on Courthouse News's speech, because it applies only to individuals with remote online access to court records. Courthouse News does not currently have such access, and we have determined that it is not constitutionally entitled to receive that access." *Smith*, 126 F.4th at 917.

In making their argument that the Dissemination Restriction directly impairs their rights, Plaintiffs claim that the Dissemination Restriction is a restriction on "access to people or records with information about civil cases." ECF 48, 11. The right of access, however, was thoroughly litigated in *Smith* and CNS lost, with the Fourth Circuit affirming the district court's holding that Virginia's limitation on the general public's access to online digital court records was a reasonable time, place, and manner restriction. *Smith*, 126 F.4th at 916. The Plaintiffs are not unreasonably or unconstitutionally restricted in their access to the records, because they are available at the courthouse during business hours. *Id.* Therefore, the Fourth Circuit has already held that CNS (and Lee, which is identically situated) "lacks standing to challenge [the Dissemination] restriction." *Id.* at 917. That holding remains binding on this Court.

The Plaintiffs are, therefore, restricted to arguing that they have standing to challenge the Dissemination Restriction because they are indirectly harmed "by hindering [their] ability to acquire electronic court records from attorneys with OCRA access." *Id.* The Court held that to make that argument, CNS would have to "show that there exists a speaker willing to convey the information" to them. *Id.* Plaintiffs purport to have found such a speaker, in David Lacy. ECF 48, 14. Because Plaintiffs can claim only a derivative injury, *Smith*, 126 F.4th at 917, then if Plaintiffs have failed to adequately allege that the law violates the free speech rights of Lacy, and other lawyers like him who would be willing to share downloaded pleadings from OCRA but for the dissemination restriction, then Plaintiffs have failed to state a basis to challenge the law even using a derivative injury.

**D. <u>Code § 17.1-293(H) regulates lawyer conduct, with only an incidental burden on speech.</u>**

As a threshold question, Plaintiffs must first adequately allege that the Dissemination Restriction regulates speech and not professional conduct with only an incidental burden on

speech. The nature of the regulation and the justification and purposes for the regulation receive different levels of scrutiny. *360 Virtual Drone Servs. LLC v. Ritter*, 102 F.4th 263, 271 (4th Cir. 2024). Plaintiffs argue that the Dissemination Restriction is a content-based regulation of speech that should be subject to strict scrutiny. The Dissemination Restriction is, however, a regulation of professional conduct that only incidentally impacts speech, therefore Fourth Circuit precedent dictates that it is subject to "a more relaxed form of intermediate scrutiny that mandates only that the restriction be 'sufficiently drawn' to protect a 'substantial' state interest." *Id.* Because the Dissemination Restriction applies only to subscribers who receive OCRA access as licensed Virginia attorneys and others who qualify as "officers of the court" and it is necessary to enforce the constitutional access restriction that was upheld in *Smith*, the Dissemination Restriction easily passes relaxed intermediate scrutiny.

**1. The statute by its plain language regulates the sharing of digital files, not the contents of court records**.

The statute taken as a whole, rather than just the Dissemination Restriction in isolation, is focused on "Posting and availability of certain information on the Internet." Code § 17.1-293. The statute lists six types of information that must be redacted from court records if, and only if, they are posted on the Internet. Code § 17.1-293(B). The information is not restricted if the public accesses the "original document" at the courthouse. Code § 17.1-293(D). There are a number of exemptions to the redaction requirement, including in relevant part when the information is posted as part of "secure remote access to nonconfidential court records . . . to members in good standing with the Virginia State Bar" and their agents and certain government agencies. Code § 17.1-293(E)(7) [the "Access Restriction"].

At issue in the current litigation is the Dissemination Restriction, Code § 17.1-293(H). The Dissemination Restriction prohibits "any data accessed by secure remote access to be sold or

posted on any other website or in any way distributed to any third party." Plaintiffs argue this means that a subscriber cannot disclose any of the information in a court pleading that was accessed via OCRA in addition to not disseminating the digital court file itself, which involves a tortured reading of what the statute means by "data." ECF 1, ¶ 79 (claiming that "OCRA's rules prevented Lacy from proving even a summary of the allegations in a pleading accessed via OCRA), ¶ 81 (alleging Lacy refused to provide a reporter "the complaint or the information requested about the complaint" because of "OCRA's restrictions."), ¶ 82 (alleging Lacy refused to provide copies of pleadings or information from pleadings because of the Dissemination Restriction), ¶ 84 (alleging that Lacy refused to "summarize what [a] petition alleged and counsel's contact information" because it "could be construed as improper circumvention of OCRA"), ¶ 85 (alleging that Lacy would not summarize a pleading via email because of "OCRA's terms"); ECF 48, 38 (arguing that the Dissemination Restriction's use of the word "data" means that a subscriber cannot discuss the contents of a pleading because he downloaded it from OCRA).

Plaintiffs deliberately use a misleading and overly broad definition of "data" to construe the Dissemination Restriction to apply to subscriber speech and not just the act of sharing digital files themselves. ECF 48, 38. Even Plaintiffs' own dictionary source, Dictionary.com, defines "data" first as "information in digital format, as encoded text or numbers, or multimedia images, audio, or video. "Data," Dictionary.com/browse/data (last visited March 17, 2026). The secondary definition is the broader "a body of facts; information" cited by Plaintiffs. *Id.*

The statute at issue is clearly referring to information in a digital format, because the entire statute governs the sharing of court records on the internet. It enacts specific restrictions and redaction requirements for records available online, particularly when they are publicly

accessible and not restricted in an access-secured database available to lawyers and court personnel. Code § 17.1-293. The statute does not purport to regulate the sharing of information in court records more generally, just digital files accessible through the internet. *Id.*

Returning to the plain meaning of "data," the more authoritative Merriam-Webster dictionary defines "data" as follows:

> 1) factual information (such as measurements and statistics) used as a basis for reasoning, discussion, or calculation;
>
> 2) information in digital form that can be transmitted or processed; and
>
> 3) information that is output by a sensing device or organ and that must be processed to be meaningful.

https://www.merriam-webster.com/dictionary/data (last visited March 17, 2026). Merriam-Webster's definition combined with the commonsense context of the statute make it clear that the Dissemination Restriction refers to the actual digital files downloaded from OCRA, not reading the content of pleadings over the phone to a reporter, or providing an original summary of the information learned in a court pleading. After all, identical records are available during business hours at the courthouse. There would be no public policy reason to restrict lawyers from sharing the information about the case one can glean from reading the pleading.

Even if the plain meaning of the statute were not clear, however, the cannon of constitutional avoidance would dictate that this Court interpret the statutory language to avoid an unconstitutional result. *See Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018). The cannon of constitutional avoidance is a statutory interpretation principle that is used when, and only when, "after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction." *Id.* When confronted with multiple ways to interpret the plain meaning of a statute, then a court must choose the construction of the language of the statute that is "fairly possible by which the [constitutional] question may be avoided." *Id.* (internal quotation omitted).

This does not mean re-writing the statute, but instead, if presented with two reasonable constructions of the statutory language, choosing the one that avoids a constitutional issue.

The Dissemination Restriction applies to sharing digital files that are particularly vulnerable to data mining by its plain language, which restricts access to court records that have not had certain types of identifying information redacted. Code §§ 17.1-293(B), 17.1-293(E)(7). The plain meaning of the Dissemination Restriction is to prevent lawyers with OCRA access from providing public access to digital court files that have not had the information listed in subsection B redacted, which would defeat the purpose of the statute. In light of the plain meaning of the word data and the principle of constitutional avoidance, the principles of statutory interpretation dictate that the plaintiffs' overly broad and unconstitutional reading of the Dissemination Restriction should be rejected.

**2. The Dissemination Restriction is a regulation of professional conduct.**

Understanding the language of the statute is fundamental to the analysis of whether Plaintiffs have alleged that OCRA subscriber David Lacy's free speech rights are infringed by the Dissemination Restriction. The Dissemination Restriction is a regulation of professional conduct for those "members in good standing with the Virginia State Bar and their authorized agents" and others who qualify for OCRA access pursuant to Code § 17.1-293(E)(7) to prevent them from providing public access to records by selling or posting the records on a website or distributing the digital records another way to third parties who do not qualify to obtain OCRA access directly. To the degree this creates a burden on speech, it is incidental to the regulation of the conduct of professionals given privileged access to records with sensitive information in a format that makes the records particularly vulnerable to data mining and exploitation. *Smith*, 126 F.4th at 911-12.

The Dissemination Restriction easily passes the Fourth Circuit's test for a regulation of professional conduction that only incidentally burdens speech. *Ritter*, 102 F.4th at 278. The "speech" being regulated, namely, providing third party access to digital court records that are vulnerable to data mining in a way that paper records viewed at a courthouse are not, carries economic, legal, and privacy consequences. *See Smith*, 126 F.4th at 911-12. The transmission of these records as alleged by Plaintiffs in the case at bar is in private conversations between a single attorney and various reporters. The Dissemination Restriction is not content-based at all and therefore does not "seek[] to quell unpopular or dissenting speech," but rather regulates the medium of digital court files, regardless of content (other than that the records are not redacted in compliance with Code § 17.1-293(B)). In the simplest terms, the Dissemination Restriction simply prevents lawyers with OCRA access from giving the general public access to court records that would otherwise be controlled by the clerks' offices to ensure that there are adequate measures to protect litigants' privacy and information security without impairing the efficient administration of justice. Therefore, it is a regulation of professional conduct, not "speech as speech," *Ritter*, 102 F.4th at 278.

**E. <u>The Dissemination Restriction is properly analyzed using relaxed intermediate scrutiny.</u>**

Another fundamental flaw in Plaintiffs' argument is that Fourth Circuit already affirmed the ruling that the access restriction is "a content-neutral time, place, and manner restriction that is narrowly tailored to further the Commonwealth's important interests in protecting sensitive personal information and promoting the orderly and efficient administration of justice." *Smith*, 126 F.4th at 916-17. That holding precludes most of the arguments Plaintiffs assert in their opposition to the Dissemination Restriction, which is simply a way to prevent lawyers and other

authorized OCRA users from permitting public access to OCRA that the public cannot obtain from the clerks directly. Plaintiffs cannot relitigate the issues that were fundamental to that holding.

First, the Fourth Circuit found that "Courthouse News undisputedly has access to all the civil court records it seeks, including the records the First Amendment entitles it to review, at the courthouses themselves. *Id.* at 908. Therefore, the access restriction was a time, place, and manner restriction subject to "relaxed" scrutiny, not strict scrutiny. *Id.* at 908. As a regulation of professional conduct, that only incidentally burdens speech, the Dissemination Restriction is subject to an even more relaxed standard of intermediate scrutiny, that "just requires that the restriction be sufficiently drawn to protect a substantial state interest." *Ritter*, 102 F.4th at 278.

There is no genuine argument that the Dissemination Restriction could not meet this standard, which is why Plaintiffs spend the entirety of their complaint and opposition attempting to recast the Dissemination Restriction on a prior restraint of free speech, subject to strict scrutiny. In *Smith*, CNS conceded the state interest at issue was substantial. *Smith*, 126 F.4th at 910. Even if they hadn't, however, the Fourth Circuit held that it "[had] no doubt [the governmental interests] are significant." *Id.* (internal quotation omitted). The Dissemination Restriction is also sufficiently drawn to protect that interest, because without it, lawyers and others who qualify as OCRA subscribers with privileged access to digital court records that are vulnerable to data mining could simply download and resell the pleadings to their own group of subscribers. This would defeat the entire statutory scheme that attempts to facilitate the efficient administration of the court system without unnecessarily exposing litigants' personal information to exploitation by bad actors adept at exploiting data mining of court records for nefarious

purposes. Because the Dissemination Restriction is sufficiently drawn to serve this substantial state interest, it is constitutional as a matter of law.

**F. *Soderberg* does not apply because the statute at issue does not impose a penal sanction.**

In an attempt to avoid intermediate scrutiny, Plaintiffs rely on the holding of *Soderberg v. Carrion* to argue that strict scrutiny should apply to the Dissemination Restriction. ECF 48, 29 (citing *Soderberg v. Carrion*, 999 F.3d 962, 964-65 (4th Cir. 2021)). This reliance omits a key aspect of the statute being analyzed in *Soderberg* that is missing from the Dissemination Restriction. In *Soderberg*, the court held that strict scrutiny applied to even partial bans of publishing truthful information about a court case when the ban is enforced by a "penal sanction." *Id.* at 968. The statute at issue in *Soderberg* was "properly assessed as a penal sanction for publishing information released to the public in official court records," subject to strict scrutiny, rather than a prohibition akin to the broadcast ban in Federal Rule of Criminal Procedure 53, which prohibits photography and broadcasting judicial proceedings, but which does not impose a criminal penalty for doing so. *Id.* at 964, 967. The *Soderberg* court held that the Federal Rule's ban was subject to only intermediate scrutiny.

The statute at issue in the case at bar, Code § 17.1-293(H) does not impose a criminal penalty. In fact, it does not impose even a civil fine. Instead, at most, violators are subject to potential revocation of their right to access that jurisdiction's OCRA database. Code § 17.1-293(H).[2] Without a penal sanction, which is material to the *Soderberg* analysis, there is no basis

[2] As noted in the Complaint, a licensed Virginia lawyer who engaged in professional misconduct, such as by participating in a conspiracy to commit identity theft by selling information obtained through OCRA to criminals or thieves would be subject to sanctions by the Virginia State Bar for engaging in "a criminal or deliberately wrongful act that reflects adversely on the lawyer's honestly . . . or fitness to practice law." ECF 1, 22 n. 1 (quoting Va. R. Prof. Conduct 8.4). The sanction imposed, however, would not be solely for violating the Dissemination Restriction as

to impose strict scrutiny. *Soderberg*, 999 F.3d at 964. On the contrary, the restriction is closer to the non-penal restriction in the Rules of Criminal Procedure, which is a constitutional broadcast restriction that was properly subject to intermediate scrutiny. *Id.* at 967. Even the Plaintiffs' best case authority for their position contradicts the imposition of strict scrutiny to the statute at issue.

## III. CONCLUSION

For the reasons stated above, Hade respectfully requests that this Court dismiss the case with prejudice if it finds the Plaintiffs have standing to bring their claim at all.

Respectfully submitted,

KARL R. HADE

By Counsel:

/s/ Erin R. McNeill

Erin R. McNeill (VSB# 78816)*
Senior Assistant Attorneys General
Office of the Virginia Attorney General
202 North 9th Street
Richmond, Virginia 23219
Telephone (ERM): (804) 692-0598
Facsimile (ERM): (804) 371-0200
Email (ERM): EMcneill@oag.state.va.us
**Counsel of Record for Hade*

Jay C. Jones
*Attorney General of Virginia*

Gretchen E. Nygaard
*Deputy Attorney General*

Jacqueline C. Hedblom
*Senior Assistant Attorney General*

## CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel of record.

/s/ Erin R. McNeill
Erin R. McNeill (VSB No. 78816)
Senior Assistant Attorney General

claimed, however. It would require disseminating the information in a manner that violated the Rules of Professional Conduct.

UNITED STATES DISTRICT COURT
For the Western District of Virginia
Abingdon Division

| | | |
|---|---|---|
| COURTHOUSE NEWS SERVICES, et al., | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:25-cv-00075 |
| | ) | |
| KARL R. HADE, in his official capacity as Exec. Sec'y of the Office of Exec. Sec'y of the Supreme Ct. of Va., *et al.* | ) | |
| | ) | |
| *Defendants.* | ) | |

**REPLY IN SUPPORT OF DEFENDANT KARL R. HADE'S**
**RULE 12(b)(1) AND RULE 12(b)(6) MOTION TO DISMISS**

The Defendant, Karl R. Hade ("Hade"), by counsel, submits this reply in support of his Rule 12(b)(1) and Rule 12(b)(6) Motion to Dismiss.

I. INTRODUCTION

Plaintiffs direct this Court's attention to a number of cases except the one that truly dictates the outcome of the current lawsuit: *Courthouse News Serv. v. Smith*, 126 F.4th 899 (4th Cir. 2025), which held that the general public, including Courthouse News Service (CNS), does not have a constitutional right to access digital court records available on OCRA. CNS, now joined by Lee, cannot reckon with that holding, because if they have no constitutional right to access the digital files on OCRA through direct subscription, then they surely have no constitutional right to access them indirectly, through a proxy.

## II. ARGUMENT

### A. <u>Neither Lee Enterprises Incorporated nor Lee BHM LLC are proper parties.</u>

As a threshold issue, Plaintiffs have not correctly associated the proper entities to state a claim on behalf of the publisher of various newspapers throughout Virginia. First, Lee Enterprises, Incorporated ("LEI") is not a proper party to this action. The first sentence of the Complaint alleges that Lee BHM LLC ("BHM") is the publisher of various papers throughout Virginia, "Plaintiffs Lee Enterprises, Incorporated and its wholly owned subsidiary, Lee BHM LLC, publisher of, among others, the *Richmond Times-Dispatch*, *The Roanoke Times*, *Bristol Herald Courier*, *Lynchburg News and Advance*, *Fredericksburg Free Lance Star* and *The Daily Progress* in Charlottesville (collectively, "Lee")." ECF 1 at 2. These allegations indicate that LEI and BHM are two related companies, and that one of those companies, BHM, publishes various papers throughout the Commonwealth. Nowhere in the Complaint do the plaintiffs state "particularized allegations of fact supporting [LEI's] standing to sue." *Carroll v. New People's Bank, Inc*., No. 1:17-cv-0044, 2018, U.S. Dist. LEXIS 57916, *3 (W.D. Va. April 5, 2018) (citing *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990)).

In response, the plaintiffs chide Hade for "misreading" the Complaint. They assert that because the Complaint "defines both Lee plaintiffs collectively as 'Lee,' and alleges the collective 'Lee' publishes the Virginia newspapers," the plaintiffs have plausibly pleaded standing. ECF 48 at 16. Apparently uncomfortable with this position, however, the plaintiffs attempt to raise factual allegations outside the Complaint to buttress their claimed standing. *Id*. The declaration submitted by the plaintiffs raises new facts not set forth in the Complaint and describes accounting practices that blur the distinct corporate existence of LEI and BHM. ECF 48-1 at 1.

Faced with these new facts, Hade asserts now that both BHM and LEI lack standing to pursue claims in this case.

**1. A defendant may raise factual challenges to a plaintiff's claim of standing.**

Hade is procedurally entitled to raise evidence in support of his standing challenge. In the Fourth Circuit, a defendant may challenge subject-matter jurisdiction in one of two ways: facially or factually. *See Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). In a facial challenge, the facts alleged in the complaint are taken as true. *Id.* In a factual challenge, however, the defendant may challenge the veracity of the jurisdictional allegations in the complaint, and this Court may "go beyond the allegations of the complaint" to determine if there are facts to support standing. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). *See also Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) ("For a factual challenge, on the other hand, the court may go beyond the complaint to resolve the disputed jurisdictional facts.") (citation omitted).

"When, as here, a defendant challenges the existence of subject matter jurisdiction in fact, the plaintiff bears the burden of proving the truth of such facts by a preponderance of the evidence." *See Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982) ("The burden of proving subject matter jurisdiction on a motion to dismiss is on the plaintiff, the party asserting jurisdiction."). *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347-48 (4th Cir. 2009). Thus the Plaintiffs must show that the LEI and BHM are the correct entities to bring a claim based on standing they are asserting that arises from being the publisher of the Virginia newspapers listed in the complaint.

**2. New factual evidence indicates LEI and BHM do not have standing to sue as publishers of the alleged Virginia-based newspapers**.

LEI and BHM are likely not proper parties. LEI is not registered with the Virginia State Corporation Commission ("SCC") to transact business in the Commonwealth. ***See*** **Ex. 1**.[1] Exhibit 1 shows that no company named "Lee Enterprises, Incorporated" is registered with the SCC. The only corporation named "Lee Enterprises" is a now defunct entity formerly headquartered at a residence in Henrico County. Similarly, the SCC's records do not indicate that "Lee BHM LLC" is registered with the SCC, though a search does reveal that "Lee BHM Corp." is registered with the SCC. ***See*** **Ex. 2**. That corporation also holds fictitious name certificates for numerous publications, including those referenced in the Complaint. *Id.*

Lee BHM Corp., who is not a party to this action, was a party to a recent action in this district. *See Conlon v. Baber,* No. 5:23-cv-0040 (W.D. Va. 2023). David Lacy, who is mentioned throughout the Complaint as counsel for Lee, was counsel of record for Lee BHM Corp. in that case. Moreover, in that case, Lacy indicated that he represented "Lee BHM Corp. d/b/a *The Daily Progress*." Motion to Dismiss, *Conlon v. Baber,* No. 5:23-cv-0040, ECF 38 at 1 (W.D. Va. Aug. 15, 2023). **Ex. 3**. Lacy also represented "Lee BHM Corp. Publisher of the *Richmond Times Dispatch*" as an interested party in a criminal matter in the Eastern District of Virginia. *See* Docket Sheet, *USA v. Ruiz*, 3:22-cr-00038 (E.D. Va. 2022). ***See*** **Ex. 4**.

Lee BHM Corp. has also been involved in Virginia state court litigation. Lacy represented "Lee BHM Corp., publishers of the *Richmond Times Dispatch*" in a mandamus proceeding in Henrico County Circuit Court. *In re: Public Access to November 22, 2021 Transfer Hearing Relating to the Death of Lucia Bremer*, CL21-7567, Henrico County Circuit

[1] Exhibits 1 and 2 were obtained from a website operated by the Virginia State Corporation Commission. *See* https://cis.scc.virginia.gov/EntitySearch/Index (last visited March 18, 2026).

Court, Nov. 29, 2021. **Ex. 5**. Mr. Lacy also represented "Lee BHM Corp., d/b/a Free Lance Star Publishing" in a civil matter in Spotsylvania County Circuit Court. *Brubaker v. Epps*, CL23-2210, Spotsylvania County Circuit Court, July 12, 2023. **Ex. 6**.

Finally, the Form 10-K Annual Report submitted by LEI to the United States Securities and Exchange Commission lists "Lee BHM Corp." as a subsidiary but makes no mention of "Lee BHM LLC." Annual Rpt. at 91. https://investors.lee.net/static-files/a595a4e4-39a9-4d66-bdad-a38a538a27d1 (last visited 3/10/2026).

All of the above facts point to the conclusion that "Lee BHM Corp.," not "Lee BHM LLC" is the publisher of the various news publications employing reporters who seek access to records in this case. If this is correct, then Lee BHM LLC lacks standing, because it does not transact business in Virginia. Likewise, LEI would lack standing because LEI's only connection to this case is through "Lee BHM LLC" according to the Complaint and the Plaintiffs' memorandum opposing the motions to dismiss.

In any event, BHM, as a limited liability company, cannot maintain this lawsuit unless and until it registers with the SCC. Va. Code § 13.1-1057. Additionally, if LEI transacts business in Virginia, it must obtain a certificate of authority from the SCC. Va. Code § 13.1-757.

Accordingly both BHM and LEI are improper plaintiffs in the lawsuit at bar and Hade respectfully requests that they be dismissed based on the above facts. Furthermore, any facts or claims arising from their status as publishers of the named Virginia papers should be struck from the complaint and disregarded.

**B. <u>Hade is not a proper party.</u>**

Hade is also not a proper party to a suit seeking an injunction of the Dissemination Restriction for the simple reason that the statute at issue does not give anyone but the circuit

court clerks authority to enforce the restriction. Code § 17.1-293(H)(" . . . and the clerk, in his discretion, may deny secure remote access to ensure compliance with these provisions . . ."). Hade's lack of authority to enforce the Dissemination Restriction is a much clearer question of law than the Access Restriction, which simply creates an exception to subsection B's redaction requirements if court records available on the internet are only available via secure remote access for Virginia-barred attorneys and other enumerated people. Code §§ 17.1-293(B), (E)(7). But for the Dissemination Restriction, it is a clear question of law: only the clerk has authority to enforce the restriction. Therefore, an injunction against Hade as the Executive Secretary would not affect the enforcement of the Dissemination Restriction. There is no additional factual development necessary, nor can additional facts change this simple statutory reality. Only the clerk can authorize the revocation of access to his jurisdiction's OCRA database to enforce the prohibition against selling or disseminating digital court records downloaded from OCRA to third parties. Hade is not a proper party and is properly dismissed with prejudice.

**C. <u>There is no right to receive digital court records downloaded from OCRA</u>.**

Plaintiffs' case also fails to state a claim. Plaintiffs begin by attempting to relitigate the holding in *Smith* that they have standing to challenge Code § 17.1-293(H) ("the Dissemination Restriction") on the basis that the Dissemination Restriction impairs their constitutional right to "gather news." ECF 48, 11. This is directly contradicted by the binding authority in the Fourth Circuit's opinion in *Smith*, which held that "The Dissemination Restriction does not impose any restraint on Courthouse News's speech, because it applies only to individuals with remote online access to court records. Courthouse News does not currently have such access, and we have determined that it is not constitutionally entitled to receive that access." *Smith*, 126 F.4th at 917.

In making their argument that the Dissemination Restriction directly impairs their rights, Plaintiffs claim that the Dissemination Restriction is a restriction on "access to people or records with information about civil cases." ECF 48, 11. The right of access, however, was thoroughly litigated in *Smith* and CNS lost, with the Fourth Circuit affirming the district court's holding that Virginia's limitation on the general public's access to online digital court records was a reasonable time, place, and manner restriction. *Smith*, 126 F.4th at 916. The Plaintiffs are not unreasonably or unconstitutionally restricted in their access to the records, because they are available at the courthouse during business hours. *Id.* Therefore, the Fourth Circuit has already held that CNS (and Lee, which is identically situated) "lacks standing to challenge [the Dissemination] restriction." *Id.* at 917. That holding remains binding on this Court.

The Plaintiffs are, therefore, restricted to arguing that they have standing to challenge the Dissemination Restriction because they are indirectly harmed "by hindering [their] ability to acquire electronic court records from attorneys with OCRA access." *Id.* The Court held that to make that argument, CNS would have to "show that there exists a speaker willing to convey the information" to them. *Id.* Plaintiffs purport to have found such a speaker, in David Lacy. ECF 48, 14. Because Plaintiffs can claim only a derivative injury, *Smith*, 126 F.4th at 917, then if Plaintiffs have failed to adequately allege that the law violates the free speech rights of Lacy, and other lawyers like him who would be willing to share downloaded pleadings from OCRA but for the dissemination restriction, then Plaintiffs have failed to state a basis to challenge the law even using a derivative injury.

**D. <u>Code § 17.1-293(H) regulates lawyer conduct, with only an incidental burden on speech.</u>**

As a threshold question, Plaintiffs must first adequately allege that the Dissemination Restriction regulates speech and not professional conduct with only an incidental burden on

speech. The nature of the regulation and the justification and purposes for the regulation receive different levels of scrutiny. *360 Virtual Drone Servs. LLC v. Ritter*, 102 F.4th 263, 271 (4th Cir. 2024). Plaintiffs argue that the Dissemination Restriction is a content-based regulation of speech that should be subject to strict scrutiny. The Dissemination Restriction is, however, a regulation of professional conduct that only incidentally impacts speech, therefore Fourth Circuit precedent dictates that it is subject to "a more relaxed form of intermediate scrutiny that mandates only that the restriction be 'sufficiently drawn' to protect a 'substantial' state interest." *Id.* Because the Dissemination Restriction applies only to subscribers who receive OCRA access as licensed Virginia attorneys and others who qualify as "officers of the court" and it is necessary to enforce the constitutional access restriction that was upheld in *Smith*, the Dissemination Restriction easily passes relaxed intermediate scrutiny.

**1. The statute by its plain language regulates the sharing of digital files, not the contents of court records**.

The statute taken as a whole, rather than just the Dissemination Restriction in isolation, is focused on "Posting and availability of certain information on the Internet." Code § 17.1-293. The statute lists six types of information that must be redacted from court records if, and only if, they are posted on the Internet. Code § 17.1-293(B). The information is not restricted if the public accesses the "original document" at the courthouse. Code § 17.1-293(D). There are a number of exemptions to the redaction requirement, including in relevant part when the information is posted as part of "secure remote access to nonconfidential court records . . . to members in good standing with the Virginia State Bar" and their agents and certain government agencies. Code § 17.1-293(E)(7) [the "Access Restriction"].

At issue in the current litigation is the Dissemination Restriction, Code § 17.1-293(H). The Dissemination Restriction prohibits "any data accessed by secure remote access to be sold or

posted on any other website or in any way distributed to any third party." Plaintiffs argue this means that a subscriber cannot disclose any of the information in a court pleading that was accessed via OCRA in addition to not disseminating the digital court file itself, which involves a tortured reading of what the statute means by "data." ECF 1, ¶ 79 (claiming that "OCRA's rules prevented Lacy from proving even a summary of the allegations in a pleading accessed via OCRA), ¶ 81 (alleging Lacy refused to provide a reporter "the complaint or the information requested about the complaint" because of "OCRA's restrictions."), ¶ 82 (alleging Lacy refused to provide copies of pleadings or information from pleadings because of the Dissemination Restriction), ¶ 84 (alleging that Lacy refused to "summarize what [a] petition alleged and counsel's contact information" because it "could be construed as improper circumvention of OCRA"), ¶ 85 (alleging that Lacy would not summarize a pleading via email because of "OCRA's terms"); ECF 48, 38 (arguing that the Dissemination Restriction's use of the word "data" means that a subscriber cannot discuss the contents of a pleading because he downloaded it from OCRA).

Plaintiffs deliberately use a misleading and overly broad definition of "data" to construe the Dissemination Restriction to apply to subscriber speech and not just the act of sharing digital files themselves. ECF 48, 38. Even Plaintiffs' own dictionary source, Dictionary.com, defines "data" first as "information in digital format, as encoded text or numbers, or multimedia images, audio, or video. "Data," Dictionary.com/browse/data (last visited March 17, 2026). The secondary definition is the broader "a body of facts; information" cited by Plaintiffs. *Id.*

The statute at issue is clearly referring to information in a digital format, because the entire statute governs the sharing of court records on the internet. It enacts specific restrictions and redaction requirements for records available online, particularly when they are publicly

accessible and not restricted in an access-secured database available to lawyers and court personnel. Code § 17.1-293. The statute does not purport to regulate the sharing of information in court records more generally, just digital files accessible through the internet. *Id.*

Returning to the plain meaning of "data," the more authoritative Merriam-Webster dictionary defines "data" as follows:

> 1) factual information (such as measurements and statistics) used as a basis for reasoning, discussion, or calculation;
>
> 2) information in digital form that can be transmitted or processed; and
>
> 3) information that is output by a sensing device or organ and that must be processed to be meaningful.

https://www.merriam-webster.com/dictionary/data (last visited March 17, 2026). Merriam-Webster's definition combined with the commonsense context of the statute make it clear that the Dissemination Restriction refers to the actual digital files downloaded from OCRA, not reading the content of pleadings over the phone to a reporter, or providing an original summary of the information learned in a court pleading. After all, identical records are available during business hours at the courthouse. There would be no public policy reason to restrict lawyers from sharing the information about the case one can glean from reading the pleading.

Even if the plain meaning of the statute were not clear, however, the cannon of constitutional avoidance would dictate that this Court interpret the statutory language to avoid an unconstitutional result. *See Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018). The cannon of constitutional avoidance is a statutory interpretation principle that is used when, and only when, "after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction." *Id.* When confronted with multiple ways to interpret the plain meaning of a statute, then a court must choose the construction of the language of the statute that is "fairly possible by which the [constitutional] question may be avoided." *Id.* (internal quotation omitted).

This does not mean re-writing the statute, but instead, if presented with two reasonable constructions of the statutory language, choosing the one that avoids a constitutional issue.

The Dissemination Restriction applies to sharing digital files that are particularly vulnerable to data mining by its plain language, which restricts access to court records that have not had certain types of identifying information redacted. Code §§ 17.1-293(B), 17.1-293(E)(7). The plain meaning of the Dissemination Restriction is to prevent lawyers with OCRA access from providing public access to digital court files that have not had the information listed in subsection B redacted, which would defeat the purpose of the statute. In light of the plain meaning of the word data and the principle of constitutional avoidance, the principles of statutory interpretation dictate that the plaintiffs' overly broad and unconstitutional reading of the Dissemination Restriction should be rejected.

**2. The Dissemination Restriction is a regulation of professional conduct.**

Understanding the language of the statute is fundamental to the analysis of whether Plaintiffs have alleged that OCRA subscriber David Lacy's free speech rights are infringed by the Dissemination Restriction. The Dissemination Restriction is a regulation of professional conduct for those "members in good standing with the Virginia State Bar and their authorized agents" and others who qualify for OCRA access pursuant to Code § 17.1-293(E)(7) to prevent them from providing public access to records by selling or posting the records on a website or distributing the digital records another way to third parties who do not qualify to obtain OCRA access directly. To the degree this creates a burden on speech, it is incidental to the regulation of the conduct of professionals given privileged access to records with sensitive information in a format that makes the records particularly vulnerable to data mining and exploitation. *Smith*, 126 F.4th at 911-12.

The Dissemination Restriction easily passes the Fourth Circuit's test for a regulation of professional conduction that only incidentally burdens speech. *Ritter*, 102 F.4th at 278. The "speech" being regulated, namely, providing third party access to digital court records that are vulnerable to data mining in a way that paper records viewed at a courthouse are not, carries economic, legal, and privacy consequences. *See Smith*, 126 F.4th at 911-12. The transmission of these records as alleged by Plaintiffs in the case at bar is in private conversations between a single attorney and various reporters. The Dissemination Restriction is not content-based at all and therefore does not "seek[] to quell unpopular or dissenting speech," but rather regulates the medium of digital court files, regardless of content (other than that the records are not redacted in compliance with Code § 17.1-293(B)). In the simplest terms, the Dissemination Restriction simply prevents lawyers with OCRA access from giving the general public access to court records that would otherwise be controlled by the clerks' offices to ensure that there are adequate measures to protect litigants' privacy and information security without impairing the efficient administration of justice. Therefore, it is a regulation of professional conduct, not "speech as speech," *Ritter*, 102 F.4th at 278.

### E. <u>The Dissemination Restriction is properly analyzed using relaxed intermediate scrutiny.</u>

Another fundamental flaw in Plaintiffs' argument is that Fourth Circuit already affirmed the ruling that the access restriction is "a content-neutral time, place, and manner restriction that is narrowly tailored to further the Commonwealth's important interests in protecting sensitive personal information and promoting the orderly and efficient administration of justice." *Smith*, 126 F.4th at 916-17. That holding precludes most of the arguments Plaintiffs assert in their opposition to the Dissemination Restriction, which is simply a way to prevent lawyers and other

authorized OCRA users from permitting public access to OCRA that the public cannot obtain from the clerks directly. Plaintiffs cannot relitigate the issues that were fundamental to that holding.

First, the Fourth Circuit found that "Courthouse News undisputedly has access to all the civil court records it seeks, including the records the First Amendment entitles it to review, at the courthouses themselves. *Id.* at 908. Therefore, the access restriction was a time, place, and manner restriction subject to "relaxed" scrutiny, not strict scrutiny. *Id.* at 908. As a regulation of professional conduct, that only incidentally burdens speech, the Dissemination Restriction is subject to an even more relaxed standard of intermediate scrutiny, that "just requires that the restriction be sufficiently drawn to protect a substantial state interest." *Ritter*, 102 F.4th at 278.

There is no genuine argument that the Dissemination Restriction could not meet this standard, which is why Plaintiffs spend the entirety of their complaint and opposition attempting to recast the Dissemination Restriction on a prior restraint of free speech, subject to strict scrutiny. In *Smith*, CNS conceded the state interest at issue was substantial. *Smith*, 126 F.4th at 910. Even if they hadn't, however, the Fourth Circuit held that it "[had] no doubt [the governmental interests] are significant." *Id.* (internal quotation omitted). The Dissemination Restriction is also sufficiently drawn to protect that interest, because without it, lawyers and others who qualify as OCRA subscribers with privileged access to digital court records that are vulnerable to data mining could simply download and resell the pleadings to their own group of subscribers. This would defeat the entire statutory scheme that attempts to facilitate the efficient administration of the court system without unnecessarily exposing litigants' personal information to exploitation by bad actors adept at exploiting data mining of court records for nefarious

purposes. Because the Dissemination Restriction is sufficiently drawn to serve this substantial state interest, it is constitutional as a matter of law.

**F. *Soderberg* does not apply because the statute at issue does not impose a penal sanction.**

In an attempt to avoid intermediate scrutiny, Plaintiffs rely on the holding of *Soderberg v. Carrion* to argue that strict scrutiny should apply to the Dissemination Restriction. ECF 48, 29 (citing *Soderberg v. Carrion*, 999 F.3d 962, 964-65 (4th Cir. 2021)). This reliance omits a key aspect of the statute being analyzed in *Soderberg* that is missing from the Dissemination Restriction. In *Soderberg*, the court held that strict scrutiny applied to even partial bans of publishing truthful information about a court case when the ban is enforced by a "penal sanction." *Id.* at 968. The statute at issue in *Soderberg* was "properly assessed as a penal sanction for publishing information released to the public in official court records," subject to strict scrutiny, rather than a prohibition akin to the broadcast ban in Federal Rule of Criminal Procedure 53, which prohibits photography and broadcasting judicial proceedings, but which does not impose a criminal penalty for doing so. *Id.* at 964, 967. The *Soderberg* court held that the Federal Rule's ban was subject to only intermediate scrutiny.

The statute at issue in the case at bar, Code § 17.1-293(H) does not impose a criminal penalty. In fact, it does not impose even a civil fine. Instead, at most, violators are subject to potential revocation of their right to access that jurisdiction's OCRA database. Code § 17.1-293(H).[2] Without a penal sanction, which is material to the *Soderberg* analysis, there is no basis

[2] As noted in the Complaint, a licensed Virginia lawyer who engaged in professional misconduct, such as by participating in a conspiracy to commit identity theft by selling information obtained through OCRA to criminals or thieves would be subject to sanctions by the Virginia State Bar for engaging in "a criminal or deliberately wrongful act that reflects adversely on the lawyer's honestly . . . or fitness to practice law." ECF 1, 22 n. 1 (quoting Va. R. Prof. Conduct 8.4). The sanction imposed, however, would not be solely for violating the Dissemination Restriction as

to impose strict scrutiny. *Soderberg*, 999 F.3d at 964. On the contrary, the restriction is closer to the non-penal restriction in the Rules of Criminal Procedure, which is a constitutional broadcast restriction that was properly subject to intermediate scrutiny. *Id.* at 967. Even the Plaintiffs' best case authority for their position contradicts the imposition of strict scrutiny to the statute at issue.

III. CONCLUSION

For the reasons stated above, Hade respectfully requests that this Court dismiss the case with prejudice if it finds the Plaintiffs have standing to bring their claim at all.

Respectfully submitted,

KARL R. HADE

By Counsel:

/s/ Erin R. McNeill
Erin R. McNeill (VSB# 78816)*
Senior Assistant Attorneys General
Office of the Virginia Attorney General
202 North 9th Street
Richmond, Virginia 23219
Telephone (ERM): (804) 692-0598
Facsimile (ERM): (804) 371-0200
Email (ERM): EMcneill@oag.state.va.us
**Counsel of Record for Hade*

Jay C. Jones
*Attorney General of Virginia*

Gretchen E. Nygaard
*Deputy Attorney General*

Jacqueline C. Hedblom
*Senior Assistant Attorney General*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 19, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel of record.

/s/ Erin R. McNeill
Erin R. McNeill (VSB No. 78816)
Senior Assistant Attorney General

---

claimed, however. It would require disseminating the information in a manner that violated the Rules of Professional Conduct.

Exhibit 1

# State Corporation Commission
# Clerk's Information System

Business Entity Search Results

| Entity ID | Entity Name | Name Type | Entity Type | Series LLC | Principal Office Address | RA Name |
|---|---|---|---|---|---|---|
| 11510729 | Lee Enterprises & Co, LLC | Legal Name | Limited Liability Company | No | 25406 Ferndale Rd, North Dinwiddie, VA, 23803, USA | Raven S Lee |
| S6549523 | LEE ENTERPRISES AND PROPERTIES LLC | Legal Name | Limited Liability Company | No | 11203 Statesman Ct, Fredericksburg, VA, 22408 - 2450, USA | PAMELA L MCLEOD |
| 08423634 | LEE ENTERPRISES INC. | Legal Name | Stock Corporation | | 225 ORAMS LANE, HENRICO, VA, 23223 - 0000, USA | ALISHA ALEXANDER |
| 11134829 | LEE ENTERPRISES LLC | Legal Name | Limited Liability Company | No | 1108 E Main St # 750 Ste 906, Richmond, VA, 23219 - 3539, USA | LEGALINC CORPORATE SERVICES INC. |
| S5384153 | LEE ENTERPRISES LLC | Legal Name | Limited Liability Company | No | 1312 Brighton Court, Blacksburg, VA, 24060 - 0000, USA | REPUBLIC REGISTERED AGENT LLC |

Privacy Policy | Contact Us

# State Corporation Commission Clerk's Information System

| | | | | | | |
|---|---|---|---|---|---|---|
| | ENTERPRISES, L.L.C. | Name | Liability Company | | CASTLETOWN WAY, ALEXANDRIA, VA, 22310 - 0000, USA | EDWARDS |
| 11712690 | Lee Enterprises, LLC | Legal Name | Limited Liability Company | No | 1504 Kelvin Ct, Virginia Beach, VA, 23454 - 6946, USA | Olivia Lee |

**Page 1 of 1, records 1 to 7 of 7**

**Note:** Export limitation for Word is 5000 records, Export limitation for PDF is 15000 records

Back Back to Login

Privacy Policy | Contact Us

# State Corporation Commission
# Clerk's Information System

## Entity Information

### Entity Information

| | | | |
|---|---|---|---|
| Entity Name: | Lee Enterprises Inc. | Entity ID: | 08423634 |
| Entity Type: | Stock Corporation | Entity Status: | **Inactive** |
| Series LLC: | N/A | Reason for Status: | Automatically Terminated - Annual Report and/or Fees - Cannot Reinstate |
| Formation Date: | 03/19/2019 | Status Date: | 08/27/2025 |
| VA Qualification Date: | 03/19/2019 | Period of Duration: | Perpetual |
| Industry Code: | 0 - General | Annual Report Due Date: | 03/31/2020 |
| Jurisdiction: | VA | Charter Fee: | $50.00 |
| Registration Fee Due Date: | 03/31/2020 | | |

### Registered Agent Information

| | | | |
|---|---|---|---|
| RA Type: | Individual | Locality: | HENRICO COUNTY |
| RA Qualification: | Director of the Corporation | | |
| Name: | ALISHA ALEXANDER | Registered Office Address: | 225 ORAMS LANE, HENRICO, VA, 23223 - 0000, USA |

### Principal Office Address

Privacy Policy | Contact Us

# State Corporation Commission
# Clerk's Information System

Principal Information

| Title | Director | Name | Address | Last Updated |
|---|---|---|---|---|
| | Yes | ALISHA ALEXANDER | 225 ORAMS LANE, HENRICO, VA, 23223 - 0000, USA | 03/19/2019 |

Current Shares

Total Shares: 10000

Filing History RA History Name History Previous Registrations

Garnishment Designees Image Request

Back Return to Search Return to Results

Back to Login

Privacy Policy | Contact Us

Exhibit 2

# State Corporation Commission
# Clerk's Information System

Entity Information

Entity Information

| | | | |
|---|---|---|---|
| Entity Name: | Lee BHM Corp. | Entity ID: | 11023383 |
| Entity Type: | Stock Corporation | Entity Status: | **Pending Inactive** |
| Series LLC: | N/A | Reason for Status: | Annual Registration Fee Past Due and/or Penalties Unpaid and Annual Report Past Due - Not in Good Standing |
| Formation Date: | 02/12/2020 | Status Date: | 03/02/2026 |
| VA Qualification Date: | 02/18/2020 | Period of Duration: | Perpetual |
| Industry Code: | 0 - General | Annual Report Due Date: | 02/28/2026 |
| Jurisdiction: | DE | Charter Fee: | $50.00 |
| Registration Fee Due Date: | 02/28/2026 | | |

Registered Agent Information

| | | | |
|---|---|---|---|
| RA Type: | Entity | Locality: | |
| RA Qualification: | BUSINESS ENTITY THAT IS AUTHORIZED TO TRANSACT BUSINESS IN VIRGINIA | | |
| Name: | CORPORATION | Registered Office | 100 Shockoe Slip Fl 2, |

Privacy Policy | Contact Us

# State Corporation Commission Clerk's Information System

Davenport, IA, 52807,
USA

Principal Information

| Title | Director | Name | Address | Last Updated |
|---|---|---|---|---|
| President | Yes | Kevin D. Mowbray | 4600 E 53rd St, Davenport, IA, 52807 - 3479, USA | 02/18/2020 |
| Vice President, Treasurer | No | Timothy R. Millage | 4600 E 53rd St, Davenport, IA, 52807 - 3479, USA | 02/18/2020 |
| Vice President | No | Nathan Bekke | 4600 E 53rd St, Davenport, IA, 52807, USA | 01/25/2021 |
| Secretary | No | THEODORE F. OLT III | 4600 E 53rd St, Davenport, IA, 52807, USA | 01/09/2024 |

Current Shares

Total Shares: 1000

Filing History RA History Name History Previous Registrations

Privacy Policy | Contact Us

State Corporation Commission
Clerk's Information System

# State Corporation Commission
# Clerk's Information System

## Name History

### Entity Information

| | | | |
|---|---|---|---|
| Entity Name: | Lee BHM Corp. | Entity ID: | 11023383 |
| Entity Type: | Stock Corporation | Entity Status: | **Pending Inactive** |
| Series LLC: | N/A | Reason for Status: | Annual Registration Fee Past Due and/or Penalties Unpaid and Annual Report Past Due - Not in Good Standing |
| Formation Date: | 02/12/2020 | Status Date: | 03/02/2026 |
| VA Qualification Date: | 02/18/2020 | Period of Duration: | Perpetual |
| Industry Code: | 0 - General | Annual Report Due Date: | 02/28/2026 |
| Jurisdiction: | DE | Charter Fee: | $50.00 |
| Registration Fee Due Date: | 02/28/2026 | | |

### Name History Details

| Effective Start Date | Effective End Date | Name | Name Type |
|---|---|---|---|
| 05/13/2020 | N/A | Amherst New Era Progress | Fictitious Name |
| 05/12/2020 | N/A | Wytheville Enterprise | Fictitious Name |
| 05/12/2020 | N/A | Washington County News | Fictitious Name |
| 05/12/2020 | N/A | The Rural Virginian | Fictitious Name |

Privacy Policy

# State Corporation Commission
# Clerk's Information System

| | | | |
|---|---|---|---|
| 05/12/2020 | N/A | Richmond Times-Dispatch | Fictitious Name |
| 05/12/2020 | N/A | Richmond GOTCHA | Fictitious Name |
| 05/12/2020 | N/A | Richlands News-Press | Fictitious Name |
| 05/12/2020 | N/A | Progress Weekly | Fictitious Name |

< Previous ... 1 2 3 4 ... Next > **Page 1 of 4, records 1 to 10 of 38** Go to Page

Back Return to Search
Return to Results

Back to Login

# State Corporation Commission
# Clerk's Information System

## Name History

### Entity Information

| | | | |
|---|---|---|---|
| Entity Name: | Lee BHM Corp. | Entity ID: | 11023383 |
| Entity Type: | Stock Corporation | Entity Status: | **Pending Inactive** |
| Series LLC: | N/A | Reason for Status: | Annual Registration Fee Past Due and/or Penalties Unpaid and Annual Report Past Due - Not in Good Standing |
| Formation Date: | 02/12/2020 | Status Date: | 03/02/2026 |
| VA Qualification Date: | 02/18/2020 | Period of Duration: | Perpetual |
| Industry Code: | 0 - General | Annual Report Due Date: | 02/28/2026 |
| Jurisdiction: | DE | Charter Fee: | $50.00 |
| Registration Fee Due Date: | 02/28/2026 | | |

### Name History Details

| Effective Start Date | Effective End Date | Name | Name Type |
|---|---|---|---|
| 05/12/2020 | N/A | Print Innovators | Fictitious Name |
| 05/12/2020 | N/A | Powhatan Today | Fictitious Name |
| 05/12/2020 | N/A | Orange County Review | Fictitious Name |
| 05/12/2020 | N/A Privacy Policy | Contact Nelson County Times | Fictitious Name |

# State Corporation Commission
# Clerk's Information System

| | | | |
|---|---|---|---|
| 05/12/2020 | N/A | Martinsville Bulletin | Fictitious Name |
| 05/12/2020 | N/A | Madison County Eagle | Fictitious Name |
| 05/12/2020 | N/A | Greene County Record | Fictitious Name |
| 05/12/2020 | N/A | Gotcha Central Virginia | Fictitious Name |

< Previous ... 1 2 3 4 ... Next > Page 2 of 4, records 11 to 20 of 38 Go to Page

Back Return to Search

Return to Results

Back to Login

Privacy Policy | Contact Us

# State Corporation Commission
# Clerk's Information System

Name History

## Entity Information

| | | | |
|---|---|---|---|
| Entity Name: | Lee BHM Corp. | Entity ID: | 11023383 |
| Entity Type: | Stock Corporation | Entity Status: | **Pending Inactive** |
| Series LLC: | N/A | Reason for Status: | Annual Registration Fee Past Due and/or Penalties Unpaid and Annual Report Past Due - Not in Good Standing |
| Formation Date: | 02/12/2020 | Status Date: | 03/02/2026 |
| VA Qualification Date: | 02/18/2020 | Period of Duration: | Perpetual |
| Industry Code: | 0 - General | Annual Report Due Date: | 02/28/2026 |
| Jurisdiction: | DE | Charter Fee: | $50.00 |
| Registration Fee Due Date: | 02/28/2026 | | |

## Name History Details

| Effective Start Date | Effective End Date | Name | Name Type |
|---|---|---|---|
| 05/12/2020 | N/A | Free Lance-Star Publishing | Fictitious Name |
| 05/12/2020 | N/A | Franklin News-Post | Fictitious Name |
| 05/12/2020 | N/A | Floyd Press | Fictitious Name |
| 05/12/2020 | N/A | Danville Register & Bee | Fictitious Name |

Privacy Policy | Contact

# State Corporation Commission
# Clerk's Information System

| | | | |
|---|---|---|---|
| 05/12/2020 | N/A | The News Virginian | Fictitious Name |
| 05/12/2020 | N/A | The News & Advance | Fictitious Name |
| 05/12/2020 | N/A | The Mechanicsville Local | Fictitious Name |
| 05/12/2020 | N/A | The Goochland Gazette | Fictitious Name |

< Previous ... 1 2 3 4 ... Next > Page 3 of 4, records 21 to 30 of 38 Go to Page

Back Return to Search
Return to Results

Back to Login

Privacy Policy | Contact Us

# State Corporation Commission
# Clerk's Information System

Name History

## Entity Information

| | | | |
|---|---|---|---|
| Entity Name: | Lee BHM Corp. | Entity ID: | 11023383 |
| Entity Type: | Stock Corporation | Entity Status: | **Pending Inactive** |
| Series LLC: | N/A | Reason for Status: | Annual Registration Fee Past Due and/or Penalties Unpaid and Annual Report Past Due - Not in Good Standing |
| Formation Date: | 02/12/2020 | Status Date: | 03/02/2026 |
| VA Qualification Date: | 02/18/2020 | Period of Duration: | Perpetual |
| Industry Code: | 0 - General | Annual Report Due Date: | 02/28/2026 |
| Jurisdiction: | DE | Charter Fee: | $50.00 |
| Registration Fee Due Date: | 02/28/2026 | | |

## Name History Details

| Effective Start Date | Effective End Date | Name | Name Type |
|---|---|---|---|
| 05/12/2020 | N/A | The Daily Progress | Fictitious Name |
| 05/12/2020 | N/A | The Clinch Valley News | Fictitious Name |
| 05/12/2020 | N/A | The Buzz | Fictitious Name |
| 05/12/2020 | N/A | The Burg | Fictitious Name |

# State Corporation Commission Clerk's Information System

| | | | |
|---|---|---|---|
| 05/12/2020 | N/A | Charlottesville Woman | Fictitious Name |
| 02/18/2020 | N/A | Lee BHM Corp. | Legal Name |

< Previous ... 1 2 3 4 ... Next > Page 4 of 4, records 31 to 38 of 38 Go to Page

Back Return to Search

Return to Results

Back to Login

Privacy Policy | Contact Us

Exhibit 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Harrisonburg Division**

**Kathleen M. Conlon,**

**Plaintiff,**

**v.** **Case No.: 5:23-cv-00040-EKD**

**Hilda L. Baber, *et al.*,**

**Defendants.**

**DEFENDANT LEE BHM CORP.'S**
**MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

Defendant Lee BHM Corp., d/b/a *The Daily Progress* (the "Newspaper"), by counsel, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, respectfully moves to dismiss the Complaint [Dkt. No. 1] filed by Plaintiff Kathleen M. Conlon because it fails to state a claim against the Newspaper upon which relief may be granted. The grounds for the Newspaper's motion are set forth more fully in the supporting memorandum filed contemporaneously herewith.

WHEREFORE, the Newspaper respectfully requests that its motion to dismiss be granted; that the Complaint be dismissed as against the Newspaper with prejudice; and that the Newspaper be awarded any additional relief that this Court deems fair and just.

Date: August 15, 2023.

Respectfully submitted,

LEE BHM CORP.,
publisher of *The Daily Progress*

By Counsel

/s/ David B. Lacy
David B. Lacy (VSB No. 71177)
dlacy@cblaw.com

Grayson B. Cassada (VSB No. 98007)
gcassada@cblaw.com
Harley J. McClellan (VSB No. 98295)
hmcclellan@cblaw.com
CHRISTIAN & BARTON, L.L.P.
901 East Cary Street, Suite 1800
Richmond, Virginia 23219
Tel.: (804) 697-4100
Fax: (804) 697-6112

**CERTIFICATE OF SERVICE**

I hereby certify that on August 15, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

/s/ David B. Lacy
David B. Lacy (VSB No. 71177)
dlacy@cblaw.com
CHRISTIAN & BARTON, L.L.P.
901 East Cary Street, Suite 1800
Richmond, Virginia 23219
Tel.: (804) 697-4100
Fax: (804) 697-4112

#4874-4219-4806

Exhibit 4

CLOSED,INTERPRETER

**U.S. District Court**
**Eastern District of Virginia - (Richmond)**
**CRIMINAL DOCKET FOR CASE #: 3:22-cr-00038-REP All Defendants**

Case title: USA v. Ruiz

Date Filed: 04/05/2022

Date Terminated: 01/25/2023

---

Assigned to: District Judge Robert E. Payne

**Defendant (1)**

**Hector Ruiz**
02966-506
Pensacola Federal Prison Camp
P.O. Box 3949
Pensacola, FL 32509
*TERMINATED: 01/25/2023*

represented by **Edwin Frederick Brooks**
Law Office of Edwin F Brooks
6 W Broad St
Richmond, VA 23220
(804) 648-1448
Email: brooks@efbrooks.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Ali John Amirshahi**
Ali J Amirshahi PLLC
101 Shockoe Slip
Suite O
Richmond, VA 23219
(804) 658-5384
Email: ali.amirshahi@shockoelaw.com
*TERMINATED: 06/27/2024*
*Designation: CJA Appointment*

| **Pending Counts** | **Disposition** |
|---|---|
| 21:846, 841(a)(1) and (b)(1)(A) CONSPIRACY TO DISTRIBUTE AND POSSESS WITH INTENT TO DISTRIBUTE ONE KILOGRAM OR MORE OF HEROIN; FORFEITURE ALLEGATION (1) | 55 MONTHS IMPRISONMENT, 5 YEARS SUPERVISED RELEASE, $100 SPECIAL ASSESSMENT |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 21:841(a)(1) and (b)(1)(A) and 18:2; DISTRIBUTION OF ONE KILOGRAM | DISMSISED ON MOTION OF GOVERNMENT |

OR MORE OF HEROIN; AIDING AND ABETTING; FORFEITURE ALLEGATION
(2)

18:1956(h) CONSPIRACY TO COMMIT INTERNATIONAL MONEY LAUNDERING; FORFEITURE ALLEGATION
(3)

DISMISSED ON MOTION OF GOVERNMENT

**Highest Offense Level (Terminated)**

Felony

**Complaints**

21 U.S.C. § 846; Conspiracy to Possess with Intent to Distribute and Distribute 1 Kilogram or More of Heroin AND 18 U.S.C. § 1956(a)(2); Laundering of Monetary Instruments

**Disposition**

---

**Interested Party**

**Lee BHM Corp.**
*Publisher of the Richmond Times-Dispatch*

represented by **David Brendan Lacy**
Christian & Barton LLP
901 East Cary Street
Suite 1800
Richmond, VA 23219
804-697-4100
Fax: 804-697-4112
Email: dlacy@cblaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Grayson Cassada**
Christian & Barton
901 East Cary Street
Suite 1800
Richmond, VA 23219
804-697-4100
Email: gcassada@cblaw.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

---

**Plaintiff**

**USA**

represented by **Stephen Eugene Anthony**
United States Attorney's Office (Richmond)
SunTrust Building
919 East Main Street

Suite 1900
Richmond, VA 23219
(804) 819-5428
Fax: (804) 771-2316
Email: stephen.e.anthony@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/09/2022 | 1 | MOTION to Seal Case by USA as to Hector Ruiz. (jsau, ) [3:22-mj-00020-EWH *SEALED*] (Entered: 03/09/2022) |
| 03/09/2022 | 2 | ORDER granting 1 Motion to Seal Case as to Hector Ruiz. Signed by Magistrate Judge Elizabeth W. Hanes on 3/9/22. (jsau, ) [3:22-mj-00020-EWH *SEALED*] (Entered: 03/09/2022) |
| 03/09/2022 | 3 | SEALED CRIMINAL COMPLAINT as to Hector Ruiz. (Attachments: # 1 Affidavit) (jsau, ) [3:22-mj-00020-EWH *SEALED*] (Entered: 03/09/2022) |
| 03/09/2022 | 4 | Arrest Warrant Issued in case as to Hector Ruiz. (jsau, ) [3:22-mj-00020-EWH *SEALED*] (Entered: 03/09/2022) |
| 03/24/2022 | 6 | Rule 5(c)(3) Documents Received from the U.S. District Court, Southern District of Texas (Houston) as to Hector Ruiz. (jpow, ) [3:22-mj-00020-EWH *SEALED*] (Entered: 03/24/2022) |
| 03/24/2022 | | Arrest of Hector Ruiz in Southern District of Texas (Houston). (jpow, ) [3:22-mj-00020-EWH *SEALED*] (Entered: 03/24/2022) |
| 03/24/2022 | 8 | SEALED CJA 23 Financial Affidavit by Hector Ruiz (jpow, ) [3:22-mj-00020-EWH *SEALED*] (Entered: 03/24/2022) |
| 04/05/2022 | 9 | INDICTMENT as to Hector Ruiz counts 1, 2, 3. (asho, ) (Entered: 04/06/2022) |
| 04/05/2022 | 11 | Minute Entry as to Hector Ruiz: Before Magistrate Judge Mark R. Colombell. Appearances Jessica Wright, AUSA, and Racheal Steck, Court Reporter. Indictment, a true bill, returned before a Magistrate Judge at Richmond. Government's motion for the issuance of an arrest warrant heard and so-ordered. (asho, ) (Entered: 04/06/2022) |
| 04/06/2022 | 12 | Arrest Warrant Issued for Hector Ruiz. Clerk hand-delivered to USMS. (asho, ) (Entered: 04/06/2022) |
| 04/06/2022 | | Case as to Hector Ruiz reassigned to District Judge Robert E. Payne. District Judge David J. Novak no longer assigned to the case. (jsmi, ) (Entered: 04/06/2022) |
| 04/12/2022 | | Interpreter Information: Johnnie Benningfield is the Interpreter. Spanish is the type of language required. Appointment is set for April 12, 2022 @ 1:00 PM for an Initial Appearance (lgar, ) (Entered: 04/12/2022) |
| 04/12/2022 | | Arrest of Hector Ruiz. (mful) (Entered: 04/13/2022) |
| 04/12/2022 | 13 | Arrest Warrant Returned Executed on 4/12/22 in case as to Hector Ruiz (22mj20 & 22cr38). (mful) (Entered: 04/13/2022) |
| 04/12/2022 | 14 | Minute Entry for proceedings held before Magistrate Judge Elizabeth W. Hanes (Johnnie Benningfield, Int): Initial Appearance as to Hector Ruiz held on 4/12/2022; Govt summarized charges; Deft advised of rights; Deft submitted financial affidavit and |

| | | |
|---|---|---|
| | | requested counsel - Granted; FPD conflict, CJA atty to be appointed; Govt seeking detention - Granted; Arraignment and Detention Hearing set for 4/15/2022 at 11:00 AM in Richmond Courtroom 5400 before Magistrate Judge Elizabeth W. Hanes; Deft remanded. (FTR)(mful) (Entered: 04/13/2022) |
| 04/12/2022 | | Federal Public Defender Office is conflicted out of this case. Clerk's Office will appoint CJA Attorney for Hector Ruiz.(mful) (Entered: 04/13/2022) |
| 04/12/2022 | | CJA 20 as to Hector Ruiz: Appointment of Attorney Ali John Amirshahi for Hector Ruiz. (mful) (Entered: 04/13/2022) |
| 04/12/2022 | 15 | CJA 23 Financial Affidavit by Hector Ruiz.(mful) (Entered: 04/13/2022) |
| 04/12/2022 | 16 | Temporary Detention Order as to Hector Ruiz. Signed by Magistrate Judge Elizabeth W. Hanes on 4/12/22. (mful) (Entered: 04/13/2022) |
| 04/13/2022 | | Interpreter Information: Patricia Michelsen-King is the Interpreter. Spanish is the type of language required. Appointment is set for April 15, 2022 @ 11:00 AM for an Arraignment (lgar, ) (Entered: 04/13/2022) |
| 04/14/2022 | 17 | Pretrial Services Bond REPORT (SEALED - government and defense counsel) as to Hector Ruiz. (mful) (Entered: 04/14/2022) |
| 04/15/2022 | 18 | Minute Entry for proceedings held before Magistrate Judge Elizabeth W. Hanes:Arraignment and Detention hearings as to Hector Ruiz Count 1-3 held on 4/15/2022; Court reminded counsel of prosecutorial obligations as required under Rule 5(f); Govt moved to unseal case - GRANTED; Deft waived formal arraignment; Deft entered plea of not guilty as to counts 1-3 and requested jury trial; Deft submitted written Waiver of Detention Hearing; Deft held without bond pending the Jury Trial set for 6/21/2022 at 09:30 AM in Richmond Courtroom 7400 before District Judge Robert E. Payne; Deft remanded. (jsau, ) (Entered: 04/15/2022) |
| 04/15/2022 | 19 | WAIVER of Detention by Hector Ruiz (jsau, ) (Entered: 04/15/2022) |
| 04/15/2022 | 20 | ORDER as to Hector Ruiz. This matter comes before the Court on its own initiative. In accord with the Due Process Protections Act and Rule 5(f) of the Federal Rules of Criminal Procedure, this Court CONFIRMS the United States obligation to disclose to the defendant all exculpatory evidence, that is, evidence that favors the defendant or casts doubt on the United States case, as required by Brady v. Maryland, 373 U.S. 83 (1963) and its progeny, and hereby ORDERS the United States to do so. Failure to disclose exculpatory evidence in a timely manner may result in serious consequences, including, but not limited to, exclusion of evidence, adverse jury instructions, dismissal of charges, contempt proceedings, disciplinary action, or sanctions by the Court. Having given counsel the oral admonition required by the Due Process Protection Act, this Order serves as the reminder of prosecutorial obligation and duties in accordance with Rule 5(f) and the Eastern District of Virginia Standing Order concerning the same. Signed by Magistrate Judge Elizabeth W. Hanes on 4/15/22. (jsau, ) (Entered: 04/15/2022) |
| 04/15/2022 | 21 | ORDER OF DETENTION as to Hector Ruiz. Signed by Magistrate Judge Elizabeth W. Hanes on 4/15/22. (jsau, ) (Entered: 04/15/2022) |
| 06/02/2022 | | Set Hearings as to Hector Ruiz: Plea Agreement Hearing set for 6/7/2022 at 9:30 AM in Richmond Courtroom 5300 before Magistrate Judge Elizabeth W. Hanes. (mful) (Entered: 06/02/2022) |
| 06/02/2022 | | Interpreter Information: Patricia Michelsen-King is the Interpreter. Spanish is the type of language required. Appointment is set for June 7, 2022 @ 9:30 AM for a Plea. Interpreter to arrive by 9:00 AM (lgar, ) (Entered: 06/02/2022) |

| | | |
|---|---|---|
| 06/07/2022 | 24 | Minute Entry for proceedings held before Magistrate Judge Elizabeth W. Hanes (Patricia Michelsen-King, Interpreting): Plea Agreement Hearing as to Hector Ruiz held on 6/7/2022; Rule 11 Waiver submitted; Deft rearraigned on Count 1 of the Indictment and entered plea of guilty; Court accepted plea; Sentencing set for 8/25/2022 at 11:30 AM in Richmond Courtroom 7400 before District Judge Robert E. Payne; Deft remanded. (FTR) (mful) (Entered: 06/07/2022) |
| 06/07/2022 | 25 | Waiver of Right to Rule 11 before a US District Judge by Hector Ruiz.(mful) (Entered: 06/07/2022) |
| 06/07/2022 | 26 | Statement of Facts as to Hector Ruiz.(mful) (Entered: 06/07/2022) |
| 06/07/2022 | 27 | PLEA AGREEMENT as to Hector Ruiz.(mful) (Entered: 06/07/2022) |
| 06/07/2022 | 28 | Order for sentencing guidelines as to Hector Ruiz. Signed by Magistrate Judge Elizabeth W. Hanes on 6/7/22. (mful) (Entered: 06/07/2022) |
| 06/07/2022 | 29 | REPORT AND RECOMMENDATIONS on Plea of Guilty as to Hector Ruiz ; Objections to R&R due by 6/24/2022. Signed by Magistrate Judge Elizabeth W. Hanes on 6/7/22. (mful) (Entered: 06/07/2022) |
| 06/08/2022 | | Interpreter Information: Patricia Michelsen-King is the Interpreter. Spanish is the type of language required. Appointment is set for August 25, 2022 @ 11:30 AM for a Sentencing (lgar, ) (Entered: 06/08/2022) |
| 06/27/2022 | 30 | ORDER ADOPTING REPORT AND RECOMMENDATIONS - It is hereby ORDERED that the report and recommendation of the Magistrate Judge is ADOPTED and the Defendant is found guilty of Count ONE (1) of the Indictment. Signed by District Judge Robert E. Payne on 6/27/2022. (jpow, ) (Entered: 06/27/2022) |
| 07/21/2022 | 31 | PRESENTENCE INVESTIGATION REPORT (Disclosed Presentence Investigation Report) (SEALED - government and defense counsel) as to Hector Ruiz. Objections to PSI due 08/04/22. (smith, lisa) (Entered: 07/21/2022) |
| 08/08/2022 | 32 | PRESENTENCE INVESTIGATION REPORT (Sentencing Presentence Investigation Report) (SEALED - government and defense counsel) as to Hector Ruiz. (Harrison, Dorothy)INCLUDES ADDENDUM (Entered: 08/08/2022) |
| 08/17/2022 | 34 | MOTION for Acceptance of Responsibility *Additional One-Level Reduction* by USA as to Hector Ruiz. (Anthony, Stephen) (Entered: 08/17/2022) |
| 08/17/2022 | 35 | Position on Sentencing by USA as to Hector Ruiz (Anthony, Stephen) (Entered: 08/17/2022) |
| 08/18/2022 | 36 | MOTION for Variance Sentence by Hector Ruiz. (Amirshahi, Ali) (Entered: 08/18/2022) |
| 08/18/2022 | 37 | Position on Sentencing by Hector Ruiz (Amirshahi, Ali) (Entered: 08/18/2022) |
| 08/25/2022 | 38 | Minute Entry for proceedings held before District Judge Robert E. Payne: Matter came on for Sentencing held on 8/25/2022 for Hector Ruiz. No objections to PSR; government's motion for acceptance of responsibility (ECF No. 34 ) granted; transcript of bench conference to be sealed; sentencing hearing continued to 10/27/2022 at 1:30 p.m. for reasons explained to the Court; defendant remanded (Court Reporter Tracy Stroh, OCR.) (nbrow) (Entered: 08/25/2022) |
| 08/25/2022 | 39 | ORDER For the reasons set forth on the record during the hearing on August 25, 2022, it is hereby ORDERED that : The sentencing hearing is continued to October 27, 2022 at 1:30 PM ; and, The MOTION FOR ADDITIONAL ONE- LEVEL REDUCTION PURSUANT TO U. S. S. G. § 3El. l(b) FOR TIMELY ACCEPTANCE OF RESPONSIBILITY (ECF |

| | | |
|---|---|---|
| | | No. 34 ) is GRANTED. Signed by District Judge Robert E. Payne on 8/25/2022. (asho, ) (Entered: 08/25/2022) |
| 08/26/2022 | | Set Hearing as to Hector Ruiz: Sentencing set for 10/27/2022 at 01:30 PM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (nbrow) (Entered: 08/26/2022) |
| 09/26/2022 | 40 | ORDER. The sentencing hearing scheduled for 1:30 p.m. October 27, 2022 is rescheduled to 10:30 a.m. November 3, 2022. Signed by District Judge Robert E. Payne on 9/26/2022. Copy to USPO as directed. (jsmi, ) (Entered: 09/26/2022) |
| 09/26/2022 | | Reset Hearing as to Hector Ruiz: Sentencing set for 11/3/2022 at 10:30 AM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (nbrow) (Entered: 09/26/2022) |
| 09/29/2022 | | Interpreter Information: Patricia Michelsen-King is the Interpreter. Spanish is the type of language required. Appointment is set for November 3, 2022 @ 10:30 AM for a Sentencing (lgar, ) (Entered: 09/29/2022) |
| 11/03/2022 | 42 | Minute Entry for proceedings held before District Judge Robert E. Payne: Matter came on for Sentencing held on 11/3/2022 for Hector Ruiz. Court requiring additional briefing re: sealing courtroom; defendant to file motion by 11/11/2022, government & Richmond Times Dispatch to respond by 11/18/2022; defendant to reply by 11/23/2022; Court permitting press to file motion in consultation with its counsel, if needed; sentencing continued generally - interpreter to be appointed; defendant remanded into custody (Court Reporter Diane Daffron, OCR.)(nbrow) (Entered: 11/03/2022) |
| 11/04/2022 | 43 | ORDER that the Defendant shall file a written Motion to Seal the Courtroom by November 11; The Government shall file its Response by November 18; The Defendant shall file his Reply by November 23. If any interested parties wish to file Motions or Responses, they may do so on the same timeline as listed above. The sentencing is continued generally pending further order from this Court. Signed by District Judge Robert E. Payne on 11/4/2022. (jsmi, ) (Entered: 11/04/2022) |
| 11/08/2022 | 44 | NOTICE *of Special Appearance for Newspaper* by Hector Ruiz (Lacy, David) (Entered: 11/08/2022) |
| 11/11/2022 | 45 | MOTION to Seal Proceedings by Hector Ruiz. (Amirshahi, Ali) (Entered: 11/11/2022) |
| 11/18/2022 | 46 | NOTICE *of Special Appearance for Newspaper* by Hector Ruiz (Cassada, Grayson) (Entered: 11/18/2022) |
| 11/18/2022 | 47 | Opposition by Lee BHM Corp. as to Hector Ruiz re 45 MOTION to Seal *Proceedings* (Cassada, Grayson) (Entered: 11/18/2022) |
| 11/18/2022 | 49 | RESPONSE to Motion by USA as to Hector Ruiz re 45 MOTION to Seal (Anthony, Stephen) (Entered: 11/18/2022) |
| 12/12/2022 | 52 | ORDER. DEFENDANT'S MOTION TO SEAL PROCEEDINGS AND MEMORANDUM OF LAW 45 (unsealed), 48 (sealed) is GRANTED in part and DENIED in part. It is ORDERED that the Sentencing Hearing will begin by calling the case (unsealed); the Court will then consider all evidence and argument that, in the accompanying sealed Memorandum Opinion, is found to justify sealing (sealed); and the proceedings will be unsealed and the Court will consider any other evidence pertinent to sentencing and impose sentence (unsealed). Counsel will further arrange a conference telephone call to set a sentencing date. See Order for additional details. Signed by District Judge Robert E. Payne on 12/12/2022. (jsmi, ) (Entered: 12/12/2022) |
| 12/29/2022 | 53 | ORDER that the sentencing hearing is scheduled for January 18, 2023, at 11:00 AM. Signed by District Judge Robert E. Payne on 12/29/2022. (adun, ) (Entered: 12/29/2022) |

| | | |
|---|---|---|
| 12/29/2022 | | Set/Reset Hearings as to Hector Ruiz: Sentencing set for 1/18/2023 at 11:00 AM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (jpow, ) (Entered: 12/29/2022) |
| 12/29/2022 | | Minute Entry for proceedings held before District Judge Robert E. Payne: Telephone Conference as to Hector Ruiz held on 12/29/2022 (Court Reporter Gil Halasz, OCR.) (nbrow) (Entered: 01/20/2023) |
| 12/30/2022 | | Interpreter Information: Johnny Benningfield is the Interpreter. Spanish is the type of language required. Appointment is set for January 18, 2023 @ 11:00 AM before Judge Payne for a Sentencing (lgar,) (Entered: 12/30/2022) |
| 01/11/2023 | 54 | ORDER Due to a conflict in the Court's docket, it is ORDERED that the Sentencing Hearing originally scheduled for January 18, 2023 at 11:00 am (ECF No. 53 ) will now take place on January 18, 2023 at 2:00 pm. Signed by District Judge Robert E. Payne on 1/11/2022. (asho, ) (Entered: 01/11/2023) |
| 01/12/2023 | | Reset Hearings as to Hector Ruiz: Sentencing set for 1/18/2023 at 02:00 PM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (jpow, ) (Entered: 01/12/2023) |
| 01/12/2023 | | Interpreter Information: Patricia Michelsen-King is replacing Johnnie Benningfield as the Interpreter. Spanish is the type of language required. Appointment is set for January 18, 2022 @ 2:00 PM for a Sentencing (lgar, ) (Entered: 01/12/2023) |
| 01/18/2023 | 55 | Minute Entry for proceedings held before District Judge Robert E. Payne: Sentencing held on 1/18/2023 for Hector Ruiz. Court opened case publicly and sealed courtroom from 2:18PM-2:30PM (transcript to be sealed); defendant's motion for variance sentence (ECF No. 36 ) withdrawn - denied as moot; Count 1: 55 months imprisonment, 5 years supervised release, $100 special assessment; Counts 2 & 3: dismissed by motion of government; advised of right to appeal; remanded to custody (Court Reporter Krista Liscio, OCR.) (nbrow) (Entered: 01/18/2023) |
| 01/18/2023 | 57 | ORDER that the defendant's 36 MOTION FOR VARIANCE SENTENCE is DENIED AS MOOT and the government's 9 ORAL MOTION TO DISMISS COUNTS 2 and 3 of the INDICTMENT is GRANTED. Signed by District Judge Robert E. Payne on 1/18/2023. (jsmi, ) (Entered: 01/18/2023) |
| 01/25/2023 | 58 | JUDGMENT as to Hector Ruiz, Count 1: 55 MONTHS IMPRISONMENT, 5 YEARS SUPERVISED RELEASE, $100 SPECIAL ASSESSMENT; Count 2: DISMSISED ON MOTION OF GOVERNMENT; Count 3: DISMISSED ON MOTION OF GOVERNMENT. Signed by District Judge Robert E. Payne on 1/25/2023. (nbrow) (Entered: 01/25/2023) |
| 01/25/2023 | 59 | SEALED Statement of Reasons as to Hector Ruiz. Signed by District Judge Robert E. Payne on 1/25/2023. (nbrow) (Entered: 01/25/2023) |
| 03/04/2024 | 60 | MOTION to Reduce Sentence - USSC 821 Amendment by Hector Ruiz. (Attachments: # 1 Envelope)(adun, ) Modified on 2/27/2026 (mful, ). (Entered: 03/05/2024) |
| 03/04/2024 | 61 | MOTION to Appoint Counsel by Hector Ruiz. (Attachments: # 1 Envelope)(adun, ) (Entered: 03/05/2024) |
| 03/05/2024 | 62 | 821 STANDING ORDER as to Hector Ruiz. Signed by District Judge M. Hannah Lauck on 10/31/2023. Copy mailed to Defendant. (adun, ) (Entered: 03/05/2024) |
| 03/06/2024 | 63 | USSC 821 Amendment Work Sheet (Sealed Document) as to Hector Ruiz (Geurts, Sami) (Entered: 03/06/2024) |

| | | |
|---|---|---|
| 04/05/2024 | 64 | ORDER that Mr. Amirshahi file the required notice by April 11, 2024. At the present stage, counsel must only express whether he is available for reappointment, or whether some conflict has arisen such that the Court must reassign representation. Counsel will have the opportunity to express aposition as to the merits of relief at a later time and/or seek to withdraw if he cannot identify a viable basis for relief after independently reviewing the defendant's case and the 821 Worksheet. SEE ORDER FOR DETAILS. Signed by District Judge Robert E. Payne on 4/5/2024. Copy of order mailed to Defendant and electronic notice sent to Mr. Amirshahi. (adun, ) (Entered: 04/05/2024) |
| 04/08/2024 | 65 | NOTICE *Receipt of 821 Worksheet and Availability of Counsel* by Hector Ruiz re 64 Order,, (Amirshahi, Ali) (Entered: 04/08/2024) |
| 04/10/2024 | 66 | ORDER as to Hector Ruiz. It is hereby ORDERED that the defendant's pro se Motion to Appoint Counsel (ECF No. 61 ) is granted and the Clerk is directed to appoint Ali J. Amirshahi, Esquire. It is further ORDERED that: (1) By May 10, 2024, the defendant shall file a Motion for Reduction of Sentence Pursuant to Amendment 821; and (2) By May 24, 2024, the United States Attorney's Office shall file its response; and (3) By May 31, 2024, the defendant shall file his reply. *See for complete detail*. It is so ORDERED. Signed by District Judge Robert E. Payne on 04/09/2024. (nbrow) (Entered: 04/10/2024) |
| 04/10/2024 | | CJA 20 as to Hector Ruiz: Appointment of attorney Ali J. Amirshahi, Esquire for Hector Ruiz. (nbrow) (Entered: 04/10/2024) |
| 05/10/2024 | 67 | MOTION to Seal by Hector Ruiz. (Attachments: # 1 Proposed Order)(Amirshahi, Ali) (Entered: 05/10/2024) |
| 05/15/2024 | 68 | ORDER - The DEFENDANT'S MOTION TO SEAL 67 is granted. The Clerk is directed to file the defendant's MOTION FOR REDUCTION IN SENTENCE PURSUANT TO 18 U.S.C. §3582(c) AND U.S.S.G. AMENDMENT 821 under seal. Signed by District Judge Robert E. Payne on 5/15/2024. (adun, ) (Entered: 05/15/2024) |
| 05/15/2024 | 69 | SEALED MOTION to Reduce Sentence - USSC 821 Amendment by Hector Ruiz. (adun, ) (Entered: 05/15/2024) |
| 05/30/2024 | 71 | Sealed Response in Opposition to Defendant's Motion for Reduction of Sentence. (jenjones, ) (Entered: 05/30/2024) |
| 06/20/2024 | 72 | MOTION to Withdraw as Attorney by Ali J Amirshahi. by Hector Ruiz. (Amirshahi, Ali) (Entered: 06/20/2024) |
| 06/27/2024 | 73 | ORDER - that the MOTION TO WITHDRAW AS COUNSEL (ECF No. 72 ) is granted and the Clerk shall remove Ali J. Amirshahi as counsel for the defendant. It is further ORDERED that the Clerk shall appoint new counsel for the defendant respecting his eligibility for relief pursuant to the retroactive application of Amendment 821 to the United States Sentencing Guidelines; and Newly appointed defense counsel shall review the file and the previous defense attorney's filings and file, by July 15, 2024, a Notice advising the Court whether he or she adopts the previous filings of the former defense counsel or desires to refile the Motion for Reduction of Sentence Pursuant to Amendment 821. Signed by District Judge Robert E. Payne on 06/27/2024. (ewat, ) (Entered: 06/27/2024) |
| 06/27/2024 | | CJA 20 Appointment of Attorney Edwin Frederick Brooks for Hector Ruiz. (ewat, ) (Entered: 06/27/2024) |
| 07/15/2024 | 74 | MOTION for Extension *to File Statement regarding re-filing Motion for Reduction of Sentence* by Hector Ruiz. (Brooks, Edwin) (Entered: 07/15/2024) |
| 07/16/2024 | 75 | ORDER that having considered the defendant' s MOTION FOR EXTENSION OF TIME (ECF No. 74 ), and for good cause shown, it is hereby ORDERED that the MOTION FOR |

| | | |
|---|---|---|
| | | EXTENSION OF TIME (ECF No. 74) is granted. It is further ORDERED that: (1) The Clerk shall send a copy of the United States' response (ECF No. 71 ) to Edwin F. Brooks, Esquire by electronic mail; and (2) By July 18, 2024, Mr. Brooks shall file a Notice advising the Court whether he adopts the former defense counsel's previous filings or desires to refile the Motion for Reduction of Sentence Pursuant to Amendment 821. Signed by District Judge Robert E. Payne on 7/16/2024. (ewat, ) (Entered: 07/17/2024) |
| 07/18/2024 | 76 | NOTICE by Hector Ruiz re 73 Order on Motion to Withdraw as Attorney,,, (Brooks, Edwin) (Entered: 07/18/2024) |
| 07/31/2024 | 77 | ORDER that the MOTION FOR REDUCTION IN SENTENCE PURSUANT TO 18 U.S.C. § 3582(c) AND U.S.S.G. AMENDMENT 821 (ECF No. 69 ) is denied as moot; and by August 16, 2024, the defendant shall file a Motion for Reduction of Sentence Pursuant to Amendment 821; and By August 30, 2024, the United States shall file its response; and by September 6, 2024, the defendant shall file his reply. SEE ORDER FOR DETAILS.Signed by District Judge Robert E. Payne on 7/31/2024. (ewat, ) (Entered: 07/31/2024) |
| 08/16/2024 | 78 | Consent MOTION for Extension *to File Motion for Reduction of Sentence Pursuant to Amendment 821* by Hector Ruiz. (Brooks, Edwin) (Entered: 08/16/2024) |
| 08/21/2024 | 79 | ORDER - The MOTION FOR EXTENSION OF TIME (ECF No. 78 ) is granted. It is further ORDERED that: By August 23, 2024, the defendant shall file a Motion for Reduction of Sentence Pursuant to Amendment 821; and By September 9, 2024, the United States shall file its response; and By September 16, 2024, the defendant shall file his reply. Signed by District Judge Robert E. Payne on 8/21/2024. (ewat, ) (Entered: 08/21/2024) |
| 08/23/2024 | 80 | MOTION to Reduce Sentence - USSC 821 Amendment by Hector Ruiz. (Brooks, Edwin) (Entered: 08/23/2024) |
| 09/13/2024 | 81 | MOTION for Leave to File *Response to 821 Motion* by USA as to Hector Ruiz. (Attachments: # 1 Proposed Response)(Anthony, Stephen) (Entered: 09/13/2024) |
| 09/19/2024 | 82 | ORDER- It is hereby ORDERED the Motion for Leave (ECF No. 81 ) is granted. It is further ORDERED that the United States shall file its proposed response by September 20, 2024; and the defendant shall file his reply by September 27, 2024. It is so ORDERED. Signed by District Judge Robert E. Payne on 09/19/2024. (Kski, ) (Entered: 09/19/2024) |
| 09/20/2024 | 83 | RESPONSE by USA as to Hector Ruiz re 80 MOTION to Reduce Sentence - USSC 821 Amendment (Anthony, Stephen) (Entered: 09/20/2024) |
| 09/27/2024 | 84 | REPLY TO GOVERNMENT'S RESPONSE by Hector Ruiz re 83 Response (Brooks, Edwin) Modified on 9/30/2024 (ewat, ). (Entered: 09/27/2024) |
| 03/17/2025 | 85 | Waiver of Hearing to modify conditions of supervised release as to Hector Ruiz. It is SO ORDERED. SEE ORDER FOR DETAILS. Signed by District Judge Robert E. Payne on 3/17/2025. (ewat, ) (Entered: 03/17/2025) |
| 02/27/2026 | 86 | Order - The DEFENDANT'S MOTION FOR SENTENCE REDUCTION PURSUANT TO AMENDMENT 821 PART B (ECF No. 80 ) is denied as moot. Signed by District Judge Robert E. Payne on 2/26/26. (mful, ) (Entered: 02/27/2026) |

**VIRGINIA:**

**IN THE CIRCUIT COURT FOR THE COUNTY OF HENRICO**

**In re: Public Access To November 22, 2021 Transfer Hearing Relating to Death of Lucia Bremer**

**Case No.:** CL21-7567

**EMERGENCY PETITION FOR WRIT OF MANDAMUS**

Lee BHM Corp., publisher of the *Richmond Times-Dispatch* (the "Newspaper"), by counsel, pursuant to Va. Code §§ 8.01-644, 16.1-302(C) and 17.1-513, petitions this Court for the issuance of a writ of mandamus directed to the Honorable Stacy E. Lee, Presiding Judge of the Juvenile and Domestic Relations Court for the County of Henrico (the "JDR Court"), and in support thereof, states the following:

**INTRODUCTION**

1. This action concerns the public's right of access to a transfer hearing in the JDR Court scheduled for November 22, 2021, at 9:00 a.m.

2. The underlying criminal proceeding arises out of the death of Lucia Bremer. The defendant is at least 14 years old and has been charged with murder, among other things. Accordingly, pursuant to Virginia Code § 16.1-302(C), the public has a presumptive right of access to the transfer hearing.

3. On November 17, 2021, the JDR Court granted a motion to close the November 22 transfer hearing to the public. The JDR Court granted the closure motion without first holding a hearing on the motion, and without making any specific findings of particularized prejudice. The JDR Court also relied on a statute that has no application; indeed, applying the statute to restrict the public's right of access violates

NOV 29 2021
RECEIVED & FILED IN OFFICE
Deputy Clerk, Henrico Circuit Court

both the Virginia and the federal Constitutions, as the Supreme Court of Virginia has held.

4. Moreover, the JDR Court refused to enter an order memorializing its ruling on the closure motion, thereby preventing the Newspaper from appealing the ruling.

5. For these reasons, explained more fully below, the Newspaper respectfully requests that this Court direct the JDR Court to make reasonable arrangements for the public, including the Newspaper, to observe the November 22 transfer hearing. Alternatively, if this Court is unable to rule before the November 22 transfer hearing transpires, the Newspaper respectfully requests that this Court direct the JDR Court to make available to the public any transcript of the transfer hearing, as well as any exhibits entered into evidence during the transfer hearing, and any written orders or rulings relating to the transfer hearings.

## BACKGROUND

6. On October 28, 2021, the Newspaper's reporter notified the Clerk of the JDR Court of her intent to attend the November 22 transfer hearing. *See* Exhibit A. In response, the Deputy Clerk for the Chief Judge of the JDR Court informed the reporter that, pursuant to unidentified COVID-19 regulations relating to social distancing, only "parties directly related to the case" will be allowed to attend the hearings. *See* Exhibit B.

7. Accordingly, on November 3, 2021, the Newspaper filed a *Petition For Leave To Intervene And Motion For Remote Hearing* ("Petition") requesting (i) that the JDR Court grant the Newspaper leave to intervene for the limited purpose of asserting the right of the public, including the Newspaper, to attend the November 22 transfer hearing,

and (ii) that the JDR Court allow the public to attend the transfer hearing remotely, to ensure compliance with the Court's COVID-19 policy of not allowing anyone to physically enter the courtroom other than parties directly related to the case. *See* Exhibit C.

8. On November 4, 2021, the Newspaper requested, in writing, an expedited hearing on its Petition. *See* Exhibit D.

9. Also on November 4, 2021, the defendant filed his *Response To Petition For Leave To Intervene and Motion For Remote Hearing and Defendant's Motion For Closure Pursuant To § 16.1-302* ("Closure Motion"), which doubled as a response to the Newspaper's Petition and a motion to close the November 22 hearing to the public. *See* Exhibit E.

10. On November 10, 2021, the Newspaper filed its *Opposition To Defendant's Closure Motion And Reply To Defendant's Response To Newspaper's Petition* ("Opposition To Closure Motion"). In its cover letter, the Newspaper reiterated its request for an expedited hearing. *See* Exhibit F.

11. To the Newspaper's knowledge, no hearing was held on either the Newspaper's Petition or the defendant's Closure Motion.

12. On November 17, 2021, the JDR Court issued a letter ruling granting the Closure Motion. *See* Exhibit G. The letter ruling states, in its entirety, that:

> The Court has considered the legal authority and briefing presented by counsel for both Lee BHM Corporation and Defense Counsel. After careful consideration and for good cause shown, the Court grants the Defendant's Motion for Closure and closes the proceeding in the juvenile matters relating to Lucia Bremer. In addition to granting the motion based on the Defendant's request pursuant to VA Code § 16.1-302(C), the Court also finds that the sensitive nature of the information regarding the juvenile to be discussed at the transfer hearing is such that it must remain

> protected by the Juvenile & Domestic Relations Court until such time as the Court determines whether it appropriate to transfer the matters to Circuit Court. Therefore, the Court shall prohibit the media pursuant to VA Code § 19.2-266.

Exhibit G.

13. On November 18, 2021, the Supervising Deputy Clerk for the JDR Court advised that the JDR Court did not intend to enter an order memorializing its ruling. *See* Exhibit H.

14. On November 19, 2021, the Newspaper sought to notice an appeal of the JDR Court's November 17, 2021, ruling granting the Closure Motion. The JDR Clerk, however, refused to accept the Newspaper's appeal without an order, which as noted, the JDR Court refused to enter.

**<u>JURISDICTION</u>**

15. Pursuant to Virginia Code § 17.1-513, this Court has jurisdiction to issue writs of mandamus to all inferior tribunals, including the JDR Court.

16. Although mandamus cannot be used as a substitute for appeal, *see Hertz v. Times-World Corp.*, 259 Va. 599, 610, 528 S.E.2d 458, 464 (2000), here, an appeal is not available to the Newspaper because the JDR Court refused to enter an order, and the JDR Clerk refused to accept an appeal without an order. Accordingly, a writ of mandamus is the only available remedy.

17. Additionally, a writ of mandamus is the appropriate remedy to ensure that the issue of closure of the November 22 transfer hearing is timely addressed. *See Hertz*, 259 Va. at 614, 528 S.E.2d at 466–67 (Koontz, J., dissenting). In fact, mandamus is the Newspaper's only remedy given the imminent transfer hearing. As the Supreme Court of Virginia has observed:

> [T]o work effectively, public access must be contemporaneous—the public must be able to scrutinize the judicial process as it takes place. Newspapers, such as Daily Press, serve as surrogates for the public. They are the first rough draft of history, providing immediate descriptions of events as they unfold. However, the newsworthiness of a particular story is often fleeting. To delay or postpone disclosure undermines the benefits of public scrutiny and may have the same result as complete suppression.

*Daily Press, Inc. v. Commonwealth*, 285 Va. 447, 453, 739 S.E.2d 636, 640 (2013) (internal quotations and source omitted). Hence, "mandamus is the preferred method of review for orders restricting press activity related to criminal proceedings." *In re Washington Post Co.*, 807 F.2d 383, 388 (4th Cir. 1986).

## ARGUMENT AND AUTHORITIES

18. Virginia Code § 16.1-302(C) provides that:

> The general public shall be excluded from all juvenile court hearings and only such persons admitted as the judge shall deem proper. **However,** proceedings in cases involving an adult charged with a crime and **hearings held on a petition or warrant alleging that a juvenile fourteen years of age or older committed an offense which would be a felony if committed by an adult shall be open**. Subject to the provisions of subsection D for good cause shown, the court may, sua sponte or on motion of the accused or the attorney for the Commonwealth close the proceedings. If the proceedings are closed, the court shall state in writing its reasons and the statement shall be made a part of the public record.

(Emphasis added).

19. The defendant in the underlying criminal proceeding is at least 14 years old and charged with a felony level offense (murder), as the defendant conceded in his Closure Motion.

20. Accordingly, pursuant to Virginia Code § 16.1-302(C), the November 22 transfer hearing is presumptively open to the public absent a showing of "good cause."

21. Importantly, "good cause" is not a simple matter of the JDR Court's discretion. *In re Times-World Corp.*, 50 Va. Cir. 25, 1999 WL 33726355, *7 (Va. Cir. Ct.

Feb. 22, 1999). It is a rigorous standard that requires the movant to meet a high threshold. To overcome the presumption of public access, the defendant "must bear the burden of establishing an interest so compelling that it cannot be protected reasonably by some measure other than a [closure] order." *Shenandoah Pub. House, Inc. v. Fanning*, 235 Va. 253, 258–59 (1988); *see also Daily Press, Inc. v. Commonwealth*, 285 Va. 447, 455 (2013) ("The public's right of access can only be denied upon a strong showing of a compelling governmental interest[.]").

22. Furthermore, if a juvenile succeeds in demonstrating a particularized harm likely to occur if the hearing is open, the reviewing court must still consider alternatives to closure. *Richmond Newspapers, Inc. v. Commonwealth*, 222 Va. 574, 589 (1981) ("*Richmond Newspapers II*"). For example, "[w]hen it is not possible to hold the entire hearing in public, only that portion that would be prejudicial should be closed." *Id.* (citations omitted). In short, "[t]he public's right of access can only be denied upon a strong showing of a compelling governmental interest, and any closure must be narrowly tailored to serve that interest." *Daily Press*, 285 Va. at 455.

23. There are also procedural requirements that the JDR Court must follow before closing a presumptively open hearing.

24. The JDR Court must make "specific findings of particularized prejudice resulting to the juvenile should the hearing be open to the public," *In re Times-World Corp.*, 1999 WL 33726355 at *7, and those specific findings must be stated in writing and made part of the public record, *see* Va. Code § 16.1-302(C) ("If the proceedings are closed, the court shall state in writing its reasons and the statement shall be made a part of the public record."). This process is, by design, burdensome. It "ensure[s] that the

decision to seal [juridical proceedings] will not be made lightly." *Stone v. Univ. of Maryland Med. Sys. Corp.*, 855 F.2d 178, 182 (4th Cir. 1988); *see also Daily Press*, 285 Va. at 455 ("To ensure stringent safeguarding of the constitutional rights at stake, courts are required to justify any decision to close with specific reasons and findings on the record.").

25. Additionally, if the closure motion is opposed, the JDR Court must hold a hearing before ruling. *See Richmond Newspapers II*, 222 Va. at 592 (holding that the trial court "erred in ordering closure without affording the intervenors a hearing on the merits."). Indeed, "[a]bsent a hearing, there could be no record of the necessary findings to support closure." *Id.*

26. The JDR Court's November 17, 2021 letter granting the Closure Motion failed to comply with these procedural and substantive requirements for restricting public access to the November 22 transfer hearing.

27. The JDR Court did not hold a hearing before granting the Closure Motion.

28. Moreover, the JDR Court failed to make any specific findings of particularized harm to the defendant if the hearing is open to the public. The JDR Court's November 17, 2021 letter only refers generally to "the sensitive nature of the information regarding the juvenile to be discussed at the transfer hearing." *See* Exhibit G.

29. In his Closure Motion, the defendant also did not identify any particularized harm he would suffer if the November 22 transfer hearing is open. He relied instead on vague and conclusory assertions about "deeply personal and private" information, "including medical, psychological and educational information," and

purported "genuine harm" if "some or all of that information" is publicly disclosed. *See* Def.'s Closure Motion ¶ 5.

30. To the extent the JDR Court accepted at face value the defendant's vague and conclusory assertions, the JDR Court violated well-established authority from the Supreme Court of Virginia, which has repeatedly admonished lower courts that "a court may not base its decision to limit public access to court proceedings or records upon the conclusory assertions of the party requesting the closure." *Perreault v. The Free Lance-Star*, 276 Va. 375, 390, 666 S.E.2d 352, 360 (2008) (citation omitted). *Accord Lotz v. Commonwealth*, 277 Va. 345, 351, 672 S.E.2d 833, 837 (2009) (collecting cases).

31. Furthermore, the defendant's arguments fail to acknowledge that every transfer hearing requires consideration of a juvenile defendant's medical, psychological and educational history. *See* Va. Code §§ 16.1-269.1(A)(4)(g)—(i). Accordingly, disclosure of the defendant's medical, psychological and educational information during the November 22 transfer hearing is not a particularized harm; it is simply the reality for every juvenile defendant subjected to a transfer hearing. Thus, to deny public access on the bases identified by the defendant would negate the General Assembly's determination that transfer hearings are presumptively open to the public.

32. Lastly, the JDR Court's reliance on Virginia's "cameras in the courtroom" statute, Virginia Code § 19.2-266, is entirely misplaced. The Newspaper did not request permission under Section 19.2-266 to bring cameras into the courtroom. Moreover, the discretion conferred on trial courts under Section 19.2-266 is separate and distinct from the non-discretionary requirements attendant to the public's right of access to judicial proceedings. Thus, as the Virginia Supreme Court has explained, "the closure of a

pretrial hearing pursuant to the authority of § 19.2-266 would be violative of Article I, Section 12 of the Constitution of Virginia and the First Amendment to the Federal Constitution." *Richmond Newspapers II*, 222 Va. at 592, 281 S.E.2d at 925.

**CONCLUSION**

WHEREFORE, for the foregoing reasons, Lee BHM Corp., publisher of the *Richmond Times-Dispatch*, respectfully requests that this Court issue a writ of mandamus directing the JDR Court to vacate its November 17, 2021, ruling and to make reasonable arrangements for the public, including the Newspaper, to observe the November 22 transfer hearing. Alternatively, if this Court is unable to rule before the November 22 transfer hearing transpires, the Newspaper respectfully requests that this Court direct the JDR Court to make available to the public any transcript of the transfer hearing, as well as any exhibits entered into evidence during the transfer hearing, and any written orders or rulings relating to the transfer hearing. The Newspaper requests any additional relief this Court deems fair and just.

Dated: November 19, 2021.

Respectfully submitted,

LEE BHM CORP.

By counsel:

David B. Lacy (VSB No. 71177)
Gordon M. Phillips (VSB No. 90982)
CHRISTIAN & BARTON, LLP
901 East Cary Street, Suite 1800
Richmond, VA 23219-4037
Telephone: (804) 697-4121
Facsimile: (804) 697-6121
dlacy@cblaw.com
gphillips@cblaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of November, 2021, a true and accurate copy of the foregoing was sent to the following:

**By Hand Delivery:**

The Honorable Stacy E. Lee, Judge
Chambers
Henrico Juvenile & Domestic Relations District Court
4201 E. Parham Road
Henrico, Virginia 23273

**By Electronic Mail:**

Shannon L. Taylor, Esq.
Toni M. Randall, Esq.
Henrico Commonwealth's Attorney
4309 E. Parham Road
Henrico, VA 23228
Tay03@henrico.us
ran38@henrico.us

*Attorneys for the Commonwealth*

Kevin D. Purnell, Esq.
KEVIN D. PURNELL, PLLC
106 N. Thompson Street, Floor 1
Richmond, VA 23221
kplesq@gmail.com

G. Russell Stone, Esq.
ROCKECHARLIE STONE, PLLC
530 East Main Street, Suite 608
Richmond, VA 23219
rstone@rockstonelaw.com

*Counsel for the Defendant*

Counsel

#2786525

# EXHIBIT A

JA48519 11/1/21 #4
JJ594703 11/22/21 #

**Richmond Times-Dispatch**

***By Hand Delivery***

Oct. 19, 2021

The Honorable Shannon Flinchum Meadowcroft, Clerk
Henrico Juvenile and Domestic Relations District Court
4201 E. Parham Road
Henrico, VA 23228-2745

HENRICO JUVENILE AND DOMESTIC RELATIONS DISTRICT COURT
OCT 19 2021
RECEIVED

***Re: In re Lucia Bremer***

Dear Ms. Meadowcroft:

I intend to attend two upcoming hearings in proceedings arising out of the death of Lucia Bremer on March 26, 2021. Specifically, I will attend the hearing on November 1, 2021, in the proceeding against Richard M. Pierce, and the transfer hearing on November 22, 2021, in the proceeding against the defendant accused of shooting Ms. Bremer.

The Virginia Code provides that:

> The general public shall be excluded from all juvenile court hearings and only such persons admitted as the judge shall deem proper. However, **proceedings in cases involving an adult charged with a crime and hearings held on a petition or warrant alleging that a juvenile fourteen years of age or older committed an offense which would be a felony if committed by an adult shall be open.** Subject to the provisions of subsection D for good cause shown, the court may, sua sponte or on motion of the accused or the attorney for the Commonwealth close the proceedings. If the proceedings are closed, the court shall state in writing its reasons and the statement shall be made a part of the public record.

Va. Code § 16.1-302(C) (emphasis added). Mr. Pierce is an adult, and the defendant in the Lucia Bremer shooting proceeding is at least 14 years old and charged with multiple offenses that would constitute a felony if committed by an adult, including murder. Therefore, all hearings in both matters are presumptively open to the public, including the November 1, 2021 hearing and the transfer hearing on November 22, 2021.

To my knowledge, the Court has not entered an order closing either the November 1 hearing or the November 22 hearing. If such an order(s) has been entered, please provide me a copy at your earliest convenience. In the interest of time, please email it to me at arockett@timesdispatch.com.

Assuming no closure order has been entered, please let me know the time at which the November 1 and November 22 hearings are scheduled to begin and the courtroom number. Please also let me know if either hearing is rescheduled, or if any additional hearings are scheduled in either matter.

Richmond Times-Dispatch

Additionally, if any party moves to close the November 1 hearing or the November 22 hearing, I hereby request notice of the date and time when such closure motion will be heard by the Court so that we can participate and, if appropriate, submit our position in writing in advance of the hearing. "[M]otions to close a hearing should be made in writing and filed with the court before the day of the hearing involved, and the public must be given reasonable notice that a closure hearing will be conducted." *Richmond Newspapers, Inc. v. Commonwealth*, 222 Va. 574, 590, 281 S.E.2d 915, 924 (1981).

Please contact me if you have any questions. Again, my email is arockett@timesdispatch.com and my cell phone number is (804) 322-9360.

Sincerely,

Alison K Rockett

Ali Rockett
Reporter

cc: Shannon L. Taylor, Commonwealth's Attorney (*by email*) (tay03@henrico.us)
Kevin D. Purnell, Esquire (*by email*) (kp1esq@gmail.com)
G. Russell Stone, Esquire (*by email*) (rstone@rockstonelaw.com)

# EXHIBIT B

**From:** Caitlyn L Ballou <cballou@vacourts.gov>
**Sent:** Wednesday, October 27, 2021 10:30:20 AM
**To:** Alison Rockett
**Cc:** Shannon Flinchum Meadowcroft
**Subject:** Letter - Ref Lucia Bremer

**This Message Is From an External Sender**
This message came from outside your organization.

Good Morning Ms. Rockett,

Judge Deglau has received your letter requesting to attend two upcoming hearings in Henrico JDR Court. Since we are still in covid-19 regulations the only people permitted inside the court rooms are parties directly related to the case because our court rooms are so small, it does not allow for the required 6 feet distance when there are more than several people in the court room. Please let me know if you have any further questions.

Thank you,
Caitlyn Ballou
Deputy Clerk for Honorable Margaret W. Deglau
Courtroom #4
Henrico County Juvenile & Domestic Relations Court
(804) 501-5412 Direct Line
(804) 501-4688 Office Line
(804) 501-4756 Office Fax
cballou@vacourts.gov
www.vacourts.gov

# EXHIBIT C

VIRGINIA:

**IN THE JUVENILE AND DOMESTIC RELATIONS COURT FOR HENRICO COUNTY**

**In re: Public Access To Hearings in Case Relating to Death of Lucia Bremer**

**Case No. ________________**

**PETITION FOR LEAVE TO INTERVENE AND MOTION FOR REMOTE HEARING**

Lee BHM Corp., publisher of the *Richmond Times-Dispatch* (the "Newspaper"), by counsel, petitions this Court for leave to intervene for the limited purpose of asserting the right of the public, including the Newspaper, to attend hearings in the criminal matter arising out of the death of Lucia Bremer, including, but not limited to, the hearing scheduled for November 22, 2021.

This matter involves a juvenile defendant who is at least 14 years old and charged with murder, among other things. Pursuant to Virginia Code § 16.1-302(C), the public, including the Newspaper, has a presumptive right to attend hearings in this matter:

> The general public shall be excluded from all juvenile court hearings and only such persons admitted as the judge shall deem proper. However, proceedings in cases involving an adult charged with a crime and **hearings held on a petition or warrant alleging that a juvenile fourteen years of age or older committed an offense which would be a felony if committed by an adult shall be open.** Subject to the provisions of subsection D for good cause shown, the court may, sua sponte or on motion of the accused or the attorney for the Commonwealth close the proceedings. If the proceedings are closed, the court shall state in writing its reasons and the statement shall be made a part of the public record.

Va. Code § 16.1-302(C) (emphasis added).

No party has filed a closure motion, nor has any order been entered closing hearings in this matter to the public. The Newspaper has been advised, however, that to protect against the spread of COVID-19, it is the Court's policy to not allow anyone to

physically enter the courtroom other than parties directly related to the case. Therefore, the Newspaper requests that the public be permitted to observe hearings in this matter remotely utilizing the Court's existing WebEx service or other similar video-conferencing technology.

The Newspaper's standing to intervene for the limited purpose of asserting the public's right to observe hearings in this matter is well-established and beyond peradventure. *See Hertz v. Times-World Corp.*, 259 Va. 599, 609, 528 S.E.2d 458, 463 (2000) ("The newspapers were entitled to intervene in the respective preliminary hearings for the limited purpose of asserting their objections to the juvenile and domestic relations district courts' rulings barring them from the courtrooms.").

Furthermore, providing remote access is consistent with the Court's obligation to consider less restrictive alternatives to a blanket denial of the public's right to access judicial proceedings in this Court. *See Daily Press, Inc. v. Commonwealth*, 285 Va. 447, 456 n.8, 739 S.E.2d 636, 641 n.8 (2013); *Shenandoah Pub. House, Inc. v. Fanning*, 235 Va. 253, 258–59, 368 S.E.2d 253, 256 (1988). *Accord In re Knight Pub. Co.*, 743 F.2d 231, 234 (4th Cir. 1984) ("Even with findings adequate to support closure, the trial court must consider alternatives before the courtroom can be closed constitutionally.").

Providing remote access also ensures that the public's access is contemporaneous. *See Daily Press*, 285 Va. at 453, 739 S.E.2d at 639–40 ("[T]he Commonwealth's argument ignores the **contemporaneous** need of a daily newspaper for access to criminal proceedings.") (emphasis in original). As the Virginia Supreme Court explained in *Daily Press*:

> [T]o work effectively, public access must be contemporaneous—the public must be able to scrutinize the judicial process as it takes place.

> Newspapers, such as the *Daily Press*, serve as surrogates for the public. They are the first rough draft of history, providing immediate descriptions of events as they unfold. However, the newsworthiness of a particular story is often fleeting. To delay or postpone disclosure undermines the benefits of public scrutiny and may have the same result as complete suppression.

*Id.* at 453, 739 S.E.2d at 640 (internal quotations and sources omitted; brackets added).

Consistent with the obligation to impose the least restrictive measures and to ensure that the public's access is contemporaneous, the Supreme Court of Virginia has responded to the COVID-19 pandemic by livestreaming its oral arguments to the public.[1] Other courts have adopted similar measures to accommodate both concerns about the spread of COVID-19 and the public's right to contemporaneously observe judicial proceedings. *See United States v. Akhavan*, 2021 WL 1216909, *3–4 (S.D.N.Y. Apr. 1, 2021) (noting that the court "facilitate[d] remote access to the courtroom" in response to COVID-19, including transmitting a live video feed of the proceedings to an "overflow" courtroom and posting a "telephonic dial-in number" that "allow[ed] anyone to listen in"); *Vazquez Diaz v. Commonwealth*, 167 N.E.3d 822, 840–41 (Mass. 2021) (approving the trial court's use of a "virtual alternative" to the public's in-person attendance of judicial proceedings that was "accessible to all members of the public with access to the requisite technology").

Here, the Newspaper essentially asks the Court to take the same measures as the Supreme Court and make arrangements for the public to contemporaneously observe hearings in this matter remotely. Unquestionably, protecting against the spread of COVID-19 is important, but so is the public's right to access hearings in this matter. These competing interests are not mutually exclusive, however. To the contrary,

---

[1] *See* https://www.vacourts.gov/news/items/covid/scv_oral_session_livestream.pdf.

allowing the public to attend hearings remotely simultaneously addresses the Court's COVID-19 concerns while simultaneously protecting the public's right of access. Furthermore, to hold otherwise would effectively negate the public's right of access for the duration of the pandemic, which unfortunately shows few signs of abating anytime soon.

A sketch Order granting the Newspaper's petition and motion is attached hereto.

**CONCLUSION**

WHEREFORE, for the foregoing reasons, Lee BHM Corp., publisher of the *Richmond Times-Dispatch*, respectfully requests that its motion be granted; that the Newspaper be permitted to intervene for the limited purposes described herein; that arrangements be made to allow the public to contemporaneously observe hearings in this matter, including the hearing scheduled for November 22, 2021, remotely through WebEx or other comparable video-conferencing platform; and that the Court award any additional relief it deems fair and just.

Dated: November 3, 2021.

Respectfully submitted,

LEE BHM CORP.

By counsel:

David B. Lacy (VSB No. 71177)
Gordon M. Phillips (VSB No. 90982)
CHRISTIAN & BARTON, LLP
901 East Cary Street, Suite 1800
Richmond, VA 23219-4037
Telephone: (804) 697-4121
Facsimile: (804) 697-6121
dlacy@cblaw.com
gphillips@cblaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of November, 2021, a true and accurate copy of the foregoing was sent by email and overnight delivery to the following:

Shannon L. Taylor, Esq.
Toni M. Randall, Esq.
Henrico Commonwealth's Attorney
4309 E. Parham Road
Henrico, VA 23228
Tay03@henrico.us
ran38@henrico.us

*Attorneys for the Commonwealth*

Kevin D. Purnell, Esq.
KEVIN D. PURNELL, PLLC
106 N. Thompson Street, Floor 1
Richmond, VA 23221
kplesq@gmail.com

G. Russell Stone, Esq.
ROCKECHARLIE STONE, PLLC
530 East Main Street, Suite 608
Richmond, VA 23219
rstone@rockstonelaw.com

*Counsel for the Defendant*

Counsel

#2786584

**VIRGINIA:**

**IN THE JUVENILE AND DOMESTIC RELATIONS COURT
FOR HENRICO COUNTY**

**In re: Public Access To Hearings in Case Relating to Death of Lucia Bremer**

**Case No. _______________**

**ORDER**
**(Granting Petition To Intervene and Motion For Remote Hearing)**

COMES NOW Lee BHM Corp., publisher of the *Richmond Times-Dispatch* (the "Newspaper"), pursuant to Virginia Code § 16.1-302(C), and petitions the Court for leave to intervene for the limited purpose of asserting the right of the public, including the Newspaper, to attend hearings in the criminal matter arising out of the death of Lucia Bremer, including, but not limited to, the hearing scheduled for November 22, 2021. In connection therewith, the Newspaper moves that hearings in this matter be contemporaneously accessible by the public through remote means.

Upon consideration of the pleadings and the argument of counsel, and for the reasons stated on the record, it is hereby ORDERED that:

1. The Newspaper's petition to intervene for the limited purpose of asserting the public's right of access is GRANTED;
2. The Newspaper's motion for remote hearing is GRANTED;
3. The public shall be permitted to contemporaneously observe the hearing in this matter scheduled for November 22, 2021, through WebEx; and
4. To the extent there are other hearings in this matter, absent further order of the Court, the public shall be permitted to contemporaneously observe such hearings through WebEx.

It is so ORDERED.

Let the Clerk send a copy of this Order to all counsel of record.

ENTERED: / / 2021

______________________________
Judge
Henrico Juvenile and Domestic Relations Court

WE ASK FOR THIS:

______________________________
David B. Lacy (VSB No. 71177)
Gordon M. Phillips (VSB No. 90982)
CHRISTIAN & BARTON, LLP
901 East Cary Street, Suite 1800
Richmond, VA 23219-4121
Telephone: (804) 697-4121
Facsimile: (804) 697-6121

*Counsel for Lee BHM Corp.*

SEEN AND __________________:

______________________________
Shannon L. Taylor (VSB No. ________)
Toni M. Randall (VSB No. ________)
Henrico Commonwealth's Attorney
4309 E. Parham Road
Henrico, VA 23228

*Attorneys for the Commonwealth*

SEEN AND __________________:

______________________________
Kevin D. Purnell (VSB No. ________)
KEVIN D. PURNELL, PLLC
106 N. Thompson Street, Floor 1
Richmond, VA 23221
kplcsq@gmail.com

G. Russell Stone (VSB No. ________)
ROCKECHARLIE STONE, PLLC
530 East Main Street, Suite 608
Richmond, VA 23219
rstone@rockstonelaw.com

*Counsel for the Defendant*

#2786526

# EXHIBIT D

CHRISTIAN & BARTON, LLP
ATTORNEYS AT LAW

DAVID B. LACY
Direct Dial: 804.697.4121
Direct Fax: 804.697.6121
E-mail: dlacy@cblaw.com

November 4, 2021

***By Fax (804) 501-5746***
***And by Overnight Delivery***

Hon. Shannon Flinchum Meadowcroft, Clerk
Henrico Juvenile and Domestic Relations District Court
4201 E. Parham Road
Henrico, VA 23228-2745

**Re:** ***In re Lucia Bremer***

Dear Ms. Meadowcroft:

We write on behalf of Lee BHM Corp., publisher of the *Richmond Times-Dispatch*, to request a hearing on the newspaper's *Petition For leave To Intervene And Motion For Remote Hearing* that was filed with your office on November 3, 2021.

Because the newspaper's *Petition* concerns public access to a hearing scheduled for November 22, 2021, we respectfully request that the Court schedule a hearing on the *Petition* on an expedited basis, not only to ensure that the *Petition* is decided prior to the November 22 hearing, but also to enable the newspaper and the parties to make any necessary arrangements depending on how the Court rules on the *Petition*.

Our only avoid date between now and November 22 is November 10, 2021.

Please contact me if you have any questions or if we can be of assistance. My direct dial is (804) 697-4121, and my email is dlacy@cblaw.com.

Sincerely,

David B. Lacy

cc: The Honorable Stacy E. Lee, Judge's Chambers (*by Overnight Delivery*)
Shannon L. Taylor, Commonwealth's Attorney (*by email*) (tay03@henrico.us)
Toni Randall, Deputy Commonwealth's Attorney (*by email*) (ran38@henrico.us)
Kevin D. Purnell, Esquire (*by email*) (kplcsq@gmail.com)
G. Russell Stone, Esquire (*by email*) (rstone@rockstonelaw.com)
Gordon M. Phillips, Esquire

# EXHIBIT E

ROCKECHARLIE STONE, PLLC

530 EAST MAIN STREET,
SUITE 608

RICHMOND, VIRGINIA 23219

November 4, 2021

Ms. Shannon Flinchum Meadowcroft, Clerk
Henrico Juvenile and Domestic Relations Court
4201 East Parham Road
P.O. Box 90775
Henrico, Virginia 23273-0775

By FAX: 804-501-5746

Re: Defendant's Response to Petition for Leave to Intervene and Motion for Remote Hearing and Defendant's Motion for Closure Pursuant to § 16.1-302

Dear Ms. Meadowcroft:

Enclosed please find the enclosed motion which is filed in response to the motion filed by LEE, BHM CORP. and styled "In Re: Public Access To Hearings in Case Relating to the Death of Lucia Bremer" Due to the obvious issues of confidentiality in juvenile proceedings, I have not included identifying information in this filing, including case numbers. However it specifically relates to the closure of the hearing currently pending on November 22, 2021 in your Court.

If there are any questions as to the case wherein this response is filed please do not hesitate to contact me.

Thank you for your attention to this matter.

Very truly yours,

G. Russell Stone, Jr.

Telephone – (804) 655-2449 Fax – (804) 774-7128
Rstone@rockstonelaw.com

CC.
Commonwealth's Attorney
Fax Number: 804-501-5592

David B. Lacy
Gordon M. Phillips
Christian Barton, LLP
Fax Number: 804-697-6121

VIRGINIA:

IN THE JUVENILE AND DOMESTIC RELATIONS COURT
FOR THE COUNTY OF HENRICO

**In re: Public Access To Hearings in Case Relating to Death of Lucia Bremer**

**Hearing Date: November 22, 2021, 9:00 a.m.**

**DEFENDANT'S RESPONSE TO PETITION FOR LEAVE TO INTERVENE AND MOTION FOR REMOTE HEARING AND DEFENDANT'S MOTION FOR CLOSURE PURSUANT TO § 16.1-302**

**COMES NOW** the Defendant, by counsel, and objects to the petition filed by media representatives to wit: LEE BHM CORP. to permit access to the upcoming hearing in the Juvenile and Domestic Relations Court for the County of Henrico. Additionally, the defendant expressly waives defendant's right to a public hearing and explicitly moves that said proceeding be closed to all except the parties to the case pursuant to §16.1-302(C). In support of said Motion for Closure the defendant states as follows:

1. The defendant, a juvenile of age 14 at the time of the alleged offenses stands charged with offenses which, if committed by an adult would be felonies. A hearing as to whether the cases should be transferred to Circuit Court and the defendant be tried as an adult is scheduled for November 22, 2021 at 9:00 a.m. in the Juvenile and Domestic Relations Court for the County of Henrico.

2. The transfer as an adult has not, at this time, occurred and will not be determined until, at least, the conclusion of the hearing on November 22, 2021. Therefore, as of the moment of this filing and unless and until such a determination has been made by a Court of proper jurisdiction the defendant is and remains a child of tender years and subject to the protection of the Juvenile and Domestic Relations Court.

3. The defendant, expressly desires a closed proceeding as to the question of transfer and expressly moves the Court to close the proceedings.

4. The defendant asserts that the very nature of a transfer proceeding will involve deeply personal and private information and evidence and, without discussing said information and evidence in this filing, would reference the considerations necessary in a transfer proceeding pursuant to § 16.1-269.1(A)(4) which include the defendant child's age, the nature of the offense and evidence of said offense, whether effective treatment and rehabilitation can be maintained by the Juvenile Court, the appropriateness and availability of services and dispositional alternatives, the prior record of the juvenile, the number and nature of prior contacts with the Juvenile Court, the number and nature of any prior commitments to juvenile facilities, the number and nature of community based services and/or treatments, the nature of any prior offenses, the extent of the juvenile's degree of intellectual disability or mental illness, the juvenile's school and educational records, the juvenile's mental and emotional maturity, and the juvenile's physical condition and maturity.

5. The defendant asserts that by the very nature of the hearing the information that will be presented is of a deeply personal and private nature, including medical psychological and educational information, and there would be genuine harm to the juvenile if some or all of that information would be made public and that the protection of juvenile defendants remains a paramount interest of the Juvenile and Domestic Relations Court.

6. The defendant asserts that the concerns expressed above as to the possibility of public dissemination of such information supercedes the petitioner's "right to know" at this stage of a juvenile proceeding and that the interests of the media should not override the Court's interests in protecting a child of tender years. Unless and until a

transfer is ordered in the instant case, the defendant in this matter remains a juvenile.

7. Pursuant to §16.1-302(C) "the court may, sua sponte or on the motion of the accused or the attorney for the Commonwealth close the proceedings." The defendant so moves.

For the aforementioned reasons, the defendant objects to the Petitioner's motion and asks that any and all hearings prior to a formal determination of transfer as an adult remain closed to all but the parties.

Respectfully submitted by counsel for the defendant

G. Russell Stone, Jr., Esquire, VSB #30109
Rockecharlie Stone, PLLC.
530 East Main Street, Suite 608
Richmond, Virginia 23219
(804) 655-2449 phone (804) 774-7128 fax
rstone@rockstonelaw.com

Kevin D. Purnell, Esq.
106 N. Thompson Street, Floor 1
Richmond, VA 23221
kplesq@gmail.com

**CERTIFICATE**

I hereby certify that a true and exact copy of the foregoing Motion was sent via facsimile and mail, this 4th day of November, 2021, to the Commonwealths Attorney's Office for the County of Henrico, P.O. Box 90775, Henrico, Virginia 23273. FAX No.: 804-501-5592 and to David B. Lacy and Gordon M. Phillips, Christian Barton, LLP, 901 East Cary Street, Suite 1800, Richmond, VA 23219-4037, BY Fax 804-697-6121

G. Russell Stone, Jr.

# EXHIBIT F

CHRISTIAN & BARTON, LLP
ATTORNEYS AT LAW

DAVID B. LACY
Direct Dial: 804.697.4121
Direct Fax: 804.697.6121
E-mail: dlacy@cblaw.com

November 10, 2021

***By Fax (804) 501-5746***
***And by Overnight Delivery***

Hon. Shannon Flinchum Meadowcroft, Clerk
Henrico Juvenile and Domestic Relations District Court
4201 E. Parham Road
Henrico, VA 23228-2745

**Re:** ***In re Lucia Bremer***

Dear Ms. Meadowcroft:

On behalf of Lee BHM Corp., publisher of the *Richmond Times-Dispatch*, enclosed please find the original and one copy of the newspaper's opposition to the defendant's closure motion. We would be obliged if you would date stamp the copy and return it in the envelope provided.

Additionally, on November 4, 2021, we provided our avoid dates and requested an expedited hearing on the newspaper's *Petition For leave To Intervene And Motion For Remote Hearing*. Please let us know if such a hearing has been scheduled.

Please contact me if you have any questions or if we can be of assistance. My direct dial is (804) 697-4121, and my email is dlacy@cblaw.com.

Sincerely,

David B. Lacy

Enclosures

cc: The Honorable Stacy E. Lee, Judge's Chambers (*by overnight del. w/encl.*)
Shannon L. Taylor, Commonwealth's Attorney (*by email w/encl.*) (tay03@henrico.us)
Toni Randall, Deputy Commonwealth's Attorney (*by email w/encl.*) (ran38@henrico.us)
Kevin D. Purnell, Esquire (*by email w/encl.*) (kplesq@gmail.com)
G. Russell Stone, Esquire (*by email w/encl.*) (rstone@rockstonelaw.com)
Gordon M. Phillips, Esquire

**VIRGINIA:**

**IN THE JUVENILE AND DOMESTIC RELATIONS COURT
FOR HENRICO COUNTY**

**In re: Public Access To Hearings in
Case Relating to Death of
Lucia Bremer**

**Case No. ________________**

**NEWSPAPER'S OPPOSITION TO DEFENDANT'S CLOSURE MOTION AND
REPLY TO DEFENDANT'S RESPONSE TO NEWSPAPER'S PETITION**

Lee BHM Corp., publisher of the *Richmond Times-Dispatch* (the "Newspaper"), by counsel, pursuant to Virginia Code § 16.1-302(C), submits this reply and opposition to *Defendant's Response To Petition For Leave To Intervene and Motion For Remote Hearing and Defendant's Motion For Closure Pursuant To § 16.1-302* ("Closure Motion") filed by Defendant.

**CASE BACKGROUND**

This matter involves a juvenile defendant who is at least 14 years old and charged with murder, among other things. A hearing on a motion to transfer pursuant to Virginia Code § 16.1-269.1 is scheduled for November 22, 2021, at 9:00 a.m.

On November 3, 2021, the Newspaper filed a *Petition For Leave To Intervene and Motion For Remote Hearing* (the "Newspaper's Motion") requesting that (i) the Court grant the Newspaper leave to intervene for the limited purpose of asserting the right of the public, including the Newspaper, to attend the November 22 transfer hearing, and (ii) that the Court allow the public to attend the transfer hearing remotely, to ensure compliance with the Court's COVID-19 policy of not allowing anyone to physically enter the courtroom other than parties directly related to the case.

In response to the Newspaper's Motion, on November 4, 2021, Defendant served his Closure Motion, which seeks a blanket prohibition on public access to the November 22 transfer hearing.

Also on November 4, the Newspaper requested an expedited hearing on its Motion. *See Richmond Newspapers, Inc. v. Commonwealth*, 222 Va. 574, 592 (1981) ("*Richmond Newspapers II*") (trial court "erred in ordering closure without affording the intervenors a hearing on the merits. Absent a hearing, there could be no record of the necessary findings to support closure.").

## ARGUMENT AND AUTHORITIES

### I. Defendant Bears the Burden of Demonstrating A Compelling Interest Sufficient To Overcome the Public's Presumptive Right To Attend the November 22 Transfer Hearing.

Defendant does not dispute the Newspaper's standing to intervene in this matter for the limited purpose of asserting the public's right to attend the transfer hearing. (*See generally*, Def.'s Closure Motion.)

Additionally, Defendant admits that he is "a juvenile of age 14 at the time of the alleged offenses" and "stands charged with offenses which, if committed by an adult, would be felonies." (*See* Def.'s Closure Motion ¶ 1.) Accordingly, it is not disputed that pursuant to Virginia Code § 16.1-302(C), the November 22 transfer hearing is presumptively open to the public, and the burden is on Defendant to establish "good cause" to restrict the public's right of access. *See* Va. Code § 16.1-302(C); *see also Richmond Newspapers II*, 222 Va. at 590 (burden is on the party seeking closure to overcome the public's presumptive right of access).

Importantly, "good cause" is not a simple matter of the Court's discretion. *In re Times-World Corp.*, 50 Va. Cir. 25, 1999 WL 33726355, *7 (Va. Cir. Ct. Feb. 22, 1999). It is a rigorous standard requiring the movant to meet a high threshold to override a codified right. To overcome the presumption of public access, Defendant "must bear the burden of establishing an interest so compelling that it cannot be protected reasonably by some measure other than a [closure] order." *Shenandoah Pub. House, Inc. v. Fanning*, 235 Va. 253, 258–59 (1988); *see also Daily Press, Inc. v. Commonwealth*, 285 Va. 447, 455 (2013) ("The public's right of access can only be denied upon a strong showing of a compelling governmental interest[.]").

Furthermore, the Court must make "specific findings of particularized prejudice resulting to the juvenile should the hearing be open to the public," *In re Times-World Corp.*, 1999 WL 33726355 at *7, and those specific findings must be stated in writing and made part of the public record, *see* Va. Code § 16.1-302(C) ("If the proceedings are closed, the court shall state in writing its reasons and the statement shall be made a part of the public record."). This process is, by design, burdensome. It is meant to "ensure that the decision to seal [juridical proceedings] will not be made lightly." *Stone v. Univ. of Maryland Med. Sys. Corp.*, 855 F.2d 178, 182 (4th Cir. 1988); *see also Daily Press*, 285 Va. at 455 ("To ensure stringent safeguarding of the constitutional rights at stake, courts are required to justify any decision to close with specific reasons and findings on the record.").

Notably, if the juvenile succeeds in demonstrating a particularized harm likely to occur if the hearing is open, the reviewing court must consider alternatives to closure. *Richmond Newspapers II*, 222 Va. at 589. "When it is not possible to hold the entire

hearing in public, only that portion that would be prejudicial should be closed." *Id.* (citations omitted). In short, "[t]he public's right of access can only be denied upon a strong showing of a compelling governmental interest, and any closure must be narrowly tailored to serve that interest." *Daily Press*, 285 Va. at 455.

In his Closure Motion, Defendant requests a blanket prohibition on public access to the November 22 transfer hearing for two reasons: Defendant is a juvenile, and the November 22 hearing will include evidence concerning his medical, psychological and educational history. Mindful of the foregoing principles, and for the reasons explained below, neither reason suffices to justify the blanket prohibition on public access sought by Defendant.

**II. This Case Exemplifies Why the Public Has A Presumptive Right To Attend the November 22 Transfer Hearing.**

Preliminarily, it is important to understand why the law affords the public a presumptive right of access to the November 22 transfer hearing.

Public access "ensures that proceedings are conducted fairly, discourages perjury, safeguards against secret bias or partiality, and imparts legitimacy to the decisions of our judiciary." *Daily Press, Inc. v. Commonwealth*, 285 Va. 447, 453 (2013). Additionally, "[s]ignificant societal value has also been recognized from public access to criminal proceedings: when a shocking crime occurs, a community reaction of outrage typically follows, and thereafter the open process of justice serves an important prophylactic purpose, providing an outlet for community concern and emotion." *Id.* at 453 n.4. *Accord Richmond Newspapers II*, 222 Va. at 585 (public access "serves both a therapeutic value, as an outlet for community concern when a shocking crime occurs, and as a means for the public to see that all citizens are treated equally.").

Here, a shocking crime has occurred: the killing of one adolescent by another. The community, therefore, has more than a voyeuristic interest in monitoring proceedings in this matter. Access to the November 22 transfer hearing provides an important outlet for the community's emotion and concern. It allows the community to understand not just what happened, but also what is being is being done about it, and why.

Furthermore, the public's right of access is not diminished because the proceeding on November 22 is a preliminarily hearing, as opposed to a trial on the merits. To the contrary, "the public's interest in the conduct of the judicial system may be even more acute when pretrial hearings are involved." *Richmond Newspapers II*, 222 Va. at 587. Indeed, preliminary hearings often involve the adjudication of substantive rights. *See id.* That is certainly the case here: the purpose of the November 22 hearing is to determine whether Defendant should be tried as an adult.

Also, access in this case is not a matter of the "media's interests," as Defendant suggests. (*See* Def.'s Closure Motion ¶ 6.) The Newspaper's right of access to the November 22 hearing is indistinguishable from the public's. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (U.S. 1980) ("*Richmond Newspapers I*") ("media representatives enjoy the same right of access as the public"). The media is simply a "surrogate" for the public because "attendance at court is no longer a widespread pastime . . . Instead of acquiring information about trials by firsthand observation or by word of mouth from those who attended, people now acquire it chiefly through the print and electronic media." *Id.* at 572-73. *Accord Daily Press*, 285 Va. at 453 ("Newspapers . . . serve as 'surrogates for the public.'") (quoting *Richmond Newspapers I*).

## III. The Fact That Defendant Is A Juvenile Is Not A Basis For Prohibiting Public Access.

Defendant's first reason for demanding closure is his status as a juvenile. He claims that as a juvenile, this Court's paramount obligation is to "protect" him. (*See* Def.'s Closure Motion ¶ 2.) Defendant contends that "the interests of the media should not override the Court's interests in protecting a child of tender years." (*Id.* ¶ 6.) Defendant's "juvenile" argument is misguided.

The fact that these proceedings involve a juvenile is not, by statute, a sufficiently compelling reason to exclude the public. Section 16.1-302(C) presupposes the involvement of a juvenile. Closing a proceeding encompassed by Section 16.1-302(C) simply because it involves a juvenile would, therefore, nullify the statute.

Furthermore, the Court's paramount interest in this instance is protecting the public's right of access, not Defendant. The General Assembly made this determination in 1996 when it amended Section 16.1-302(C) to provide that cases involving a 14-year-old juvenile defendant "shall be open." *See* Va. Code § 16.1-302(C); *see also In re Times-World Corp.*, 1999 WL 33726355 at *5-6 (discussing the legislative history of § 16.1-302(C)).[1] Thus, Defendant has it reversed. The inquiry is not whether the public's right of access overrides Defendant's interest in confidentiality; it is whether Defendant's interest in confidentiality overrides the public's right of access.

Notably, the amendment to Section 16.1-302(C) was part of a larger overhaul of Virginia's juvenile justice system. *See In re Times-World Corp.*, 1999 WL 33726355 at

---

[1] A copy of the circuit court's decision in *In re Times-World Corp.* is attached hereto. The Virginia Supreme Court subsequently reversed the circuit court on procedural grounds, finding in a 4-3 decision that a writ of mandamus was not an appropriate vehicle for challenging the JDR court's decision to deny access. *See Hertz v. Times-World Corp.*, 259 Va. 599 (2000).

*4-6. The net result of the overhaul is that "juveniles fourteen years of age or older charged with certain violent felonies are now treated more like adult offenders." *Id.* at *4. This is true even before the juvenile is transferred to circuit court, as evidenced by the fact that the statutes governing transfer hearings and public access in a JDR court both presume that the defendant is a juvenile of fourteen years of age or older. *See* Va. Code §§ 16.1-269.1(A); 16.1-302(C). Hence, Defendant's assertion that the access analysis differs somehow before the Court decides the underlying transfer motion is without merit. (*See* Def.'s Closure Motion ¶¶ 2, 6.)

For all these reasons, the fact that Defendant is 14 years old is immaterial to whether Defendant can overcome the statutory presumption in favor of public access. Indeed, the fact that Defendant is 14 years old confirms the public's presumptive right to access the November 22 hearing.

**IV. Defendant's Vague Concerns About the Disclosure Of Personal Information <u>Do Not Justify A Blanket Prohibition on Public Access.</u>**

In addition to his age, Defendant states that as part of the November 22 transfer hearing, evidence will be presented "of a deeply personal and private nature, including medical, psychological and educational information." (Def.'s Closure Motion ¶ 5.) Defendant claims that he will suffer "genuine harm" if "some or all of that information" is publicly disclosed. (*Id.*)

Defendant does not identify the specific medical, psychological and educational information he seeks to shield from the public, or the specific harm he claims he will suffer if such information is publicly disclosed. Consequently, the Newspaper is, to some extent, hamstrung in its ability to evaluate Defendant's argument.

However, as Defendant acknowledges, every transfer hearing requires consideration of a juvenile defendant's medical, psychological and educational history. *See* Va. Code § 16.1-269.1(A)(4)(g)—(i). Accordingly, disclosure of a juvenile defendant's medical, psychological and educational information during a transfer hearing should not, without some specific, particularized harm unique to this case. To deny public access based on personal or private matters necessarily at issue in a transfer hearing would negate the General Assembly's determination that such hearings are presumptively open to the public.

Stated differently, to overcome the public's right of access, Defendant must demonstrate "particularized prejudice" that would result from public disclosure of his medical, psychological and educational information. *In re Times-World Corp.*, 1999 WL 33726355 at *7. "Simply stated, this factor involves the actual versus the abstract; concrete and not intangible." *Falkoff v. Falkoff*, 103 Va. Cir. 405, 2019 WL 11813646, *6 (Va. Cir. Ct. Dec. 6, 2019).

> Starting with the Supreme Court of Virginia's general admonition against sealing files based on "abstract" concerns of damage to professional reputation, emotional damage, or financial harm is the implicit permission to seal for **particularized** or concrete concerns. Thus, where a party to a case shows specific or actual damage to professional reputation, emotional damage, or financial harm, courts should consider requests to seal. By using the abstract versus particularized line, the Supreme Court raises the bar to seal records much higher than, for example, its bar for the expungement of criminal charges, which permits expungements based on substantial speculation.

*Id.* (emphasis in original; citation omitted). Here, concerns about the disclosure of information that is required to be disclosed in a transfer hearing does not constitute the "particularized prejudice" required to deny public access. *Cf. Perreault v. The Free Lance-Star*, 276 Va. 375, 391–92 (2008) ("While we are not unmindful of the seriousness

of the concerns expressed by the personal representatives with respect to the potential consequences of the financial terms of their settlements being made public, concerns of emotional damage or financial harm when stated in the abstract, do not constitute sufficient reasons to seal judicial records.").

Nevertheless, even if Defendant can identify specific information that establishes a particularized harm sufficient to overcome the public's right of access, the Court must consider less restrictive alternatives to the blanket prohibition sought by Defendant. *Richmond Newspapers II*, 222 Va. at 589.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Lee BHM Corp., publisher of the *Richmond Times-Dispatch*, respectfully requests that its motion be granted; that the Newspaper be permitted to intervene for the limited purposes described herein; that arrangements be made to allow the public to contemporaneously observe hearings in this matter, including the hearing scheduled for November 22, 2021; that Defendant's Closure Motion be denied; and that the Court award any additional relief it deems fair and just.

Dated: November 10, 2021.

Respectfully submitted,

LEE BHM CORP.

By counsel:

David B. Lacy (VSB No. 71177)
Gordon M. Phillips (VSB No. 90982)
CHRISTIAN & BARTON, LLP
901 East Cary Street, Suite 1800
Richmond, VA 23219-4037
Telephone: (804) 697-4121
Facsimile: (804) 697-6121

dlacy@cblaw.com
gphillips@cblaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of November, 2021, a true and accurate copy of the foregoing was sent by email and overnight delivery to the following:

Shannon L. Taylor, Esq.
Toni M. Randall, Esq.
Henrico Commonwealth's Attorney
4309 E. Parham Road
Henrico, VA 23228
Tay03@henrico.us
ran38@henrico.us

*Attorneys for the Commonwealth*

Kevin D. Purnell, Esq.
KEVIN D. PURNELL, PLLC
106 N. Thompson Street, Floor 1
Richmond, VA 23221
kplesq@gmail.com

G. Russell Stone, Esq.
ROCKECHARLIE STONE, PLLC
530 East Main Street, Suite 608
Richmond, VA 23219
rstone@rockstonelaw.com

*Counsel for the Defendant*

Counsel

#2788354

50 Va. Cir. 25
Circuit Court of Virginia,
Bedford County.

In re Petition of TIMES–WORLD CORPORATION, Shannon D. Harrington, Virginia Newspapers, Inc., Terry Scanlon, Richmond Newspapers, Inc., and Rex Bowman.

No. CL98009486–00.
|
Feb. 22, 1999.

**Opinion**

JAMES W. UPDIKE, JR., Judge.

*1 On November 24, 1998, a preliminary hearing was held before the Juvenile and Domestic Relations District Court of Bedford County in the cases of *Commonwealth v. Randy Dwayne Ross and Commonwealth v. Keirstin D. Davis* pursuant to § 16.1–269.1(B) of the Code of Virginia. In accordance with this statute, this was a preliminary hearing, rather than a transfer hearing, because Randy Dwayne Ross was charged with capital murder and Keirstin D. Davis was charged with first degree murder, and both juveniles were older than fourteen years of age. Both juveniles were also charged with certain ancillary felonies. The Honorable A. Burke Hertz, Judge Designate, presided.

Before this preliminary hearing, counsel for Randy Dwayne Ross made the following request pursuant to § 16.1–302(C):

> We submit in this particular case because of the pre-trial publicity that has already been engendered by these proceedings and what we might anticipate with respect to coverage of today's proceedings that the court should use its discretion and require that the matter be closed to the media and open only to the family of the alleged victim in the case and of the accused.

(Tr. pp. 4 and 5.)

Counsel for the Randy Dwayne Ross further argued:

> We submit that it would affect quite seriously—the types of coverages that are reported today—potential jury selection in this case, and that is the real basis of what we say.

(Tr. p. 5.)

Counsel for Keirstin D. Davis stated: "Judge, I would join in that motion on behalf of Keirstin Davis." (Tr. p. 6.)

The Commonwealth took no position on the issue of closure of the hearing and stated that the matter was within the discretion of the court.

The court then ruled:

> Based on what counsel has represented based on § 16.1–302, and the court is very sympathetic to the public interest that this matter has engendered, the public's right to know as much as possible about matters of this nature is most important, but this court believes that the rights of the defendants as expressed by counsel transcends the right of the public to know and therefore we will order at this time that the media be excluded and that the hearing be closed except to family members and relations and that sort of thing. I do not want to inhibit these defendants' rights in any way when it comes time for jury selection; they could be harmed very seriously in many ways as counsel has expressed. We do not want that to happen and in this court's opinion it transcends the rights of the public to be fully informed in this matter.

(Tr. p. 7.)

After the court's ruling, petitioner Terry Scanlon informed the court that he had earlier requested permission to be present during the hearing but had received no reply. Petitioner Shannon D. Harrington, as well as a reporter from a local television station, requested a delay to allow their attorneys to argue the issue of closure. These requests were denied, and the preliminary hearing proceeded after exclusion of the media. (Tr. pp. 8 and 9.)

*2 Pursuant to the disclosure requirements of § 16.1–302(C), the court released orders of closure which stated the following reason for closure of the hearing: "Motion of Defense Counsel alleging jeopardy to client's right to a fair trial." (Orders of Closure, 11/24/98.)

In response, the petitioners filed this petition for the issuance of a writ of mandamus compelling the following:

> (1) the lower court's ruling excluding the press be reversed and vacated as being violative of Virginia Code § 16.1–302, the First Amendment of the United States Constitution, and Article 1, § 12, of the Virginia Constitution; (2) the lower court be barred from excluding the press from any further proceedings in these matters; and (3) the transcript of the closed portion of the preliminary hearing be made public.

(Joint Petition for the Writ of Mandamus, p. 9.)

The petitioners further requested "such other relief as the nature of the case may require." (Joint Petition for Writ of Mandamus, p. 5.)

Counsel for the parties first argued in their memoranda of law the issue of whether closure of the preliminary hearing of November 24, 1998, violated the First Amendment of the United States Constitution, and Article 1, § 12, of the Virginia Constitution. When addressing this issue, counsel for the parties discussed at length the following decisions of the Supreme Court of the United States: *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555 (1980); *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596 (1982); *Press–Enterprise Co. v. Superior Court,* 464 U.S. 501 (1984) (*Press–Enterprise I* ); and *PressEnterprise Co. v. Superior Court,* 478 U.S. 1 (1986) (*Press–Enterprise II* ).

Though all of these cases are instructive, I find *Press–Enterprise II* to be the most applicable because in that case, the Supreme Court of the United States was asked "to decide whether petitioner has a First Amendment right of access to the transcript of a preliminary hearing growing out of a criminal prosecution." 478 U.S. at 3.

When deciding this issue, the Supreme Court first applied a two-prong analysis:

> In cases dealing with the claim of a First Amendment right of access to criminal proceedings, our decisions have emphasized two complementary considerations. First, because a "tradition of accessibility implies the favorable judgment of experience," *Globe Newspaper,* 457 U.S. at 605 (quoting *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 589 (1980) (Brennan, J., concurring in judgment)), we have considered whether the place and process have historically been open to the press and general public....
>
> Second, in this setting the Court has traditionally considered whether public access plays a significant positive role in the functioning of the particular process in question. *Globe Newspaper, supra,* at 606. Although many governmental processes operate best under public scrutiny, it takes little imagination to recognize that there are some kinds of government operations that would be totally frustrated if conducted openly. A classic example is that "the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings." *Douglas Oil Co. v. Petrol Stops North–West,* 441 U.S. 211, 218 (1979). Other proceedings plainly require public access. In *Press–Enterprise I,* we summarized the holdings of prior cases, noting that openness in criminal trials, including the selection of jurors, "enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." 464 U.S. at 501.

*3 479 U.S., at 8, 9.

The Supreme Court continued by stating:

> If the particular proceeding in question passes these tests of experience and logic, a qualified First Amendment right of public access attaches. But even when a right of access attaches, it is not absolute. *Globe Newspaper Co. v. Superior Court, supra,* at 606. While open criminal proceedings give assurances of fairness to both the public and the accused, there are some limited circumstances in which the right of the accused to a fair trial might be undermined by publicity. In such cases, the trial court must determine whether the situation is such that the rights of the accused override the qualified First Amendment right of access.

*Press–Enterprise II,* 478 U.S. at 9.

The Supreme Court then quoted the following from *Press–Enterprise I:*

> The presumption may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.
>
> 464 U.S. at 510.

*Press–Enterprise II,* 478 U.S. at 9.

It is important to note that the preliminary hearing addressed in *PressEnterprise II* was a preliminary hearing in the criminal prosecution of an adult defendant. When applying the two-part analysis of *Press–Enterprise II* to the present case, the first question to be answered is whether juvenile proceedings, such as the preliminary hearing in this case, "have historically been open to the press and general public" so that a "tradition of accessibility implies the favorable judgment of experience." 478 U.S. at 8.

There is apparently no guidance from the Supreme Court of the United States in this regard. As stated by the Supreme Court of Illinois, "[t]he Supreme Court has yet to determine whether the constitutional right of access in criminal trials extends to juvenile proceedings." *In re a Minor,* 205 Ill.App.3d 480, 486, 563 N.E.2d 1069 (1990).

The Supreme Court of the United States has acknowledged that "all fifty states have statutes that provide in some way for confidentiality" of juvenile proceedings. *Smith v. Daily Mail Publishing Co.,* 443 U.S. 97, 105 (1979). However, as stated in *In re a Minor, supra,* several state courts have determined that there is no historically based, constitutional presumption of openness in juvenile proceedings: *In re J.S.,* 140 Vt. 458, 438 A.2d 1125 (Vt.1981); *Edward A. Sherman Publishing Co. v. Goldberg,* 443 A.2d 1252 (R.I.1982); *Florida Publishing Co. v. Morgan,* 253 Ga. 467, 322 S.E.2d 233 (Ga.1984); *Associated Press v. Bradshaw,* 410 N.W.2d 577 (S.D.1987); and *In re T.R.,* 52 Ohio St.3d 6, 556 N.E.2d 439 (Ohio 1990).

I have found no decision of the Virginia Supreme Court or the Virginia Court of Appeals on point, nor has any such case been presented to me. However, as I understand the experience in Virginia, juvenile proceedings have not been presumptively open. Because of this understanding and the above-cited decisions from other states, I am not persuaded that the first prong of the two-part analysis of *Press–Enterprise II* is satisfied, and I am not prepared to rule that there is a qualified constitutional right of access to juvenile proceedings in Virginia, whether pursuant to the Constitution of the United States or the Constitution of Virginia. In addition, it is my opinion that the issue before this court can be resolved by an analysis of the applicable state statute as was done in the above cited cases from other states.

***4** Section 16.1–302(C) of the Code of Virginia provides:

> The general public shall be excluded from all juvenile court hearings and only such persons admitted as the judge shall deem proper. However, proceedings in cases involving an adult charged with a crime and hearings held on a petition or warrant alleging that a

> juvenile fourteen years of age or older committed an offense which would be a felony if committed by an adult shall be open. Subject to the provisions of subsection D for good cause shown, the court may sua sponte or on motion of the accused or the attorney for the Commonwealth close the proceedings. If the proceedings are closed, the court shall state in writing its reasons and the statement shall be made a part of the public record.

Code of Virginia, § 16.1–302(C).

Subsection D of § 16.1–302 is not really relevant to this discussion because it generally pertains to the right of a juvenile or an adult, charged with a crime or a traffic infraction before a juvenile court, to be present during the proceedings and to have a public trial, unless such rights are waived.

As to general principles of statutory construction, the Virginia Court of Appeals has stated:

> The principles of statutory construction require us to ascertain and give effect to the legislative intent.... The plain, obvious, and rational meaning of a statute is always preferred to any curious, narrow or strained construction; a statute should never be construed so that it leads to absurd results.... Where possible, a statute should be construed with a view toward harmonizing it with other statutes.

*Branch v. Commonwealth,* 14 Va.App. 836, 839, 419 S.E.2d 422 (1992) (citations omitted).

When determining the legislative intent of § 16.1–302(C), and when attempting to harmonize this statute with other statutes, I feel it important to review briefly the legislative history of § 16.1–302. This statute was amended by Chapters 755 and 914 of the 1996 Acts of Assembly. In addition, these chapters also amended and reenacted forty-nine other statutes pertaining to juvenile offenders, the trial of juveniles as adults, and records and other matters concerning juveniles. Four new statutes were also enacted by Chapters 755 and 914 concerning juveniles and juvenile proceedings. As a consequence, the focus of juvenile law was altered, and in many respects, juveniles fourteen years of age or older charged with certain violent felonies are now treated more like adult offenders.

For example, before July 1, 1996, § 16.1–227 provided in pertinent part:

> It is the intention of this law that in all proceedings the welfare of the child and the family is the paramount concern of the Commonwealth
>
> ....

1996 Acts of Assembly, Chapters 755 and 914.

As a consequence of the 1996 amendment, § 16.1–227 now provides in pertinent part:

> It is the intention of this law that in all proceedings the welfare of the child and the family, *the safety of the community and the protection of the rights of victims* are the paramount concerns of the Commonwealth....

*5 Code of Virginia, § 16.1–227 (emphasis added).

Before July 1, 1996, § 16.1–269.1 stated that when a juvenile fourteen years of age or older was charged with an offense that would be a felony if committed by an adult, the juvenile court was to conduct a transfer hearing, upon proper notice, and determine not only probable cause, but find, in accordance with certain stated factors, whether the juvenile was a proper person to remain within the jurisdiction of the juvenile court. There were, however, limited exceptions to the last requirement when the juvenile was charged with certain violent offenses.

After the 1996 amendment, § 16.1–269.1(B) provides:

> The juvenile court shall conduct a

> preliminary hearing whenever a juvenile fourteen years of age or older is charged with murder in violation of §§ 18.2–31, 18.2–32, or 18.2–40, or aggravated malicious wounding in violation of § 18.2–51.2.

Code of Virginia, § 16.1–269.1(B).

Section 16.1–269.1(D) now provides in pertinent part:

> Upon a finding of probable cause pursuant to a preliminary hearing under subsection B or C, the juvenile court shall certify the charge, and all ancillary charges, to the grand jury. Such certification shall divest the juvenile court of jurisdiction as to the charge and any ancillary charges.
>
> If the court does not find probable cause to believe that the juvenile has committed the violent juvenile felony as charged in the petition or warrant or if the petition or warrant is terminated by dismissal in the juvenile court, the attorney for the Commonwealth may seek a direct indictment in the circuit court.

Code of Virginia, § 16.1–269.1(D).

As a consequence, when a juvenile fourteen years of age or older is charged with murder, he now receives a preliminary hearing in juvenile court, rather than a transfer hearing, in much the same fashion as an adult charged with murder receives a preliminary hearing in general district court.

I also feel it pertinent to this analysis that § 16.1–301 was amended by the General Assembly in 997. This statute provides in pertinent part:

> The court shall require all law-enforcement agencies to take special precautions to ensure that law-enforcement records concerning a juvenile are protected against disclosure to any unauthorized person.

Code of Virginia, § 16.1–301(A).

In 1997, the last sentence of this subsection was amended to read as follows:

> Such records with respect to such juvenile shall not be opened to public inspection nor their contents disclosed to the public unless a juvenile fourteen years of age or older is charged with a violent juvenile felony as specified in subsection B of § 16.1–269.1.

Code of Virginia, § 16.1–301(A).

Subsection B of § 16.1–269.1 is, of course, the statute pursuant to which the preliminary hearing in question was conducted.

It is not necessary or appropriate to discuss all of the amendments enacted by Chapters 755 and 914 of the 1996 Acts of Assembly pertaining to juveniles and juvenile proceedings, or all subsequent amendments. However, as previously stated, juveniles fourteen years of age or older who are charged with certain violent felonies are now treated more as adults charged with such offenses are treated. I therefore believe it important that § 16.1–302, regarding public access to juvenile proceedings, was also amended by Chapters 755 and 914 of the 1996 Acts of Assembly.

*6 Before the amendment of 1996, § 16.1–302(C) provided in pertinent part:

> The general public shall be excluded from all juvenile court hearings and only such persons admitted as the judge shall deem proper, except that in any hearing held for the purpose of adjudicating the alleged violation of any criminal law, or law defining a traffic infraction, the child or adult so charged shall have a right to be present and shall have the right to a public hearing unless expressly waived by such person.

1996 Acts of Assembly, Chapters 755 and 914.

Though § 16.1–302(C) still provides that the "general public shall be excluded from all juvenile court hearings and only such persons admitted as the judge shall deem proper," the following qualification was added to this subsection by the amendment of 1996:

> However, proceedings in cases involving an adult charged with a crime and hearings held on a petition or warrant alleging that a juvenile fourteen years of age or older committed an offense which would be a felony if committed by an adult shall be *open*. Subject to the provision of subsection D *for good cause shown*, the court may sua sponte or on motion of the accused or the attorney for the Commonwealth close the proceedings. If the proceedings are closed, *the court shall state in writing its reasons and the statement shall be made a part of the public record*.

Code of Virginia, § 16.1–302(C) (emphasis added).

I also feel it important that § 16.1–302(C) not only provides that hearings on a felony charge against a juvenile at least fourteen years of age "shall be open," but "cases involving an adult charged with a crime ... shall be open." The requirements for closure in both instances are the same, and again, there is similar treatment of cases involving adults charged with a crime and hearings involving juveniles at least fourteen years of age charged with a felony.

When harmonizing amended § 16.1–302(C) with the other statutes amended in 1996, and when applying to § 16.1–302(C) its "plain, obvious, and rational meaning," as required by *Branch v. Commonwealth, supra,* I am convinced that the legislature intended that a preliminary hearing of a juvenile who is at least fourteen years of age and charged with a felony shall be open to the public unless good cause is shown. I am equally convinced that the General Assembly did not intend in such proceedings the decision of admitting or excluding the public to be merely a matter of judicial discretion. Otherwise, the 1996 amendment to § 16.1–302(C) becomes meaningless.

Before 1996, § 16.1–302(C) required exclusion of the public from all juvenile hearings except such persons "as the judge shall deem proper." I interpret the quoted phrase to mean that the juvenile court judge had the discretion of determining, before 1996, who could be present during juvenile court hearings. Indeed, this phrase still applies to a juvenile who is not fourteen years of age or not charged with a felony regardless of age. Nevertheless, interpreting § 16.1–302(C) in its present form as granting the juvenile court judge the discretion of determining who may be present during hearings such as the one in question extends to the juvenile court judge the same authority had before the 1996 amendment. If the General Assembly did not intent to change the meaning of § 16.1–302(C) by its amendment of 1996, why was the statute amended? As stated in *Branch, supra,* "a statute should never be construed so that it leads to absurd results." 14 Va.App. at 839.

*7 Rather than closure of hearings such as the one in question being a matter of judicial discretion, it is my opinion that the General Assembly intended by its 1996 amendment of § 16.1–302(C) to require such hearings to be open unless the judge makes and articulates specific findings of particularized prejudice resulting to the juvenile should the hearing be open to the public. Upon closure, such findings must be made public. Indeed, § 16.1–302(C) specifically states that such hearings "shall be open," except "for good cause shown," and "[i]f the proceedings are closed, the court shall state in writing its reasons and the statement shall be made a part of the public record."

Upon my examination of the partial transcript of the preliminary hearing of November 24, 1998, I note that counsel for Randy Dwayne Ross stated that his client's right to a fair trial could be jeopardized by an open hearing because pretrial publicity would "affect quite seriously" the "potential jury selection in the case." (Tr. p. 5.) No reasons or justifications for this conclusion were offered.

Counsel for Keirstin D. Davis simply joined in this motion on behalf of his client.

The juvenile court judge, in his rulings from the bench, stated his belief that "the rights of the defendants as expressed by counsel transcend the right of the public to know." (Tr. p. 7.) The judge also stated: "I do not want to inhibit these defendants' rights in any way when it comes

time for jury selection, they could be harmed very seriously in many ways as counsel has expressed." (Tr. p. 7.) Again, conclusions are stated, but nothing is stated in support of these conclusions.

In the Orders of Closure, which were made public, the following is stated as the reason for closure: "Motion of defense counsel alleging jeopardy to client's right to a fair trial." (Orders of Closure, 11–24–98.)

It is my opinion that conclusory statements, without articulation of reasons or findings in support of such conclusions, do not satisfy the requirements for closure set forth in § 16.1–302(C), and do not constitute "good cause shown" within the context of that statute.

The efforts of the juvenile court judge to protect the defendants in this case from the effects of pretrial publicity are commendable, without question. However, when balancing a defendant's right to a fair trial against the public right of access, the Supreme Court of the United States has stated:

> It is also important to remember that these interests are not necessarily inconsistent. Plainly, the defendant has a right to a fair trial but, as we have repeatedly recognized, one of the important means of assuring a fair trial is that the process be open to neutral observers.

*Press–Enterprise II*, 478 U.S. at 7.

In my opinion, whether the qualified right of access has a constitutional basis or a statutory basis, this statement of the Supreme Court applies with equal force.

My ruling in this case is narrow and confined to the language of § 16.1–302(C). I do not rule that a preliminary hearing such as the one in this case cannot be closed for reasons of pretrial publicity. Indeed, even the right of access guaranteed by the First Amendment to the Constitution of the United States is not absolute, as acknowledged in all of the cited decisions of the United States Supreme Court. Instead, in my opinion, juvenile hearings such as the one in question may be closed to the public, in accordance with § 16.1–302(C), upon specific findings of good cause, based upon particularized prejudice to the juvenile, and these findings must be articulated, reduced to writing, and then made public. I do not believe a preliminary hearing, even though attended by members of the media, in and of itself constitutes good cause for closure under § 16.1–302(C). Otherwise, I fail to understand why the General Assembly would require, pursuant to § 16.1–269.1(B), a preliminary hearing in cases such as this, then require, pursuant to § 16.1–302(C), that such hearings be open, absent good cause shown, if an open preliminary hearing is itself sufficient reason for closure.

***8** I am also concerned that in the judge's rulings from the bench, he stated: "We will order at this time that the media be excluded and that the hearing be closed except to family members and relations and that sort of thing." (Tr. p. 7.) As repeatedly stated, § 16.1–302(C) requires hearings of the nature of the preliminary hearing in this case to be open, and upon "good cause shown," the proceedings may be closed. In my opinion, this statute does not authorize a partially closed hearing. I recognize the limited discretion accorded a juvenile court judge to admit in a closed hearing a victim and an adult chosen by a juvenile victim pursuant to § 16.1–302.1. I also recognize the inherent authority of the court to exclude persons from proceedings for such reasons as disruption. Of course, the parent or guardian of a child charged with delinquency may be present. Nevertheless, in this case, the juvenile court judge apparently excluded the media, then admitted "family members and relations and that sort of thing." (Tr. p. 7.) This approach appears to be more in conformity with the previously discussed discretion accorded a juvenile court judge before July 1, 1996, and the discretion that apparently still exists in hearings involving juveniles under the age of fourteen years or those not charged with a felony, of any age. In those instances, as previously discussed, the juvenile court has the discretion of admitting "such persons as the judge shall deem proper." § 16.1–302(C). It is my opinion that the juvenile court applied the wrong standard when excluding the media from the preliminary hearing in this case while admitting "family members and relations and that sort of thing."

I will briefly address the arguments of the respondent concerning the appropriateness of mandamus as a remedy in this case. The respondent argues that mandamus is not an available remedy because no constitutional right of access exists and the decision to close the preliminary hearing was an exercise of discretion, and not a ministerial act. The respondent further argues that the issues presented are now moot. Though I have not found a qualified constitutional right of access to hearings such as

the one in question, I have found a qualified statutory right of access pursuant to § 16.1–302(C). In my opinion, the same analysis applies, whether the qualified right of access has a constitutional basis or a statutory basis. Consequently, I refer to the following statement of the Court of Appeals of Virginia:

> While we agree that mandamus is an extraordinary writ and will lie only where there is a clear and unequivocal duty of a public official to perform the act in question, for reasons implicit in *Times–World,* we believe mandamus rather than appeal is the proper means to challenge the closure in a pending criminal trial. In *Times–World,* we recognize that appeal of a closure order in such a case generally would not permit the issue to be timely addressed by the appellate court because of the typically short duration of a trial, and, thus, the matter would evade review. *Times–World,* 7 Va.App. 323–33, 373 S.E.2d at 477. Also, we noted that the issue of denial of public access is capable of repetition in other cases. *Id.* Similarly, the United States Fourth Circuit Court of Appeals has concluded that "[m]andamus, not appeal, 'is the preferred method of review for orders restricting press activity related to criminal proceedings'." *Baltimore Sun Co. v. Goetz,* 886 F.2d 60, 63 (4th Cir.1989) (quoting *In re Washington Post Co.,* 807 F.2d 383, 388 (4th Cir.1986)). Accordingly, we hold that mandamus is the proper vehicle for challenging the trial court's closure order *arising from a pending criminal trial.*

***9** *In re Worrell Enterprises, Inc.,* 14 Va.App. 671, 675, 419 S.E.2d 271, 274 (1992) (emphasis in original).

It is my further opinion that appropriate interpretation and application of § 16.1–302(C) and application of the correct standard pursuant to that statute constitute ministerial duties and not discretionary acts.

I therefore grant the Petition for a Writ of Mandamus, and I vacate the Orders of Closure entered by the Juvenile and Domestic Relations District Court of Bedford County on November 24, 1998, in the cases of *Commonwealth v. Randy Dwayne Ross and Commonwealth v. Keirstin D. Davis.*

I take no action concerning petitioners' request that the lower court be barred from excluding the press from any further proceedings in these matters. Pursuant to § 16.1–269.1(D), the jurisdiction of the juvenile court was divested as to the felony charges in these cases upon certification to the grand jury.

Concerning the petitioners' request that the transcript of the preliminary hearing in these cases be made public, I note that this preliminary hearing was transcribed in accordance with the order that I entered on behalf of the Circuit Court of Bedford County on September 30, 1998, pursuant to § 19.2–185. This statute provides in pertinent part:

> The judge of the court of record to which the case may be or has been certified may order the testimony of the witnesses at the preliminary hearing to be reduced to writing.

Code of Virginia, § 19.2–185.

I therefore determine that I have authority over this transcript, and, to accord fully the remedy awarded petitioners, I direct the clerk of this court to request Central Virginia Reporters to provide this court with one copy of the transcript of the preliminary hearing of November 24, 1998, in the cases of *Commonwealth v. Randy Dwayne Ross and Commonwealth v. Keirstin D. Davis.* I further direct the clerk of this court to file this transcript in the public record of this court in the case of *Commonwealth v. Randy Dwayne Ross.* A notation of such filing will be placed in the public record of this court in the case of *Commonwealth v. Keirstin D. Davis.* Payment for this transcript will be at public expense and taxed as costs, if appropriate under applicable statutes.

Finally, the order incorporating my rulings in this matter will be certified to Central Virginia Reporters with the instruction that a copy of the transcript of this preliminary hearing be made available to any member of the general public, including the media, who pays Central Virginia Reporters the cost for same.

Upon entry of the order, copies shall be certified to the Juvenile and Domestic Relations District Court of Bedford County and to all counsel of record in this case and the related criminal cases. Copies of the order and this opinion shall also be filed in the cases of *Commonwealth v. Randy Dwayne Ross and Commonwealth v. Keirstin D. Davis.*

**All Citations**

Not Reported in S.E.2d, 50 Va. Cir. 25, 1999 WL 33726355

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT G

# COMMONWEALTH of VIRGINIA

Margaret W. Deglau, Chief Judge
Linda Y. Lambert, Judge
Stacy E. Lee, Judge
Sharon G. Jacobs, Judge
Stuart L. Williams, Jr., Judge

HENRICO COUNTY
*Juvenile and Domestic Relations District Court*
4201 East Parham Rd at Dixon Powers Drive
P.O. Box 90775
Henrico, VA 23273-0775
804/501-4688
804/501-4756 – Fax
http://www.co.henrico.va.us/jdrcourt

Shannon F. Meadowcroft
Clerk
smeadowcroft@vacourts.gov

November 17, 2021

David Lacy, Esq.
Christian & Barton, LLP
901 East Cary Street, Suite 1800
Richmond, VA 23219
dlacy@cblaw.com

Dear Mr. Lacy,

The Court has considered the legal authority and briefings presented by counsel for both Lee BHM Corporation and Defense Counsel. After careful consideration and for good cause shown, the Court grants the Defendant's Motion for Closure and closes the proceeding in the juvenile matters relating to Lucia Bremer. In addition to granting the motion based on the Defendant's request pursuant to VA Code § 16.1-302(C), the Court also finds that the sensitive nature of the information regarding the juvenile to be discussed at the transfer hearing is such that it must remain protected by the Juvenile & Domestic Relations Court until such time as the Court determines whether it appropriate to transfer the matters to Circuit Court. Therefore, the Court shall prohibit the media pursuant to VA Code § 19.2-266.

Sincerely,

Stacy E. Lee

Stacy E. Lee
Presiding Judge

Cc: Shannon Taylor (via email tay03@henrico.us)
Toni Randall (via email ran38@henrico.us)
Kevin Purnell (via email kplesq@gmail.com)
G. Russell Stone (via email rstone@rockstonelaw.com)
Gordon Phillips (via email gphillips@cblaw.com)

# EXHIBIT H

**David Lacy**

| | |
|---|---|
| **From:** | Erin Cowardin Jacoby <ejacoby@vacourts.gov> |
| **Sent:** | Thursday, November 18, 2021 1:48 PM |
| **To:** | David Lacy |
| **Cc:** | tay03@henrico.us; Randall, Toni; Kevin Purnell; rstone@rockstonelaw.com; Gordon Phillips |
| **Subject:** | [EXTERNAL SENDER, USE CAUTION] RE: Judge Lee's response to Lee BHM Corporation's Petition for Leave to Intervene and Motion for Remote Hearing and Defendant's Motion for Closure |

Judge Lee does not intend to issue an order.

**From:** David Lacy <dlacy@cblaw.com>
**Sent:** Thursday, November 18, 2021 11:59 AM
**To:** Erin Cowardin Jacoby <ejacoby@vacourts.gov>
**Cc:** tay03@henrico.us; Randall, Toni <ran38@henrico.us>; Kevin Purnell <kp1esq@gmail.com>; rstone@rockstonelaw.com; Gordon Phillips <GPhillips@cblaw.com>
**Subject:** RE: Judge Lee's response to Lee BHM Corporation's Petition for Leave to Intervene and Motion for Remote Hearing and Defendant's Motion for Closure

EXTERNAL EMAIL

THIS MESSAGE ORIGINATED FROM AN EXTERNAL ADDRESS. USE CAUTION CLICKING ON ANY LINKS OR DOWNLOADING ANY ATTACHMENTS

Ms. Jacoby –

This confirms receipt of Judge Lee's letter. We would appreciate it if, at your earliest convenience, you could also email a copy of the order memorializing Judge Lee's decision. If Judge Lee does not intend to enter an order, we would appreciate it if you would let us know that, too.

Respectfully,

David Lacy

*David B. Lacy*
CHRISTIAN & BARTON LLP
ATTORNEYS AT LAW
901 East Cary Street, Suite 1800
Richmond, Virginia 23219
804.697.4121 tel
804.697.6121 fax
dlacy@cblaw.com
www.cblaw.com

**From:** Erin Cowardin Jacoby <ejacoby@vacourts.gov>
**Sent:** Wednesday, November 17, 2021 4:25 PM
**To:** David Lacy <dlacy@cblaw.com>
**Cc:** tay03@henrico.us; Randall, Toni <ran38@henrico.us>; Kevin Purnell <kp1esq@gmail.com>; rstone@rockstonelaw.com; Gordon Phillips <GPhillips@cblaw.com>
**Subject:** [EXTERNAL SENDER, USE CAUTION] Judge Lee's response to Lee BHM Corporation's Petition for Leave to Intervene and Motion for Remote Hearing and Defendant's Motion for Closure

Please see attached.

Erin Jacoby
Supervising Deputy Clerk, Pre Court
Henrico Juvenile & Domestic Relations Court
4201 E. Parham Road, P.O. Box 90775
Henrico, VA 23273-0775
(804)501-4734--direct
(804)501-4756--fax

PICKED UP FROM
JUDGE'S CHAMBERS

RECEIVED back.

DEC 02 2021

CLERK'S OFFICE
HENRICO CIRCUIT COURT

***SCANNED***
DLT

***SCANNED***
DLT

Clear All Data

# COVER SHEET FOR FILING CIVIL ACTIONS

COMMONWEALTH OF VIRGINIA

Case No. CL21-7567
(CLERK'S OFFICE USE ONLY)

Henrico Circuit Court

v./In re: Public Access to November 22, 2021 Transfer Hearing Relating to Death of Lucia Bremer

PLAINTIFF(S) DEFENDANT(S)

I, the undersigned [ ] plaintiff [ ] defendant [✓] attorney for [✓] plaintiff [ ] defendant hereby notify the Clerk of Court that I am filing the following civil action. (Please indicate by checking box that most closely identifies the claim being asserted or relief sought.)

## GENERAL CIVIL

**Subsequent Actions**
- [ ] Claim Impleading Third Party Defendant
  - [ ] Monetary Damages
  - [ ] No Monetary Damages
- [ ] Counterclaim
  - [ ] Monetary Damages
  - [ ] No Monetary Damages
- [ ] Cross Claim
- [ ] Interpleader
- [ ] Reinstatement (other than divorce or driving privileges)
- [ ] Removal of Case to Federal Court

**Business & Contract**
- [ ] Attachment
- [ ] Confessed Judgment
- [ ] Contract Action
- [ ] Contract Specific Performance
- [ ] Detinue
- [ ] Garnishment

**Property**
- [ ] Annexation
- [ ] Condemnation
- [ ] Ejectment
- [ ] Encumber/Sell Real Estate
- [ ] Enforce Vendor's Lien
- [ ] Escheatment
- [ ] Establish Boundaries
- [ ] Landlord/Tenant
  - [ ] Unlawful Detainer
- [ ] Mechanics Lien
- [ ] Partition
- [ ] Quiet Title
- [ ] Termination of Mineral Rights

**Tort**
- [ ] Asbestos Litigation
- [ ] Compromise Settlement
- [ ] Intentional Tort
- [ ] Medical Malpractice
- [ ] Motor Vehicle Tort
- [ ] Product Liability
- [ ] Wrongful Death
- [ ] Other General Tort Liability

## ADMINISTRATIVE LAW

- [ ] Appeal/Judicial Review of Decision of (select one)
  - [ ] ABC Board
  - [ ] Board of Zoning
  - [ ] Compensation Board
  - [ ] DMV License Suspension
  - [ ] Employee Grievance Decision
  - [ ] Employment Commission
  - [ ] Local Government
  - [ ] Marine Resources Commission
  - [ ] School Board
  - [ ] Voter Registration
  - [ ] Other Administrative Appeal

## DOMESTIC/FAMILY

- [ ] Adoption
  - [ ] Adoption – Foreign
- [ ] Adult Protection
- [ ] Annulment
  - [ ] Annulment – Counterclaim/Responsive Pleading
- [ ] Child Abuse and Neglect – Unfounded Complaint
- [ ] Civil Contempt
- [ ] Divorce (select one)
  - [ ] Complaint – Contested*
  - [ ] Complaint – Uncontested*
  - [ ] Counterclaim/Responsive Pleading
  - [ ] Reinstatement – Custody/Visitation/Support/Equitable Distribution
- [ ] Separate Maintenance
  - [ ] Separate Maintenance Counterclaim

## WRITS

- [ ] Certiorari
- [ ] Habeas Corpus
- [✓] Mandamus
- [ ] Prohibition
- [ ] Quo Warranto

## PROBATE/WILLS AND TRUSTS

- [ ] Accounting
- [ ] Aid and Guidance
- [ ] Appointment (select one)
  - [ ] Guardian/Conservator
  - [ ] Standby Guardian/Conservator
  - [ ] Custodian/Successor Custodian (UTMA)
- [ ] Trust (select one)
  - [ ] Impress/Declare/Create
  - [ ] Reformation
- [ ] Will (select one)
  - [ ] Construe
  - [ ] Contested

## MISCELLANEOUS

- [ ] Amend Death Certificate
- [ ] Appointment (select one)
  - [ ] Church Trustee
  - [ ] Conservator of Peace
  - [ ] Marriage Celebrant
- [ ] Approval of Transfer of Structured Settlement
- [ ] Bond Forfeiture Appeal
- [ ] Declaratory Judgment
- [ ] Declare Death
- [ ] Driving Privileges (select one)
  - [ ] Reinstatement pursuant to § 46.2-427
  - [ ] Restoration – Habitual Offender or 3rd Offense
- [ ] Expungement
- [ ] Firearms Rights – Restoration
- [ ] Forfeiture of Property or Money
- [ ] Freedom of Information
- [ ] Injunction
- [ ] Interdiction
- [ ] Interrogatory
- [ ] Judgment Lien-Bill to Enforce
- [ ] Law Enforcement/Public Official Petition
- [ ] Name Change
- [ ] Referendum Elections
- [ ] Sever Order
- [ ] Taxes (select one)
  - [ ] Correct Erroneous State/Local
  - [ ] Delinquent
- [ ] Vehicle Confiscation
- [ ] Voting Rights – Restoration
- [ ] Other (please specify)

Damages in the amount of $ .................... are claimed.

***SCANNED***
DLT

11/19/2021
DATE

[signature]
[ ] PLAINTIFF [ ] DEFENDANT [✓] ATTORNEY FOR [✓] PLAINTIFF [ ] DEFENDANT

David B. Lacy (VSB No. 71177)
PRINT NAME

901 E. Cary Street, Ste. 1800 - Richmond, VA 23219-4037
ADDRESS/TELEPHONE NUMBER OF SIGNATOR

(804) 697-4121

dlacy@cblaw.com
EMAIL ADDRESS OF SIGNATOR (OPTIONAL)

*"Contested" divorce means any of the following matters are in dispute: grounds of divorce, spousal support and maintenance, child custody and/or visitation, child support, property distribution or debt allocation. An "Uncontested" divorce is filed on no fault grounds and none of the above issues are in dispute.

FORM CC-1416 (MASTER) PAGE ONE 07/16

RECEIVED & FILED
JUL 12 2023
SPOTSYLVANIA CIRCUIT COURT

**VIRGINIA:**

**IN THE CIRCUIT COURT FOR SPOTSYLVANIA COUNTY**

**Theresa Brubaker,**

**Plaintiff,**

**v.** **Case No. CL23-2210**

**Akiva Epps, *et al.*,**

**Defendants.**

**LEE BHM CORP.'S ANSWER TO COMPLAINT**

Lee BHM Corp., d/b/a Free Lance Star Publishing ("Lee BHM"), by counsel, pursuant to Rule 3:8 of the Rules of the Supreme Court of Virginia, submits this answer to the Complaint filed by Theresa Brubaker ("Brubaker").

**ANSWER**

1. Lee BHM lacks knowledge and information sufficient to either admit or deny the allegations in Paragraph 1 of the Complaint, and therefore they are denied.

2. Lee BHM lacks knowledge and information sufficient to either admit or deny the allegations in Paragraph 2 of the Complaint, and therefore they are denied.

3. Lee BHM lacks knowledge and information sufficient to either admit or deny the allegations in Paragraph 3 of the Complaint, and therefore they are denied.

4. Lee BHM lacks knowledge and information sufficient to either admit or deny the allegations in Paragraph 4 of the Complaint, and therefore they are denied.

5. The allegations in Paragraph 5 of the Complaint are legal conclusions to which no response is required. To the extent a response is required, Lee BHM lacks knowledge and

information sufficient to either admit or deny the allegations in Paragraph 5, and therefore they are denied.

6. The allegations in Paragraph 6 of the Complaint are legal conclusions to which no response is required. To the extent a response is required, Lee BHM lacks knowledge and information sufficient to either admit or deny the allegations in Paragraph 6, and therefore they are denied.

7. The allegations in Paragraph 7 of the Complaint are denied.

8. The allegations in Paragraph 8 of the Complaint are denied.

9. The allegations in Paragraph 9 of the Complaint are denied. Lee BHM denies that it was liable to Plaintiff for any reason or in any amount.

10. To the extent that the allegations in Paragraph 10 of the Complaint are directed at Lee BHM, they are denied. Lee BHM lacks knowledge and information sufficient to either admit or deny the remaining allegations in Paragraph 10, and therefore they are denied.

11. The allegations in Paragraph 11 of the Complaint are legal conclusions to which no response is required. To the extent a response is required, Lee BHM lacks knowledge and information sufficient to either admit or deny the allegations in Paragraph 11, and therefore they are denied.

12. Lee BHM lacks knowledge and information sufficient to either admit or deny the allegations in Paragraph 12 of the Complaint, and therefore they are denied.

13. Lee BHM denies that it is liable to or owes Brubaker for any reason or in any amount.

14. Lee BHM denies, or lacks knowledge and information sufficient to either admit or deny, and therefore denies, any allegation in the Complaint not specifically and explicitly admitted herein.

**AFFIRMATIVE DEFENSES**

1. The Complaint fails to state a claim against Lee BHM upon which relief may be granted.

2. The Complaint should be dismissed as against Lee BHM because Akiva Epps was an independent contractor, and therefore Lee BHM is not vicariously liable for any act or omission by Epps alleged in the Complaint. *See Richmond Newspapers, Inc. v. Gill*, 224 Va. 92 (1982); *McDonald v. Hampton Training Sch. for Nurses*, 254 Va. 79, 81 (1997); *Ballantyne v. Virginian Pilot*, No. 1498-92-1, 1992 WL 441872 (Va. Ct. App. Nov. 10, 1992).

3. To the extent the evidence permits, some or all of the claims against Lee BHM are barred, in whole or in part, by the doctrine of contributory negligence.

4. To the extent the evidence permits, some or all of the claims against Lee BHM are barred, in whole or in part, by the doctrine of implied assumption of risk.

5. To the extent the evidence permits, some or all of the claims against Lee BHM are barred, in whole or in part, by the doctrine of sudden emergency.

6. To the extent the evidence permits, some or all of the claims against Lee BHM are barred, in whole or in part, by the doctrine of unavoidable accident.

7. Without admitting liability, some or all of the claims against Lee BHM for damages may be barred in whole or in part by a failure to mitigate damages.

8. Lee BHM reserves the right to assert at trial any other matter constituting an avoidance or affirmative defense after discovery in this case.

WHEREFORE, Lee BHM respectfully requests that judgment be entered in its favor; that Brubaker take nothing; that the Complaint be dismissed with prejudice; and that Lee BHM be awarded any additional relief that this Court deems fair and just.

Date: July 11, 2023.

Respectfully submitted,

**LEE BHM CORP.,**
**D/B/A FREE LANCE STAR PUBLISHING**

Grayson B. Cassada

David B. Lacy (VSB No. 71177)
dlacy@cblaw.com
Grayson B. Cassada (VSB No. 98007)
gcassada@cblaw.com
Harley J. McClellan (VSB No. 98295)
hmcclellan@cblaw.com
CHRISTIAN & BARTON, L.L.P.
901 East Cary Street, Suite 1800
Richmond, Virginia 23219
Tel.: (804) 697-4100
Fax: (804) 697-6112

## CERTIFICATE OF SERVICE

I hereby certify that on July 11, 2023, a true and correct copy of the foregoing was sent by email and U.S. mail to:

Courtney A. Van Winkle, Esq.
Emily E. Smith, Esq.
ALLEN, ALLEN, ALLEN & ALLEN
1809 Staples Mill Road
Richmond, VA 23230
Tel.: (804) 257-7560
Fax: (804) 257-7560
courtney.vanwinkle@allenandallen.com
emily.smith@allenandallen.com

*Counsel for Plaintiff*

John R. Owen, Esq.
Imanie E. Sowell, Esq.
HARMAN, CLAYTOR, CORRIGAN & WELLMAN
4951 Lake Brook Dr, Suite 100
Glen Allen, VA 23060
Tel.: (804) 747-5200
Fax: (804) 747-6085
jowen@hccw.com

*Counsel for Akiva Epps*

Grayson B. Cassada
Counsel

#4860-1327-5503

CHRISTIAN & BARTON, LLP
ATTORNEYS AT LAW

GRAYSON B. CASSADA
Direct Dial: 804.697.4118
Fax: 804.697.6112
E-mail: gcassada@cblaw.com

July 11, 2023

***By Overnight Delivery***

Hon. Christalyn M. Jett, Clerk
Circuit Court for Spotsylvania County
9107 Judicial Center Lane
Spotsylvania, VA 22553

RECEIVED & FILED
JUL 12 2023
SPOTSYLVANIA CIRCUIT COURT

**Re:** ***Theresa Brubaker v. Akiva Epps, et al.***
**Case No. CL23-2210**

Dear Ms. Jett:

Enclosed please find the original and one copy of Defendant Lee BHM Corp. d/b/a Free Lance Star Publishing's Answer to Plaintiff Theresa Brubaker's Complaint. I would be obliged if you would date stamp the copy and return it in the envelope provided.

Please contact me if you have any questions or if we can be of assistance.

Sincerely,

Grayson B. Cassada

Grayson B. Cassada

Enclosures

cc: Courtney A. Van Winkle, Esq. (*by email and reg. mail w/encls.*) (courtney.vanwinkle@allenandallen.com)
Emily E. Smith, Esq. (*by email and reg. mail w/encls.*) (emily.smith@allenandallen.com)
John R. Owen, Esq. (*by email and reg. mail w/encls.*) (jowen@hccw.com)
Imanie E. Sowel, Esq. (*by email and reg. mail w/encls.*) (isowell@hccw.com)
David B. Lacy, Esq.
Harley J. McClellan, Esq.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Abingdon Division**

COURTHOUSE NEWS SERVICE, *et al.*,

Plaintiffs,

v. Civil Action No. 1:25-cv-75-JPJ-PMS

KARL R. HADE, *et al.,*

Defendants.

**REPLY BRIEF IN SUPPORT OF THE CLERKS' MOTION TO DISMISS PURSUANT TO RULE 12(B)(1)**

Defendants Edward Jewett, Brenda Hamilton, and Kelly Flannagan (collectively, the "Clerks") file this Reply Brief in support of their Motion to Dismiss Pursuant to Rule 12(b)(1).

## INTRODUCTION

Plaintiffs' Omnibus Opposition ("Opposition Brief," ECF No. 48) contains a significant concession. Plaintiffs admit they are not advancing any First Amendment right "derivative of OCRA subscribers," like their attorney David Lacy. Opp. Br. at 15. Instead, Plaintiffs assert the Dissemination Restriction impairs "their ***own*** First-Amendment protected 'right to gather news.'" Opp. Br. at 9. This concession is fatal to Plaintiffs' arguments regarding standing, ripeness, and the Eleventh Amendment.

First, Plaintiffs cannot claim standing for "their own" First Amendment rights because the Fourth Circuit has already held that the "Dissemination Restriction does not apply to Courthouse News's speech, [so] it lacks standing to challenge that provision." *Courthouse News Serv. v. Smith*, 126 F.4th 899, 917 (4th Cir. 2025). The Fourth Circuit only left the standing door open for Plaintiffs to allege a "derivative injury" on behalf of "attorneys with OCRA access." *Id*. Plaintiffs,

however, have conceded they are not asserting any right "derivative of OCRA subscribers." Opp. Br. at 15. As a result, they lack standing.

Second, to satisfy ripeness, Plaintiffs argue they "are presently subject to the Dissemination Restriction." Opp. Br. at 19. But, again, the Fourth Circuit has already held that the Dissemination Restriction "does not apply" to Plaintiffs. Plaintiffs alternatively contend the Dissemination Restriction causes Mr. Lacy "self-censorship." Opp. Br. at 18. But Mr. Lacy is not a party to this lawsuit, and Plaintiffs have conceded they are not derivatively vindicating his rights.

Third, regarding the *Ex parte Young* exception to the Eleventh Amendment, Plaintiffs argue that the OCRA subscriber agreements "alone [are] enough for Defendant Clerks to satisfy . . . [the] 'enforcement' requirements of *Ex parte Young*." Opp. Br. at 25–26. But Plaintiffs are not a signatory to those subscriber agreements, and, once again, Plaintiffs are not advancing rights "derivative of OCRA subscribers" who are. Opp. Br. at 15. Because Plaintiffs cannot show any imminent enforcement proceeding against them, they have failed to satisfy the *Ex parte Young* exception.

For these reasons, this Court lacks subject-matter jurisdiction over the Complaint, and this Court should dismiss this lawsuit as a result.

## ARGUMENT

### A. PLAINTIFFS HAVE FAILED TO DEMONSTRATE ARTICLE III STANDING.

In their Memorandum in Support of their 12(b)(1) motion ("Clerk Memorandum," ECF No. 42), the Clerks argued that Plaintiffs lack third-party standing to litigate a First Amendment claim on behalf of their attorney, Lacy. Clerk Mem. at 14–25.

In response, Plaintiffs concede that they are *not* asserting third-party standing derivatively on behalf of Mr. Lacy. Opp. Br. at 9. Instead, Plaintiffs argue they "have standing to sue over restrictions impairing their ***own*** First-Amendment protected 'right to gather news.'" *Id.* (quoting

*Overbey v. Mayor of Baltimore*, 930 F.3d 215, 227, n.11 (4th Cir. 2019)). Therefore, Plaintiffs seek to vindicate only their own First Amendment rights directly.

This standing theory fails for two reasons. First, the Fourth Circuit has already foreclosed Plaintiffs' direct standing theory. Second, the Complaint fails to show that Plaintiffs have suffered a direct prior restraint injury.

**1. The Fourth Circuit Has Already Foreclosed Plaintiffs' Standing for a Direct First Amendment Injury.**

Plaintiffs claim that the Dissemination Restruction impairs "their own" First Amendment rights. Opp. Br. at 9. But the Fourth Circuit has already held:

> The Dissemination Restriction *does not impose any restraint on Courthouse News's speech*, because it applies only to individuals with remote online access to court records. Courthouse News does not currently have such access, and we have determined it is not constitutionally entitled to receive that access. . . . *Because the Dissemination Restriction does not apply to Courthouse News's speech*, it lacks standing to challenge that provision.

*Courthouse News Serv. v. Smith*, 126 F.4th 899, 917 (4th Cir. 2025) (emphases added). The Fourth Circuit only left the standing door open for Plaintiffs to allege a "derivative injury" on behalf of "attorneys with OCRA access." *Id*.

Yet Plaintiffs have now conceded that "the question is *not* whether CNS and Lee [Enterprises] can assert third-party standing derivative of Free Speech protections for OCRA subscribers." Opp. Br. at 9 (internal brackets and citations omitted) (emphasis added). They admit they are not seeking standing "derivative of OCRA subscribers." *Id.* at 15.

This concession is fatal. The Fourth Circuit has already held that the Dissemination Restriction does not directly violate Plaintiffs' First Amendment rights. Because Plaintiffs admit that they are *not* advancing a derivative third-party standing theory, they have conceded they lack standing to advance this case.

**2. Plaintiffs Lack Any Direct Injury-in-Fact to a First Amendment Right.**

Even if this Court finds that the Fourth Circuit has not definitively ruled on this issue, Plaintiffs' standing theory still fails because they have not shown that they, specifically, suffered a prior restraint injury.

Standing to bring a constitutional claim pursuant to 42 U.S.C. § 1983 is unique. Section 1983 claims "must be based on injuries to the plaintiff." *S.C. State Conf. of the NCAAP v. S.C. Dep't of Juv. Just.*, 165 F.4th 858, 868 (4th Cir. 2026). A constitutional plaintiff must show "that *he, himself*, sustained a *deprivation of a right*, privilege or immunity secured to him by the Constitution and laws of the United States." *Inmates v. Owens*, 561 F.2d 560, 562-63 (4th Cir. 1977) (emphases added); *see also Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 796 (1984) ("[A] litigant only has standing to vindicate his own constitutional rights.").

Thus, to have constitutional standing, Plaintiffs must show they have been deprived of a constitutional right. As pled, that alleged right is a prior restraint. An Article III "injury" in a prior restraint claim is "censorship." *Covenant Media of N.C., L.L.C. v. City of Monroe*, 285 F. App'x 30, 36-37 (4th Cir. 2008) (unpublished opinion) (citing *City of Lakewood v. Plain Dealer Publ'g.*, 486 U.S. 750, 755–56 (1988)).

Plaintiffs have not plausibly alleged that the Clerks have, or will, specifically censor them. While Plaintiffs mention that the purported restriction results in "self-censorship," they allege only that this censorship burdens their attorney, Mr. Lacy. *See* Opp. Br. at 15, n.6. However, Plaintiffs do not seek standing derivatively for Mr. Lacy, and the Fourth Circuit has already held that the Dissemination Restriction "does not apply" to Plaintiffs. *Courthouse News Serv.*, 126 F.4th at 917. Therefore, they lack standing to allege any prior restraint injury to their personal First Amendment rights. Plaintiffs cannot claim that Virginia Code § 17.1-293(H) deprives them of their rights when it does not apply to them.

Plaintiffs nonetheless claim that the statute violates their "right to gather news." Opp. Br. at 9. But the Complaint does not plead this claim in Count One, which is a prior restraint claim. A prior restraint claim is distinct from a claim based on a violation of the alleged right to gather news. *See Soderberg v. Carrion*, 999 F.3d 962, 968 n.3 (2021). Plaintiffs' cited authority to support their newsgathering rights, for instance, fails to even mention a "prior restraint." *See Overbey v. Mayor of Baltimore*, 930 F.3d 215 (4th Cir. 2019); *Doe v. Pub. Citizen*, 749 F.3d 246 (4th Cir. 2014). Plaintiffs cannot claim standing to vindicate a right that their Complaint does not even include as a cause of action.

Even if properly pled, the Dissemination Restriction in Virginia Code § 17.1-293(H) does not censor Plaintiffs' ability to "gather" court records. Plaintiffs allege that the civil court records available through OCRA "are the same" as those available to the public at the physical courthouse. Compl. ¶ 66, *see* ¶ 63. Although they argue it is "impossible" to collect these records in person, the Complaint alleges that they have been able to do so for the past 35 years. *See id.* ¶¶ 29-31, 36, 45, 47. Virginia Code § 17.1-293(H) does not punish or prevent Plaintiffs from gathering this information at the courthouse, and thus it has not deprived Plaintiffs of any alleged newsgathering right.

While Plaintiffs point to the increased difficulty to collect court records in person versus OCRA, "minor inconveniences are distinct from an absolute deprivation" of a right. *Lane v. Holder*, 703 F.3d 668, 673 (4th Cir. 2012) (finding that a gun regulation did "not burden the plaintiffs directly" and "plaintiffs are not prevented from acquiring the handguns they desire"); *see also Adams v. Dobbins*, No. 7:01cv964, 2002 U.S. Dist. LEXIS 29020, at *2 (W.D. Va. Apr. 12, 2002) ("[T]o demonstrate a violation [of access to court records], it is not enough for an inmate to complain of theoretical impediments or inconveniences."). Furthermore, inconvenience is not

categorically a prior restraint injury. If Plaintiffs concede they can access the court records at the courthouse, then there is no restraint on the speech at all before it occurs.

More broadly, Plaintiffs lack standing to advance a purported right to "gather" court records through OCRA because, to have individual standing for such a claim, Plaintiffs must have a right to access court records through OCRA in the first place. But Plaintiffs lack OCRA access.

Plaintiffs cite to certain cases, for example, where the press sought access to court records placed under seal. But the press's right to those records solely existed because they had access to those records generally: "It is this *public* right of access that gives third-party press intervenors standing to intervene on appeal to seek review of sealing orders of the district courts." *Rosenfeld v. Montgomery Cty. Pub. Schs.*, 25 F. App'x 123, 131 (4th Cir. 2001) (unpublished opinion). In other words, the press could challenge the *sealing* of a court record only because they had a First Amendment right to that court record, but-for the sealing.

By contrast, Plaintiffs lack any initial right of access to the OCRA records at all, as held by the Fourth Circuit. They cannot claim standing for their inability to gather or access government records that they lack any constitutional access to.

**B. PLAINTIFFS' RIPENESS ARGUMENTS ARE INCONSISTENT WITH THEIR STANDING THEORY AND PRIOR RESTRAINT CLAIM.**

The Clerks argued that Plaintiffs' prior restraint claim was not ripe because they "do not claim that they are presently subject to an injunction under the [challenged statute] or that one is being sought against them." *See Woodall v. Reno*, 47 F.3d 656, 658 (4th Cir. 1995).

Plaintiffs' arguments in response do not demonstrate how they are currently subject to any injunction or order. Instead, Plaintiffs advance several arguments that are irrelevant and in conflict with their prior restraint claim.

First, Plaintiffs contend that they—not their attorney—"are presently subject to the Dissemination Restriction." Opp. Br. at 19 (internal quotation marks omitted). But the "Dissemination Restriction does not apply to Courthouse News's speech." *Courthouse News Serv.*, 126 F.4th at 917. Plaintiffs cannot be "presently subject" to a statute that does not apply to them.

Second, Plaintiffs argue that the Dissemination Restriction is currently causing Mr. Lacy "self-censorship." (Opp. Br. at 18.) However, Plaintiffs have already conceded that they are not derivatively vindicating Mr. Lacy's individual rights. Opp. Br. at 9, 15. They cannot claim, on the one hand, that they have standing to assert a claim for their own individual rights, and, on the other, that they have ripeness for the rights of a third party.

Third, Plaintiffs claim that the statute "currently restricts their access to sources of information." Opp. Br. at 18. But the Complaint fails to allege any "access to sources" right. Moreover, the First Amendment does not "require government to accord the press special access to information not shared by members of the public generally." *Pell v. Procunier*, 417 U.S. 817, 834 (1974). Court records available through OCRA are not accessible by the public generally, and the Fourth Circuit has held that such an access restriction is constitutional.

Because the Complaint contains a prior restraint claim, Plaintiffs must demonstrate that they are currently subject to an injunction or order from the Clerks. Because they have failed to do so, their claim is not ripe.

### C. THE ELEVENTH AMENDMENT IMMUNIZES THE CLERKS FROM SUIT IN FEDERAL COURT.

Plaintiffs do not dispute that the Clerks are state officials and that they generally enjoy Eleventh Amendment immunity. *See* Opp. Br. at 25–27. Instead, Plaintiffs contest whether the *Ex parte Young* exception to that immunity applies to the Complaint. *See id.*

That exception only applies to claims that exclusively seek "prospective, injunctive relief against a state officer to prevent ongoing violations of federal law." *McBurney v. Cuccinelli*, 616

F.3d 393, 399 (4th Cir. 2010). Specifically, the state official defendant must (1) have a "special relation" to the "challenged statute" at issue, (2) "threaten" or "about to commence" enforcement proceedings under that statute against the plaintiff where (3) that statutory authority is "ministerial in nature" and not discretionary. *Ex parte Young*, 209 U.S. 123, 158 (1908); *McBurney*, 616 F.3d at 399 (quoting *Ex parte Young,* 209 U.S. at 155–56).

In light of this standard, the Clerks argued that (1) they have no "special" relation to the Virginia State Bar or ethical disciplinary proceedings; (2) they have not threatened, nor are they about to initiate, any enforcement OCRA revocation proceeding against Plaintiffs; and (3) the challenged statute—Virginia Code § 17.1-293(H)—involves discretionary, not ministerial authority. As discussed below, none of the Plaintiffs' arguments in response adequately address these points.

**1. Plaintiffs Have Abandoned Any Relief Regarding Ethical Disciplinary Proceedings.**

The Complaint aims to prevent the Clerks from pursuing "penalties including disbarment" of Mr. Lacy and other counsel for sharing pleadings accessed through OCRA. Compl. at 32; *see id.* ¶¶ 4, 61. In their 12(b)(1) motion to dismiss, the Clerks argued that they have no enforcement authority under the Virginia Rules of Professional Conduct and that the Complaint does not allege any immediate enforcement action. Additionally, any possible penalties for Mr. Lacy's violation of Virginia Code § 17.1-293(H) or the Clerks' subscriber agreements based on this law are purely hypothetical. Essentially, no consequences have occurred from Mr. Lacy sharing court records obtained from OCRA; it remains a matter of speculation.

Plaintiffs offered little to no response to this argument. "Failure to respond to conspicuous, nonfrivolous arguments in an opponent's brief constitutes a waiver of the corresponding claims." *Evans v. City of Lynchburg*, 766 F. Supp. 3d 614, 618 (W.D. Va. 2025); *see also Simpson v.*

*Portfolio Recovery Assocs., LLC*, No. 5:24-cv-00094, 2025 U.S. Dist. LEXIS 262777, at *35 (W.D. Va. Dec. 19, 2025); *Chadwell v. Brewer*, 59 F. Supp. 3d 756, 765 n.6 (W.D. Va. 2014). Because of Plaintiffs' failure to respond, this Court should therefore dismiss any request for injunctive or other relief related to hypothetical and speculative disbarment or ethical disciplinary proceedings that the Clerks have no connection with.

**2. The Complaint Fails to Allege that the Clerks Are Threatening or About to Commence Any Enforcement Proceeding against Mr. Lacy, or Plaintiffs.**

The Clerks argued that "the Complaint fails to plead any threatened enforcement action to revoke Mr. Lacy's OCRA access for sharing electronic court records with Plaintiffs." Clerks' Mem. at 13.

Without citing any legal authority, Plaintiffs contend that the mere existence of the OCRA subscriber agreements "alone is enough for Defendant Clerks to satisfy . . . [the] 'enforcement' requirements of *Ex parte Young*." Opp. Br. at 25–26. There are procedural, legal, and factual flaws with this argument.

First, Plaintiffs have procedurally abandoned this argument. Failing to cite authority in support of an argument in response to a dispositive motion means the party has abandoned that argument. *Keystone Transp. Sols, LLC v. Nw. Hardwoods, Inc.*, No. 5:18-cv-00039, 2019 U.S. Dist. LEXIS 67102, at *23 (W.D. Va. Apr. 19, 2019); *Carmichael v. Sebelius*, No. 3:13CV129, 2013 U.S. Dist. LEXIS 152410, at *13 (E.D. Va. Oct. 23, 2013). Plaintiffs offer no case authority that the mere *potential* to enforce a challenged statute via a voluntary agreement satisfies the "threaten" requirement of *Ex parte Young*. They have therefore abandoned this argument.

Second, even if not abandoned, the law does not support Plaintiffs' position. Counsel for the Clerks was unable to find any binding precedent concluding that the mere existence of a voluntary agreement constitutes a "threatened" enforcement proceeding to satisfy *Ex parte Young*.

Nor would such a holding make sense in the *Ex parte Young* context. The existence of a contract alone does not show that the Clerks are "about to" enforce Virginia Code § 17.1-293(H) or revoke a Virginia-licensed attorney's OCRA access. To hold otherwise would render the "threaten" requirement as superfluous—any plaintiff could avoid the Eleventh Amendment by merely citing to some legal enforcement authority, whether its enforcement is imminent or speculative.

Moreover, *Ex parte Young* applies to injunctive relief against the enforcement of a "challenged *statute*." *McBurney*, 616 F.3d at 399 (emphasis added). The issue is not, as Plaintiffs frame it, whether the Clerks "threaten" to enforce the OCRA subscriber agreement. Instead, the question is whether the Clerks have threatened to revoke OCRA access to a subscriber, specifically as permitted by Virginia Code § 17.1-293(H). The Complaint fails to allege sufficient facts to show such imminent enforcement against Mr. Lacy.

Third, as pled in the Complaint, the provisions in the Clerks' OCRA subscriber agreements with Virginia-licensed attorneys cannot be enforced against Plaintiffs. Those subscriber agreements only exist between the Clerks and OCRA subscribers. But Plaintiffs have conceded they are not bringing any First Amendment claim "derivative of OCRA subscribers." Opp. Br. at 15. Plaintiffs cannot claim imminent enforcement of an agreement to which they are not a signatory.

**3. *Ex Parte Young* & Discretionary Authority.**

*Ex parte Young* does not apply to "the exercise of the discretion" of a state official. *Ex parte Young*, 209 U.S. at 158.

Plaintiffs concede that Virginia Code § 17.1-293(H) gives the Clerks discretion as to whether to revoke an attorney's OCRA access. Opp. Br. at 26. Plaintiffs nonetheless argue that *Ex parte Young* still applies to injunctions "that State officials 'comply with federal law,' not how to use their discretion in complying." Opp. Br. at 27 (*quoting Antrican v. Odom*, 290 F.3d 178, 191 (4th Cir. 2002)).

For purposes of this motion to dismiss exclusively, the Clerks withdraw their argument regarding the discretionary OCRA revocation authority in Virginia Code § 17.1-293(H) supporting Eleventh Amendment immunity, to the extent Plaintiffs are seeking an injunction to only restrain the Clerks from revoking pre-existing OCRA access for a dissemination of a court record obtained from OCRA. *See Ex parte Young*, 209 U.S. at 159 ("The general discretion regarding the enforcement of the laws . . . is not interfered with by an injunction which restrains the state officer from taking any steps towards the enforcement of an unconstitutional enactment to the injury of complainant.").

To the extent Plaintiffs seek any injunction of broader effect—such as the Clerks' authority to offer OCRA access generally or to administer OCRA—such an injunction would lie outside the scope of *Ex parte Young* and within the scope of Eleventh Amendment immunity. Such powers are discretionary and therefore an injunction to impose "affirmative action" on the Clerks—to enjoin the Clerks to act instead of refrain from acting—violates the Eleventh Amendment. *See id.*

## CONCLUSION

Plaintiffs allege that the Dissemination Restriction in Virginia Code § 17.1-293(H) violates their own First Amendment rights directly. But the Fourth Circuit has already held that Plaintiffs lack standing to challenge the Dissemination Restriction. Nor has the Complaint shown that Plaintiffs are subject to any injunction or order from the Clerks, or that the Clerks have threatened

an enforcement proceeding against Plaintiffs. Plaintiffs thus lack standing, their claims are not ripe, and the Eleventh Amendment bars this suit against the Clerks. This Court lacks subject-matter jurisdiction over the Complaint, and it should dismiss this lawsuit as a result.

Respectfully submitted,

**EDWARD JEWETT**, in his official capacity as
Clerk of the Circuit Court for the City of Richmond,
Virginia;

**BRENDA HAMILTON**, in her official capacity as
Clerk of the Circuit Court for the City of Roanoke,
Virginia; and

**KELLY FLANNAGAN**, in her official capacity as
Clerk of the Circuit Court for the City of Bristol,
Virginia

By: /s/ Peter Askin
William W. Tunner (VSB No. 38358)
William D. Prince IV (VSB No. 77209)
Rachel W. Adams (VSB No. 92605)
Peter S. Askin (VSB No. 93371)
*Thompson*McMullan, P.C.
100 Shockoe Slip, 3rd Floor
Richmond, Virginia 23219
Telephone: (804) 649-7545
Facsimile: (804) 780-1813
wtunner@t-mlaw.com
wprince@t-mlaw.com
radams@t-mlaw.com
paskin@t-mlaw.com

*Counsel for Defendants Edward Jewett, in his official capacity as the Clerk of the Circuit Court for the City of Richmond, Virginia, Brenda Hamilton, in her official capacity as the Clerk of the Circuit Court for the City of Roanoke, Virginia, and Kelly Flannagan, in her official capacity as the Clerk of the Circuit Court for the City of Bristol, Virginia*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of March, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record:

Roger Myers, *pro hac vice* forthcoming
Rachel Matteo-Boehm, *pro hac vice* forthcoming
Carlie Tenenbaum, *pro hac vice* forthcoming
BRYAN CAVE LEIGHTON PAISNER LLP
3 Embarcadero Center, 7th Floor
2100 East Cary Street, Suite 310
San Francisco, California 94111
Telephone: (415) 675-3400
roger.myers@bclplaw.com
rachel.matteo-boehm@bclplaw.com
carlie.tenenbaum@bclplaw.com

*Counsel for Plaintiffs Courthouse News Service, Lee Enterprises, Incorporated and Lee BHM LLC*

Dabney J. Carr IV, Esq.
Lauren H. Miller, Esq.
TROUTMAN PEPPER LOCKE LLP
P.O. Box 1122
Richmond, Virginia 23218
Telephone: (804) 697-1200
Facsimile: (805) 697-1339
dabney.carr@troutman.com
lauren.h.miller@troutman.com

*Counsel for Plaintiffs Courthouse News Service, Lee Enterprises, Incorporated and Lee BHM LLC*

By: /s/ Peter Askin
Peter S. Askin (VSB No. 93371)
*Thompson*McMullan, P.C.
100 Shockoe Slip, Third Floor
Richmond, Virginia 23219
Telephone: (804) 649-7545
Facsimile: (804) 780-1813
Email: paskin@t-mlaw.com

*Counsel for Defendants Edward Jewett, Brenda Hamilton, and Kelly Flannagan*

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Abingdon Division**

COURTHOUSE NEWS SERVICE, *et al.*,

Plaintiffs,

v. Civil Action No. 1:25-cv-75-JPJ-PMS

KARL R. HADE, *et al.,*

Defendants.

**REPLY BRIEF IN SUPPORT OF THE CLERKS' MOTION TO DISMISS PURSUANT TO RULE 12(B)(6)**

Defendants Edward Jewett, Brenda Hamilton, and Kelly Flannagan (collectively, the "Clerks") file this Reply Brief in support of their Motion to Dismiss Pursuant to Rule 12(b)(6).

**INTRODUCTION**

First Amendment claims come in many forms. A plaintiff can challenge a statute as a prior restraint, as a penal sanction, as overbroad, as retaliation, or as an invalid time, manner, and place restriction, among others. These different categories of claims, however, have distinct definitions, elements, and corresponding levels of constitutional scrutiny.

The Complaint advances just one of these potential options—asserting that Virginia Code § 17.1-293(H)'s prohibition of disseminating OCRA-accessed court records ("Dissemination Restriction") is a prior restraint. As a threshold matter, the Dissemination Restriction must, as a matter of statutory interpretation, be or authorize an injunction or order that prevents Plaintiffs' speech before it occurs.

The Dissemination Restriction fails that threshold step. It neither allows the Clerks to enter any order or injunction, nor does it stop dissemination of electronic court records obtained from OCRA before it occurs. More importantly, the Dissemination Restriction does not restrain

*Plaintiffs'* speech rights, specifically. While Plaintiffs argue that it restrains their newsgathering rights, they lack any right to "gather" OCRA pleadings because the Fourth Circuit has already held that Plaintiffs "are not constitutionally entitled to receive OCRA access." *Courthouse News Serv. v. Smith*, 126 F.4th 899, 917 (4th Cir. 2025). By extension, they have no right to "gather" OCRA pleadings through their attorney-agent.

Plaintiffs' arguments in their Omnibus Opposition ("Opposition Brief," ECF No. 48) fail to directly address these points. Instead, Plaintiffs reference various legal standards for claims they have not pleaded and that are otherwise irrelevant to the issues raised in this motion to dismiss. While the Clerks will defer to the Commonwealth of Virginia to defend the constitutionality of Virginia Code § 17.1-293(H), the Clerks' subscriber agreements for Virginia-barred attorneys to obtain OCRA access—which nearly mirror the language of the Virginia statute word for word—do not violate the First Amendment or impose any restraint on Plaintiffs' speech.

Because the Complaint fails to state a prior restraint claim under the First Amendment, this Court should grant the Clerks' motion to dismiss and dismiss the Complaint with prejudice.

## ARGUMENT

### A. VIRGINIA CODE § 17.1-293(H) IS NOT A PRIOR RESTRAINT, NOR DOES IT RESTRAIN PLAINTIFFS' SPEECH.

The Complaint asserts a single claim—that the Dissemination Restriction in Virginia Code § 17.1-293(H), along with the Clerks' subscriber agreements based on that statute, constitute a prior restraint. To succeed in alleging a First Amendment violation, Plaintiffs must plausibly allege that the statute is indeed a prior restraint and that it specifically restrains their speech. They cannot do so as a matter of law.

**1. Virginia Code § 17.1-293(H) Is Not a Prior Restraint.**

Prior restraints of speech are "administrative and judicial *orders* forbidding certain communications when issued *in advance* of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (emphasis added and omitted). It "freez[es]" speech before it occurs, rather than punishing the speech "after publication." *See Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

Virginia Code § 17.1-293(H) does not precondition disclosure of OCRA records obtained on discretionary approval from the Clerks before such disclosure occurs. Instead, like any legal enforcement mechanism, it gives the Clerks discretion to impose a subsequent consequence for doing so—revoking OCRA access.

The statute also does not give the Clerks any authority to issue an order or injunction to enforce this consequence. The hallmark of a prior restraint is not just *when* it stops speech, but also *how* it does so—with the threat of criminal or contempt consequences. Plaintiffs have failed to identify these aspects of a prior restraint of speech in this lawsuit.

**2. Virginia Code § 17.1-293(H) Does Not Restrain Plaintiffs' Alleged Speech.**

Even assuming *arguendo* that the Dissemination Restriction is a prior restraint, Plaintiffs tacitly concede that Virginia Code § 17.1-293(H) does not restrain Plaintiffs' speech specifically.

Plaintiffs admit they are not advancing any First Amendment right "derivative of OCRA subscribers," like their attorney David Lacy. Opp. Br. at 15. Instead, Plaintiffs assert the Dissemination Restriction impairs "their ***own*** First-Amendment protected 'right to gather news.'" Opp. Br. at 9.

At the outset, Plaintiffs have failed to plead any alleged right to "gather news" in Count One of their Complaint. Nor is the right to "gather news" pertinent to a prior restraint claim. A

prior restrain claim concerns whether  an injunction or forbids speech before it occurs—it is not relevant to gathering news. Plaintiffs' cited authority to support their newsgathering rights, for instance, fails to even mention a "prior restraint." *See Overbey v. Mayor of Baltimore*, 930 F.3d 215 (4th Cir. 2019). A prior restraint

More importantly, Plaintiffs have no right to "gather" OCRA pleadings because the Fourth Circuit has already held Plaintiffs "are not constitutionally entitled to receive OCRA access." *Courthouse News Service*, 126 F.4th at 917. If Plaintiffs have no constitutional right to OCRA pleadings *directly*, then they have no right to it via their *agent* because courts "treat an attorney as legally synonymous with his or her client." *Newman v. Newman*, 42 Va. App. 557, 567 (2004). And the First Amendment does not otherwise "require government to accord the press special access to information not shared by members of the public generally." *Pell v. Procunier*, 417 U.S. 817, 834 (1974). Virginia Code § 17.1-293(H) cannot constitute a prior restraint of Plaintiffs' access to electronic OCRA records that they do not have a legal right to access.

**3. Plaintiffs' Argument Threatens the Constitutionality of Other Statutes.**

To hold that Virginia Code § 17.1-293(H) constitute a prior restraint would also threaten other statutes that prohibit the disclosure of certain documents or information. These could include:

- Prohibiting disclosure of juvenile court records. Va. Code § 16.1-305.
- Prohibiting persons from releasing or disseminating criminal intelligence and terrorism investigation documents, punishable as a misdemeanor. Va. Code § 52-48(C) & (D).
- Prohibiting disclosure of criminal history record information. Va. Code § 19.2-389(A).
- Prohibiting disclosure of certain health records. Va. Code § 32.1-127.1:03(A)(3).

Like the Dissemination Restriction, these statutes give certain persons access to government records and correspondingly prohibit those persons from disclosing them to the public. For

example, Virginia Code § 16.1-305(A)(3) gives the "attorney for any party" in a juvenile case access to certain juvenile court records.

Under Plaintiffs' theory, these statutes would all constitute prior restraints, would have to satisfy a high level of scrutiny, and would be constitutionally void. This result demonstrates the sweeping nature of Plaintiffs' argument—that any statutory disclosure limitation could be invalidated. More importantly, it exposes the precise danger courts have warned about "stretch[ing]" the definition of prior restraint "well beyond [its] limits." *Alexander*, 509 U.S. at 549–50.

**B. PLAINTIFFS' COUNTERARGUMENTS ARE INAPPLICABLE OR LACK MERIT.**

Plaintiffs' Opposition Brief fails to demonstrate how Virginia Code § 17.1-293(H) gives the Clerks' injunctive or contempt power, freezes Plaintiffs' speech before it occurs, or otherwise amounts to a prior restraint. Instead, Plaintiffs cite to legal standards and cases about other distinct First Amendment claims that are not included in the Complaint, are irrelevant to this Motion, or otherwise lack merit.

**1. General Discretion to Act, Alone, Does Not Render a Statute as a Prior Restraint.**

Relying on *City of Lakewood*, Plaintiffs argue that "discretion" in a statute "*alone* 'constitutes a prior restraint.'" Opp. Br. at 28 (quoting *City of Lakewood v. Plain Dealer Pub'g Co.*, 486 U.S. 750, 757 (1988)) (emphasis added).

Plaintiffs take this case law quote out of context. The word "alone" does not appear in the above quote. In its full context, *City of Lakewood* stated:

> At the root of this long line of precedent is the time-tested knowledge that in the area of free expression a *licensing statute* placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship. . . . [T]he mere existence of the *licensor's* unfettered discretion, *coupled with the power of prior restraint*, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused.

*Lakewood*, 486 U.S. at 757 (emphases added). That "discretion" in a prior restraint must be "discretion in the hands of an official *to grant or deny a license*." *Famine Relief Fund v. West Virginia*, 905 F.2d 747, 753 (4th Cir. 1990) (emphasis added). Thus, "unbridled discretion" in a licensor to "grant or deny a license" to speak, "coupled with the power of prior restraint," can render a statute or government authority as unconstitutional.

Here, the discretion in Virginia Code § 17.1-293(H) is not about whether to "grant or deny" an attorney or other person OCRA access, nor have Plaintiffs identified any such statutory feature. Instead, the statute gives the Clerks discretion—*after* granting OCRA access—to then revoke that access for violating the statute. Virginia Code § 17.1-293(H) otherwise does not give the Clerks the power to restrain the dissemination of OCRA records before such dissemination occurs, nor does it give the Clerks an administrative power to create a licensing regime requiring pre-approval before an OCRA record is disseminated. To hold that any discretion in a statute, alone, renders a statute as a prior restraint, would invalidate many prosecutorial and regulatory enforcement powers and other statutes that provide for discretionary consequences after a legal violation.

**2. Virginia Code § 17.1-293(H) Is Not Analogous to a Gag Order.**

Plaintiffs cite various cases involving "gag orders"—where courts entered orders prohibiting litigating attorneys or trial participants from talking about a pending case with the press. Opp. Br. at 12, 30-31. These cases all have the same things in common: (1) they involved a judge, (2) the judge issued an order restricting trial court participants from speaking about a pending case, and (3) there was a threat of contempt of court and imprisonment for violating that order.

Neither Virginia Code § 17.1-293(H) nor the subscriber agreements are a gag order, nor do they grant the Clerks authority to issue one. The statute does not involve an order from a judge and

does not threaten contempt or imprisonment for non-compliance. Additionally, the Clerks' subscriber agreements for OCRA access, which are based on this statute, do not include such provisions.

More importantly, a gag order restrains speech about information that trial participants had lawfully obtained—jurors, witness, and trial attorneys are all legally permitted to hear the testimony and evidence while in court. Plaintiffs, by contrast, "are not constitutionally entitled to receive" OCRA access, *Courthouse News Service*, 126 F.4th at 917, and they lack any First Amendment interest for "sources of information not available to members of the public generally." *Pell*, 417 U.S. 834–35.

**3. A Prior Restraint Is Distinct from a Subsequent Penal Sanction Claim, Which the Complaint Has Not Pled.**

Citing a footnote in *Soderberg v. Carrion*, Plaintiffs argue that whether Virginia Code § 17.1-293(H) is viewed as a prior restraint or a subsequent punishment is "not dispositive" of their prior restraint claim. *See* Opp. Br. at 28 (citing *Soderberg v. Carrion*, 999 F.3d 962, 968 n.3 (4th Cir. 2021)).

But courts "have steadfastly preserved the distinction between prior restraints and subsequent punishments." *Alexander*, 509 U.S. at 553–54. For instance,

> [a] criminal penalty . . . is subject to the whole panoply of protections afforded by deferring the impact of the judgment until all avenues of appellate review have been exhausted . . . . A prior restraint, by contrast, . . . has an immediate and irreversible sanction.

*CBS v. Davis*, 510 U.S. 1315, 1317 (1994). In other words, while a subsequent penal sanction can, conceivably, constitute a First Amendment violation, such a First Amendment challenge is still entirely distinct from a prior restraint claim. To blur the lines between the two would render a prior restraint definition—and its corresponding level of scrutiny—superfluous.

Plaintiffs have otherwise taken the dicta in the *Soderberg* footnote out of context. The footnote did not establish that a prior restraint and a subsequent punishment were, by definition, the same. Instead, the court reasoned that—regardless of whether the statute at issue in *Soderberg* was characterized as a prior restraint or a subsequent penal sanction on speech—it failed either corresponding level of scrutiny. *See Soderberg*, 999 F.3d at 968 n.3. In fact, the *Soderberg* citation Plaintiffs rely on originally came from *Smith v. Daily Mail Pub. Co.*, where the plaintiffs there did "not argue that the statute is a prior restraint because it imposes a criminal sanction for certain types of publication." 443 U.S. 97, 100 n.1 (1979).

*Soderberg* also was not a prior restraint case. The plaintiffs there never asserted such a claim. Instead, they alleged that the statute at issue—which provided for contempt of court if a person published videos of criminal case proceedings—was an unconstitutional punishment of speech *after* publication. 999 F.3d at 966-67. Thus, even the litigants in Plaintiffs' own cited cases acknowledge the distinct between a prior restraint and a subsequent punishment, and specifically pled and argued the latter.

The Complaint in this case, by contrast, only asserts a prior restraint claim, and therefore, Plaintiffs must demonstrate that Virginia Code § 17.1-293(H) qualifies as a prior restraint. It does not as a matter of law. Any argument about whether that statute may or may not restrict speech after it happens is irrelevant to the Complaint and this motion to dismiss.

**4. Virginia Code § 17.1-293(H) Is Not a Penal Sanction on Plaintiffs' Purported Newsgathering Rights.**

The Complaint does not plead that Virginia Code § 17.2-293(H) is an invalid penal sanction. But even assuming *arguendo* the Plaintiffs had properly pled such a claim, the statute is not a penal sanction that violates the First Amendment.

The First Amendment prohibits the government from "imposing *sanctions* on the publication of truthful information contained in official court records *open to public inspection*." *Soderberg*, 999 F.3d at 967 (citation omitted) (emphases added). "Once true information is disclosed in public court documents *open to public inspection*, *the press* cannot be sanctioned for publishing it." *Id.* at 967-68 (emphases added).

Thus, to satisfy such a claim, Plaintiffs must show that Virginia Code § 17.1-293(H): (1) imposes a penal sanction, (2) against the press for (3) publishing information from court records open to the public. The Complaint fails to meet these requirements.

First, the Dissemination Restriction in Virginia Code § 17.1-293(H) is not a penal sanction—it does not threaten criminal punishment, imprisonment, or contempt for disclosing OCRA pleadings. Plaintiffs' cited authority, by contrast, involved statutes that imposed such punishments. *See Soderberg*, 999 F.3d at 964. Revoking OCRA access is not a penal sanction.

Second, the Dissemination Restriction does not sanction "the press." *See Soderberg*, 999 F.3d at 967-68. Virginia Code 17.1-293(H) "does not impose any restraint on Courthouse News's speech." *Courthouse News Serv.*, 126 F.4th at 917. The statute's only prescribed consequence—possible revocation of OCRA access—is a consequence for the OCRA subscriber. But Plaintiffs admit they are not asserting any First Amendment right "derivative of OCRA subscribers." Opp. Br. at 15.

Third, the Dissemination Restriction does not punish disclosure of court records "open to the public" because the general public does not have OCRA access. The First Amendment does not require the government "to accord the press special access to information not shared by members of the public generally." *Pell*, 417 U.S. at 834. Even if an order prohibits disclosure of information, it is still not a prior restraint if it allows dissemination of information "gained through

means independent of the court's processes." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34 (1984).

The Access Restriction limits OCRA access to Virginia-licensed attorneys, their staff, and select government agencies. Compl. ¶ 4. The Fourth Circuit has held that this restriction is constitutional. Thus, court records obtained from OCRA are not accessible to the public. Accordingly, the Dissemination Restriction is constitutional if it otherwise permits dissemination of similar information "gained through means independent of the court's processes" outside of OCRA. *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34 (1984). Nothing in Virginia Code § 17.1-293(H) prohibits Plaintiffs from receiving the alleged speech they desire. Plaintiffs have admitted that they can, and have, accessed court records in person at the courthouse, and that their attorney can widely disseminate such records.

**5. Judge Gregory's Dissent Was Rejected by an En Banc Petition Panel.**

Plaintiffs cite to Judge Gregory's dissent in *Courthouse News Service v. Smith* where Judge Gregory found Virginia Code § 17.1-293(H) "to be a prior restraint." *See Courthouse News*, 126 F.4th at 925 (Gregory, J., dissenting). However, that was a dissent—it is not binding precedent because Plaintiffs lost that case. In fact, Plaintiffs also lost their petition for Fourth Circuit en banc review by a vote of 10 to 4. *See Courthouse News Serv. v. Smith*, 2025 U.S. App. LEXIS 10123 (Apr. 28, 2025).

Moreover, Judge Gregory's conclusion that the Dissemination Restriction was unconstitutional was contingent on his other dissenting opinion—that the Access Restriction was also unconstitutional. This makes sense to some degree: *if* Plaintiffs had a constitutional right of access to OCRA pleadings, *then* Virginia Code § 17.1-293(H) would be prohibiting the dissemination of lawfully-obtained information. However, the Fourth Circuit majority held that

Plaintiffs "are not constitutionally entitled to receive that access," *Courthouse News Service*, 126 F.4th at 917, and Plaintiffs do not challenge the Access Restriction in this lawsuit. Judge Gregory's dissent is not binding, is far from a majority opinion, and is conditioned on the Access Restriction.

**6. A Scrutiny Analysis Is Unnecessary Because the Complaint Fails to Plead the Existence of Any Prior Restraint.**

Plaintiffs argue that the Clerks fail to contend that the Dissemination Restriction "meets strict scrutiny" and therefore "their motions should be denied." Opp. Br. at 43.

Plaintiffs misunderstand the Clerks' argument in their Motion to Dismiss. The Complaint pled a single prior restraint claim based on Virginia Code § 17.1-293(H). Before applying the appropriate scrutiny standard for prior restraint claims, there is a threshold issue—is that statute actually a prior restraint? It is not, as argued above. This Court need not proceed with a scrutiny analysis if the Complaint has failed to even demonstrate the basic premise of its only claim.

The Opposition Brief also discusses other levels of scrutiny, including intermediate scrutiny for "content-neutral time, place, and manner regulation[s]." Opp. Br. at 43–44. These arguments are irrelevant to this motion. The Complaint does not plead this or other First Amendment theories. It fails to mention "time, place, or manner" at all. The Clerks will not attempt to guess what specific First Amendment claim and level of scrutiny that Plaintiffs wish to plead without the Complaint giving proper notice thereof. Additionally, the Eastern District of Virginia has already ruled that the Dissemination Restriction is a valid time, place, and manner regulation. *Courthouse News Serv. v. Hade*, 631 F. Supp. 3d 349, 368-70 (E.D. Va. 2022), *rev'd on other grounds*, 126 F.4th 899. Therefore, the Complaint fails to state a plausible First Amendment violation under a prior restraint theory or otherwise.

**CONCLUSION**

For these reasons, this Court should dismiss the Complaint with prejudice.

Respectfully submitted,

**EDWARD JEWETT**, in his official capacity as
Clerk of the Circuit Court for the City of Richmond,
Virginia;

**BRENDA HAMILTON**, in her official capacity as
Clerk of the Circuit Court for the City of Roanoke,
Virginia; and

**KELLY FLANNAGAN**, in her official capacity as
Clerk of the Circuit Court for the City of Bristol,
Virginia

By: /s/ Peter Askin

William W. Tunner (VSB No. 38358)
William D. Prince IV (VSB No. 77209)
Rachel W. Adams (VSB No. 92605)
Peter S. Askin (VSB No. 93371)
*Thompson*McMullan, P.C.
100 Shockoe Slip, 3rd Floor
Richmond, Virginia 23219
Telephone: (804) 649-7545
Facsimile: (804) 780-1813
wtunner@t-mlaw.com
wprince@t-mlaw.com
radams@t-mlaw.com
paskin@t-mlaw.com

*Counsel for Defendants Edward Jewett, in his official capacity as the Clerk of the Circuit Court for the City of Richmond, Virginia, Brenda Hamilton, in her official capacity as the Clerk of the Circuit Court for the City of Roanoke, Virginia, and Kelly Flannagan, in her official capacity as the Clerk of the Circuit Court for the City of Bristol, Virginia*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of March, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record:

Roger Myers, *pro hac vice* forthcoming
Rachel Matteo-Boehm, *pro hac vice* forthcoming
Carlie Tenenbaum, *pro hac vice* forthcoming
BRYAN CAVE LEIGHTON PAISNER LLP
3 Embarcadero Center, 7th Floor
2100 East Cary Street, Suite 310
San Francisco, California 94111
Telephone: (415) 675-3400
roger.myers@bclplaw.com
rachel.matteo-boehm@bclplaw.com
carlie.tenenbaum@bclplaw.com

*Counsel for Plaintiffs Courthouse News Service, Lee Enterprises, Incorporated and Lee BHM LLC*

Dabney J. Carr IV, Esq.
Lauren H. Miller, Esq.
TROUTMAN PEPPER LOCKE LLP
P.O. Box 1122
Richmond, Virginia 23218
Telephone: (804) 697-1200
Facsimile: (805) 697-1339
dabney.carr@troutman.com
lauren.h.miller@troutman.com

*Counsel for Plaintiffs Courthouse News Service, Lee Enterprises, Incorporated and Lee BHM LLC*

By: /s/ Peter Askin
Peter S. Askin (VSB No. 93371)
*Thompson*McMullan, P.C.
100 Shockoe Slip, Third Floor
Richmond, Virginia 23219
Telephone: (804) 649-7545
Facsimile: (804) 780-1813
Email: paskin@t-mlaw.com

*Counsel for Defendants Edward Jewett, Brenda Hamilton, and Kelly Flannagan*

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Abingdon Division**

CLERKS OFFICE US DISTRICT COURT
AT HARRISONBURG, VA
FILED
03/28/2026
LAURA A. AUSTIN, CLERK
BY: /s/ Amy Fansler
DEPUTY CLERK

COURTHOUSE NEWS SERVICE; LEE ENTERPRISES, INCORPORATED; AND LEE BHM LLC, PUBLISHER OF THE RICHMOND TIMES-DISPATCH, THE ROANOKE TIMES, BRISTOL HERALD COURIER, LYNCHBURG NEWS AND ADVANCE, FREDERICKSBURG FREE LANCE STAR AND THE DAILY PROGRESS.

Plaintiff,

v.

KARL R. HADE, in his official capacity as Executive Secretary of the Office of Executive Secretary of the Supreme Court of Virginia,

and

EDWARD JEWETT, in his official capacity as Clerk of the Circuit Court for the City of Richmond, Virginia,

and

BRENDA HAMILTON, in her official capacity as Clerk of the Circuit Court for the City of Roanoke, Virginia,

and

KELLY FLANNAGAN, in her official capacity as Clerk of the Circuit Court for the City of Bristol, Virginia

Defendants.

Civil Action No. 1:25-cv-00075-JPJ-PMS

**[PROPOSED] SUR-REPLY**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........ 1

I. DEFENDANTS' NEW THEORY THAT CNS' AND LEE'S NEWSGATHERING CLAIM IS FORECLOSED MISREADS SMITH AND OVERLOOKS OVERBEY ........ 2

II. UNABLE TO PASS EVEN INTERMEDIATE SCRUTINY, DEFENDANT HADE SEEKS "MORE RELAXED" SCRUTINY INAPPLICABLE TO RESTRICTIONS ON SPEECH........ 5

III. DEFENDANT CLERK'S NEW THEORY FAILS BECAUSE INVALIDATING A RESTRAINT ON DISCLOSURE OF NON-CONFIDENTIAL RECORDS WILL NOT THREATEN LAWS BARRING DISCLOSURE OF CONFIDENTIAL RECORDS........ 8

IV. DEFENDANT HADE'S ATTEMPT TO CONVERT HIS STANDING ATTACK FROM FACIAL TO FACTUAL IS PROCEDURALLY AND FACTUALLY FLAWED........ 9

V. DEFENDANT CLERKS DO NOT EXPLAIN HOW THEIR NEW THEORY TO LIMIT EX PARTE YOUNG CAN SQUARE WITH THEIR RESTRICTIONS ON OCRA ACCESS........ 11

CONCLUSION........ 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*360 Virtual Drone Servs. v. Ritter*,
102 F.4th 263 (4th Cir. 2024) ....................6, 7

*Alexander v. United States*,
509 U.S. 544 (1993)....................9

*Billups v. City of Charleston*,
961 F.3d 673 (4th Cir. 2020) ....................5, 7, 12

*Blick v. Shapiro & Brown, LLP*,
2018 WL 1547124 (W.D. Va. Mar. 29, 2018)....................10

*Cap. Associated Indus., Inc. v. Stein*,
922 F.3d 198 (4th Cir. 2019) ....................7

*CBS, Inc. v. Davis*,
510 U.S. 1315 (1994)....................9

*Clendening v. United States*,
19 F.4th 421 (4th Cir. 2021) ....................2, 8

*In re Complaint of Royal Carribean Cruises Ltd.*,
459 F. Supp. 2d 1284 (S.D. Fla. 2006) ....................6

*Courthouse News Serv. v. Hade*,
580 F. Supp. 3d 289 (E.D. Va. 2022) ....................5, 7, 8, 12

*Courthouse News Serv. v. Schaefer*,
2 F.4th 318 (4th Cir. 2021) ....................7

*Courthouse News Serv. v. Smith*,
126 F.4th 899 (4th Cir. 2025) ....................1, 3

*Cox Broadcasting Corp. v. Cohn*,
420 U.S. 469 (1975)....................9

*Doe v. Mast*,
2024 WL 3371122 (W.D. Va. July 10, 2024)....................8

*Fernandez v. Keisler*,
502 F.3d 337 (4th Cir. 2007) ....................3

*Goldsboro City Bd. of Educ. v. Wayne Cty. Bd. of Educ.*,
745 F.2d 324 (4th Cir. 1984) ....................1

*Herbert v. Nat'l Acad. of Science*,
974 F.2d 192 (D.C. Cir. 1992) ....................6

*Hunt v. Nuth*,
57 F.3d 1327 (4th Cir. 1995) ....................1

*Innotec LLC v. Visiontech Sales, Inc.*,
2018 WL 4387639 (W.D. Va. Sept. 14, 2018) ....................6

*Marcotte v. Virginia Beach City Pub. Schs.*,
2018 WL 11509748 (E.D. Va. Aug. 24, 2018) ....................1

*In re Murphy-Brown, LLC*,
907 F.3d 788 (4th Cir. 2018) ....................4

*N. Carolina Fisheries Ass'n v. Pritzker*,
2015 WL 4488509 (E.D.N.C. July 22, 2015) ....................10

*Nat'l Ass'n of Immigr. Judges v. Owen*,
160 F.4th 100 (4th Cir. 2025) ....................4

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
585 U.S. 755 (2018) ....................6, 7

*Nebraska Press Assn. v. Stuart*,
427 U.S. 539 (1976) ....................9

*Nelson v. Middlesex Dep't of Soc. Servs.*,
820 S.E.2d 400 (Va. Ct. App. 2018) ....................8

*Ostergren v. Cuccinelli*,
615 F.3d 263 (4th Cir. 2010) ....................5

*Overbey v. Mayor of Baltimore*,
930 F.3d 215 (4th Cir. 2019) ....................3, 4

*S.C. State Conf. of NAACP v. Kohn*,
2023 WL 144447 (D.S.C. Jan. 10, 2023) ....................5

*Schneider v. CCC-Boone, LLC*,
2014 WL 12743788 (W.D.N.C. Nov. 21, 2014) ....................10

*Schneider v. CCC-Boone, LLC*,
2015 WL 2400995 (W.D.N.C. May 19, 2015) ....................10

*Smith v. Daily Mail Pub. Co.*,
443 U.S. 97 (1979) ........ *passim*

*Soderberg v. Carrion*,
999 F.3d 962 (4th Cir. 2021) ........ 9

*United States v. Brooks*,
524 F.3d 549 (4th Cir. 2008) ........ 3, 4

*United States v. County of Culpeper*,
245 F. Supp. 3d 758 (W.D. Va. 2017) ........ 1

*United States v. Murphy*,
855 F. App'x 131 (4th Cir. 2021) ........ 2

*United States v. Tockes*,
530 F.3d 628 (7th Cir. 2008) ........ 6

*United States v. Dinwiddie*,
885 F. Supp. 1286 (W.D. Mo. 1995) ........ 4

*United States v. Dinwiddie*,
76 F.3d 913 (8th Cir. 1996) ........ 4

*United States v. White*,
670 F.3d 498 (4th Cir. 2012) ........ 3

*United States v. White*,
810 F.3d 212 (4th Cir. 2016) ........ 3

*Virginia Innovation Sciences, Inc. v. Amazon.com, Inc.*,
2019 WL 6117308 (E.D. Tex. Nov. 18, 2019) ........ 10

*In re Wall St. J.*,
601 F. App'x 215 (4th Cir. 2015) (per curiam) ........ 3

*Wikimedia Found. v. Nat'l Sec. Agency*,
857 F.3d 193 (4th Cir. 2017) ........ 10, 11

*Ex parte Young*,
209 U.S. 123 (1908) ........ 11

**Statutes**

Va. Code § 8.01-420.8 ........ 5

Va. Code § 16.1-305 ........ 8

Va. Code § 17.1-293(E)(7) ........ 6

Va. Code § 17.1-293(H)....................2

Va. Code § 19.2-389(A)....................8

Va. Code § 32.1-127.1:03....................8

Va. Code § 52-48....................8

**Regulations**

6 Va. Admin. Code 20-120-30....................9

## INTRODUCTION

"Federal courts generally disregard new arguments raised for the first time in a reply brief because it would be unfair to the nonmoving party and would risk improvident or ill-advised opinions on the legal issues raised." *Marcotte v. Virginia Beach City Pub. Schs.*, 2018 WL 11509748, *7 n.3 (E.D. Va. Aug. 24, 2018) (refusing to consider such arguments in denying Rule 12(b)(1) and (b)(6) motions) (citing *Hunt v. Nuth*, 57 F.3d 1327, 1338 (4th Cir. 1995)).

It is unclear whether Defendants were "'sandbagging,'" as the Fourth Circuit has "describ[ed] [this] practice," *United States v. County of Culpeper*, 245 F. Supp. 3d 758, 769 n.8 (W.D. Va. 2017) (quoting *Goldsboro City Bd. of Educ. v. Wayne Cty. Bd. of Educ.*, 745 F.2d 324, 327 n.3 (4th Cir. 1984)), or turning to new theories in a vain effort to circumvent Plaintiffs' Omnibus Opposition to their Motions (Doc. 48). Either way, as in *County of Culpeper*, their new "arguments fail" to change the outcome "[e]ven if properly before the Court." *Id.*

Hade asserts Plaintiffs Lee Enterprises and Lee BHM LLC (collectively, "Lee") lack standing for new reasons. He argues "the Dissemination Restriction is subject to an even more relaxed standard of intermediate scrutiny," Defendant Hade's Reply in Supp. of Motions to Dismiss 12-13 ("Doc. 59"), a theory not raised in his motion based on a case he never mentioned. The Clerks claim this case threatens the constitutionality of other statutes not discussed in their moving papers. And all Defendants assert *Courthouse News Serv. v. Smith*, 126 F.4th 899 (4th Cir. 2025), foreclosed the ability of Courthouse News ("CNS") and Lee ("Plaintiffs") to assert their right to gather news from OCRA subscribers, an argument not raised before despite being the basis of the Complaint, ¶ 62, and an issue *Smith* did not address.

As in *Marcotte*, the Court can just "disregard" these new arguments. Even if the Court considers them, it should hold – as in *County of Culpeper* – that all these "arguments fail."

## I.

## DEFENDANTS' NEW THEORY THAT CNS' AND LEE'S NEWSGATHERING CLAIM IS FORECLOSED MISREADS *SMITH* AND OVERLOOKS *OVERBEY*

CNS' and Lee's First Amendment claim has not changed: By restraining subscribers to Virginia's Officer of the Court Remote Access ("OCRA") from "in any way redistribut[ing] to any third party," or making "available to the general public," any information accessed through OCRA, Va. Code § 17.1-293(H),[1] this Dissemination Restriction "infringe[s] Plaintiffs' First Amendment rights, and the rights of the public, to gather, disseminate and read about newsworthy information," Compl., ¶ 62, from those who "subscribe[] to OCRA." *Id.*, ¶ 90.[2]

Defendants' arguments have changed, however. They now contend *Smith* held "Plaintiffs have no right to 'gather'" information from OCRA. Defendant Clerks Reply in Supp. of Rule 12(b)(6) Mot. to Dismiss 4 ("Clerks Reply II"); Defendant Clerks Reply in Supp. of Rule 12(b)(1) Mot. to Dismiss 1 ("Clerks Reply I"); Hade Reply 6-7. The "[C]ourt [is] not required to consider [this] argument" because "new arguments cannot be raised in a reply brief." *United States v. Murphy*, 855 F. App'x 131, 132 (4th Cir. 2021). But "[e]ven if [Defendants] had not waived this argument by failing to squarely raise it until [the] Reply Brief[s], it is unavailing," *Clendening v. United States*, 19 F.4th 421, 430 (4th Cir. 2021), as *Smith* held no such thing.

The focus of *Smith* was the Access Restriction, which prevents CNS from subscribing to OCRA. But winning that claim alone would be pyrrhic because the Dissemination Restriction would prevent CNS from reporting information in those records. So it sued over both and did not identify a willing speaker because ***CNS would be the speaker*** if the Access Restriction fell.

---

[1] Defendant Hade's preferred dictionary definitions of "any data" as used in the Dissemination Restriction all involve "'factual information'" or "'information.'" Hade Reply 10.

[2] Defendant Clerks thus clearly err in mistakenly asserting "Plaintiffs have failed to plead any alleged right to 'gather news' in Count One of their Complaint." Clerks Reply II 3 & Reply I 5.

This is what *Smith* meant in saying that, because the Access Restriction did not fall, "the Dissemination Restriction does not apply to Courthouse News's speech." 126 F.4th at 917. The Court did not hold CNS (and Lee) "lack any right to 'gather'" information from OCRA subscribers, Clerks Reply II 2.[3] In fact, it recognized exactly the opposite – that CNS (and Lee) could "'assert a right to receive speech'" from OCRA subscribers if they could "'show that there exists a speaker willing to convey the information to [them].'" *Smith*, 126 F.4th at 917.[4]

Having found CNS lacked standing, *Smith* did not address the merits of a newsgathering claim, and it is axiomatic "'that panel authority that does not address an issue is not binding as to the unaddressed issue.'" *United States v. White*, 670 F.3d 498, 523-24 (4th Cir. 2012) (Floyd, Circuit Judge, concurring in part), *abrogation on other grounds*, 810 F.3d 212, 220 (4th Cir. 2016); *Fernandez v. Keisler*, 502 F.3d 337, 343 n.2 (4th Cir. 2007) ("stare decisis is not applicable unless the issue was 'squarely addressed' in the prior decision").

Nor could *Smith* have "foreclosed" this claim. Clerks Reply I 3; Hade Reply 6. Before *Smith*, the Fourth Circuit held the media have standing to assert a "legally protected interest" in their "right to gather news, which derives from the First Amendment." *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 227-28 & nn.11, 13 (4th Cir. 2019). "As our court has consistently recognized, 'a panel of this court cannot over-rule, explicitly or implicitly, the precedent set by a prior panel of this court.'" *United States v. Brooks*, 524 F.3d 549, 559 n.17 (4th Cir. 2008). If

---

[3] Unless otherwise noted, citations for internal quotations are omitted, ***bold italicized*** emphases are added and those only in *italics* were in the original.

[4] Defendants attempt to blur lines by asserting *Smith* held CNS and Lee "lack any right to 'gather' OCRA pleadings," Clerks Reply II 2, 4, and bars a "constitutional right of access" to OCRA "through a proxy." Hade Reply 1. This merges two distinct concepts: the right of access to court records, which was at issue in *Smith*, and the right to gather news, which *Smith* declined to address. The media have standing to assert both, Opp. 11 (citing, e.g., *In re Wall St. J.*, 601 F. App'x 215, 218 (4th Cir. 2015) (per curiam) (sealing and gag orders)); *cf.* Hade Reply 7 (misstating Opp. 11 as describing Dissemination Restriction), but only the latter is at issue here.

"two panel decisions conflict, [the] earlier decision" – here, *Overbey* – "controls unless it has been overruled by subsequent en banc or Supreme Court decision." *Id.*

On this issue, then, this case is controlled by *Overbey*, which Hade continues to ignore. The Clerks say only that *Overbey* "fails to even mention a 'prior restraint,'" Clerks Reply I 5 & Reply II 4, which is beside the point. Where they err is in saying CNS and Lee "pled a single prior restraint claim" and must "allege that the statute …. specifically restrains their speech." Clerks Reply II 2 & 11. CNS and Lee do not allege the Restriction imposes a prior restraint on their speech, but on their sources of information – subscribers to OCRA. Compl., ¶¶ 61, 67-85 & 90. That claim is ripe because those sources "are presently subject" to the Restriction, Clerks Reply I 6, and are censoring their speech to CNS and Lee to comply. Compl., ¶¶ 11-12, 43, 77-79 & 81-85. The Restriction thus "has interfered," and continues to interfere, "with [their] right to receive newsworthy information from willing speakers." *Overbey*, 930 F.3d at 228-29. The resulting "significant and deleterious effect on [their] reporting" violates their right to gather news unless the restriction on their sources – here, the Dissemination Restriction – survives constitutional scrutiny, regardless of whether it is called a prior restraint. *Id.*; Opp. 29-33.[5]

---

[5] As "government action that would prevent a communication from reaching the public," the Dissemination Restriction is clearly "[a] prior restraint." *United States v. Dinwiddie*, 885 F. Supp. 1286, 1298 (W.D. Mo. 1995), *aff'd and remanded*, 76 F.3d 913 (8th Cir. 1996). For example, the Fourth Circuit has recognized gag orders on speech about civil litigation are "prior restraints." *In re Murphy-Brown, LLC*, 907 F.3d 788, 796-97 (4th Cir. 2018). Defendant Clerks claim the Dissemination Restriction is not analogous because those gagged are lawfully entitled to the information the order prevents them from disclosing. Clerks Reply II 7. But so, too, are OCRA subscribers lawfully entitled to access records on OCRA. That gag orders are imposed by one branch of government (judicial) and the Dissemination Restriction by another (legislative), *id.* at 6, is immaterial. *See, e.g., Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 100-02 (1979) (affirming ruling that "statute operated as a prior restraint on speech"); Opp. 37 n.24. The Clerks also err in saying Judge Gregory's dissent in *Smith* finding the Dissemination Restriction is a prior restraint was "rejected" by the vote denying rehearing en banc. Clerks Reply II 10-11. "Mere disagreement with the merits of a panel's decision is seldom sufficient grounds" for "rehearing [a] case en banc." *Nat'l Ass'n of Immigr. Judges v. Owen*, 160 F.4th 100, 101 (4th Cir. 2025) (Wilkinson, Circuit Judge, concurring in denial of rehearing en banc).

## II.

## UNABLE TO PASS EVEN INTERMEDIATE SCRUTINY, DEFENDANT HADE SEEKS "MORE RELAXED" SCRUTINY INAPPLICABLE TO RESTRICTIONS ON SPEECH

None of Defendants' three reply briefs mention *Courthouse News Serv. v. Hade*, 580 F. Supp. 3d 289 (E.D. Va. 2022) ("*Hade I*"), which denied motions to dismiss on the same Rule 12(b)(1) and 12(b)(6) grounds Defendants assert here. As *Hade I* shows, the Court need not, at this stage, decide whether the Dissemination Restriction is a prior restraint or another restriction subject to strict scrutiny – or instead is subject to intermediate scrutiny as a time, place and manner regulation – because the Complaint contains the same allegations *Hade I* held "could lead to the reasonable inference that the … restriction is not narrowly tailored to preserve a significant governmental interest and thus, could violate the First Amendment" even under intermediate scrutiny. *Id.* at 296; *see* Compl., ¶¶ 58-59, 63-66 & 91.[6]

Moreover, dismissal on intermediate scrutiny grounds is rarely appropriate because (1) Defendants' bear the burden of proof and (2) their "burden in this regard is satisfied only when [they] present[] 'actual evidence supporting [their] assertion[s].'" *Billups v. City of Charleston*, 961 F.3d 673, 688 (4th Cir. 2020); *S.C. State Conf. of NAACP v. Kohn*, 2023 WL 144447, *1, 8 (D.S.C. Jan. 10, 2023) (denying motion to dismiss claim over ban on "'scraping'" electronic docket sheets under intermediate scrutiny as "factual disputes render determination of the First Amendment issues more appropriate for a motion for summary judgment").

Rather than attempt to address *Hade I* (or *Billups*), Hade seeks dismissal on a new ground and case not cited before: "As a regulation of professional conduct, that only incidentally

[6] *See also* Va. Code § 8.01-420.8 (requiring parties to redact sensitive information such as Social Security and financial account numbers ***before*** filing); *Ostergren v. Cuccinelli*, 615 F.3d 263, 286-87 (4th Cir. 2010) (clerks' "failure to redact SSNs before placing land records online means that barring Ostergren's protected speech" – by posting those records online – "would ***not be narrowly tailored*** to Virginia's interest in protecting individual privacy").

burdens speech, the Dissemination Restriction is subject to an ***even more relaxed standard of intermediate scrutiny***, that 'just requires that the restriction be sufficiently drawn to protect a substantial state interest.'" Hade Reply 13 (quoting *360 Virtual Drone Servs. v. Ritter*, 102 F.4th 263, 278 (4th Cir. 2024), without noting petition for certiorari docketed). But this Court need not consider this new ground for asserting CNS and Lee "fail[] to state a claim," as "consideration of new arguments raised for the first time in a reply brief would be 'manifestly unfair' to the opposing side." *Innotec LLC v. Visiontech Sales, Inc*., 2018 WL 4387639, *2 n.1 (W.D. Va. Sept. 14, 2018) (quoting *Herbert v. Nat'l Acad. of Science*, 974 F.2d 192, 195 (D.C. Cir. 1992)).

Moreover, Defendant Hade's new case said "the precedent of this Court and the Supreme Court establish that professional regulations – like other regulations implicating speech – are subject to various levels of scrutiny, depending on their nature," and described the analysis needed to determine whether a statute "is a regulation of 'speech as speech,' or a regulation of professional conduct" as a "thicket," through which "'drawing the line … can be difficult.'" *Ritter*, 102 F.4th at 271-72 (quoting *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 769 (2018) ("*NIFLA*")). But Hade makes no effort to follow the Fourth Circuit's "guideposts through this thicket," *id.* at 272, as his "brief fails to conduct the rudimentary legal analysis necessary to establish" that the OCRA could possibly be considered a regulation of professional conduct that only incidentally burdens speech. *In re Complaint of Royal Carribean Cruises Ltd*., 459 F. Supp. 2d 1284, 1293 (S.D. Fla. 2006). "Unsupported and undeveloped arguments like this are considered waived." *United States v. Tockes*, 530 F.3d 628, 633 (7th Cir. 2008).

There is an obvious reason why Defendant Hade does not even attempt to draw this line: not only is OCRA ***not*** limited to attorneys – as employees of governmental agencies may also subscribe, Va. Code § 17.1-293(E)(7) – it does not implicate "legal services or advice" or the

"[attorney]-patient relationship," *Ritter*, 102 F.4th at 275, or any other touchstone identified by the Supreme Court – which "cited cases about malpractice, anticompetitive agreements, client solicitation, and informed consent" – suggesting OCRA is sufficiently akin to a "generally applicable licensing regime that restricts the practice of law to bar members and entities owned by bar members" to be considered a regulation of the professional conduct of attorneys that only "'incidentally involves speech.'" *Cap. Associated Indus., Inc. v. Stein*, 922 F.3d 198, 207 (4th Cir. 2019) (quoting *NIFLA*, 585 U.S. at 756). As in *NIFLA*, the Dissemination Restriction falls "outside the context of 'professional conduct'" because it "'applie[s] to all interactions" between an OCRA subscriber (lawyer or not) and anyone – far beyond clients – who might dissemination that information to the public, "regardless of whether [legal advice] [was] ever sought, offered, or performed.'" *Ritter*, 102 F.4th at 272 (quoting *NIFLA*, 585 U.S. at 770).

OCRA access is not limited to court records on subscribers' own cases. They can access all civil court records on OCRA but cannot talk about any information in any of those records with anyone who might make it available to the public (i.e., a reporter). It does not regulate conduct at all (even forwarding a court record to a reporter ***is*** speech), and "undoubtedly burdens protected speech," *Billups*, 961 F.3d at 683 (rejecting argument regulation was of professional conduct), about new civil complaints and other non-confidential public records in ongoing civil litigation, a matter of "important [public] interest." *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 328 (4th Cir. 2021). Consequently, Defendant Hade's belated invitation to apply the "even more relaxed" scrutiny applicable to regulations of professional conduct must be rejected.[7]

[7] Defendant's belated and benighted attempt to rely on *Ritter* tacitly concedes that, as in *Hade I*, he cannot carry his burden to show the Dissemination Restriction is narrowly drawn to protect against downloading and datamining. Neither CNS nor Lee can subscribe to OCRA, so they must ask a subscriber for information from it. It is inconceivable a subscriber could download and ***transfer*** an entire OCRA database to CNS or Lee and, even if not, Defendants' subscription agreements can be revised to explicitly prevent it, just as CNS' Case Portal terms do. Opp. 8, 46.

## III.

## DEFENDANT CLERK'S NEW THEORY FAILS BECAUSE INVALIDATING A RESTRAINT ON DISCLOSURE OF NON-CONFIDENTIAL RECORDS WILL NOT THREATEN LAWS BARRING DISCLOSURE OF CONFIDENTIAL RECORDS

Continuing their efforts to avoid the actual issue, Defendant Clerks float yet another new theory in their reply – to wit, if OCRA's ban on disclosure of non-confidential information in public records violates the First Amendment, then statutes restricting disclosure of confidential information in non-public records may be unconstitutional, as well. Clerks Reply II 4-5

Not only does this new theory come too late, *see, e.g.., Clendening*, 19 F.4th at 430 n.7, it is without merit. The non-confidential civil case records available on OCRA are public under Virginia and First Amendment law, and those same records for a given circuit court can be viewed by any member of the public at the courthouse. *See Hade I*, 580 F. Supp. 3d at 292-95.

In contrast, the statutes cited by the Clerk involve records required by law "'to be kept confidential'" except as provided in the statute. *Doe v. Mast*, 2024 WL 3371122, *13 (W.D. Va. July 10, 2024) (quoting *Nelson v. Middlesex Dep't of Soc. Servs.*, 820 S.E.2d 400, 411 (Va. Ct. App. 2018) ("citing Va. Code § 16.1-305," which "protects the confidentiality" of "juvenile court records")); Va. Code § 52-48 ("records … or information relative to criminal intelligence or any terrorism investigation … ***shall be confidential***"); Va. Code § 32.1-127.1:03 ("There is hereby recognized an individual's ***right of privacy*** in the content of his health records.").[8]

First Amendment law has long recognized that government may bar public disclosure of

[8] The final statute cited by Defendant Clerks, Va. Code § 19.2-389(A), treats criminal history records as confidential while allowing designated disclosure. Despite that, its regulations allow disclosures to the public about information in those records that the Dissemination Restriction prohibits: "Nothing in this chapter shall be construed as prohibiting a criminal justice agency from disclosing to the public factual information concerning the status of an investigation; the apprehension, arrest, release or prosecution of an individual; the adjudication of charges; or the correctional status of an individual, which is related to the offense for which the individual is currently within the criminal justice system." 6 Va. Admin. Code 20-120-30.

the contents of records made confidential by law, but only where, *inter alia*, that information has not been "'released to the public in official court records." *Soderberg v. Carrion*, 999 F.3d 962, 969 (4th Cir. 2021) (quoting *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 495-96 (1975)).[9] As the court records on OCRA have been "'released to the public,'" statutes involving records confidential by law and not released to the public are inapt and unthreatened by this litigation.

## IV.

## DEFENDANT HADE'S ATTEMPT TO CONVERT HIS STANDING ATTACK FROM FACIAL TO FACTUAL IS PROCEDURALLY AND FACTUALLY FLAWED

Defendant Hade's standing argument eschews the theory asserted in his moving papers – that Lee Enterprises lacks standing because only Lee BHM publishes Lee's Virginia newspapers – and instead asserts two new theories. Hade argues Lee Enterprises is not registered to do business in Virginia. And he notes Lee BHM is registered to do business, and has litigated several First Amendment issues, in Virginia as a corporation, not an LLC. Hade Reply 2-5.

---

[9] As *Soderberg* made clear, when a statute prohibits disclosure of information in public court records "'the most exacting [i.e., strict] scrutiny'" applies regardless of whether the statute is called a "'prior restraint'" or a "'penal sanction'" (because another provisions allows punishment of those who publish regardless of the prohibition, in *Soderberg*, by contempt of court). 999 F.3d at 968 n.3. Defendant Clerks, at Reply II 7, ask the Court to ignore *Soderberg* based on a decision in a RICO case long before *Soderberg* – *Alexander v. United States*, 509 U.S. 544 (1993) – and their mis-citation of a decision by single Justice explaining why a prior restraint should be stayed (because it imposes "'immediate and irreversible sanction'" without the procedure protections given a "'criminal penalty or judgment in a defamation case'"). *CBS, Inc. v. Davis*, 510 U.S. 1315, 1317 (1994) (Blackmun, J., in chambers) (quoting *Nebraska Press Assn. v. Stuart,* 427 U.S. 539, 559 (1976)). Of course, this Court cannot ignore *Soderberg*. Nor should it, as *Soderberg* was quoting a Supreme Court decision affirming a ruling invalidating a "statute" because it "operated as a prior restraint on speech." *Daily Mail*, 443 U.S. at 100. As another statute provided that violations of that prior restraint constituted a misdemeanor, the Supreme Court explained that "[w]hether we view the statute as a prior restraint or as a penal sanction for publishing lawfully obtained, truthful information is not dispositive because even the latter action requires the highest form of state interest to sustain its validity." *Id.* at 101-02. In contrast, *Anderson* was simply explaining why the forfeiture provision in a criminal statute – the Racketeer Influenced and Corrupt Organizations Act (RICO), which allowed seizure of obscene material after defendant was convicted – was not a prior restraint. 509 U.S. at 553-54.

As it happens, Lee BHM changed its corporate structure to an LLC in 2024 and recently changed its Virginia registration to reflect it. Decl. of D. Kvapil, ¶¶ 3-4 & Exhs. A-B. And Lee Enterprises has also registered do business in Virginia, as was its intent since assuming employer status for the staffs of its Virginia newspapers, and received its certification. *Id.*, ¶ 5 & Exh. C.

Hade's attacks on the Lee entities' standing thus fail on the merits, in addition to being procedurally flawed. The Lee entities have been Plaintiffs from the start. These arguments were available when Hade filed his motion and courts do "not accept new arguments, or a change of theory raised for the first time in a reply." *Virginia Innovation Sciences, Inc. v. Amazon.com, Inc.*, 2019 WL 6117308, *4 (E.D. Tex. Nov. 18, 2019); *Schneider v. CCC-Boone, LLC*, 2014 WL 12743788, *3 (W.D.N.C. Nov. 21, 2014) ("The Court will not analyze the merits of jurisdiction under CAFA because this change in jurisdictional theory midstream will not be allowed."), *on reconsideration*, 2015 WL 2400995 (W.D.N.C. May 19, 2015).

Hade's attempt to change his facial challenge into a factual one is also improper. "'A defendant may challenge [standing at the motion-to-dismiss stage] in ***one of two ways***: facially ***or*** factually.'" *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (brackets in original). What a defendant cannot do is what Hade did here – change from a facial challenge in his moving papers to a factual one after the Opposition was filed, *see* Hade Reply 3 – and "[t]he court [should] reject[] the state defendant['s] belated attempt to couch [his] attack as a factual challenge" in his "reply" brief after his motion "presented a facial challenge." *N. Carolina Fisheries Ass'n v. Pritzker*, 2015 WL 4488509, *3 n.5 (E.D.N.C. July 22, 2015);[10] *see also Blick v. Shapiro & Brown, LLP*, 2018 WL 1547124, *2 n.3 (W.D. Va. Mar. 29, 2018)

[10] Indeed, they present different issues. Hade's facial attack assumed the Complaint's allegations are true but argued they were insufficient to allege standing. *Wikimedia*, 857 F.3d at 208. He cannot now assert a factual challenge, which "contend[s] 'that the jurisdictional allegations of the complaint [are] not true.'" *Id.*; *N. Carolina Fisheries*, 2015 WL 4488509 at *3 n.5.

("Court declines to consider this new evidence" contained in "exhibits … [to the] reply brief").

## V.

## DEFENDANT CLERKS DO NOT EXPLAIN HOW THEIR NEW THEORY TO LIMIT *EX PARTE YOUNG* CAN SQUARE WITH THEIR RESTRICTIONS ON OCRA ACCESS

In their reply, Defendant Clerks withdraw their sovereign immunity argument based on their discretion to enforce the Dissemination Restriction by revoking OCRA access for violations of that Restriction. Clerks Reply I 11. But they raise a new argument that any other "injunction of broader effect" would exceed the scope of *Ex parte Young*, 209 U.S. 123 (1908). *Id.*

In their moving papers, the Clerks focused on two things: their lack of an enforcement relationship with Virginia State Bar disciplinary proceedings and their discretion to revoke OCRA access. Clerks Mem. I 12-14. The first was never at issue; the Complaint in this case never sought any "injunctive and declaratory relief regarding enforcement of the Rules of Professional Conduct, other ethical standards, or disbarment proceedings." *Id.* 12. And the second they now withdraw, at least with respect to their discretion to revoke OCRA access.

But the relief sought is not limited to enjoining their ability to revoke OCRA access for violations of the Dissemination Agreement. Rather, the Complaint seeks to enjoin Defendant Clerks from continuing to enforce OCRA's Dissemination Restriction and related declaratory relief, Compl., Prayer ¶¶ 1-3, which the Clerks enforce by, *inter alia*, including an even stricter version in the terms and conditions in the subscription agreements, *id.*, Exhs. 3-5, the "original version" of which was prepared by Hade's OES. Req. for Jud. Not., Exh. 4.[11]

[11] As the alleged "'Wizard of Oz'" behind the OCRA curtain, Compl, Exh. 6 at 3 & 9, Hade and OES do not have a get-out-of-litigation-over-OCRA-free card because the statute gives Defendant Clerks "discretion" to enforce the Dissemination Restriction. Hade Reply 5-6. Many forces may be brought to bear on how discretion is exercised, and the Complaint alleges more than enough facts to show Hade and OES have exercised control over enforcement of that Restriction, just as *Hade I* held regarding both the Access and Dissemination Restrictions. And Plaintiffs' Motion for Leave to Amend identifies additional facts that can be alleged.

Consequently, the relief sought would prohibit Defendants from requiring OCRA users to sign agreements that include the Dissemination Restriction, not just prohibit revoking access after the fact. Defendant Clerks have offered no explanation of how their relationship with the Dissemination Restriction does not extend to enforcing it through the subscription agreements.[12]

## CONCLUSION

Unable to adequately address the authorities and arguments in Plaintiffs' Ominbus Opposition that demonstrate their motions to dismiss should fail, Defendants presented a slew of new arguments and authorities for the first time in their reply briefs. As shown, the Court need not consider these new issues and, even if it does, they cannot save Defendants' motions from facing the same fate as the same motions denied at the same stage of the case in *Hade I*.

WHEREFORE, Plaintiffs CNS and Lee respectfully request that the Court deny all Defendants' motions to dismiss under Federal Rule of Civil Procedure 12(b)(1) & (b)(6).

Dated: March 26, 2026

Respectfully Submitted,

**BRYAN CAVE LEIGHTON PAISNER LLP**

By: */s/ Roger Myers*
Roger Myers
*Pro hac vice* forthcoming
Rachel Matteo-Boehm
*Pro hac vice* forthcoming
3 Embarcadero Center, 7th Floor
San Francisco, California 94111
Tel: (415) 675-3400
roger.myers@bclplaw.com
rachel.matteo-boehm@bclplaw.com

**TROUTMAN PEPPER LOCKE LLP**

By: */s/ Dabney J. Carr IV*
Dabney J. Carr IV
VSB No. 28679
Lauren H. Miller
VSB No. 100566
P.O. Box 1122
Richmond, Virginia 23218
Tel: (804) 697-1238
dabney.carr@troutman.com
lauren.h.miller@troutman.com

*Counsel for Plaintiffs Courthouse News Service, Lee Enterprises, Incorporated and Lee BHM LLC*

[12] Of course, this relief would not prevent the agreements from prohibiting subscribers from downloading or datamining a circuit court's entire OCRA database, which are "readily available, less-speech-restrictive alternatives" to the Dissemination Restriction. *Billups*, 961 F.3d at 688.

# Declaration of Danelle Kvapil

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Abingdon Division**

COURTHOUSE NEWS SERVICE; LEE ENTERPRISES, INCORPORATED; AND LEE BHM LLC, PUBLISHER OF THE RICHMOND TIMES-DISPATCH, THE ROANOKE TIMES, BRISTOL HERALD COURIER, LYNCHBURG NEWS AND ADVANCE, FREDERICKSBURG FREE LANCE STAR AND THE DAILY PROGRESS.

Plaintiff,

v.

KARL R. HADE, in his official capacity as Executive Secretary of the Office of Executive Secretary of the Supreme Court of Virginia,

and

EDWARD JEWETT, in his official capacity as Clerk of the Circuit Court for the City of Richmond, Virginia,

and

BRENDA HAMILTON, in her official capacity as Clerk of the Circuit Court for the City of Roanoke, Virginia,

and

KELLY FLANNAGAN, in her official capacity as Clerk of the Circuit Court for the City of Bristol, Virginia

Defendants.

Civil Action No. 1:25-cv-0075-JPJ-PMS

**DECLARATION OF DANELLE KVAPIL**

I, Danelle Kvapil, declare and state as follows:

1. I am the Director of Privacy & Manager, Legal Services at Lee Enterprises, Incorporated ("Lee Enterprises" or "Lee"). I have been employed by Lee for 11 years and have served in my role as Manager, Legal Services for that entire period, and have served in my role as Director of Privacy for one year.

2. In my role as Manager, Legal Services, I have personal knowledge of Lee's corporate filings and state registrations for itself and its subsidiaries, including Lee BHM LLC (f/k/a Lee BHM Corp.).

3. Lee BHM Corp. was incorporated in the State of Delaware on February 12, 2020, and subsequently registered to do business in the Commonwealth of Viriginia. On September 10, 2024, Lee BHM Corp. filed a Certificate of Conversion with the State of Delaware, changing its name to Lee BHM LLC ("Lee BHM"). The effective date of the Certificate of Conversion is September 13, 2024. A true and correct copy of the Certificate of Conversion is attached hereto as Exhibit A.

4. Lee BHM has also now changed its registration with the Commonwealth of Viriginia to reflect the LLC conversion and name change. At the time of the commencement of this ligation, Lee BHM was still identified as "Lee BHM Corp." on Virigina's State Corporation Commission Clerk's Information System website. However, Lee BHM filed documents with the Commonwealth of Viriginia to update the registration, and a certificate of registration to do business in Virginia has now been issued to Lee BHM LLC. A true and correct copy of the Certificate of Registration is attached hereto as Exhibit B.

5. On January 1, 2025, the Viriginia employees of Lee BHM shifted their employment to Lee Enterprises, Incorporated. At that time, it was the intention of Lee Enterprises to register to do business in the Commonwealth of Virginia. Lee Enterprises recently filed documents with the Commonwealth of Viriginia to register to do business in the Commonwealth, and a certificate of registration to do business in Virginia has now been issued to Lee Enterprises. A true and correct copy of the Certificate of Registration is attached hereto as Exhibit C.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed in Davenport, Iowa on this 26TH day of March 2026.

Danelle Kvapil

Danelle Kvapil

# Declaration of Danelle Kvapil Exhibit A

# Delaware

The First State



*I, CHARUNI PATIBANDA-SANCHEZ, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "LEE BHM LLC" AS RECEIVED AND FILED IN THIS OFFICE.*

*THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:*

*CERTIFICATE OF INCORPORATION, FILED THE TWELFTH DAY OF FEBRUARY, A.D. 2020, AT 11:35 O`CLOCK A.M.*

*CERTIFICATE OF CONVERSION, CHANGING ITS NAME FROM "LEE BHM CORP." TO "LEE BHM LLC", FILED THE TENTH DAY OF SEPTEMBER, A.D. 2024, AT 1:55 O`CLOCK P.M.*

*AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF THE AFORESAID CERTIFICATE OF CONVERSION IS THE THIRTIETH DAY OF SEPTEMBER, A.D. 2024.*

*CERTIFICATE OF FORMATION, FILED THE TENTH DAY OF SEPTEMBER, A.D. 2024, AT 1:55 O`CLOCK P.M.*

*AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF THE AFORESAID CERTIFICATE OF FORMATION IS THE THIRTIETH DAY OF SEPTEMBER, A.D. 2024.*

C. P. Sanchez

Charuni Patibanda-Sanchez, Secretary of State

7848978 8100H
SR# 20261286910

Authentication: 203409760
Date: 03-19-26

You may verify this certificate online at corp.delaware.gov/authver.shtml

# Delaware

The First State



***AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE AFORESAID LIMITED LIABILITY COMPANY, "LEE BHM LLC".***

C. P. Sanchez

Charuni Patibanda-Sanchez, Secretary of State

7848978 8100H
SR# 20261286910

Authentication: 203409760
Date: 03-19-26

You may verify this certificate online at corp.delaware.gov/authver.shtml

State of Delaware
Secretary of State
Division of Corporations
Delivered 11:35 AM 02/12/2020
FILED 11:35 AM 02/12/2020
SR 20201030248 - File Number 7848978

**CERTIFICATE OF INCORPORATION**
**OF**
**LEE BHM CORP.**

The undersigned, for the purpose of forming a corporation pursuant to the provisions of the General Corporation Law of the State of Delaware, does hereby certify as follows:

FIRST: The name of the corporation is **Lee BHM Corp.**

SECOND: The address of the registered office of the corporation in the State of Delaware shall be 251 Little Falls Drive, Wilmington, DE 19808, located in the County of New Castle, and the name of its registered agent at such address shall be Corporation Service Company.

THIRD: The purpose of the corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of Delaware as set forth in Title 8 of the Delaware Code, as amended (the "GCL").

FOURTH: The total number of shares of all classes of stock which the corporation has authority to issue is one thousand (1,000) shares of common stock, with no par value (the "Common Stock").

FIFTH: The name and address of the incorporator is Brett R. Marshall, c/o Lane & Waterman, LLP, 220 N. Main Street, Suite 600, Davenport, Iowa 52801.

SIXTH: The corporation is to have perpetual existence.

SEVENTH: In furtherance and not in limitation of the powers conferred by statute, the board of directors is expressly authorized to make, alter or repeal the by-laws of the corporation.

EIGHTH: The corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred on the stockholders herein are granted subject to this reservation.

NINTH: A director of this corporation shall not be personally liable to the corporation or its stockholders for monetary damages for breach of any fiduciary duty as a director, except (i) for any breach of the director's duty of loyalty to the corporation or its stockholders, (ii) for acts or omissions not in good faith or that involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the GCL, as the same exists or hereafter may be amended, or (iv) for any transaction from which the director derived an improper personal benefit. If the GCL is amended after the date of incorporation of the corporation to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the GCL, as so amended.

Any repeal or modification of the foregoing paragraph by the stockholders of the corporation shall be prospective only, and shall not adversely affect any limitation on the personal liability of a director of the corporation existing at the time of such repeal or modification.

By: Brett R Marshall

Brett R. Marshall, Incorporator

# STATE OF DELAWARE
# CERTIFICATE OF CONVERSION
# FROM A CORPORATION TO A
# DELAWARE LIMITED LIABILITY COMPANY
# PURSUANT TO SECTION 18-214 OF
# THE DELAWARE LIMITED LIABILITY COMPANY ACT

1. The jurisdiction where the corporation was first formed is DELAWARE and the date the corporation first formed is 2/12/2020.

2. The jurisdiction immediately prior to filing this Certificate is DELAWARE.

3. The name of the corporation immediately prior to filing this Certificate is LEE BHM CORP..

4. The name of the limited liability company as set forth in the Certificate of Formation is LEE BHM LLC.

5. The effective date and time of this application, if different than the date and time of filing: Date: 9/30/2024

IN WITNESS WHEREOF, the undersigned have executed this Certificate on the 9th day of September, A.D. 2024.

By: [signature]
Authorized Person

Name: T. F. OLT III, SECRETARY
Print or Type

State of Delaware
Secretary of State
Division of Corporations
Delivered 01:55 PM 09/10/2024
FILED 01:55 PM 09/10/2024
SR 20243645789 - File Number 7848978

# STATE OF DELAWARE
# CERTIFICATE OF FORMATION
# OF LIMITED LIABILITY COMPANY

The undersigned authorized person, desiring to form a limited liability company pursuant to the Limited Liability Company Act of the State of Delaware, hereby certifies as follows:

1. The name of the limited liability company is LEE BHM LLC.

2. The Registered Office of the limited liability company in the State of Delaware is located at 251 LITTLE FALLS DRIVE (street), in the City of WILMINGTON, Zip Code 19808. The name of the Registered Agent at such address upon whom process against this limited liability company may be served is CORPORATION SERVICE COMPANY.

3. The effective date and time of this application, if different than the date and time of filing: Date: 9/30/2024

By: [signature]
Authorized Person

Name: T. F. OLT III, SECRETARY
Print or Type

State of Delaware
Secretary of State
Division of Corporations
Delivered 01:55 PM 09/10/2024
FILED 01:55 PM 09/10/2024
SR 20243645789 - File Number 7848978

# Declaration of Danelle Kvapil Exhibit B

# Commonwealth of Virginia

## STATE CORPORATION COMMISSION

Richmond, March 24, 2026

This certificate of registration to transact business in Virginia is this day issued for

**LEE BHM LLC**

a limited liability company organized under the laws of Delaware and the said limited liability company is authorized to transact business in Virginia, subject to all Virginia laws applicable to the company and its business.

STATE CORPORATION COMMISSION
Attest:

Clerk of the Commission

**COMMONWEALTH OF VIRGINIA**
**STATE CORPORATION COMMISSION**

AT RICHMOND, MARCH 24, 2026

The State Corporation Commission has found the accompanying application for a certificate of registration to transact business in Virginia submitted on behalf of

LEE BHM LLC

to comply with the requirements of law, and confirms payment of all required fees. Therefore, it is ORDERED that this

CERTIFICATE OF REGISTRATION TO TRANSACT BUSINESS IN VIRGINIA

be issued and admitted to record with the application in the Office of the Clerk of the Commission, effective March 24, 2026.

The limited liability company is registered to transact business in Virginia, subject to all Virginia laws applicable to the limited liability company and its business.

STATE CORPORATION COMMISSION

By Samuel T. Towell

Samuel T. Towell
Commissioner

**COMMONWEALTH OF VIRGINIA**
**STATE CORPORATION COMMISSION**

**Office of the Clerk**

March 24, 2026

LANE & WATERMAN LLP
BARBARA L. NICOL
220 NORTH MAIN STREET
Suite 600
Davenport, IA, 52801

**RECEIPT**

| | |
|---|---|
| RE: | LEE BHM LLC |
| ID: | 11989261 |
| FILING NO: | 2603249787436 |
| WORK ORDER NO: | 202603237185322 |

Dear Customer:

This is your receipt for $100.00 to cover the fee for filing an application for a certificate of registration for a limited liability company with this office.

The effective date of the certificate of registration is March 24, 2026.

If you have any questions, please call (804) 371-9733 or toll-free 1-866-722-2551.

Sincerely,

Bernard J. Logan
Clerk of the Commission

Delivery Method: Email

# Declaration of Danelle Kvapil Exhibit C

# Commonwealth of Virginia

## STATE CORPORATION COMMISSION

Richmond, March 26, 2026

This is to certify that a certificate of authority to transact business in Virginia was this day issued and admitted to record in this office for

**Lee Enterprises, Incorporated**

a corporation organized under the laws of Delaware and that the said corporation is authorized to transact business in Virginia, subject to all Virginia laws applicable to the corporation and its business.

STATE CORPORATION COMMISSION
Attest:

Clerk of the Commission

**COMMONWEALTH OF VIRGINIA**
**STATE CORPORATION COMMISSION**

AT RICHMOND, MARCH 26, 2026

The State Corporation Commission has found the accompanying application for a certificate of authority to transact business in Virginia submitted on behalf of

Lee Enterprises, Incorporated

to comply with the requirements of law, and confirms payment of all required fees. Therefore, it is ORDERED that this

CERTIFICATE OF AUTHORITY TO TRANSACT BUSINESS IN VIRGINIA

be issued and admitted to record with the application in the Office of the Clerk of the Commission, effective March 26, 2026.

The corporation is authorized to transact business in Virginia, subject to all Virginia laws applicable to the corporation and its business.

STATE CORPORATION COMMISSION

By [signature]

Samuel T. Towell
Commissioner